1   ROBBINS UMEDA LLP
    BRIAN J. ROBBINS (190264)
2   brobbins@robbinsumeda.com
    FELIPE J. ARROYO (163803)
3   farroyo@robbinsumeda.com
    SHANE P. SANDERS (237146)
4   ssanders@robbinsumeda.com
    KEVIN S. KIM (275200)
5   kkim@robbinsumeda.com
    600 B Street, Suite 1900
6   San Diego, CA 92101
    Telephone: (619) 525-3990
7   Facsimile: (619) 525-3991

8   Attorneys for Plaintiff

9               UNITED STATES DISTRICT COURT

10             NORTHERN DISTRICT OF CALIFORNIA

11                    SAN JOSE DIVISION

12  PHILIP RICCIARDI, Derivatively on Behalf    )   Case No. **12-6003 HRL**
    of HEWLETT-PACKARD COMPANY,                 )
13                                              )
                         Plaintiff,             )   VERIFIED SHAREHOLDER DERIVATIVE
14                                              )   COMPLAINT
              v.                                )
15                                              )
    MICHAEL R. LYNCH, LÉO                       )
16  APOTHEKER, MARGARET C.                      )
    WHITMAN, CATHERINE A. LESJAK, G.            )
17  KENNEDY THOMPSON, RAJIV L.                  )
    GUPTA, SHUMEET BANERJI, GARY M.             )   **BY FAX**
18  REINER, JOHN H. HAMMERGREN,                 )
    MARC L. ANDREESSEN, RAYMOND J.              )
19  LANE, PATRICIA F. RUSSO, ANN M.             )
    LIVERMORE, RALPH V. WHITWORTH,              )
20  SHANE V. ROBISON, LAWRENCE T.               )
    BABBIO, JR., SARI M. BALDAUF,               )
21  DOMINIQUE SENEQUIER, DELOITTE               )
    LLP, KPMG LLP, PERELLA WEINBERG             )
22  PARTNERS UK LLP, and BARCLAYS               )
    CAPITAL,                                    )
23                                              )
                         Defendants,            )
24                                              )
              -and-                             )
25                                              )
    HEWLET-PACKARD COMPANY, a                   )
    Delaware corporation,                       )
26                                              )
                 Nominal Defendant.             )
27  _____        )   DEMAND FOR JURY TRIAL

28

────────────────────────────────────────────

            VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## NATURE AND SUMMARY OF THE ACTION

1.    This is a verified shareholder derivative action brought by plaintiff on behalf of nominal defendant Hewlett-Packard Company ("HP" or the "Company") against certain of its current and former officers and directors, Deloitte LLP ("Deloitte UK"), KPMG LLP ("KPMG"), Perella Weinberg Partners UK LLP ("Perella Weinberg"), and Barclays Capital Securities Ltd. ("Barclays Capital") for violations of the Securities Exchange Act of 1934 ("Exchange Act"), breaches of fiduciary duties, waste of corporate assets, unjust enrichment, negligence, and aiding and abetting thereof.  These wrongs resulted in billions of dollars in damages to HP, in addition to damage to its reputation, goodwill and intangible assets, and standing in the business community.

2.    This action arises out of the defendants' materially deficient transaction due diligence and illicit business practices in connection with HP's acquisition of a British software company named Autonomy Corporation plc ("Autonomy"), for $11.1 billion in October 2011 (the "Acquisition"), and the false and misleading statements made in connection with and a result of this Acquisition.  On November 20, 2012, approximately one year after the Acquisition, HP shocked the market when it issued a press release announcing that the Company was forced to write-down goodwill and intangible assets related to the Autonomy Acquisition by a whopping $8.8 billion, nearly 80% of the purchase price paid by HP barely a year ago.[1]  Simply stated, HP grossly overpaid for Autonomy.  The November 20, 2012 press release explained that the "majority of this impairment charge is linked to serious accounting improprieties, disclosure failures, and outright misrepresentations at Autonomy Corporation plc...."  The HP Individual Defendants (as defined herein) have attempted to shift the blame for the botched Acquisition to

---

[1] Goodwill is a long-term asset categorized as an intangible asset.  Goodwill arises when a company acquires another entire business.  The amount of goodwill is the cost to purchase the business minus the fair market value of the tangible assets, the intangible assets that can be identified, and the liabilities obtained in the purchase.  The amount in the goodwill account is required to be adjusted to a smaller amount if there is an impairment in the value of the acquired company as of a balance sheet date.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1   Autonomy's former Chief Executive Officer ("CEO"), defendant Michael R. Lynch ("Lynch"),

2   and on Deloitte UK and the Advisor Defendants (as defined herein).  The HP Individual

3   Defendants, however, cannot assign away their fiduciary duties to outsiders.  When making

4   business decisions, boards of directors must be active, including reviewing all reasonably

5   available information.  The performance of the HP Individual Defendants' duties is simply

6   incompatible with their claimed blind reliance on defendant Lynch's misrepresentations, and

7   Deloitte UK's and the Advisor Defendants' responsibilities and recommendations.

8        3.      HP has suffered substantial damages in connection with the Acquisition because

9   of the HP Individual Defendants' failure to abide by their fiduciary duties and securities laws.  As

10  set forth more fully below, the HP Individual Defendants consciously disregarded numerous red

11  flags alerting them to Autonomy's accounting improprieties and its gross overvaluation,

12  including, but not limited to: (i) concerns about Autonomy's finances from hedge fund investors,

13  media, and analysts; (ii) the enormous amount of goodwill and intangible assets HP was forced

14  to book as part of the Autonomy Acquisition; (iii) opposition from HP's Chief Financial Officer

15  ("CFO") defendant Catherine A. Lesjak ("Lesjak"); (iv) industry leaders, including Oracle

16  Corporation's ("Oracle") CEO Larry Ellison's ("Ellison"), vocal statements concerning

17  Autonomy's overvaluation; (v) Autonomy's suspiciously high receivables and low unearned

18  income on its profit/loss and balance sheets; (vi) the inexplicably fast growth in Autonomy's

19  reported operating margins considering the limited growth in its customer base; (vii) the

20  purchase price of Autonomy in light of valuations of other similarly sized companies in the same

21  industry space; and (viii) HP's history of overpaying for acquisitions resulting in subsequent

22  write-offs.

23       4.      During and after HP's acquisition of Autonomy, the HP Individual Defendants

24  consistently misled the public with improper statements concerning: (i) the due diligence they

25  purportedly conducted in valuing and vetting the accounting and operations of Autonomy; (ii)

26  the alleged benefits the Acquisition would provide to HP; and (iii) Autonomy's goodwill and

27  acquired intangible assets.  The HP Individual Defendants continued to issue these statements

28  even after the Company initiated a six-month investigation in response to a whistle-blower's May

- 2 -

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1  2012 allegation concerning Autonomy's accounting fraud. Worse, during this time, HP's Board
2  of Directors (the "Board") permitted the Company to repurchase artificially inflated HP stock as
3  part of the share repurchase program they authorized on July 21, 2011. Despite being aware that
4  forthcoming announcements regarding Autonomy's heavily impaired goodwill and intangible
5  assets would cause the Company's stock to tumble, the Board caused HP to repurchase over
6  twenty-three million shares of its own stock during the time of investigation at artificially
7  inflated prices twice as high as these shares were worth when the truth about Autonomy's
8  accounting improprieties and overvaluation was revealed.

9     5.     Plaintiff brings this action to repair the harm that defendants caused the Company
10  with their violations of federal law, deceptive business practices, recklessly deficient due
11  diligence, and grossly negligent auditing practices.

12                         **JURISDICTION AND VENUE**

13     6.     This Court has jurisdiction in this case under Article III of the United States
14  Constitution and 28 U.S.C. §1331 because it includes claims arising under the Exchange Act.
15  This Court has supplemental jurisdiction pursuant to 28 U.S.C. §1367(a) over all other claims
16  that are so related to claims in the action within such original jurisdiction that they form part of
17  the same case or controversy under Article III of the United States Constitution. This action is
18  not a collusive action designed to confer jurisdiction on a court of the United States that it would
19  not otherwise have.

20     7.     This Court has jurisdiction over each defendant named herein because each
21  defendant is either a corporation that conducts business in and maintains operations in this
22  District, or is an individual who has sufficient minimum contacts with this District to render the
23  exercise of jurisdiction by the District courts permissible under traditional notions of fair play
24  and substantial justice.

25     8.     Venue is proper in this Court in accordance with 28 U.S.C. §1391(a) because: (i)
26  HP maintains its principal place of business in this District; (ii) one or more of the defendants
27  either resides in or maintains executive offices in this District; (iii) a substantial portion of the
28  transactions and wrongs complained of herein, including the defendants' primary participation in

1  the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of
2  fiduciary duties owed to HP, occurred in this District; and (iv) defendants have received
3  substantial compensation in this District by doing business here and engaging in numerous
4  activities that had an effect in this District.

5  **INTRADISTRICT ASSIGNMENT**

6      9.      A substantial portion of the transactions and wrongdoings which give rise to the
7  claims in this action occurred in the County of San Jose, and as such, this action is properly
8  assigned to the San Jose division of this Court.

9  **THE PARTIES**

10  **Plaintiff**

11      10.     Plaintiff Philip Ricciardi is a shareholder of HP and has continuously held stock
12  since August 2007.

13  **Nominal Defendant**

14      11.     Nominal Defendant HP is a Delaware corporation with principal executive offices
15  located at 3000 Hanover Street, Palo Alto, California.  HP is a global provider of products,
16  technologies, software, solutions, and services to individual consumers, small- and medium-size
17  businesses, and large enterprises, including customers in the government, health, and education
18  sectors.  HP completed its acquisition of Autonomy in October 2011.

19  **Defendants**

20      12.     Defendant Lynch was Autonomy's CEO from 1996 until the time of the
21  Acquisition.  Defendant Lynch was also HP's Executive Vice President, Information
22  Management from November 2011 to May 2012.  Defendant Lynch resigned from HP at
23  approximately the same time the Company received notice of accounting fraud at Autonomy
24  from a whistle-blower.  As the CEO of Autonomy at the time of the Acquisition, defendant
25  Lynch was ultimately responsible for Autonomy's operations, financial statements, and internal
26  controls.  Defendant Lynch took the lead in directing the sale of Autonomy to HP and is
27  responsible for deceptively inducing HP to materially overpay for Autonomy at time when it was
28  overvalued due to known accounting improprieties.  As revealed by HP's investigation in

- 4 -
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1    response to a whistle-blower's allegations of accounting fraud, defendant Lynch materially
2    misstated Autonomy's revenues and growth rate prior to the Acquisition.

3         13.    Defendant Léo Apotheker ("Apotheker") was HP's CEO, President, and a director
4    from November 2010 to September 2011. Defendant Apotheker knowingly, recklessly, or with
5    gross negligence failed to conduct adequate due diligence of Autonomy prior to the Acquisition.
6    Moreover, defendant Apotheker knowingly, recklessly, or with gross negligence made improper
7    statements concerning HP's financial health and business prospects that: (i) concealed the fact
8    that serious accounting improprieties, disclosure failures, and outright misrepresentations
9    overvalued Autonomy at the time of HP's acquisition; and (ii) failed to disclose that HP overpaid
10   for Autonomy, delaying the Company from taking the necessary substantial impairment charge
11   to HP's goodwill and acquired intangible assets. HP paid defendant Apotheker the following
12   compensation as an executive:

| Year | Salary | Bonus | Stock Awards | All Other Compensation | Total |
|------|--------|-------|--------------|------------------------|-------|
| 2011 | $1,152,770 | $6,400,000 | $17,660,759 | $5,199,247 | $30,412,776 |

15        14.    Defendant Margaret C. Whitman ("Whitman") is HP's CEO and President and has
16   been since September 2011 and a director and has been since January 2011. Defendant Whitman
17   knowingly, recklessly, or with gross negligence made improper statements concerning HP's
18   financial health and business prospects that: (i) concealed the fact that serious accounting
19   improprieties, disclosure failures, and outright misrepresentations overvalued Autonomy at the
20   time of HP's acquisition; and (ii) failed to disclose that HP overpaid for Autonomy, delaying the
21   Company from taking the necessary substantial impairment charge to HP's goodwill and
22   acquired intangible assets. While HP's stock traded at artificially inflated prices due to the
23   foregoing improper statements, defendant Whitman authorized and implemented repurchases of
24   the Company's stock at these artificially inflated prices. HP paid defendant Whitman the
25   following compensation as an executive:

| Year | Salary | Option Awards | All Other Compensation | Total |
|------|--------|---------------|------------------------|-------|
| 2011 | $1 | $16,146,331 | $372,598 | $16,518,930 |

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1       15.    Defendant Lesjak is HP's Executive Vice President and CFO and has been since

2 January 2007.  Defendant Lesjak was also HP's Interim CEO from August 2010 to November

3 2010; Senior Vice President from 2003 to December 2006; and Treasurer from 2003 to March

4 2007.  Defendant Lesjak has served at HP for twenty-four years in a broad range of financial

5 leadership roles.  Despite purportedly opposing the acquisition of Autonomy, defendant Lesjak

6 knowingly, recklessly, or with gross negligence made improper statements concerning HP's

7 financial health and business prospects that: (i) concealed the fact that serious accounting

8 improprieties, disclosure failures, and outright misrepresentations overvalued Autonomy at the

9 time of HP's acquisition; and (ii) failed to disclose that HP overpaid for Autonomy, delaying the

10 Company from taking the necessary substantial impairment charge to HP's goodwill and

11 acquired intangible assets.  HP paid defendant Lesjak the following compensation as an

12 executive:

| Year | Salary | Stock Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|------|--------|-------------|----------------------------------------|------------------------|-------|
| 2011 | $825,000 | $9,310,408 | $679,143 | $101,507 | $10,916,058 |

