# EXHIBIT A

JOSEPH W. COTCHETT (Cal. SBN 36324)
jcotchett@cpmlegal.com
MARK C. MOLUMPHY (Cal. SBN 168009)
mmolumphy@cpmlegal.com
ARON K. LIANG (Cal. SBN 228936)
aliang@cpmlegal.com
MATTHEW K. EDLING (Cal. SBN: 250940)
medling@cpmlegal.com
JENNIFER R. CRUTCHFIELD (Cal. SBN: 275343)
jcrutchfield@cpmlegal.com
COTCHETT, PITRE & McCARTHY, LLP
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577

*Lead Counsel for Plaintiff Stanley Morrical,*
*derivatively on behalf of Hewlett-Packard Company*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **IN RE HEWLETT-PACKARD COMPANY SHAREHOLDER DERIVATIVE LITIGATION** | **Master Docket**<br><br>**NO. C-12-6003-CRB** |
| THIS DOCUMENT RELATES TO:<br><br>ALL ACTIONS | **[REDACTED] CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT** |

LAW OFFICES
Cotchett, Pitre
& McCarthy, LLP

# Table of Contents

**Page**

I.   INTRODUCTION.................................................................................................. 2

II.  JURISDICTION AND VENUE.......................................................................... 12

III. THE PARTIES .................................................................................................... 13

      A.   The Plaintiff ............................................................................................ 13

      B.   The Nominal Defendant.......................................................................... 13

      C.   The Individual Defendants ...................................................................... 13

      D.   The Bank Defendants.............................................................................. 22

      E.   Relevant Non-Parties .............................................................................. 23

      F.   Unnamed Participants ............................................................................. 24

      G.   Aiding and Abetting ............................................................................... 25

IV.  STATEMENT OF FACTS.................................................................................. 25

      A.   A Brief History of the Hewlett-Packard Company................................. 25

      B.   Mark Hurd Rejects Autonomy Acquisition ........................................... 26

      C.   HP's Recent History of Bad Deals and Failures .................................... 27

      D.   Road to Autonomy: Léo Apotheker Becomes New CEO ...................... 30

      E.   Contrary to Public Statements, KPMG Did Not Audit the Work of Deloitte, Autonomy's Auditor .............................................................. 37

      F.   ███████████████████████ .................................................. 40

      G.   HP Ignored Other Warnings About the Propriety of Acquiring Autonomy ......... 47

         1.   HP's Chief Financial Officer Warned HP Against the Autonomy Acquisition ... 47

         2.   There Were Public Reports of Improprieties at Autonomy ................................. 48

         3.   Analysts Warned of Autonomy's Outdated Technology........................................ 53

4.   Other Companies Refused to Acquire Autonomy .................................... 54

       a.   Oracle Warned HP of Autonomy's Overvaluation ......................... 54

       b.   Dell Rejected Autonomy Acquisition Proposal Because It Was
            "Overwhelmingly Obvious" that Autonomy Was Overvalued ..................... 57

       c.   HP's Former CEO Mark Hurd Rejected Autonomy As Overvalued ............. 57

5.   HP Knew of Problems at Autonomy That Warranted Additional
     Due Diligence ....................................................................... 58

H.   Individual Defendants Were Improperly Influenced By External Advisors
     With Conflicted Interests ............................................................ 60

     1.   External Advisors Improperly Influence the HP Board Decision ......................... 60

     2.   Defendants Barclays and Perella Put Their Own Self-Interest Before
          That of Their Client, HP ....................................................... 62

     3.   Defendants Failed to Perform Due Diligence for HP ............................. 65

I.   HP Pushed Forward With Autonomy Acquisition, Disregarding
     All the Red Flags ................................................................... 67

J.   August 18, 2011: Autonomy Acquisition Is Closed ............................... 70

     1.   HP's Board of Directors Vote to Acquire Autonomy.......................... 70

     2.   HP Publicly Hypes Autonomy Acquisition ...................................... 72

K.   September 13, 2011: HP Extolls The Value of the Transformative
     Autonomy IDOL Technology and the "Extensive" Nature of HP's
     Due Diligence ...................................................................... 79

L.   September 22, 2011:  CEO Léo Apotheker Forced Out of HP; New
     CEO Meg Whitman Continues to Praise the Autonomy IDOL Technology........ 81

M.   HP Significantly Overpaid for Autonomy ........................................... 83

N.   HP Mishandled the Autonomy Acquisition: Hands the Keys Over
     to Autonomy ....................................................................... 84

O.   November 21, 2011: Defendants Continued to Misrepresent the Autonomy
     Technology and HP's Extensive" Due Diligence................................. 86

**CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT**                              ii

P.    November 29, 2011: HP Discover Vienna:  IDOL 10 Integrated Next Generation Platform is the Centerpiece of HP's Product Launch ........................ 89

Q.    HP Continues to Tout Autonomy Acquisition After HP Discover Vienna .......... 95

R.    Whistleblower Informs HP of Accounting Irregularities With Autonomy .......... 98

S.    May 2012: Mike Lynch Was Pushed Out of Autonomy ...................................... 99

T.    June 4, 2012: HP Discover Las Vegas: HP Continued to Tout Availability Of Integrated HP Next Generation Information Platform IDOL 10 Autonomy/Vertica.............................................................................................. 101

U.    Summer of 2012: HP Began Planning How to Best Sell the Write-Down to the Public ...................................................................................................... 104

V.    HP Began Publically Announcing the Failures of the Autonomy Acquisition....................................................................................................... 107

W.    HP's Board of Directors Acted Recklessly in Approving Massive Stock Purchases While They Knew That An Multibillion Dollar Write-   Down of Autonomy Was Pending .......................................................................... 113

X.    HP Controlled the Release of Information Concealling the Truth About Autonomy ....................................................................................................... 114

Y.    November 20, 2012: HP Announced $8.8 Billion Write-down on Autonomy Acquisition....................................................................................................... 116

Z.    Mike Lynch Challenged HP's Assertion That the Entire $8.8 Billion Write-down is  Related to Accounting Irregularities at Autonomy.................... 120

AA.    HP's Officers and Directors Adamantly Denied All Responsibility for the Autonomy  Acquisition Debacle -- It Is Obvious They Cannot Evaluate Their Own Misconduct.................................................................................... 125

BB.    Analysts Doubt That An $8.8 Billion Write-Down Could Be Blamed on Autonomy's  Accounting Improprieties Alone.................................................. 127

CC.    HP's Sarbanes-Oxley Violations ...................................................................... 129

DD.    HP's Misrepresentations Continue Today ........................................................ 129

V.    RESPONSIBILITIES OF CORPORATE OFFICERS AND DIRECTORS ..................... 132

**CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT**    iii

LAW OFFICES
COTCHETT, PITRE
& McCARTHY, LLP

VI.  DEMAND ALLEGATIONS.................................................................................... 139

    A.    Demand is Futile Because the Individual Defendant Directors Are Not
        Disinterested .................................................................................................. 139

    B.    The Conduct of the Individual Defendants Is Not Protected By the Business
        Judgment Rule ................................................................................................ 142

    C.    Demand is Futile Because the Individual Defendant Directors Face
        Substantial Personal Liability for the Wrongdoing Alleged in this
        Complaint........................................................................................................ 144

    D.    Certain Individual Director Defendants Face Greater Liability Because
        TheyFailed to Meet Their Obligations As HP Committee Members ................. 147

    E.    The Misconduct of the HP Board of Directors Has Harmed HP ....................... 149

    F.    Demand on the Board is Excused .................................................................... 149

    G.    None of the Directors of HP Are Disinterested ................................................ 151

    H.    HP's Establishment of a Special Litigation Committee Established
        the Futility of a Demand ................................................................................. 165

VII. CLAIMS FOR RELIEF.......................................................................................... 167

    FIRST CLAIM FOR RELIEF ..................................................................................... 167

    SECOND CLAIM FOR RELIEF.................................................................................. 169

    THIRD CLAIM FOR RELIEF..................................................................................... 171

    FOURTH CLAIM FOR RELIEF .................................................................................. 173

    FIFTH CLAIM FOR RELIEF ...................................................................................... 174

    SIXTH CLAIM FOR RELIEF ...................................................................................... 175

    SEVENTH CLAIM FOR RELIEF................................................................................. 175

    EIGHTH CLAIM FOR RELIEF ................................................................................... 177

VIII.  PRAYER FOR RELIEF ......................................................................................... 179

JURY TRIAL DEMAND .................................................................................................. 180

⊗
LAW OFFICES
Cotchett, Pitre
& McCarthy, LLP

**CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT**        iv

Plaintiff Stanley Morrical ("Plaintiff"), derivatively on behalf of the Hewlett-Packard Company ("HP"), alleges the following based upon his and his counsel's investigation, including a review of legal and regulatory filings, press releases, analysts' calls, industry publications, media reports, witness interviews and statements, and other documents about HP and its professional advisors relating to HP's acquisition of Autonomy Corp. ("Autonomy").

Plaintiff further obtained internal records concerning HP's acquisition of Autonomy, and post-acquisition accounting issues, including HP Board of Director minutes and reports by outside advisors, pursuant to shareholder inspection demands made under California Corporations Code Section 1601 and Delaware General Corporation Law Section 220, as well as a separately filed Petition for Writ of Mandate, *Morrical v. Hewlett-Packard Co.*, Santa Clara Superior Court No. 11-cv-238913.  Virtually all of the documents produced by HP were designated as confidential and, accordingly, references to such confidential information have been redacted from the public version of this Complaint filed with the Court.

Plaintiff brings claims against Defendants Margaret C. Whitman ("Whitman" or "Meg Whitman"), Léo Apotheker ("Apotheker"), Raymond J. Lane ("Lane"), Marc L. Andreesen ("Andreesen"), Shumeet Banerji ("Banerji"), Rajiv L. Gupta ("Gupta"), John H. Hammergren ("Hammergren"), Ann M. Livermore ("Livermore"), Gary M. Reiner ("Reiner"), Patricia F. Russo ("Russo"), G. Kennedy Thompson ("Thompson"), Ralph V. Whitworth ("Whitworth"), Lawrence T. Babbio, Jr. ("Babbio"), Sari M. Baldauf ("Baldauf"), Dominique Senequier ("Senequier"), Shane Robison ("Robison") (hereinafter referred to collectively as the "Individual Defendants'), Barclays Capital ("Barclays"), and Perella Weinberg Partners LP ("Perella") for violations of California and federal law.

# I.

## INTRODUCTION

> **"We did that analysis at great length, in great detail, and we feel that we paid a very fair price for Autonomy.  And it will give a great return to our shareholders."**
>
> - Léo Apotheker, Former CEO of HP
>   September 13, 2011, announcing acquisition of Autonomy

> **"[D]uring our very extensive due diligence process, we hired KPMG to audit Deloitte, and neither of them saw what we now see . . . ."**
>
> - Meg Whitman, Current CEO of HP
>   November 20, 2012, announcing $8.8 billion write-down of Autonomy

1.     Corporate officers and directors owe the highest fiduciary duties of care and loyalty to the corporation they serve.  This action involves a massive breach of such duties relating to HP's acquisition of Autonomy and its post-acquisition public statements.  Rather than evaluating this important transaction with eyes wide open, HP's fiduciaries consciously decided to proceed with eyes closed shut, ignoring the warnings of their own professional advisors.  HP's Board performed no technical due diligence.  ███████████████████████████████████████████████████████████████████████████ ██████  HP's financial advisor, Barclays, was conflicted in advising the Board while simultaneously underwriting the financing of the deal.  Compounding the problem, after the acquisition closed, HP's fiduciaries misrepresented the facts to conceal their own failings.  This lawsuit is being brought by Plaintiff, on behalf of HP, to seek redress for the devastating harm suffered by the corporation.

2.     On August 18, 2011, HP announced it was spending $11.7 billion to acquire Autonomy, a British enterprise software company.  This acquisition would consume the majority of HP's available cash.  The acquisition closed on October 3, 2011.  Approximately one year later, on November 20, 2012, HP announced it was writing down $8.8 billion of that $11.7

⊛
LAW OFFICES
COTCHETT, PITRE
& MCCARTHY, LLP

billion purchase price.  How this occurred is the story of the failings and misconduct of the Defendants named in this action.

3.      This story begins in 2002, when Mark Hurd was the CEO of HP, a position he held until 2010.  During Mark Hurd's tenure, HP spent significant time and resources attempting to gain traction in the enterprise software field, a highly profitable business.  At that time, HP conducted an internal analysis in which it decided to grow its position in the enterprise software industry organically.  Acquisitions were discussed but, as of fiscal year 2009, Autonomy was not considered a prime acquisition target.

4.      That changed in November of 2010, when Defendant Léo Apotheker replaced Mark Hurd as the CEO of HP.  Defendant Apotheker, along with the entire HP Board of Directors, especially Defendant Raymond Lane, HP's Chairman of the Board, were desperate to "transform" HP.  In that desperate search for a "transformative" strategy, the Individual Defendants fixated on Autonomy.  For years, HP had used acquisitions as the means of "transforming" HP but that approach had resulted in one failed and overpriced acquisition after another.  Such a history would result in increased due diligence for most companies.  For HP's Board of Directors, the decision was made to rush into an even larger acquisition than the past failures, in the quixotic hopes of redeeming itself.

5.      Experts had warned HP of serious potential problems with Autonomy before the acquisition was announced and before HP even considered acquiring Autonomy.  Industry experts warned that Autonomy's technology was outdated and suffered from increased competition from numerous other companies.  Financial analysts viewed Autonomy as highly overvalued and cautioned that its financial statements contained potential accounting concerns, such as revenue recognition and profit margin.  Even competitors, such as Oracle, knew that Autonomy was highly overvalued and faced serious accounting problems.

6.      During the entire "due diligence" process Autonomy refused to provide HP with any non-public information about itself because of a U.K. City Code that purportedly required Autonomy to provide to all potential suitors the same information it provided to HP.

**CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT**                    3

1   Autonomy's absolute refusal to give HP any non-public information, in and of itself, was a red

2   flag.  Nevertheless, the U.K. City Code does not forbid Autonomy from providing HP with

3   information.  Instead, it only requires that the provision of such information be equal amongst

4   legitimate potential suitors.  Considering the fact that HP was the only company willing to

5   spend $11.7 billion to acquire Autonomy, it could have and should have insisted that Autonomy

6   provide it with non-public information.  That would be the only way for HP to assure itself that

7   the accounting and technology red flags that it knew about and were warned of, were not true

8   problems.  Instead, HP decided that it was more eager to spend $11.7 billion on a high visibility

9   acquisition than actually figuring out what it was buying.

10          7.   ██████████████████████████████████████████

11   █████████████████████████████████████████████

12   ████████████████████████████████████████████

13   ██████████████████████████████████████████████

14   ██████████████████████████████████████████████

15   █████████████████████████████████████████████

16   ██████████████████████████████████████████████

17   █████████████████████████████████████████████

18   ██████████████████████████████████████████████

19   ████████

20          8.   ██████████████████████████████████████████

21   ██████████████████████████████████████████████

22   ██████████████████████████████████████████████

23   ████████████████████████████████████████████

24   ██████████████████████████████████████████████

25   █████████████████████████████████████████████

26   ████████████████████████████████████████████

27   ██████████████████████████████████████████████

10.     The HP Technology Committee, which is directed with guiding HP's technology strategy met only once prior to the announcement of the Autonomy acquisition.

11.     On <u>August 18, 2011</u>, despite all of the known red flags, HP's Board of Directors nevertheless voted to approve the Autonomy acquisition.

LAW OFFICES
COTCHETT, PITRE
& McCARTHY, LLP

12.     Immediately thereafter, HP released a press release announcing the Autonomy acquisition.  The Autonomy acquisition came under immediate criticism from shareholders, the media and the public, all of whom complained that HP had grossly overspent to acquire Autonomy.  In responding to that criticism, HP publically stated that the Autonomy technology would be "transformative" and stressed that their review of Autonomy's accounting was "extensive" and "rigorous."

13.     On numerous occasions, Léo Apotheker touted the exhaustive due diligence reportedly conducted by HP, including investigating the accounting of Autonomy.  When asked directly about the issue of accounting due diligence on a <u>September 13, 2011</u> Deutsche Bank Technology Conference analyst conference call, Léo Apotheker responded by stating, "[w]e have and are running an **extremely tight and very professional due diligence process**.  I've got to tell you I have challenges with the question itself."  The truth, however was that no due diligence was done.  This was a fraud that was known at the highest levels of HP, including its Board of Directors.

14.     On <u>November 29, 2011</u>, at HP Discovery Vienna (HP Discovery is a major event in which new products are launched), anxious to justify the highly criticized Autonomy acquisition, HP represented to the world that on <u>December 1, 2011</u>, the integrated Next Generation Information Platform IDOL 10 Autonomy/Vertica would be available to the market. HP claimed that this integrated IDOL 10 Autonomy/Vertica product would **change the world and would revolutionize** the enterprise software space.  HP claimed this revolutionary new technology would justify spending $11.7 billion to acquire Autonomy.

15.     **There was ONE PROBLEM** with that representation – the integrated HP Next Generation Information Platform that HP promised **DID NOT AND DOES NOT EXIST**.  The integrated Next Generation Information Platform that HP claimed existed did not exist in the form that was announced, it was a fraud – <u>not only</u> an accounting fraud as stated by HP – but a more fundamental and foundational fraud because HP did not and does not have the revolutionary product it promised the public, its customers and its shareholders.  Even today, this

⊛
LAW OFFICES
COTCHETT, PITRE
& MCCARTHY, LLP

product is not available for sale as an integrated product.  After HP acquired Autonomy, Autonomy was still on the 5-year old, technologically inferior IDOL 7.  In an effort to defend this $11.7 billion acquisition, HP skipped from IDOL 7 to IDOL 10, claiming that Autonomy and Vertica (another HP acquisition) had merged their products together to create a product that had no competitor.  HP did not tell investors, the public and shareholders that this integrated platform was in fact unavailable on <u>December 1, 2011</u> and is unavailable today.  Nevertheless, HP told the public that it did exist and it was available for sale as of <u>December 1, 2011</u>.  This was also a fraud.

16.     On <u>June 4, 2012</u> at HP Discover Las Vegas, HP reiterated that the Autonomy acquisition was justified because of the next generation integrated IDOL 10 Information Platform, which combined the functionalities of Autonomy's and Vertica's technology.  The promise of this world-changing technology is that it would combine Autonomy's ability to search unstructured data with Vertica's ability to search structured data into a single processing layer.  Not only did HP claim that this groundbreaking product justified the acquisition, it claimed the product had been available for sale since <u>December 1, 2011</u>.  HP did not make aspirational statements about the integrated HP Next Generation Information Platform IDOL 10 Autonomy/Vertica.  HP told the public that this product existed.  It did not, and the officers and directors of HP knew it.

17.     On <u>November 20, 2012</u>, HP issued a press release announcing that it would write down **$8.8 billion** of the value of Autonomy.  HP claimed that the vast majority of the write-down was because of accounting improprieties:

> "HP is extremely disappointed to find that some former members of Autonomy's management team used accounting improprieties, misrepresentations and disclosure failures to inflate the underlying financial metrics of the company, prior to Autonomy's acquisition by HP. These efforts appear to have been a willful effort to mislead investors and potential buyers, and severely impacted HP management's ability to fairly value Autonomy at the time of the deal.  **We remain 100 percent committed to Autonomy and its industry-leading technology.**"

LAW OFFICES
COTCHETT, PITRE
& MCCARTHY, LLP

18.     HP's <u>November 20, 2012</u> statement, which purportedly reveals the truth of its earlier misstatements, is not curative since that <u>November 20, 2012</u> statement is also false and misleading.  HP blamed the write-down on Autonomy's accounting but failed to take accountability for failing to conduct due diligence and buying a non-existent technology.  By seeking to blame others instead of itself, HP knows that it faces the serious risk of securities litigation and shareholder revolt.  HP cannot admit that its complete failure to conduct due diligence resulted in it overpaying for a company with accounting irregularities, an outdated product and with revenues that weren't growing.  HP cannot admit that it made misstatements to the market for years claiming that it had an integrated enterprise search platform that, in reality, does not exist.  Autonomy is essentially selling IDOL 7, the exact same product it has been selling for the last five years.  IDOL 7 is not worth $11.7 billion.  In an effort to conceal their own gross mismanagement, fraudulent conduct and potential exposure to securities claims, HP's officers and directors have blamed the vast majority of the $8.8 billion write-down on accounting issues.

19.     To this day, HP continues to claim that the reason for the write down was simply accounting issues with Autonomy that they could not have detected prior to the acquisition.  Even now, HP continues to claim that there was no way they could have detected the fraud because of the exhaustive due diligence conducted by Deloitte (Autonomy's auditor) and KPMG (hired by HP for accounting due diligence).  On a <u>November 20, 2012</u> analyst conference call, CEO Whitman stated, "**[a]nd by the way during our very extensive due diligence process, we hired KPMG to audit Deloitte**, and neither of them saw what we now see after someone came forward to point us in the right direction." ████████████████████████ ████████████████████████████████████████ ████████████████████████     This statement is not true.  The Individual Defendants knew that there was virtually no due diligence done of Autonomy prior to the acquisition.  HP's Board of Directors breached their fiduciary duties to shareholders by: (1) voting in favor of the acquisition irrespective of the absence of due diligence, and (2) misrepresenting to its

shareholders, customers, the media and the public that it had done "extensive" and "exhaustive" due diligence, as Leo Apotheker claimed during the Deutsche Bank Technology Conference analyst conference call on September 13, 2011.

20.      To this day, HP is also still concealing the fact that the Autonomy acquisition did not provide HP the technology that HP promised to the public.  On December 4, 2012, Defendant Whitman emphatically stated at the HP Discover Frankfurt event that she remained "100 percent committed to Autonomy's industry-leading technology and its employees."  She also claimed that Autonomy's "incredible" technology would be essential to HP's future growth. HP continues to misrepresent the truth about what is really happening at HP and what the real issues are with the Autonomy acquisition.  As recently as April 10, 2013, Meg Whitman stated "[w]e remain committed to Autonomy; we remain committed to the brand, to Cambridge, to the U.K.," "It is an almost **magical technology**…It plays into a big shift in the market, the area of Big Data which H-P should be in." Even after this announcement, made almost a year and a half after the initial announcement that the product was already available, IDOL10 was, and is, still not available.

21.      Six months after the announcement of the $8.8 billion write-down, HP has still failed to truthfully explain or justify the write-down.  Mike Lynch, Autonomy's founder has repeatedly challenged HP for seeking to blame the write-down on "accounting improprieties," stating that accounting irregularities at Autonomy could not have resulted in an $8.8 billion write-down.  The truth is, while HP has claimed that $5 billion of the write-down is due to accounting improprieties at Autonomy, in actuality, HP did not and does not have the top-of-the-line software that it claims to have acquired from Autonomy.  If HP had done a thorough due diligence of the technology, it would have learned that Autonomy's IDOL 7 database program had not been updated in the last five years.  This information was known to many technology analysts in the field and HP.  Autonomy had many competitors and many of them offered products equal to or superior to Autonomy.  For example, Vivisimo, one of the top enterprise search companies quietly acquired by IBM in April of 2012, has very advanced software.  This is

all information that HP knew or should have known before spending $11.7 billion to acquire Autonomy.

22.     In a similar vein, if HP had conducted a thorough due diligence of the accounting of Autonomy, it would have known before it acquired Autonomy of all the accounting problems that it claims it did not discover until November 2012. ██████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████ Instead, HP's Board of Directors intentionally chose to accept Autonomy "just trust me" representation and not to demand access to Autonomy's non-public information.  Such conduct is imprudent and a breach of the Individual Defendants' fiduciary.

23.     According to analysts, HP sought to maximize the amount of the write-down it could blame on fraud in order to take the largest write-down it could of Autonomy without acknowledging the misconduct and mismanagement of HP's own officers and directors.  In an interview with business reporters, Mike Lynch insisted, "[t]here is nothing there that you can warrant such a big effect in terms of write-down."  While there were accounting issues at Autonomy, it is evident that HP is using those accounting issues as an excuse to write down the value of another bad investment without admitting that HP overpaid for Autonomy.

24.     Here, the Board of Directors of HP and its officers have a fiduciary duty to act in the best interests of HP and its shareholders – treating their interests with the same care and solicitude as they would their own interests.  The Individual Defendants, however, breached the duties owed to HP by failing to comply with the duties of care and loyalty owed to the company. Moreover, when it became evident that the Individual Defendants had acted wrongfully, they

chose to make misrepresentations to the public, their customers, the media, and to their shareholders in order to conceal their misconduct, putting HP at serious litigation risk in order to protect themselves.

25.     This unlawful behavior has severely damaged HP.  HP has incurred the huge cost of investigating the misconduct, implementing remedial measures, and defending suits, along with the corresponding damage to HP's business operations, corporate image and goodwill.  In addition to its exposure to investigations, lawsuits, damages and potential fines, the disastrous acquisition of Autonomy has resulted in a substantial decline in HP's shareholder value and has significantly impacted the ability of HP to execute a positive business strategy.  At the same time, Defendants have been enriched by salaries, bonuses, fees, stock options and other perks not justified by HP's unlawful activities and performance under their stewardship.

26.     Due to the persistent failures of the HP Board of Directors, Plaintiff is forced to bring this action derivatively on behalf of HP against the Board of Directors and officers of HP for gross mismanagement, breaches of fiduciary duty and other misconduct arising from and relating to an $8.8 billion write-down of HP's shareholder value.  For these reasons and as set forth more fully herein, Plaintiff seeks to enjoin the Individual Defendants from continuing to manage HP in the manner they have managed the company for the last few years.  Dramatic corporate governance and management changes are necessary to ensure that HP, which is an important part of the California economy, is able to reevaluate its core business strategy and internal corporate management.  Plaintiff, on behalf of HP and its shareholders, also seeks monetary damages from those who engaged in the wrongdoing because they should be held responsible for making HP and its shareholders whole for the financial and reputational harm suffered by HP as a result of their misconduct.

27.     As to those Individual Defendants in which there is a finding by this Court that such Individual Defendants breached their fiduciary duties to HP, Plaintiff intends to pursue the removal of such Individual Defendants as directors of HP.  HP's officers and directors continue to blame HP's problems on third parties without holding themselves accountable for their own

1    misconduct.  Defendant Whitman has gone on record stating that the HP Board of Directors is

2    blameless.  Plaintiff therefore has no choice but to bring his claims to protect HP and its

3    shareholders.

## II.

## JURISDICTION AND VENUE

6        28.    This Court has jurisdiction of this dispute.  The amount in controversy, exclusive

7    of interest and costs exceeds the jurisdictional minimum of this Court.  This Court also has

8    jurisdiction under Article III of the United States Constitution and 28 U.S.C. § 1331 because it

9    includes claims brought under federal law, including claims under the Securities Exchange Act

10   of 1934.  This Court has supplemental jurisdiction over all other state law claims pursuant to 28

11   U.S.C. § 1367(a) because such claims are so related to claims in the action within such

12   jurisdiction that they form part of the same case or controversy under Article III of the United

13   States Constitution.

14       29.    This Court has jurisdiction since this case involves a Delaware corporation with

15   its headquarters at 3000 Hanover Street, Palo Alto, California, which is located in this

16   jurisdiction.  HP, which is headquartered in Palo Alto, California, has and will continue to have a

17   significant impact on the economy of California.  Each Defendant has sufficient contacts with

18   California as a director and/or officer of HP to make proper the exercise of personal jurisdiction

19   over them.  Each Defendant has significant minimum contacts with this Court to render the

20   exercise of jurisdiction by this Court permissible under traditional notions of fair play and

21   substantial justice.  Plaintiff served a letter on HP demanding the right to inspect the books and

22   records of HP.

23       30.    Venue is proper in this Court.  A substantial part of the events or omissions giving

24   rise to the claims alleged occurred in the Northern District of California.  Several of HP's

25   directors and senior management are residents of this District.  Meg Whitman, the current CEO

26   of HP and a director of the company, resides in Atherton, which is in this District.  Léo

27   Apotheker, the former CEO of HP, who was also an HP director during the Autonomy

28

⊕

LAW OFFICES
COTCHETT, PITRE
& McCARTHY, LLP

**CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT**                    12

acquisition, also resides in Atherton, which is located in this District. Former HP executive and current director Ann Livermore resides in Woodside, which is located in this District. HP is headquartered in this District and many of the Individual Defendants conduct business operations and/or reside in this District, rendering venue in this District proper.

### III.

### THE PARTIES

**A.    The Plaintiff**

31.    Plaintiff **STANLEY MORRICAL ("Plaintiff" or "Morrical")**, a citizen of California, is the owner of 1200 shares of HP common stock. Plaintiff has owned HP shares at all times relevant hereto, and continues to be an HP shareholder. Morrical has been appointed Lead Plaintiff in this action (Dkt No. 65).

**B.    The Nominal Defendant**

32.    Nominal Defendant **HEWLETT-PACKARD COMPANY ("HP" or the "Company")** is a Delaware corporation with its headquarters at 3000 Hanover Street, Palo Alto, California. HP is a Fortune 500 company that has been a leader in the computer and technology sector since its founding in 1939 by Stanford graduates Bill Hewlett and Dave Packard. HP is named in this Complaint as a nominal defendant in its derivative capacity, and this shareholder's derivative action is brought on its behalf. HP is headquartered and conducts the vast majority of its operations in California.

**C.    The Individual Defendants**

33.    Defendant **MARGARET C. WHITMAN ("Whitman" or "Meg Whitman")** has served as HP's President and Chief Executive Officer since September of 2011. She has been a member of HP's Board of Directors since January 2011. Whitman was one of the directors who voted in favor of the Autonomy acquisition and remains on the HP Board of Directors. Defendant Whitman was on the Technology Committee ███████████ ████████████████████████████████████████████ Without having conducted any due diligence on Autonomy's technology or received any presentation about

**CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT**                    13

1    Autonomy's technology, on ███████████████████████████████████████████

2    ███████████████████████████████ Defendant Whitman has made repeated public

3    statements, such as the ones she made on an analyst conference call on <u>November 20, 2011</u>,

4    saying that the HP Board of Directors was blameless and relied on experts, such as KPMG.

5    Those were misrepresentations. ███████████████████████████████████████

6    ████████████ ████████████████████████████████████████████████████████████████

7    ████████████████████████████████████████████████████████████████████

8    ████████████████████ and they had the strongest incentive to push this deal through,

9    irrespective of whether it was actually in the best interests of HP.  Numerous red flags about

10   Autonomy were raised with the HP Board of Directors, which Defendant Whitman knew about.

11   Despite this, Defendant Whitman continues to make misrepresentations about the scope of work

12   done by purported experts and the reliance on this purported "extensive" and "exhaustive" due

13   diligence by the HP Board of Directors.  Besides holding positions as an officer and director of

14   HP, Whitman has also held executive level positions at eBay Inc., Hasbro Inc., FTD, Inc., The

15   Stride Rite Corporation, The Walt Disney Company, and Bain & Company. Currently, Whitman

16   serves as a Director of The Procter & Gamble Company and Zipcar, Inc.  Whitman resides in

17   this District, in Atherton, California.

18       34.    Defendant **LÉO APOTHEKER ("Apotheker")** served as President and Chief

19   Executive Officer of HP from November 2010 through September 2011.  He served as a member

20   of the Board of Directors from 2010 through 2011.  Apotheker was the CEO and President of

21   HP, as well as a Director of HP at the time of the Autonomy acquisition.  He currently serves as

22   the Chairman of the supervisory board of Schneider Electric SA and is a member of the board of

23   PlaNet Finance, a non-profit organization.  Defendant Apotheker was an important force in favor

24   of the Autonomy acquisition. ██████████████████████████████████████

25   ████████████████████████████████████████████████████████████

26   ████████████████████████████████████████████████████████████████

27   ████████████████████████████████████████████████████████████

28

⊛
LAW OFFICES
COTCHETT, PITRE
& McCARTHY, LLP

███████████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████████████

Apotheker resides in this District, in Atherton, California.

35.     Defendant **RAYMOND J. LANE ("Lane")** currently serves as Executive Chairman of the HP Board of Directors and has served since September 2011.  Previously, Lane served as HP's non-Executive Chairman from November 2010 to September 2011.  On <u>April 4, 2013</u>, Defendant Lane stepped down as Chairman of the HP Board of Directors.  However, Defendant Lane remains a director of HP.

36.     Lane was one of the directors who voted in favor of the Autonomy acquisition and remains on the HP Board of Directors.  Lane has served as Managing Partner of venture capitalist firm Kleiner Perkins Caufield & Byers since 2000.  Lane also serves as Director of Quest Software, Inc., and several other private companies.

37.     Defendant Lane was a driving force behind the Autonomy acquisition, insistent that the deal had to be done in order to "transform" HP.  Defendant Lane's singular focus on "transforming" HP led him to ignore the lack of due diligence of Autonomy.  ███████████

██████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████     The status of due diligence was that none had been conducted and the key findings were that Autonomy's refusal to provide information to HP made due diligence of the known red flags impossible.  Regardless, Defendant Lane pushed forward with and recommended that HP acquire Autonomy.

38.     Defendant **MARC L. ANDREESEN ("Andreesen")** currently serves as a Director of HP and has since 2009.  Andreesen was one of the directors who voted in favor of the

Autonomy acquisition and remains on the HP Board of Directors.  Defendant Andreesen was the Chairperson of the Technology Committee at HP, ██████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████ Andreesen is the co-founder and general partner of Andreeseen Horowitz, co-founder and Chairman of Ning, Inc., co-founder and Chairman of Opsware, Inc., and currently also serves as Director of several other companies including eBay, Inc.  Andreesen resides in the District, in Los Altos, California.

39.    Defendant **SHUMEET BANERJI ("Banerji")** currently serves as a Director of HP and has since 2011.  Banerji was one of the directors who voted in favor of the Autonomy acquisition and remains on the HP Board of Directors.  Banerji was a member of both the Audit Committee and the Finance and Investment Committee. ██████████████████████

████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████ Banerji has served in multiple positions at the consulting firm Booz & Company since 2008, including as Chief Executive Officer.

LAW OFFICES
COTCHETT, PITRE
& MCCARTHY, LLP

40.     Defendant **RAJIV L. GUPTA ("Gupta")** currently serves as a Director of HP and has since January 2009.  Gupta was one of the directors who voted in favor of the Autonomy acquisition and remains on the HP Board of Directors.  Gupta has also served as Lead Independent Director for the HP Board of Directors since 2011, although Gupta has demonstrated that he is not, in fact, an independent director.  ████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ███████████████████████████████ Gupta voted in favor of the acquisition. Gupta has served in multiple positions at Avantor Performance Materials and Rohm and Haas Company.  Gupta currently serves as Director for Delphi Automotive PLC, Tyco International Ltd., The Vanguard Group and several other private companies.

