WACHTELL, LIPTON, ROSEN & KATZ
MARC WOLINSKY (*pro hac vice*)
GEORGE T. CONWAY III (*pro hac vice*)
RACHELLE SILVERBERG (*pro hac vice*)
VINCENT G. LEVY (*pro hac vice*)
51 West 52nd Street
New York, NY  10019
Tel./Fax:  212.403.1000/2000
MWolinsky@wlrk.com
GTConway@wlrk.com
RSilverberg@wlrk.com
VGLevy@wlrk.com

FARELLA, BRAUN & MARTEL, LLP
NEIL A. GOTEINER, State Bar No. 83524
THOMAS B. MAYHEW, State Bar No. 183539
CHRISTOPHER C. WHEELER, State Bar No. 224872
235 Montgomery Street, 17th Floor
San Francisco, CA  94104
Tel./Fax:  415.954.4400/4480
NGoteiner@fbm.com
TMayhew@fbm.com
CWheeler@fbm.com

*Attorneys for Defendant Hewlett-Packard Company*

# IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE HEWLETT-PACKARD COMPANY SHAREHOLDER DERIVATIVE LITIGATION | Master File No. 12-CV-6003 CRB |
| | **DEFENDANT HEWLETT-PACKARD COMPANY'S REPLY MEMORANDUM IN FURTHER SUPPORT OF MOTION TO STAY** |
| This Document Relates to:  All Actions | Date:    Friday, September 6, 2013 |
| | Time:    10:00 a.m. |
| | Dept.:   Courtroom 6, 17th Floor |
| | Judge:   Hon. Charles R. Breyer |

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................ ii

STATEMENT OF ISSUES ................................................................................................. v

SUMMARY OF ARGUMENT ........................................................................................... v

ARGUMENT ...................................................................................................................... 1

    A.    The Law Recognizes a Strong Presumption in Favor of Staying Derivative Litigation Pending Evaluation of the Putative Stockholder's Claims by a Committee or by the Board. ....................................................................................... 1

    B.    Plaintiff Does Not and Cannot Overcome the Stay Presumption. ................................ 5

        1.    The Independence of the DRC Cannot Seriously Be Challenged. ................... 5

        2.    There Is no Basis to Contest the Good Faith of the DRC's Investigation ........................................................................................................ 8

    C.    The Pending Securities Suit Further Supports a Stay. ................................................ 11

        1.    Parallel Litigation of the Two Cases Would Create a Conflict for HP........... 11

        2.    A Stay Would Conserve Judicial and Party Resources. ................................. 13

    D.    The Pending Government Investigations Further Justify a Stay. .............................. 14

    E.    A Stay of the Derivative Case Would Not Prejudice Plaintiff.................................... 15

CONCLUSION ................................................................................................................... 15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbey* v. *Computer & Commc'ns Tech. Corp.*,
  457 A.2d 368 (Del. Ch. 1983) ................................................................................................ 3

*Alaska Elec. Pension Fund* v. *Sperling*, Order,
  No. CV06-2124 (Dkt. No. 56) (D. Ariz. Dec. 4, 2006) .................................................. 12

*Aronson* v. *Lewis*,
  473 A.2d 805 (Del. 1984) ............................................................................................... 1, 6

*ASCII Corp.* v. *STD Entm't USA, Inc.*,
  844 F. Supp. 1378 (N.D. Cal. 1994) ............................................................................... 3

*Biondi* v. *Scrushy*,
  820 A.2d 1148 (Del. Ch. 2003) ......................................................... 2, 3, 5, 6, 7, 8, 9

*Breault* v. *Folino*,
  2002 WL 31974381 (C.D. Cal. Mar. 15, 2002) .............................................................. 14

*Brehm* v. *Eisner*,
  746 A.2d 244 (Del. 2000) ............................................................................................... 4, 7

*Brenner* v. *Albrecht*,
  2012 WL 252286 (Del. Ch. Jan. 27, 2012) .................................................................... 12

*Carlton Invs.* v. *TLC Beatrice Int'l Holdings, Inc.*,
  1996 WL 33167168 (Del. Ch. June 6, 1996) ................................................................... 3

*Charal Inv. Co.* v. *Rockefeller*,
  1995 WL 684869 (Del. Ch. Nov. 7, 1995) ....................................................................... 1

*City of Austin Police Ret. Sys.* v. *ITT Educ. Servs.*,
  2005 WL 280345 (S.D. Ind. Feb. 2, 2005) ..................................................................... 12

*CMAX, Inc.* v. *Hall*,
  300 F.2d 265 (9th Cir. 1962) ........................................................................................... 3

*Copeland* v. *Lane*,
  2012 WL 4845636 (N.D. Cal. Oct. 10, 2012) ................................................................. 4

*Curtis* v. *Nevens*,
  31 P.3d 146 (Colo. 2001) ................................................................................................ 9

*In re Bank of N.Y. Deriv. Litig.*,
  2000 WL 1708173 (S.D.N.Y. Nov. 14, 2000) ................................................................ 14

*In re Citigroup Inc. S'holder Deriv. Litig.*,
  964 A. 2d 106 (Del. Ch. 2009) ....................................................................................... 7

*In re E.F. Hutton Banking Practices Litig.*,
  634 F. Supp. 265 (S.D.N.Y. 1986) .................................................................................. 13

*In re First Solar Deriv. Litig.*,
    2012 WL 6570914 (D. Ariz. Dec. 17, 2012) ........................................................ 12, 14

*In re Groupon Deriv. Litig.*,
    882 F. Supp. 2d 1043 (N.D. Ill. 2012) ................................................................ 14

*In re InfoUSA, Inc. S'holders Litig.*,
    2008 WL 762482 (Del. Ch. Mar. 17, 2008) ..................................................... 2, 3, 5

*In re Massey Energy Co.*,
    2011 WL 2176479 (Del. Ch. May 31, 2011) ......................................................... 14

*In re Oracle Corp. Deriv. Litig.*,
    808 A.2d 1206 (Del. Ch. 2002) ..................................................................... 2

*In re Storage Tech. Corp. Sec. Litig.*,
    804 F. Supp. 1368 (D. Colo. 1992) ................................................................. 14

*In re UnitedHealth Grp. Inc. S'holder Deriv. Litig.*,
    2007 WL 803048 (D. Minn. Mar. 14, 2007) ..................................................... 2, 12

*In re Woodcraft Studios, Inc.*,
    2012 WL 160225 (N.D. Cal. Jan. 28, 2012) ......................................................... 3

*International Broadcasting Corp.* v. *Turner*,
    734 F. Supp. 383 (D. Minn. 1990) ................................................................... 6

*Kaplan* v. *Wyatt*,
    484 A.2d 501 (Del. Ch. 1984) ...................................................................... 2

*Katell* v. *Morgan Stanley Grp., Inc.*,
    1993 WL 390525 (Del. Ch. Sept. 27, 1993) .......................................................... 5