16       16.    Defendant G. Kennedy Thompson ("Thompson") is an HP director and has been

17 since 2006. Defendant Thompson is also Chairman of HP's Audit Committee and has been since

18 at least September 2011 and a member of that committee and has been since at least February

19 2011. Defendant Thompson was a member of HP's Finance and Investment Committee from at

20 least February 2011 to at least September 2011.  Defendant Thompson knowingly or recklessly

21 failed to conduct adequate due diligence of Autonomy prior to the Acquisition.  Moreover,

22 defendant Thompson knowingly or recklessly reviewed and approved improper statements

23 concerning HP's financial health and business prospects that: (i) concealed the fact that serious

24 accounting improprieties, disclosure failures, and outright misrepresentations overvalued

25 Autonomy at the time of HP's acquisition; and (ii) failed to disclose that HP overpaid for

26 Autonomy, delaying the Company from taking the necessary substantial impairment charge to

27 HP's goodwill and acquired intangible assets.  While HP's stock traded at artificially inflated

28 prices due to the foregoing improper statements, defendant Thompson authorized and

- 6 -

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

implemented repurchases of the Company's stock at these artificially inflated prices. HP paid defendant Thompson the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2011 | $71,333 | $275,037 | $346,370 |

17.    Defendant Rajiv L. Gupta ("Gupta") is HP's Lead Independent Director and has been since November 2011 and a director and has been since January 2009. Defendant Gupta is also a member of HP's Audit Committee and has been since at least April 2012. Defendant Gupta was a member of HP's Audit Committee from at least September 2011 to January 2012. Defendant Gupta knowingly or recklessly failed to conduct adequate due diligence of Autonomy prior to the Acquisition. Moreover, defendant Gupta knowingly or recklessly reviewed and approved improper statements concerning HP's financial health and business prospects that: (i) concealed the fact that serious accounting improprieties, disclosure failures, and outright misrepresentations overvalued Autonomy at the time of HP's acquisition; and (ii) failed to disclose that HP overpaid for Autonomy, delaying the Company from taking the necessary substantial impairment charge to HP's goodwill and acquired intangible assets. While HP's stock traded at artificially inflated prices due to the foregoing improper statements, defendant Gupta authorized and implemented repurchases of the Company's stock at these artificially inflated prices. HP paid defendant Gupta the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Option Awards | All Other Compensation | Total |
|---|---|---|---|---|---|
| 2011 | $158,667 | $87,504 | $87,258 | $22,439 | $355,868 |

18.    Defendant Shumeet Banerji ("Banerji") is an HP director and has been since January 2011. Defendant Banerji is also a member of HP's Audit Committee and has been since February 2011 and a member of the Finance and Investment Committee and has been since at least February 2011. Defendant Banerji knowingly or recklessly failed to conduct adequate due diligence of Autonomy prior to the Acquisition. Moreover, defendant Banerji knowingly or recklessly reviewed and approved improper statements concerning HP's financial health and business prospects that: (i) concealed the fact that serious accounting improprieties, disclosure

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1  failures, and outright misrepresentations overvalued Autonomy at the time of HP's acquisition;

2  and (ii) failed to disclose that HP overpaid for Autonomy, delaying the Company from taking the

3  necessary substantial impairment charge to HP's goodwill and acquired intangible assets. While

4  HP's stock traded at artificially inflated prices due to the foregoing improper statements,

5  defendant Banerji authorized and implemented repurchases of the Company's stock at these

6  artificially inflated prices. HP paid defendant Banerji the following compensation as a director:

| Fiscal Year 2011 | Fees Paid in Cash $51,000 | Stock Awards $275,037 | Total $326,037 |
|---|---|---|---|

9      19.    Defendant Gary M. Reiner ("Reiner") is an HP director and has been since

10  January 2011. Defendant Reiner is also a member of HP's Audit Committee and has been since

11  at least September 2012 and a member of the Finance and Investment Committee and has been

12  since at least February 2012. Defendant Reiner knowingly or recklessly failed to conduct

13  adequate due diligence of Autonomy prior to the Acquisition. Moreover, defendant Reiner

14  knowingly or recklessly reviewed and approved improper statements concerning HP's financial

15  health and business prospects that: (i) concealed the fact that serious accounting improprieties,

16  disclosure failures, and outright misrepresentations overvalued Autonomy at the time of HP's

17  acquisition; and (ii) failed to disclose that HP overpaid for Autonomy, delaying the Company

18  from taking the necessary substantial impairment charge to HP's goodwill and acquired

19  intangible assets. While HP's stock traded at artificially inflated prices due to the foregoing

20  improper statements, defendant Reiner authorized and implemented repurchases of the

21  Company's stock at these artificially inflated prices. HP paid defendant Reiner the following

22  compensation as a director:

| Fiscal Year 2011 | Fees Paid in Cash $43,000 | Stock Awards $137,518 | Option Awards $137,128 | Total $317,646 |
|---|---|---|---|---|

25      20.    Defendant John H. Hammergren ("Hammergren") is an HP director and has been

26  since 2005. Defendant Hammergren is also Chairman of HP's Finance and Investment

27  Committee and has been since at least February 2011. Defendant Hammergren knowingly or

28  recklessly failed to conduct adequate due diligence of Autonomy prior to the Acquisition.

- 8 -

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1   Moreover, defendant Hammergren knowingly or recklessly made improper statements

2   concerning HP's financial health and business prospects that: (i) concealed the fact that serious

3   accounting improprieties, disclosure failures, and outright misrepresentations overvalued

4   Autonomy at the time of HP's acquisition; and (ii) failed to disclose that HP overpaid for

5   Autonomy, delaying the Company from taking the necessary substantial impairment charge to

6   HP's goodwill and acquired intangible assets.  While HP's stock traded at artificially inflated

7   prices due to the foregoing improper statements, defendant Hammergren authorized and

8   implemented repurchases of the Company's stock at these artificially inflated prices.  HP paid

9   defendant Hammergren the following compensation as a director:

10

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2011 | $58,000 | $275,037 | $15,151 | $348,188 |

13       21.    Defendant Marc L. Andreessen ("Andreessen") is an HP director and has been

14   since 2009.  Defendant Andreessen knowingly or recklessly failed to conduct adequate due

15   diligence of Autonomy prior to the Acquisition.  Moreover, defendant Andreessen knowingly or

16   recklessly made improper statements concerning HP's financial health and business prospects

17   that: (i) concealed the fact that serious accounting improprieties, disclosure failures, and outright

18   misrepresentations overvalued Autonomy at the time of HP's acquisition; and (ii) failed to

19   disclose that HP overpaid for Autonomy, delaying the Company from taking the necessary

20   substantial impairment charge to HP's goodwill and acquired intangible assets.  While HP's stock

21   traded at artificially inflated prices due to the foregoing improper statements, defendant

22   Andreessen authorized and implemented repurchases of the Company's stock at these artificially

23   inflated prices.  HP paid defendant Andreessen the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2011 | $28,000 | $275,037 | $7,298 | $310,335 |

26       22.    Defendant Raymond J. Lane ("Lane") is HP's Executive Chairman of the Board

27   and has been since September 2011 and a director and has been since November 2010.

28

- 9 -

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1  Defendant Lane was also HP's non-Executive Chairman of the Board from November 2010 to

2  September 2011. Defendant Lane knowingly or recklessly failed to conduct adequate due

3  diligence of Autonomy prior to the Acquisition. Moreover, defendant Lane knowingly or

4  recklessly made improper statements concerning HP's financial health and business prospects

5  that: (i) concealed the fact that serious accounting improprieties, disclosure failures, and outright

6  misrepresentations overvalued Autonomy at the time of HP's acquisition; and (ii) failed to

7  disclose that HP overpaid for Autonomy, delaying the Company from taking the necessary

8  substantial impairment charge to HP's goodwill and acquired intangible assets. While HP's stock

9  traded at artificially inflated prices due to the foregoing improper statements, defendant Lane

10  authorized and implemented repurchases of the Company's stock at these artificially inflated

11  prices. HP paid defendant Lane the following compensation as a director:

12
13

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2011 | $115,667 | $175,009 | $290,676 |

14    23.    Defendant Patricia F. Russo ("Russo") is an HP director and has been since

15  January 2011. Defendant Russo knowingly or recklessly failed to conduct adequate due

16  diligence of Autonomy prior to the Acquisition. Moreover, defendant Russo knowingly or

17  recklessly made improper statements concerning HP's financial health and business prospects

18  that: (i) concealed the fact that serious accounting improprieties, disclosure failures, and outright

19  misrepresentations overvalued Autonomy at the time of HP's acquisition; and (ii) failed to

20  disclose that HP overpaid for Autonomy, delaying the Company from taking the necessary

21  substantial impairment charge to HP's goodwill and acquired intangible assets. While HP's stock

22  traded at artificially inflated prices due to the foregoing improper statements, defendant Russo

23  authorized and implemented repurchases of the Company's stock at these artificially inflated

24  prices. HP paid defendant Russo the following compensation as a director:

25
26

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2011 | $115,667 | $175,009 | $290,676 |

27
28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1       24.    Defendant Ann M. Livermore ("Livermore") is an HP director and has been since

2  June 2011.  Defendant Livermore is also a member of HP's Finance and Investment Committee

3  and has been since at least February 2012.  Defendant Livermore knowingly or recklessly failed

4  to conduct adequate due diligence of Autonomy prior to the Acquisition.  Moreover, defendant

5  Livermore knowingly or recklessly made improper statements concerning HP's financial health

6  and business prospects that: (i) concealed the fact that serious accounting improprieties,

7  disclosure failures, and outright misrepresentations overvalued Autonomy at the time of HP's

8  acquisition; and (ii) failed to disclose that HP overpaid for Autonomy, delaying the Company

9  from taking the necessary substantial impairment charge to HP's goodwill and acquired

10  intangible assets.  While HP's stock traded at artificially inflated prices due to the foregoing

11  improper statements, defendant Livermore authorized and implemented repurchases of the

12  Company's stock at these artificially inflated prices.

13       25.    Defendant Ralph V. Whitworth ("Whitworth") is an HP director and has been

14  since November 2011.  Defendant Whitworth is also a member of the Finance and Investment

15  Committee and has been since February 2011.  Defendant Whitworth knowingly or recklessly

16  made improper statements concerning HP's financial health and business prospects that: (i)

17  concealed the fact that serious accounting improprieties, disclosure failures, and outright

18  misrepresentations overvalued Autonomy at the time of HP's acquisition; and (ii) failed to

19  disclose that HP overpaid for Autonomy, delaying the Company from taking the necessary

20  substantial impairment charge to HP's goodwill and acquired intangible assets.  While HP's stock

21  traded at artificially inflated prices due to the foregoing improper statements, defendant

22  Whitworth authorized and implemented repurchases of the Company's stock at these artificially

23  inflated prices.

24       26.    Defendant Shane V. Robison ("Robison") was HP's Executive Vice President and

25  Chief Strategy and Technology Officer from May 2002 to November 2011.  In addition to

26  defendant Apotheker, defendant Robison was one of the key people behind the Autonomy

27  Acquisition.  Defendant Robison knowingly, recklessly, or with gross negligence failed to

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1    conduct adequate due diligence of Autonomy prior to the Acquisition.  HP paid defendant

2    Robison the following compensation as an executive:

| Year | Salary | Stock Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|------|--------|--------------|----------------------------------------|------------------------|-------|
| 2011 | $781,250 | $7,620,151 | $606,506 | $15,660 | $9,023,567 |

27.    Defendant Lawrence T. Babbio, Jr. ("Babbio") was an HP director from 2002 to

March 2012.  Defendant Babbio was also a member of HP's Audit Committee from January

2012 to March 2012 and a member of the Finance and Investment Committee from at least

February 2011 to at least September 2011.  Defendant Babbio knowingly or recklessly failed to

conduct adequate due diligence of Autonomy prior to the Acquisition.  Moreover, defendant

Babbio knowingly or recklessly made improper statements concerning HP's financial health and

business prospects that: (i) concealed the fact that serious accounting improprieties, disclosure

failures, and outright misrepresentations overvalued Autonomy at the time of HP's acquisition;

and (ii) failed to disclose that HP overpaid for Autonomy, delaying the Company from taking the

necessary substantial impairment charge to HP's goodwill and acquired intangible assets.  While

HP's stock traded at artificially inflated prices due to the foregoing improper statements,

defendant Babbio authorized and implemented repurchases of the Company's stock at these

artificially inflated prices. HP paid defendant Babbio the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Option Awards | All Other Compensation | Total |
|-------------|-------------------|--------------|---------------|------------------------|-------|
| 2011 | $171,000 | $87,504 | $87,258 | $5,948 | $351,710 |

28.    Defendant Sari M. Baldauf ("Baldauf") was an HP director from 2006 to March

2012.  Defendant Baldauf was also a member of HP's Audit Committee from at least January

2010 to at least February 2012.  Defendant Baldauf knowingly or recklessly failed to conduct

adequate due diligence of Autonomy prior to the Acquisition.  Moreover, defendant Baldauf

knowingly or recklessly made improper statements concerning HP's financial health and business

prospects that: (i) concealed the fact that serious accounting improprieties, disclosure failures,

and outright misrepresentations overvalued Autonomy at the time of HP's acquisition; and (ii)

- 12 -

1    failed to disclose that HP overpaid for Autonomy, delaying the Company from taking the

2    necessary substantial impairment charge to HP's goodwill and acquired intangible assets. While

3    HP's stock traded at artificially inflated prices due to the foregoing improper statements,

4    defendant Baldauf authorized and implemented repurchases of the Company's stock at these

5    artificially inflated prices. HP paid defendant Baldauf the following compensation as a director:

6

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2011 | $154,000 | $175,009 | $329,009 |

8        29.    Defendant Dominique Senequier ("Senequier") was an HP director from January

9    2011 to March 2012. Defendant Senequier was also a member of HP's Audit Committee from

10   February 2011 to December 2011 and a member of the Finance and Investment Committee from

11   at least February 2011 to at least September 2011. Defendant Senequier knowingly or recklessly

12   failed to conduct adequate due diligence of Autonomy prior to the Acquisition. Moreover,

13   defendant Senequier knowingly or recklessly made improper statements concerning HP's

14   financial health and business prospects that: (i) concealed the fact that serious accounting

15   improprieties, disclosure failures, and outright misrepresentations overvalued Autonomy at the

16   time of HP's acquisition; and (ii) failed to disclose that HP overpaid for Autonomy, delaying the

17   Company from taking the necessary substantial impairment charge to HP's goodwill and

18   acquired intangible assets. While HP's stock traded at artificially inflated prices due to the

19   foregoing improper statements, defendant Senequier authorized and implemented repurchases of

20   the Company's stock at these artificially inflated prices. HP paid defendant Senequier the

21   following compensation as a director:

22

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2011 | $33,000 | $275,037 | $308,037 |

24       30.    Defendant Deloitte UK is a United Kingdom limited liability partnership and the

25   United Kingdom member firm of Deloitte Touche Tohmatsu Limited with principal executive

26   offices located at 2 New Street Square, London EC4A 3BZ, United Kingdom. Defendant

27   Deloitte UK served as Autonomy's independent auditor prior to and during HP's acquisition of

28   Autonomy. Defendant Deloitte UK consciously disregarded numerous red flags that alerted it of

- 13 -

1 | Autonomy's potential accounting improprieties and its failed adherence to prescribed auditing

2 | standards.