41.     Defendant **JOHN H. HAMMERGREN ("Hammergren")** currently serves as Director and has since 2005.  Hammergren was one of the directors who voted in favor of the Autonomy acquisition and remains on the HP Board of Directors.  Defendant Hammergren was and still is the Chairperson of the Finance and Investment Committee.  ████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ This is demonstrated by the fact that, on April 4, 2013, Defendant Hammergren announced he would resign as a director of HP.  Hammergren has also served as

LAW OFFICES
COTCHETT, PITRE
& McCARTHY, LLP

1    Chairman of McKesson Corporation since 2001, and is currently a Director of Nadro, S.A. de

2    C.V. (Mexico).

3          42.     Defendant **ANN M. LIVERMORE ("Livermore")** currently serves as a Director

4    of HP and has since 2011.  Livermore was one of the directors who voted in favor of the

5    Autonomy acquisition and remains on the HP Board of Directors.  Livermore was also a senior

6    executive at HP who supported the Autonomy acquisition.  ██████████████████████

7    ████████████████████████████████████████████████████████████████

8    ████████████████████████████████████████████████████████████████

9    ████████████████████████████████████████████████████████████████

10   ████████████████████████████████████████████████████

11   ██████████████████████████████████████████████████████████

12   ████████████████████████As an executive at HP, Defendant Livermore also possessed greater

13   institutional knowledge of HP's internal functioning than the other directors.  Despite knowing

14   of the absence of due diligence at HP, Defendant Livermore voted in favor of the Autonomy

15   acquisition. Livermore served as Executive Vice President of the HP enterprise services business

16   from May 2011 to August 2011.   Previously, Livermore served as Executive Vice President of

17   the former HP Enterprise Business from May 2004 until June 2011.  Livermore also serves as a

18   Director of United Parcel Service, Inc.  Livermore resides in this District, in Woodside,

19   California.

20         43.     Defendant **GARY M. REINER ("Reiner")** currently serves as a Director of HP

21   and has since 2011.  Reiner was one of the directors who voted in favor of the Autonomy

22   acquisition and remains on the HP Board of Directors.  ████████████████████████

23   ████████████████████████████████████████████████████████████████

24   ██████████████████████████████████████████████

25   ████████████████████████████████████████████████████████████████

26   ████████████████████████████████████████████████████████████████

27   ████████████████████████████████████████████████████████████████

28   ████████████████████████████████████████████████████████████████

LAW OFFICES
COTCHETT, PITRE
& McCARTHY, LLP

**CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT**                    18

1 ████████████████████████████████████████████████████

2 ████████████████████████████████████████████████████

3 ████ Defendant Reiner recommended going forward with the Autonomy acquisition and

4 ultimately voted in favor of it.  On <u>March 20, 2013</u>, Defendant Reiner was named to a Special

5 Litigation Committee ("SLC"), purportedly because the remaining eight directors of HP were not

6 disinterested.  However, due to Defendant Reiner's direct knowledge of the lack of due diligence

7 of Autonomy's technology, Defendant Reiner is not a disinterested director since his personal

8 actions are subject to review for potential misconduct.  Reiner has also served as Special Advisor

9 at General Atlantic since September 2010.

10         44.     Defendant **PATRICIA F. RUSSO ("Russo")** currently serves as a Director of

11 HP and has since 2011.  Russo was one of the directors who voted in favor of the Autonomy

12 acquisition and remains on the HP Board of Directors.  Defendant Russo was a member of the

13 Technology Committee. ████████████████████████████████████

14

15 ████████████████████████████████████████████████████

16 Despite this knowledge, Defendant Russo recommended going forward with the Autonomy

17 acquisition.  Russo also is a Director of General Motors Company, Merck & Co., Inc., and Alcoa

18 Inc.

19         45.     Defendant **G. KENNEDY THOMPSON ("Thompson")** currently serves as a

20 Director of HP and has since 2005.  Thompson was one of the directors who voted in favor of the

21 Autonomy acquisition and remains on the HP Board of Directors.  Defendant Thompson served

22 as the Chairperson of the Audit Committee and he was also on the Finance and Investment

23 Committee.  In his position, ██████████████████████████████████

24 ████████████████████████████████████████████████████

25 ████████████████████████████████████████████

26 ████████████████████████████████████████████████████

27 ████████████████████████████████████████████████████

28 ████████████   ████████████████████████████████████

✪
LAW OFFICES
COTCHETT, PITRE
& MCCARTHY, LLP

1

2

3    This was likely because HP was so focused on acquiring Autonomy, the decision had been made

4    by the HP Board of Directors that they were going to spend $11.7 billion based solely on their

5    reliance on Autonomy's representations, without conducting any independent due diligence.

6              46.    On March 20, 2013, Defendant Thompson was appointed to a SLC to evaluate the

7    allegations being made against the company related to the Autonomy acquisition.  This is an

8    admission by HP that the other eight directors are not disinterested, although, for the reasons set

9    forth above, Plaintiff contends that Defendant Thompson is similarly not independent or

10   disinterested.  Defendant Thompson's personal knowledge and conduct is highly questionable

11   during this time period and there is no doubt that Defendant Thompson will not and cannot fairly

12   evaluate his own conduct, which subjects him to serious potential liability.  This is demonstrated

13   by the fact that, on April 4, 2013, Defendant Thompson announced his plan to resign as a

14   director of HP.  Thompson has also served as Senior Advisor to Aquiline Capital Partners LLC

15   since May 2009.  He previously served as Chief Financial Officer and Chairman of Wachovia.

16             47.    Defendant **RALPH V. WHITWORTH ("Whitworth")** currently serves as a

17   Director of HP and has since 2011.  Defendant Whitworth did not vote for the Autonomy

18   acquisition but was on the HP Board of Directors after the acquisition closed and was involved

19   with the $8.8 billion write-down and the decision to represent the write-down as relating only to

20   "accounting," instead of admitting that HP acquired a company with outdated technology.  On

21   March 20, 2013, Defendant Whitworth was named to lead the SLC.  The decision to name

22   Defendant Whitworth as the head of the SLC because he was the only member of the HP Board

23   of Directors who did not vote for the Autonomy acquisition is an admission that every single

24   director who either recommended going forward with the Autonomy acquisition or voted for it

25   cannot truly and fairly evaluate any potential claims against themselves for their role in the failed

26   acquisition.  Whitworth has been a principal of Relational Investors LLC since 1996.  Whitworth

27

28

is a former Director of Genzyme Corporation, Sovereign Bancorp, Inc., and Sprint Nextel

Corporation.  Whitworth resides in La Orilla Rancho Santa Fe, California.

48.     Defendant **LAWRENCE T. BABBIO, JR. ("Babbio")** served as a Director of

HP from 2002 through 2011.  Babbio supported the Autonomy acquisition and was on the Board

of Directors while the Autonomy acquisition was being considered.  ██████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████  Regardless, Defendant Babbio

recommended going forward with the Autonomy acquisition. Babbio has served as senior

advisor to Warburg Pincus since 2007. He previously held an executive level position for

Verizon Communications, Inc., and Bell Atlantic.

49.     Defendant **SARI M. BALDAUF ("Baldauf")** served as a Director of HP from

2006 through 2011.  Baldauf supported the Autonomy acquisition and was on the Board of

Directors while the Autonomy acquisition was being considered.  ████████████████

██████████████████████████████████████████████████████████

████████████████████████  Defendant Baldauf made no effort to demand

that a real due diligence of Autonomy's technology be conducted before HP spent $11.7 billion

to acquire the company.  Baldauf served as Executive Vice President and General Manager of

the Networks group for Nokia Corporation from 1998 until 2005.  Baldauf also served as a

Director for Daimler AG and two public companies headquartered in Finland.

50.     Defendant **DOMINIQUE SENEQUIER ("Senequier")** served as a Director of

HP in 2011.  Senequier supported the Autonomy acquisition and was on the Board of Directors

while the Autonomy acquisition was being considered.  Defendant Senequier was a member of

the Finance and Investment Committee.  ████████████████████████████

████████████████████████████████████████████████████████

---

LAW OFFICES
COTCHETT, PITRE
& McCARTHY, LLP

1

2

3

4             ▮▮▮▮▮▮▮▮▮  Nevertheless, Senequier recommended going forward with the

5   Autonomy acquisition.  Senequier served as Chairman and Chief Executive Officer of AXA

6   Private Equity. Senequier also served on the supervisory board of Schneider Electric SA and the

7   Board of Directors of Compagnie Industriali Riunite S.p.A.

8           51.     Defendant **SHANE ROBISON ("Robison")** is a former officer of HP who was

9   heavily involved in the Autonomy acquisition.  From May 2002 to November 2011, he served as

10  HP's Executive Vice President and Chief Strategy and Chief Technology Officer.   Defendant

11  Robison was a key figure in pushing forward with the Autonomy acquisition.  ▮▮▮▮▮▮▮

12

13

14

15

16

17

18

19  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  Defendant Whitman has

20  blamed Defendant Robison as a key culprit in the wrongdoing in an effort to protect herself and

21  the HP Board of Directors.  During 2011, HP awarded Robison over $9 million in total

22  compensation.

23  **D.      The Bank Defendants**

24          52.     Defendant **BARCLAYS CAPITAL ("Barclays")**, is a British multinational

25  investment bank headquartered in London, United Kingdom and is a division of Barclays Bank

26  plc.  Barclays, according to its own Annual Report in 2011 stated it "played a crucial role in

27  every aspect of the [Autonomy] transaction."  The Annual Report went on, "in addition to

28  providing strategic M&A advice on the transaction as well as delivering a fairness option to the

HP board of directors, Barclay's Capital acted as sole arranger and sole underwriter for a fully-committed $8.5 billion bridge facility to support the transaction, which was successfully syndicated to a select group of core relationship banks upon announcement.  Barclays Capital also led, and was billing and delivery agent for $4.6 of senior notes."  Barclays provides financing and risk management services to large companies, institutions and government clients. Barclays also served as a joint financial advisor and corporate broker to HP in connection with its acquisition of Autonomy.  Barclays received at least $18.1 million in fees, and as much as $30 million, for its role as a financial advisor to HP during its acquisition of Autonomy.  Barclays consciously disregarded numerous red flags that alerted it of Autonomy's potential accounting improprieties and resulting overvaluation.

53.     Defendant **PERELLA WEINBERG PARTNERS LP ("Perella")** is a limited partnership providing advisory and asset management services to corporations, institutions and governments.  Perella was one of the lead financial advisors handling the $11.7 billion acquisition of Autonomy by HP.  The Advisory business advises clients on mergers and acquisitions, financial restructuring, capital structure advisory, private capital raising, pension matters, strategic advisory, independent special committee advisory, and government services. Perella employs over 400 employees located in its New York, London, Abu Dhabi, Austin, Beijing, Denver, Dubai, and San Francisco offices.  Perella served as joint financial advisor to HP during its acquisition of Autonomy.  Perella received $12 million in fees for its role as a financial advisor to HP during its acquisition of Autonomy.  Perella consciously disregarded numerous red flags that alerted it of Autonomy's potential accounting improprieties and resulting overvaluation.

**E.     Relevant Non-Parties**

54.     Autonomy received financial advice from relevant non-parties Qatalyst Partners, UBS, Goldman Sachs, Citigroup, JPMorgan Chase and Bank of America Merrill Lynch.  As discussed herein, Qatalyst Partners, the investment bank run by Frank Quattrone, was the lead

advisor for Autonomy and Mr. Quattrone had long standing relationships with certain HP Board members, including a number of the Individual Defendants.  At least some of the Individual Defendants were improperly influenced by their relationship with Quattrone and Qatalyst Partners in agreeing to ignore the lack of due diligence and move forward with the Autonomy acquisition.

55.     According to published sources, Qatalyst, UBS, Goldman Sachs, Citigroup, JPMorgan Chase and Bank of America Merrill Lynch, received $35 million to $40 million in connection with the Autonomy acquisition.

56.     HP received legal counsel from several firms:  <u>Gibson, Dunn & Crutcher</u>, <u>Freshfields Bruckhaus Deringer</u>, <u>Drinker Biddle & Reath LLP</u>, and <u>Skadden, Arps, Slate, LLP, Meagher & Flom</u> (counsel to H.P.'s board).  Gibson Dunn & Crutcher acted as primary deal counsel in both the US and the UK for HP.  Freshfields Bruckhaus Deringer advised HP primarily on antitrust and Human Relations issues.  Drinker Biddle & Reath LLP provided HP with US antitrust advice.  Skadden Arps Slate Meagher & Flom acted as counsel to HP's board of directors and also gave advice on tax matters.

57.     Although Morgan, Lewis & Bockius is now representing nominal defendant HP, during the acquisition of Autonomy, Morgan Lewis did not represent HP.  Instead, Morgan Lewis served as a legal adviser to Autonomy.  Additionally, Autonomy received legal counsel from Slaughter & May.

**F.     Unnamed Participants**

58.     Numerous individuals and entities participated actively during the course of and in furtherance of the wrongdoing described herein.  The individuals and entities acted in concert by joint ventures and by acting as either agents for principals or as co-conspirators, in order to advance the objectives of the scheme and to provide the scheme to benefit defendants and themselves to the detriment of HP.

## G.    Aiding and Abetting

59.    At all relevant times, Defendants were the agents of each of the remaining Defendants, and in doing the acts alleged herein, were acting within the course and scope of such agency.  Defendants ratified and/or authorized the wrongful acts of each of the other Defendants.  Defendants, and each of them, are individually sued as participants and as aiders and abettors in the improper acts, plans, schemes, and transactions that are the subject of this Complaint.

60.    At all relevant times, Defendants, and each of them, pursued a conspiracy, common enterprise, and common course of conduct to accomplish the wrongs complained of herein.  The purpose and effect of the conspiracy, common enterprise, and common course of conduct complained of was, *inter alia*, to financially benefit Defendants, and each of them, by engaging in illegal, fraudulent, and wrongful activities.  Each Defendant was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and common course of conduct complained of herein, and was aware of his/its overall contribution to, and furtherance of, the conspiracy, common enterprise and common course of conduct.  Defendants' acts of conspiracy include, *inter alia*, all of the acts that Defendants, and each of them, are alleged to have committed in furtherance of the wrongful conduct complained of herein.

## IV.

## STATEMENT OF FACTS

## A.    A Brief History of the Hewlett-Packard Company

61.    The Hewlett-Packard Company is considered one of the founders of Silicon Valley.  HP was founded in 1939 by Bill Hewlett and Dave Packard in a one-car garage in Palo Alto, California.  HP was incorporated in 1947 and went public in 1957.  HP was one of the first technology companies in the world.  HP was one of the first companies to develop a profit sharing system, in which employees would share in corporate earnings.  Under Bill Hewlett and Dave Packard, HP created a work environment conducive to innovation and achievement, which became known as the "HP Way."  The "HP Way" is described as a work culture with "values that include uncompromising integrity, emphasis on teamwork to achieve common objectives

LAW OFFICES
COTCHETT, PITRE
& MCCARTHY, LLP

and encouraging flexibility and innovation."  One of the key focuses of the "HP Way" was **"uncompromising integrity."**

62.     HP's initial growth was in the areas of data printing, medical electronics and analytical instrumentation in the United States.  Shortly after going public in 1957, HP began selling its products to international markets.  By 1976, HP sales surpassed $1 billion and in 1977, the founders named John Young the next President of HP and he became CEO in 1978.  In 1984, HP created a new, inexpensive market for printing with the debut of the ThinkJet printer and the LaserJet Printer.  These have been HP's most successful products and printers continue to be a major part of HP's business today.  Lewis E. Platt succeeded Young as CEO in 1992.  By 1995, HP's product lines included electronic test and measurement instruments and systems for chemical analysis, handheld calculators and electronic components, as well as computer and computer-related products and services.

63.     In July of 1999, HP named Carly Fiorina as the next CEO of HP after Platt retired.  In September of 2001, Fiorina announced the controversial merger with Compaq, a leading PC hardware manufacturer and an industry competitor of HP's.  Fiorina fought for the merger, and it was implemented despite strong opposition from board member Walter Hewlett, Bill Hewlett's son.  The Compaq merger proved harmful to HP as the company lost half of its market value under Fiorina's leadership.  In 2005, Fiorina was asked to resign by the HP Board of Directors, citing different views of how to execute HP's future strategies.  In March of 2005, Mark Hurd was named the new CEO of HP.  The battle over the Compaq merger and Carly Fiorina's time as CEO changed the culture at HP.  The same company that Bill Hewlett and Dave Packard had founded during the Great Depression had become a divided company with board members and officers in constant battle with each other.

**B.     Mark Hurd Rejects Autonomy Acquisition**

64.     From March of 2005 until August of 2010, Mark Hurd, an experienced Silicon Valley executive, served as the CEO of HP.  Mark Hurd's focus was on aggressive cost-cutting to improve HP's profitability.  Mark Hurd laid off 15,200 workers, reduced the IT department

from 19,000 to 8,000, reduced the number of software applications that HP used from 6,000 to 1,500, and consolidated HP's 85 data centers to 6.  Hurd imposed a 5% pay cut on all employees and removed many benefits.

65.     While cost-cutting was a short-term solution for profitability, Mark Hurd also understood that HP needed to return to innovation.  During Mark Hurd's tenure, HP had spent a lot of time and resources attempting to determine how to gain traction in the enterprise software field, a highly profitable business.  As part of that internal analysis, HP spent considerable amounts of time conducting due diligence regarding how best to position itself in the enterprise software industry.  Under Mark Hurd's leadership, the decision was made to develop this functionality organically using internal resources and personnel.  There were discussions about potential acquisitions to gain this functionality but that approach was rejected.  One of the companies that was considered during that time period was Autonomy.  For fiscal year 2009, Autonomy had annual revenues of approximately $740 million.  During that time period, Autonomy was never considered a serious acquisition target by HP, especially not at the inflated price that Autonomy was seeking.  HP's cursory initial review of Autonomy was not to go forward with an acquisition, especially not for an inflated price that was in the multiples of revenue and was far outside business norms.

**C.     HP's Recent History of Bad Deals and Failures**

66.     HP has had a history of bad deals, leading back to the Compaq merger in 2001. For almost a decade, HP had been struggling to innovate and transform itself into a leader in the technology industry, and not just a hardware maker.  Its main line of business, hardware manufacturing, was a low-margin business that had become stagnant.  With single digit profit margins, HP had remained profitable only because of extensive cost-cutting for years under the leadership of former CEO Mark Hurd.  These issues led to HP's attempts to use mergers and acquisitions to solve its business problems.

67.     Within a year of HP's announcement of the $8.8 billion Autonomy write-down, HP announced an $8 billion Electronic Data Systems ("EDS") write-down and the $1.67 billion

Palm write-down, along with HP's decision to close down Palm's webOS operating system business.  These write-downs explain why HP has not been honest about the real reason for this latest $8.8 billion write-down.  By blaming the vast majority of the latest Autonomy write-down on accounting "fraud," HP hopes to conceal the mismanagement and failings of its officers and directors on a much larger and widespread scale.

68.     On <u>May 13, 2008</u>, HP announced it was acquiring EDS, an electronic data processing management company founded in 1962 by H. Ross Perot for $13.9 billion.

69.     On <u>April 28, 2010</u>, HP announced a $1.2 billion all-cash acquisition of Palm, Inc. ("Palm"), a former leader in the mobile device space.  HP intended to develop a new tablet device, the HP TouchPad, using the Palm webOS operating system.  The TouchPad failed miserably.  On <u>August 18, 2011</u>, the same day that it announced the Autonomy acquisition, HP announced that it was discontinuing its webOS smartphone and tablet businesses, about a year after the Palm acquisition.  In <u>November of 2011</u>, HP took a $1.67 billion write-down of the Palm business, a write-down larger than the acquisition itself.

70.     On <u>August 8, 2012</u>, HP took an $8 billion write-down due to a goodwill impairment related to the EDS acquisition.  This write-down, on top of the Palm write-down, equated to approximately $10 billion in write-downs of shareholder value in about one year.

71.     The foregoing background is important to understanding what led HP into the Autonomy acquisition and why HP and its officers and directors would misrepresent the truth regarding the Autonomy acquisition and the $8.8 billion write-down announced on <u>November 22, 2012</u>.  The Autonomy acquisition was driven by HP's history of bad deals.  HP was desperate to enter into the business enterprise software business and earn the higher profit margins that would result from that business.  HP therefore was prepared and willing to bypass appropriate due diligence protocols in order to force the acquisition of Autonomy through.  This background of bad deals also explains why HP made misrepresentations about the nature of the $8.8 billion write-down related to the Autonomy acquisition.

72.     The Individual Defendants further abdicated their duties by consciously ignoring red flags regarding the Autonomy acquisition. The knowledge of recent acquisition failures should have caused HP to scrutinize the Autonomy deal much more closely, ask more questions of HP's advisors, and apply healthy skepticism to the proposal to acquire Autonomy for $11.7 billion. ███████████████████████████████████████████ ██████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████ █████████ Nonetheless, the Individual Defendants took no action to terminate the acquisition, conduct any due diligence, or take any steps to investigate the red flags.  Instead, HP's Board of Directors agreed to spend $11.7 billion on a small U.K. company without any independent verification that anything Autonomy had represented to it was true.

73.     It is evident that HP and its Board of Directors are unwilling and unable to review this situation in a fair and objective manner.  Many of the HP Board of Director Members, including Defendant Lane and others have been long-time Board members who have guided and directed HP's business strategy over the last few years.  That has included the debacle of the merger between HP and Compaq, which ultimately resulted in its former CEO Carly Fiorina being forced to resign.  That also includes HP's botched acquisitions of EDS and Palm, Inc.

74.     In the face of these recent disastrous occurrences at HP, when the decision was made to write down the value of the Autonomy transaction, HP misrepresented the truth behind the write-down.  HP's officers and directors have also knowingly made false statements to the press and to the public about its products, misstatements that would expose HP's officers and directors to fraud claims.  HP knew that it had bought an outdated product, named IDOL 7, and that it had misrepresented that Autonomy could and would deliver a revolutionary integrated enterprise search platform.  By trying to blame $5 billion worth of the write-down on fraud at Autonomy, HP hopes to avoid criticism of its history of bad deals and failing business strategy,

as well as the fraudulent acts of HP's own officers and directors.  HP's directors therefore cannot be trusted to be disinterested in evaluating potential claims against themselves.

**D.      Road to Autonomy: Léo Apotheker Becomes New CEO**

75.      Autonomy, founded in 1996, was focused on high-margin software development for business.  Autonomy's main technology, referred to as 'Intelligent Data Operating Layer' ("IDOL") allows a company to search and process information from databases, audio files, video files, text files or streams.  The purpose of this technology is to understand forms of unstructured information and then conduct searches of that information.  For example, text-based searching is a relatively straightforward process if the data is text-searchable.  Autonomy's technology sought to expand that search process to formats that are typically not susceptible to that type of search. This technology also seeks to learn from users and infer what information the user is seeking.  In 1996, IDOL was a revolutionary product in the enterprise search field.  However, Autonomy had not updated its technology and by 2011, IDOL was facing serious competition from multiple products that were as good as, if not better than IDOL.

76.      The business justification for Autonomy that would justify an $11.7 billion price tag would have to be extraordinary to support this acquisition.  In August of 2010, Mark Hurd resigned as CEO of HP after an internal probe uncovered an unreported relationship with Jodie Fisher, a former HP employee.  In November of 2010, Léo Apotheker replaced Mark Hurd as the CEO of HP.  Apotheker, the former head of German software company SAP, had no experience managing a company the size of HP and lacked a strong knowledge of technology that an HP executive needed.  After Apotheker arrived, a number of SAP loyalists soon joined him, including Martin "Marty" Homlish, a marketing executive at SAP who became an Executive Vice President of HP and its Chief Marketing Officer.

77.      Shortly after Apotheker's ascension, the decision was made to acquire Autonomy. Desperate to move out of the low margin hardware business, Apotheker and HP began looking around to find an acquisition that would allow HP to "transform" and move into the higher end software business.  According to the Wall Street Journal knowledgeable confidential sources

LAW OFFICES
COTCHETT, PITRE
& MCCARTHY, LLP

inside HP, Apotheker was trying furiously to find a way to move HP away from the low margin computer hardware business and into the lucrative corporate software and services area.  These same confidential sources have told reporters that Apotheker contacted a number of potential acquisition targets, including telecom software companies Comverse Technology and Amdocs, and corporate software maker Tibco Software.  Those overtures went nowhere.

78. ███████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████████
████████████████████████████████████████████   ███████████████████
███████████████████████████   ████████████████████████████████████████
█████████████████████████████████████████████████████████████████
████████████████████

79. █████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████

LAW OFFICES
COTCHETT, PITRE
& MCCARTHY, LLP

80.

81.     The project to acquire Autonomy was led by SAP executives who had come to HP with Defendant Apotheker, including Marty Homlish and Jerome Levadoux, two high-ranking SAP marketing executives.  The purported justification for the acquisition was to get into the "Big Data" field.  "Big Data" is a reference to the technology that is used to comb through mountains of corporate data to find information that is useful for a specific person or project.  For example, a search engine like Google is a powerful consumer tool but corporations, especially large ones, require more powerful and customized products, something that Autonomy had helped pioneer in 1996.  However, by 2011, Autonomy's product was five years old and it

was facing serious competition.  For fiscal year 2010, Autonomy announced revenues of approximately $870 million and net profits of approximately $292 million.  Those figures, however, were driven by acquisitions and not organic growth, which HP knew when it made the decision to acquire Autonomy.

82.



83.

LAW OFFICES
COTCHETT, PITRE
& McCARTHY, LLP



86.

87.

88.

89.

LAW OFFICES
COTCHETT, PITRE
& McCARTHY, LLP



90.     This same month, Apotheker met with Autonomy founder Mike Lynch at Deauville on the Normandy Coast, a seaside resort in France and reached a handshake agreement on the $11.7 billion acquisition.  According to a November 30, 2012 *Reuters* article, citing more than a dozen confidential sources directly connected to the Autonomy acquisition or the accounting investigation, HP was so desperate to change its business fortunes that it performed no due diligence in reviewing Autonomy's financial statements.  HP also did nothing to review the actual technology or product.  In fact, according to many technology analysts Autonomy's IDOL 7 was a five-year-old product that was facing increasing competition from many other companies.

91.     According to a source at HP with knowledge of the deal, "[w]hat happened is he [Apotheker] talked to Autonomy and they got into a dialogue and he told the board that we have to do something."  The source described the Autonomy acquisition as "[i]t was out of frustration and desperation to a large degree."

92.     After the July 19-21, 2011 Board meeting and Apotheker's meeting with Lynch in France, HP brought in investment bank Barclays and boutique firm Perella as HP's financial advisors on the deal.

**E.      Contrary to Public Statements, KPMG Did Not Audit the Work of Deloitte, Autonomy's Auditor**

93.   ███████████████████████████████████████████

███████████████████████ Contrary to the express representations of Defendants Apotheker and Whitman, KPMG was not hired to audit Autonomy or the work of Autonomy's auditor – Deloitte — in connection with the Autonomy acquisition. ██████████████████

████████████████████████████████████████████

████████████████████ KPMG has publicly stated, contrary to Defendant Whitman's statement, that KPMG was not retained to audit Deloitte's work.  "KPMG was not engaged by HP to perform any audit work on this matter,…The firm's only role was to provide a limited set of non-audit related services.  **KPMG did not audit or oversee the work being questioned regarding Deloitte's audit of Autonomy, nor did KPMG review Deloitte's work papers as part of this engagement**.  Within the narrow scope of non-audit tasks KPMG did perform, we can say with confidence that we acted responsibly and with integrity.  Our professional obligations and client confidentiality agreements prevent us from speaking in any greater detail without HP's consent."

94.   ███████████████████████████████████

██████████████████████████ ████████ ████████████

████████████████████████████████████████

95.   ███████████████████████████████████

████████████████████████████████████████

███████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████

96.   ███████████████████████████████████

97.

98.

99.



LAW OFFICES
COTCHETT, PITRE
& McCARTHY, LLP



**F.**

102.

CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT                    40

LAW OFFICES
COTCHETT, PITRE
& McCARTHY, LLP

103.



104.

LAW OFFICES
COTCHETT, PITRE
& McCARTHY, LLP

105.

106.

107.



108.    Schultz also stated during that November 20, 2012 call that, "[f]rom an accounting perspective, there were improprieties, but also there were severe disclosure failures."

109.

110.

111. ████████████████████

███████████████████████████████
███████████████████████████████
█████████████████

112. ██████████████████████

█████████████████████████████████
████████████████████████████████
██████

113. █████████████████████

█████████████████████████████████
████████████████████████████████
████████████████████████████████
███████████████

114. ██████████████████████

█████████████████████████████████
█████████████████████████████████
████████████████████████████████
█████████████████████████████████
█████████████████████████████████
████████████████████████████████
██████████████████████

115. ████████████████████

█████████████████████████████████
█████████████████████████████████
██████████████████████████
█████████████████████████████████

LAW OFFICES
COTCHETT, PITRE
& McCARTHY, LLP

1 ███████████████████████████████████████████████████

2 ███████████████████████████████████████████████

3 ███████████████████████████████████████████████████

4 █████████████████████████████████████████████████

5 ████████████████████████████████████████████████████

6 ███████████████████████████████████████████████████

7 ██████████████████████████████████

**G.     HP Ignored Other Warnings About the Propriety of Acquiring Autonomy**

116.     ████████████████████████████████████████████████████

████████████████████████████     HP's CFO, analysts, other potential acquiring companies

and investment firms all publically commented on the impropriety and overpricing of Autonomy.

**1.     HP's Chief Financial Officer Warned HP Against the Autonomy Acquisition**

117.     Even at the time of Autonomy's acquisition, there were serious questions raised

about the acquisition, both internally and from outsiders.  According to *Fortune*, in a meeting

with the HP Board of Directors, HP CFO Catherine Lesjak adamantly opposed the deal, telling

the Individual Defendants that the acquisition price was too high.  Lesjak told the HP Board of

Directors and its officers that the acquisition price, which was eleven times Autonomy's revenue,

was too high when compared to similar companies that were selling for three times their revenue.

According to *Fortune*, Lesjak made an impassioned case against the acquisition before the HP

Board of Directors.  "I can't support it," Lesjak told the directors, according to a person who was

present at the HP Board of Directors meeting, "I don't think it's a good idea.  I don't think we're

ready.  I think it's too expensive.  I'm putting a line down.  This is not in the best interests of the

company."

118.     Defendants were therefore well aware that the price they were paying for

Autonomy was well beyond the normal acquisition price for similar companies in the industry.

Knowing that HP was going to spend almost four times more than the price for similar

companies, the Individual Defendants should have conducted more rigorous due diligence.

Instead, HP's Board of Directors agreed to acquire Autonomy after conducting minimal to no due diligence.

**2.     There Were Public Reports of Improprieties at Autonomy**

119.     HP CFO Lesjak was not alone in being concerned about the Autonomy acquisition.  Many business and investment analysts who had followed Autonomy, were aware of red flags at Autonomy. ███████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████ In interviews by *The Wall Street Journal* with former Autonomy employees, Autonomy business partners, and attorneys close to HP and Autonomy, they described a hard-driving sales culture at Autonomy which was driven towards rapid growth.  Mike Lynch was described as a domineering character who often berated employees who he didn't feel were measuring up.  According to these sources, Autonomy used aggressive accounting practices to make sure revenue from software licensing kept growing.

120.     Other sources, ████████████████, stated that Autonomy was aggressive in recognizing revenue upfront, instead of deferring revenues to when those revenues were actually earned.  This type of aggressive accounting inflates company revenues but it is detectable if appropriate due diligence is conducted. ███████████████████████████████

███████████████████████████████████████████

██████████████████████████████ this was an area of concern that HP should have scrutinized, especially given the size of the acquisition. █████████████████████████

████████████████████████████████████████

█████████████████████

121.     Similarly, Autonomy was known to have engaged in "round-trip transactions" in which corporate entities buy and sell goods and services from each other.  For example, if Company A sells $100 worth of apples to Company B and Company B sells $100 worth of apples to Company A, there is no meaningful business transaction but both can claim to have

**CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT**                    48

LAW OFFICES
COTCHETT, PITRE
& MCCARTHY, LLP

1    earned revenues of $100. These types of transactions have been notorious, especially in the

2    technology sector, for inflating revenues, especially if both companies have no need for those

3    goods or services. █████████████████████████████

4    ████████████████████████████████████████

5    ████████████████████████████████████████████

6    ████████████

7        122.    One example of a "round-trip transaction" is the deal that Autonomy entered with

8    VMS Information, a transaction that was known to HP, its auditor KPMG and its financial

9    advisors Barclays and Perella. According to Peter Wengryn, the former CEO of VMS

10   Information, in July of 2009, Autonomy sold $9 million in software to VMS Information while

11   at the same time Autonomy agreed to buy about $13 million worth of licenses for data from

12   VMS Information. According to three people familiar with the matter, Autonomy recognized the

13   $9 million in software sales as top line revenue, a key indicator for Autonomy. Autonomy then

14   buried the cost of the data licenses from VMS Information as part of Autonomy's sales,

15   marketing or other expenses, a part of the income statement that is usually not considered a key

16   indicator for growing technology companies like Autonomy.

17       123.    HP knew that revenue recognition was an accounting red flag at Autonomy.

18   While HP now claims it "discovered" that revenue recognition was a problem post-transaction,

19   this is disingenuous. HP knew before that transaction that revenue recognition was an identified

20   problem but went ahead with the acquisition without performing requisite due diligence in

21   advance. KPMG has publically stated, its review was limited to publically available documents

22   and it did not audit Autonomy's accounting or the work done by Deloitte.

23       124.    According to Peter Wengryn, the size of Autonomy's purchase from VMS

24   Information played a major role in the size of VMS Information's reciprocal purchase from

25   Autonomy. Wengryn told *The Wall Street Journal*, "[t]he fact that they [Autonomy] were

26   interested in licensing our [VMS Information] data certainly made that type of deal easier, no

27   doubt about it." Wengryn added that "[w]e were interested in doing a deal, but maybe not of the

28

magnitude that we ended up doing." In another deal, Autonomy sold £4 million ($6.4 million) in products to a reseller company called Tikit Group plc. Autonomy immediately recognized the entire amount as top line revenue. However, Tikit Group was only a reseller of products and did not pay Autonomy until later, when Tikit Group sold Autonomy's software to end clients. Autonomy claimed that the delivery of products to the reseller constituted revenue. ███████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████

████████████

125.    Similarly, HP claims it was not informed of a situation where a U.S. executive of Autonomy was fired in 2010 after allegedly expressing concerns about Autonomy's revenue recognition practices. A spokeswoman for Mike Lynch, the former CEO of Autonomy, stated that this entire incident was disclosed to HP and came up during HP's due diligence process. HP nevertheless went forward with the deal.