*Landis* v. *N. Am. Co.*,
    299 U.S. 254 (1936) ............................................................................... 2

*Lockyer* v. *Mirant Corp.*,
    398 F.3d 1098 (9th Cir. 2005) ...................................................................... 2

*Maccoumber* v. *Austin*,
    2004 WL 1745751 (N.D. Ill. Aug. 2, 2004) ...................................................... 1, 11

*Mills* v. *Esmark, Inc.*,
    91 F.R.D. 70 (N.D. Ill. 1981) ....................................................................... 1

*Moradi* v. *Adelson*,
    2012 WL 3687576 (D. Nev. Aug. 27, 2012) ................................... 2, 4, 5, 10, 11, 14, 15

*Mount Moriah Cemetery* v. *Moritz*,
    1991 WL 50149 (Del. Ch. Apr. 04, 1991) ............................................................ 9

*Mozes* v. *Welch*,
    638 F. Supp. 215 (D. Conn. 1986) ................................................................ 9, 14

*Nken* v. *Holder*,
556 U.S. 418 (2009)...........................................................................................................3

*Piven* v. *Ryan*,
2006 WL 756043 (N.D. Ill. Mar. 23, 2006).................................................................1, 2, 9

*Rales* v. *Blasband*,
634 A.2d 927 (Del. 1993) ...................................................................................................1

*Scattered Corp.* v. *Chicago Stock Exch., Inc.*,
701 A.2d 70 (Del. 1997) .....................................................................................................4

*SEC* v. *Global Real Estate Inv. Fund I, LLC*,
289 Fed. App'x 183 (9th Cir. 2008) ..................................................................................14

*Smachlo* v. *Birkelo*,
576 F. Supp. 1439 (D. Del. 1983)........................................................................................1

*Smith* v. *Sperling*,
2012 WL 79237 (D. Ariz. Jan. 11, 2012) .....................................................................10, 12

*Sonkin* v. *Baker*,
670 F. Supp. 249, 254 (S.D. Ind. 1987) .............................................................................13

*Sutherland* v. *Sutherland*,
2008 WL 571253 (Del. Ch. Feb. 14, 2008) .....................................................................5, 9

*United States* v. *Acorn Tech. Fund, L.P.*,
2004 WL 1803321 (E.D. Pa. Aug. 12, 2004) ...................................................................14

*Zapata Corp.* v. *Maldonado*,
430 A.2d 779 (Del. 1981) ............................................................................................1, 3, 4

**Statutes**

8 DEL. C. § 141(a) ......................................................................................................................1

8 DEL. C. § 141(c) ......................................................................................................................3

8 DEL. C. § 141(e) ......................................................................................................................7

**Other Authorities**

ALI, PRINCIPLES OF CORP. GOVERNANCE .................................................................................3

**Rules**

FED. R. CIV. P. 23.1 ...................................................................................................................2

**STATEMENT OF ISSUES**

Should this consolidated shareholder derivative action be temporarily stayed when (1) a committee of independent directors is investigating the complaint's allegations, so that the board may determine whether to prosecute claims belonging to the corporation; (2) the law recognizes a strong presumption in favor of a stay in those circumstances; and (3) other relevant factors, including parallel securities-laws proceedings, an ongoing criminal investigation, and lack of prejudice to the plaintiff, all support entry of a temporary stay?

**SUMMARY OF ARGUMENT**

Delaware law puts directors in charge of managing Delaware corporations.  That authority includes the power to decide whether, when, and whom to sue on the corporation's behalf.  And lest that authority be vitiated by derivative actions brought by self-appointed champions of the corporate cause, Delaware law *presumptively* requires that derivative suits should be stayed so that the directors — fiduciaries elected by *all* stockholders — can investigate and deliberate on whether to bring claims.  It would utterly "subvert[]" that law "[i]f a derivative plaintiff were to be permitted to depose corporate officers and directors and to demand the production of corporate documents … at the same time that a duly authorized litigation committee was investigating whether or not it would be in the best interests of the corporation to permit the suit to go forward."  *Moradi* v. *Adelson*, 2012 WL 3687576, at *2 (D. Nev. Aug. 27, 2012).

In response to these well-settled principles, plaintiff's opposition offers nothing but misdirection.  Casually quoting a couple of cases, plaintiff urges that stays in federal court may issue "[o]nly in rare circumstances."  Opp. 4.  The cases plaintiff cites, however, do not involve derivative litigation at all, but rather address an irrelevant question about federal judges' authority to control their docket:  namely, whether "a litigant in one cause [ought to] be compelled to stand aside while a litigant in another settles the rule of law that will define the rights of both."  *Lockyer* v. *Mirant Corp.*, 398 F.3d 1098, 1109-10 (9th Cir. 2005) (quoting *Landis* v. *N. Am. Co.*, 299 U.S. 248, 255 (1936)).  Beyond this, plaintiff makes only a spurious effort to distinguish the case law that does govern derivative litigation:  he asserts that this case law doesn't control because HP's full board has empowered its Demand Review Committee to investigate possible claims, but has retained for itself ulti-

mate authority to decide how HP should respond.  Opp. 7-10.  Yet plaintiff cites *no* case that has de-

nied a stay based on this unprincipled distinction.

To the contrary, the law makes clear that "the relative power of the SLC [special litigation

committee] vis-à-vis the Board to make critical decisions regarding the decision to proceed with a

shareholder derivative action is of no significant import here," and that it would be "premature to

demean the SLC's legitimacy before it finishes its investigation and makes its recommendations to

the Board."  *Moradi*, 2012 WL 3687576, at *3.  If the board ultimately decides to dismiss this case

on the basis of the DRC's investigation, plaintiff will have time enough to challenge "both the inde-

pendence of the [DRC] and the good faith of its inquiry."  *Sutherland* v. *Sutherland*, 2008 WL

571253, at *1 (Del. Ch. Feb. 14, 2008).  In the meantime, the DRC and the board are entitled to

"generous leeway to investigate and respond."  *Maccoumber* v. *Austin*, 2004 WL 1745751, at *4

(N.D. Ill. Aug. 2, 2004).

But even if it were not "premature," plaintiff's attempt here to "demean the … legitimacy" of

HP's board and DRC would be doomed to fail.  *Moradi*, 2012 WL 3687576, at *3.  Plaintiff seeks to

cram this case into the narrow exception recognized in *Biondi* v. *Scrushy*, 820 A.2d 1148 (Del. Ch.

2003), a case involving the notorious (and ultimately imprisoned) CEO of HealthSouth, Richard

Scrushy.  But the facts just aren't there; not even close.  The *Biondi* investigation was a transparent

sham:  an "odd confluence of unusual and highly troubling facts" that compelled the conclusion that

a stay would be "futile and wasteful."  *Id.* at 1165.  In contrast, all three members of the DRC meet

HP's stringent independence requirements; two weren't on the board when it voted to approve the

Autonomy deal.  One of the two, Bob Bennett, joined the board just last month, while the other —

the one who is leading the committee, the respected investor Ralph Whitworth — is the beneficial

owner of nearly 2% of the company's stock, some 34 million shares worth almost $900 million at

today's prices.  Mr. Whitworth thus has many, many million reasons more than the plaintiff to do

what's right for HP.