3 |     31.    Defendant KPMG is the United States member firm of KPMG International.

4 | Defendant KPMG is a limited liability partnership with principal executive offices located at 345

5 | Park Avenue, New York, New York.  Defendant KPMG was engaged by HP to conduct finance

6 | and accounting due diligence of Autonomy which included the review of defendant Deloitte

7 | UK's audits of Autonomy.  Defendant KPMG consciously disregarded numerous red flags that

8 | alerted it of Autonomy's potential accounting and audit improprieties and resulting

9 | overvaluation.

10 |     32.    Defendant Perella Weinberg is a United Kingdom limited liability partnership

11 | with principal executive offices located at 20 Grafton Street, London W1S 4DZ, United

12 | Kingdom.  Defendant Peralla Weinberg served as joint financial advisor to HP in connection

13 | with its acquisition of Autonomy.  Defendant Perella Weinberg received $12 million in fees for

14 | its role as a financial advisor to HP during the Acquisition.  Defendant Perella Weinberg

15 | consciously disregarded numerous red flags that alerted it of Autonomy's potential accounting

16 | improprieties and resulting overvaluation.

17 |     33.    Defendant Barclays Capital is the investment banking division of Barclays Bank

18 | plc with principal executive offices located at 5 The North Colonnade, Canary Wharf, London

19 | E14 4BB, United Kingdom.  Defendant Barclays Capital served as joint financial adviser and

20 | corporate broker to HP in connection with its acquisition of Autonomy.  Defendant Barclays

21 | Capital received $18.1 million in fees for its role as a financial advisor to HP during the

22 | Acquisition.  Defendant Barclays Capital consciously disregarded numerous red flags that alerted

23 | it of Autonomy's potential accounting improprieties and resulting overvaluation.

24 |     34.    The defendants identified in ¶¶12-15, 26 are referred to herein as the "Officer

25 | Defendants."  The defendants identified in ¶¶13-14, 16-25, 27-29 are referred to herein as the

26 | "Director Defendants."  The defendants identified in ¶¶16-19, 27-29 are referred to herein as the

27 | "Audit Committee Defendants."  The defendants identified in ¶¶16, 18-20, 24-25, 27, 29 are

28 | referred to herein as the "Finance and Investment Committee Defendants."  Collectively, the

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1  defendants identified in ¶¶13-29 are referred to herein as the "HP Individual Defendants."
2  Collectively, the defendants identified in ¶¶32-33 are referred to herein as the "Advisor
3  Defendants."

## DUTIES OF THE HP INDIVIDUAL DEFENDANTS

**Fiduciary Duties**

6      35.     By reason of their positions as officers, directors, and/or fiduciaries of HP, their
7  access to Autonomy, and their ability to control the business and corporate affairs of HP, the HP
8  Individual Defendants owed and owe HP and its shareholders fiduciary obligations of trust,
9  loyalty, good faith, and due care, and were and are required to use their utmost ability to control
10 and manage HP in a fair, just, honest, and equitable manner.  The HP Individual Defendants
11 were and are required to act in furtherance of the best interests of HP and its shareholders so as
12 to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

13     36.     Each officer and director of the Company owes to HP and its shareholders the
14 fiduciary duty to exercise good faith and diligence in the administration of the affairs of the
15 Company and in the use and preservation of its property and assets, and the highest obligations
16 of fair dealing.

**Additional Duties of the Audit Committee Defendants**

18     37.     In addition to these duties, under its charter in effect since 2010, the Audit
19 Committee Defendants, defendants Babbio, Baldauf, Banerji, Gupta, Reiner, Senequier, and
20 Thompson, owed specific duties to HP to assist the Board in monitoring "risk assessment and
21 risk management." The Audit Committee's Charter provides that it is responsible for "overseeing
22 … HP's financial reporting processes and the audit of HP's financial statements, including the
23 integrity of HP's financial statements …."  Moreover, the Audit Committee's Charter required
24 these defendants to "review the adequacy and effectiveness of HP's internal controls, including
25 any significant deficiencies in such controls and significant changes or material weaknesses in
26 such controls…."  Defendants Thompson, Babbio, Baldauf, and Banerji were classified by the
27 Board as "audit committee financial expert[s]" as the term is defined in the U.S. Securities and
28 Exchange Commission's ("SEC") rules and regulations.

**Additional Duties of the Finance and Investment Committee Defendants**

38.     Defendants Babbio, Banerji, Hammergren, Livermore, Reiner, Senequier, Thompson, and Whitworth, as members of the Finance and Investment Committee, owed specific duties "[t]o provide oversight of the finance and investment functions of HP." Moreover, pursuant to HP's merger and acquisition approval policies, these defendants were required "to assist the Board in evaluating investment, acquisition, enterprise services, joint venture and divestiture transactions in which HP engages as part of its business strategy from time to time." Finally, the Finance and Investment Committee had a duty to "evaluate the execution, financial results and integration of HP's completed investment, acquisition, enterprise services, joint venture and divestiture transactions." Despite these heightened duties under the Finance and Investment Committee Charter, defendants Babbio, Banerji, Hammergren, Livermore, Reiner, Senequier, Thompson, and Whitworth consciously disregarded blatant red flags (discussed herein) alerting them of questionable accounting at Autonomy in conducting inadequate due diligence and then approving the Acquisition.

**Control, Access, and Authority**

39.     HP Individual Defendants, because of their positions of control and authority as officers and/or directors of HP, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

40.     Because of their advisory, executive, managerial, and directorial positions with HP, each Individual Defendant had access to adverse, non-public information about the true value of Autonomy.

41.     At all times relevant hereto, each Individual Defendant was the agent of each of the other HP Individual Defendants and of HP, and was at all times acting within the course and scope of such agency.

**Reasonable and Prudent Supervision**

42.     To discharge their duties, the officers and directors of HP were required to exercise reasonable and prudent supervision over the management, policies, practices, and

- 16 -

1   controls of the financial affairs of the Company. By virtue of such duties, the officers and
2   directors of HP were required to, among other things:

3              (a)    conduct a thorough due diligence investigation before agreeing to acquire
4   a company;

5              (b)    conduct the affairs of the Company in an efficient, business-like manner
6   so as to make it possible to provide the highest quality performance of its business, to avoid
7   wasting the Company's assets, and to maximize the value of the Company's stock;

8              (c)    remain informed as to how HP conducted its operations, and, upon receipt
9   of notice or information of imprudent or unsound conditions or practices, make reasonable
10  inquiry in connection therewith, and take steps to correct such conditions or practices and make
11  such disclosures as necessary to comply with applicable laws;

12             (d)    ensure that the Company was operated in a diligent, honest, and prudent
13  manner in compliance with all applicable laws, rules, and regulations; and

14             (e)    ensure that the Company complied with its legal obligations and
15  requirements, including acting only within the scope of its legal authority and refrain from
16  engaging in deceptive or fraudulent conduct.

17  **Breaches of Duties**

18       43.    Each Individual Defendant, by virtue of his or her position as an officer and/or
19  director, owed to the Company the fiduciary duty of loyalty and good faith and the exercise of
20  due care and diligence in the management and administration of the affairs of the Company, as
21  well as in the use and preservation of its property and assets. The conduct of the HP Individual
22  Defendants complained of herein involves a knowing and culpable violation of their obligations
23  as officers and directors of HP, the absence of good faith on their part, and a reckless disregard
24  for their duties to the Company that the HP Individual Defendants were aware or reckless in not
25  being aware posed a risk of serious injury to the Company. The conduct of the HP Individual
26  Defendants who were also officers and/or directors of the Company has been ratified by the
27  remaining HP Individual Defendants who collectively comprised all of HP's Board during the
28  time of the misconduct.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1      44.     The HP Individual Defendants breached their duty of loyalty and good faith by

2   allowing defendants to cause, or by themselves causing, the Company to engage in improper

3   practices that wasted the Company's assets, and caused HP to incur substantial damage.  The HP

4   Individual Defendants also failed to prevent the other HP Individual Defendants from taking

5   such illegal actions.  As a result, HP has expended, and will continue to expend, significant sums

6   of money.

7            **CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

8      45.     In committing the wrongful acts alleged herein, the defendants have pursued, or

9   joined in the pursuit of, a common course of conduct, and have acted in concert with and

10  conspired with one another in furtherance of their common plan or design.  In addition to the

11  wrongful conduct herein alleged as giving rise to primary liability, the defendants further aided

12  and abetted and/or assisted each other in breaching their respective duties.

13     46.     The purpose and effect of the defendants' conspiracy, common enterprise, and/or

14  common course of conduct was, among other things, to disguise their violations of law, breaches

15  of fiduciary duty, waste of corporate assets, and unjust enrichment; and to conceal adverse

16  information concerning the Company's operations.

17     47.     The defendants accomplished their conspiracy, common enterprise, and/or

18  common course of conduct by causing the Company to purposefully or recklessly ignore blatant

19  red flags concerning accounting improprieties and the true value of Autonomy and then causing

20  the Company to make false statements during and after the Acquisition.  Because the actions

21  described herein occurred under the authority of the Board, each of the HP Individual

22  Defendants was a direct, necessary, and substantial participant in the conspiracy, common

23  enterprise, and/or common course of conduct complained of herein.

24     48.     Each of the defendants aided and abetted and rendered substantial assistance in

25  the wrongs complained of herein.  In taking such actions to substantially assist the commission

26  of the wrongdoing complained of herein, each defendant acted with knowledge of the primary

27  wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was aware of

28  his or her overall contribution to and furtherance of the wrongdoing.

- 18 -

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## SUBSTANTIVE ALLEGATIONS

**Factual Background to HP's Acquisition of Autonomy**

49.     HP acquired Autonomy in October 2011.  Under the terms of the transaction, HP acquired all of the outstanding shares of Autonomy for £25.50 ($42.11) per share in cash.  The transaction was unanimously approved by the Boards of both HP and Autonomy.  Based on the closing stock price of Autonomy on August 17, 2011 (the day before the transaction was first announced), the consideration represented a one day premium to Autonomy shareholders of approximately 64% and a premium of approximately 58% to Autonomy's prior one month average closing price.

50.     Approximately seven months after the close of the transaction, in May 2012, a whistle-blower approached HP concerning alleged accounting fraud that had occurred in Autonomy prior to the Acquisition.  As required, this prompted HP to conduct an internal investigation, which it says turned up certain accounting improprieties at Autonomy.  HP's internal investigation discovered that Autonomy misclassified revenue, improperly mixing sales of hardware with sales of software licenses falsely depicting a more robust operational view of Autonomy.  This improper accounting measure made it look as though Autonomy's software business was doing better than it was.  This improper classification of revenue also misled HP concerning Autonomy's profitability, especially with regard to its gross margins, key industry indicator because software generally has higher margins.  Furthermore, HP discovered that Autonomy also booked revenue too early, prior to a proper sale taking place in violation of prescribed accounting guidance.

51.     Without the help from such improper aggressive accounting, Autonomy most likely had operating margins of 28% to 30% at the time of the Acquisition, rather than the 40% to 45% margins it had touted to HP.  The recognition of these accounting improprieties severely diminished the value of Autonomy for HP and rendered HP's decision to purchase Autonomy for $11.1 billion a disastrous waste of corporate assets.  As result, HP was forced to take an $8.8 billion or nearly 80% write-down on Autonomy barely a year after the Acquisition.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

**The HP Individual Defendants and the Advisor Defendants Ignore Blatant Red Flags Alerting Them of Autonomy's Overvaluation**

52.     The HP Individual Defendants and the Advisor Defendants had access to and knew or consciously disregarded numerous red flags alerting them of Autonomy's potential accounting improprieties and its overvaluation, including, but not limited to: (i) concerns about Autonomy's finances from hedge fund investors, media, and analysts; (ii) the enormous goodwill and intangible assets HP was forced to book in acquiring Autonomy; (iii) opposition from defendant Lesjak; (iv) Ellison's vocal statements concerning Autonomy's overvaluation; (v) Autonomy's suspiciously high receivables and low unearned income on its profit/loss and balance sheets; (vi) the suspicious growth in Autonomy's reported operating margins given the limited growth in its customer base; (vii) their valuation of Autonomy in light of valuations of other similarly sized companies in the same industry space; and (viii) HP's history of overpaying for acquisitions.   Despite facing these numerous and blatant red flags, however, the HP Individual Defendants and the Advisor Defendants consciously approved the Acquisition of Autonomy without conducting proper due diligence.