126.    Put simply, even analysts and companies that had no vested interest in HP's acquisition of Autonomy knew that there were serious red flags at Autonomy. █████████

███████████████████████████████████████████████████

████████████There had been no independent due diligence conducted of Autonomy by HP or anyone hired by HP. █████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████

████████████████████████████ Any assertion by HP's Board of Directors that they received "comfort" that there were no material concerns regarding Autonomy is, by its nature, false.

127.    For several years, industry experts had been raising red flags related to Autonomy's accounting practices and claims of continuous growth.

LAW OFFICES
COTCHETT, PITRE
& McCARTHY, LLP

**CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT**                    50

128.     In 2007, Dan Mahoney of the accounting research firm CFRA, who covered Autonomy until it was acquired by HP, described Autonomy as having all the hallmarks of a company that recognized revenue too aggressively.  According to Mahoney, the reason for implementing revenue recognition standards is because revenue that is recorded, but not-yet collected from customers, is at risk of not being paid.  In that case, a company would be claiming to have made a certain amount of money in revenues when that money may never actually be paid to the company.  "The rules aren't that complicated," Mahoney stated in a *The Wall Street Journal* article.  Companies have been engaging in aggressive revenue recognition and "round-trip" transactions for years and it is a well-known mechanism for accounting fraud that HP and its auditors and financial advisors knew or should have known about.  These are areas that warranted significant due diligence, especially considering the size of the transaction.  Instead, HP was intent on closing the Autonomy acquisition without conducting appropriate due diligence.

129.     In July of 2009, James Chanos of Kynikos Associates LP, an investment firm, criticized Autonomy's accounting.  Software companies typically rely heavily on service contracts in which revenue is earned over the life of the contract and thus a large portion of revenue is deferred.  According to Kynikos, Autonomy's deferred revenues were suspiciously low for a software company.  The low deferred revenue was an indicator that the revenue being reported was not good revenue linked to the sale of a strong, in-demand product.  Kynikos believed that Autonomy might have hidden its underperformance with acquisitions.  This was known to HP during its review of Autonomy prior to HP's acquisition.  The fact that Autonomy's growth was driven by acquisition was not a secret.  HP knew that there was little organic growth at Autonomy.  Autonomy was the same company that Mark Hurd had rejected in 2010 and before, and it was the same company that Apotheker pushed to acquire for a whopping $11.7 billion in 2011.

130.     According to James Chanos, in describing HP's acquisition of Autonomy, "[t]his whole thing is a debacle and probably should have never happened."  Chanos added that "[w]e

**CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT**          51

had been short Autonomy in our European fund in 2010 and 2011, and watched in horror as it was taken out at a big premium by Hewlett-Packard.  It was one of our absolute favorite shorts at the time."  Chanos stated that the accounting problems were **hard to miss** and characterized HP's decision to ignore the warning signs as constituting "willful blindness."  Chanos added that "[i]t was pretty clear if you look at Autonomy's books over time that it was a very, very aggressive roll-up."  HP knew that Autonomy was buying other companies, writing them down and putting the goodwill on its books.  HP's own internal review showed all of this information.  Chanos recognized this type of accounting scheme as what "most accounting mavens know is a real way to play earnings games if you want to."

131.    Autonomy also had poor cash conversion rates, a fact reported by analysts and known to HP.  This meant that Autonomy was not able to generate sufficient cash, another warning sign that Autonomy's product was not the top-of-the-line product that Autonomy was promoting.  This also indicates that Autonomy's growth was being built on transactions like acquisitions, not organic business growth.  In an October 31, 2009 article, the *Daily Telegraph* questioned Autonomy's cash conversion rates.  The article noted that Autonomy's cash conversion rate "should ring alarm bells for investors."  According to one analyst at KBC Peel Hunt in July 2010, "[t]here is always something of concern with Autonomy, whether it is poor cash conversion or increased research and development capitalization."

132.    In June of 2010, Deutsche Bank analyst Marc Geall wrote a detailed report on the problems at Autonomy.  Geall had formerly worked at Autonomy, where he ran a software division and also served as head of investor relations and corporate strategy.  Geall was highly critical of Autonomy's management and business model, stating that the management structure, controls and systems at Autonomy were "more representative of a start-up than a major global player."  According to Geall, Autonomy's service business was "too lean" and "risk[ed] falling short of standards demanded by customers."  HP was well aware that Autonomy was not investing in its own technology and that its technology was outdated and not competitive.

133.    In September 2010, analyst David Khan of J.P. Morgan called Autonomy's latest quarterly earnings report "very disappointing" and that its earnings momentum appears to be negative."

### 3.    Analysts Warned of Autonomy's Outdated Technology

134.    Technology analysts were also well aware of the limitations of Autonomy.  On September 2, 2011, Forrester Research, a well-known technology research firm, published a reported entitled *Market Overview: Enterprise Search*, which was an overview of the market in which Autonomy was in.  That report identified multiple competitors for Autonomy, many of whom, like Vivisimo, had products that were as good as, if not better than Autonomy's.  In describing Autonomy, the Forrester report states:

> "**Autonomy.**  Autonomy is an established player with robust functionality; it has been at the forefront of trends like multimedia search, intent-based recommendations, and hierarchical facet blending. **But it lacks transparent product management practices, making it difficult for customers to plan their road maps; there has not been a major version release in more than five years.**  Also, clients report difficulty with its connectors.  IDOL has particularly strong security features and has a robust "Control Center" where administrators can set up "watch lists" to track production issues. IDOL is not for amateurs, but the product does offer a simplified interface into some intricate functionality, such as relevance tuning, and provides a range of APIs for integration with other applications.  IDOL requires a significant financial investment and a dedicated administration team to operate to its full potential."

135.    When HP made the decision to buy Autonomy, it knew, because of this report and others, that it was acquiring an outdated product that was not user-friendly.  Autonomy was known for having a product that was difficult to use and needed to be highly customized for specific clients.  This was not a product that could be easily sold.  Nevertheless, HP paid an unprecedented premium to acquire Autonomy and its outdated product.  HP was desperate to be able to claim that the acquisition gave it a competitive advantage in the "Big Data" field by having a next generation integrated information platform.  HP, along with others in the enterprise search space knew that Autonomy was not a valuable company and certainly not worth $11.7 billion, an astronomical premium over Autonomy's reported revenues and profits.

136.    After the announcement, analysts slammed HP's purchase.  Kevin Hunt of Auriga USA, LLC stated that HP is "massively overpaying" for Autonomy and Deutsche Bank analyst Chris Whitmore predicted that Autonomy would "destroy" the value of HP's stock.

137.    Leslie Owens, a Forrester Research analyst, has criticized Autonomy, stating that the company "didn't invest in R&D; they didn't have regular software releases; they weren't transparent with a road map of where they were going; they didn't seek customer feedback."  In providing further criticisms of Autonomy, Owens added that "customers complained, but the promise of managing all their information and making better decisions was so attractive.  They bought more."  Owens and Forrester Research have been outspoken critics about Autonomy's lack of technological innovation, and their statements were disseminated to the public.  HP, as a purported leader in information technology, would certainly have reviewed industry reports about a company before agreeing to spend $11.7 billion to acquire that company.  As such, HP's Board of Directors knew that Autonomy's IDOL product was not transparent and was outdated.  It was gross mismanagement that led HP to spend an unprecedented premium for a company with outdated technology.

### 4.    Other Companies Refused to Acquire Autonomy

#### a.    Oracle Warned HP of Autonomy's Overvaluation

138.    Shortly after the announcement of the acquisition of Autonomy, Larry Ellison, the CEO of Oracle Corporation, warned HP that the Autonomy acquisition was a mistake.  Ellison disclosed on a conference call that Autonomy had tried to sell itself to Oracle in 2010, a process led by Quattrone.  Ellison stated that Oracle had "taken a pass" on Autonomy and also stated that HP had paid an "absurdly high" price for Autonomy.  Ellison stated publically that Autonomy was overvalued even at $6 billion and that a $6 billion price tag for Autonomy was "way too high."  HP would go on to pay nearly twice that amount for Autonomy.

139.    After the conference call, Mike Lynch immediately disclaimed trying to shop Autonomy, claiming that Ellison was telling falsehoods.  In response, Ellison disclosed details

LAW OFFICES
COTCHETT, PITRE
& MCCARTHY, LLP

about his meetings with Mike Lynch.  In a press release dated <u>September 28, 2011</u>, Oracle set out preliminary information about the meeting, saying that Mike Lynch's denials of trying to sell Autonomy to Oracle were untrue.  The press release stated:

**Oracle Issues Statement**

REDWOOD SHORES, Calif., September 28, 2011

Oracle issued the following statement:

"After HP agreed to acquire Autonomy for over $11.7 billion dollars, Oracle commented that Autonomy had been 'shopped' to Oracle as well, but Oracle wasn't interested because the price was way too high.  Mike Lynch, Autonomy CEO, then publically denied that his company had been shopped to Oracle.  Specifically, Mr. Lynch said, 'If some bank happened to come with us on a list, that is nothing to do with us.'  Mr. Lynch then accused of Oracle of being 'inaccurate'.  **Either Mr. Lynch has a very poor memory or he's lying.**  'Some bank' did not just happen to come to Oracle with Autonomy 'on a list.'  The truth is that Mr. Lynch came to Oracle, along with his investment banker, Frank Quattrone, and met with Oracle's head of M&A, Douglas Kehring and Oracle President Mark Hurd at 11 am on April 1, 2011.  After listening to Mr. Lynch's PowerPoint slide sales pitch to sell Autonomy to Oracle, Mr. Kehring and Mr. Hurd told Mr. Lynch that with a current market value of $6 billion, Autonomy was already extremely over-priced.  The Lynch shopping visit to Oracle is easy to verify.  We still have his PowerPoint slides."

140.    In a second <u>September 28, 2011</u> press release entitled ***Another Whopper from Autonomy CEO Mike Lynch***, Oracle provided additional details about that meeting:

**Another Whopper from Autonomy CEO Mike Lynch**

REDWOOD SHORES, Calif., September 28, 2011

Oracle issued the following statement:

"Autonomy CEO Mike Lynch continues to insist that Autonomy was never 'shopped' to Oracle.  But now at least he remembers and admits to meeting with Oracle President Mark Hurd and Doug Kehring, Oracle's head of M&A, this past April. But CEO Lynch insists that it was a purely technical meeting, limited to a 'lively discussion of database technologies.'  Interesting, but not true.  The slides Lynch showed Oracle's Mark Hurd and Doug Kehring were all about Autonomy's financial results, Autonomy's stock price history, Autonomy's Price/Earnings history and Autonomy's stock market valuation. Ably assisting Mike Lynch's attempt to sell Autonomy to Oracle was Silicon Valley's most famous shopper/seller of companies, the legendary investment banker Frank Quattrone.  After the sales pitch was over, Oracle refused to make an offer because Autonomy's current market value of $6 billion was way too high.

We have put Mike Lynch's PowerPoint slide sales-pitch up on the Oracle website – Oracle.com/PleaseBuyAutonomy – with the hope Mike Lynch will recognize his slides, his memory will be restored, and he will recall what he and Frank Quattrone discussed during their visit to Oracle last April.  Yesterday, the Autonomy CEO did not remember having any meeting with Oracle.  Today, he remembers the April meeting and inaccurately describes how it came about and what was discussed (see next paragraph). Tomorrow, he will need to explain his slides.

Mike Lynch describes his meeting with Oracle: "On one of my trips to SF (April 2011), Frank Quattrone whom I have known for a long time offered to introduce me to Mark Hurd.  Oracle was a customer and I have never met him, so it was a good opportunity. Frank does this from time to time on my visits, he has introduced me to many people. . NOTE: Frank was not engaged by Autonomy and there was no process running. The company was not for sale.  I recall meeting with Mark and someone else I believe called Doug.  At the start of the meeting they joked that Frank was there to sell them something. Frank and I made it clear that was not the case.  We then met and had a lively discussion about database technologies.  The meeting lasted approximately 30 mins.  Frank is happy to confirm this."

141.     This entire situation occurred before the closing of the Autonomy acquisition and was known to HP.  Attached to this complaint as **EXHIBITS 2 and 3** are copies of the Powerpoint presentations that Mike Lynch provided to Oracle when it was shopping itself, which Oracle made publically available.  In the Powerpoint presentation that was provided to Oracle back on <u>January 24, 2011</u>, Autonomy was valued at $5.7 billion, approximately a six times revenue multiple.  Even that was a high number, given the fact that Autonomy's product was outdated and it was struggling in a highly competitive market.  Oracle rejected Autonomy, saying the price was too high for the company.  Eight months later, HP would pay more than **twice that amount** to acquire Autonomy.  The battle between Oracle and Mike Lynch, which resulted in Oracle publishing documents contradicting Mike Lynch's statements, also showed that Mike Lynch and Autonomy warranted additional due diligence.

142.     HP's Board of Directors, however, refused to listen to Oracle because of bad blood.  HP's former CEO, Mark Hurd, was now the President of Oracle.  The current CEO of HP, Defendant Apotheker was, at that time, part of a lawsuit between Oracle and SAP, where Defendant Apotheker was formerly the CEO.  SAP had admitted to violating Oracle's copyrights and was in the midst of a lawsuit pending before the Northern District of California.  Defendant Apotheker had a personal feud with Oracle and was threatened with a trial subpoena if he

showed up in Palo Alto on the day of his appointment as CEO of HP.  Defendant Lane, the Chairman of the HP Board of Directors and one of the guiding forces behind the Autonomy acquisition, also had his own personal issues with Oracle.  A former officer and director of Oracle, he was pushed out by Larry Ellison.

### b.   Dell Rejected Autonomy Acquisition Proposal Because It Was "Overwhelmingly Obvious" that Autonomy Was Overvalued

143.   Michael Dell, the CEO of Dell Inc. came forward in an interview with the U.K.'s *The Sunday Telegraph* revealing that Autonomy had also shopped itself to Dell.  Michael Dell told *The Sunday Telegraph* that he rejected the British software company's efforts to sell itself to Dell, stating that it was "overwhelmingly obvious" that it was overpriced.  Michael Dell added that "any reasonable person" would have drawn the same conclusion.  In discussing the huge premium paid by HP to acquire Autonomy, Michael Dell stated that "the premium that you pay is in some way a measurement of the risk that you're willing to take on.  If you pay a small premium relative to the market's then current opinion, you are actually not taking on very much risk, but if you pay an unbelievably large premium, you are taking on an unbelievably large risk."  HP's officers and directors took an unbelievably large risk in paying an unprecedented premium to acquire HP.  Such a large risk was unwarranted, especially in light of Autonomy's outdated technology, the known accounting issues, and the massive red flags fluttering everywhere around Autonomy.

### c.   HP's Former CEO Mark Hurd Rejected Autonomy As Overvalued

144.   During the time that Mark Hurd was the CEO of HP, Autonomy had been one of the companies on HP's radar as a potential acquisition target.  That review process had never gone very far, however, since Hurd did not believe that Autonomy added value to HP and was not worth a high premium to acquire.  Nevertheless, shortly after Hurd's departure, Defendant Apotheker and HP's Board of Directors began actively pursuing Autonomy because they were desperate for a "transformative" deal to change HP.  For personal reasons unrelated to the business case, they were unwilling to listen to Oracle, which had provided evidence showing that

1   Autonomy was overpriced at $5.7 billion. This was known prior to the closing of Autonomy,

2   which was later priced at $11.7 billion.  Ignoring all of the red flags and warning signs, HP

3   pushed forward with the acquisition of Autonomy.

### 5.   HP Knew of Problems at Autonomy That Warranted Additional Due Diligence

6   145.   HP was well aware of numerous problems at Autonomy that warranted further

7   due diligence.  Software companies generally have high unearned income on their profit and loss

8   statements and balance sheets.  This is because software companies typically sell licenses that

9   provide revenue over the life of the license.  Software companies generally have lower

10  immediate receivables since they are not selling physical products for which revenue is earned

11  immediately.  Autonomy was different from other software companies, reporting unusually high

12  receivables and lower unearned income. This was a red flag.

13  146.   HP knew all of this information when it acquired Autonomy.  The internal

14  investigation that HP claims it is doing now is the exact same due diligence that it could have

15  done and should have done back in 2011.  For fiscal year 2010, Autonomy booked revenues of

16  $870 million, receivables at $330 million, and deferred revenue at $177 million.  Recently, HP

17  has claimed that Autonomy was selling more hardware products than it had first claimed at the

18  time of the acquisition.  HP also now claims that it did not know Autonomy was recording more

19  revenue upfront than it should have.  Public documents, including Autonomy's financial

20  statements and the information contained in Autonomy's sales pitch presentation to Oracle

21  contained all of the red flags needed to detect this type of problem.  The Defendants in this case,

22  which consist of the officers and directors of HP, and investment banking advisors all knew of

23  this information.

25  147.   ██████████████████████████████████

26  ████████████████████████████████████████

27  ████████████████████████████████████████

28  ████████████████████████████████████

LAW OFFICES
COTCHETT, PITRE
& McCARTHY, LLP



148.

149.     All of this information was readily available to HP and its army of accountants, bankers, and lawyers in reviewing Autonomy prior to the acquisition.  The reality is that the $8.8 billion write-down is not only for the reasons that HP is claiming.  HP knew full well all of the

accounting problems at Autonomy, including the potential revenue recognition problems, capitalization of research and development that inflated margins and the fact that Autonomy's growth was inflated through acquisitions and did not come from organic growth.  HP's assertion that they did not "discover the accounting fraud" until late 2012 is disingenuous, a calculated misstatement approved of by HP's Board of Directors.  Even if true, HP's failure to "discover" accounting problems at Autonomy was not due to any great skill at obfuscation by Autonomy but because HP went into the Autonomy acquisition relying solely on Autonomy's representations, irrespective of the many red flags that HP chose not to independently evaluate and verify.

150.    HP knew that Autonomy did not have a cutting-edge product that would revolutionize the "Big Data" field.  HP knew that IDOL 10 was not the next generation integrated information platform that would transform HP into a player in the enterprise software field.  The write-down of almost 80% of the goodwill of Autonomy was because HP had bought a company without revolutionary technology that a simple due diligence process would have uncovered.  In writing down $8.8 billion of the Autonomy acquisition price, HP is acknowledging that the Autonomy technology was really worth about $2.5 billion.  HP's claim that $5 billion of the write-down is related to "accounting improprieties" is false.  The true justification for the size of this write-down cannot only be accounting irregularities but is also that Autonomy did not have the integrated next-generation information platform that HP claimed existed and was available to customers.

**H.    Individual Defendants Were Improperly Influenced By External Advisors With Conflicted Interests**

     **1.    External Advisors Improperly Influence the HP Board Decision**

151.    Frank Quattrone was one of the main champions of Autonomy and was actively pushing the Individual Defendants for HP to go forward with the acquisition.  Frank Quattrone, of Qatalyst Partners, was a corporate dealmaker in the technology sector.  Quattrone, a top

investment banker in the technology industry, has a long history of involvement in civil litigation and run-ins with securities regulators.

152.    Quattrone had come under scrutiny for his "Friends of Frank" brokerage accounts, which contained shares of hot IPOs that routinely soared in price immediately after the initial public offering.  Quattrone allegedly had been using his "Friends of Frank" brokerage accounts and his connections in the technology industry to improperly influence transactions and manipulate the stock market.  HP and the Individual Defendants have a long, close relationship with Quattrone.  One of these "Friends of Frank" was Defendant Meg Whitman.  Defendant Andreesen was also a "Friend of Frank."  In fact, Quattrone had a deep, personal relationship with Defendant Andreesen since 1995 when Quattrone led the IPO of Netscape Communications Corp., which was co-founded by Defendant Andreesen.  That IPO transaction vaulted both Defendant Andreesen and Quattrone into prominence and made both men very wealthy.  That close relationship has continued over the last two decades.  Both Defendants Whitman and Andreesen were on the HP Board of Directors when Quattrone was pitching the Autonomy acquisition to HP.

153.    Three of Quattrone's clients were acquired by HP: Palm Inc., 3PAR Inc. and Autonomy.  Each of these acquisitions resulted in HP substantially overpaying for the target.  Palm was acquired for $1.2 billion and the acquisition failed spectacularly, with HP essentially shutting down the entire operation and discontinuing the Palm operating system.  This resulted in HP taking a $1.67 billon write-down on Palm.  The write-down occurred immediately prior to the Autonomy deal closing.  In the 3Par acquisition, Quattrone was able to draw HP into a bidding war with Dell, in which HP agreed to overpay to acquire 3Par by almost 240%.  This history of over-paying deals sponsored by Quattrone should have made the HP Board of Directors even more skeptical of relying on Quattrone.  At a minimum, the Individual Defendants should have approached the Autonomy transaction cautiously, learning the lessons from their earlier deals involving Quattrone.  Instead, the Individual Defendants knowingly repeated the same mistakes that had harmed HP before.

154.     Quattrone's influence with the HP Board of Directors, and his reputation and relationships in the technology industry all played an instrumental role in convincing the Individual Defendants at HP to go forward with the Autonomy acquisition.  Quattrone was Autonomy's lead advisor and was deeply involved in shopping Autonomy to potential buyers. Quattrone's involvement was a substantial factor in causing the Individual Defendants to ignore their due diligence obligations and agree to overpay to acquire Autonomy.  At all times Quattrone was acting on behalf of Autonomy and was therefore highly biased in Autonomy's favor.

155.     Quattrone had an obvious personal financial interest in the transaction going through in his role as advisor for Autonomy.  As the stewards of HP, it was the obligation of the Individual Defendants to maintain skepticism and act in the best interests of HP irrespective of Quattrone's reputation and history with the HP Board of Directors.  It was a breach of the fiduciary duties of the Individual Defendants to go forward with the Autonomy acquisition without conducting due diligence and instead relying on communications and past relationships with Quattrone.

## 2.     Defendants Barclays and Perella Put Their Own Self-Interest Before That of Their Client, HP

156.     The two lead financial advisors to HP on the Autonomy acquisition were Defendants Barclays and Perella.  Barclays prides itself as one of the top investment banking companies in the world, while Perella prides itself as a boutique firm specializing in acquisitions of this nature.  These two companies, hired by HP and its Board of Directors, were required to conduct due diligence of the proposed Autonomy acquisition.  They were also purportedly hired by the Individual Defendants to act in the best interests of HP and its shareholders.  Instead, both companies failed to conduct due diligence and instead promoted the consummation of the Autonomy acquisition for their own financial gain.

157.     Barclays, according to its own Annual Report in 2011 stated it "played a crucial role in every aspect of the [Autonomy] transaction."  The Annual Report went on, "in addition to providing strategic M&A advice on the transaction as well as delivering a fairness option to the

HP board of directors, Barclay's Capital acted as sole arranger and sole underwriter for a fully-committed $8.5 billion bridge facility to support the transaction, which was successfully syndicated to a select group of core relationship banks upon announcement. Barclays Capital also led, and was billing and delivery agent for $4.6 of senior notes." Barclays' dual-role as sole underwriter (in which it received substantial fees contingent on the deal going through) and investment advisor (providing a fairness opinion on the transaction) was a substantial conflict of interest that seriously calls into question the independence of Barclay's fairness opinion. HP's Board of Directors, purportedly sophisticated business professionals, were fully aware of this conflict of interest, but allowed Barclays to remain in both positions. The Individual Defendants ignored the fact that Barclays had an obvious and massive financial incentive to opine that the Autonomy acquisition was fair to HP because underwriting fees were contingent on the deal going through. Barclays is liable to HP for allowing its personal pecuniary gain to override its obligations to HP in providing its fairness opinion. The Individual Defendants are liable for allowing Barclays to continue to advise HP with a significant and known conflict of interest.

158.     In 2011, Barclays came under fire in a shareholder lawsuit for a very similar conflict of interest involving a Del Monte Food buyout. At the crux of the suit was Barclays' role as both an advisor and a lender in the transaction. By providing both advice and financing, Barclays was able to collect double the fees. Barclays also had a massive financial incentive for pushing the transaction forward and allowed that financial incentive to override all of its legal obligations to its clients. The Court opinion in the Del Monte Food case stated that, "Barclays secretly and selfishly manipulated the sale process to engineer a transaction that would permit Barclays to obtain lucrative buy-side financing fees." *In re Del Monte Foods Company Shareholders* Litigation, C.A. No. 6027-VCL (Feb. 14, 2011). Here, similarly, Barclays provided a fairness opinion supporting the same $11.7 billion acquisition while simultaneously receiving lucrative buyer-side financing fees.

159.     In its conflicted position as both deal advisor and lender in this transaction, the Del Monte Food Board of Directors spent more money in fees to obtain another opinion on the

deal.  At Barclays' insistence, a boutique financial firm was brought in for "independent advice" and collected an addition $3 million in fees from the Del Monte Food Board of Directors.

160.    Notably, that boutique financial firm was Defendant Perella.  Defendant Barclays was sharply criticized by the Delaware Court of Chancery for its conflicted role and its abuse of its position to manipulate the transactions.  In the end, Defendant Barclays was forced to settle the Del Monte Food case for $89.4 million.

161.    The conflict here is even more egregious than the conflict in the Del Monte Foods action.  Here, Defendant Barclays, as the investment advisor to HP and sole underwriter for the $8 billion bridge loan to fund the acquisition, had a conflict of interest that was known to the HP Board of Directors.  For the Individual Defendants to rely on a conflicted investment advisor's "fairness" opinion to move forward on a transaction is a breach of their fiduciary duties to the company.

162.    Moreover, the same two advisors that manipulated the Del Monte Food transaction –Barclays and Perella –are the same two advisors that the Individual Defendants chose to rely on in entering into one of the largest corporate acquisitions in HP's history.  At the time the Individual Defendants hired Perella and Barclays to give HP "fairness" opinions on the Autonomy acquisition, the Individual Defendants knew or should have known about the Del Monte Food situation.  Indeed, the Del Monte Food case came down on February 14, 2011, just a few months before HP hired Barclays and Perella to perform due diligence and issue fairness opinions.  HP could have hired anyone to provide it with "fairness" opinions on the Autonomy transaction.  Presumably, HP could have hired companies with both accounting expertise and/or technology expertise to provide the "fairness" opinion.  Instead, HP chose to ignore all of the accounting red flags raised by the accounting experts and chose not to seek any technological expertise from technology experts.  The Individual Defendants chose to base their decision-making for a deal that the Individual Defendants themselves described as "transformative" and "revolutionary" by seeking "fairness" opinions from two conflicted and non-neutral firms.  Moreover, HP chose two firms that were, just months earlier, allegedly implicated in a secretive and manipulative sales process in Del Monte.

163.   These two firms have systematically deprived HP of the objective and independent opinions they were hired to provide in order to collect large fees.  Defendant Perella, for example, was the investment advisor on Olympus' acquisition of Gyrus, a British technology company, an acquisition that prompted investigations in the United States, United Kingdom and Japan into fees and payments made by Olympus.  Olympus hired Perella to execute the transaction.  In total, Olympus paid $687 million in fees to several "advisors," including Perella, a sum that was the highest ever merger in acquisition fee.  This fee was paid in 2008 in the Olympus scandal was later relieved on <u>October 14, 2011</u>.  The Del Monte and Olympus transactions demonstrate the improper relationship these two firms each had and the excessive fees that they received from acquiring companies that purchased transactions resulting in complete and utter failures.  Here, Defendants Barclays and Perella again have put their own self-interest before that of HP and violated their legal obligations to the company by failing to conduct any due diligence of Autonomy before issuing "fairness" opinions on the acquisition.

**3.   Defendants Failed to Perform Due Diligence for HP**

164.   Defendant Barclays, in this matter, earned between $18 and $30 million in fees as an advisor for the Autonomy acquisition.  In addition, Barclays was sole underwriter for a £5 billion ($8.3 billion) bridge loan to help finance the acquisition and which paid very substantial fees to Barclays.  Barclays therefore profited significantly, in both roles.  Barclays was incentivized to underwrite as large of a bridge loan as possible – to earn greater fees – and had no incentive to perform meaningful due diligence.  If anything, Barclays was incentivized to rubber-stamp the $11 billion acquisition so that it could fully realize its fees.  Defendant Perella similarly obtained massive profits ($12 million) from its role as one of the lead advisors of the Autonomy acquisition.  Both Barclays and Perella failed in their due diligence obligations as fiduciaries of HP, in terms of investigating both the accounting issues and Autonomy's lack of a revolutionary technology.  While other market participants pick up on these issues, neither of them provided HP with the due diligence and appropriate financial advice that they were obligated to provide before HP paid $11.7 billion for Autonomy.

165.     Defendants Barclays and Perella, as the financial advisors for HP conducting due diligence of the Autonomy acquisition, were required to evaluate Autonomy's financial statements, including a review of the accounting, as well as evaluate the technology and products purportedly being sold by Autonomy.  It was the responsibility of Defendants Barclays and Perella to ensure that Autonomy was, in fact, selling high-margin business software and not low-margin hardware, which was critical to justify the inflated purchase price for Autonomy. Defendants Barclays and Perella were obligated to evaluate the technology and review technology analyst reports, especially those issued by technology analysts with expertise in the enterprise search field, in which Autonomy was but one of many competitors.  Understanding what exactly is being proposed to be bought is crucial to issuing a "fairness" opinion.  Running numbers through a spreadsheet based on untested assumptions and relying on financial results and management representations that have not been tested or verified, is not sufficient before issuing a "fairness" opinion.

166.     Defendants Barclays and Perella failed in their due diligence obligations and fiduciary duties.  Each of these companies failed to evaluate or failed to report the gross accounting issues at Autonomy that would later help lead to a $8.8 billion write-down.  At a minimum, Defendants Barclays and Perella would have had to responsibly inform HP that it could not issue a "fairness" opinion because it lacked the transparency from Autonomy to offer such an opinion.  Defendant Barclays and Perella, however, were highly motivated to drive this deal through for their own pecuniary gain, and they knowingly issued "fairness" opinions favoring the Autonomy acquisition while knowing that no due diligence had been done, and choosing not to do any of their own.

167.     ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

LAW OFFICES
COTCHETT, PITRE
& MCCARTHY, LLP

168. ███████████████████████████████████████

169. ███████████████████████████████████████

**I.      HP Pushed Forward With Autonomy Acquisition, Disregarding All the Red Flags**

170. ███████████████████████████████████████

LAW OFFICES
COTCHETT, PITRE
& MCCARTHY, LLP

171.    Despite this absence of due diligence, the HP Board of Directors abdicated their responsibilities by giving Defendants Apotheker and Robison broad authority to decide on Autonomy and its worth.

LAW OFFICES
COTCHETT, PITRE
& McCARTHY, LLP

172.  ███████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████

173.   Defendant Apotheker consulted frequently with the HP Board of Directors on the deal.  After the Autonomy write-down, Defendant Apotheker issued a statement contradicting the assertions by Defendants Whitman and Lane that Defendant Apotheker was the sole driving force behind the Autonomy acquisition.  Defendant Apotheker stated that he was in frequent contact with Defendant Lane, the Chairman of HP, who actively pushed the deal and was critical in getting Board support for the acquisition.  HP's due diligence of Autonomy consisted almost entirely on relying on the public statements of Autonomy, without conducting any independent review or exercising any skepticism, professional or otherwise.  Defendants Apotheker and Lane, as well as the other directors, were desperate to close a "transformative" deal which resulted in their willingness to short circuit appropriate due diligence.

174.  ████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████████

LAW OFFICES
COTCHETT, PITRE
& MCCARTHY, LLP



**J.      August 18, 2011: Autonomy Acquisition Is Closed**



**CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT**                 71

181. ████████████████████████████

182. ████████████████████████████

183. ████████████████████████████

184. ████████████████████████████

### 2.    HP Publicly Hypes Autonomy Acquisition

185.    On <u>August 18, 2011</u>, HP announced it was acquiring Autonomy, a British enterprise software company that serves high-end business clients.  The acquisition of Autonomy had the unanimous support of the HP Board of Directors.  Earlier that date,  the HP Board of Directors, in particular the members of the Finance and Investment Committee, had reviewed and verified all of the statements that HP was about to make, including the fact that HP had conducted a "rigorous" and "exhaustive" due diligence process.  As such, they are personally liable for any such misrepresentations contained in those statements.

186.    In a news release dated <u>August 18, 2011</u>, HP touted the acquisition of Autonomy as shifting away from its hardware business to an enterprise software business model.  The press release stated:

**HP to Acquire Leading Enterprise Information Management Software Company Autonomy Corporation plc**

Highly complementary acquisition provides leadership position in large and growing space.

Expected to be accretive to non-GAAP earnings per share for HP shareholders in the first full year following completion.

PALO ALTO, Calif., and CAMBRIDGE, England, Aug. 18, 2011

-------------------------------------------------------------------------------

- HP (NYSE: HPQ) and Autonomy Corporation plc (LSE: AU. or AU.L) today announced the terms of a recommended transaction under which HP (through an indirect wholly-owned subsidiary, HP SPV) will acquire all of the outstanding shares of Autonomy for £25.50 ($42.11) per share in cash (the "Offer"). The transaction was unanimously approved by the boards of directors of both HP and Autonomy. The Autonomy board of directors also has unanimously recommended its shareholders accept the Offer.

- Based on the closing stock price of Autonomy on August 17, 2011, the consideration represents a one day premium to Autonomy shareholders of approximately 64 percent and a premium of approximately 58 percent to Autonomy's prior one month average closing price. The transaction will be implemented by way of a takeover offer extended to all shareholders of Autonomy. A document containing the full details of the Offer will be dispatched as soon as practicable after the date of this release. The acquisition of Autonomy is expected to be completed by the end of calendar 2011.

- Founded in 1996, Autonomy is a global leader in infrastructure software for the enterprise with a customer base of more than 25,000 global companies, law firms and public sector agencies, and approximately 2,700 employees worldwide. Autonomy's Intelligent Data Operating Layer (IDOL) platform allows computers to harness the richness of information, forming a conceptual and contextual understanding of any piece of electronic data, including unstructured information, such as text, email, web pages, voice and video.  Autonomy's software powers a full spectrum of mission-critical enterprise applications, including pan-enterprise search, customer interaction solutions, information governance, end-to-end eDiscovery, records management, archiving, business process management, web content management, web optimization, rich media management and video and

audio analysis. Autonomy's IDOL is the de-facto standard among more than 400 OEMs, supported by substantial intellectual property (IP), and Autonomy is a significant cloud player with over 30 petabytes of customer information under management. Autonomy's recent operating and financial performance has been strong, including its most recent results for the quarter ending June 30, 2011. Over the last five years, Autonomy has grown its revenues at a compound annual growth rate of approximately 55 percent and adjusted operating profit at a rate of approximately 83 percent.