Nor is there substance to plaintiff's claim that the committee's investigation is an "artifice for

delay," and merely duplicative of a prior review, conducted by PwC, of Autonomy's pre-acquisition

disclosures and conduct.  The DRC's mandate is much broader than was PwC's — thanks in part to

plaintiff.  The DRC must evaluate the allegations made not just in this case, but also in other deriva-
tive suits and various demand letters, that relate not only to pre-acquisition Autonomy, but also to (1)
HP's due diligence of Autonomy, (2) HP's post-acquisition accounting, (3) the integration of Auton-
omy into HP, (4) HP's stock-repurchase plan, (5) HP's disclosures relating to Autonomy, and (6)
numerous other matters outside the scope of PwC's mandate.  Plaintiff and other stockholders have
put each of these matters in issue, and it is the HP board's duty to carefully and thoroughly review
all of them.  A stay is needed so that the board can properly do so.

A stay is also warranted for other reasons as well.   For one thing, by his silence, plaintiff ef-
fectively concedes that the ongoing government investigations — by the DoJ, the SEC, and the U.K.
Serious Fraud Office — support a stay.  So, too, do the parallel securities and ERISA cases pending
before this Court; the derivative plaintiff would seek to attack the same officers and directors whose
credibility HP must invoke to defend those cases.  That, by itself, justifies a stay.  *Brenner* v. *Al-
brecht*, 2012 WL 252286, at *6 (Del. Ch. Jan. 27, 2012); *In re First Solar Deriv. Litig.*, 2012 WL
6570914, at *2 (D. Ariz. Dec. 17, 2012); HP Br. 9-10.  On the other side of the ledger, plaintiff iden-
tifies no particular harm — *none* — that a stay would or could visit upon him.  Indeed, this being a
derivative case, he has no interest to advance here other than HP's.  And HP — along with *all* of its
stockholders — would unquestionably be best served by a stay.

\*   \*   \*

In short, HP's board has adopted a process that provides for a thorough, unbiased review of
all the issues and allegations arising from HP's purchase of Autonomy.  That process will take time.
But in light of the significant stakes at issue, the expense of any litigation to HP (including on ac-
count of expenses HP may be required to advance to others), and the breadth of the allegations, the
need for a careful and thorough review is neither surprising nor unusual.  The Court should stay this
action and set a hearing for January 17, 2014, to review the continued appropriateness of a stay.

## ARGUMENT

**A.  The Law Recognizes a Strong Presumption in Favor of Staying Derivative Litigation Pending Evaluation of the Putative Stockholder's Claims by a Committee or by the Board.**

Ultimately at issue here is an important principle of corporate governance.  The plaintiff sues *not* on his own behalf, or even on behalf of other stockholders; instead, he seeks to assert *the corporation's* claims.  *Aronson* v. *Lewis*, 473 A.2d 805, 815 (Del. 1984).  But by statute, directors — not self-appointed stockholders — "manag[e]" "[t]he business and  affairs of every corporation." 8 DEL. C. § 141(a).  That "managerial decision making power" includes "decisions whether to initiate, or refrain from entering, litigation" on behalf of the corporation.  *Zapata Corp.* v. *Maldonado*, 430 A.2d 779, 782 (Del. 1981) (citing 8 DEL. C. § 141(a)).  So the board of a Delaware corporation has the right and power to take over a derivative case, or "to cause [it] to be dismissed as detrimental to the company," a decision that "will be respected unless it was wrongful." *Zapata*, 430 A. 2d at 784.

And in deciding whether to assert claims for the company, directors have the right to "determine the best method to inform themselves of the facts relating to the alleged wrongdoing and the considerations, both legal and financial, bearing on a response to the demand" to bring suit.  *Rales* v. *Blasband*, 634 A.2d 927, 935 & n.11 (Del. 1993).  "[T]he board must investigate the alleged wrongdoing and then decide upon an appropriate course of action."  *Piven* v. *Ryan*, 2006 WL 756043, at *2 (N.D. Ill. Mar. 23, 2006).  Case after case confirms that boards are entitled to "an adequate and reasonable amount of time" to be adequately informed.  *E.g.*, *Smachlo* v. *Birkelo*, 576 F. Supp. 1439, 1445 (D. Del. 1983) (quoting *Mills* v. *Esmark, Inc.*, 91 F.R.D. 70, 73 (N.D. Ill. 1981)); *Charal Inv. Co.* v. *Rockefeller*, 1995 WL 684869, *3 (Del. Ch. Nov. 7, 1995); *Maccoumber* v. *Austin*, 2004 WL 1745751, at *4 (N.D. Ill. Aug. 2, 2004).

These principles of corporate governance would be meaningless if individual shareholders and their attorneys — attorneys who seek fees not from their clients, but from the *corporation* — could litigate company claims while the directors elected by all stockholders conduct the investigation and deliberation the law requires.  Accordingly, to preserve the board's powers, Delaware law has presumptively required that derivative litigation be stayed pending a board's investigation —

including when the investigation is conducted by a committee on the board's behalf.  Put simply:

> If a derivative plaintiff were to be permitted to depose corporate officers and directors and to demand the production of corporate documents, etc. at the same time that a duly authorized litigation committee was investigating whether or not it would be in the best interests of the corporation to permit the suit to go forward, the very justification for the creating of the litigation committee in the first place might well be subverted.

*Moradi* v. *Adelson*, 2012 WL 3687576, at *3 (D. Nev. Aug. 27, 2012) (staying derivative case pending resolution of committee's investigation and recommendation to board).

And so stays in circumstances like this are a matter of routine and almost invariably granted. *In re Oracle Corp. Deriv. Litig.*, 808 A.2d 1206, 1211-12 (Del. Ch. 2002); *Kaplan* v. *Wyatt*, 484 A.2d 501, 510 (Del. Ch. 1984); *In re InfoUSA, Inc. S'holders Litig.*, 2008 WL 762482, at *2 (Del. Ch. Mar. 17, 2008); *In re UnitedHealth Grp. Inc. S'holder Deriv. Litig.*, 2007 WL 803048, at *2 (D. Minn. Mar. 14, 2007).  To hold otherwise would frustrate the board's authority and "the policy of Rule 23.1."  *Piven*, 2006 WL 756043, at *2.  Stay applications are denied only in "highly unusual circumstances" — when it would be "futile and wasteful" because "the undisputed facts will make it impossible for the court later to accept a decision of the special litigation committee to terminate the derivative litigation."  *Biondi* v. *Scrushy*, 820 A.2d 1148, 1164-65 (Del. Ch. 2003).

Against the weight of this precedent, plaintiff does not cite contrary authority, or say that HP's cases were wrongly decided, or say that those cases do not reflect Delaware law, or even suggest that the Court should not follow Delaware law.  He instead invokes inapposite authority, draws spurious distinctions, and misrepresents the law.