A.     Concerns About Autonomy's Finances from Hedge Fund Investors, Media, and Analysts

53.     The HP Individual Defendants and the Advisor Defendants ignored hedge fund investors, media, and analysts who had been skeptical about Autonomy for several years.  These publicly available sources of criticism included, but were not limited to:

• A detailed report published in July 2009 by Kynikos Associates ("Kynikos"), the firm founded by the investor James S. Chanos ("Chanos").  Kynikos criticized Autonomy's accounting in ways that now appear prescient.  In its 2009 note, Kynikos said that Autonomy's deferred revenue appeared too low for a software company.  Software companies usually have high deferred incomes because of the extensive service component that is attached to their products.  Kynikos added that Autonomy might have masked its underperformance with acquisitions.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1   • A story on the Daily Telegraph website dated Oct. 31, 2009 – two years before

2   Autonomy was acquired by HP – raising concerns about Autonomy's growth rate. The

3   story specifically questioned Autonomy's ability to turn earnings into cash and said

4   Autonomy's cash conversion rate "should ring alarm bells for investors."

5   • Skepticism from British analysts regarding Autonomy's financial results. According to

6   one analyst at KBC Peel Hunt in July 2010, "There is always something of concern with

7   Autonomy, whether it is poor cash conversion or increased research and development

8   capitalization."

9   • Deutsche Bank analyst, Marc Geall's ("Geall") 2010 detailed report on the problems at

10  Autonomy. Geall worked at Autonomy until June 2010 and had first-hand knowledge of

11  the company that HP wanted to acquire. While at Autonomy, Geall ran a software

12  division for several years and then served as head of investor relations and corporate

13  strategy. Geall was highly critical of Autonomy's management and business model. The

14  management structure, controls, and systems at Autonomy, he said, were "more

15  representative of a start-up than a major global player." Senior management lacked

16  "bandwidth," he wrote. "This can lead to some decision paralysis as middle management

17  is sometimes limited in its autonomy." Geall's report went on to say that Autonomy's

18  investment in the business had lagged revenues, a problem that "could affect customer

19  satisfaction towards the product and the value it delivers." Geall also described the

20  company's service business as "too lean" and "risk[ed] falling short of standards

21  demanded by customers."

22      54.     Not surprisingly, analysts were shocked at the $11.1 billion price tag HP agreed to

23  pay to acquire Autonomy. For example, Kevin Hunt, an analyst with Auriga USA, LLC,

24  maintained that HP "is massively overpaying for an acquisition."

25

26

27

28

- 21 -

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

**B.      The Premium HP Paid to Acquire Autonomy Forced the Company to Book Enormous Goodwill and Intangible Assets**

55.      When HP agreed to acquire Autonomy, Autonomy listed $3.5 billion of total assets on its balance sheet but net tangible assets of just $80.2 million as of June 30, 2011. With only $80.2 million of net tangible assets on Autonomy's balance sheet as of Q2 2011, HP recorded $6.6 billion of goodwill -- which was later revised upward to $6.9 billion -- as well as $4.6 billion of amortizable purchased intangible assets. Goodwill and intangible assets in this instance made up the vast majority of the difference between the purchase price and the fair market value of Autonomy's net tangible assets. The HP Individual Defendants initially recorded such high valuations of the goodwill and intangible assets because they knew Autonomy's identifiable assets were worth much less than HP paid. Now, HP is writing down that goodwill and those intangible assets.

**C.      Defendant Lesjak Speaks Out Against Acquisition Prior to Closing of Deal**

56.      The HP Individual Defendants, including the Board, and the Advisor Defendants, ignored defendant Lesjak's opposition to HP's proposed acquisition of Autonomy. According to a story published in Fortune in May 2012, defendant Lesjak was quoted as telling the directors that she could not support the deal. Defendant Lesjak was quoted as saying: "I don't think it's a good idea. I don't think we're ready. I think it's too expensive. I'm putting a line down. This is not in the best interests of the company." Despite this vehement opposition from HP's CFO, the Board backed the Acquisition.

57.      Moreover, defendant Lesjak was not the only HP insider who was uncomfortable with moving forward on the Autonomy deal. HP general counsel John Schultz ("Schultz") said in an interview that he was aware that there were rumors about accounting issues at Autonomy before the deal closed. Moreover, Schultz said Autonomy kept opaque books and that "[c]ritical documents were missing from the obvious places...."

**D.      Ellison's Vocal Statements Concerning Autonomy's Overvaluation**

58.      The HP Individual Defendants and the Advisor Defendants disregarded Oracle CEO Ellison's public statements concerning the overvaluation of Autonomy. Moreover, the HP

- 22 -

1   Individual Defendants and the Advisor Defendants also ignored Ellison's statements concerning

2   defendant Lynch's dishonesty. As HP was in the process of acquiring Autonomy for over $11

3   billion, Ellison publicly stated that Autonomy was overvalued at $6 billion. Ellison disclosed

4   that Oracle had been approached by investment banker Frank Quattrone and defendant Lynch to

5   shop Autonomy. Ellison was vocal about how Oracle had "taken a pass" on Autonomy and

6   maintained that HP had paid an "absurdly high" price for the Acquisition.

7          59.    In addition to alerting the HP Individual Defendants and the Advisor Defendants

8   concerning the true value of Autonomy, Ellison also provided them an opportunity to recognize

9   defendant Lynch's tenacity for dishonesty. Immediately after Ellison's public statements,

10  defendant Lynch issued a denial that he had shopped Autonomy to Oracle. This set off some

11  dueling press statements between both parties (one Oracle press release was headlined "Another

12  Whopper from Autonomy CEO Mike Lynch"). Ellison came forward with details regarding

13  multiple meetings that had occurred between his merger and acquisition team and Autonomy.

14  When defendant Lynch attempted to explain these meetings and argue that he was "not there to

15  sell anything," Ellison published the PowerPoint slides defendant Lynch had provided Oracle

16  when it was pitching the sale of Autonomy. Oracle followed up with a press release stating that

17  "Either Mr. Lynch has a very poor memory or he's lying." It was apparent then that defendant

18  Lynch was lying.

19         60.    The PowerPoint slides that Oracle published on its public website provided the

20  HP Individual Defendants and the Advisor Defendants another reason to question the true value

21  of Autonomy. One slide in particular presented Autonomy's revenue and enterprise value as of

22  January 24, 2011 — shortly before HP's announcement that it planned to acquire Autonomy —

23  converted to U.S. dollars and compared against other notable software companies. At the time,

24  Autonomy was valued at about $5.7 billion, or a little less than six times revenue.

25  Approximately six months later, HP would pay nearly twice as much to acquire Autonomy.

26  Now HP says it paid about $5 billion too much for Autonomy.

27

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

E.   **Autonomy's Reported Receivables Versus Unearned Income on its Profit/Loss and Balance Sheets**

61.   Software companies tend to have low receivables and higher unearned income on their profit/loss and balance sheets. At Autonomy, however, it was the reverse. A receivable is a debt a company is owed and expects to be paid. While companies that sell durable and tangible goods book large receivables because they complete their obligations upon the sale of the item, software is usually sold for cash up front, and then any further payments tend to come from either service and support on an ongoing basis. A software company cannot report the ongoing payments as income because it has not been paid yet or completed the earnings process and since there are no tangible goods involved, the risk of not being paid is higher. The customer could go out of business, cancel the subscription, or simply stop paying. As such, the expected future payments cannot be counted as assets, and in fact have to be accounted for as a liability, essentially money that might be lost. Usually, this is called "deferred revenue" or "unearned income."

62.   The HP Individual Defendants and the Advisor Defendants would have seen a glaring problem with Autonomy if they conducted appropriate due diligence. Autonomy was booking as income lots of cash it had not received (which is why the receivables were large) and not booking any obligation to provide future services for that income. Autonomy booked sales at $870 million, receivables at $330 million, and deferred revenue at $177 million. The amount of receivables compared to total sales was too large. The HP Individual Defendants and the Advisor Defendants would only need to look at Autonomy's publicly reported balance sheet to recognize this critical red flag. At the very least, defendants Thompson, Babbio, Baldauf, and Banerji, as the "audit committee financial expert[s]," were expected to recognize this red flag prior to approving HP's acquisition of Autonomy.

F.   **Autonomy's Reported Operating Margins Were Too High**

63.   The HP Individual Defendants and the Advisor Defendants knew or recklessly ignored the fact that Autonomy's operating margins, which grew from 15% in 2005 and surpassed 50% by early 2010, were too high to make sense. Autonomy could increase its

- 24 -
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1  margins by better amortizing its research and developments costs, which are essentially the only

2  real costs associated with creating software. The only way to better amortize these costs was to

3  boost the number of customers to which Autonomy was selling its software. Autonomy's

4  reported margins, however, were growing substantially faster than its relatively small customer

5  base.

6        **G.    Comparison with Other Similarly Sized Companies in the Same Industry**

7               **Space Reflects the Overvaluation of Autonomy**

8        64.    HP's acquisition of Autonomy for £25.50 per share, or approximately $42 per

9  share, was particularly overpriced when compared to other similarly sized companies in the same

10  industry space as Autonomy. Two common ways to value public software companies are by

11  deriving the trading multiples for total enterprise value to last twelve month ("LTM") revenues

12  and LTM earnings before interest, taxes, depreciation, and amortization ("EBITDA") of a peer

13  group and then applying that range of multiples to the subject company's respective financial

14  measure. Total enterprise value is commonly calculated by taking a company's total equity

15  value, adding in debt, and subtracting cash. The total enterprise value to LTM revenue multiple

16  is derived by dividing the company's total enterprise value by its LTM of revenues, while the

17  total enterprise value to LTM EBITDA multiple is derived by dividing the total enterprise value

18  by its LTM EBITDA.

19        65.    In August 2011, at the time HP announced the Acquisition, Autonomy's peers had

20  a total enterprise value range of between 2.06x and 3.61x LTM revenues. Based on these

21  multiples, Autonomy's total enterprise value would have been in a range between $1.916 billion

22  to $3.364 billion or, on a per share basis, $4.67 to $10.62 per share. The chart below

23  demonstrates Autonomy's overvaluation based on these multiples:

24

25

26

27

28

- 25 -

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT



66.    Similarly, in August 2011, Autonomy's peers had a total enterprise value range of between 7.57x and 15.09x LTM EBITDA. Based on these multiples, Autonomy's total enterprise value would have been in a range between $3.109 billion to $6.197 billion or, on a per share basis, $9.57 to $22.28 per share. The chart below demonstrates Autonomy's overvaluation based on these multiples:



- 26 -

67.     An alternate method to determine the fair value of an acquisition is by deriving the multiples for comparable historical transactions, specifically by deriving the multiple for the transaction value to the target company's LTM revenues.  The transaction value to LTM revenue multiple is derived by dividing the transaction value by the target company's LTM of revenues. In the five-year period prior to the announcement of HP's acquisition of Autonomy, there were eleven comparable transactions in the packaged software industry.  For those transactions, the target companies were valued in a range between 2.58x and 4.66x LTM revenues.  Based on these multiples, a fair value for HP's acquisition of Autonomy would have been in a range between $2.043 billion to $4.335 billion or, on a per share basis, $6.67 to $14.62 per share.  The chart below demonstrates Autonomy's overvaluation based on these multiples:



72.     These valuation ranges, while far below what HP paid for Autonomy in 2011, are consistent with the current valuation of Autonomy following the recently announced $8.8 billion write-down.  Both the Advisor Defendants and the HP Individual Defendants had access to competitor's public data and analyses and should have compared the valuation of Autonomy with other similarly sized companies in the same industry space before recommending and approving the Acquisition.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

### H.   HP's Previous Overpayments Provided Guidance

73.    Executives and directors at HP in particular should have been particularly suspicious when causing the Company to make major acquisitions due to HP's history of vastly overpaying for companies.  This is the second multi-billion dollar charge to earnings resulting from an acquisition this year.  In the third quarter, HP took an $8 billion charge on its acquisition of Electronic Data Systems ("EDS"), which failed to perform up to expectations and support the value HP paid.

74.    Prior to overpaying for EDS, HP overpaid to acquire Palm, Inc. ("Palm").  HP spent $1.2 billion to buy Palm in 2010.  The Company was then forced to write off $3.3 billion, about half of which was "related to the wind down of HP's webOS device business."  HP purchased Palm when the technology was already being beaten by Android and iPhone.  As with Autonomy, HP booked a large amount of goodwill and intangible assets related to the acquisition, due to the premium the Company paid and certain liabilities that were associated with Palm.  After writing off $3.3 billion, defendant Whitman said HP will make "prudent investments" in the future.  Despite these promises, however, the Company and its shareholders continue to suffer from ill-conceived acquisitions.

## DELOITTE UK'S FAILURE TO DISCOVER AUTONOMY'S ACCOUNTING IMPROPRIETIES AND RESULTING OVERVALUATION

75.    Defendant Deloitte UK breached its duties by failing to discover Autonomy's accounting improprieties and its resulting material overvaluation.  As Autonomy's purported independent auditor at the time of the Acquisition, defendant Deloitte UK was contractually obligated to Autonomy to audit and review Autonomy's financial statements in accordance with professional attestation standards, including the International Standards on Accounting (UK and Ireland) ("ISA UK").  Indeed, defendant Deloitte UK states in its audit opinion of Autonomy, "Our responsibility is to audit and express an opinion on the financial statements in accordance with applicable law and International Standards on Auditing (UK and Ireland)."  The ISA UK deals with the auditor's responsibilities relating to fraud in an audit of financial statements.