"**Autonomy presents an opportunity to accelerate our strategic vision to decisively and profitably lead a large and growing space,**" said Léo Apotheker, HP president and chief executive officer. "Autonomy brings to HP higher value business solutions that will help customers manage the explosion of information. Together with Autonomy, we plan to reinvent how both unstructured and structured data is processed, analyzed, optimized, automated and protected. Autonomy has an attractive business model, including a strong cloud based solution set, which is aligned with HP's efforts to improve our portfolio mix. **We believe this bold action will squarely position HP in software and information to create the next-generation Information Platform, and thereby, create significant value for our shareholders.**"

Apotheker continued, "**Autonomy is a highly profitable and globally respected software company**, with a well-regarded management team and talented, dedicated employees. We look forward to partnering with a company who shares our commitment to solving customer problems by creating smart, cutting-edge products and solutions. I am particularly pleased that Dr. Mike Lynch, who heads a team of brilliant scientists and employees, will continue to lead Autonomy. I look forward to our collaboration as we focus on creating maximum value for the combined company, its customers and employees."

"This is a momentous day in Autonomy's history," said Dr. Mike Lynch, chief executive officer and founder, Autonomy. "From our foundation in 1996, we have been driven by one shared vision: to fundamentally change the IT industry by revolutionizing the way people interact with information. HP shares this vision and provides Autonomy with the platform to bring our world-leading technology and innovation to a truly global stage, making the shift to a future age of the information economy a reality."

**Strategic and financial benefits**

- Positions HP as leader in large and growing space: Autonomy has a strong position in the $20 billion enterprise information management space, which is growing at 8 percent annually and is uniquely positioned to continue growth within this space. Furthermore, key Autonomy assets would provide HP with the ability to reinvent the $55 billion business analytics software and services space, which is growing at 8 percent annually.

- Complements HP's existing technology portfolio and enterprise strategy: Autonomy offers solutions that are synergistic across HP's enterprise offerings and strengthens capabilities for data analytics, the cloud, industry capabilities and workflow management. This will bolster HP's cloud offerings with key assets for information management and data analytics. Autonomy also complements existing HP offerings from enterprise servers, storage, networking, software, services and its Imaging and Printing Group (IPG).

- Provides differentiated IP for services and extensive vertical capabilities in key industries: Acquiring Autonomy would provide differentiated IP for services, including extensive vertical capabilities in key industries such as government, financial services, legal, pharmaceutical and healthcare.

- Provides IPG a base for content management platforms: Autonomy provides HP with a content management platform and accelerates a major component of the IPG enterprise strategy to continue its growth of document and content management and higher value commercial printing opportunities.

- **Enhances HP's financial profile: Autonomy's strong growth and profit margin profile complements HP's efforts to improve its business mix by focusing on enterprise software and solutions. Autonomy has a consistent track record of double-digit revenue growth, with 87 percent gross margins and 43 percent operating margins in calendar year 2010.**

- Accretive to HP's earnings: HP expects the acquisition to be accretive to non-GAAP earnings per share for HP shareholders in the first full year following completion.

Lynch will continue to lead Autonomy and will report to Apotheker. Following the acquisition, Autonomy will operate separately.

The Offer documents related to the transaction are available at www.hp.com/investor/offer documents. The Offer will be subject to the conditions and further terms set out in the Offer documents. HP intends to finance the transaction through offshore cash and debt financing.

**Conference call**

HP will host a conference call with the financial community today at 2 p.m. PT / 5 p.m. ET to discuss this announcement, as well as HP's third quarter 2011 financial results. The call is accessible via an audio webcast at www.hp.com/investor/2011q3webcast.

**About Autonomy**

Autonomy Corporation plc (LSE: AU. or AU.L), a global leader in infrastructure software for the enterprise, spearheads the Meaning Based Computing movement. IDC

recently recognized Autonomy as having the largest market share and fastest growth in the worldwide search and discovery market. Autonomy's technology allows computers to harness the full richness of human information, forming a conceptual and contextual understanding of any piece of electronic data, including unstructured information, such as text, email, web pages, voice, or video. Autonomy's software powers the full spectrum of mission-critical enterprise applications including pan-enterprise search, customer interaction solutions, information governance, end-to-end eDiscovery, records management, archiving, business process management, web content management, web optimization, rich media management and video and audio analysis.

Autonomy's customer base is comprised of more than 25,000 global companies, law firms and federal agencies including: AOL, BAE Systems, BBC, Bloomberg, Boeing, Citigroup, Coca Cola, Daimler AG, Deutsche Bank, DLA Piper, Ericsson, FedEx, Ford, GlaxoSmithKline, Lloyds TSB, NASA, Nestlé, the New York Stock Exchange, Reuters, Shell, Tesco, T-Mobile, the U.S. Department of Energy, the U.S. Department of Homeland Security and the U.S. Securities and Exchange Commission.  More than 400 companies OEM Autonomy technology, including Symantec, Citrix, HP, Novell, Oracle, Sybase and TIBCO.  The company has offices worldwide.

**About HP**

HP creates new possibilities for technology to have a meaningful impact on people, businesses, governments and society.  The world's largest technology company, HP brings together a portfolio that spans printing, personal computing, software, services and IT infrastructure at the convergence of the cloud and connectivity, creating seamless, secure, context-aware experiences for a connected world. More information about HP is available at http://www.hp.com.

187.     Attached as **EXHIBIT 4** is a copy of the <u>August 18, 2011</u> press release.  A key portion of that announcement is Defendant Apotheker's statement that the business justification for the $11.7 billion price tag is the creation of a next-generation Information Platform which would "create significant value for our [HP's] shareholders."  It is the next generation Information Platform promised by Defendant Apotheker that would revolutionize the "Big Data" field.  This statement was made notwithstanding the fact that IDOL 7 had not been updated in five years.  Nevertheless, HP was desperate to justify the deal.  Despite knowing that there was no next generation Information Platform, HP stressed that platform as the lynchpin of its acquisition of Autonomy.

188.  <u>August 18, 2011</u> marked a major milestone for HP.  On that day, HP announced several major developments: its struggling financial results; the failure of the Palm acquisition and plans to discontinue Palm's operations; that HP might sell its PC business; and HP announced its intended acquisition of Autonomy.  The <u>August 18, 2011</u> announcement marked the strategy for HP going forward.  The Autonomy acquisition was a key part of that strategy.

189.  Immediately after the <u>August 18, 2011</u> announcement, the stock price of HP dropped precipitously.  When the market closed on <u>August 18, 2011</u>, HP shares were trading at $28.69 per share.  When the market closed on <u>August 19, 2011</u>, the price of HP shares had dropped to $22.95 per share.  This stock drop put HP in a precarious position as it was imperative that HP be able to justify and explain the Autonomy acquisition.  After the press and shareholders reacted negatively to the potential sale of the PC business by HP, all that was left of the <u>August 18, 2011</u> announcement that had any potential of being positive for HP was the Autonomy acquisition.  It was essential that the deal be beneficial to HP.

190.  On an <u>August 18, 2011</u> earnings conference call, Defendant Apotheker touted the Autonomy acquisition as being hugely positive for HP, focusing on the technology that Autonomy would purportedly add to HP.  On the earnings conference call, Defendant Apotheker promoted the Autonomy deal by stating:

> "Moreover, Autonomy's business is well-aligned to HP's effort to change and focus our business mix.  In 2010, Autonomy had gross margins in the high 80s and operating margins about 40%.  They have demonstrated a strong consistent track record of double-digit revenue growth."

> "All of the decisive moves I've made provide HP with the most shareholder return, markets where we can demonstrate sustainable competitive advantage, maximize customer value, deliver on our solutions vision…"

191.  A diligent analysis of Autonomy, however, would have demonstrated that Autonomy's growth itself had largely been driven by acquisitions and not by organic growth in its products.  By touting the double-digit revenue growth, Defendant Apotheker concealed the fact that Autonomy's technology was out-of-date and facing heavy competition.  ███████

**CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT**                                      77

LAW OFFICES
COTCHETT, PITRE
& MCCARTHY, LLP

1    ███████████████████████████████████   Instead, Defendant

2    Apotheker promoted the Autonomy acquisition and the $11.7 billion price tag as being driven by

3    purported revolutionary technology:

4
5    "Let me start by actually making sure that everybody on the call understands what
     Autonomy represents for us.

6    **Autonomy represents an opportunity for HP for us to accelerate our vision to**
7    **decisively and profitably lead a large and growing space which is the Enterprise**
     **Information Management space.**  It also brings HP higher value business solutions that
8    will help customers manage the explosion of information.  **If we execute this deal, it will**
     **position HP as a leader in the large and growing space.**  It will complement our
9    existing technology portfolio and enterprise strategy.

10   It will provide differentiated IP for Services and extensive vertical capability in key
     industries.  It will provide IPG a base for content management platform.  It will, over
11   time, significant enhance HP's financial profile and the Board believes that the
     transaction is accretive to HP's non-GAAP earnings in its first full year after completion.
12
13   **Autonomy as a business has a very profitable business model with a very compelling**
14   **value proposition and I have been able to bring solutions into 400 OEMs, which**
     **shows that they are basically a de facto industry standard.**  Autonomy has grown its
15   revenues at a compound annual rate of approximately 55% and adjusted operating profit
     at the rate of approximately 83% over the last 5 years.  **We're buying a very strong**
16   **business and we believe that we can extract a lot more out of this business by**
     **combining it with HP.  And that was the justification for the price.**
17

18
19        192.    The August 18, 2011 press release and conference call came to be referred to in

20   the press as Apotheker's "Waterloo."  The proposed sale of HP's PC business and the Autonomy

21   acquisition were expected to boost HP's sale price by creating a bold, new strategy for HP.

22   According to Defendant Apotheker himself, that strategy was devised jointly by Defendant Lane,

23   the Chairman of the HP Board of Directors and Defendant Apotheker.  However, when it

24   became evident that the public would respond negatively to the announcement, Defendant Lane

25   backtracked immediately, seeking to cast blame for the failed new direction of HP solely on

26   Defendant Apotheker.  This is additional evidence of the inability of HP's Board of Directors to

27   adequately evaluate their own level of malfeasance in regards to the Autonomy acquisition.

28

193.    On <u>August 22, 2011</u>, HP released a statement to Autonomy's shareholders urging them to accept the offer from HP.

194.    ████████████████████████████████

████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████

██████████████████████████████████

**K.    September 13, 2011: HP Extolls The Value of the Transformative Autonomy IDOL Technology and the "Extensive" Nature of HP's Due Diligence**

195.    The initial deadline for shareholder approval of the Autonomy acquisition was <u>September 12, 2011</u>.  However, by that date, less than half of the Autonomy shareholders had voted in favor of the Autonomy acquisition.  HP and Autonomy extended the deadline for voting on the acquisition until <u>October 3, 2011</u>.

196.    Because of the failure to obtain sufficient votes to approve the Autonomy acquisition by <u>September 12, 2011</u>, the next day Defendant Apotheker, on a conference call with analyst Chris Whitmore at the Deutsche Bank Technology Conference stressed the fact that the Autonomy acquisition was voted upon only after considerable due diligence had been done. **This was a misstatement and the entire HP Board of Directors knew about it.**   The HP Board of Directors, at an <u>August 18, 2011</u> Board meeting approved all of the communications documents and press releases relating to Autonomy.  At least by <u>August 18, 2011</u>, all of the directors of HP knew that the due diligence process could not honestly be referred to as "rigorous."

197.    Defendant Apotheker was adamant that HP had a **rigorous process** for evaluating acquisitions before going through with them and that process was followed in regard to the Autonomy Acquisition:

> APOTHEKER:  And let me just try to build on that and help you understand how we came to the valuation of Autonomy.  **We have a pretty rigorous process inside HP that we follow for all of our acquisitions**, which is a DCF-based model, and **we try to take a very conservative view at this**.  Just to make sure everybody understands.  **Autonomy will be, on day one, accretive to HP.  For FY 2012, Autonomy, once we integrate it, is accretive to HP**.
>
> Now, we have identified five synergy possibilities - five synergy leverages on how we can build up the Autonomy business and how we can synergize it between HP and Autonomy.  And I can walk you through that, through these various elements.  But just take it from us.  **We did that analysis at great length, in great detail, and we feel that we paid a very fair price for Autonomy.  And it will give a great return to our shareholders.**
>
> Now, what are these five synergies?  The first one is we can leverage our sales force tremendously.  Autonomy doesn't have a very large sales force.  They sell, essentially, in two countries, the UK and the US.  It's a very tiny sales force.  We have a pretty large sales force, and we can take Autonomy around the world.  Straightforward, lower-hanging fruit.  It doesn't require any rocket science.
>
> The second equally low-hanging fruit is attached with our storage devices.  We are a big storage vendor.  Our attach rates are relatively low today, 15% or 16%.  We believe that, with Autonomy, we can reach the best in class in this industry, in the mid 30s, and that will happen rather quickly.  So that's straightforward synergy as well, and it's high margin business.
>
> The third synergy I talked about earlier on the synergy we can with IPG in our digitalization effort.
>
> The fourth synergy is a synergy along verticals.  There's a lot of opportunity that we see to combine our vertical capabilities or industry-specific capabilities, and those of Autonomy.  And we have a great future as well.
>
> **And, last but not least, the core essence of the acquisition of Autonomy is to actually build out the next-generation information platform.**  And we have high hopes for that as well.

September 13, 2011 Deutsche Bank Technology Conference

LAW OFFICES
COTCHETT, PITRE
& MCCARTHY, LLP

198.    As Defendant Apotheker articulated once again on <u>September 13, 2011</u>, the next-generation information platform was the "core essence" of the Autonomy acquisition and the driving force behind the $11.7 billion acquisition.  Attached as **EXHIBIT 5** to this complaint is a copy of the Final Transcript of the <u>September 13, 2011</u> Hewlett Packard Company's conference call at the Deutsche Bank Technology Conference.  The statements made by Defendant Apotheker misrepresent the truth since Autonomy's technology was painfully outdated and certainly not "next-generation," and the due diligence process was anything but rigorous.

199.    Furthermore, during the <u>September 13, 2011</u> conference call, an analyst from Deutsche Bank asked Defendant Apotheker about what specific due diligence steps he took in regards to investigating Autonomy prior to announcing the transaction.  Defendant Apotheker answered as follows:

> "**We have and are running an extremely tight and very professional due diligence process.**  I've got to tell you I have challenges with the question itself.  Autonomy is a publicly traded company in the UK.  And they are therefore, audited like any other FTSE company, and they're being audited on very professional standards.  **And, therefore, that's where we pick up the trail and do our due - that's the basis of our due diligence.**"

200.    This is a misrepresentation since the truth was that HP simply accepted all of Autonomy's public financial statements and representations as true without conducting any independent investigation.  The due diligence that a "transformative" acquisition costing HP most of its available cash, entered into on the heels of repeated acquisition failures, seemingly would have been exceedingly thorough.  Instead, HP's due diligence was amongst the most lax.  HP chose to ignore multiple red flags and rely solely on Autonomy's publically available information.

**L.    September 22, 2011:  CEO Léo Apotheker Forced Out of HP; New CEO Meg Whitman Continues to Praise the Autonomy IDOL Technology**

201.    On <u>September 22, 2011</u>, Defendant Apotheker was terminated as CEO of HP.  As part of his severance, Defendant Apotheker was given a $7.2 million severance payment, a $2.4 million bonus and the accelerated vesting of 156,000 shares of restricted stock.  This severance

⊛
LAW OFFICES
COTCHETT, PITRE
& MCCARTHY, LLP

1   was paid by HP for the services of an individual whom, according to HP, destroyed shareholder

2   value at the company.

3   202.   

4

5

6

7

8   203.

9

10

11

12

13

14

15

16

17

18

19

20

21

22   204.

23

24

25

26

27

28

LAW OFFICES
COTCHETT, PITRE
& MCCARTHY, LLP

**CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT**                82

205.   <u>That same day</u>, Defendant Whitman appeared on a conference call hosted by HP stating that: "[T]he Autonomy acquisition, which I'm excited about, is proceeding as planned, and is expected to be completed by the end of the calendar year."  On that call, Defendant Meg Whitman continued to tout the Autonomy acquisition, as well as defend the incredibly high premium that HP paid to acquire Autonomy.

206.   The acquisition of Autonomy closed on <u>October 3, 2011</u> after sufficient Autonomy shareholders voted in favor of the acquisition.  Mike Lynch personally made $800 million from the sale of Autonomy to HP.

**M.   HP Significantly Overpaid for Autonomy**

207.   HP significantly overpaid for Autonomy.  At the time of the acquisition in 2011, Autonomy was trading in the range between $25 to $29.  HP paid $11.7 billion, over 11 times the annual revenue of the company.  In the Autonomy sales pitch presentation to Oracle, it showed that Autonomy's past acquisitions had been in the range of 1.5x to 3.6x LTM ("Last Twelve Months") revenues.  In August of 2011, Autonomy itself showed that it only had a fully-diluted enterprise value of $5.7 billion, which was approximately 6.6x the estimated revenues for 2010 and 5.9x the estimated revenues for 2011.  Using the multiples that Autonomy itself had used in its own acquisitions, Autonomy would have only been valued at between $1.3 billion and $3.1 billion.  The final purchase price HP paid for Autonomy would be about 13.4x the LTM revenues for Autonomy for fiscal year 2010, which was about $870 million.  The only justification for such a price was that Autonomy would be able to deliver a revolutionary technology that HP claimed would forever change the enterprise search field.

208.   Any acquisition significantly impacts the balance sheet of a corporation.  The price that the acquiring company paid for the acquired company must somehow be reflected on the financial statements.  When there is a large discrepancy between the value of the actual assets acquired and the acquisition price, the difference is generally put on the books as goodwill or

other intangible assets.  In this manner, the acquiring company is representing to the public and to its shareholders how it is valuing the acquired company, whether it be the intangible assets of the acquired company or the reputation (*i.e.*, good will) of the acquired company.  When HP acquired Autonomy, Autonomy had listed $3.5 billion of total assets on the balance sheet, with net tangible assets of $80.2 million as of June 30, 2011.  With the vast difference between the net tangible assets of Autonomy and the purchase price, HP booked almost the entire acquisition value as goodwill and intangible assets, recording $6.6 billion of the acquisition price – later amended to $6.9 billion - as goodwill and $4.6 billion as amortizable purchased intangible assets.

209.   In writing down $8.8 billion, HP was writing down almost all of the goodwill and intangible assets of Autonomy.  In its press release and public statements, HP has claimed that this write-down was driven principally by accounting issues.  In other words, the company was worth less than what HP paid for because there was some revenue recognition issues.  However, these revenue recognition issues alone would not have resulted in an $8.8 billion write-down.  The delta between the revenue recognition issues and $8.8 billion is the overpayment for a company that did not have the technology that was promised.  Autonomy's enterprise search engine, at least by 2011, was inferior to most of its competitors.  As a September 2, 2011 Forrester Research report indicates, Autonomy had not refreshed its system in the last five years.  In addition, Autonomy's program required a significant investment by customers and was not user-friendly.  If HP had done its due diligence, it would have known that it was buying an outdated technology that was not unique and in a market that is highly competitive.  When it realized its mistake, HP misrepresented the truth to the public and to its shareholders.

## N.   HP Mishandled the Autonomy Acquisition: Hands the Keys Over to Autonomy

210.   Immediately after the acquisition closed in October of 2011, HP handed over control of the entire Information Management business to Mike Lynch and to the Autonomy team, a move that was approved by the officers and directors of HP.  After having spent $11.7 billion on Autonomy, HP's Board of Directors was prepared to hand over complete control of one of HP's largest business units to an outsider even though no meaningful due diligence had

been conducted.  Gerard Brossard was tasked with the assignment of integrating Autonomy into HP, even though Brossard was the same individual who had been tasked with integrating EDS into HP, a failed process that also led to an $8 billion write-down.  Despite this, HP's officers and Directors selected him once again to attempt another failed integration.  Due to the gross mismanagement of HP's Board of Directors and officers, Brossard was allowed to collectively wipe out over $16 billion of shareholder value from the EDS and Autonomy acquisitions.

211.    Information Management is a major business area for HP.  Autonomy, as an enterprise software company, fit under the Information Management umbrella.  Autonomy, however, was not the only business within Information Management.  Shortly after the acquisition was completed, not only was Autonomy allowed to operate autonomously; Autonomy was put in control of the entire HP Information Management division, which became known as HP's Autonomy unit.  Desperate to justify the $11.7 billion price tag, HP gave Autonomy and its loyalists free reign through HP's Information Management division. Beginning in November of 2011, Mike Lynch and his associates, including Chief Marketing Officer Nicole Eagan, immediately and drastically cut down the personnel headcount in Information Management in order to create the impression of increased profits.  Just like how Mike Lynch used acquisitions to create the illusion of profitability at Autonomy, he used reductions in personnel to create the same illusion of profitability at HP.

212.    Mike Lynch and Autonomy also gained control over all of the businesses under the Information Management division, including another HP acquisition known as Vertica. Vertica was also in the enterprise search business.  Vertica Systems is an analytic database management software company that was founded in 2005 by database researchers Michael Stonebraker and Andrew Palmer.  The former CEOs of Vertica included Ralph Breslauer and Christopher P. Lynch.  Vertica was acquired by HP on March 22, 2011.  The Vertica transaction expanded the enterprise software division of HP, including the information optimization, business intelligence and analytics portfolio.  Shortly after the acquisition closing, HP began making public statements that it had been able to fully integrate Autonomy's IDOL technology

LAW OFFICES
COTCHETT, PITRE
& MCCARTHY, LLP

with Vertica's system to create the next generation Information Platform.  This was heavily hyped by Nicole Eagan, the former Autonomy Chief Marketing Officer who now dictated the marketing approach for HP's Information Management division.

213.     With the Autonomy transaction completed, HP shifted towards making Autonomy the lynchpin of its future product launches. The process of transforming Autonomy into the lynchpin of HP's future strategy was directed by and reviewed by all levels of HP.  HP's officers and Board of Directors fully supported making Autonomy and its IDOL technology as the centerpiece of its next product launch.  Having spent $11.7 billion to acquire Autonomy and enduring extensive criticism of the deal and its price, HP had no choice but to make Autonomy and IDOL the core of its product launch.  The HP Next Generation Information Platform IDOL 10 would be an integrated Autonomy/Vertica platform that combined the functionality of both programs.  This combined functionality would revolutionize enterprise software and propel HP past rivals such as Oracle and Google.

214.     On November 8, 2011, on a public webcast entitled "Optimizing Marketing Performance with Real-Time Insight & Analytics," it was publically announced by Nicole Eagan and Andrew Joiner that HP had already integrated Autonomy's IDOL 10 product with Vertica's Analytics Platform.  This public webcast was featured on Autonomy's website in the aftermath of the merger.  The webcast represented that HP had integrated Vertica's ability to search structured data with Autonomy's ability to search unstructured data into a single integrated product.

O.     **November 21, 2011: Defendants Continued to Misrepresent the Autonomy Technology and HP's Extensive" Due Diligence**

215.     ███████████████████████████████████████
████████████████████████████████████████████
███████████████████████████████████████
████████████████████████████████████████

LAW OFFICES
COTCHETT, PITRE
& McCARTHY, LLP

1  ███████████████████████████████████████████████████

2  ████████████████████████

3  216.  ████████████████████████████████████

4  ███████████████████████████████████████████████████████

5  ███████████████████████████████████████████████████████

6  ███████████████████████████████████████████████████████

7  ████████████████████████████████████████████████████████

8  ██████████████████████████████████████████████████████

9  ██████████████████████████████████████████████████████

10 █████████████████████████████████████████████████

11 ██████████████████████████████████████████████████████

12 █████████████████████████████████████████████████████████

13 ████████████████████████████████████████████████████

14 ████████████████

15 217.  ████████████████████████████████████

16 ██████████████████████████████████████████████████

17 ██████████████████████████████████████████████████

18 █████████████████████████████████████████████

19 ████████████████████████████████████████████

20 █████████████████████████████████████████████████████

21 █████████████████████████████████████████████████████

22 █████████████████████████████████████████████████████

23 ████████████   At the <u>November 29, 2011</u> HP Discover Vienna event, HP announced that this

24 product was immediately available.

26     218.    On <u>November 21, 2011</u>, Defendant Meg Whitman, the CEO of HP, and Catherine

27 Lesjak, the CFO of HP, conducted HP's fourth quarter earning conference call.  On that

28 conference call, Autonomy was a major talking point for HP.  Defendant Meg Whitman herself

stressed that Autonomy had a next generation information platform that would change the enterprise software industry and that was why HP spent $11.7 billion to acquire Autonomy. Defendant Meg Whitman also stated unequivocally that the business unit that HP was building for Autonomy would include both Autonomy and Vertica and that she personally would oversee that business unit, with the reporting chain going directly up to her:

> "[W]e closed the Autonomy acquisition on October 3. In the last month, we've had hundreds of leads passed between the two companies, and **we've created a new information management business group that combines Autonomy, Vertica, and other HP software assets under Mike Lynch, and reports directly to me.**
>
> Well, let me just spend a moment on Autonomy. I am really excited about this acquisition. **As you all know, I think it really positions HP as a leader in the Next-generation information management and analytics capabilities, as the explosion of data is making these capabilities absolutely critical. Autonomy is a unique asset. It has a remarkable ability to manage unstructured information in a way that no one else in the market does.** I think that adds a lot of value not only in their space but actually across HP.
>
> So, what've set up it Autonomy is actually running fairly autonomously (laughter) but we have done a great job I think of integrated the go-to market. So, there are sales leads that are going from Autonomy to HP - interestingly, which we didn't expect so much of in terms of a hardware pull-through - but also from our HP sales team back to Autonomy. We've got a clearing house that vets all those leads. So, that what we turn over to Autonomy are really high quality leads that will allow Autonomy to grow much faster than they would have grown on their own. That's the name of the game for 2012.
>
> There's going to be lots of other things we do together but accelerating the growth of Autonomy using the distribution capability of HP is priority number one, two and three for 2012.
>
> During that conference call, HP CFO Catherine Lesjak added:
>
> "We closed the acquisition of Autonomy in October, and therefore, we had roughly one month of results in the software numbers. **The integration is going well thus far, and we are focused on enabling our global sales force to ramp on the Autonomy product line-up, so they can begin selling Autonomy software in fiscal '12.**"

219. The first opportunity that HP had to be specific about the products that Autonomy would add to HP's product lineup was at HP Discover Vienna, which took place from November 29, 2011 through December 1, 2011. HP Discover is HP's largest press event where it informs

the market, its shareholders and analysts about its business plans.  It is also a time to make major product announcements.  The decision was made within HP that the HP Next Generation Information Platform, which purportedly integrated IDOL with Vertica, would be at the center of the HP Discover Vienna product announcement.  HP leadership internally chose to go forward with presenting IDOL 10/Vertica as both an integrated product and an existing product because the company was desperate to justify the Autonomy acquisition, especially in light of the negative response surrounding HP's <u>August 18, 2011</u> press release.

**P.    November 29, 2011: HP Discover Vienna:  IDOL 10 Integrated Next Generation Platform is the Centerpiece of HP's Product Launch**

220.    HP Discover Vienna went forward beginning on <u>November 29, 2011</u>.  The integrated HP Next Generation Information Platform IDOL 10 Autonomy/Vertica was heavily advertised and promoted as an integrated product combining both Autonomy's IDOL and Vertica's enterprise search technology.  Nicole Eagan, the chief marketing officer at HP responsible for Autonomy, said at HP Discover Vienna that HP's Autonomy unit had updated IDOL so that it integrated with Vertica to create a "single layer" information platform.  According to Eagan, "Autonomy's strength has been in text, audio, and video, while Vertica brings more of the columnar database processing and analytics."  More significantly, Nicole Eagan stated that the integrated HP Next Generation Information Platform IDOL 10 Autonomy/Vertica, would be available on <u>December 1, 2011</u> and would offer users the ability to work with structured data that is being held in the Vertica platform.  Nicole Eagan was promising that the product was ready to ship immediately since HP Discover Vienna lasted from <u>November 29, 2011</u> until <u>December 1, 2011</u>.

221.    Eagan's announcement that this integrated HP Next Generation Information Platform IDOL 10 Autonomy/Vertica was ready to ship on <u>December 1, 2011</u> was a material misrepresentation since HP was not allowed to announce and promote a product at HP Discover Vienna unless it was available for sale at the time of the announcement or immediately

thereafter.  This was not a situation where HP claimed that there was the potential for integration or that HP was working on something new and innovative.  HP was unequivocal and definitive in its statement that this Next Generation Information Platform IDOL 10 Autonomy/Vertica existed and was available for sale on <u>December 1, 2011</u>.  Since HP's fiscal quarter ended on the last day of January, HP wanted to push ahead with an earlier announced release date to make it appear as if HP had made a good deal in acquiring Autonomy.  HP's leadership, desperate to defend the $11.7 billion Autonomy acquisition, permitted HP to claim that a product was available with specific capabilities that it did not have.  HP knew it would not be ready to ship on that date and in fact, it is still not available to ship.

222.    Eagan made numerous misstatements of fact about what the product could actually provide.  Eagan specifically referred to this new integrated Next Generation Information Platform as a "unified interface" which would synthesize into a single workflow both structured and unstructured data.  Vertica's technology was focused on search functionality of structured data while Autonomy's IDOL worked with unstructured data.  Eagan stated that, in most enterprises, structured and unstructured data are handled by separate systems.  The Next Generation Information Platform, which HP promoted as being already available as of <u>December 1, 2011</u>, would uniquely be able to handle both types of data, a revolutionary product in the enterprise search business.

223.    As promoted by HP, data culled from social media sites such as Twitter, which is typically captured as unstructured data, could be explored using Vertica's social graphing functionality and projective analytics.  The package could also combine click-stream analytics captured in Vertica with sentiment analysis data captured in Autonomy.  Video or audio, both of which IDOL can ingest, could be paired with related sensor data or historical data stored in Vertica for real-time intelligent monitoring.  As an example, a bank could monitor a phone call with a customer requesting credit, which can be parsed through Autonomy.  "If during that call, the caller said something to cause the mortgage provider or bank to be worried about a credit risk, they might want to run that against a Vertica credit risk analyzer in real time," Eagan said.

224.    The HP Next Generation Information Platform IDOL 10, an integrated Autonomy/Vertica enterprise search technology would have been a revolutionary product, if it existed.  The paired offering was envisioned to provide a single interface for working with both IDOL and Vertica data. Ovum enterprise software analyst Tony Baer has stated that the Autonomy and Vertica software would be a good fit for each other, because the Autonomy software could provide a superior user-facing front-end for the Vertica software.  HP even announced that beyond the HP Next Generation Information Platform, HP might also combine IDOL and Vertica for other analytic packages.  Eagan stated that, "[t]his is a great starting-off point. With things like big data and social media being as hot as they are, you will see different things evolve."

225.    HP repeatedly stated publically that the HP Next Generation Information Platform was ready for the market.  However, to this date, the HP Next Generation Information Platform IDOL 10 that was promised to the world does not exist.  In a press release dated November 29, 2011, HP was unequivocal in stating that HP's Autonomy unit was "unveiling" a new product that was available as of HP Discover Vienna:

**Autonomy Unveils Next-Generation Information Platform Built for "Human Information" Era**

IDOL 10 Delivers Real-Time Contextual Understanding of Structured and Unstructured Data
VIENNA, Austria, Nov. 29, 2011.  Autonomy, an HP Company, today announced a groundbreaking information platform, IDOL 10, designed to help organizations understand and process 100 percent of enterprise information in real time.

**IDOL 10 provides a single processing layer that enables organizations to extract meaning and act on all forms of information, including audio, video, social media, email and web content, as well as structured data such as customer transaction logs and machine-based sensor data.**

**The platform combines Autonomy's infrastructure software for automatically processing and understanding unstructured data with the high-performance real-time analytics engine for extreme structured data from Vertica, an HP Company.**

From the start of the IT industry until today, humans have had to adapt information to fit the machine, and data was organized into rows and columns, a process which relied on

people understanding and manually classifying data. Computers could not understand the complexity of human interactions.

However, people do not speak in zeroes and ones, but have complex language and idioms, send photographs and videos, and communicate via social media, all of which traditional databases cannot process. The challenge for the modern enterprise is to understand and extract the value from this rich sea of Human Information, which accounts for 85 percent of all corporate data, including emails, audio, video, social networking, blogs, call-center conversations, closed circuit TV footage, and more.

**Today, the combination of Vertica's high-speed analytics platform with Autonomy's IDOL technology marks a fundamental shift in our ability to process this volume of data.** We are at an historical moment when it is the "I" in Information technology that is changing. Autonomy provides solutions that understand the full spectrum of enterprise information, both human and structured information, and recognize the relationships that exist within it.

By enabling computers to understand the shades of grey in the world, rather than simply the black and white found in databases, Autonomy Information Management allows businesses to automate key processes and improve an organization's efficiency.

"For far too long, organizations have confined structured data to relational databases and unstructured data to simplistic keyword matching technologies," said Mike Lynch, executive vice president, Information Management, HP. "IDOL 10 brings these worlds together, allowing organizations to automatically process, understand, and act on 100 percent of their data, in real-time. The results will be dramatic, as businesses can develop entirely new applications that explore the richness and color of Human Information that live in unstructured, semi-structured, and structured forms."

Platform built for the Human Information Era. IDOL 10 features:

- **A single processing layer for forming a conceptual, contextual and real-time understanding of all forms of data, both inside and outside an enterprise.**

- **A combination of Autonomy's infrastructure software for automatically processing and understanding unstructured data with Vertica's high-performance real-time analytics engine for extreme structured data.**

- Unique pattern-matching technologies, powered by an analytics engine based on statistical algorithms that recognizes distance in ideas as well as concepts and context in real time.

- Five new solution sets. HP Big Data Solutions, HP Social Media Solutions, HP Risk Management Solutions, HP Cloud Solutions and HP Mobility Solutions.

⊗
LAW OFFICES
COTCHETT, PITRE
& McCARTHY, LLP

- "Manage-in-place" technology, which forms an index of all forms of data, allowing information to reside in its original location. This eliminates the need for making copies of data, reducing storage hardware costs and removing the need for risky and inefficient transfers of data.

- NoSQL interface that provides a single processing layer to perform cross-channel analytics that understands both structured and unstructured data.

- **The Vertica Analytics Platform, which includes enhanced native in-database analytics, including new capabilities for geospatial, event-series pattern matching, event-series joins, and advanced aggregate statistical and regression analytics.**

- Vertica's real-time analytics for real-world applications delivers performance enhancements throughout the Vertica Analytics Platform in areas such as subqueries, database statistics, life cycle management, query optimization, data re-segmentation and join filtering.

- Enhanced elasticity features that enable dynamic expansion and contraction of clusters more than 20 times faster in every deployment scenario - cloud, virtual and physical - allowing users to quickly create additional capacity as needed.

- HP Information Optimization is a core component of an Instant-On Enterprise. In a world of continuous connectivity, the Instant-On Enterprise embeds technology in everything it does to serve customers, employees, partners and citizens with whatever they need, instantly.