1.     Plaintiff asserts that a stay may issue "'[o]nly in rare circumstances,'" and that "[t]he moving party 'must make out a clear case of hardship or inequity.'"  Opp. 4.  But the cases he cites in support involved an entirely different question, one not relevant here:  whether "a litigant in one cause [ought to] be compelled to stand aside while a litigant in another settles the rule of law that will define the rights of both."  *Lockyer* v. *Mirant Corp.*, 398 F.3d 1098, 1109-10 (9th Cir. 2005) (quoting *Landis* v. *N. Am. Co.*, 299 U.S. 254, 255 (1936)).  The Court's authority to control its own docket has no bearing on the corporate-governance issues presented here.  And not one case cited by plaintiff applies the *Landis* standard to a motion to stay derivative litigation to permit a board-

---

2

authorized investigation to proceed.  In those cases, the law is precisely to the contrary.  There is a strong presumption *in favor of* a stay; only in the rare case will a stay *not* issue.  *Biondi* v. *Scrushy*, 820 A.2d 1148, 1150, 1163-65 (Del. Ch. 2003).[1]  And it is plaintiff's heavy burden to justify proceeding despite a pending board investigation.  *See In re InfoUSA*, 2008 WL 762482, at *2.[2]

2.     Plaintiff's next tack is to try to distinguish these controlling cases.  At HP, he emphasizes, the board retained the right to decide whether to sue, and tasked the DRC with only the power to investigate and recommend.  Opp. 7-10.  The law recognizes no such distinction, because the distinction makes no sense.  Courts have uniformly granted stays during the pendency of board-authorized investigations.  It does not matter whether the investigation is conducted by the full board or by a committee to which the board has delegated its power to investigate.  In either case, the group that is acting has the statutory duty and power to act, and that is the reason the stay is granted as a matter of course.  *Abbey* v. *Computer & Commc'ns Tech. Corp.*, 457 A.2d 368, 375 (Del. Ch. 1983) (stay is needed to secure SLC's board-authorized power); *Zapata*, 430 A.2d at 785 (SLC exercises board authority); 8 DEL. C. § 141(c) (permitting board delegation to committees); *see also* ALI, PRINCIPLES OF CORP. GOVERNANCE § 7.06, cmt. c ("The common practice today in derivative litigation is to stay discovery [and other proceedings] pending preparation … of a report *by the board or a committee* appointed by the board to *evaluate* the action and its impact on the corporation." (emphasis added)).

---

[1]     *Carlton Invs.* v. *TLC Beatrice Int'l Holdings, Inc.*, 1996 WL 33167168 (Del. Ch. June 6, 1996), like *Biondi*, is one of the rare cases that "demonstrate that the general rule favoring stays admits of limited exceptions."  *Biondi*, 820 A.2d at 1165 n.42.  Although plaintiff cites *Carlton* in passing (*see* Opp. 3-4), he does not argue that the case counsels against a stay or why, and it doesn't.

[2]     Plaintiff's other cases (quoted in Opp. 4) are equally unavailing.  They concern the Court's "inherent power to control the disposition of the causes on its docket in a manner which will promote economy of time and effort for itself, for counsel, and for litigants," *CMAX, Inc.* v. *Hall*, 300 F.2d 265, 268 (9th Cir. 1962), rather than the authority of a corporate board to control litigation brought on behalf of a Delaware corporation.  The *CMAX* case, for instance, involved a discretionary stay of a civil trial pending the disposition of a parallel enforcement proceeding instituted by the Civil Aeronautics Board.  300 F.2d at 268.  *ASCII Corp.* v. *STD Entertainment USA, Inc.*, concerned a stay of patent litigation pending reexamination of patent validity by the United States Patent Office.  844 F. Supp. 1378, 1380 (N.D. Cal. 1994).  *In re Woodcraft Studios, Inc.* was a decision about the propriety of a stay pending appeal, and the applicable statute required the moving party to show "cause" for such a stay.  2012 WL 160225, at *1 (N.D. Cal. Jan. 28, 2012).  Finally, *Nken* v. *Holder* concerned the stay of an immigration removal order pending judicial review of the order.  556 U.S. 418, 433-34 (2009).

---

Nor can there be any question that the board's delegation of more limited power to the committee was permissible. This Court and the Supreme Court of Delaware have both confirmed that a board can cause a suit to be dismissed on the basis of the investigation conducted by an advisory committee of directors. *Copeland* v. *Lane*, 2012 WL 4845636, at *7 (N.D. Cal. Oct. 10, 2012) (holding that use of such a "procedure is appropriate"); *Scattered Corp.* v. *Chicago Stock Exch., Inc.*, 701 A.2d 70, 75-77 (Del. 1997) (executive committee of board may determine to dismiss derivative litigation on basis of recommendation of advisory committee tasked with investigation), *overruled on other grounds*, *Brehm* v. *Eisner*, 746 A.2d 244, 253-54 (Del. 2000).[3] The DRC's authority to investigate and recommend is undisputed. The board's power to terminate or take over the suit based on the DRC's recommendation is well recognized. And the issue may become moot, for the board's power will be relevant only if the DRC recommends pursuing these claims and the board disagrees. It is "premature to demean the SLC's legitimacy before it finishes its investigation and makes its recommendations to the Board." *Moradi*, 2012 WL 3687576, at *3.

3. Although plaintiff cites no case declining to enter a stay based on the distinction he sponsors, he charges that "HP has not cited a single case in which a stay has been granted pursuant to the creation of a committee, … which does not have full and exclusive authority to act on behalf of the company in response to shareholder demands or derivative claims." Opp. 10. Wrong.

In *Moradi*, as here, the "[p]laintiffs argue[d] that the [corporate] [b]oard only delegated investigative authority to the SLC, whereas the case law supports staying an action until the conclusion of an SLC investigation *only* where the SLC is delegated authority to make the ultimate determination as to the course of action to be taken in response to shareholders' allegations." 2012 WL 3687576, at *3. The court found the distinction unconvincing. It explained that "the relative power of the SLC vis-à-vis the Board to make critical decisions regarding the decision to proceed with a shareholder derivative action is of no significant import here." *Id.*

---

[3] Plaintiff says that "[i]n *Zapata*, the Delaware Supreme Court raised a serious concern (present here with HP's creation of a DRC) with a board intentionally limiting a committee's authority." Opp. 8. But *Zapata* concerned a situation in which a majority of the board was "tainted by . . . self-interest." 430 A.2d at 786. Plaintiff's opposition does not attempt to demonstrate this is the case here, and it isn't.

In the face of this unambiguous decision, which HP cited in anticipation of the very argument that plaintiff is making, plaintiff tries to distinguish *Moradi* by turning to the resolution establishing the SLC in that case. Opp. 9. Plaintiff quotes the resolution to say that the committee had "'*full authority and power to take any and all actions* on behalf of the Company that it deems appropriate and in the best interests of the Company . . . .'" Opp. 9 (emphasis and ellipsis in plaintiff's brief).