76.    Deloitte UK failed in all of its required objectives under the ISA UK, including:

- 28 -

(a) *To identify and assess the risks of material misstatement of the financial statements due to fraud;*

(b) *To obtain sufficient appropriate audit evidence regarding the assessed risks of material misstatement due to fraud*, through designing and implementing appropriate responses; and

(c) *To respond appropriately to fraud or suspected fraud* identified during the audit.

77.     ISA UK section 240 characterizes fraud as follows:

Misstatements in the financial statements can arise from either fraud or error. The distinguishing factor between fraud and error is whether the underlying action that results in the misstatement of the financial statements is intentional or unintentional.

Although fraud is a broad legal concept, for the purposes of the ISAs (UK and Ireland), *the auditor is concerned with fraud that causes a material misstatement in the financial statements. Two types of intentional misstatements are relevant to the auditor —misstatements resulting from fraudulent financial reporting and misstatements resulting from misappropriation of assets.*

78.     As the basis for defendant Deloitte UK's opinions, ISA UK section 200 required it to obtain reasonable assurance about whether Autonomy's financial statements as a whole were free from material misstatements, whether due to fraud or error. Reasonable assurance is a high level of assurance. It is obtained when the auditor has obtained sufficient appropriate audit evidence to reduce audit risk (that is, the risk that the auditor expresses an inappropriate opinion when the financial statements are materially misstated) to an acceptably low level.

79.     Defendant Deloitte UK had a duty to plan and perform its audits with professional skepticism recognizing that circumstances may exist that cause financial statements to be misstated. In particular, ISA UK section 200 states the following regarding an auditor's duty of professional skepticism:

**Professional Skepticism** (Ref: Para. 15)

A18.   **Professional skepticism includes being alert to, for example:**

- 29 -

- **Audit evidence that contradicts other audit evidence obtained.**
- **Information that brings into question the reliability of documents and responses to inquiries to be used as audit evidence.**
- **Conditions that may indicate possible fraud.**
- Circumstances that suggest the need for audit procedures in addition to those required by the ISAs (UK and Ireland).

A19.  Maintaining professional skepticism throughout the audit is necessary if the auditor is, for example, to reduce the risks of:

- Overlooking unusual circumstances.
- Over generalizing when drawing conclusions from audit observations.
- Using inappropriate assumptions in determining the nature, timing, and extent of the audit procedures and evaluating the results thereof.

A20.  **Professional skepticism is necessary to the critical assessment of audit evidence. This includes questioning contradictory audit evidence and the reliability of documents and responses to inquiries and other information obtained from management and those charged with governance. It also includes consideration of the sufficiency and appropriateness of audit evidence obtained in the light of the circumstances, for example in the case where fraud risk factors exist and a single document, of a nature that is susceptible to fraud, is the sole supporting evidence for a material financial statement amount.**

80.     Given the numerous red flags alleged herein, and the extensive nature of Autonomy's nearly 80% write-down, it is apparent that defendant Deloitte UK failed to practice professional skepticism and apply requisite auditing procedures.  Defendant Deloitte UK needed to understand and properly address material risks in order to completely understand and satisfactorily audit Autonomy's internal controls and financial statements.  Defendant Deloitte UK was at least negligent in not adequately understanding (and/or adequately understanding but ignoring) the risks associated with Autonomy's accounting, including, but not limited to: (i) Autonomy's suspiciously high receivables and low unearned income on its profit/loss and balance sheets; and (ii) the suspicious growth in Autonomy's reported operating margins given the limited growth in its customer base.  Moreover, as HP general counsel Schultz recently

- 30 -

1  admitted in an interview, Autonomy kept opaque books and "[c]ritical documents were missing

2  from the obvious places...."  These record-keeping deficiencies alone should have sparked

3  defendant Deloitte UK's suspicions and discouraged a blanket approval of Autonomy's financial

4  statements.

5       81.    Had defendant Deloitte UK properly considered and investigated the preceding

6  audit evidence, related facts, and/or red flags, it would have concluded either: (i) a qualified audit

7  opinion was necessary; and/or (ii) additional testing was necessary; testing that would have

8  further revealed Autonomy's accounting improprieties and resulted in significant negative

9  adjustments to Autonomy's earnings and financial position.

10      82.    Defendant Deloitte UK breached its duties by failing to properly evaluate

11  Autonomy's internal controls over financial reporting and financial reports.  By failing in this

12  regard, the defendant Deloitte UK: (i) assisted defendant Lynch in deceiving HP concerning

13  accounting improprieties that had the effect of overvaluing Autonomy; and (ii) allowed the HP

14  Individual Defendants to cause the Company to issue improper statements regarding its financial

15  results and business prospects, especially with regard to Autonomy's goodwill and intangible

16  assets.

17                    **DEFENDANT KPMG'S FAILED DUE DILIGENCE**

18      83.    Defendant KPMG was hired by HP to conduct financial and accounting due

19  diligence on Autonomy.  Defendant KPMG breached their duties by their willful inability to

20  conduct adequate finance and accounting due diligence and by failing to discover Autonomy's

21  accounting improprieties as well as defendant Deloitte UK's audit failures.  As the firm hired by

22  HP to provide transaction services (i.e. due diligence) regarding the finance and accounting

23  make-up and health of Autonomy, as well as evaluate defendant Deloitte UK's audit of

24  Autonomy, defendant KPMG had a duty to provide an independent assessment to HP.

25      84.    Standard due diligence protocol includes numerous steps that defendant KPMG

26  would conduct in their due diligence procedures of Autonomy.  Minimally defendant KPMG

27  would have: (i) assessed the accounting policies and procedures of Autonomy; (ii) reviewed

28  defendant Deloitte UK's audit work papers related to the audit of Autonomy; (iii) interviewed the

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1  defendant Deloitte UK personnel responsible for the Autonomy audit; (iv) reviewed internal non-

2  publicly available financial data provided by Autonomy to HP, its advisors and defendant

3  KPMG; (v) interviewed Autonomy management to corroborate or provide insight into the

4  financial data provided; (vi) developed detailed analyses related to known industry risk areas

5  such as revenue recognition, sales channels, adherence to prescribed financial reporting

6  requirements and conversion of international reporting financial statements to those prescribed

7  by Generally Accepted Accounting Principles in the United States ("GAAP"); (vii) assessed

8  Autonomy's financial reporting; and (viii) provided HP a report detailing their due diligence

9  findings, red flags, and potential transaction risk to HP.

10      85.    The above procedures are standard and the bare minimum that defendant KPMG

11  would be required to perform and within their vast capabilities.  Defendant KPMG boasts their

12  robust capabilities to the world.  In particular, defendant KPMG states on their website[2] that their

13  "Transaction Services professionals combine extensive industry and transaction experience with

14  deep technical and accounting knowledge to help clients with every step of the deal" and "have

15  more than 3,500 Transaction professionals who can advise clients about……[p]erforming timely

16  and robust financial and business due diligence, [a]nalyzing the implications and financial

17  reporting ramifications of potential transactions".

18      86.    Defendant KPMG failed to apply their capabilities and knowledge in conducting

19  acceptable due diligence on the Acquisition.  Had defendant KPMG conducted adequate due

20  diligence on Autonomy and their auditors, they would have corroborated the following red flags:

21  The HP Individual Defendants and the Advisor Defendants had access to and knew or

22  consciously disregarded numerous red flags alerting them of Autonomy's potential accounting

23  improprieties and its overvaluation, including, but not limited to: (i) concerns about Autonomy's

24  finances from hedge fund investors, media, and analysts; (ii) the enormous goodwill and

25

26  _____

27  [2]http://www.kpmg.com/us/en/services/advisory/transactions-and-restructuring/pages/transaction-services.aspx

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1   intangible assets HP was forced to book in acquiring Autonomy; (iii) Ellison's vocal statements

2   concerning Autonomy's overvaluation; (iv) Autonomy's suspiciously high receivables and low

3   unearned income on its profit/loss and balance sheets; (v) the suspicious growth in Autonomy's

4   reported operating margins given the limited growth in its customer base; and (vi) their valuation

5   of Autonomy in light of valuations of other similarly sized companies in the same industry space.

6                                      **IMPROPER STATEMENTS**

7          87.     During and after HP's acquisition of Autonomy, the HP Individual Defendants

8   made improper statements concerning: (i) the due diligence they conducted in valuing

9   Autonomy; (ii) the purported benefits the acquisition of Autonomy would provide for HP; and

10  (iii) the Company's, and specifically Autonomy's, reported value of goodwill and acquired

11  intangible assets.

12         88.     The first improper statement was issued on August 18, 2011, when HP and

13  Autonomy released a joint press release announcing HP's acquisition of Autonomy.  In this press

14  release, defendant Apotheker touted Autonomy as a future revenue driver for the Company.

15  Defendant Apotheker stated that "Autonomy presents an opportunity to accelerate our strategic

16  vision to decisively and profitably lead a large and growing space" and that "Autonomy is a

17  highly profitable and globally respected software company."

18         89.     On an August 18, 2011 earnings conference call that followed the joint press

19  release, defendant Apotheker continued to tout the acquisition of Autonomy, this time focusing

20  on Autonomy's high gross margins and operating margins.  Defendant Apotheker stated:

21         Moreover, Autonomy's business is well-aligned to HP's effort to change and focus
           our business mix. *In 2010, Autonomy had gross margins in the high 80s and*
22         *operating margins above 40%. They have demonstrated a strong consistent*
           *track record of double-digit revenue growth.*
23

24  In this conference call, defendant Apotheker attempted to justify the price HP paid for Autonomy

25  by touting Autonomy's purportedly "strong business" and the benefits this would bring to HP,

26  stating:

27         ...Let me start by actually making sure that everybody on the call understands
           what Autonomy represents for us.
28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Autonomy represents an opportunity for HP for us to accelerate our vision to decisively and profitably lead a large and growing space which is the Enterprise Information Management space. It also brings HP higher value business solutions that will help customers manage the explosion of information. *If we execute this deal, it will position HP as a leader in the large and growing space.* It will complement our existing technology of portfolio and enterprise strategy.

It will provide differentiated IP for Services and extensive vertical capability in key industries. It will provide IPG a base for content management platform. *It will, over time, significantly enhance HP's financial profile and the Board believes that the transaction is accretive to HP's non-GAAP earnings in its first full year after completion.*

*Autonomy as a business has a very profitable financial model with a very compelling value proposition and I have been able to bring solutions into 400 OEMs, which shows that they are basically a de facto industry standard. Autonomy has grown its revenues at a compound annual growth rate of approximately 55% and adjusted operating profit at the rate of approximately 83% over the last 5 years. We're buying a very strong business and we believe that we can extract a lot more out of this business by combining it with HP. And that was the justification for the price.*

90.     On September 13, 2011, HP hosted another conference call. Defendant Apotheker discussed that HP went through a "rigorous process" in "conservative[ly]" valuing Autonomy.   Moreover, defendant Apotheker stated that HP "paid a very fair price for Autonomy" and that Autonomy "will give a great return to ... shareholders." Defendant Apotheker stated:

And let me just try to build on that and help you understand how we came to the *valuation of Autonomy. We have a pretty rigorous process inside HP that we follow for all of our acquisitions, which is a DCF-based model, and we try to take a very conservative view at this.* Just to make sure everybody understands, Autonomy will be, on day one, accretive to HP. For FY 2012, Autonomy, once we integrate it, is accretive to HP.

Now, we have identified five synergy possibilities-- five synergy leverages on how we can build up the Autonomy business and how we can synergize it between HP and Autonomy. And I can walk you through that, through these various elements. But just take it from us. *We did that analysis at great length, in great detail, and we feel that we paid a very fair price for Autonomy. And it will give a great return to our shareholders.*

91.     In this September 13, 2011 conference call, an analyst from Deutsche Bank asked defendant Apotheker: "What specific steps around due diligence did HP take to investigate any

- 34 -

concerns around accounting prior to completing or announcing the transaction?"   Defendant Apotheker answered by admitting that the basis for the Board's due diligence was work done by Autonomy's auditors, rather than HP conducting its own thorough due diligence process.   In particular, he stated:

> *We have and are running an extremely tight and very professional due diligence process.* I've got to tell you I have challenges with the question itself. Autonomy is a publicly traded company in the UK. And *they are, therefore, audited like any other FTSE company, and they're being audited on very professional standards. And, therefore, that's where we pick up the trail and do our due-- that's the basis of our due diligence.*

92.   On December 14, 2011, HP filed a Form 10-K with the SEC for the fiscal year ended October 31, 2011.   This Form 10-K was signed by defendants Whitman, Lesjak, Andreessen, Babbio, Baldauf, Banerji, Gupta, Hammergren, Lane, Livermore, Reiner, Russo, Thompson, and Whitworth, and contained improper statements concerning the Company's reported goodwill and acquired intangible assets.   This Form 10-K booked goodwill (software) and acquired intangible assets at over $24.9 billion, with Autonomy-specific goodwill and acquired intangible assets making up over $11.1 billion.   These figures were both substantially overstated because HP had overpaid for Autonomy and would soon be forced to write-down a majority of its goodwill and acquired intangible assets.