226.    Initially, HP had stated that the HP Next Generation Information Platform combining Autonomy and Vertica would be available on January 31, 2012. That date was moved forward to December 1, 2011 so that the product could become the lynchpin of the HP Discover Vienna event. Attached to this complaint as **EXHIBIT 6** is a copy of the November 29, 2011 press release. Using HP Discover Vienna to announce the existence of a product that was not available until the last day of a fiscal quarter was highly problematic since it would preclude HP from discussing the product. Because of all of the criticism relating to the Autonomy acquisition and the August 18, 2011 public announcement, HP made the decision to announce that the HP Next Generation Information Platform IDOL 10 Autonomy/Vertica was available on December 1, 2011. While there was internal concern about risking the

announcement of a product that was not yet available, HP's senior leadership overruled those concerns and went forward with the announcement.

227. In an HP Whitepaper that was released during HP Discover Vienna entitled *Information Optimization: Transition to the Human Information Era*, HP reiterated that the HP Next Generation Information Platform was an integrated single layer technology:

> The solution to accessing and processing all structured and unstructured information is a single layer that goes across the enterprise—one system that is able to process both structured and unstructured information together. The next-generation information platform, IDOL 10, is designed to understand and act on 100 percent of enterprise information in real-time. This new platform promises dramatic business impact, as organizations can develop new applications that leverage the diversity and richness of Human Information combined with extreme structured data.

- IDOL 10 provides a single processing layer for forming a conceptual, contextual, and real-time understanding of all forms of data, both inside and outside an enterprise.

- The new platform combines Autonomy's infrastructure software for automatically processing and understanding unstructured data with Vertica's high-performance real-time analytics engine for extreme structured data.



228. This single processing layer, however, does not exist. IDOL 7 remains a product but it is the same product that Autonomy has been selling for the last few years. The Vertica Analytics Platform is a product. The HP Next Generation Information Platform IDOL 10 Autonomy/Vertica, purportedly available on <u>December 1, 2011</u>, was not available then and is not available now. Autonomy's IDOL 7 product was not worth $11.7 billion. It was only after the Autonomy acquisition and after Autonomy was handed control over the entire Information Management division that HP made the decision to misrepresent to the public what products actually existed in order to justify the Autonomy acquisition. Attached to this complaint as

**EXHIBIT 7** is a copy of the PowerPoint presentation used by HP at HP Discover Vienna to promote the HP Next Generation Information Platform IDOL 10 Autonomy/Vertica.

229.    After the HP Discover Vienna event, the HP Next Generation Information Platform IDOL 10 Autonomy/Vertica was still not available.  Although a product with the name IDOL 10 existed, it was nothing more than IDOL 7 with cosmetic changes.  It did not possess the features that were promised of the HP Next Generation Information Platform that would have warranted the astronomical price paid to acquire Autonomy.  All of this was known to HP but not released to the public.  Although HP was receiving requests for information from customers, press and technology analysts to provide further information about this HP Next Generation Information Platform, information on the product became scarce.  Nevertheless, from at least October of 2011 through May of 2012, Mike Lynch controlled what was known as the Autonomy unit at HP, which consisted of one of HP's largest divisions, the Information Management division.  Without having conducted any due diligence, HP's officers and directors gave the keys to one of their most important business units to Mike Lynch and his Autonomy team.  In the aftermath of Apotheker's ouster as HP CEO, Mike Lynch found allies in the former SAP executives who had become isolated, including Marty Homlish and Jerome Levadoux, both of whom were still top-level marketing executives at HP.

230.    For months, the fiction was allowed to be maintained that the HP Next Generation Information Platform existed as an integrated product between Autonomy and Vertica.  According to a former colleague of Mike Lynch, he and his Autonomy team believed that they were taking control of HP, not the other way around.  According to sources who were present when Autonomy and Mike Lynch announced the Autonomy acquisition, Mike Lynch said "[t]he attitude was that we were a Trojan horse within HP."

**Q.     HP Continues to Tout Autonomy Acquisition After HP Discover Vienna**

231.    In the aftermath of HP Discover Vienna, HP continued to misrepresent the value that Autonomy added to HP.  The first financial statement that HP filed with the Securities and Exchange Commission ("SEC") after the Autonomy acquisition closed was its Form 10-K in

which HP incorporated the Autonomy acquisition into HP's financial statements.  This was signed by Defendants Whitman, Andreesen, Babbio, Baldauf, Banerji, Gupta, Hammergren, Lane, Livermore, Reiner, Russo, Thompson and Whitworth.  All of them signed the document attesting to its veracity as directors of the HP Board of Directors.  HP's financial statements listed $24.9 billion in goodwill for the entire company, with Autonomy-specific goodwill equating to a little under half of that amount.  As HP set forth in its Form 10-K, HP recorded approximately $6.6 billion of goodwill and $4.6 billion of amortizable purchased intangible assets related to Autonomy:

### Acquisition of Autonomy Corporation plc (from HP 2011 10K)

HP's largest acquisition in fiscal 2011 was its acquisition of Autonomy Corporation plc (''Autonomy'').  As of October 31, 2011, HP owned an approximately 99% equity interest in Autonomy, and HP expects to acquire a 100% equity interest before the end of the first quarter of fiscal 2012.  Autonomy is a provider of infrastructure software for the enterprise. HP reports the financial results of the Autonomy business in the HP Software segment.  The acquisition date fair value consideration of $11 billion consisted of cash paid for outstanding common stock, convertible bonds, vested in-the-money stock awards and the estimated fair value of earned unvested stock awards assumed by HP.  In connection with this acquisition, HP recorded approximately $6.6 billion of goodwill and amortizable purchased intangible assets of $4.6 billion.  HP is amortizing the purchased intangible assets on a straight-line basis over an estimated weighted-average life of 8.8 years.

232.   It is from that $11.2 billion in goodwill and amortizable purchased intangible assets that HP took the write-down.  In acquiring Autonomy, HP acquired almost nothing in actual, physical assets; 95% of the $11.7 billion transaction was, for accounting purposes, treated as goodwill and intangible assets.  In other words, HP was placing all of the value of the acquisition into the purported customer base that Autonomy had (which was small) and its purportedly groundbreaking technology (which HP knew or should have known was outdated and facing intense competition).  This is akin to HP's attempt to break into the mobile device space by buying Palm, a failing electronic personal organizer manufacturer that had once been prominent but was unable to compete with companies such as Apple and Google.  HP could not admit that it had once again failed to do its homework before it spent billions of dollars of

shareholder monies. By allowing this document to be filed with the SEC the Board of Directors have opened themselves up to potential individual liability.

233. On <u>February 22, 2012</u>, HP hosted a conference call in which HP's CFO Catherine Lesjak touted the Autonomy acquisition. Lesjak had been one of the loudest voices against the acquisition back in 2011 but had been ignored. However, with the acquisition completed, Lesjak toed the company line in praising the Autonomy deal, saying that HP was "pleased with the Autonomy acquisition." Lesjak stated on the conference call:

> "Software delivered revenue growth of 30% year-over-year to $946 million supported by the acquisition of Autonomy. In the quarter, we saw 12% license growth, 108% growth in services and 22% support revenue growth. Overall, first quarter operating profit for Software was $163 million, or 17.1% of revenue, unfavorably impacted by acquisition-related integration costs and accounting adjustments, as well as lower mix of license revenue in the quarter. We are pleased with the Autonomy acquisition, **the pipeline is strong and the level of lead generation we are seeing across HP for Autonomy software and services is compelling.** HP filed its Form 10-Q for the first quarter of 2012 on <u>March 12, 2012</u>. This Form 10-Q was signed by Defendant Meg Whitman as the CEO of HP and Catherine Lesjak, as CFO of HP. In that Form 10-Q, HP reported goodwill (software) and acquired intangible assets at over $24.4 billion. In that Form 10-Q, Meg Whitman and Lesjak verified that the financial statements of HP were done in accordance with Generally Accepted Accounting Principles ("GAAP"). This was not true, however. The figures contained in that Form 10-Q were grossly inflated in light of the nearly $16 billion in write-downs that were pending in the next few months.

234. ██████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

LAW OFFICES
COTCHETT, PITRE
& McCARTHY, LLP

█████████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████

█████████████████████████████████████████

███████████████████████████████████████

██████████████████

**R.      Whistleblower Informs HP of Accounting Irregularities With Autonomy**

235.      In May of 2012, a whistleblower informed HP of accounting irregularities relating to Autonomy.  The whistleblower is referred to by HP as a "senior level employee" who is still working in HP's Autonomy unit.  The whistleblower informed HP that there were issues relating to revenue recognition at Autonomy, and other accounting issues.  HP has stated that it embarked on an internal investigation at that time, which was not disclosed to the public.  The forensic review was purportedly conducted by PricewaterhouseCoopers ("PwC") and HP General Counsel John Schultz.

236.      On November 20, 2012, Schultz stated "[n]ot surprisingly, Autonomy did not have sitting on a shelf somewhere a set of well-maintained books that would walk you through what was actually happening from a financial perspective inside the company."  Schultz added that "[i]ndeed critical documents were missing from the obvious places, and it required that we look in every nook and cranny."

237.      This would be an understandable statement but for the fact that HP, Defendant Apotheker and the entire HP Board of Directors, including current CEO Defendant Meg Whitman, had represented to the public and to the market that their due diligence process was exhaustive.  Defendant Whitman has stated that the HP Board of Directors relied on an "exhaustive" due diligence process by auditors and financial advisors.  Defendant Apotheker called the due diligence process "rigorous."  Apparently, this rigorous due diligence process failed to notice that Autonomy, a company HP acquired for $11.7 billion did not have well-

⊛
LAW OFFICES
COTCHETT, PITRE
& McCARTHY, LLP

maintained books. This rigorous due diligence process failed to notice that critical documents were missing from obvious places. Moreover, the armies of lawyers, bankers, and accountants that HP purportedly relied on missed the fact that no one could actually figure out what was happening at Autonomy from a financial perspective before HP spent $11.7 billion to acquire Autonomy.

**S.      May 2012: Mike Lynch Was Pushed Out of Autonomy**

238.      In May of 2012, Mike Lynch was quietly pushed out of HP, after directing HP's Autonomy unit for six months under Meg Whitman's direct supervision.

239.

240.

1

2

241. ████████████████████████

4

5

6

7    242.    On <u>May 23, 2012</u>, the same day as the meeting, on a second quarter 2012 earnings

8

conference call, HP tried to portray Mike Lynch's departure as a business strategy shift.  By this

9

time, HP knew about accounting improprieties at Autonomy as well as the lack of an integrated

10

next generation information platform that HP had promised was already available.  None of this

11

critical information was disclosed to the public on the <u>May 23, 2012</u> call.  Instead, Whitman and

12

Lesjak tried to spin the events.  Defendant Whitman acknowledged on that call that Autonomy

13

had a "very disappointing" revenue quarter without disclosing the accounting or technology

14

issues.  Defendant Whitman stated on the conference call:

15

16    "To help improve Autonomy's performance, Bill Veghte, HP's Chief Strategy Officer
      and Executive Vice President of HP Software, will step in to lead Autonomy.  Mike

17    Lynch, Autonomy's Founder and Executive Vice President for Information Management
      will leave HP after a transition period.  **The market and competitive position for**

18    **Autonomy remains strong**, particularly in cloud offerings, and we have been flooded

19    with a number of big deal leads.  Bill is an experienced software leader, who will develop
      the right processes and discipline to scale Autonomy and fulfill its promise, although it

20    will take a few quarters to see tangible improvement."

21

22    243.    By <u>May 23, 2012</u>, HP had settled on the story it was going to sell to the market.

23

HP knew that it had acquired outdated technology and did not have the HP Next Generation

24

Information Platform that it promised back on <u>November 29, 2011</u>.  HP also knew that it was

25

aware of serious accounting red flags at Autonomy prior to agreeing to acquire Autonomy and

26

had willfully ignored those red flags in order to push the acquisition through.  To cover up this

27

fiasco, the ground was laid to portray this debacle as an "accounting fraud" and place all of the

28

blame on Autonomy.  While HP's officers and directors knew that they would draw some fire

✆
LAW OFFICES
COTCHETT, PITRE
& McCARTHY, LLP

**CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT**          100

from an "accounting scandal" at Autonomy, they could at least seek to portray themselves as victims of an elaborate fraudster and not a corporate board that had failed utterly to meet even the minimal fiduciary responsibilities owed to HP and its shareholders.  After quietly removing Mike Lynch from a position of power at HP that HP itself had given him, the company was now in the process of preparing for a massive write-down of Autonomy and putting as much blame as possible for that write-down on "accounting fraud by Autonomy."

244.    During this entire time, there was still no real due diligence of the fundamental technology that had been acquired and which Apotheker, Whitman and Eagan all stated definitively was a revolutionary integrated next generation information platform.  Behind HP's claims of accounting irregularities at Autonomy, which are serious, are HP's own issues, including: (1) the failure of HP to conduct due diligence of the technology it was acquiring, and (2) misrepresentations approved by HP's officers and directors to conceal these failures.  By wiping out 80% of the value of Autonomy by claiming "accounting improprieties," HP sought to hide and is still seeking to hide the fact that it paid a fortune to acquire a product that was only competitive back in 1996 and not in 2011.

**T.    June 4, 2012: HP Discover Las Vegas: HP Continued to Tout Availability Of Integrated HP Next Generation Information Platform IDOL 10 Autonomy/Vertica**

245.    The next HP Discover event after Vienna began on <u>June 4, 2012</u> in Las Vegas.  At the time of the HP Discover Las Vegas event, the whistleblower had already come forward to HP with information about accounting irregularities at Autonomy.  HP certainly knew that the HP Next Generation Information Platform which it promised would be available on <u>December 1, 2011</u>, was still not available, almost seven months later.  This was a significant opportunity for HP to inform the public that there were serious allegations of fraud at Autonomy.  Assuming that Schultz was being honest in describing the internal investigation, by <u>June 4, 2012</u>, HP and PwC had discovered that critical records were missing from obvious places at Autonomy and that there were no well-maintained books at Autonomy that set forth the actual state of Autonomy's financial conditions, facts that were apparently missed in HP's "rigorous" due diligence process.

HP had enough material, non-public information that it knew would impact its share price for which HP was required to disclose. HP's officers and directors concealed that information.

246. In its HP Discover Las Vegas presentation, HP continued to maintain that the HP Next Generation Information Platform was a single integrated product that was immediately available for sale:



247. At HP Discover Las Vegas, HP continued to maintain that the HP Next Generation Information Platform IDOL 10 Autonomy/Vertica was an available product and had been available for months. HP Discover Las Vegas was an opportunity for HP to be honest to the public, to its customers and to its shareholders. HP, however, had spent $11.7 billion on a company without the revolutionary technology that Defendants Apotheker and Meg Whitman were on record as saying would change HP's business direction and transform the company.

248. Back on August 18, 2011, when HP announced the acquisition, Defendant Apotheker stated that the Autonomy acquisition would "squarely position HP in software and information to create the next-generation Information Platform, and thereby, create significant value for our shareholders."

249.   On <u>November 21, 2011</u>, Defendant Meg Whitman doubled down, saying that the Autonomy acquisition "really positions HP as a leader in the Next-generation information management and analytics capabilities, as the explosion of data is making these capabilities absolutely critical.  Autonomy is a unique asset."

250.   On <u>November 29, 2011</u>, at HP Discover Vienna, HP stated that this product was available on <u>December 1, 2011</u>.

251.   HP's misrepresentations continued at HP Discover Las Vegas.  In another slide in HP's presentation at HP Discover Las Vegas, HP stated that there exists a single layer integrated product involving Autonomy's IDOL 10 and Vertica:



252.   At HP Discover Las Vegas, HP continued to misrepresent that "IDOL 10 provides the **single platform** that consumes all the data from all sources . . ."  This, however, was not true.  In a <u>November 20, 2012</u> *New York Times* article entitled "Hewlett's Loss: A Folly Unfolds, by the Numbers," the reporter quoted Leslie Owens from Forrester Research, a technology analyst who specializes in the enterprise search business that includes Autonomy.  The article referred to how Autonomy announced a new version of its core product called the HP Next Generation Information Platform IDOL 10 Autonomy/Vertica that was such a quantum leap past Autonomy's former IDOL 7 product that there did not need to be an IDOL 8 or IDOL 9.  The article then recounted that after HP's acquisition of Autonomy, Owens stated that "we asked for

1   a demo" but that "we're still waiting."  The Next Generation Information Platform is, in reality,

2   nothing more than IDOL 7.  There was no Autonomy integration with Vertica to create the

3   "single processing layer" that HP has represented to the market as an existing and available

4   product.

5   **U.    Summer of 2012: HP Began Planning How to Best Sell the Write-Down to the Public**

6           253.    On June 8, 2012, HP filed its financial statements with the SEC on Form 10-Q for

7   the second quarter of 2012.  Again, the Form 10-Q was signed by HP CEO Meg Whitman and

8   HP CFO Catherine Lesjak.  The Form 10-Q was verified by both individuals who swore that the

9   financial statements were done in accordance with GAAP.  In that Form 10-Q for the second

10  quarter of 2012, HP reported goodwill (software) and acquired intangible assets of over $24.5

11  billion, with Autonomy-specific goodwill and acquired intangible assets consisting of $10.8

12  billion of that $24.5 billion.  This statement of assets by HP was grossly inflated and fraudulent.

13  By this time, HP knew for certain about the accounting and technology problems related to the

14  Autonomy acquisition.  A whistleblower had already come forward with specific facts about

15  significant accounting issues at Autonomy and HP had already hired PriceWaterhouse Coopers

16  ("PwC") to further investigate.  Notwithstanding the fraudulent misstatements being made, HP

17  was also concealing material, non-public information that it knew would have a significant

18  negative impact on HP's financial condition and share price.  By filing false SEC statements, the

19  Individual Defendants demonstrated knowledge and understanding of the potential liability that

20  they faced.

21

22          254.    ███████████████████████████████████████████████████

23  ████████████████████████████████████████████████████████

24  █████████████████████████████████████████████████████████

25  █████████████████████████████████████████████████████████

26  ██████████████████████████████████████████████████

27  ████████████████████████████████████████████████████

28  ████████████████████████████████████████████

LAW OFFICES
COTCHETT, PITRE
& McCARTHY, LLP

255. ████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████ ████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████

256. ████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████

257. ███████████████████████████████
████████████████████████████
█ ████████████████████████████████
  ████████████████████████
█ █████████████████████████████████
  █████████████
█ ████████████████████████████
█ █████████████████████████████████

258. ████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████

⊛
LAW OFFICES
COTCHETT, PITRE
& McCARTHY, LLP

259. All of this could have and would have been discovered if any of the Individual Defendants had insisted on conducting independent due diligence of Autonomy, and not simply relying on the representations of Autonomy. This complete failure of due diligence is even more egregious because of the massive size of the transaction and the multiple red flags that the Individual Defendants were aware of. Larger transactions require more evaluation of red flags, not less. The Individual Defendants' contrary conduct is a breach of their fiduciary duties.

260.

261.

1

2

3

4

## V. HP Began Publically Announcing the Failures of the Autonomy Acquisition

262.    On <u>August 8, 2012</u>, HP issued a press release announcing that it expected to record an $8 billion goodwill impairment charge within its Enterprise Services segment. This write-down relates directly to the failed integration of EDS into HP. Gerard Brossard, the man who was responsible for integrating EDS into HP's Enterprise Services segment (and who failed to do so) was the same man who was tasked with integrating Autonomy into HP.

263.    As part of the <u>August 8, 2012</u> press release entitled "HP Announces Organizational Changes for Enterprise Services," HP included the following section:

> **Q3FY12 GAAP outlook**
> **Services goodwill impairment charge**
>
> **HP expects to record a non-cash pre-tax charge for the impairment of goodwill within its Services segment of approximately $8 billion in the third quarter of its fiscal 2012.**
>
> The impairment review stems from the recent trading values of HP's stock, coupled with market conditions and business trends within the Services segment. Under accounting rules, when indicators of potential impairment are identified, companies are required to conduct a review of the carrying amounts of goodwill and other long-lived assets to determine if an impairment exists.
>
> HP does not expect this estimated goodwill impairment charge to result in any future cash expenditures or otherwise affect the ongoing business or financial performance of its Services segment.

264.    Once again, there is no mention of Autonomy or the accounting irregularities and technology issues that HP was aware of by that time.

265.    On <u>August 22, 2012</u>, HP confirmed in an Form 8-K filed with the SEC that it was taking an $8 billion goodwill impairment charge associated with the Enterprise Services segment against third quarter 2012 earnings.

In an <u>August 22, 2012</u> press release, HP stated:

**HP Reports Third Quarter 2012 Results**

PALO ALTO, Calif., Aug. 22, 2012

--------------------------------------------------------------------------------

- Third quarter non-GAAP diluted earnings per share of $1.00, above previously provided outlook of $0.94 to $0.97 per share and in line with pre-announcement

- Third quarter GAAP loss per share of $4.49

- Third quarter net revenue of $29.7 billion, down 5% from the prior-year period and down 2% when adjusted for the effects of currency

- Returned $625 million in cash to shareholders in the form of dividends and share repurchases

HP today announced financial results for its third fiscal quarter ended July 31, 2012. For the quarter, net revenue of $29.7 billion was down 5% year over year and down 2% when adjusted for the effects of currency.

GAAP loss per share was $4.49, down from earnings per share (EPS) of $0.93 in the prior-year period. Non-GAAP diluted EPS was $1.00, down 9% from the prior-year period. Third quarter non-GAAP earnings information excludes after-tax costs of $10.8 billion, or $5.49 per diluted share, related to the amortization and impairment of purchased intangible assets, the impairment of goodwill, restructuring charges, acquisition-related charges and charges relating to the wind-down of certain retail publishing business activities, including the previously announced charges related to the impairment of goodwill within HP's Services segment, the restructuring program announced in May 2012, and the impairment of the purchased intangible asset associated with the "Compaq" trade name.

266.    By <u>August 22, 2012</u>, HP was well aware that the HP Next Generation Information Platform did not exist, even though HP had told the market it had been available for months. HP was well aware that there were serious accounting fraud allegations against Autonomy, which are purportedly being investigated by HP's General Counsel and PwC. None of this material information was disclosed to the market. Instead, HP simply reported disappointing results in the Enterprise Services segment.

⊛
LAW OFFICES
COTCHETT, PITRE
& MCCARTHY, LLP

267. On a conference call that same day, Defendant Meg Whitman discussed both the Enterprise Services segment write-down and the Autonomy acquisition:

> Now, let me outline some areas where we're not where we need to be. While Enterprise Services performance in the third quarter was within our expectations, there's still a lot of work that needs to be done. Earlier this month we announced a change in leadership at ES with Mike Nefkens stepping in to lead on an acting basis. Mike is an experienced leader who has led IT transformations for a number of our largest accounts.
>
> * * *
>
> **Autonomy still requires a great deal of attention and we've been aggressively working on that business.** Among the many changes we've instituted is a global dashboard to track Autonomy's pipeline. A single global sales methodology, a single HP Services engagement process, and a global process to measure client satisfaction and service delivery progress. These actions are designed to help deliver predictable results and improve after-sale customer satisfaction.

268. On that same conference call, Lesjak added:

> Moving on to Services. As we announced on August 8, we are recording a GAAP only non-cash pretax charge of approximately $8 billion for the impairment of goodwill within the Services segment. The impairment stems from the recent trading values of HP stock coupled with market conditions and business trends within the Services segment. We do not expect this goodwill impairment charge to result in any future cash expenditures or otherwise affect the ongoing business or financial performance of the Services segment.

On that same conferences call Meg Whitman, continuing the misrepresentation that

Autonomy was an integrated system stated:

> And we continue to leverage the IP of our acquisitions across the portfolio. We announced a number of integrated solutions that combine the power of Autonomy, Vertica, Enterprise Services, and our Converged Infrastructure to address the problems and opportunities of big data.

269. On September 10, 2012, HP filed its Form 10-Q with the SEC for the third quarter of 2012. This Form 10-Q, like the previous two, were signed by HP's CEO Whitman and CFO Lesjak. This statement, like the other two, included language verifying that the financial statement was done in compliance with GAAP. This time, HP lists goodwill (software) and acquired intangible assets of $22.5 billion, with Autonomy-specific goodwill and acquired intangible assets constituting $10.7 billion of that $22.5 billion sum. This Form 10-Q for third

quarter 2012, just like the Form 10-Q's for the first and second quarters, and the Form 10-K for the fiscal year ending 2011, were all false and misleading.  HP had a duty and an obligation to disclose the nature of the whistleblower allegations, the lack of an integrated HP Next Generation Information Platform IDOL 10 Autonomy/Vertica, and the accounting issues that HP knew about.  Nevertheless, HP's officers and directors chose to remain silent and filed fraudulent and misleading financial statements with the SEC on four separate occasions: <u>December 14, 2011</u>, <u>March 12, 2012</u>, <u>June 8, 2012</u> and <u>September 10, 2012</u>.  The potential exposure that the Individual Defendants face involving securities fraud litigation make them unable to independently or objectively investigate, or fairly and independently, adjudicate claims against themselves as members of the HP Board of Directors.

270. ████████████████████████████████  ████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████

271. ████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████
██████████████████████████████

272. ████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████
████████████████████████████████████████

LAW OFFICES
COTCHETT, PITRE
& McCARTHY, LLP



LAW OFFICES
COTCHETT, PITRE
& McCARTHY, LLP

275. ███████████████████████████████

████████████████████████████████

█████████████████████████████████████

█████████████████████████████████████

██████████████████████████████████

███████████

276. ██████████████████████████████████████

████████████████████████████████████

████████████████

277. █████████████████████████████████

██████████████████████████████████████

██████████  ███████████████████████████

██████████████████████████████████████

███████████████████████████████████████

███████████

278. ████████████████████████████████

████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

██████████████████████████████████

███████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████

279. ██████████████████████████████

██████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████

LAW OFFICES
COTCHETT, PITRE
& McCARTHY, LLP

1

2

3

4     280.

5

6

7

8     281.

9

10

11

12

13

14

**W.    HP's Board of Directors Acted Recklessly in Approving Massive Stock Purchases While They Knew That An Multibillion Dollar Write-Down of Autonomy Was Pending**

282.    During this entire time, while HP was preparing for $16 billion in write-downs, HP's Board of Directors and its officers continued to act as if none of these problems were occurring.  Defendant Lane and the HP Board of Directors approved massive stock repurchases at HP, which further drained HP's treasury, especially after the same directors had wasted $11.7 billion buying Autonomy which was only worth a fraction of that amount.  These stock repurchases were authorized by the HP Board of Directors in the months before the $8 billion EDS write-down and the $8.8 billion Autonomy write-down.  HP's Board of Directors knew that the company was about to announce the loss of $16 billion in shareholder value, knew that there was accounting fraud at Autonomy, and knew that HP had promised a revolutionary Autonomy technology that did not exist.  In the face of this knowledge, it was grossly irresponsible to

authorize these stock repurchases, knowing that any announcement involving these material facts would dramatically impact HP's stock price.

283. Between June of 2011 and November of 2012, while in possession of material, nonpublic information that negatively impacted HP, the Individual Defendants directed or permitted HP to overpay for its own stock through massive stock repurchases. In particular, on July 21, 2011, less than a month before the announcement of the Autonomy acquisition, Defendants Apotheker, Livermore, Lane, Babbio, Hammergren, Baldauf, Thompson, Gupta, Andreessen, Banerji, Reiner, Russo, Senequier, and Whitman authorized an additional $10 billion for HP's stock repurchase program, which still had $5.9 billion of repurchase authorization remaining. It was unnecessary to authorize such a massive stock repurchase. Nevertheless, the HP Board of Directors permitted HP to repurchase over $2.1 billion of HP's artificially inflated stock between August 2011 and October 2012, while having knowledge of information at HP that made such a decision grossly negligent, if not reckless.

284. By the time HP announced the repurchase authorization in July of 2011, the Board had already decided to acquire Autonomy for over $11 billion. The Individual Defendants knew or recklessly disregarded numerous red flags that alerted them about Autonomy's substantial overvaluation, such as the revenue recognition issues at Autonomy and the fact that Autonomy's growth came from acquisitions, not organic growth. Meanwhile, a whistleblower informed HP of accounting issues at Autonomy in approximately May of 2012. The whistleblower's information and the investigation that followed ultimately resulted in HP writing down approximately 80% of the acquisition price of Autonomy. The Individual Defendants allowed HP to deplete its assets by paying to repurchase its own stock despite knowing that these forthcoming announcements would cause HP's stock to tumble.

## X.     HP Controlled the Release of Information Concealing the Truth About Autonomy

285. HP's August 8, 2012 announcement that it was writing down $8 billion from its Enterprise Services division relating to the EDS acquisition was the beginning of HP's damage control public campaign. On October 3, 2012, at an analyst meeting, Michael Nefkens, HP's

Acting Global Enterprise Services Leader and Jean-Jacques Charhon, the Senior Vice President and Chief Operating Officer of Enterprise Services, laid out in detail the reasons why profitability at the Enterprise Services had fallen so dramatically.  Their reasons were explained through a PowerPoint presentation.  The Enterprise Services division explained that operating margin had decreased from 10% to 5% on nearly $6 billion in quarterly revenue, as of August of 2011.  By October of 2012, Enterprise Services' operating margins had fallen an additional 40%, to approximately 3%.  During the meeting, HP added that the Enterprise Services segment's 2013 revenue would slide by 11% to 13% and that operating margins were expected to be in the range of 0% to 3%.  In other words, the trend for HP was continuing in the same direction it had even before the Autonomy acquisition.  HP's core product lines were seeing operating margins that were in the low single digits to potentially 0%.  The purpose of the Autonomy acquisition and the HP Next Generation Information Platform IDOL 10 Autonomy/Vertica was to reverse that trend and give HP double digit profit margins.

286.    The market responded negatively to HP's write-down announcement.  In an October 3, 2012 research report, Topeka Capital Markets wrote the following:

> "**Most Negative Impact to FY13 EPS to the Enterprise Services.**  Yesterday we talked about the services business being our biggest concern.  The biggest driver of YoY EPS decline is HP Enterprise Services, that is expected to negatively impact FY13 EPS by $0.29-$0.35 with sales falling 11%-13% YoY.  The operating margin of the Enterprise Services business is expected to be 0% to 3% in FY13 and well below the 11% delivered in 3QFY12.  Keep in mind, HP had at one time expected operating margin to be 16% to 17.5% in this business.  Given a result CRN article indicating HP has been trying to sell its Enterprise Services business (and since denied by HP), we believe there was some truth to this article given HP's weak FY13 outlook for this business.  Since Enterprise Services was the biggest contributor of profit for HP last quarter . . . this is a long term concern."

287.    In an October 4, 2012 *Contra Costa Times* article, the newspaper wrote:

> "Analysts expect the company's revenue and margins to falter, increasing uncertainty about its recent strategic decisions which focus on transforming the former industry powerhouse into an enterprise computing corporation that take on IBM and Dell.

LAW OFFICES
COTCHETT, PITRE
& McCARTHY, LLP

'HP's assumption of turning around the enterprise services business within one-two years looks aggressive, given the significant revenue decline and margin deterioration expected in fiscal 2013,' BMO Capital Markets analyst Keith Bachman said.

288.    With all of HP's business operations faltering and with operating margins collapsing, the admission by HP that its officers and directors had spent $11.7 billion on a lemon without conducting due diligence would devastate the venerable seventy plus year old company, one of the founders of Silicon Valley.  This Board of Directors and these officers had overseen the monumental fall from grace of one of the pioneering companies of the 20th century.  With its Enterprise Services division facing low single-digit operating margins, HP needed Autonomy to remain a positive for HP.  The decision was made to initiate a massive write-down of Autonomy and blame the majority of that write-down on the accounting issues at Autonomy.  In doing so, HP could wipe out the value of the Autonomy acquisition and its outdated technology without any blame falling on the HP officers and directors.  By blaming Autonomy's accounting, HP could still pretend to have the groundbreaking IDOL technology that HP could continue to proclaim would transform the industry.

**Y.     November 20, 2012: HP Announced $8.8 Billion Write-down on Autonomy Acquisition**

289.    On <u>November 20, 2012</u>, HP released its fourth quarter and full year financial results for 2012, which were extremely disappointing.  In that news release, HP announced that its financial results were significantly lower than what it had experienced a year ago:

- Full year fiscal 2012 non-GAAP diluted earnings per share of $4.05, within the previously provided outlook of $4.05 to $4.07

- Full year fiscal 2012 GAAP loss per share of $6.41

- Full year fiscal 2012 net revenue of $120.4 billion, down 5% from the prior-year period and down 4% when adjusted for the effects of currency

- Fourth quarter non-GAAP diluted earnings per share of $1.16, down 1% from the prior-year period

- Fourth quarter GAAP loss per share of $3.49

**CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT**                    116

LAW OFFICES
COTCHETT, PITRE
& MCCARTHY, LLP

- Fourth quarter net revenue of $30.0 billion, down 7% from the prior-year period and down 4% when adjusted for the effects of currency

- Cash flow from operations of $4.1 billion, up 69% from the prior-year period

- Returned $384 million in cash to shareholders in the form of dividends and share repurchases

- Fourth quarter and full year fiscal 2012 results include a non-cash goodwill and intangible asset impairment charge of $8.8 billion relating to the Autonomy business within the Software segment

- For the full year fiscal 2012, net revenue of $120.4 billion was down 5% from the prior-year period and down 4% when adjusted for the effects of currency.

- Full-year GAAP loss per share was $6.41, down from diluted earnings per share (EPS) of $3.32 in the prior-year period.  Full-year non-GAAP diluted EPS was $4.05, down 17% from the prior-year period.  Full year non-GAAP earnings information excludes after tax costs of $20.7 billion, or $10.46 per diluted share, related to the impairment of goodwill and purchased intangible assets, restructuring charges, amortization of purchased intangible assets, charges relating to the wind down of non-strategic businesses and acquisition-related charges.

290.    HP also announced on that same day that it was writing down $8.8 billion of the value of Autonomy, based on information received from a whistleblower in May of 2012.  In the November 20, 2012 press release, HP stated that:

"HP is extremely disappointed to find that some former members of Autonomy's management team used accounting improprieties, misrepresentations and disclosure failures to inflate the underlying financial metrics of the company, prior to Autonomy's acquisition by HP. These efforts appear to have been a willful effort to mislead investors and potential buyers, and severely impacted HP management's ability to fairly value Autonomy at the time of the deal. We remain 100 percent committed to Autonomy and its industry-leading technology."

Additional background:

HP today announced a non-cash impairment charge of $8.8 billion related to Autonomy in the fourth quarter of its 2012 fiscal year. The majority of this impairment charge, more than $5 billion, is linked to serious accounting improprieties, misrepresentation and disclosure failures discovered by an internal investigation by HP and forensic review into Autonomy's accounting practices prior to its acquisition by HP. The balance of the

impairment charge is linked to the recent trading value of HP stock and headwinds against anticipated synergies and marketplace performance.