Note the ellipsis at the end of that quote. And see the words plaintiff's ellipsis replaced:

> RESOLVED, that the Audit Committee is hereby delegated full authority and power to take any and all actions on behalf of the Company that it deems appropriate and in the best interests of the Company ***in connection with investigating the allegations in the Shareholder Derivative Actions and any related shareholder derivative actions that may be filed***, including, without limitation, the engagement of independent counsel, accountants and other advisors at the Company's expense to assist the Committee in its investigation.

8/13/13 Molumphy Decl. Ex. 4 at 5 (emphasis added). The complete board resolution thus shows that the *Moradi* SLC was as described in the court's decision, and as advertised in HP's brief. The committee in *Moradi* only had authority to conduct an investigation. The same is true here.[4]

**B.     Plaintiff Does Not and Cannot Overcome the Stay Presumption.**

**1.     The Independence of the DRC Cannot Seriously Be Challenged.**

As a general matter, "judicial economy is served by permitting [the independence] issue to be addressed *after* the committee has issued its report, because the court may then consider questions of committee independence at the same time it examines the reasonableness of the bases for the committee's conclusion." *Moradi*, 2012 WL 3687576, at \*4 (emphasis added; quoting *InfoUSA*, 2008 WL 762482, at \*2); *see also Sutherland* v. *Sutherland*, 2008 WL 571253, at \*1 (Del. Ch. Feb. 14, 2008); *Katell* v. *Morgan Stanley Grp., Inc.*, 1993 WL 390525 (Del. Ch. Sept. 27, 1993). *See* HP Br. 8. In *Biondi*, the court held that a plaintiff could deviate from this rule only in the "very unusual" case, by showing that a stay would be "futile and wasteful" because "the undisputed facts will make

---

[4]     Plaintiff says that, in *In re InfoUSA*, "a stay was granted *only because*" of the plenary authority of the SLC. Opp. 8-9 (emphasis added). But given that it entered a stay, the court had no occasion to hold that a stay would not issue if the situation were different — and obviously did not so hold. Moreover, in entering a stay, the court emphasized only that it was "confident … the SLC ha[d] the authority it need[ed] to *conduct its investigation*." 2008 WL 762482, at \*2 (emphasis added). Plaintiff does not dispute that the DRC here has the authority to conduct an investigation.

1   it impossible for the court later to accept a decision of the special litigation committee to terminate

2   the derivative litigation."  820 A.2d at 1164-65.

3           Here, there is no basis to deny a stay because of purported director interest — and certainly

4   not under the *Biondi* standard.  Plaintiff basically ignores the fact that one of the members of the

5   DRC, Mr. Bennett, became a member of the board just last month.  *See* Opp. 6-7 (noting only that

6   "while one of the DRC members has been replaced by Robert Bennett, that was only recently in July

7   2013").  Plaintiff obviously cannot (and so does not seek to) challenge Mr. Bennett's independence.

8           Mr. Whitworth, likewise, was not on the board at the time the Autonomy deal was approved.

9   Opp. 7.  He is a highly respected investor, widely known as a principled and knowledgeable cham-

10  pion of virtuous corporate governance.  Just this past June, he received a lifetime achievement award

11  for his contributions to the field of good corporate governance.  8/20/13 Wolinsky Decl. Ex. C.  As

12  the beneficial owner of nearly 2% of the outstanding stock of HP, some 34 million shares, his inter-

13  ests are directly aligned with those of HP and its shareholders.  The bulk of what plaintiff has to say

14  about Mr. Whitworth's supposed "bias" amounts to nothing more than variations of the argument

15  that he has "personal liability for approving a questioned transaction."  *Aronson*, 473 A.2d at 815.

16          But the potential for personal liability, "standing alone, is insufficient to challenge either the

17  independence or disinterestedness of directors."  *Id.*[5]  And any claim that Mr. Whitworth or, for that

18  matter, any other member of the DRC faces liability must be discounted in view of HP's charter,

19  which contains an exculpatory provision, and the lack of any factual support in plaintiff's complaint

20  for his conclusory assertion that any member of the DRC (or even the board) disloyally or intention-

21  ally wronged the corporation.  HP Br. 8.  Equally unavailing is plaintiff's allegation that Mr. Whit-

22  worth's independence can be questioned because he had nice things to say in a press release when

23  three directors left the HP board.  Opp. 7.  This kind of corporate politeness, praising outgoing direc-

24  tors in generalized terms, hardly proves that Mr. Whitworth has prejudged the DRC's investigation.

---

[5]       Plaintiff cites the terse case of *International Broadcasting Corp.* v. *Turner* — which con-
cerned a Minnesota corporation, 734 F. Supp. 383, 385 (D. Minn. 1990) — for the proposition that a
stay should not issue when "two of the three SLC members were named defendants."  Opp. at 7.  To
the extent the case so holds, that is not the law in Delaware, as the Delaware Supreme Court long
ago held.  *Aronson*, 473 A.2d at 815.

The only allegation plaintiff can gin up to seek to try to tarnish Mr. Reiner is that he was a member of the HP Technology Committee, which allegedly never received a presentation about Autonomy's technology. Opp. 6 & Deriv. Compl. ¶ 376. This is again a variation on the same personal-liability claim. It fails to get off the ground. And in any event, Mr. Reiner was entitled by statute to rely on management's due diligence. HP Br. 7; *see* 8 DEL. C. § 141(e). Plaintiff's only response is the (untrue) assertion, made nowhere in the complaint, that Mr. Reiner's reliance was "blind." Opp. 6. But to overcome Section 141(e), plaintiff must plead in his complaint "particularized facts (not conclusions) that" would show, for instance, that Mr. Reiner "did not in fact rely on [management]" or that his "reliance was not in good faith" or even that "the decision of the Board was so unconscionable as to constitute waste or fraud." *Brehm*, 746 A.2d at 262; *In re Citigroup Inc. S'holder Deriv. Litig.*, 964 A. 2d 106, 135 (Del. Ch. 2009). The conclusory allegations in plaintiff's complaint do not satisfy this standard — let alone show that "the undisputed facts will make it impossible for the court later" to rule that Mr. Reiner is independent. *Biondi*, 820 A.2d at 1164-65.

In the face of all this, plaintiff nonetheless seeks to fit this case into a narrow exception recognized in *Biondi* v. *Scrushy*, the case involving the notorious (and ultimately criminally convicted) CEO of HealthSouth, Richard Scrushy. But this case is nothing like *Biondi*. Consider all the malodorous facts from this infamous case:

- The target of the investigation, Mr. Scrushy, had sold large blocks of shares at an inflated price, making millions for himself right before the company's stock price plummeted following the disclosure of nonpublic company information. 820 A.2d at 1149-50.

- The board formed an SLC and appointed to it directors with long-standing and close personal ties to Mr. Scrushy. *Id.* at 1157.