93.   On February 22, 2012, HP hosted a conference call in which defendant Lesjak commented on HP's evaluation of the Autonomy acquisition.   Despite opposing the acquisition in the summer of 2011, defendant Lesjak now stated that HP was "pleased with the Autonomy acquisition." Defendant Lesjak stated:

> Software delivered revenue growth of 30% year-over-year to $946 million supported by the acquisition of Autonomy. In the quarter, we saw 12% license growth, 108% growth in services and 22% support revenue growth. Overall, first quarter operating profit for Software was $163 million, or 17.1% of revenue, unfavorably impacted by acquisition-related integration costs and accounting adjustments, as well as lower mix of license revenue in the quarter. *We are pleased with the Autonomy acquisition, the pipeline is strong and the level of lead generation we are seeing across HP for Autonomy software and services is compelling.*

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1      94.     On March 12, 2012, HP filed a Form 10-Q with the SEC for the first quarter

2   ended January 31, 2012. This Form 10-Q was signed by defendants Whitman and Lesjak and

3   contained improper statements concerning the Company's reported goodwill and acquired

4   intangible assets. This Form 10-Q booked goodwill (software) and acquired intangible assets at

5   over $24.4 billion, with Autonomy-specific goodwill and acquired intangible assets making up

6   over $10.9 billion. These figures were both substantially overstated because HP had overpaid for

7   Autonomy and would soon be forced to write-down a majority of its goodwill and acquired

8   intangible assets.

9      95.     On June 8, 2012, HP filed a Form 10-Q with the SEC for the second quarter

10  ended April 30, 2012. This Form 10-Q was signed by defendants Whitman and Lesjak and

11  contained improper statements concerning the Company's reported goodwill and acquired

12  intangible assets. This Form 10-Q booked goodwill (software) and acquired intangible assets at

13  over $24.5 billion, with Autonomy-specific goodwill and acquired intangible assets making up

14  over $10.8 billion. These figures were both substantially overstated because HP had overpaid for

15  Autonomy and would soon be forced to write-down a majority of its goodwill and acquired

16  intangible assets.

17     96.     On September 7, 2012, HP filed a Form 10-Q with the SEC for the third quarter

18  ended July 31, 2012. This Form 10-Q was signed by defendants Whitman and Lesjak, and

19  contained improper statements concerning the Company's reported goodwill and acquired

20  intangible assets. This Form 10-Q booked goodwill (software) and acquired intangible assets at

21  over $22.5 billion, with Autonomy-specific goodwill and acquired intangible assets making up

22  over $10.7 billion. These figures were both substantially overstated because HP had overpaid for

23  Autonomy and would soon be forced to impair a majority of its goodwill and acquired intangible

24  assets.

25                    **REASONS STATEMENTS WERE IMPROPER**

26     97.     The true facts, which were known by the defendants but concealed from the

27  investing public were as follows:

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1     (a)  as early as May 2012, HP received notice that Autonomy was plagued by

2 accounting improprieties;

3     (b)  the HP Individual Defendants had engaged in blatantly inadequate due

4 diligence during the Autonomy acquisition and, as a result thereof, the Company materially

5 overpaid for Autonomy; and

6     (c)  the Company's reported goodwill and acquired intangible assets were

7 overstated and would have to be written down.

8           **THE TRUTH EMERGES**

9   98.  HP shocked the market when it issued a press release on November 20, 2012,

10 announcing that the Company was forced to write down goodwill and intangible assets related to

11 the Autonomy business by a whopping $8.8 billion, or nearly 80% of the amount HP paid for it

12 barely a year ago.  The November 20, 2012 press release explained that the "majority of this

13 impairment charge is linked to serious accounting improprieties, disclosure failures, and outright

14 misrepresentations at Autonomy Corporation plc that occurred prior to HP's acquisition of

15 Autonomy and the associated impact of those improprieties, failures, and misrepresentations on

16 the expected future financial performance of the Autonomy business over the long-term."

17          **FRAUDULENT REPURCHASES**

18   99.  While the HP Individual Defendants were making misleading and improper

19 statements that artificially inflated the Company's stock price, defendants Apotheker, Livermore,

20 Lane, Babbio, Hammergren, Baldauf, Thompson, Gupta, Andreessen, Banerji, Reiner, Russo,

21 Senequier, and Whitman directed or permitted the Company to overpay for its own stock through

22 the massive repurchases discussed herein.  In particular, on July 21, 2011, less than a month

23 before the announcement of the Acquisition, defendants Apotheker, Livermore, Lane, Babbio,

24 Hammergren, Baldauf, Thompson, Gupta, Andreessen, Banerji, Reiner, Russo, Senequier, and

25 Whitman inexplicably authorized an additional $10 billion to the Company's stock repurchase

26 program, which still had $5.9 billion of repurchase authorization remaining.  The Board

27 permitted the Company to repurchase over $2.1 billion of the Company's artificially inflated

28 stock between August 2011 and October 2012.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

100.   By the time the Company announced the repurchase authorization in July 2011, the Board had either already decided to, or was anticipating the decision to, acquire Autonomy for over $11 billion.   As alleged herein, these defendants knew or recklessly disregarded numerous red flags that alerted them of Autonomy's substantial overvaluation.  Moreover, at least as early as May 2012, the Board received notice of accounting fraud at Autonomy from a whistle-blower and began a six-month internal investigation. This investigation would culminate in HP almost entirely writing down the value of Autonomy.   Indeed, about $9 billion of Autonomy's approximately $11 billion price tag was impaired.   Defendants Apotheker, Livermore, Lane, Babbio, Hammergren, Baldauf, Thompson, Gupta, Andreessen, Banerji, Reiner, Russo, Senequier, and Whitman allowed the Company to deplete its assets by paying to repurchase its own stock despite knowing that these forthcoming announcements would cause the Company's stock to tumble.

101.   Defendants caused the Company to repurchase 83,752,070 shares of its stock at an aggregate cost to the Company of over $2.1 billion.  As demonstrated by the chart below, under the defendants' direction, the Company bought back its shares at a weighted average price of $25.30; double HP's current share price of approximately $12 after the news broke about Autonomy's true value:

| July 21, 2011 Repurchase Program | Period | Shares Repurchased | Average Price Per Share | Weighted Average Calculation | Approximate Aggregate Cost |
|---|---|---|---|---|---|
| | Aug-11 | 10,074,000 | $31.51 | $3.79 | $317,431,740 |
| | Sep-11 | 7,088,000 | $25.76 | $2.18 | $182,586,880 |
| | Oct-11 | - | - | - | - |
| | Nov-11 | 9,566,452 | $26.88 | $3.07 | $257,146,230 |
| | Dec-11 | 11,941,032 | $26.86 | $3.83 | $320,736,120 |
| | Jan-12 | 7,592,586 | $26.55 | $2.41 | $201,583,158 |
| | Feb-12 | 5,229,000 | $28.68 | $1.79 | $149,967,720 |
| | Mar-12 | 2,639,000 | $24.88 | $0.78 | $65,658,320 |
| | Apr-12 | 5,569,000 | $24.11 | $1.60 | $134,268,590 |
| | May-12 | 10,322,000 | $23.09 | $2.85 | $238,334,980 |
| | Jun-12 | 3,520,000 | $21.85 | $0.92 | $76,912,000 |
| | Jul-12 | 2,611,000 | $19.14 | $0.60 | $49,974,540 |
| | Aug-12 - Oct-12 | 7,600,000 | $16.32 | $1.48 | $124,000,000 |

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

| Total: | | 83,752,070 | | $25.30 | $2,118,600,278 |
|--------|--|-----------|--|--------|----------------|

## DAMAGES TO HP

102.   As a result of the HP Individual Defendants' improprieties, HP materially overpaid for Autonomy.   These actions have irreparably damaged HP's corporate image and goodwill and intangible assets.  HP's top solution partners are now lashing out at the Board in the wake of the Autonomy fiasco.  According to one CEO for a top HP enterprise partner, who did not want to be identified, "It is amazing how much incompetence they have shown at the top board level."  As a direct and proximate result of the HP Individual Defendants' actions, HP has expended, and will continue to expend, significant sums of money.  Such expenditures include, but are not limited to:

        (a)     costs incurred from overpaying for Autonomy;

        (b)     costs incurred from the internal investigation into Autonomy's alleged accounting fraud;

        (c)     costs incurred from overpaying for its own stock at artificially inflated prices; and

        (d)    costs incurred from compensation paid to the defendants who have breached their duties to HP.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

103.   Plaintiff brings this action derivatively in the right and for the benefit of HP to redress injuries suffered, and to be suffered, by HP as a direct result of violations of the Exchange Act, breaches of fiduciary duty, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof, by defendant Lynch, HP Individual Defendants, defendant Deloitte UK, and Advisor Defendants.  HP is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

104.   Plaintiff will adequately and fairly represent the interests of HP in enforcing and prosecuting its rights.

- 39 -

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1    105.   Plaintiff was a shareholder of HP at the time of the wrongdoing complained of,

2  has continuously been a shareholder since that time, and is a current HP shareholder.

3    106.   The current Board of HP consists of the following eleven individuals: defendants

4  Andreessen, Banerji, Gupta, Hammergren, Lane, Livermore, Reiner, Russo, Thompson,

5  Whitman, and Whitworth.  Plaintiff has not made any demand on the present Board to institute

6  this action because such a demand would be a futile, wasteful, and useless act, as set forth below.

7  **Demand Is Excused Because the Director Defendants' Conduct Is Not a Valid Exercise of**

8  **Business Judgment**

9    107.   Defendants Thompson, Gupta, Banerji, Reiner, Hammergren, Andreessen, Lane,

10  Russo, and Livermore's decision to approve the purchase of Autonomy for over $11 billion

11  despite the numerous red flags alleged herein without conducting adequate due diligence is not

12  protected by the business judgment rule.  Defendant Deloitte UK's and the Advisor Defendants'

13  reviews and recommendations do not absolve these defendants from liability.   Defendants

14  Thompson, Gupta, Banerji, Reiner, Hammergren, Andreessen, Lane, Russo, and Livermore had

15  an independent duty to consider all reasonably available information before entering into the

16  Acquisition.  This is particularly true here considering the numerous red flags that alerted them

17  of Autonomy's overvaluation.  Therefore, demand is futile.

18    108.   Defendants Andreessen, Banerji, Gupta, Hammergren, Lane, Livermore, Reiner,

19  Russo, Thompson, and Whitman's decision to direct or permit the Company to overpay for its

20  own stock through the massive repurchases discussed herein is also not protected by the business

21  judgment rule.  Defendants Andreessen, Banerji, Gupta, Hammergren, Lane, Livermore, Reiner,

22  Russo, Thompson, and Whitman allowed the Company to repurchase over $2.1 billion of the

23  Company's artificially inflated stock between August 2011 and October 2012, the same time they

24  were causing HP to issue improper statements concerning Autonomy's goodwill and intangible

25  assets and the purported benefits the Acquisition was providing to the Company.   These

26  defendants were at a minimum grossly negligent in authorizing these repurchases at the same

27  time that they knew or consciously disregarded the fact that the Company's stock was

28  artificially inflated due to the misleading statements alleged herein and their knowledge or

- 40 -

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1    conscious disregard for the impaired value of Autonomy.  At a minimum, the Board knew of

2    the accounting fraud at Autonomy since May 2012, when a whistle-blower came forward with

3    this information.  This began a six-month internal investigation which culminated in HP almost

4    entirely writing down the value of Autonomy.   Despite being aware that these forthcoming

5    announcements would cause the Company's stock to tumble, defendants Andreessen, Banerji,

6    Gupta, Hammergren, Lane, Livermore, Reiner, Russo, Thompson, and Whitman caused HP to

7    repurchase over twenty-three million artificially inflated shares after May 2012.  Such a reckless

8    disregard for the Company's assets is at a minimum a breach of the Board's duty of care.

9    Accordingly, the Board's decision to authorize the repurchases is not protected by the business

10   judgment rule.  Therefore, demand is futile.

11   **Demand Is Excused Because Defendants Andreessen, Banerji, Gupta, Hammergren, Lane,
     Livermore, Reiner, Russo, Thompson, Whitman, and Whitworth Face a Substantial
12   Likelihood of Liability for Their Misconduct**

13         109.    As alleged above, defendant Whitman faces a substantial likelihood of liability for

14   her violation of section 10(b) of the Exchange Act and breaching her fiduciary duty.  Defendant

15   Whitman, as CEO of HP, was ultimately responsible for the Company's operations, financial

16   statements, and internal controls.   However, in complete abdication of her fiduciary duties,

17   defendant Whitman knowingly or extremely recklessly made the improper statements regarding

18   the Company's financial results and business prospects, especially with regard to the value of

19   Autonomy's goodwill and intangible assets.  Accordingly, because defendant Whitman faces a

20   substantial likelihood of liability for violations of federal securities law, demand upon her is

21   futile.

22         110.    Defendants Andreessen, Banerji, Gupta, Hammergren, Lane, Livermore, Reiner,

23   Russo, Thompson, and Whitworth face a substantial likelihood of liability for violation of

24   section 20(a) of the Exchange Act because they had the power and ability to control and prevent

25   the dissemination of the foregoing false and misleading statements.   Notwithstanding, these

26   defendants allowed the false and misleading statements to be disseminated into the market,

27   which had the effect of artificially inflating the value of the Company's stock.  These defendants'

28   failure to exercise proper control over the Company's public disclosures further caused the

- 41 -

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1   Company to repurchase over $2.1 billion of its own stock at inflated prices. Accordingly,
2   Andreessen, Banerji, Gupta, Hammergren, Lane, Livermore, Reiner, Russo, Thompson, and
3   Whitworth face a substantial likelihood of liability for violations of federal securities law,
4   rendering any demand upon them futile.