HP launched its internal investigation into these issues after a senior member of Autonomy's leadership team came forward, following the departure of Autonomy founder Mike Lynch, alleging that there had been a series of questionable accounting and business practices at Autonomy prior to the acquisition by HP. This individual provided numerous details about which HP previously had no knowledge or visibility.

HP initiated an intense internal investigation, including a forensic review by PricewaterhouseCoopers of Autonomy's historical financial results, under the oversight of John Schultz, executive vice president and general counsel, HP.
As a result of that investigation, HP now believes that Autonomy was substantially overvalued at the time of its acquisition due to the misstatement of Autonomy's financial performance, including its revenue, core growth rate and gross margins, and the misrepresentation of its business mix.

Although HP's investigation is ongoing, examples of the accounting improprieties and misrepresentations include:

- The mischaracterization of revenue from negative-margin, low-end hardware sales with little or no associated software content as "IDOL product," and the improper inclusion of such revenue as "license revenue" for purposes of the organic and IDOL growth calculations.

- This negative-margin, low-end hardware is estimated to have comprised 10-15% of Autonomy's revenue.

- The use of licensing transactions with value-added resellers to inappropriately accelerate revenue recognition, or worse, create revenue where no end-user customer existed at the time of sale.

This appears to have been a willful effort on behalf of certain former Autonomy employees to inflate the underlying financial metrics of the company in order to mislead investors and potential buyers. These misrepresentations and lack of disclosure severely impacted HP management's ability to fairly value Autonomy at the time of the deal.

HP has referred this matter to the US Securities and Exchange Commission's Enforcement Division and the UK's Serious Fraud Office for civil and criminal investigation. In addition, HP is preparing to seek redress against various parties in the appropriate civil courts to recoup what it can for its shareholders. The company intends to aggressively pursue this matter in the months to come.

291. That same day, Defendant Whitman, on an analyst conference call, intentionally moved to shift blame from the HP Board of Directors to third parties by claiming that the HP

LAW OFFICES
COTCHETT, PITRE
& MCCARTHY, LLP

Board of Directors relied on an "extensive" and "exhaustive" audit of Deloitte conducted by KPMG. On the <u>November 20, 2012</u> conference call, Defendant Whitman stated "we hired KPMG to audit Deloitte, and neither of them saw what we now see after someone came forward to point us in the right direction." KPMG shortly thereafter went public by stating that its review of Autonomy's financials was not an audit. KPMG stated that the review done was very limited and included only publically available documents. Both Defendants Whitman and KPMG cannot be telling the truth. Defendant Whitman's statement that "KPMG audited Deloitte" and the statement that "neither of them saw" the accounting issues that would eventually result in the $8.8 billion write-down are demonstrably false.

292. In addition Whitman stated that "[t]he majority of this impairment charge is linked to serious accounting improprieties, disclosure failure, and outright misrepresentations that occurred prior to HP's acquisition." This statement, however, intentionally conceals the lack of due diligence by HP, which the Individual Defendants, including Defendant Whitman knew about.

293. ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

294. Since the announcement of the $8.8 billion write-down, the value of HP and its stock has fallen dramatically. On <u>November 19, 2012</u>, the day before the announcement, HP stock was trading at $13.30 per share. By the close of the trading day on <u>November 20, 2012</u>, HP common stock had dropped to $11.71 per share. HP is unwilling and unable to evaluate its own misconduct in this case. HP's officers and directors are seeking to use the "accounting

LAW OFFICES
COTCHETT, PITRE
& McCARTHY, LLP

1  irregularities" at Autonomy as a scapegoat to hide its corporate fraud, mismanagement and

2  misconduct.

3  **Z.  Mike Lynch Challenged HP's Assertion That the Entire $8.8 Billion Write-down is**

4  **Related to Accounting Irregularities at Autonomy**

5  295.    In interviews with the financial press, Autonomy's former CEO, Mike Lynch,

6  stated that even if there were issues regarding revenue recognition, it equaled closer to $100

7  million and by any measure magnitudes smaller than $8.8 billion.  According to Lynch, "it's

8  inconceivable how, from $100 million of revenue that just changes classification, you could

9  possibly have a write-down as big as $5 billion.  Something else must be going on.  People are

10  starting to spot this.  They've had to do a very big write-down and they tried to blame it on the

11  accounting but obviously something else is going on.  That is a question that Hewlett-Packard

12  has got to answer."

13  296.    After HP's November 20, 2012 announcement accusing Mike Lynch and

14  Autonomy of engaging in accounting improprieties, Mike Lynch set up a website entitled

15  AutonomyAccounts.org which is located at http://autonomyaccounts.org/.  On that website, Mike

16  Lynch included open letters, the first of which is dated November 27, 2012 to HP's officers and

17  directors, challenging them to explain the rationale for its $8.8 billion write-down:

**Mike Lynch publishes an open letter to Hewlett-Packard**

**Open Letter from Dr. Mike Lynch to the Board of Directors of Hewlett-Packard**

27 November 2012

To: The Board of Directors of Hewlett-Packard Company

On 20 November Hewlett-Packard (HP) issued a statement accusing unspecified
members of Autonomy's former management team of serious financial impropriety. It
was shocking that HP put non-specific but highly damaging allegations into the public
domain without prior notification or contact with me, as former CEO of Autonomy.

I utterly reject all allegations of impropriety.

Autonomy's finances, during its years as a public company and including the time period
in question, were handled in accordance with applicable regulations and accounting
practices. Autonomy's accounts were overseen by independent auditors Deloitte LLC,

LAW OFFICES
COTCHETT, PITRE
& McCARTHY, LLP

who have confirmed the application of all appropriate procedures including those dictated by the International Financial Reporting Standards used in the UK.

Having no details beyond the limited public information provided last week, and still with no further contact from you, I am writing today to ask you, the board of HP, for immediate and specific explanations for the allegations HP is making. HP should provide me with the interim report and any other documents which you say you have provided to the SEC and the SFO so that I can answer whatever is alleged, instead of the selective disclosure of non-material information via background discussions with the media.

I believe it is in the interest of all stakeholders, and the public record, for HP to respond to a number of questions:

Many observers are stunned by HP's claim that these allegations account for a $5 billion write down and fail to understand how HP reaches that number. Please publish the calculations used to determine the $5 billion impairment charge.

Please provide a breakdown of the relative contribution for revenue, cash flow, profit and write down in relation to:

The alleged "mischaracterization" of hardware that HP did not realize Autonomy sold, as I understand this would have no effect on annual top or bottom lines and a minor effect on gross margin within normal fluctuations and no impact on growth, assuming a steady state over the period;

The alleged "inappropriate acceleration of revenue recognition with value-added resellers" and the "[creation of] revenue where no end-user customer existed at the time of sale", given their normal treatment under IFRS; and

The allegations of incorrect revenue recognition of long-term arrangements of hosted deals, again given the normal treatment under IFRS.

In order to justify a $5 billion accounting write down, a significant amount of revenue must be involved. Please explain how such issues could possibly have gone undetected during the extensive acquisition due diligence process and HP's financial oversight of Autonomy for a year from acquisition until October 2012 (a period during which all of the Autonomy finance reported to HP's CFO Cathie Lesjak).

Can HP really state that no part of the $5 billion write down was, or should be, attributed to HP's operational and financial mismanagement of Autonomy since the acquisition?

How many people employed by Autonomy in September 2011 have left or resigned under the management of HP?

HP raised issues about the inclusion of hardware in Autonomy's IDOL Product revenue, notwithstanding this being in accordance with proper IFRS accounting practice. P lease

confirm that Ms. Whitman and other HP senior management were aware of Autonomy's hardware sales before 2012. Did Autonomy, as part of HP, continue to sell third-party hardware of materially similar value after acquisition? Was this accounted for by HP and was this reported in the Autonomy segment of their accounts?

Were Ms. Whitman and Ms. Lesjak aware that Paul Curtis (HP's Worldwide Director of Software Revenue Recognition), KPMG and Ernst & Young undertook in December 2011 detailed studies of Autonomy's software revenue recognition with a view to optimizing for US GAAP?

Why did HP senior management apparently wait six months to inform its shareholders of the possibility of a material event related to Autonomy?

Hewlett Packard is an iconic technology company, which was historically admired and respected all over the world. Autonomy joined forces with HP with real hopes for the future and in the belief that together there was an opportunity to make HP great again. I have been truly saddened by the events of the past months, and am shocked and appalled by the events of the past week.

I believe it is in the best interests of all parties for this situation to be resolved as quickly as possible.

I am placing this letter in the public domain in the interests of complete transparency.

Yours faithfully,

Dr. Michael R. Lynch

297. All of Mike Lynch's questions posed to HP's Board of Directors are relevant questions because there is a much larger story surrounding the Autonomy acquisition than simply accounting improprieties. While accounting irregularities did exist, it is not plausible for HP to claim that a $5 billion accounting fraud occurred without the knowledge of Barclays, Perella, HP's own internal staff, HP's officers and its directors.

298. In an effort to justify the acquisition, material misrepresentations were made by HP about what products were available. The core product at the heart of the Autonomy acquisition was the HP Next Generation Information Platform IDOL 10 Autonomy/Vertica. Defendants Meg Whitman and Apotheker publically stated that this was the product that justified the $11.7 billion price tag. The HP Board of Directors unanimously approved the acquisition

because of that technology. On <u>November 29, 2011</u>, HP unequivocally stated that the product existed. These issues and more explain the $8.8 billion write-down. The accounting improprieties are only the tip of the iceberg, but they do not protect HP's officers and directors from avoiding responsibility and liability.

299. Dr. Mike Lynch again addressed the HP shareholders and the public with another open letter, posted on his website on <u>March 20, 2013</u>, the day of HP's annual shareholder meeting.

### Open letter from Mike Lynch to the shareholders of Hewlett-Packard

Today HP will hold its annual shareholder meeting. This meeting provides a moment of accountability for HP's Board of Directors to all its stakeholders, and is an appropriate time for the Board to address material questions.

A significant issue for HP's stakeholders is the allegations HP has made against the former management team of Autonomy in relation to the acquisition of that company, and the related impairment charge of $8.8 billion taken against shareholder funds. As a member of the former management team of Autonomy I have a shared interest with the shareholders of HP (of which I am not one) in getting to the bottom of those allegations, understanding exactly what happened within HP related to this situation and resolving it as soon as possible.

We therefore put forward some questions that we believe HP's Board of Directors needs to answer at the shareholder meeting:

1. Can the Board provide details and evidence of the allegations it has made against the former management team of Autonomy to shareholders and to the people it has accused, so that everyone can understand the allegations that are being made and how it relates to the decisions and statements the Board has made? Can the Board confirm when it first became aware of these specific allegations? Will the Board provide the report from PwC on which its allegations are based to the former Autonomy management team so that this issue can move toward resolution? Will the Board also make available the conclusions of the findings of the recently appointed committee investigating the circumstances of the acquisition?

2. How did HP calculate the impairment charge it has taken against Autonomy? Several qualified commentators, including a former Chief Accountant of the SEC, have questioned how the alleged irregularities in Autonomy's accounting could generate such a large write-down. How much of the impairment charge was related to the operating performance of Autonomy post-acquisition?

3. Did HP approach the UK Takeover Panel at any stage in an attempt to rescind its offer to buy Autonomy before completion? If so what was the reason it gave and why was this material change of view not communicated to shareholders?

4. The former management of Autonomy began alerting Ms. Whitman as early as December 2011 to significant problems with the integration of Autonomy into HP that were negatively impacting its performance. When did Ms. Whitman acknowledge that Autonomy was not performing against expectations? Why was this not communicated to shareholders at that time?

5. Will HP commit to behaving in a transparent manner in providing information about these allegations and the legal processes that have been set in motion? This includes not pre-empting announcements by regulatory authorities and not waiting long periods to disclose information.

 We continue to reject the allegations made against us by HP and believe it is in the interests of all parties that these questions be addressed directly by the Board so this issue can be resolved as swiftly as possible. HP has acted in an aggressive and unusual manner throughout this episode, making highly damaging public accusations without providing any supporting evidence, either to the public or to the people they have accused.

As we have said before, we believe the problem with the Autonomy acquisition by HP lies in the mismanagement of that business by HP under its ownership, making it impossible for Autonomy to deliver on HP's expectations. Autonomy's accounts were fully audited by Deloitte throughout the period in question and Deloitte has confirmed that it conducted its audit work in full compliance with regulation and professional standards. We refuse to be a scapegoat for HP's own failings.

   Dr. Mike Lynch

300.    HP's massive write-down needs to be scrutinized carefully.  By putting forth a gargantuan single write-down, HP can conceal the truth of that write-down by hiding the many aspects of that write-down that are directly attributable to the malfeasance and wrongdoing of the defendants.  The $8.8 billion write-down by HP needs to be reviewed independently.  However, HP's internal management and directors cannot be trusted to perform that important work as they are too embroiled in the creation of the problem.

301.    It is now obvious that the reason HP has concealed the specific details of the write-down is because of two reasons.  One, referring to the write-down generically as being

based on "accounting improprieties" allows HP to conceal the fact that it acquired outdated technology without having conducted due diligence. Two, revealing the specific details of the write-down would provide unequivocal evidence that accounting red flags were raised with HP and its' Board of Directors prior to the acquisition closing. HP knew about all of the potential accounting problem areas with Autonomy before the closing of the acquisition, such as Autonomy's revenue recognition and operating margins. HP also knew that Autonomy was refusing to give HP the information HP would need to independently determine if those potential accounting problem areas with Autonomy were real. HP's contention that it didn't know about the purported accounting fraud at HP before the acquisition closed is false. Months before the acquisition closed, there was a giant red flag that HP chose to ignore because Autonomy threw a curtain over it and HP agreed not to look behind it.

302. HP has refused to substantiate the $8.8 billion write-down or explain how it came to the conclusion that approximately $5 billion of that $8.8 billion write-down can be attributed solely to accounting improprieties at Autonomy. While HP has generically blamed Autonomy, no specific details have been provided by HP. HP's Board of Directors unanimously approved the acquisition of Autonomy. HP's Board of Directors was ultimately responsible for conducting due diligence and defending the interests of HP. However, on a <u>November 20, 2012</u> conference call with analysts, HP CEO Defendant Whitman adamantly stated that the HP Board of Directors was not responsible. Coincidentally, Defendant Whitman was a member of the Board of Directors who voted in favor of the Autonomy deal. In her statement, Defendant Whitman stated adamantly that the two people who were responsible were former CEO Léo Apotheker and Shane Robison. Conveniently, both of these individuals are now gone from HP.

**AA.** **HP's Officers and Directors Adamantly Denied All Responsibility for the Autonomy Acquisition Debacle -- It is Obvious They Cannot Evaluate Their Own Misconduct**

303. HP's CEO has denied all responsibility for the Autonomy acquisition. In an interview with Benjamin A. Reitzes, after the Autonomy write-down was announced, Defendant

Whitman asserted that HP's management and directors bore no responsibility for the Autonomy acquisition debacle:

> **REITZES:**  Meg, with regard to the Autonomy situation, we understand what you're doing in terms of going after the folks that you feel misled you, but what about internally? What do you -- who's responsible internally for the acquisition?  **How are you analyzing yourself internally?  The board -- I think everybody at the board was there when the Autonomy decision was made, except for Mr. Whitworth.**  So what's the introspective?  What are you doing internally to make sure that you have the right processes?  And who are you holding accountable internally, if anyone, to make sure this doesn't happen again and that maybe even there are some folks internally that need to be held responsible and we could see repercussions of this in the near future?  How are you looking at it internally?
>
> **WHITMAN: Yes, well, first of all, the CEO at the time and the head of strategy who led this deal are both gone, Léo and Shane Robison.**  With regard to the board, you're right. Most of the board was here and voted for this deal, and we feel terribly about that.  **What I will say is the board relied on audited financials, audited by Deloitte, not brand x accounting firm but Deloitte.  And by the way, during our very extensive due diligence process, we hired KPMG to audit Deloitte,** and neither of them saw what we now see after someone came forward to point us in the right direction. That said, obviously, we have not done any big acquisitions, and we will review the acquisition process.  What I will say is due diligence now reports to our Chief Financial Officer.  At the time, when I came to the company, I was surprised to find that due diligence and M&A reported [to] strategy as opposed to the Chief Financial Officer.  I've never seen that before in my career, and that's a decision I made right away before I knew any of this. So I understand your point of view, and we have made a few changes in that regard.  But in the end, you have to rely on audited financials and we did, and we will now carry on. And as you know, we've reported this to the SEC, as well as to the Serious Fraud Office, and we will take it from here.
>
> **REITZES:**  And in terms of internal personnel, though, based on what you see right now, the organization is -- can remain stable based on this occurrence?
>
> **WHITMAN:** Yes, it can.  **I mean, really, the 2 people that should have been held responsible are gone, and that's the way I see it right now.**  So I feel good about the sort of the stability of leadership.

304.    On CNBC, Defendant Meg Whitman was asked whether, when she was on the board, she discussed accounting issues relating to Autonomy.  Meg Whitman responded, "[n]ot when I was on the board.  What I do know is that after we announced the acquisition there were a number of blogs that came to the fore about potential issues at Autonomy.  The former

⊛
LAW OFFICES
COTCHETT, PITRE
& MCCARTHY, LLP

management team ran that to ground and came up with the conclusion that there was nothing there."  Defendant Whitman has repeatedly attempted to absolve herself and the current HP Board of Directors from any responsibility for the Autonomy acquisition, but her assertion that HP conducted "extensive" and "exhaustive" due diligence prior to the closing of the Autonomy acquisition and that HP's Board of Directors "relied" on third parties, such as KPMG, are not true.

305.    Defendant Whitman and the other members of the HP Board of Directors owed HP a fiduciary duty to act in the best interests of the company.  It is evident that they did not because they unanimously approved an acquisition for an astronomical price tag without conducting due diligence.  At its most basic level, HP's Board of Directors voted to approve a deal involving outdated technology and obvious accounting red flags without conducting any due diligence, and then handed over one of its key divisions to Mike Lynch and his Autonomy team, without ensuring that this was in the best interests of HP.  HP, desperate to be relevant in the high-profit margin enterprise search engine business, then went so far as to announce that it had developed a product that did not exist as described by HP: The HP Next Generation Information Platform IDOL 10 Autonomy/Vertica.

## BB.    Analysts Doubt That An $8.8 Billion Write-Down Could Be Blamed on Autonomy's Accounting Improprieties Alone

306.    HP took the $8.8 billion charge in the fourth quarter of 2012, claiming that this write-down purportedly reflected the reduced value of Autonomy.  HP now claims that it has discovered "serious accounting improprieties" at Autonomy, including what it said were ruses that inflated revenue and profitability metrics.  HP contends that such accounting improprieties were behind more than $5 billion of the $8.8 billion charge.  For many analysts, that doesn't add up.

307.    "Out of the $8.8 billion, I'd be very surprised if more than a couple of billion was due to accounting improprieties," said Aswath Damodaran, a professor of finance at New York University's Stern School of Business.  The evidence strongly supports that HP is overstating the

LAW OFFICES
COTCHETT, PITRE
& MCCARTHY, LLP

financial effects of the accounting chicanery in order to write off as much of the value of Autonomy for fraud-related reasons. This allows HP to avoid responsibility and to avoid scrutiny of its own misconduct. According to HP, Autonomy caused HP to overpay for Autonomy, not HP's own gross mismanagement and negligence.

308. Although a charge the size of this $8.8 billion write-down hurts HP's fourth quarter earnings, a big charge also has the advantage of cleaning the slate for 2013 for HP's new corporate chief, Defendant Meg Whitman. With Autonomy now only a small part of HP's balance sheet, there is a much smaller chance that the troubled division will lead to more embarrassing write-downs.

309. When a company accounts for an acquisition, it assesses the value of the target, subtracting its liabilities from its assets. It then compares this so-called fair value with the price it is paying. If it is paying more than the fair value, the difference is recorded as good will on the buyer's balance sheet. When HP acquired Autonomy for $11.7 billion, it got roughly $4 billion of intangible assets (Autonomy's expertise, intellectual property and brand recognition) and recorded roughly $6 billion of good will. In the charge announced by HP, HP slashed the value of both, effectively saying Autonomy was worth 80% less than it originally thought.

310. Although it is evident that Autonomy's accounting is not in accordance with U.S. GAAP, these differences do not account for $5 billion. According to Anup Srivastava, an assistant professor at the Kellogg School of Management at Northwestern University, "I can't justify it," he said. According to HP and its CFO, Catherine Lesjak, these accounting improprieties may have boosted revenues about 10 to 15% , but that was not enough to cause an $8.8 billion write-down. Catherine Lesjak stated that even without the accounting tricks, Autonomy would have still been profitable, not enough to justify the $8.8 billion write-down that HP took. Defendant Whitman has said Autonomy could still be something of a "growth engine" for HP. These statements, however, are false and misleading because they concealed the truth that HP did not have the integrated next generation information platform that would purportedly be that "growth engine" referred to by Defendant Whitman. The only way the $8.8 billion write-

1   down can be explained is from both accounting improprieties at Autonomy and outdated

2   technology that HP purchased.  These were two problems that were major red flags for HP's

3   Board of Directors that they close to ignore.

4       311.    When asked to comment on the write-down, an HP spokesman, Michael

5   Kuczkowski, responded in an e-mail which stated that there were improper accounting

6   maneuvers at Autonomy but "[b]ecause our investigation into the accounting improprieties and

7   misrepresentations at Autonomy remains ongoing, and given our referral of this matter to

8   regulatory authorities in the U.S. and the U.K., it would not be appropriate for us to provide a

9   more detailed description at this time."  In repeated statements from HP and from Defendant

10   Whitman, it is evident that HP's Board of Directors cannot and will not take responsibility for

11   this disaster.

## CC.    HP's Sarbanes-Oxley Violations

13       312.    As set forth above and throughout this complaint, there were numerous violations

14   of the Sarbanes-Oxley Act of 2002, including the improper certification by HP's officers and

15   directors that documents being filed with the SEC were true and correct and that HP had

16   adequate internal controls within the company to protect against the type of fraud and

17   misconduct set forth in this complaint.  These violations of Sarbanes-Oxley by HP's officers and

18   directors subject themselves personally and the company to potential civil and criminal penalties

19   by government agencies and regulators.

## DD.    HP's Misrepresentations Continue Today

22       313.    HP's misrepresentations continue today and have come from the highest levels of

23   HP.  At HP Discover Frankfurt, Defendant Whitman continued to promote the technology of

24   Autonomy, claiming that it continues to be a revolutionary technology that will forever change

25   HP.  At HP Discover Frankfurt, which began on December 3, 2012, Defendant Whitman

26   unequivocally stated that, "[w]e remain 100 percent committed to Autonomy's industry-leading

27   technology and its employees."  Whitman also reportedly called Autonomy's technology

28

LAW OFFICES
COTCHETT, PITRE
& McCARTHY, LLP

**CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT**    129

"incredible" and that it would be essential to HP's future growth. The story from HP remains that the Autonomy acquisition involved an accounting fraud that HP could not have discovered, but that HP still has this incredible next generation information platform that integrates Autonomy's IDOL 10 and Vertica. HP's story is essential because an accounting scandal can be fixed and the company can move past it. However, an $11.7 billion acquisition of outdated technology exemplifies HP's failed business strategy. Coupled with an $8.8 billion write-down, and a complete lack of due diligence, this exemplifies the malfeasance and gross mismanagement at HP by its current officers and directors.

314. On the Internet today, Autonomy is listed as "an HP company" and HP controls the contents of the website. Since Autonomy is an HP company, the contents of its website are reviewed and approved by HP. That website claims that the HP Next Generation Information Platform IDOL 10 Autonomy/Vertica, which was promised back on November 29, 2011, exists. Even today, HP is marketing the product as a "single processing layer" that "combines the IDOL 10 core engine for automatic processing of unstructured data with Vertica's high-performance real-time analytics engine for extreme structured data." The IDOL 10 product advertised by HP, however, did not exist over a year ago and does not exist today.

315. HP misrepresented that the HP Next Generation Information Platform existed on December 1, 2011 and continues to exist today in order to justify to the market why it spent $11.7 billion on a company that it failed to conduct due diligence of. Against the backdrop of its two earlier multibillion dollar acquisition failures (EDS and Palm), HP's officers and directors chose to mislead the market about the truth regarding the Autonomy acquisition. The truth is that the $8.8 billion write-down is concealing much larger problems at HP.



316.     On <u>December 13, 2012</u>, Defendant Apotheker rejected the contentions by Defendants Whitman and Lane that all of the blame for the Autonomy acquisition can be placed on him.  Defendant Apotheker stated all of HP's Board of Directors share responsibility for the bad acquisition.  In an e-mailed statement, Defendant Apotheker wrote, "[n]o single CEO is ever able to make a decision on a major acquisition in isolation, particularly at a company as large as HP – and certainly not without the full support of the chairman of the board."  In that statement, Defendant Apotheker went on to say that "[t]he HP Board, **led by its chairman**, met many times to review the acquisition and unanimously supported the deal, as well as the underlying strategic objective to bolster HP's market presence in enterprise data."  According to Defendant Apotheker, all of the Defendants are equally responsible for the Autonomy debacle.  In fact,

⊛
LAW OFFICES
COTCHETT, PITRE
& McCARTHY, LLP

Defendant Lane was a driving force behind the Autonomy acquisition and is still Chairman of the Board.

317. The public statements of all of the Defendants demonstrate why demand on the HP Board of Directors is futile. None of the Defendants are prepared to accept any responsibility for this situation and all have pointed fingers at others. Defendant Apotheker has stated that Defendant Lane was one of the driving forces behind the Autonomy acquisition. Meanwhile, Defendants Whitman and Lane have placed all of the blame on Defendant Apotheker, claiming that he essentially pushed the Autonomy acquisition forward without the involvement of the Board of Directors. These inconsistent statements by the Defendants, all of which seek to place the blame on others, demonstrate why demand on the HP Board of Directors is futile.

## V.

## RESPONSIBILITIES OF CORPORATE OFFICERS AND DIRECTORS

318. Corporate directors owe fiduciary duties to the companies that they serve, which includes a duty of loyalty and a duty of care. The fundamental principle of the corporate law governing HP is that that the business and affairs of HP are managed by and under the direction of HP's Board of Directors. In exercising its powers, corporate directors are charged with an unyielding fiduciary duty to protect the interests of the corporation and to act in the best interests of the shareholder. The HP Board of Directors, all of whom are named defendants in this action owed HP the highest fiduciary duties and were obligated to protect and defend the interests of HP. The corporate directors owe that fiduciary duty to both the corporation and its shareholders.

319. The duty of care includes a duty by each director of HP to inform themselves, prior to making the business decision, of all material information available to the director. This includes a requirement that the director inform himself or herself of all material information relating to that business decision and to consider all alternatives. ██████████████

██████████████████████████████████

████████████████████████████████████ st

LAW OFFICES
COTCHETT, PITRE
& McCARTHY, LLP

1 ████████████████████████████████████████████████████

2 ████████████████████████████████████████████████████

3 ██████████████████████████████████ The more

significant the decision, the greater the requirement to probe and consider alternatives. The

decision to spend $11.7 billion to acquire a start-up company based on purported transformative

technology is certainly a business decision of great significance that placed on HP's Board of

Directors the highest due diligence requirements. In light of two failed acquisitions and in light

of the massive cash expenditure that HP was agreeing to, the HP Board of Directors could not

simply claim that others told them it was a good deal and then vote in favor of it. The HP Board

of Directors, in this scenario, were obligated to review the finances, the accounting and the

technology. They did not do so.

320. All of the corporate directors of HP, who are Defendants in this case, owed a duty

of care to HP. The most important aspect of that duty of care was to perform due diligence

before spending $11.7 billion of corporate assets in an acquisition, especially when HP was well

aware that it was overpaying to acquire Autonomy. The due diligence on such a

"transformative" acquisition as Defendants Lane and Apotheker referred to Autonomy, needed to

be perfect. Simply reviewing the publically available information of the target company and

relying solely on representations made by the target company is not enough. This is especially

true when HP knew that there were serious red flags. This relates to both Autonomy's

accounting and its technology. There were massive information gaps that HP was operating

under and HP's Board of Directors were told that there was a lot of additional information that

would be needed before anyone could state definitively that a thorough due diligence process

was completed. HP's Board of Directors ignored those massive information gaps and pushed

forward with the acquisition anyway, ignoring multiple warnings of problems at Autonomy.

HP's corporate directors breached their duty of care by rushing forward with an $11.7 billion

acquisition without any confidence that HP had independently evaluated the serious red flags at

Autonomy.

321.     According to General Counsel John Schultz, Autonomy did not keep well-maintained books and records and it was impossible for HP to understand the financial history of Autonomy.  Schultz also stated that critical documents regarding Autonomy's documents were not in the obvious places. Defendant Whitman stated that they hired KPMG to perform an audit of Autonomy and Deloitte's work on Autonomy, but KPMG has denied Defendant Whitman's public representation. These facts were known to HP.  HP's Board of Directors, in making a decision to spend $11.7 billion, which is a massive portion of HP's cash was obligated to perform the highest levels of due diligence.  The mere facts that books were not well-maintained, that HP did not understand the financial history and condition of Autonomy, and the lack of critical documents in obvious places, alone would preclude the HP Board of Directors from voting in favor of the Autonomy acquisition.

322.     Similarly, HP knew or should have known that Autonomy's IDOL product was outdated and there was no integrated next generation information platform along the lines that were represented by HP, including by Defendants Whitman and Apotheker.  According to Forrester Research, a technology analyst company that had long been following Autonomy, the IDOL technology had not been refreshed in five years, was not user-friendly and required a massive financial investment from its customers before it could be used.  While the focus has been on the accounting and financial issues at Autonomy, the reason for making business decisions is to make decisions that are good for the business.  In this case, the reason for the purchase of Autonomy was to acquire its purported revolutionary enterprise search technology.  The HP Board of Directors were under a duty to investigate and understand the technology and product that the company was spending $11.7 billion on.  Nevertheless, HP and its Board of Directors bought an outdated technology product at an astronomical premium without having done any due diligence of the product or the company.

323.     HP's Board of Directors are the fiduciaries of HP and its shareholders.  Their duty is to personally assure themselves that HP was not wasting $11.7 billion on a company that was not worth an astronomical premium over its annual revenues.  HP's Board of Directors failed in

that duty. After acquiring Autonomy, HP's Board of Directors then handed complete control over the Information Management division to Autonomy, one of HP's most important business units. Again, this was a failure on the part of HP's Board of Directors since they were required to act in the best interests of the company. Even after the Autonomy acquisition, HP's Board of Directors failed in their obligations by allowing Autonomy free reign throughout HP. This impacts Defendant Meg Whitman personally since she, as the CEO of HP, was selected to personally supervise Mike Lynch and his Autonomy group. Defendant Meg Whitman, however, failed in that responsibility, as both the CEO of HP and as a corporate director.

324. HP's Board of Directors also breached the duties owed to the corporation and to the shareholders by continuously misrepresenting facts to the public, to customers and to its shareholders about what products were available that purportedly emerged from the Autonomy acquisition. In the Fall of 2011, HP was deluged with an overwhelming amount of negative press relating to the failure of the Palm acquisition and the HP TouchPad, and the proposed decision to sell HP's PC business. On November 29, 2011, at HP Discover Vienna, the HP board made the decision to misrepresent to the public that the HP Next Generation Information Platform was already available for sale by HP. These statements were made by the highest levels of HP, including Defendant Meg Whitman. Product announcements are vetted at the highest levels of HP. HP's Board of Directors approved or knew of these misrepresentations by HP. According to Leslie Owens of Forrester Research, the HP Next Generation Information Platform IDOL 10 Autonomy/Vertica that was promised on November 29, 2011 is still not available today.

325. Corporate directors also owe a duty of loyalty to the corporation that they serve. That duty of loyalty is a broad and all-encompassing duty which imposes on corporate directors a special obligation to serve the interests of the corporation above their own interests. The duty of loyalty embodies both an affirmative duty to protect the interests of the corporation and an obligation to refrain from conduct that would injure the corporation and its shareholders in any way. "A public policy, existing through the years, and derived from a profound knowledge of

LAW OFFICES
COTCHETT, PITRE
& McCARTHY, LLP

human characteristics and motives, has established a rule that demands of a corporate officer or director, peremptorily and inexorably, the most scrupulous observance of his duty, not only affirmatively to protect the interests of the corporation committed to his charge, but also to refrain from doing anything that would work injury to the corporation, or to deprive it of profit or advantage which his skill and ability might properly bring to it, or to enable it to make in the reasonable and lawful exercise of its powers."  *Bancroft-Whitney Co. v. Glen*, (1966) 64 Cal.2d 327,345.

326.     In this case, HP's Board of Directors put their own interests ahead of that of the company.  HP's Board of Directors permitted false financial statements to be filed with the SEC and permitted false and misleading statements to be made to the public, including to HP's customers and to its shareholders.  HP's Board of Directors allowed this in order to protect their positions as HP directors and the financial benefits of being an HP director.  HP's Board of Directors also allowed these misrepresentations to occur in order to avoid personal liability. Instead of being honest with HP's shareholders and the public about the real situation at HP and with Autonomy, the decision was made to blame the $8.8 billion write-down on accounting improprieties perpetrated by Autonomy in order to shift all the blame to others.  HP's Board of Directors is prepared to risk HP's future as a leader in the technology industry and potential criminal and civil claims against the company in order to protect their own pecuniary interests and to protect themselves from criminal and civil claims against themselves personally.

327.     Defendants Babbio, Baldauf, Banerji, Gupta, Reiner, Senequier, and Thompson are all members of HP's Audit Committee.  The members of HP's Audit Committee have additional duties specifically imposed on them as members of the Audit Committee, including monitoring "risk assessment and risk management."  These Individual Defendants also have unique knowledge and skills as members of the Audit Committee regarding auditing and accounting issues.  The HP Audit Committee's Charter provides that it is responsible for "overseeing . . . HP's financial reporting processes and the audit of HP's financial statements, including the integrity of HP's financial statements . . ."  The Audit Committee is also required

LAW OFFICES
COTCHETT, PITRE
& MCCARTHY, LLP

1   to "review the adequacy and effectiveness of HP's internal controls, including any significant

2   deficiencies in such controls and significant changes or material weaknesses in such controls . .

3   ."  Defendants Thompson, Babbio, Baldauf and Banerji were also designated by the Board of

4   Directors as "audit committee financial expert[s]" as the term is defined by the SEC.  This makes

5   their failure to conduct due diligence of the Autonomy acquisition, especially its accounting,

6   even more egregious.