- On the day the board formed the SLC, the company announced it had retained Fulbright & Jaworski to conduct exactly the same investigation the SLC was conducting. *Id.*

- Six days later, the company put out a press release in which Mr. Scrushy's successor to the job of CEO stated: "'I want to make it clear that Richard M. Scrushy had absolutely no knowledge about any change in Medicare reimbursement rules until August 6, 2002, and none of us had any knowledge whatsoever that a possible rule change would have a material, financial impact on our company until August 15, 2002'" — which was "the very question" that the SLC was tasked with investigating. *Id.*

- One member of the SLC then abruptly resigned "in view of a large contract that his glass company had recently received from" HealthSouth, at which point he issued a strong

statement in support of Mr. Scrushy.  *Id.*

- Only 30 days later, the company put out another press release explaining that Fulbright & Jaworski had issued a report that "cleared" Scrushy of any wrongdoing.  *Id.* at 1157-58.

- The work of the SLC was at that point in its most preliminary stages.  Nevertheless, the Chair of the SLC endorsed the company's claim that Fulbright & Jaworski (which, again, did not work for the SLC) had absolved Mr. Scrushy:  "This thorough outside review conducted by Fulbright & Jaworski puts to rest any question whether Mr. Scrushy had any inkling or knowledge of the Medicare reimbursement rule change or its impact prior to his stock transactions in May and July 2002."  *Id.* at 1158.

- The company was then forced to issue a corrective disclosure at Fulbright & Jaworski's request:  "Although the Fulbright & Jaworski report apparently uncovered 'no oral inter-view or written document' that established that Scrushy was aware of the effect of the Group Rate Policy at the time of his May trade and the July Buyback, the firm was ex-pressing 'no views as to the inferences that may be drawn from the facts and circum-stances' in that report."  *Id.*

*Biondi* v. *Scrushy* thus involved an SLC investigation that was a transparent, and shameful, sham — where the chair of the committee charged with the investigation swiftly exculpated the tar-get based on the flimsy report of the company's law firm, which itself disclaimed the company's at-tempt to suggest that it had concluded that the corrupt CEO had done no wrong.  It was this "odd confluence of unusual and highly troubling facts" that caused the *Biondi* court to conclude that a stay would be "futile and wasteful," as the investigation could serve no purpose.  *Id.* at 1165.  Neither Mr. Whitworth's polite parting words to the three resigning HP directors (Opp. 7), nor CEO Whit-man's statements about the board's reliance on Deloitte's audit (Opp. 2), nor HP's selection of litiga-tion counsel (Opp. 5 & Ex. B), nor anything else asserted here, comes close to the sad chronicle of "eyebrow-raising event[s]" recounted in *Biondi*.  820 A.2d at 1157.

### 2.    There Is no Basis to Contest the Good Faith of the DRC's Investigation.

Plaintiff opposes the stay on the ground that HP has purportedly provided insufficient infor-mation about the DRC investigation, which is allegedly redundant of the PwC investigation.  Opp. 5-6, 10-11.  The common theme is that the DRC investigation is alleged to be an "artifice for delay."

As with the matter of director independence, this is not the time to question the good faith of the DRC's investigation.  If the board decides to pursue the suit, the question will be moot.  If it de-cides to dismiss the suit, plaintiff will have the opportunity to challenge "both the independence of

the [DRC] and the good faith of its inquiry." *Sutherland*, 2008 WL 571253, at *1; *Biondi*, 820 A.2d at 1164 ("the inquiry whether the SLC's recommendation should be respected is usually made after the committee has concluded its investigation and issued its report").  Until then, there is no justifi-cation for evaluating the DRC's investigation.  The case of *Curtis* v. *Nevens*, upon which plaintiff relies (Opp. 5-6), actually confirms as much; it holds that a court commits legal error when it evalu-ates "the reasonableness of the SLC's proposed procedures" in "a pre-investigation context" — at least absent extraordinary circumstances. 31 P.3d 146, 153 (Colo. 2001) (applying Colorado law).[6]

In any event, there is no basis to conclude that three independent HP directors are leading a multi-month investigation that is a "mere artifice for delay." Opp. 10-11.  It would have been "rea-sonable" for the board to hold off altogether on responding to the stockholder demand (and this suit) "in order to focus on related litigation." *Piven*, 2006 WL 756043, at *3; *Mozes* v. *Welch*, 638 F. Supp. 215, 221 (D. Conn. 1986) ("reasonable" to delay response to demand letters until "two months after the completion of" related grand-jury investigation).  The notion that the independent HP board would have engaged in an expensive charade in order to obtain time it could have received merely by writing Mr. Morrical a letter telling him to go away and by filing a motion to dismiss his claims on the basis of the pending securities suits and government investigations defies common sense.

Plaintiff's only allegation in support of his fanciful claim is that the company has already conducted an investigation with PwC's assistance.  But the DRC investigation is not duplicative of the PwC investigation.  The "intense internal investigation" that PwC performed focused on "the al-legations" of "a senior member of Autonomy's leadership team." Molumphy Decl. Ex. 2 at 5.  PwC thus conducted a "forensic review … of Autonomy's historical financial results." Opp. 2.  The in-vestigation revealed that Autonomy had made "misrepresentations" to the public, and that these had "impacted HP management's ability to fairly value Autonomy at the time of the deal." Opp. 2.

That was a substantial inquiry, but separate from the DRC's ongoing investigation, which was prompted by plaintiff's claims as well as those of other putative stockholders in litigation de-

---

[6]    And even after the fact, the court's review of the reasonableness of an investigation will be circumspect and circumscribed, and the specifics "not … second guessed" by courts. *See, e.g.*, *Mount Moriah Cemetery* v. *Moritz*, 1991 WL 50149, at *4 (Del. Ch. Apr. 04, 1991).

mand letters and derivative suits.  7/30/13 Wolinsky Decl. Ex. B (Board resolution establishing DRC).  As discussed, the claims being investigated are far reaching.  *See* 7/30/13 Wolinsky Decl. Ex. B, at 1 (setting forth DRC's mandate).  Most of the matters now being investigated would not have been uncovered, reviewed, or even touched upon in a forensic investigation of Autonomy's pre-acquisition books and records.  To take a specific example, plaintiff here says that the "crux" of his complaint "is that HP was aware that there was no IDOL10 product" available for sale after the Autonomy acquisition.  Opp., Ex. A.  This is not something PwC evaluated in investigating whether, before the acquisition, Autonomy had cooked its books.  Nor did PwC evaluate HP's due diligence of Autonomy, Autonomy's integration into HP, HP's stock-repurchase plan, or countless other matters the DRC must now evaluate.

Plaintiff ignores another, significant aspect of the DRC's mandate.  Unlike this plaintiff, other putative stockholders have demanded that HP take action not only against its own directors, officers, and advisers, but also against the Autonomy officials and advisers who misled HP into buying Autonomy.  (Indeed, another derivative suit alleging claims against Autonomy's former CEO was filed just last week, in Santa Clara County.  8/20/13 Wolinsky Decl. Ex. A (complaint).)  The DRC must review and make recommendations about those potential claims as well.