5       111.    Defendants Andreessen, Banerji, Gupta, Hammergren, Lane, Livermore, Reiner,
6   Russo, Thompson, and Whitman face a substantial likelihood of liability for wasting billions of
7   dollars of the Company's assets. Each of these defendants authorized and failed to halt HP's
8   massive $2.1 billion repurchase of its own stock. At the same time that defendants Andreessen,
9   Banerji, Gupta, Hammergren, Lane, Livermore, Reiner, Russo, Thompson, and Whitman
10  authorized and refused to halt the repurchase, they knew the non-public inside information
11  concerning accounting impropriates relating to HP's acquisition of Autonomy and the inevitable
12  impairment to Autonomy's goodwill and intangible assets. No reasonable person would have
13  paid the price that these defendants caused the Company to pay for HP stock if they knew the
14  non-public information they knew. Accordingly, defendants Andreessen, Banerji, Gupta,
15  Hammergren, Lane, Livermore, Reiner, Russo, Thompson, and Whitman are liable for the
16  amount that the Company wasted and therefore, demand as to defendants Andreessen, Banerji,
17  Gupta, Hammergren, Lane, Livermore, Reiner, Russo, Thompson, and Whitman is futile.

18      112.    Similarly, defendants Andreessen, Banerji, Gupta, Hammergren, Lane,
19  Livermore, Reiner, Russo, Thompson, and Whitman face a substantial likelihood of liability for
20  wasting billions of dollars of the Company's assets in acquiring Autonomy. These defendants
21  had access to and knew or consciously disregarded numerous red flags alerting them to
22  Autonomy's potential accounting improprieties and its overvaluation, including, but not limited
23  to: (i) concerns about Autonomy's finances from hedge fund investors, media, and analysts; (ii)
24  the enormous goodwill and intangible assets HP was forced to book in acquiring Autonomy; (iii)
25  opposition from defendant Lesjak; (iv) Ellison's vocal statements concerning Autonomy's
26  overvaluation; (v) Autonomy's suspiciously high receivables and low unearned income on its
27  profit/loss and balance sheets; (vi) the suspicious growth in Autonomy's reported operating
28  margins given the limited growth in its customer base; (vii) their valuation of Autonomy in light

- 42 -

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1   of valuations of other similarly sized companies in the same industry space; and (viii) HP's

2   previous overpayments for acquisitions.  Despite facing these numerous and blatant red flags,

3   however, these defendants consciously approved the acquisition of the overpriced Autonomy

4   without conducting proper due diligence.  Accordingly, defendants Andreessen, Banerji, Gupta,

5   Hammergren, Lane, Livermore, Reiner, Russo, Thompson, and Whitman breached their

6   fiduciary duty of loyalty and good faith because they participated in the wrongdoing described

7   herein.  Thus, defendants Andreessen, Banerji, Gupta, Hammergren, Lane, Livermore, Reiner,

8   Russo, Thompson, and Whitman face a substantial likelihood of liability for their breach of

9   fiduciary duties so any demand upon them is futile.

10      113.    Defendants Andreessen, Banerji, Gupta, Hammergren, Lane, Livermore, Reiner,

11  Russo, Thompson, Whitman, and Whitworth also face a substantial likelihood of liability for

12  making and allowing the other HP Individual Defendants to continue to make improper

13  statements about the Company's health, especially with regard to the true value of its goodwill

14  and acquired intangible assets.  Each of these defendants knew, or in reckless disregard for their

15  fiduciary duties failed to know, the truth about the accounting improprieties relating to HP's

16  acquisition of Autonomy and the inevitable impairment to Autonomy's goodwill and intangible

17  assets.   Nevertheless, Andreessen, Banerji, Gupta, Hammergren, Lane, Livermore, Reiner,

18  Russo, Thompson, Whitman, and Whitworth either participated in or allowed the improper

19  statements to continue.

20      114.    Defendants Banerji, Gupta, Reiner, and Thompson served on the Audit

21  Committee during the wrongdoing alleged herein.  The Audit Committee's Charter provides that

22  it is responsible for "overseeing ... HP's financial reporting processes and the audit of HP's

23  financial statements, including the integrity of HP's financial statements...." Defendants Banerji,

24  Gupta, Reiner, and Thompson owed specific duties to HP to assist the Board in monitoring "risk

25  assessment and risk management" and "review[ing] the adequacy and effectiveness of HP's

26  internal controls, including any significant deficiencies in such controls and significant changes

27  or material weaknesses in such controls...."  Thus, defendants Banerji, Gupta, Reiner, and

28  Thompson were responsible for overseeing and directly participating in the dissemination of

- 43 -

1   HP's improper financial statements.  Despite their knowledge of the inadequate due diligence as

2   discussed herein, defendants Banerji, Gupta, Reiner, and Thompson approved the dissemination

3   of the improper statements concerning the benefits to be achieved through the acquisition of

4   Autonomy.   Defendants Banerji, Gupta, Reiner, and Thompson reviewed and approved the

5   dissemination of the improper statements which failed to adequately disclose the breadth of

6   financial misconduct at Autonomy and its resulting overvalued goodwill and intangible assets.

7   Defendants Banerji, Gupta, Reiner, and Thompson as members of the Audit Committee, and

8   defendants Banerji and Thompson in particular as "audit committee financial expert[s]," were

9   familiar with the relevant accounting rules concerning goodwill and intangible assets write-

10  downs and the risks that HP faced from not accurately reporting the value of its goodwill and

11  intangible assets.  Accordingly, defendants Banerji, Gupta, Reiner, and Thompson breached their

12  fiduciary duty of loyalty because they participated in the preparation of financial statements that

13  contained improper information.  Thus, defendants Banerji, Gupta, Reiner, and Thompson face a

14  substantial likelihood of liability for their breach of fiduciary duties so any demand upon them is

15  futile.

16      115.    Defendants Banerji, Hammergren, Livermore, Reiner, Thompson, and Whitworth

17  served on the Finance and Investment Committee during the wrongdoing alleged herein.  As

18  members of the Finance and Investment Committee, these defendants owed specific duties "[t]o

19  provide oversight of the finance and investment functions of HP."  Moreover, pursuant to HP's

20  merger and acquisition approval policies, these defendants were required to assist "the Board in

21  evaluating investment, acquisition, enterprise services, joint venture and divestiture transactions

22  in which HP engages as part of its business strategy from time to time."  Despite these

23  heightened duties under the Finance and Investment Committee Charter, these defendants caused

24  HP to overpay for the acquisition of Autonomy.  In so doing, defendants Banerji, Hammergren,

25  Livermore, Reiner, Thompson, and Whitworth consciously disregarded numerous red flags

26  alerting them to Autonomy's potential accounting improprieties and its overvaluation, including,

27  but not limited to: (i) concerns about Autonomy's finances from hedge fund investors, media,

28  and analysts; (ii) the enormous goodwill and intangible assets HP was forced to book in

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1   acquiring Autonomy; (iii) opposition from defendant Lesjak; (iv) Ellison's vocal statements

2   concerning Autonomy's overvaluation; (v) Autonomy's suspiciously high receivables and low

3   unearned income on its profit/loss and balance sheets; (vi) the suspicious growth in Autonomy's

4   reported operating margins given the limited growth in its customer base; (vii) their valuation of

5   Autonomy in light of valuations of other similarly sized companies in the same industry space;

6   and (viii) HP's previous overpayments for acquisitions. Thus, defendants Banerji, Hammergren,

7   Livermore, Reiner, Thompson, and Whitworth face a substantial likelihood of liability for their

8   breach of fiduciary duties so any demand upon them is futile.

9        116.   The acts complained of constitute violations of the fiduciary duties owed by HP's

10   officers and directors and are incapable of ratification.

11        117.   HP has been and will continue to be exposed to significant losses due to the

12   wrongdoing complained of herein. Despite the HP Individual Defendants having knowledge of

13   the claims and causes of action raised by plaintiff, the HP Individual Defendants and the current

14   Board have not filed any lawsuits against themselves or others who were responsible for the

15   wrongful conduct to attempt to recover for HP any part of the damages HP suffered and will

16   suffer thereby. The Board's stubborn failure to investigate, correct, and commence legal action

17   against those responsible for the misconduct alleged herein in the face of heavy media and

18   investor scrutiny on the matter, demonstrates that the Board is hopelessly incapable of

19   independently addressing any legitimate demand.

20        118.   Plaintiff has not made any demand on the other shareholders of HP to institute

21   this action since such demand would be a futile and useless act for at least the following reasons:

22        (a)   HP is a publicly held company with 1.9 billion shares outstanding and

23   thousands of shareholders;

24        (b)   making demand on such a number of shareholders would be impossible

25   for plaintiff who has no way of finding out the names, addresses, or phone numbers of

26   shareholders; and

27        (c)   making demand on all shareholders would force plaintiff to incur

28   excessive expenses, assuming all shareholders could be individually identified.

- 45 -

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## COUNT I

### Against Defendants Apotheker, Whitman, and Lesjak for Violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5 Promulgated Thereunder

119.  Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

120.  Defendants Apotheker, Whitman, and Lesjak knowingly or with extreme recklessness made and caused the publication of misleading statements regarding the financial health of the Company and its business prospects in connection with its acquisition of Autonomy.

121.  Defendants Apotheker, Livermore, Lane, Babbio, Hammergren, Baldauf, Thompson, Gupta, Andreessen, Banerji, Reiner, Russo, Senequier, and Whitman caused HP to repurchase 83,752,070 shares of its own stock at a cost to the Company of over $2.1 billion at artificially inflated prices caused by the false and misleading statements.

122.  The wrongful conduct alleged herein was continuous, connected, and on-going. These defendants' misconduct resulted in continuous, connected, and on-going harm to the Company.

123.  Defendants Apotheker, Whitman, and Lesjak violated section 10(b) of the Exchange Act and SEC rule 10b-5 promulgated thereunder in that they:

(a)  employed devices, schemes, and artifices to defraud;

(b)  made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)  engaged in acts, practices, and a course of business that operated as a fraud or deceit upon HP stock.

124.  HP has suffered damages by repurchasing the Company's stock at prices these defendants knew were artificially inflated as a result of the false and misleading statements. But for these defendants' misconduct, the Company would not have purchased its stock at the prices

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1  it paid, or at all, if it had been aware that the market prices had been artificially and falsely

2  inflated by the misleading statements.

3                              **COUNT II**

4    **Against the Director Defendants for Violation of Section 20(a) of the Exchange Act**

5        125.    Plaintiff incorporates by reference and realleges each and every allegation

6  contained above, as though fully set forth herein.

7        126.    The wrongful conduct alleged herein was continuous, connected, and on-going.

8  Defendants Livermore, Lane, Babbio, Hammergren, Baldauf, Thompson, Gupta, Andreessen,

9  Banerji, Reiner, Russo, Senequier, and Whitworth's misconduct resulted in continuous,

10 connected, and on-going harm to the Company.

11       127.    Defendants Livermore, Lane, Babbio, Hammergren, Baldauf, Thompson, Gupta,

12 Andreessen, Banerji, Reiner, Russo, Senequier, and Whitworth had the power and/or ability to,

13 and did, directly or indirectly control or influence the Company's general affairs, including the

14 content of public statements disseminated by HP and the timing and amount of stock

15 repurchases, and had the power and/or ability directly or indirectly to control or influence one

16 another, and defendants Apotheker, Whitman, and Lesjak in connection with the specific

17 conduct that violated section 10(b) of the Exchange Act and SEC rule 10b-5 promulgated

18 thereunder as alleged above.

19       128.    Each of these defendants is jointly and severally liable under section 20(a) of the

20 Exchange Act to the same extent as defendants Apotheker, Whitman, and Lesjak for the primary

21 violations of section 10(b) and rule 10b-5 promulgated thereunder, as set forth herein.

22 Defendants Whitman, Lesjak, Apotheker, Livermore, Lane, Babbio, Hammergren, Baldauf,

23 Thompson, Gupta, Andreessen, Banerji, Reiner, Russo, Senequier, and Whitworth did not act in

24 good faith.

25                              **COUNT III**

26   **For Breach of Fiduciary Duty Against the HP Individual Defendants**

27       129.    Plaintiff incorporates by reference and realleges each and every allegation

28 contained above, as though fully set forth herein.

130.  As alleged in detail herein, the HP Individual Defendants by reason of their positions as officers and directors of HP and because of their ability to control the business and corporate affairs of HP, owed the Company fiduciary obligations of due care and loyalty, and were and are required to use their utmost ability to control and manage HP in a fair, just, honest, and equitable manner.

131.  Defendants Apotheker, Whitman, and Lesjak violated their duty of care by making improper statements in the Company's press releases, conference calls, and other public disclosures. Defendant Apotheker was one of the key people behind the Autonomy Acquisition. Accordingly, defendants Apotheker, Whitman, and Lesjak breached their duties of care, good faith, and loyalty.

132.  The Director Defendants owed HP the highest duty of loyalty.  The Director Defendants failed to conduct proper due diligence with regard to HP's acquisition of Autonomy. Moreover, these defendants breached their duty of loyalty by allowing the Company to execute a repurchase of over $2.1 billion of the Company's stock at prices they knew, or in reckless disregard of their duties did not know, were artificially inflated.  Accordingly, the Director Defendants breached their duty of good faith and loyalty.

133.  The Audit Committee Defendants breached their fiduciary duty of loyalty by knowingly or recklessly reviewing and approving improper statements in the Company's public filings, press releases, and earnings conference calls.  Additionally, the Audit Committee Defendants, and especially defendants Thompson, Babbio, Baldauf, and Banerji as "audit committee financial expert[s]," failed to conduct due diligence with regard to HP's acquisition of Autonomy.  This constituted a violation of the duties of the members of the Audit Committee under its Charter.

134.  The Finance and Investment Committee Defendants were specifically tasked with assisting "the Board in evaluating investment, acquisition, enterprise services, joint venture and divestiture transactions in which HP engages as part of its business strategy from time to time." The Finance and Investment Committee Defendants breached their fiduciary duty of loyalty by allowing the Company to materially overpay for the acquisition of Autonomy despite the

- 48 -

1 numerous red flags alerting them of Autonomy's overvaluation alleged herein. This constituted a

2 violation of the duties of the members of the Finance and Investment Committee under its

3 Charter.

4     135.   As a direct and proximate result of the HP Individual Defendants' foregoing

5 breaches of fiduciary duties, the Company has suffered significant damages, as alleged herein.