7          328.   Defendant Babbio, Banerji, Hammergren, Livermore, Reiner, Senequier,

8   Thompson, and Whitworth also served on the Finance and Investment Committee which

9   imposed upon them the specific duty "[t]o provide oversight of the finance and investment

10  functions of HP."  They were also required, under HP's merger and acquisition approval policies

11  "to assist the Board in evaluating investment, acquisition, enterprise services, joint venture and

12  divestiture transactions in which HP engages as part of its business strategy from time to time."

13  These HP directors were therefore directly tasked with analyzing and understanding the nature of

14  the Autonomy acquisition, the technology that was being acquired and the value of that

15  technology.  It is the board of directors, and not the shareholders that has ultimate responsibility

16  for the management of a corporation.  It was their responsibility to supervise and manage the

17  work of any outside experts to ensure that the work was done properly.  In this case, the Finance

18  and Investment Committee was directly responsible for understanding what HP was acquiring

19  and justifying the price being paid.  HP's Finance and Investment Committee had a duty to

20  "evaluate the execution, financial results and integration of HP's completed investment,

21  acquisition, enterprise services, joint venture and divestiture transactions."

22          329.   The Finance and Investment Committee was therefore specifically charged with

23  the integration and management of Autonomy, even after the decision was made to drastically

24  overpay to acquire the company. ████████████████████████████

25  ████████████████████████████████████████████████

26  ████████████████████████████████████████████████

27  ████████████████████████████████████████████████

28

⊛
LAW OFFICES
COTCHETT, PITRE
& McCARTHY, LLP



330. I

331.

LAW OFFICES
COTCHETT, PITRE
& McCARTHY, LLP

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

332. Corporate officers are also fiduciaries of the companies that they serve and owe the company the same duties of loyalty and care that corporate directors owe to the corporation. Defendants Apotheker and Whitman, as the former and current CEO of HP, respectively, owed the same duties of loyalty and care as the directors of HP. Defendants Apotheker and Whitman breached those duties by making false and misleading statements to the market, to HP's customers, and to HP's shareholders regarding the accounting at HP, HP's due diligence regarding the Autonomy acquisition, and the purportedly revolutionary products that HP had available. Defendants Apotheker and Whitman supported and ultimately voted to approve the acquisition of Autonomy without having conducted due diligence of the company. Defendant Robison, as the CTO of HP, also breached his fiduciary duties to HP by failing to conduct due diligence of Autonomy prior to the acquisition. In committing these acts and failing to fulfill their responsibilities Officers of HP, they breached their fiduciary duties to the company.

## VI.

## DEMAND ALLEGATIONS

**A. Demand is Futile Because the Individual Defendant Directors Are Not Disinterested**

333. Plaintiff brings this action derivatively in the right of and for the benefit of HP to redress injuries suffered and to be suffered by HP as a result of the Defendants' breaches of fiduciary duty, abuse of control, and gross mismanagement. Plaintiff and his counsel will adequately and fairly represent the interests of HP in enforcing and prosecuting its rights.

334. Plaintiff has not made any demand on HP's Board of Directors to investigate and prosecute the wrongdoing alleged herein. Such a demand is excused because: (i) making a demand would be a futile and useless act as the majority of HP's directors are not able to conduct

LAW OFFICES
COTCHETT, PITRE
& McCARTHY, LLP

an independent and objective investigation of the alleged wrongdoing; and (ii) the wrongful

conduct of defendants is not subject to protection under the business judgment rule.  Under such

circumstances, the demand requirement is excused since making such a demand on the Board of

Directors would be futile.  Based upon the Defendants' acts and omissions in direct violation of

their fiduciary duties of care, good faith, honesty and loyalty, a pre-suit demand on the HP Board

to bring the claims asserted in this action is excused as a futile and useless act.  HP's Board of

Directors personally profited from the wrongdoing alleged in this Complaint.  It was HP's Board

of Directors and officers who made the ultimate decision to go forward with the Autonomy

acquisition.  It was HP's Board of Directors and officers who mismanaged the Autonomy

acquisition after it closed.  It was HP's Board of Directors and officers who either made or

approved false and misleading statements being made about the products available by HP that

emerged from the Autonomy acquisition.  The officers and managers of HP were ultimately

responsible for conducting due diligence and for ensuring that the Autonomy acquisition was

beneficial for HP and its shareholders.  HP's Board of Directors and its officers are also the

individuals who oversaw HP's dramatic decline in revenues and profits.  These individuals have

now sought to blame that decline, the $8.8 billion write-down and the failed Autonomy

acquisition on others.  HP's Board of Directors and officers have made it evident that they do not

have the ability to evaluate their own misconduct and failures in regards to HP's declining value,

revenues and profits, the $8.8 billion write-down and the failed Autonomy acquisition.

335.    At the time this derivative lawsuit was commenced, HP's Board of Directors

consisted of eleven directors.  None of the eleven directors are disinterested.  Demand is futile if

at least a majority of HP's Board of Directors, in this case consisting of six directors, cannot be

relied upon to fairly and independently adjudicate potential claims against themselves.  Of those

eleven directors, ten of them were on the HP Board of Directors when it voted to approve the

Autonomy acquisition.  That includes Defendant Lane, who was the Chairman of the HP Board

of Directors, and Defendant Whitman, who was a director when she voted in favor of the

acquisition and is currently the CEO of HP.  Defendant Lane was a driving force for the

Autonomy deal and was active in the negotiation.  Certain defendants, such as Defendants Meg Whitman and Apotheker, have also made public statements about Autonomy and its technology subjecting them not only to reputational risk but also to direct financial risk.  Accordingly, a majority of the board has engaged and continues to engage in the wrongdoing, and have interests adverse to performing a fair, unbiased investigation.

336.    All of the Individual Defendants had a financial incentive to push forward with the Autonomy acquisition as well as to conceal the truth about the $8.8 billion write-down related to Autonomy.  All of them were well-compensated to serve as officers and directors of HP.  In order to preserve their positions on the HP Board of Directors and to protect their compensation packages, the Individual Defendants failed to conduct due diligence prior to the Autonomy acquisition.  The Individual Defendants also engaged in fraud by making false and misleading statements to the public and to HP's customers and shareholders.  The Individual Defendants also signed and submitted false and misleading statements to the SEC.  The Individual Defendants therefore face potential personal liability for their wrongful conduct as officers and/or members of the HP Board of Directors.

337.    As a result of the HP Individual Defendants' improprieties, HP materially overpaid for Autonomy. These actions have irreparably damaged HP's corporate image and goodwill and intangible assets.  HP has also seriously disrupted its relationship with many of its major business partners.  According to one CEO for a top HP enterprise partner, who did not want to be identified, "[i]t is amazing how much incompetence they have shown at the top board level."  The fact that HP has promised an integrated next generation information platform that does not exist exposes the company to even more reputational, financial, litigation and potentially criminal risk.  As a direct and proximate result of the HP Individual Defendants' actions, HP has expended, and will continue to expend, significant sums of money.  Such expenditures include, but are not limited to:

LAW OFFICES
COTCHETT, PITRE
& McCARTHY, LLP

1    (a)    costs incurred from overpaying for Autonomy;

2    (b)    costs incurred from the internal investigation into Autonomy's alleged accounting

3           fraud;

4    (c)    costs incurred from criminal and civil investigations and litigation against HP and

5           its officers and directors;

6    (d)    reputational harm to HP and destruction of the value of the HP brand name;

7    (e)    costs incurred from lost customers and business opportunities;

8    (f)    costs incurred from overpaying for its own stock at artificially inflated prices; and

9    (g)    costs incurred from compensation paid to the defendants who have breached their

10          duties to HP.

**B.     The Conduct of the Individual Defendants Is Not Protected By the Business
Judgment Rule**

338.    The Individual Defendants' decision to approve the purchase of Autonomy for

approximately $11.7 billion, despite the numerous red flags alleged herein without conducting

adequate due diligence, is not protected by the business judgment rule.  The Individual

Defendants' misconduct after the acquisition closed is likewise not protected by the business

judgment rule.  The Individual Defendants misrepresented facts to the public, to HP's customers

and to HP's shareholders.  The Individual Defendants failed to supervise HP's Autonomy unit

and mismanaged the business.  The Board of Directors of HP had an independent duty to

consider all reasonably available information before making any business decision.  Demand is

futile since it is evident that the Individual Defendants have personally engaged in misconduct

that is not protected by the business judgment rule.

339.    ████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████    Additionally, the business judgment rule is

inapplicable to the defendant <u>officers</u> of HP under California law.

⊛
LAW OFFICES
COTCHETT, PITRE
& McCARTHY, LLP

340. The decision of the Individual Defendants to direct or permit HP to overpay for its own stock through the massive repurchases discussed herein is also not protected by the business judgment rule. Defendants Andreessen, Banerji, Gupta, Hammergren, Lane, Livermore, Reiner, Russo, Thompson, and Whitman allowed HP to repurchase over $2.1 billion of HP's artificially inflated stock between August 2011 and October 2012, at the same time they were causing HP to issue improper statements concerning Autonomy's goodwill and intangible assets and the purported benefits the acquisition would provide to HP. Based on detailed information from a "senior member" of Autonomy's leadership team, and further information provided by PwC, the HP directors had actual knowledge of accounting fraud at Autonomy beginning in May 2012. Notwithstanding such knowledge, the HP directors failed to disclose this information or prevent HP stock repurchases. During this time, the Individual Defendants allowed false and misleading statements about Autonomy's purportedly transformative technology to be issued to the investing public. The Individual Defendants misrepresented to the public the justification for the $11.7 billion acquisition of Autonomy and continue to make misrepresentations to conceal the full extent of their misconduct.

341. Despite being aware of the overpayment for Autonomy and the whistleblower investigation that would wipe out 80% of the value of the Autonomy acquisition, it was improper for the Individual Defendants to approve or permit a stock repurchase. The Individual Defendants knew that these announcements would cause the share price of HP to drop precipitously. Nevertheless, the Individual Defendants caused HP to repurchase over twenty-three million artificially inflated shares after May of 2012. Such a reckless disregard for HP's assets is a breach of the Board of Director's duty of care. Accordingly, the Board's decision to authorize the repurchases is not protected by the business judgment rule. For this additional reason, demand on the HP Board of Directors is futile.

**C.    Demand is Futile Because the Individual Defendant Directors Face Substantial Personal Liability for the Wrongdoing Alleged in this Complaint**

342.    Demand is also futile because the Individual Defendants here face substantial potential personal liability for approving the Autonomy acquisition, making misrepresentations about the acquisition and its value and then making misrepresentations about the $8.8 billion write-down and the reasons for that write-down.  For example, Defendant Whitman faces a substantial likelihood of liability for her violation of section 10(b) of the Exchange Act and breaching her fiduciary duty.  Defendant Whitman, as CEO of HP, was ultimately responsible for HP's operations, financial statements, and internal controls.  However, in complete abdication of her fiduciary duties, Defendant Whitman knowingly or extremely recklessly made the improper statements regarding HP's financial results and business prospects, especially with regard to the value of Autonomy's goodwill and intangible assets. HP was aware of accounting issues prior to the close of Autonomy, such as revenue recognition.  HP was aware that Autonomy's accounting methods were questionable prior to the acquisition, but HP proceeded with the transaction anyways.  Accordingly, because Defendant Whitman faces a substantial likelihood of liability for violations of federal securities law, demand upon her is futile.

343.    The Individual Defendants face a substantial likelihood of liability for violation of section 20(a) of the Exchange Act because they had the power and ability to control and prevent the dissemination of false and misleading statements about the Autonomy acquisition and the later $8.8 billion write-down.  These defendants allowed false and misleading statements to be disseminated into the market, which had the effect of artificially inflating the value of HP's stock.  These Defendants' failure to exercise proper control over HP's public disclosures further caused HP to repurchase over $2.1 billion of its own stock at inflated prices.  The Individual Defendants did not disclose that the technology HP reported to have for sale did not exist, nor did they disclose that they had failed to evaluate any of the accounting red flags that they knew about prior to the closing of the Autonomy acquisition.  Accordingly, the Individual Defendants

LAW OFFICES
COTCHETT, PITRE
& McCARTHY, LLP

face a substantial likelihood of liability for violations of federal securities law, rendering any demand upon them futile.

344.    The Individual Defendants also face a substantial likelihood of liability for wasting billions of dollars of the Company's assets.  Each of these defendants authorized and failed to halt HP's massive $2.1 billion repurchase of its own stock at inflated prices.  At the same time that the Individual Defendants authorized and refused to halt the repurchase, they knew non-public inside information concerning accounting impropriates relating to HP's acquisition of Autonomy and the inevitable impairment to Autonomy's goodwill and intangible assets.  No reasonable person would have paid the price that these Individual Defendants caused HP to pay for HP stock if they knew the non-public information they knew.  Accordingly, the Individual Defendants are liable for the amount that HP wasted.  Therefore, demand as to the Individual Defendants, who are or were directors of HP, is futile.

345.    Similarly, the Individual Defendants face a substantial likelihood of liability for causing the waste of billions of dollars of HP assets by ignoring many red flags about Autonomy. These Defendants had access to and knew or disregarded numerous red flags alerting them to Autonomy's potential accounting improprieties and its overvaluation, including, but not limited to: (i) concerns about Autonomy's financial condition and accounting from institutional investors, media, analysts; and an SEC whistleblower (ii) the enormous goodwill and intangible assets HP was forced to book in acquiring Autonomy; (iii) opposition from HP CFO Catherine Lesjak; (iv) Ellison's vocal statements concerning Autonomy's overvaluation based on a pitch presentation by Autonomy to sell itself to Oracle earlier; (v) Autonomy's suspiciously high receivables and low unearned income on its profit/loss and balance sheets; (vi) the suspicious growth in Autonomy's reported operating margins given the limited growth in its customer base; (vii) the valuation of Autonomy in light of valuations of other similarly sized companies in the same industry space; (viii) HP's previous overpayments for acquisitions; and (ix) ███████████ ████████████████████████████████████████████ Despite facing these numerous and blatant red flags, including but not limited to however, the Individual

LAW OFFICES
COTCHETT, PITRE
& McCARTHY, LLP

1  Defendants consciously approved the acquisition of the overpriced Autonomy without

2  conducting proper due diligence.  Accordingly, the Individual Defendants breached their

3  fiduciary duty of loyalty and good faith because they participated in the wrongdoing described

4  herein. Thus, the Individual Defendants face a substantial likelihood of liability for their breach

5  of fiduciary duties so any demand upon them is futile.

6       346.   The Individual Defendants also face a substantial likelihood of liability for either

7  themselves making or allowing other Defendants to make false and misleading statements about

8  HP's financial condition and health, especially with regard to the true value of its goodwill and

9  acquired intangible assets.   Each of these Defendants knew, or in reckless disregard of their

10  fiduciary duties failed to know, the truth about the accounting improprieties relating to HP's

11  acquisition of Autonomy and the inevitable impairment to Autonomy's goodwill and intangible

12  assets.  Nevertheless, Defendants Andreessen, Banerji, Gupta, Hammergren, Lane, Livermore,

13  Reiner, Russo, Thompson, Whitman, and Whitworth either participated in or allowed the

14  improper statements to continue.

15       347.   The Individual Defendants also face a substantial likelihood of liability for either

16  themselves making or allowing other Defendants to make false and misleading statements about

17  the products that were available for sale by HP.  The Individual Defendants made false and

18  misleading statements for almost a year that a product was available with certain features that

19  was not available.  Since November 29, 2011, HP has claimed that the HP Next Generation

20  Information Platform IDOL 10 Autonomy/Vertica exists and that it is in an integrated single

21  processing layer including the functionality of both Autonomy and Vertica.  The product that HP

22  said exists does not exist. HP explicitly stated the dates when this product was available and to

23  date the "revolutionary" new product that HP promised it already had, still is not available.  This

24  was a material misrepresentation by HP to the market and to its customers and shareholders.

25       348.   The acts complained of constitute violations of the fiduciary duties owed by HP's

26  officers and directors and are incapable of ratification.

27

28

LAW OFFICES
COTCHETT, PITRE
& MCCARTHY, LLP

**CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT**     

**D.     Certain Individual Director Defendants Face Greater Liability Because They Failed to Meet Their Obligations As HP Committee Members**

349.    Defendants Babbio, Baldauf, Banerji, Gupta, Reiner, Senequier, and Thompson served on the Audit Committee at the time of the Autonomy acquisition.  The Audit Committee's Charter provides that it is responsible for "overseeing . . . HP's financial reporting processes and the audit of HP's financial statements, including the integrity of HP's financial statements . . ." Defendants Banerji, Gupta, Reiner, and Thompson owed specific duties to HP to assist the Board in monitoring "risk assessment and risk management" and "review[ing] the adequacy and effectiveness of HP's internal controls, including any significant deficiencies in such controls and significant changes or material weaknesses in such controls . . ."  Thus, Defendants Banerji, Gupta, Reiner, and Thompson were responsible for overseeing and directly participating in the dissemination of HP's improper financial statements.  Despite their knowledge of the inadequate due diligence as discussed herein, Defendants Banerji, Gupta, Reiner, and Thompson approved the dissemination of the improper statements concerning the benefits to be achieved through the acquisition of Autonomy.  Defendants Banerji, Gupta, Reiner, and Thompson reviewed and approved the dissemination of the improper statements which failed to adequately disclose the breadth of financial misconduct at Autonomy and its resulting overvalued goodwill and intangible assets.  Defendants Babbio, Baldauf, Banerji, Gupta, Reiner, Senequier, and Thompson, as members of the Audit Committee, and Defendants Banerji and Thompson in particular as "audit committee financial expert[s]," were familiar with the relevant accounting rules concerning goodwill and intangible assets write-downs and the risks that HP faced from not accurately reporting the value of its goodwill and intangible assets.  Accordingly, Defendants Banerji, Gupta, Reiner, and Thompson breached their fiduciary duty of loyalty because they participated in the preparation of financial statements that contained improper information. Thus, Defendants Babbio, Baldauf, Banerji, Gupta, Reiner, Senequier, and Thompson face a substantial likelihood of liability for their failure to fulfill their duties as members of the Audit Committee so any demand upon them is futile.

LAW OFFICES
COTCHETT, PITRE
& MCCARTHY, LLP

350.     Defendants Babbio, Banerji, Hammergren, Livermore, Reiner, Senequier, Thompson, and Whitworth served on the Finance and Investment Committee during the wrongdoing alleged herein.  As members of the Finance and Investment Committee, these defendants owed specific duties "[t]o provide oversight of the finance and investment functions of HP."  Moreover, pursuant to HP's merger and acquisition approval policies, these Defendants were required to assist "the Board in evaluating investment, acquisition, enterprise services, joint venture and divestiture transactions in which HP engages as part of its business strategy from time to time."  Despite these heightened duties under the Finance and Investment Committee Charter, these Defendants caused HP to overpay for the acquisition of Autonomy.  In so doing, Defendants Babbio, Banerji, Hammergren, Livermore, Reiner, Senequier, Thompson, and Whitworth consciously disregarded numerous red flags alerting them to Autonomy's potential accounting improprieties and its overvaluation.  Thus, Defendants Babbio, Banerji, Hammergren, Livermore, Reiner, Senequier, Thompson, and Whitworth face a substantial likelihood of liability for their failure to fulfill their duties as members of the Finance and Investment Committee so any demand upon them is futile.

351.     Defendants Whitman, Andreessen, Reiner and Russo served on the Technology Committee.  The HP Charter says that its purpose is to create and implement "development strategies and the scope and quality of HP's intellectual property.  The Technology Committee makes recommendations to the Board as to scope, direction, quality, investment levels and execution of HP's technology strategies; oversees the execution of technology strategies formulated by management; provides guidance on technology as it may pertain to, among other things, market entry and exit, investments, mergers, acquisitions and divestitures, new business divisions and spin-offs, research and development investments, and key competitor and partnership strategies; and reviews and makes recommendations on proposed investment, acquisition."  Therefore, these Defendants had a heightened duty to evaluate Autonomy's technology and how it fit into HP's overall corporate strategy.  Despite these heightened duties under the Technology Committee Charter, these Defendants did nothing to evaluate Autonomy's

technology prior to making a recommendation to go forward with the acquisition. Thus, Defendants Whitman, Andreesen, Reiner and Russo face a substantial likelihood of liability for their failure to fulfill their duties as members of the Technology Committee so any demand upon them is futile.

### E. The Misconduct of the HP Board of Directors Has Harmed HP

352. HP has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein. Despite the Individual Defendants having knowledge of the claims and causes of action raised herein, the Individual Defendants have not filed any lawsuits against themselves or others who were responsible for the wrongful conduct to attempt to recover for HP any part of the damages HP suffered and will suffer thereby. While HP has publicly stated its investigation of Autonomy's management has been turned over to United States' and United Kingdom' regulators, HP's Board of Directors have and continue to fail to appropriately investigate, correct, and commence legal action against themselves who are ultimately responsible for the misconduct alleged. HP's appointment of a Special Litigation Committee SLC, as discussed below, is deeply flawed and does not constitute a legitimate effort to investigate and correct let alone commence legal action against the full Board. These failures, in the face of heavy media and investor scrutiny on the matter, demonstrates that the HP Board of Directors is hopelessly incapable of independently addressing any legitimate demand.

### F. Demand on the Board is Excused

353. Plaintiff has not made any demand on the other shareholders of HP to institute this action since such demand would be a futile and useless act for at least the following reasons:

(a) HP is a publicly held company with 1.9 billion shares outstanding and thousands of shareholders;

(b) making demand on such a number of shareholders would be impossible for plaintiff who has no way of finding out the names, addresses, or phone numbers of shareholders; and

(c)     making demand on all shareholders would force plaintiff to incur

excessive expenses, assuming all shareholders could be individually

identified.

354.     The directors of HP cannot be relied upon to reach a truly independent decision

whether to commence the demanded action against themselves and the officers responsible for

the misconduct alleged in this derivative complaint.  The Board is currently dominated by the

Defendants, who were personally and directly involved in the acts of mismanagement, abuse of

control and waste alleged and who each approved the actions complained of, and to whose

directives and views the Board has consistently acceded and will continue to accede.  For

example, Defendant Whitman, the current CEO of HP on the Board of Directors of HP at the

time of the vote on the Autonomy acquisition.  Defendant Whitman has emphatically stated to

reporters that she blames the entire Autonomy debacle on Defendants Apotheker and Robison

and takes no personal blame.  She cannot be trusted to evaluate her own role in this misconduct.

Defendant Apotheker, in turn, points the finger at the full Board most especially former

Chairman Lane for the flawed acquisition and integration.  Additionally, the Board of Directors

is essentially the same one that voted not only for the Autonomy acquisition but on a string of

other bad acquisitions in which there a similar lack of due diligence, including the acquisitions of

EDS and Palm.  None of them are in a position to fairly evaluate their own misconduct in this

case.

355.     This domination of HP's Board of Director prevents it from validly exercising its

business judgment in a fair and neutral manner, and renders it incapable of reaching an

independent decision whether to accept any demand by plaintiff to address the wrongs detailed

herein, as exemplified by their inaction in the years since the original suit was filed.

356.     A majority of the directors received personal and financial benefits while they

caused or permitted HP to engage in the extensive misconduct detailed in this derivative

complaint.  Non-employee directors received annual cash retainers, cash fees for meetings

attended, as well as lucrative equity awards for serving as directors and members of board

1    committees. Employee directors were also compensated in both cash and "incentive" awards of

2    cash and stock, in large part based on the financial results of HP and its sales results.

3    **G.     None of the Directors of HP Are Disinterested**

4          357.     The specific reasons why each of the eleven current directors of HP are not

5    disinterested are set forth below:

6          358.     **MARGARET C. WHITMAN:** Defendant Whitman is the current CEO of HP

7    but she was also one of the directors who voted to approve the acquisition of Autonomy.

8    Defendant Whitman has signed all of the Form 10-Q's for fiscal year 2012 and the Form 10-K

9    for the fiscal year ending 2011 that contain the misstatements that HP claims is based on

10   Autonomy's purportedly fraudulent conduct. The November 20, 2012 write-down of $8.8

11   billion of Autonomy directly impacts financial statements that Defendant Whitman has certified

12   to the SEC as being true and correct and reported in accordance with GAAP. Defendant

13   Whitman has personally made statements about the existence of the HP Next Generation

14   Information Platform IDOL 10 Autonomy/Vertica and about how that product is presently

15   available. Those statements have continued to the present. At the HP Discover event in

16   Frankfurt, which commenced on December 4, 2012, Defendant Whitman continued to make

17   false and misleading statements to the public.

18

19         359.     Defendant Whitman is also on record stating that she and HP is relying on the

20   superiority of the Autonomy technology, even though she has no reasonable basis for making

21   such a statement. Defendant Whitman faces serious potential personal liability for fraud and for

22   violations of US securities laws. Defendant Whitman is also the highest paid member of the HP

23   Board of Directors since she is remunerated both as a director and as the CEO of HP. Defendant

24   Whitman therefore has the most to lose by bringing a lawsuit against the Individual Defendants.

25   Defendant Whitman was also directly supervising Autonomy and Mike Lynch and therefore

26   faces personal liability for her failure to manage and supervise Autonomy and Mike Lynch.

27   Defendant Whitman has also stated publically that she and the HP Board of Directors is

28   blameless for the Autonomy acquisition. Therefore, since she has publically taken the position

that she and the entire HP Board of Directors is not at fault, and she faces personal civil and

criminal liability for her actions and statement, she is not disinterested.

360. ███████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████ After the departure of former CEO Defendant

Apotheker and the announcement of the $8.8 billion write-down of Autonomy, Defendant

Whitman has made repeated public statements, such as the ones she made on an analyst

conference call on <u>November 20, 2012</u>, saying that the HP Board of Directors was blameless and

that they relied on experts, such as KPMG.  Those were misrepresentations. █████████████

███████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████ This

makes her liable personally and demand would be futile.

361.    **RAYMOND J. LANE**:  Defendant Lane is a current director of HP and was also

a director of HP when the Board of Directors voted in favor of the Autonomy acquisition.

Defendant Lane, until April 4, 2013, was the Chairman of the HP Board of Directors and was the

Chairman of the Board of Directors when the decision was made to acquire Autonomy.

Defendant Lane was one of the driving forces behind the Autonomy acquisition.  Defendant

Lane was also one of the driving forces behind the announced decision to sell HP's PC business

as well as the decision to bring on Defendant Apotheker as CEO of HP.  Defendant Lane

therefore was directly responsible for making key decisions that have significantly harmed HP. Defendant Lane's singular focus on "transforming" HP led him to ignore the lack of due diligence of Autonomy. ████████████████████████████████████ ██████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████████████████████████████████ Regardless, Defendant Lane pushed forward on the Autonomy acquisition. When the public reacted poorly to the announcement of the Autonomy acquisition and the proposed sale of HP's PC business, Defendant Lane immediately blamed Defendant Apotheker for these decisions, even though Defendant Lane had personally approved and supported those decisions and had been the leader in bringing Defendant Apotheker on board as HP's CEO. Defendant Lane also personally made the decision to remove Defendant Apotheker as HP's CEO and replace him with Defendant Whitman. Defendant Lane was also the individual responsible for putting Defendant Whitman on the HP Board of Directors. Defendant Lane cannot independently and fairly evaluate claims against himself and the HP Board of Directors because he was one of the leaders causing HP to make the bad decisions that are the subject of this lawsuit.

362. Defendant Lane also violated his duties of care and loyalty to HP by failing to properly conduct due diligence before approving the acquisition of Autonomy. Defendant Lane signed the Form 10-K for fiscal year 2011 which contained false and misleading statements and also concealed material information from the public and from shareholders. Defendant Lane is also potentially liable either directly or as a control person for violations of federal securities laws. Defendant Lane has not contradicted the assertions made by Defendant Whitman that the HP Board of Directors is free of blame for the acquisition of Autonomy. In fact, Defendant Lane

has reiterated those statements, taking the position publically that the HP Board of Directors performed adequate due diligence and that the fault lies with others for HP's decisions to waste $11.7 billion acquiring a company with outdated technology and accounting problems. Defendant Lane is not disinterested because he cannot be relied upon to fairly adjudicate his own responsibility for a decision he made which resulted in HP spending $11.7 billion on a company with outdated technology and then having to write down over 80% of the value of that acquisition. Because of his own risk of personal liability for violations of federal and state law, as well as the duties of care and loyalty owed by himself to HP, Defendant Lane is not a disinterested director and therefore demand upon him is futile.

363. **MARC L. ANDREESEN**: Defendant Andreesen is a current director of HP and was also a director of HP when the Board of Directors voted in favor of the Autonomy acquisition. Defendant Andreesen violated his duties of care and loyalty to HP by failing to properly conduct due diligence before approving the acquisition of Autonomy. Defendant Andreesen also signed the Form 10-K for fiscal year 2011 which contained false and misleading statements and also concealed material information from the public and from shareholders. Defendant Andreesen is also potentially liable either directly or as a control person for violations of federal securities laws. Defendant Andreesen has not contradicted the assertions made by Defendant Whitman that the HP Board of Directors is free of blame for the acquisition of Autonomy. Defendant Andreesen is also not disinterested because he cannot be relied upon to fairly adjudicate his own responsibility for a decision he made which resulted in HP spending $11.7 billion on a company with outdated technology and then having to write down over 80% of the value of that acquisition.

364. ███████████████████████████

███████████████████████████

███████████████████████████

███████████████████████████

███████████████████████████

LAW OFFICES
COTCHETT, PITRE
& McCARTHY, LLP

███████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████████. Because of

his own risk of personal liability for violations of federal and state law, as well as the duties of

care and loyalty owed by himself to HP, Defendant Andreesen is not a disinterested director and

therefore demand upon him is futile.

365. **SHUMEET BANERJI**: Defendant Banerji is a current director of HP and was

also a director of HP when the Board of Directors voted in favor of the Autonomy acquisition.

Defendant Banerji violated his duties of care and loyalty to HP by failing to properly conduct

due diligence before approving the acquisition of Autonomy. Banerji was a member of both the

Audit Committee and the Finance and Investment Committee. █████████████████████

██████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████ Defendant Banerji also signed

the Form 10-K for fiscal year 2011 which contained false and misleading statements and also

concealed material information from the public and from shareholders. Defendant Banerji is also

potentially liable either directly or as a control person for violations of federal securities laws.

366. In addition, as a member of both the Audit Committee and the Finance and

Investment Committee, Banerji had heightened duties and responsibilities regarding evaluating

the Autonomy acquisition, both from an accounting perspective and from an investment

LAW OFFICES
COTCHETT, PITRE
& MCCARTHY, LLP

perspective.  Defendant Banerji's failure to meet these heightened standards makes him unable to evaluate his own misconduct relating to the Autonomy acquisition.  Defendant Banerji is also loyal to Defendant Lane, who brought him onto the HP Board of Directors in 2011 to ensure that those loyal to him personally were on the HP Board of Directors.  Defendant Banerji cannot independently and fairly evaluate the misconduct of Defendant Lane.  Defendant Banerji has not contradicted the assertions made by Defendant Whitman that the HP Board of Directors is free of blame for the acquisition of Autonomy.  Defendant Banerji is also not disinterested because he cannot be relied upon to fairly adjudicate his own responsibility for a decision he made which resulted in HP spending $11.7 billion on a company with outdated.  Because of his own risk of personal liability for violations of federal and state law, as well as the duties of care and loyalty owed by himself to HP, Defendant Banerji is not a disinterested director and therefore demand upon him is futile.

367.   **RAJIV L. GUPTA**:  Defendant Gupta is a current director of HP and was also a director of HP when the Board of Directors voted in favor of the Autonomy acquisition.  Defendant Gupta violated his duties of care and loyalty to HP by failing to properly conduct due diligence before approving the acquisition of Autonomy.  Defendant Gupta also signed the Form 10-K for fiscal year 2011 which contained false and misleading statements and also concealed material information from the public and from shareholders.  Defendant Gupta is also potentially liable either directly or as a control person for violations of federal securities laws.  In addition, as a member of the Audit Committee, Gupta had heightened duties and responsibilities regarding evaluating the Autonomy acquisition.  Defendant Gupta's failure to meet these heightened standards makes him unable to evaluate his own misconduct relating to the Autonomy acquisition.

368.   Gupta has also served as Lead Independent Director for the HP Board of Directors since 2011, although Gupta has demonstrated that he is not, in fact, an independent director.  ███████████████████████████████████████████████████

████████████████████████████████████████████████████ .

LAW OFFICES
COTCHETT, PITRE
& MCCARTHY, LLP

1 ███████████████████████████████████████████████████████████

2 ████████████████████████

369.    Defendant Gupta has not contradicted the assertions made by Defendant Whitman that the HP Board of Directors is free of blame for the acquisition of Autonomy.  Defendant Gupta is also not disinterested because he cannot be relied upon to fairly adjudicate his own responsibility for a decision he made which resulted in HP spending $11.7 billion on a company with outdated.  Because of his own risk of personal liability for violations of federal and state law, as well as the duties of care and loyalty owed by himself to HP, Defendant Gupta is not a disinterested director and therefore demand upon him is futile.

370.    **JOHN H. HAMMERGREN:**  Defendant Hammergren is a current director of HP and was also a director of HP when the Board of Directors voted in favor of the Autonomy acquisition.  According to an April 4, 2013 HP Press Release, Defendant Hammergren will leave the Board later this month after HP's May 2013 Board meeting.

371.    Defendant Hammergren violated his duties of care and loyalty to HP by failing to properly conduct due diligence before approving the acquisition of Autonomy.  Defendant Hammergren also signed the Form 10-K for fiscal year 2011 which contained false and misleading statements and also concealed material information from the public and from shareholders.  Defendant Hammergren was and still is the Chairperson of the Finance and Investment Committee. ██████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

LAW OFFICES
COTCHETT, PITRE
& MCCARTHY, LLP

**CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT**                    157

███████████████████████████████████████████████████

████████████  This is demonstrated by the fact that, on <u>April 4, 2013</u>, Defendant Hammergren announced he would resign as a director of HP.

372.  Defendant Hammergren is also liable either directly or as a control person for violations of federal securities laws.  In addition, as a member of the Finance and Investment Committee, Hammergren had heightened duties and responsibilities regarding evaluating the Autonomy acquisition.  Defendant Hammergren's failure to meet these heightened standards makes him unable to evaluate his own misconduct relating to the Autonomy acquisition. Defendant Hammergren has not contradicted the assertions made by Defendant Whitman that the HP Board of Directors is free of blame for the acquisition of Autonomy.  Defendant Hammergren is also not disinterested because he cannot be relied upon to fairly adjudicate his own responsibility for a decision he made which resulted in HP spending $11.7 billion on a company with outdated.  Because of his own risk of personal liability for violations of federal and state law, as well as the duties of care and loyalty owed by himself to HP, Defendant Hammergren is not a disinterested director and therefore demand upon him is futile.