Finally, plaintiff says that HP has not explained why it needs a stay.  Opp. 5.  But HP has explained that the DRC is conducting an investigation, which is ongoing, into allegations made by plaintiff and all other putative stockholders in derivative suits and demand letters.  Plaintiff knows what allegations he made, and indeed touts their expansiveness in opposing this stay.  Opp. 13-14 & Ex. A.  That is more than enough to trigger the stay presumption.[7]

The unsubstantiated "artifice for delay" allegations aside, plaintiff's complaint is just that the investigation is taking too long.  But where, as here, stockholder demands are not just "brush[ed]

---

[7]   Plaintiff cites *Smith* v. *Sperling*, 2012 WL 79237 (D. Ariz. Jan. 11, 2012), to argue that HP was required to say more about the DRC.  Opp. 5.  The case involved an Arizona corporation and is inapposite; under Delaware law, a stay must issue absent extraordinary circumstances.  In any event, HP has provided information about the investigation (including the resolution establishing the DRC) and its anticipated length (suggesting a hearing in January) as well as about the DRC and its independence — information similar to what was provided in *Moradi*.  8/20/13 Wolinsky Decl. Ex. B.

off," a board is entitled to "generous leeway to investigate and respond." *Maccoumber*, 2004 WL 1745751, at *4. And the modest stay HP seeks is well in line with the precedent plaintiff himself invokes. In *Moradi* (cited at Opp. 5 as an example of a reasonable stay), the board authorized its audit committee to commence an investigation in July 2011. Molumphy Decl. Ex. 4. By August 2012, the committee estimated that it needed another two months to conclude what would be a *15-month* investigation, and the court stayed the derivative case while agreeing to revisit the issue on October 30, 2012 (when the investigation was scheduled to conclude). In this case, the DRC was formed in January 2013, after Morrical filed his suit on December 19, 2012. 7/30/13 Wolinsky Decl. Ex. B at 1. It is now August 2013. HP is requesting a stay until the conclusion of the investigation, and proposing that the Court revisit the issue (as did the *Moradi* court) in January 2014 if the investigation has not concluded. By then, roughly one year will have elapsed to investigate complex legal and accounting issues under U.S. and English law and accounting principles, and to ascertain facts from witnesses and documents here and abroad. That is certainly reasonable. *See Maccoumber*, 2004 WL 1745751, at *4 (time allowed to respond varies with complexity of issues and circumstances).

## C.     The Pending Securities Suit Further Supports a Stay.

HP's motion for a stay established that federal and state courts "routinely" stay derivative litigation brought by putative stockholders during the pendency of parallel securities-law proceedings against the corporation. HP Br. 8-9 & n.7. The reason is that concurrent litigation of a derivative case threatens to prejudice the corporation, the party whose interests the derivative plaintiff purportedly represents, and, moreover, a stay would preserve judicial and party resources. Although the case law supports the entry of a stay here through the disposition of the securities case, HP is seeking only a more modest stay — pending the conclusion of the DRC's investigation — and is invoking this authority solely as further support for that more modest relief. HP Br. viii, 4, 9, 11, 13, 14, 15.

### 1.     Parallel Litigation of the Two Cases Would Create a Conflict for HP.

The potential prejudice resulting from the prosecution of the corporation's claims by someone other than HP while the securities suit is pending against HP is very real. HP Br. 9-11. Plaintiff's first response is the *non sequitur* observation that derivative and securities suits are sometimes

litigated concurrently.  Opp. 1 & n.2.  But not one of the decisions that plaintiff cites in support addressed the matter of staying a derivative suit in light of parallel litigation.  The decisions just show, as plaintiff says, that sometimes there's a derivative case at the same time as a securities case.  What he doesn't say is that in at least two of those cases the court stayed derivative litigation pending an SLC investigation.  *UnitedHealth*, 2007 WL 803048, at *2 ("courts decline to allow a stay only when confronting unusual circumstances, as in a case where the SLC is 'obviously biased'"); Order, *Alaska Elec. Pension Fund* v. *Sperling*, No. CV06-2124 (Dkt. No. 56) (D. Ariz. Dec. 4, 2006).[8]

Plaintiff cites just one decision that supports his claim that no conflict would result from the simultaneous litigation of the securities and derivative cases — an unpublished decision involving an Arizona corporation and Arizona law.  *Smith* v. *Sperling*, 2012 WL 79237 (D. Ariz. Jan. 11, 2012).  Opp. 12-13.  The *Smith* court did deny a stay application because there was no "direct conflict between the shareholders seeking damages from the corporation based on the wrongdoing of its Officers and Directors in [the securities action], and the shareholder seeking to protect the corporation's rights against the wrongdoing of its Officers and Directors in [the derivative] action."  *Id.* at *2.  The *Smith* reasoning is as perplexing as it is unpersuasive, and it does not reflect Delaware law.

The Delaware Court of Chancery has recognized that when "two actors" simultaneously pursue "divergent strategies in two [different but parallel] actions on behalf of the same entity," the "potential for conflicts" is significant and the threat of prejudice supports the entry of a stay.  *Brenner* v. *Albrecht*, 2012 WL 252286, at *6 (Del. Ch. Jan. 27, 2012); *In re First Solar Deriv. Litig.*, 2012 WL 6570914, at *2 (D. Ariz. Dec. 17, 2012); Br. 9-10.  That is the situation here.  In this derivative case, Morrical will seek to establish the individual liability of the corporation's officers and directors, and to do so on behalf of HP.  In the parallel securities case, HP is disputing its liability, and thus may seek to dispute the individual liability of the same officers and directors.

Thus, as explained in one of plaintiff's own cases, "a disinterested board might well … con-

---

[8]     Plaintiff quotes a dictum from *City of Austin Police Ret. Sys.* v. *ITT Educ. Servs., Inc.*, to the effect that "'[i]t is not unusual for securities fraud and related shareholder derivative cases to proceed along parallel tracks.'"  Opp. 11.  The court there declined to "stay" under SLUSA a books-and-records action pending in Delaware.  2005 WL 280345, at *6 (S.D. Ind. Feb. 2, 2005).  No lesson can be drawn from that case.

clude it to be unwise to subject [the company's directors] to further [derivative] litigation clearly calculated to undercut their veracity and general effectiveness as witnesses" when the same directors are likely to be witnesses in securities litigation pending against the company.  *In re E.F. Hutton Banking Practices Litig.*, 634 F. Supp. 265, 270 (S.D.N.Y. 1986) (cited at Opp. 12 n.3).  HP's board ought to be given the time needed to make an informed decision as to the resolution of this conflict, and ought not be forced to endure the conflict on an interim basis while it is investigating the matter.

Plaintiff tries to minimize this obvious conflict by asserting that his derivative action is "substantially different" from the securities action.  Opp. 12-14.  But as shown in HP's opening brief, the plaintiff here wishes to press on behalf of HP virtually the same securities-fraud claims advanced against HP in the securities case.  HP Br. 1-2, 10-11, Appendix.  Plaintiff does not argue otherwise.  Instead, he says he wishes to press additional and different claims too, citing certain of his factual allegations concerning HP's conduct of due diligence and the IDOL10 platform.  Opp. 13-15 & Ex. A.  This is irrelevant.  The fact that the derivative complaint makes additional claims and allegations that may or may not conflict with the securities case does not change the fact that the derivative complaint alleges securities claims that mirror those in the securities case.[9]

## 2.    A Stay Would Conserve Judicial and Party Resources.

HP's application showed that a stay would preserve judicial and party resources because the securities and derivative cases substantially overlap.  HP Br. 11-13.  Plaintiff's only response is, once again, that the derivative case "involve[s] entirely separate facts and legal theories," and that this case is not just a "tag-along indemnity suit[]."  Opp. 13-14.  As just discussed, that is simply not true.[10]  And "[i]f the [overlapping securities] class claims are disposed of on a motion to dismiss,

---

[9]    Plaintiff says there is no risk of providing the securities plaintiff with "free discovery" here as "both actions are subject to the PSLRA discovery stay."  Opp. 13.  But this misses the point, because the plaintiff here was *already* provided materials under books-and-records statutes, and this material can be expected to leak into the securities case.  As to the claim that HP can "quite comfortably argue . . . that neither HP nor the Director Defendants are liable," Opp. 13, HP's point is that *plaintiff* is taking a litigation position purportedly on HP's behalf that conflicts directly with the approach HP may decide to take in the pending securities case to protect the company's coffers.

[10]    In this respect, plaintiff's complaint is distinguishable from the complaint in *Sonkin* v. *Baker*.  Opp. 14-15.  Because the *Sonkin* complaint apparently did not allege any securities claims, the court was not convinced that "a stay of this action pending the outcome of the other cases would avoid needless repetition of legal proceedings."  670 F. Supp. 249, 254 (S.D. Ind. 1987).

---

then the scope of the derivative action will be significantly limited," thus preserving resources. *In re Groupon Deriv. Litig.*, 882 F. Supp. 2d 1043, 1049 (N.D. Ill. 2012); *see also First Solar*, 2012 WL 6570914, at *2 ("simultaneous litigation [generally] increase[s] the cost of the overall litigation in the near term "); *Breault* v. *Folino*, 2002 WL 31974381, at *2 (C.D. Cal. Mar. 15, 2002) ("[t]his [derivative] action will divert Emulex's financial and management resources from the pending [securities] litigations"); HP Br. 11-13 & n.7. Plaintiff nowhere disputes this legal point, which also defeats his contention that the stay would not conserve resources because he seeks remedies beyond the costs and damages incurred in the securities case.[11]

### D.    The Pending Government Investigations Further Justify a Stay.

HP's stay application explained that the U.S. Department of Justice, the Securities and Exchange Commission, and the U.K. Serious Fraud Office are each conducting investigations related to Autonomy. HP Br. 13. A stay pending the conclusion of the DRC's investigation would allow HP's board to consider the interplay of these parallel proceedings with the claims asserted in this suit, as it is entitled to do. *E.g.*, *Mozes*, 638 F. Supp. at 221. And the courts have cited the pendency of parallel government actions as supporting a stay. *In re Massey Energy Co.*, 2011 WL 2176479, at *27 (Del. Ch. May 31, 2011); *Moradi*, 2012 WL 3687576, at *3; *see also United States* v. *Acorn Tech. Fund, L.P.*, 2004 WL 1803321, at *6 (E.D. Pa. Aug. 12, 2004) (staying derivative suit). Plaintiff offers no response beyond a case that HP has already shown to be inapposite, *see* HP Br. 14 n.8 (discussing *SEC* v. *Global Real Estate Inv. Fund I, LLC*, 289 Fed. App'x 183 (9th Cir. 2008)), and the naked (and untrue) allegation that HP is seeking a stay to "shelter[] the[] Director Defendants," Opp. 15. Plaintiff thus effectively concedes the point that the pending investigations support a stay.

---

[11]    Citing *In re Bank of N.Y. Deriv. Litig.*, 2000 WL 1708173 (S.D.N.Y. Nov. 14, 2000), and *In re Storage Tech. Corp. Sec. Litig.*, 804 F. Supp. 1368 (D. Colo. 1992), plaintiff says that permitting both the derivative and securities cases to proceed would be efficient as discovery could be coordinated. Opp. 13. Neither case is in point. In *Bank of N.Y.* (which involved a New York corporation), the court refused to stay discovery in a derivative case because (1) the SLC was not created until a year after the filing of the suit, (2) discovery was proceeding in a parallel derivative case pending in state court, and (3) the committee members were not independent. 2000 WL 1708173, at *3. Similarly, *Storage Tech.* denied a stay because the court concluded that none of the directors were disinterested or independent. 804 F. Supp. at 1375-76.

**E.     A Stay of the Derivative Case Would Not Prejudice Plaintiff.**

Plaintiff Morrical says in several places that the Court should deny the stay motion because "HP and its shareholders" would "be prejudiced by delay." Opp. i, viii, 4, 11, 15. But Morrical has "no cognizable interest other than to protect the best interests of [HP]." HP Br. 14. He nowhere disputes that point. HP has also provided concrete reasons why a stay would not in fact prejudice HP — pointing out, for instance, that the limitations period has been tolled. HP Br. 14-15. Morrical gives no reason to doubt this point. And HP has given concrete reasons why, in fact, a stay of the suit would prevent prejudice to HP. *E.g.*, HP Br. 9-11 (conflict between this suit and defense of securities case). Morrical responds, but he misses the mark. See pp. 11-13, above. He also ignores the prejudice he would impose on HP by thrusting it into major, costly litigation before HP's board has had time to assess whether claims should be pursued and, if so, when and against whom.

And although plaintiff conjures the specter of prejudice and delay to him, he never does say exactly what that harm really is. That is because there is nothing to say. He would not suffer any. The contrary is true. "Proceeding with this lawsuit before the conclusion of the SLC's investigation could harm [p]laintiff[] if the SLC recommends pursuing [p]laintiff['s] litigation," for plaintiff, who would lose the opportunity to proceed, would have wasted his resources — along with those of the Court and the company whose interests he says he represents. *Moradi*, 2012 WL 3687576, at *4.

### CONCLUSION

For the foregoing reasons and the reasons stated in HP's stay application, HP respectfully requests that this Court stay the derivative action until the conclusion of the DRC's investigation, subject to revisiting the status of the stay on January 17, 2014.

Dated:  August 20, 2013

Respectfully submitted,

WACHTELL, LIPTON, ROSEN & KATZ

By

MARC WOLINSKY

Attorneys for Defendant
HEWLETT-PACKARD COMPANY