6     136.   Plaintiff, on behalf of HP, has no adequate remedy at law.

### COUNT IV

#### Against the HP Individual Defendants for Waste of Corporate Assets

9     137.   Plaintiff incorporates by reference and realleges each and every allegation

10 contained above, as though fully set forth herein.

11     138.   Defendants Apotheker, Thompson, Gupta, Banerji, Reiner, Hammergren,

12 Andreessen, Lane, Russo, Livermore, Robison, Babbio, Baldauf, and Senequier wasted HP's

13 corporate assets by failing to conduct proper due diligence and causing the Company to material

14 overpay for Autonomy.

15     139.   The Director Defendants wasted HP's corporate assets by authorizing and

16 effectuating the repurchase of over $2.1 billion of the Company's stock at prices they knew, or

17 recklessly were unaware, were artificially inflated.

18     140.   The HP Individual Defendants also wasted corporate assets by paying improper

19 compensation and bonuses to certain of the Company's executive officers and directors that

20 breached their fiduciary duty. Similarly, the HP Individual Defendants wasted corporate assets

21 by paying improper compensation to the Advisor Defendants and defendant KPMG who assisted

22 in causing the Company to materially overpay for Autonomy.

23     141.   As a result of the waste of corporate assets, the HP Individual Defendants are

24 liable to the Company.

25     142.   Plaintiff, on behalf of HP, has no adequate remedy at law.

26

27

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## COUNT V

### Against the HP Individual Defendants for Unjust Enrichment

143.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

144.    At the time of the Company's misstatements and all relevant times stated herein, the HP Individual Defendants received bonuses, stock options, stock appreciation rights, and/or similar such compensation from HP in breach of their fiduciary duties. The HP Individual Defendants were unjustly enriched thereby.

145.    To remedy the HP Individual Defendants' unjust enrichment, this Court should order them to disgorge all proceeds the HP Individual Defendants received from their bonuses and stock options.

## COUNT VI

### Against Defendant Lynch for Aiding and Abetting Breaches of Fiduciary Duty

146.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

147.    Defendant Lynch aided and abetted defendants Apotheker, Lesjak, Andreessen, Babbio, Baldauf, Banerji, Gupta, Hammergren, Lane, Livermore, Reiner, Russo, Thompson, Whitworth, Robison, Senequier, and Whitman in breaching their fiduciary duties owed to the Company.

148.    Defendants Apotheker, Lesjak, Andreessen, Babbio, Baldauf, Banerji, Gupta, Hammergren, Lane, Livermore, Reiner, Russo, Thompson, Whitworth, Robison, Senequier, and Whitman owe and owed to HP certain fiduciary duties as fully set out herein.

149.    By committing the acts alleged herein, defendants Apotheker, Lesjak, Andreessen, Babbio, Baldauf, Banerji, Gupta, Hammergren, Lane, Livermore, Reiner, Russo, Thompson, Whitworth, Robison, Senequier, and Whitman breached their fiduciary duties owed to HP.

150.    Defendant Lynch participated in the breaches of the fiduciary duties by the HP Individual Defendants for the purpose of advancing his own interests. Defendant Lynch

1 obtained pecuniary benefits from the sale of Autonomy to HP while colluding in or aiding and

2 abetting the HP Individual Defendants' breaches.

3     151. Plaintiff, on behalf of HP, has no adequate remedy at law.

4 **COUNT VII**

5 **Against Defendant Deloitte UK for Aiding and Abetting Breaches of Fiduciary Duty**

6     152. Plaintiff incorporates by reference and realleges each and every allegation

7 contained above, as though fully set forth herein.

8     153. Defendant Deloitte UK aided and abetted defendants Apotheker, Lesjak,

9 Andreessen, Babbio, Baldauf, Banerji, Gupta, Hammergren, Lane, Livermore, Reiner, Russo,

10 Thompson, Whitworth, Robison, Senequier, and Whitman in breaching their fiduciary duties

11 owed to the Company.

12     154. Defendants Apotheker, Lesjak, Andreessen, Babbio, Baldauf, Banerji, Gupta,

13 Hammergren, Lane, Livermore, Reiner, Russo, Thompson, Whitworth, Robison, Senequier, and

14 Whitman owe and owed to HP certain fiduciary duties as fully set out herein.

15     155. By committing the acts alleged herein, defendants Apotheker, Lesjak,

16 Andreessen, Babbio, Baldauf, Banerji, Gupta, Hammergren, Lane, Livermore, Reiner, Russo,

17 Thompson, Whitworth, Robison, Senequier, and Whitman breached their fiduciary duties owed

18 to HP.

19     156. Defendant Deloitte UK participated in the breaches of the fiduciary duties by the

20 HP Individual Defendants for the purpose of advancing their own interests. Defendant Deloitte

21 UK obtained pecuniary benefits from the sale of Autonomy to HP while colluding in or aiding

22 and abetting the HP Individual Defendants' breaches.

23     157. Plaintiff, on behalf of HP, has no adequate remedy at law.

24 **COUNT VIII**

25 **Against Defendant KPMG for Aiding and Abetting Breaches of Fiduciary Duty**

26     158. Plaintiff incorporates by reference and realleges each and every allegation

27 contained above, as though fully set forth herein.

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1     159.  Defendant KPMG aided and abetted defendants Apotheker, Lesjak, Andreessen,

2  Babbio, Baldauf, Banerji, Gupta, Hammergren, Lane, Livermore, Reiner, Russo, Thompson,

3  Whitworth, Robison, Senequier, and Whitman in breaching their fiduciary duties owed to the

4  Company.

5     160.  Defendants Apotheker, Lesjak, Andreessen, Babbio, Baldauf, Banerji, Gupta,

6  Hammergren, Lane, Livermore, Reiner, Russo, Thompson, Whitworth, Robison, Senequier, and

7  Whitman owe and owed to HP certain fiduciary duties as fully set out herein.

8     161.  By committing the acts alleged herein, defendants Apotheker, Lesjak,

9  Andreessen, Babbio, Baldauf, Banerji, Gupta, Hammergren, Lane, Livermore, Reiner, Russo,

10  Thompson, Whitworth, Robison, Senequier, and Whitman breached their fiduciary duties owed

11  to HP.

12     162.  Defendant KPMG participated in the breaches of the fiduciary duties by the HP

13  Individual Defendants for the purpose of advancing their own interests. Defendant KPMG

14  obtained pecuniary benefits from the sale of Autonomy to HP while colluding in or aiding and

15  abetting the HP Individual Defendants' breaches.

16     163.  Plaintiff, on behalf of HP, has no adequate remedy at law.

17

**COUNT IX**

18

**Against Advisor Defendants for Aiding and Abetting Breaches of Fiduciary Duty**

19     164.  Plaintiff incorporates by reference and realleges each and every allegation

20  contained above, as though fully set forth herein.

21     165.  The Advisor Defendants aided and abetted defendants Apotheker, Lesjak,

22  Andreessen, Babbio, Baldauf, Banerji, Gupta, Hammergren, Lane, Livermore, Reiner, Russo,

23  Thompson, Whitworth, Robison, Senequier, and Whitman in breaching their fiduciary duties

24  owed to the Company.

25     166.  Defendants Apotheker, Lesjak, Andreessen, Babbio, Baldauf, Banerji, Gupta,

26  Hammergren, Lane, Livermore, Reiner, Russo, Thompson, Whitworth, Robison, Senequier, and

27  Whitman owe and owed to HP certain fiduciary duties as fully set out herein.

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

167.   By committing the acts alleged herein, defendants Apotheker, Lesjak, Andreessen, Babbio, Baldauf, Banerji, Gupta, Hammergren, Lane, Livermore, Reiner, Russo, Thompson, Whitworth, Robison, Senequier, and Whitman breached their fiduciary duties owed to HP.

168.   The Advisor Defendants participated in the breaches of the fiduciary duties by the HP Individual Defendants for the purpose of advancing their own interests.   The Advisor Defendants obtained pecuniary benefits from the sale of Autonomy to HP while colluding in or aiding and abetting the HP Individual Defendants' breaches.

169.   Plaintiff, on behalf of HP, has no adequate remedy at law.

**COUNT X**

**Against Defendant KPMG for Negligence**

170.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

171.   Defendant KPMG was negligent in its performance of consulting and audit services to HP.   Defendant KPMG was engaged by HP on a consulting basis to review defendant Deloitte UK's audits of Autonomy.

172.   By agreeing to provide consulting and other professional services to HP, defendant KPMG owed a legal duty to HP to use the skill and care ordinarily used by a reasonable and competent professional.

173.   In order to conduct audits in compliance with the applicable professional standards of care, defendant KPMG was required to, among other things:

(a)   properly test and evaluate defendant Deloitte UK's internal controls to provide a reasonable basis for its opinions;

(b)   properly assess the accounting principles, methods, and processes used by defendant Deloitte UK and Autonomy;

(c)   inform HP management about material errors; and

(d)   advise HP's Audit Committee of internal control deficiencies.

- 53 -

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

174.   Defendant KPMG breached its duty to provide consulting and other professional services to HP at the required level of skill and care.   Defendant KPMG violated its duty of care and failed to comply with the requisite professional standards of care by, among other things:

(a)   failing to properly test and evaluate defendant Deloitte UK's internal controls; failing to perform tests of Autonomy's accounting records and such other procedures as necessary in the circumstances to provide a reasonable basis for its opinions;

(b)   failing to properly assess the accounting principles, methods, and processes used by Autonomy, including methods of consolidation of financial reports;

(c)   failing to inform HP's management about material errors; and

(d)   failing to advise HP's Audit Committee of internal control deficiencies.

175.   Defendant KPMG knew or should have known that defendant Deloitte UK's audit of Autonomy was important to HP given that HP specifically engaged KPMG to review defendant Deloitte UK's audits of Autonomy.   Additionally, this factor indicates the foreseeability of the damage caused by KPMG's negligent failure to detect and/or report the material errors.

176.   Defendant KPMG's violations of its duty of care owed to HP have proximately caused HP to suffer damages in an amount to be proven at trial, including, but not limited to, the substantial amount of money  HP overpaid for Autonomy, fees paid to KPMG for its services, and other compensatory damages proximately caused by KPMG's breaches of duty.

177.   As a direct, foreseeable, and proximate result of defendant KPMG's negligence, HP has been damaged.  HP Individual Defendants who were directors of HP have not taken appropriate action to hold KPMG accountable for the damages inflicted upon the Company by KPMG.

178.   Plaintiff, on behalf of HP, has no adequate remedy at law.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff, on behalf of HP, demands judgment as follows:

A.   Against all of the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' violations of the Exchange Act,

- 54 -

1  breaches of fiduciary duties, waste of corporate assets, unjust enrichment, negligence, and aiding

2  and abetting thereof;

3       B.       Directing HP to take all necessary actions to reform and improve its corporate

4  governance and internal procedures to comply with applicable laws and to protect HP and its

5  shareholders from a repeat of the damaging events described herein, including, but not limited to,

6  putting forward for shareholder vote, resolutions for amendments to the Company's By-Laws or

7  Articles of Incorporation and taking such other action as may be necessary to place before

8  shareholders for a vote of the following Corporate Governance Policies:

9           1.       a proposal to strengthen and make effective the Company's due diligence

10  in any future or pending acquisitions;

11          2.       a proposal to strengthen the Company's oversight and controls over its

12  stock repurchase program;

13          3.       a proposal to strengthen HP oversight of its disclosure procedures;

14          4.       a proposal to strengthen the Board's supervision of operations and

15  develop and implement procedures for greater shareholder input into the policies and guidelines

16  of the Board; and

17          5.       a provision to permit the shareholders of HP to nominate at least three

18  candidates for election to the Board;

19       C.       Extraordinary equitable and/or injunctive relief as permitted by law, equity, and

20  state statutory provisions sued hereunder, including attaching, impounding, imposing a

21  constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or

22  their other assets so as to assure that plaintiff on behalf of HP has an effective remedy;

23       D.       Awarding to HP restitution from defendants, and each of them, and ordering

24  disgorgement of all profits, benefits, and other compensation obtained by the defendants;

25       E.       Awarding to plaintiff the costs and disbursements of the action, including

26  reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

27       F.       Granting such other and further relief as the Court deems just and proper.

28

- 55 -

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1

**JURY DEMAND**

2

Plaintiff demands a trial by jury.

3

Dated: November 26, 2012

ROBBINS UMEDA LLP
BRIAN J. ROBBINS

4

FELIPE J. ARROYO
SHANE P. SANDERS

5

KEVIN S. KIM

6

7

BRIAN J. ROBBINS

8

600 B Street, Suite 1900

9

San Diego, CA 92101
Telephone:  (619) 525-3990

10

Facsimile: (619) 525-3991
brobbins@robbinsumeda.com

11

farroyo@robbinsumeda.com
ssanders@robbinsumeda.com

12

kkim@robbinsumeda.com

13

Attorneys for Plaintiff

14

15

16

17

18

19

20

21

22

23

24

25

26

27

813959

28

- 56 -

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

VERIFICATION

I, Philip Ricciardi, hereby declare as follows:

I am the plaintiff in the within entitled action. I have read the Verified Shareholder Derivative Company. Based upon discussions with and reliance upon my counsel, and as to those facts of which I have personal knowledge, the Complaint is true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Signed and Accepted:

Dated: *Nov. 26, 2012*

*Philip Ricciardi*
PHILIP RICCIARDI