373.  **ANN M. LIVERMORE:**  Defendant Livermore is a current director of HP and was also a director of HP when the Board of Directors voted in favor of the Autonomy acquisition. Defendant Livermore is also an HP insider who had previously served as an Executive Vice President of the HP Enterprise Services division and as an Executive Vice President of the former HP Enterprise Business, portions of HP that were directly impacted by write-downs at HP that expose her to potential liability now only for her conduct as a director of HP but also as a former member of senior management at HP.  Defendant Livermore was also a senior executive at HP who supported the Autonomy acquisition.

374.  ███████████████████████████████

█████████████████████████████████████████

█████████████████████████████████

█████████████████████████████████

██████████████████████████████████████████

████████████████████████████████ As an executive at HP, Defendant Livermore also possessed greater institutional knowledge of HP's internal functioning than the other directors. Despite knowing of the absence of due diligence at HP, Defendant Livermore voted in favor of the Autonomy acquisition. Livermore served as Executive Vice President of the HP enterprise services business from May 2011 to August 2011. The misrepresentations at HP relate to the portion of HP's business in which Defendant Livermore served as senior management.

375. Defendant Livermore also violated her duties of care and loyalty to HP by failing to properly conduct due diligence before approving the acquisition of Autonomy. Defendant Livemore also signed the Form 10-K for fiscal year 2011 which contained false and misleading statements and also concealed material information from the public and from shareholders. Defendant Livermore is also potentially liable either directly or as a control person for violations of federal securities laws. In addition, as a member of the Finance and Investment Committee, Livermore had heightened duties and responsibilities regarding evaluating the Autonomy acquisition. Defendant Livermore's failure to meet these heightened standards makes her unable to evaluate her own misconduct relating to the Autonomy acquisition. Defendant Livemore has not contradicted the assertions made by Defendant Whitman that the HP Board of Directors is free of blame for the acquisition of Autonomy. Defendant Livermore is also not disinterested because she cannot be relied upon to fairly adjudicate her own responsibility for a decision she made which resulted in HP spending $11.7 billion on a company with outdated. Because of her own risk of personal liability for violations of federal and state law, as well as the duties of care and loyalty owed by herself to HP, Defendant Livermore is not a disinterested director and therefore demand upon her is futile.

376. **GARY M. REINER:** Defendant Reiner is a current director of HP and was also a director of HP when the Board of Directors voted in favor of the Autonomy acquisition. Defendant Reiner violated his duties of care and loyalty to HP by failing to properly conduct due

diligence before approving the acquisition of Autonomy. ███████████████

██████████████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████

███████████████

377.    On <u>March 20, 2013</u>, Defendant Reiner was named to the SLC, purportedly because the remaining eight directors of HP were not disinterested.  However, due to Defendant Reiner's direct knowledge of the lack of due diligence of Autonomy's technology, Defendant Reiner is not a disinterested director since his personal actions are subject to review for potential misconduct.

378.    Defendant Reiner signed the Form 10-K for fiscal year 2011 which contained false and misleading statements and also concealed material information from the public and from shareholders.  Defendant Reiner is also potentially liable either directly or as a control person for violations of federal securities laws.  In addition, as a member of both the Audit Committee and the Finance and Investment Committee, Reiner had heightened duties and responsibilities regarding evaluating the Autonomy acquisition, both from an accounting perspective and from an investment perspective.  Defendant Reiner's failure to meet these heightened standards makes him unable to evaluate his own misconduct relating to the Autonomy acquisition.  Defendant Reiner is also loyal to Defendant Lane, who brought him onto the HP Board of Directors in 2011 to ensure that those loyal to him personally were on the HP Board of Directors.  Defendant Reiner cannot independently and fairly evaluate the misconduct of Defendant Lane.  Defendant Reiner has not contradicted the assertions made by Defendant

Whitman that the HP Board of Directors is free of blame for the acquisition of Autonomy. Defendant Reiner is also not disinterested because he cannot be relied upon to fairly adjudicate his own responsibility for a decision he made which resulted in HP spending $11.7 billion on a company with outdated thechnology. Because of his own risk of personal liability for violations of federal and state law, as well as the duties of care and loyalty owed by himself to HP, Defendant Reiner is not a disinterested director and therefore demand upon him is futile.

379. **PATRICIA F. RUSSO:** Defendant Russo is a current director of HP and was also a director of HP when the Board of Directors voted in favor of the Autonomy acquisition. Defendant Russo violated her duties of care and loyalty to HP by failing to properly conduct due diligence before approving the acquisition of Autonomy. Defendant Russo was a member of the Technology Committee. ███████████████████████████████████████████ ████████████████████████████████████████████████████████████ Despite this knowledge, Defendant Russo recommended going forward with the Autonomy acquisition.

380. Defendant Russo also signed the Form 10-K for fiscal year 2011 which contained false and misleading statements and also concealed material information from the public and from shareholders. Defendant Russo is also potentially liable either directly or as a control person for violations of federal securities laws. Defendant Russo is also loyal to Defendant Lane, who brought her onto the HP Board of Directors in 2011 to ensure that those loyal to him personally were on the HP Board of Directors. Defendant Russo has not contradicted the assertions made by Defendant Whitman that the HP Board of Directors is free of blame for the acquisition of Autonomy. Defendant Russo is also not disinterested because she cannot be relied upon to fairly adjudicate her own responsibility for a decision she made which resulted in HP spending $11.7 billion on a company with outdated. Because of her own risk of personal liability for violations of federal and state law, as well as the duties of care and loyalty owed by herself to HP, Defendant Russo is not a disinterested director and therefore demand upon her is futile.

LAW OFFICES
COTCHETT, PITRE
& MCCARTHY, LLP

381.   **G. KENNEDY THOMPSON:**  Defendant Thompson is a current director of HP and was also a director of HP when the Board of Directors voted in favor of the Autonomy acquisition.  According to an April 4, 2013 HP press release, Defendant Thompson will leave the Board later this month after HP's May 2013 Board meeting.

382.   Defendant Thompson served as the Chairperson of the Audit Committee and he was also on the Finance and Investment Committee. ████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████

████████████████████████

383.   On March 20, 2013, Defendant Thompson was appointed to the SLC to evaluate the allegations being made against the company related to the Autonomy acquisition.  This is an admission by HP that the other eight directors are not disinterested, although, for the reasons set forth below, Plaintiff contends that Defendant Thompson is not independent or disinterested. Defendant Thompson's personal knowledge and conduct is highly questionable during this time period and there is no doubt that Defendant Thompson will not and cannot fairly evaluate his own conduct, which subjects him to serious potential liability.  This is demonstrated by the fact that, on April 4, 2013, Defendant Thompson announced his plan to resign as a director of HP.

384.   Defendant Thompson violated his duties of care and loyalty to HP by failing to properly conduct due diligence before approving the acquisition of Autonomy.  Defendant

Thompson also signed the Form 10-K for fiscal year 2011 which contained false and misleading statements and also concealed material information from the public and from shareholders. Defendant Thompson is also potentially liable either directly or as a control person for violations of federal securities laws. In addition, as a member of both the Audit Committee and the Finance and Investment Committee, Thompson had heightened duties and responsibilities regarding evaluating the Autonomy acquisition, both from an accounting perspective and from an investment perspective. Defendant Thompson's failure to meet these heightened standards makes him unable to evaluate his own misconduct relating to the Autonomy acquisition. Defendant Thompson has not contradicted the assertions made by Defendant Whitman that the HP Board of Directors is free of blame for the acquisition of Autonomy. Defendant Thompson is also not disinterested because he cannot be relied upon to fairly adjudicate his own responsibility for a decision he made which resulted in HP spending $11.7 billion on a company with outdated technology. Because of his own risk of personal liability for violations of federal and state law, as well as the duties of care and loyalty owed by himself to HP, Defendant Thompson is not a disinterested director and therefore demand upon him is futile.

385.    **RALPH V. WHITWORTH:**  Defendant Whitworth is a current director of HP. Although he did not vote to approve the acquisition of Autonomy, he did nothing to stop it and did not do anything afterwards to ensure that the acquisition was handled appropriately. Defendant Whitworth permitted the other members of the Board of Directors to mismanage the Autonomy acquisition. Defendant Whitworth was on the HP Board of Directors after the acquisition closed and was involved with the $8.8 billion write-down and the decision to represent the write-down as an "accounting" write-down, instead of admitting that HP's write down could not be solely tied to accounting irregularities but also relates to HP's acquisition of a company with outdated technology.

386.    On <u>March 20, 2013</u>, Defendant Whitworth was named to lead the SLC. The decision to name Defendant Whitworth as the head of the SLC because he was the only member of the HP Board of Directors who did not vote for the Autonomy acquisition is an admission that

LAW OFFICES
COTCHETT, PITRE
& MCCARTHY, LLP

every single director who either recommended going forward with the Autonomy acquisition or voted for it cannot truly and fairly evaluate any potential claims against themselves for their role in the failed acquisition. Even though he did not vote for the Autonomy acquisition, Defendant Whitworth also permitted the other members of the Board of Directors to make material misstatements and conceal material facts from the public. Defendant Whitworth violated his duties of care and loyalty to HP by failing to put the interests of HP over his own interests and for failing to consider all alternatives before making key decisions for the company.

387. Defendant Whitworth also signed the Form 10-K for fiscal year 2011 which contained false and misleading statements and also concealed material information from the public and from shareholders. Defendant Whitworth is also potentially liable either directly or as a control person for violations of federal securities laws. Defendant Whitworth has not contradicted the assertions made by Defendant Whitman that the HP Board of Directors is free of blame for the acquisition of Autonomy. Because of his own involvement in the handling of the Autonomy acquisition after October 3, 2011, and his failure to challenge the acquisition at the time, Defendant Whitworth is not a disinterested director and therefore demand upon him is futile

388. At least six of the eleven directors of HP are not disinterested and therefore, demand upon the HP Board of Directors is futile. Ten of the eleven directors voted in favor of the Autonomy acquisition, which is at the core of this litigation. All eleven of the directors signed and approved filings with the SEC that are false and misleading which subject them to potential civil and criminal liability. Many of the directors were hand selected by Defendant Lane, as Chairman of the Board, to serve as directors. These individuals are personally loyal to Defendant Lane and are not able to independently and fairly evaluate not only their own misconduct but also the misconduct of Defendant Lane. Therefore, demand on the HP Board of Directors is futile.

LAW OFFICES
COTCHETT, PITRE
& MCCARTHY, LLP

**H.    HP's Establishment of a Special Litigation Committee Established the Futility of a Demand**

389.    On <u>March 20, 2013</u>, HP conceded that demand on the Board of Directors was futile by forming an SLC to investigate the allegations brought against HP and its directors.  At the HP annual shareholder meeting on <u>March 20, 2013</u>, Defendant Whitman and Defendant Schultz discussed the formation of a "special committee" which had been formed by the resolution of the board. According to John Schultz, HP's General Counsel:

> "[T]he special committee has been formed by resolution of the board. The three members are Ralph Whitworth, Gary Reiner, and Ken Thompson. That is consistent with what is provided for under applicable law. It's consistent with our past (fracas?) and policy and similar situations that we've confronted over the course of time. The charter is roughly consistent with the lawsuits that have been filed against the company. It is not simply related to the Autonomy matter but in fact relates to other aspects as well including allegations relating to certain impairment charger that were taken in connection with both the EDS acquisition and the Autonomy acquisition. As is practice, this committee retains counsel to assist them in that process. That counsel has been selected and we will be commencing its work shortly. The independence of this committee is ultimately passed on by a Court of Law and so therefore it is required to meet certain criteria that is established by these courts under the various laws in this particular instance under the laws of Delaware."

390.    Defendant Whitworth Thompson and Reiner were appointed to the SLC but none of them are truly disinterested or independent.

391.    Defendant Reiner and Defendant Thompson were both instrumental in the approval of the Autonomy acquisition.  Defendant Thompson was the Chairperson of the Audit Committee at the time of the Autonomy acquisition.  The job of the Audit Committee involved, "overseeing . . . HP's financial reporting processes and the audit of HP's financial statements, including the integrity of HP's financial statements . . ."  The Audit Committee is also required to "review the adequacy and effectiveness of HP's internal controls, including any significant deficiencies in such controls and significant changes or material weaknesses in such controls."

LAW OFFICES
COTCHETT, PITRE
& MCCARTHY, LLP

██████████████████████. In his role as Chairperson of the Audit Committee and as a member of the Finance and Investment Committee, Defendant Thompson played a central role in the decision to acquire Autonomy. Defendant Thompson blatantly disregarded the lack of due diligence of Autonomy's accounting in approving the Autonomy acquisition.

392. ████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
██████████████████████████████████. Specifically, the charter of the Technology Committee imposes on the Technology Committee three responsibilities: (1) Recommendations to Board on Technology Strategies, (2) Execution of Technology Strategies, and (3) Guidance on Technology.

393. The acquisition of Autonomy in order to provide a purported "revolutionary" new technology fits directly into the mandate of the Technology Committee, of which Defendant Reiner was a member. ████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████

394. On <u>February 25, 2013</u>, as reported in *The Wall Street Journal*, HP spokesman Howard Clabo confirmed that the board had formed an SLC "to make a recommendation to the full board as to its response to these claims."

⊛
LAW OFFICES
COTCHETT, PITRE
& MCCARTHY, LLP

395.    While no resolution of the formation of the SLC has been provided to Plaintiff or been made publicly available, based on the public statements of John Schultz, HP's General Counsel, and HP spokesman Howard Clabo, the SLC is purportedly "independent" and has "broad authority" to investigate the allegations in the many complaints being brought against HP, its officers and directors, and its outside advisors; and the determinations of the SLC are not subject to Board approval.  While Plaintiff denies that the SLC is disinterested and independent, the admission by HP that it, in fact, needs an independent committee to investigate the allegations constitutes an admission by HP that the remaining eight directors are not disinterested and that demand on the Board of Directors is futile.

## VII.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

### VIOLATION OF § 10(b) AND RULE 10b-5 OF THE SECURITIES EXCHANGE ACT FILING FALSE AND MISLEADING FINANCIAL STATEMENTS AGAINST THE HP INDIVIDUAL DEFENDANTS

396.    Plaintiff incorporates by reference the allegations set forth above as though fully restated herein.

397.    The HP Individual Defendants individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, intentionally or recklessly employed devices, schemes, and artifices to defraud, and engaged in acts, practices, and a course of business that operated as fraud and deceit upon HP.

398.    The HP Individual Defendants, as top executive officers and/or directors of HP, are liable as direct participants in the wrongs complained of herein.  Through their positions of control and authority as officers and/or directors of HP, each of these defendants were able to and did control the conduct complained of herein.

399.    HP closed the acquisition of Autonomy on October 3, 2011 and has been reporting Autonomy's financial results on its own financial statements.  Since October 3, 2011,

LAW OFFICES
COTCHETT, PITRE
& MCCARTHY, LLP

HP has filed quarterly reports to the SEC on Form 10-Q on March 12, 2012, June 8, 2012 and September 10, 2012. During that time period, HP also filed its annual report on Form 10-K on December 14, 2011. These statements were false and misleading.

400. At the time that Defendants Whitman, Andreessen, Babbio, Jr., Baldauf, Banjeri, Gupta, Hammergren, Lane, Livermore, Reiner, Russo, Thompson, and Whitworth signed the 2011 10-K on December 14, 2011, each of them knew that the financial statements contained therein for the 2011 fiscal year were materially false and misleading because these statements failed to properly record the true value of Autonomy and concealed the fact that HP's highly publicized Next Generation Information Platform IDOL 10 Autonomy/Vertica was not available to the market, even though HP had represented to the market that it already existed. Therefore, these HP Individual Defendants all knowingly violated Section 10(b) and Rule 10b-5 when they signed and filed the 2011 10-K because they knew that the 2011 10-K did not properly account for the true value of Autonomy and HP. Thus, these HP Individual Defendants acted with scienter in that they either had actual knowledge of the fraud set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them.

401. At the time that Whitman signed the March 12, 2012, June 8, 2012, and September 10, 2012 10-Q's she knew or recklessly disregarded that the statements contained therein were materially false and misleading because these financial statements failed to properly record the true value of Autonomy and concealed the fact that HP's highly publicized Next Generation Information Platform IDOL 10 Autonomy/Vertica was not available to the market, even though HP had represented to the market that it already existed.

402. HP relied upon these HP Individual Defendants in preparing and disseminating HP's financial statements in the 10-K and 10-Q's as alleged herein.

403. Furthermore, as specifically detailed above, the Individual Defendants, in particular Defendants Whitman and Apotheker made false and misleading statements in connection with the sale of securities. For example, Defendant Apotheker's misstatements on

September 13, 2011 and Defendant Whitman's misstatements on November 20, 2012 regarding HP's purported "extensive" due diligence and the "revolutionary" Autonomy technology are actionable misstatements. Under Section 10(b) and Rule 10b-5 of the Securities and Exchange Act.

404.    As a direct and proximate result of the HP Individual Defendants' foregoing violations of Section 10(b) and Rule 10b-5, HP has sustained billions of dollars in damages, including, but not limited to the, $8.8 billion write-down, the costs and expenses incurred in connection with HP's internal investigation of historical financial statements, potential securities litigation, and its loss of reputation and goodwill.

### SECOND CLAIM FOR RELIEF

### VIOLATION OF § 20(a) OF THE SECURITIES EXCHANGE ACT
### CONTROL PERSON - FILING FALSE AND MISLEADING
### FINANCIAL STATEMENTS
### AGAINST THE HP INDIVIDUAL DEFENDANTS

405.    Plaintiff incorporates by reference the allegations set forth above as though fully restated herein.

406.    The Individual Defendants are also liable under Section 20(a) of the Securities Exchange Act as control persons of HP.  By virtue of their operational and management control of HP's respective businesses and systematic involvement in the fraudulent scheme alleged herein, the Individual Defendants named herein each had the power to influence and control and did influence and control, directly or indirectly, the decision-making and actions of HP, including the content and dissemination of the various statements which Plaintiff contend are false and misleading.  Defendant Meg Whitman, in particular was an HP director who voted in favor of the Autonomy acquisition.  After becoming the CEO of HP in September of 2011, Defendant Meg Whitman, with knowledge, allowed misstatements to be made about Autonomy's technology, its functionality and its availability.  Each of the Individual Defendants

named herein had the ability to prevent the issuance of the statements alleged to be false and misleading or cause such statements to be corrected.

407.    Each of the Individual Defendants named herein had direct and supervisory involvement in the operations of HP and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

408.    Each of the Individual Defendants named herein, by virtue of their stock ownership, high-level positions, and participation in and/or awareness of HP's operations, had the power to influence and control and did influence and control, directly or indirectly, the decision-making of HP, including the content and dissemination of the various statements that Plaintiff contends are false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of HP's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

409.    As set forth above, each of the Individual Defendants violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, each of the Individual Defendants is liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of the HP Individual Defendants' foregoing violations of Section 10(b) and Rule 10b-5, HP has sustained billions of dollars in damages, including, but not limited to, the $8.8 billion write-down, the costs and expenses incurred in connection with HP's internal investigation of historical financial statements, potential securities litigation, and its loss of reputation and goodwill.

### THIRD CLAIM FOR RELIEF

### BREACH OF FIDUCIARY DUTY
### AGAINST THE HP INDIVIDUAL DEFENDANTS

410.    Plaintiff incorporates by reference the allegations set forth above as though fully restated herein.

411.    Each of the Individual Defendants owed fiduciary duties to HP.  Defendants specifically owed and owe HP the highest obligation of good faith and loyalty in the administration of the affairs of HP, including the oversight of HP's due diligence, as HP's directors and officers, were and are required to use their abilities to control and manage HP in a fair, just and equitable manner in order to ensure that the Company complied with applicable laws and contractual obligations, to refrain from abusing their positions of control, and not to favor their own interests at the expense of HP.  Defendants violated their fiduciary duties to HP, including without limitation their duties of care, good faith, honesty and loyalty.

412.    By their acts and omissions alleged herein, Defendants, and each of them, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of HP in a manner consistent with the operations of a publicly held corporation.

413.    Defendants violated their duty of care by making improper statement in HP press releases, conference calls, public filings and disclosures.

414.    The Audit Committee Defendants breached their fiduciary duty of loyalty by knowingly or recklessly reviewing and approving improper statements in HP's public filings, press releases, and earnings conference calls.  Additionally, the Audit Committee Defendants (Babbio, Baldauf, Banerji, Gupta, Reiner, Senequier, and Thompson) failed to conduct due diligence with regard to HP's acquisition of Autonomy.  This constituted a violation of the duties of the members of the Audit Committee under its Charter.

415.     The Finance and Investment Committee Defendants were specifically tasked with assisting "the Board in evaluating investment, acquisition, enterprise services, joint venture and divestiture transactions in which HP engages as part of its business strategy from time to time." The Finance and Investment Committee Defendants (Banerji, Hammergren, Reiner, Whitworth and Livermore) breached their fiduciary duty of loyalty by allowing HP to materially overpay for the acquisition of Autonomy despite the numerous red flags alerting them of Autonomy's overvaluation.  This constituted a violation of the duties of the members of the Finance and Investment Committee under its Charter.

416.     The Technology Committee Defendants (Whitman, Andreessen, Reiner and Russo), under the Committee Charter are tasked with the creation and implementation of "development strategies and the scope and quality of HP's intellectual property.  The Technology Committee makes recommendations to the Board as to scope, direction, quality, investment levels and execution of HP's technology strategies; oversees the execution of technology strategies formulated by management; provides guidance on technology as it may pertain to, among other things, market entry and exit, investments, mergers, acquisitions and divestitures, new business divisions and spin-offs, research and development investments, and key competitor and partnership strategies; and reviews and makes recommendations on proposed investment, acquisition."  Therefore, these Defendants had a heightened duty to evaluate Autonomy's technology and how it fit into HP's overall corporate strategy.  Despite these heightened duties under the Technology Committee Charter, these Defendants did nothing to evaluate Autonomy's technology prior to making a recommendation to go forward with the acquisition.  Thus, Defendants Whitman, Andreesen, Reiner and Russo face a substantial likelihood of liability for their failure to fulfill their duties as members of the Technology Committee so any demand upon them is futile.

417.     The wrongful conduct particularized herein was not due to an honest error in judgment, but rather to the Individual Defendants' gross mismanagement, bad faith and/or

reckless disregard of the rights and interests of HP, its shareholders and its ratepayers and for acting without the reasonable and ordinary care which they owed HP.

418.    As a result of the foregoing, the Individual Defendants have participated in harming HP and have breached fiduciary duties owed to HP.  The Individual Defendants knowingly aided, encouraged, cooperated and/or participated in, and substantially assisted the other Defendants in the breaches of their fiduciary duties.

419.    As a result of defendants' wrongful conduct, HP has suffered and continues to suffer economic losses and non-economic losses, all in an amount to be determined according to proof at the time of trial.  As a direct and proximate result of defendants' foregoing breaches of fiduciary duties, HP has sustained billions of dollars in damages, including, but not limited to the, $8.8 billion write-down, the costs and expenses incurred in connection with HP's internal investigation of historical financial statements, potential securities litigation, and its loss of reputation and goodwill.

## FOURTH CLAIM FOR RELIEF

### ABUSE OF CONTROL
### AGAINST THE HP INDIVIDUAL DEFENDANTS

420.    Plaintiff incorporates by reference the allegations set forth above as though fully restated herein.

421.    By virtue of their positions and financial holdings in HP, the Individual Defendants exercised control over HP and its operations, and owed duties as controlling persons to HP not to use their positions of control within the Company for their own personal interests and contrary to the interest of HP.

422.    The Individual Defendants' conduct amounts to an abuse of their control of HP, in violation of their obligations to HP.  The Individual Defendants knowingly aided, encouraged, cooperated and/or participated in, and substantially assisted the other Defendants in their abuse of control.  The Individual Defendants put their own pecuniary interests ahead of that of the corporation.  The Individual Defendants also made material misrepresentations in order to

conceal their own gross mismanagement of HP, as well as to the reduce their own individual liability for securities fraud and other malfeasance. The Individual Defendants abused their control of HP by putting their own self-preservation ahead of the best interests of the company.

423. As a result of the Individual Defendants' abuse of control, HP has sustained and will continue to sustain damages and injuries for which it has no adequate remedy at law.

## FIFTH CLAIM FOR RELIEF

## CORPORATE WASTE
## AGAINST THE HP INDIVIDUAL DEFENDANTS

424. Plaintiff incorporates by reference the allegations set forth above as though fully restated herein.

425. As alleged in detail herein, HP Individual Defendants had a fiduciary duty to exercise good faith and diligence in the administration of the affairs of HP and in the use and preservation of its property and assets, and the highest obligation of fair dealing.

426. HP Individual Defendants wasted HP's corporate assets by failing to conduct proper due diligence related both to Autonomy's true financial condition and technology and causing HP to overpay for Autonomy.

427. The HP Individual Defendants also wasted corporate assets by paying improper compensation and bonuses to certain of HP's directors and executive officers that breached their fiduciary duty. Similarly, the HP Individual Defendants wasted corporate assets by paying improper compensation to Defendants Perella Weinberg and Barclays Capital.

428. As a result of the Individual Defendants' actions, HP has to incur substantial costs in investigating and defending itself against pending securities fraud class actions. HP also has to incur the substantial costs of conducting an internal investigation, as well as the costs of dealing with investigations by regulatory agencies in the United States and United Kingdom.

429. As a result of the Individual Defendants' wrongful conduct, HP has suffered and continues to suffer damages, all in an amount to be determined according to proof at trial.

## SIXTH CLAIM FOR RELIEF

### UNJUST ENRICHMENT
### AGAINST THE HP INDIVIDUAL DEFENDANTS

430.     Plaintiff incorporates by reference the allegations set forth above as though fully restated herein.

431.     Defendants derived compensation, fees and other benefits from HP and were otherwise unjustly enriched for their management of HP during the time in which the wrongful practices occurred, to the detriment of HP.  Defendants profited by engaging in the wrongful conduct set forth above.

432.     Individual Defendants' enrichment is directly and causally related to the detriment of HP.

433.     These benefits were accepted by Defendants under such circumstances that it would be inequitable for it to be retained without payment.  As alleged above, HP Individual Defendants breached their fiduciary duties and/or abused their positions of control to HP and therefore Defendants are not justified in retaining the benefits conferred upon them.

## SEVENTH CLAIM FOR RELIEF

### AIDING AND ABETTING A BREACH OF FIDUCIARY DUTY
### AGAINST BARCLAYS AND PERELLA WEINBERG PARTNERS LP

434.     Plaintiff incorporates by reference the allegations set forth above as though fully restated herein.

435.     HP Individual Defendants had a fiduciary duty of care, loyalty, good faith and diligence in the administration of the affairs of HP and in the use and preservation of its property and assets, and the highest obligation of fair dealing.  As alleged herein, the Individual Defendants breached that duty.  Barclays and Perella acted with knowledge of these breaches and that the conduct they advocated or assisted also constituted a breach.  Barclays and Perella knowingly participated in the breaches in furtherance of their own financial gain and advantage.

⊛
LAW OFFICES
COTCHETT, PITRE
& McCARTHY, LLP

436.    Barclays and Perella aided and abetted HP Individual Defendants' breach of fiduciary duty by, among other things, failing to disclosure and/or act upon the failures of the due diligence process, as well as the material misstatements in Autonomy's financial statements or Autonomy's Next Generation Information Platform technology.  For example, Barclays and Perella allowed and/or supported Individual Defendants' decision to purchase Autonomy despite the numerous red flags related to its financial condition and technological shortcomings. Barclays and Perella also provided fairness opinions to HP's Board despite knowledge of the failures of the due diligence process, and the lack of any basis by which they could reasonably provide an opinion relating to the fairness of the transaction or the consideration to be paid by HP.

437.    Barclays and Perella allowed HP to make misleading statements about Autonomy's technology.  Barclays and Perella knew that there was no due diligence conducted of the technology or accounting at Autonomy.  Barclays and Perella knew that the HP Individual Defendants were making material and misleading statements about the value of the Autonomy technology and how it would be "transformative" of HP.  Defendant Barclays and Perella knew that the Individual Defendants were making material and misleading statements about HP's purported "extensive" due diligence.  Barclays and Perella knew that HP was paying a massive and unjustifiable premium to acquire Autonomy.  Despite this knowledge, Barclays and Perella allowed themselves to be used as cover for the HP Individual Defendants to breach their fiduciary duties to HP and its shareholders.

438.    Barclays and Perella knew that the Individual Defendants were breaching their fiduciary duties as alleged above because they were intimately involved with the due diligence process and reported directly to the HP Individual Defendants.  Barclays and Perella knew that HP was overpaying for Autonomy, they knew about the red flags at Autonomy that HP's Board of Directors were willfully ignoring and they knew that HP was paying an exorbitant sum for outdated technology.  Despite this knowledge that HP's Board of Directors were breaching their fiduciary duties, Barclays and Perella knowingly aided, abetted and encouraged that breach.

LAW OFFICES
COTCHETT, PITRE
& MCCARTHY, LLP

439.     Barclays and Perella's participation, aid, encouragement, and/or ratification of HP Individual Defendants' breaches of fiduciary duties were done for their benefit, which included among other things, preserving their relationship with the Individual Defendants and HP and securing tens of millions of dollars in compensation for audit and consulting services.

440.     Barclays and Perella were a substantial cause of the harm alleged herein.  If Barclays and Perella had not provided their approval and support of the acquisition of Autonomy, or if they had prevented the HP Individual Defendants from breaching their fiduciary duties, HP and its shareholders would not have suffered the serious injuries caused by HP's misguided acquisition of Autonomy.

441.     As a result of this wrongful conduct, HP has suffered and continues to suffer economic and non-economic losses, all in an amount to be determined according to proof at trial.

**EIGHTH CLAIM FOR RELIEF**

**NEGLIGENCE**
**AGAINST BARCLAYS AND PERELLA WEINBERG PARTNERS LP**

442.     Plaintiff incorporates by reference the allegations set forth above as though fully restated herein.

443.     Defendants Barclays and Perella, as the financial advisors for HP, were obligated and required to perform certain duties, including proper due diligence of Autonomy prior to the acquisition, proper evaluation of the transaction from a financial perspective, and whether or not they could provide a fairness opinion to HP's Board based upon the information available to them.  Defendants Barclays and Perella were also  required to evaluate Autonomy's financial statements, its accounting practices, and the technology and products purportedly being sold by Autonomy.  Defendants Barclays and Perella were responsible for ensuring that the business justification for acquiring Autonomy, including the integration of the IDOL 10 technology, was worth the premium being paid for it.  Defendants Barclays and Perella were responsible for advising HP regarding the consideration to be paid, including whether a premium should be paid

despite evidence of outdated technology that was difficult and use and not user-friendly and insufficient due diligence performed. Defendants Barclays and Perella should not have provided a fairness opinion, nor advised HP to go forward with an acquisition at an obviously inflated price, and without sufficient due diligence. Barclays and Perella failed in their obligations.

444. By agreeing to provide consulting and other professional services to HP, Defendants Barclays and Perella owed a legal duty to act with the skill and ordinary care ordinarily used by reasonable and competent professionals. By agreeing to provide fairness opinions to HP, Defendants Barclays and Perella had a duty to act with the skill and ordinary care ordinarily used by reasonable and competent professionals in providing these fairness opinions. Defendants Barclays and Perella were negligent and grossly negligent in providing these fairness opinions. Defendant Barclays was particularly negligent for serving as HP's investment advisor despite having a serious conflict of interest.

445. As a result of this wrongful conduct, HP has suffered and continues to suffer economic and non-economic losses, all in an amount to be determined according to proof at trial.

## VIII.

## PRAYER FOR RELIEF

Plaintiff, on behalf of HP, prays for judgment as follows:

1.      Awarding damages against all Defendants, jointly and severally, in an amount to be proven at trial;

2.      Awarding restitution, disgorgement of all illicit proceeds generated as a result of the wrongful conduct alleged herein, and punitive damages;

3.      Awarding appropriate equitable relief, including any injunctive or declaratory relief necessary to change and/or reform HP's corporate governance, policies and culture;

4.      Plaintiff intends to seek the removal of any and all directors in which there is a finding by this Court that such director violated his or her fiduciary duties to the corporation;

5.      Awarding pre-judgment interest, as well as reasonable attorneys' fees and other costs;

6.      Awarding such other relief as this Court may deem just and proper.

Dated:  May 3, 2013                              **COTCHETT, PITRE & McCARTHY, LLP**


                                        By:      /s/
                                                    JOSEPH W. COTCHETT

                                                 Mark C. Molumphy
                                                 Aron K. Liang
                                                 Matthew K. Edling
                                                 Jennifer R. Crutchfield
                                                 840 Malcolm Road, Suite 200
                                                 Burlingame, CA 94010
                                                 jcotchett@cpmlegal.com
                                                 mmolumphy@cpmlegal.com
                                                 aliang@cpmlegal.com
                                                 medling@cpmlegal.com
                                                 jcrutchfield@cpmlegal.com

                                                 *Lead Counsel and Attorneys for Lead Plaintiff*
                                                 *Stanley Morrical, derivatively on behalf of Hewlett-*
                                                 *Packard Company*

**CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT**                                    179

1

## JURY TRIAL DEMAND

2      Lead Plaintiff, on behalf of HP, hereby demands a trial by jury of all issues which are

3   subject to adjudication by a trier of fact.

4   Dated: May 3, 2013                          **COTCHETT, PITRE & McCARTHY, LLP**

5
                                                By:    /s/
6                                                         JOSEPH W. COTCHETT

7
                                                Mark C. Molumphy
8                                                Aron K. Liang
                                                Matthew K. Edling
9                                                Jennifer R. Crutchfield
                                                840 Malcolm Road, Suite 200
10                                               Burlingame, CA 94010
                                                jcotchett@cpmlegal.com
11                                               mmolumphy@cpmlegal.com
                                                aliang@cpmlegal.com
12                                               medling@cpmlegal.com
                                                jcrutchfield@cpmlegal.com
13

14
                                                *Lead Counsel and Attorneys for Lead Plaintiff*
15                                               *Stanley Morrical, derivatively on behalf of Hewlett-*
                                                *Packard Company*
16

17

18

19

20

21

22

23

24

25

26

27

28

LAW OFFICES
COTCHETT, PITRE
& MCCARTHY, LLP

**CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT**                    180

## VERIFICATION

I, STANLEY MORRICAL, declare:

I am the lead plaintiff in this action. I am also a shareholder of Hewlett-Packard Company and have been during the relevant time period. I certify under penalty of perjury that I have read and reviewed the Consolidated Shareholder Derivative Complaint filed in this action and authorized its filing. Based on my and my counsel's investigation, the contents of the Complaint are true to the best of my knowledge, information and belief.

Date: May 2, 2013

STANLEY MORRICAL

LAW OFFICES
COTCHETT, PITRE
& McCARTHY, LLP

**VERIFICATION TO THE CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT**