**EXHIBIT A**

**DECLARATION OF MARC WOLINSKY**
**IN FURTHER SUPPORT OF DEFENDANT HP'S MOTION TO STAY**

ENDORSED

2013 AUG 16  A 11: 50

David H. Yamasaki, Clerk of the Superior Court
County of Santa Clara California

By J. CAO-NGUYEN

1  BARRETT JOHNSTON, LLC
   GEORGE E. BARRETT
2  DOUGLAS S. JOHNSTON, JR.
   TIMOTHY L. MILES
3  217 Second Avenue, North
   Nashville, TN 37201-1601
4  Telephone: 615/244-2202
   615/252-3798 (fax)
5  gbarrett@barrettjohnston.com
   djohnston@barrettjohnston.com
6  tmiles@barrettjohnston.com

7  ROBBINS GELLER RUDMAN
     & DOWD LLP
8  ABLISH M. BAIG (201279)
   Post Montgomery Center
9  One Montgomery Street, Suite 1800
   San Francisco, CA 94104
10 Telephone: 415/288-4545
   415/288-4534 (fax)
11 abaig@rgrdlaw.com

12

13 Attorneys for Plaintiff Leroy Noel

14 [Additional counsel appear on signature page.]

15            SUPERIOR COURT OF THE STATE OF CALIFORNIA

16                    COUNTY OF SANTA CLARA

17 LEROY NOEL, Derivatively on Behalf of    )  Case No. 113CV251346
   HEWLETT-PACKARD COMPANY,                 )
18                                          )  SHAREHOLDER DERIVATIVE COMPLAINT
                           Plaintiff,       )  FOR BREACH OF FIDUCIARY DUTY,
19                                          )  CORPORATE WASTE, VIOLATION OF CAL.
        vs.                                 )  CORP. CODE §§25400/25500, CAL. CIV. CODE
20                                          )  §§1709-1710, FRAUD AND DECEIT,
                                            )  NEGLIGENT MISREPRESENTATION AND
21 MARGARET C. WHITMAN,                     )  UNJUST ENRICHMENT
   LÉO APOTHEKER,                           )
22 RAYMOND J. LANE,                         )
   MARC L. ANDREESSEN,                      )
23 SHUMEET BANERJI,                         )
   G. KENNEDY THOMPSON,                     )
24 RAJIV L. GUPTA,                          )  DEMAND FOR JURY TRIAL
                                            )
25                                          )
26 [Caption continued on following page.]

27

28

─────────────────────────────────────────────────────
                 SHAREHOLDER DERIVATIVE COMPLAINT                    BY FAX

1  JOHN H. HAMMERGREN,                    )
   ANN M. LIVERMORE,                      )
2  GARY M. REINER,                        )
   PATRICIA F. RUSSO,                     )
3  MICHAEL LYNCH and                      )
   DOES 1-10, inclusive,                  )
4                                         )
                       Defendants,        )
5                                         )
     – and –                             )
6                                         )
7  HEWLETT-PACKARD COMPANY, a             )
   Delaware corporation,                  )
8                                         )
                       Nominal Party.     )

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SHAREHOLDER DERIVATIVE COMPLAINT

## OVERVIEW OF THE ACTION

1.     This is a shareholder derivative action on behalf of nominal party Hewlett-Packard Company ("HP" or the "Company") against defendants Margaret C. Whitman, Léo Apotheker, Raymond J. Lane, Marc L. Andreessen, Shumeet Banerji, G. Kennedy Thompson, Rajiv L. Gupta, John H. Hammergren, Ann M. Livermore, Gary M. Reiner and Patricia F. Russo (together, the "HP Defendants"). The HP Defendants owed HP fiduciary duties – the highest duties known to the law – which they each breached in connection with HP's disastrous acquisition of Autonomy Corporation plc ("Autonomy"). Additionally, this action seeks to redress serious injuries suffered by HP due to violations of California law by Autonomy's founder and CEO, defendant Michael Lynch ("Lynch").

2.     On or about August 18, 2011, HP entered into an agreement with Autonomy to purchase all of the outstanding shares of Autonomy. On October 3, 2011, HP purchased Autonomy pursuant to the terms of the agreement for $10.2 billion (the "Acquisition"). Just 13 months later, however, HP announced that it would write off $8.8 billion in goodwill and other intangible assets associated with the Acquisition, or 86% of the $10.2 billion purchase price. The announcement explained that the majority of the write-down was linked to "serious accounting improprieties, misrepresentation and disclosure failures" and admitted that "Autonomy was substantially overvalued at the time of its acquisition."

3.     The HP Defendants owed the Company a fiduciary duty to preserve and protect its assets and property. Nevertheless, the HP Defendants have attempted to blame the massive write-down solely on the "willful effort on behalf of certain former Autonomy employees to inflate the underlying financial metrics of the company in order to mislead investors and potential buyers." While these individuals are also culpable, the HP Defendants cannot so easily brush aside their own fiduciary duties to act in the best interests of HP at all times and not waste its valuable corporate assets. Here, the HP Defendants breached their fiduciary duties to HP with disastrous consequences for the Company.

4.     Worse yet, despite the billions of dollars in damages suffered by the Company, the Board of Directors of HP (the "Board") has not, and will not take legal action against the HP Defendants to redress the injuries they caused HP.

5.     Defendant Lynch severely injured HP and is liable for damages. Lynch's acts and/or omissions violated, among other things, California law. More specifically, Lynch misrepresented

1  and/or omitted material facts regarding Autonomy's accounting, financial performance and business to

2  nominal party HP to induce HP to purchase Autonomy at an inflated price. Among other things, Lynch

3  failed to disclose that Autonomy's business and operating results and historic growth were the product

4  of accounting improprieties, including the mischaracterization of sales of low-margin hardware as

5  software and the improper recognition of revenue on transactions with Autonomy business partners

6  even where customers did not purchase the products.

7        6.      Defendant Lynch's acts and/or omissions damaged nominal party HP and violated the

8  law. Nevertheless, the Board has not brought legal action on behalf of nominal party HP to recover

9  damages against defendant Lynch and/or other Autonomy officials for damaging HP's once valuable

10  corporate enterprise.

11        7.      By this action, plaintiff seeks to recover damages and other relief for HP against

12  defendants for the losses caused HP by their unlawful actions.

13                              **JURISDICTION AND VENUE**

14        8.      This Court has jurisdiction over each defendant because each defendant is either a

15  corporation that conducts business in and maintains operations in this County, or is an individual who

16  has sufficient minimum contacts with California so as to render the exercise of jurisdiction by the

17  California courts permissible under traditional notions of fair play and substantial justice.

18        9.      Venue is proper in this Court because a substantial portion of the transactions and

19  wrongs complained of herein, including defendants' primary participation in the wrongful acts detailed

20  herein, occurred in this County.

21                                      **PARTIES**

22        10.     Plaintiff Leroy Noel is and has been a shareholder of HP since July 2011. Plaintiff will

23  adequately and fairly represent nominal party HP's interest in the derivative claims asserted against

24  defendants.

25        11.     Nominal party HP is a Delaware corporation with its principal executive offices located

26  at 3000 Hanover Street, Palo Alto, California 94304. HP manufacturers and sells computer products,

27  technologies, software solutions, and services to individual customers, small- and medium-sized

28  business and large enterprises.

SHAREHOLDER DERIVATIVE COMPLAINT

1    12.    Defendant Margaret C. Whitman ("Whitman") has been President, CEO and a Director

2  of HP since January 2011. Defendant Whitman approved the Acquisition although it was not in the best

3  interest of HP and is liable for the resulting damages.

4    13.    Defendant Léo Apotheker ("Apotheker") served as President, CEO and a Director of HP

5  from November 2010 until September 2011. Defendant Apotheker approved the Acquisition although

6  it was not in the best interest of HP and is liable for the resulting damages.

7    14.    Defendant Raymond J. Lane ("Lane") has been a Director of HP since November 2010.

8  Defendant Lane approved the Acquisition although it was not in the best interest of HP and is liable for

9  the resulting damages.

10    15.    Defendant Marc L. Andreessen ("Andreessen") has been a Director of HP since 2009.

11  Defendant Andreesen approved the Acquisition although it was not in the best interest of HP and is

12  liable for the resulting damages.

13    16.    Defendant Shumeet Banerji ("Banerji") has been a Director of HP since 2011.

14  Defendant Banerji approved the Acquisition although it was not in the best interest of HP and is liable

15  for the resulting damages.

16    17.    Defendant G. Kennedy Thompson ("Thompson") served as a director of HP from 2006

17  until May 2013. Defendant Thompson approved the Acquisition although it was not in the best interest

18  of HP and is liable for the resulting damages.

19    18.    Defendant Rajiv L. Gupta ("Gupta") has been a director of HP since 2009. Defendant

20  Gupta approved the Acquisition although it was not in the best interest of HP and is liable for the

21  resulting damages.

22    19.    Defendant John H. Hammergren ("Hammergren") served as a director of HP from 2005

23  until May 2013. Defendant Hammergren approved the Acquisition although it was not in the best

24  interest of HP and is liable for the resulting damages.

25    20.    Defendant Ann M. Livermore ("Livermore") has been a director of HP since June 2011.

26  Defendant Livermore approved the Acquisition although it was not in the best interest of HP and is

27  liable for the resulting damages.

28

SHAREHOLDER DERIVATIVE COMPLAINT

1    21.    Defendant Gary M. Reiner ("Reiner") has been a director of HP since 2011. Defendant

2 Reiner approved the Acquisition although it was not in the best interest of HP and is liable for the

3 resulting damages.

4    22.    Defendant Patricia F. Russo ("Russo") has been a director of HP since 2011. Defendant

5 Russo approved the Acquisition although it was not in the best interest of HP and is liable for the

6 resulting damages.

7    23.    Defendant Michael Lynch ("Lynch") co-founded Autonomy and served as Managing

8 director and CEO of Autonomy from its inception in March 1996 until the time of its acquisition by HP

9 in October 2011. Following the Acquisition, defendant Lynch continued to lead Autonomy and served

10 as HP's Executive Vice President of Information Management from October 2011 until May 2012.

11 While in California, defendant Lynch misrepresented and/or omitted material facts regarding

12 Autonomy's accounting, financial performance and business to persons within California in connection

13 with the sale of Autonomy securities to HP.   Defendant Lynch also caused and/or permitted

14 misrepresentations and/or omissions about Autonomy to be made to HP in California in connection

15 with HP's purchase of Autonomy securities.

16                              **DOE ALLEGATIONS**

17    24.    The true names and capacities of defendants sued as Does 1 through 10, inclusive, under

18 California Code of Civil Procedure §474, are presently not known to plaintiff, who therefore sues these

19 defendants by such fictitious names.  Plaintiff will seek to amend the Complaint and include these Doe

20 defendants' true names and capacities when they are ascertained.   Each of the fictitiously named

21 defendants is responsible in some manner for the conduct alleged herein and for the injuries suffered by

22 HP.

23                   **THE HP DEFENDANTS' FIDUCIARY DUTIES**

24    25.    By reason of their positions as officers and directors of HP and their ability to control the

25 business and corporate affairs of HP, the HP Defendants owed HP fiduciary obligations of care, loyalty

26 and good faith, and were and are required to use their utmost ability to control and manage HP in a fair,

27 just, honest and equitable manner. The HP Defendants were and are required to act in furtherance of

28 the best interests of HP so as to protect and preserve its corporate assets, including in connection with

the Acquisition. Additionally, the HP Defendants, because of their positions of control and authority as officers and/or directors of HP, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.

26.    Additionally, the members of the Finance and Investment Committee, including defendants Banerji, Hammergren and Thompson, owed specific duties to HP "to provide oversight of the finance and investment functions of HP" and "to assist the Board in evaluating investment, acquisition, enterprise services, joint venture and divestiture transactions in which HP engages as part of its business strategy from time to time." Defendants Banerji, Hammergren and Thompson failed to discharge these duties owed to HP.

27.    Similarly, the members of the Technology Committee, including defendants Andreessen, Livermore, Reiner and Russo, owed specific duties to HP to assist the Board in "assessing the health of HP's technology strategies and the scope and quality of HP's intellectual property," including providing guidance on technology related to proposed acquisitions. Defendants Andreessen, Livermore, Reiner and Russo failed to discharge these duties owed to HP.

28.    At all times relevant hereto, each of the HP Defendants was the agent of each of the other HP Defendants and of HP, and was at all times acting within the course and scope of such agency.

## AIDING AND ABETTING AND CONCERTED ACTION

29.    In committing the wrongful acts particularized herein, defendants have pursued or joined in the pursuit of a common course of conduct, and have acted in concert with one another in furtherance of their common plan or design. In addition to the wrongful conduct challenged herein as giving rise to their primary liability, defendants further aided and abetted and/or assisted each other in breach of their respective fiduciary duties and/or obligations under the law.

30.    Each of the defendants aided and abetted and rendered substantial assistance in the wrongs detailed herein. In taking such actions to substantially assist in the commission of the wrongdoing detailed herein, each defendant acted with knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

SHAREHOLDER DERIVATIVE COMPLAINT

1    **SUBSTANTIVE ALLEGATIONS AGAINST THE HP DEFENDANTS**

2    31.    HP provides products, technologies, software, solutions, and services to individual

3    consumers and small- and medium-sized businesses, as well as to the U.S. government, and health and

4    education sectors around the globe.

5    32.    The Company's Personal Systems Group segment offers personal computers,

6    workstations, and software and services for commercial and consumer markets.  The Company's

7    Services segment provides consulting, IT outsourcing, and technology services to infrastructure,

8    applications and business process domains.  The Company's Imaging and Printing segment provides

9    consumer and commercial printer hardware, supplies, media and scanning devices.  Its Enterprise

10   Servers, Storage and Networking segment offers industry standard servers and business critical systems.

11   33.    At the time of defendant Apotheker's appointment as CEO and Lane's appointment as

12   Chairman of HP, the Company was still reeling from a series of boardroom entanglements that

13   culminated in the firing of then HP CEO Mark Hurd in August 2010.  At the time, shareholders were

14   critical of Apotheker's appointment as CEO because, among other things, he lacked experience in the

15   Company's significant and critical hardware business.  Before working at HP, Apotheker was the CEO

16   of SAP, a small German software maker.

17   34.    Upon taking over at HP, Apotheker worked to move the Company away from its core

18   low-margin computer hardware business and into the more lucrative high-margin corporate software

19   and services area.  Towards that end, Apotheker went on the acquisition trail and, after overtures to

20   several respectable software companies failed, he set his sights on acquiring Autonomy at all costs.

21   Autonomy was purportedly a pioneer in the up-and-coming field of "big data," and Apotheker viewed

22   Autonomy as serving as a centerpiece for his new strategy.

23   35.    HP began looking at Autonomy in earnest in the spring of 2011.  In July 2011, after a

24   cursory review of the rationale behind the Acquisition, the Board voted to enter into negotiations with

25   Autonomy.  In connection with the Acquisition, the HP Defendants cursorily inspected Autonomy's

26   books and records.  The review primarily relied upon Autonomy's publicly filed financial statements

27   because Autonomy refused to grant broad access to its internal books and records.  Despite this severe

28   limitation, the HP Defendants proceeded with the Acquisition.

- 6 -
SHAREHOLDER DERIVATIVE COMPLAINT

36.     Indeed, not even HP's CFO Catherine Lesjak's objections to the Acquisition caused the HP Defendants to pause. According to news reports, Lesjak initially voiced her opposition to defendant Apotheker explaining that the purchase price, at around eleven times revenue when similar types of companies were selling for three times revenues, was too high. Lesjak reportedly also told the HP Defendants that "I can't support [the Acquisition]. I don't think it's a good idea. I don't think we're ready. I think it's too expensive. I'm putting a line down. This is not in the best interests of the company."

37.     Undaunted, the HP Defendants continued with the Acquisition. Towards that end, on August 18, 2011, the HP Defendants announced HP's plans to buy Autonomy for $10.2 billion, stating:

> "Autonomy presents an opportunity to accelerate our strategic vision to decisively and profitably lead a large and growing space," said Léo Apotheker, HP president and chief executive officer. "Autonomy brings to HP higher value business solutions that will help customers manage the explosion of information. Together with Autonomy, we plan to reinvent how both unstructured and structured data is processed, analyzed, optimized, automated and protected. Autonomy has an attractive business model, including a strong cloud based solution set, which is aligned with HP's efforts to improve our portfolio mix. We believe this bold action will squarely position HP in software and information to create the next-generation Information Platform, and thereby, create significant value for our shareholders."

> Apotheker continued, "Autonomy is a highly profitable and globally respected software company, with a well-regarded management team and talented, dedicated employees. We look forward to partnering with a company who shares our commitment to solving customer problems by creating smart, cutting-edge products and solutions. I am particularly pleased that Dr. Mike Lynch, who heads a team of brilliant scientists and employees, will continue to lead Autonomy. I look forward to our collaboration as we focus on creating maximum value for the combined company, its customers and employees."

38.     On September 13, 2011, in a Q&A session with analyst Chris Whitmore at the Deutsche Bank Technology Conference, defendant Apotheker, with the approval of the other HP Defendants, further stated:

> [APOTHEKER:]    Autonomy – I'm sure we have many more questions on Autonomy, but, just to position that squarely in everybody's minds, the idea around Autonomy is to really strengthen HP's capabilities tremendously in this whole notion of data. We talked about data in San Francisco. We will talk a lot about data, probably, today, as well, structured and unstructured. And, therefore, Autonomy is a very important asset.

                    *       *       *

> And let me just try to build on that and help you understand how we came to the valuation of Autonomy. We have a pretty rigorous process inside HP that we follow for all of our acquisitions, which is a DCF-based model, and we try to take a very

- 7 -

conservative view at this. Just to make sure everybody understands. Autonomy will be, on day one, accretive to HP. For FY 2012, Autonomy, once we integrate it, is accretive to HP.

39.    On September 22, 2011, HP announced defendant Whitman's appointment as CEO and President. In a conference call on the same date, defendant Whitman, with the approval of the other HP Defendants, stated that "the Autonomy acquisition, which I'm excited about, is proceeding as planned, and is expected to be completed by the end of the calendar year."

40.    On November 21, 2011, HP held a conference call for analysts and shareholders. With respect to the Acquisition, defendant Whitman, with the approval of the other HP Defendants, stated:

[W]e closed the Autonomy acquisition on October 3. In the last month, we've had hundreds of leads passed between the two companies, and we've created a new information management business group that combines Autonomy, Vertica, and other HP software assets under Mike Lynch, and reports directly to me.

*      *      *

Well let me just spend a moment on Autonomy. I am really excited about this acquisition. As you all know, I think it really positions HP as a leader in the Next-generation information management and analytics capabilities, as the explosion of data is making these capabilities absolutely critical. Autonomy is a unique asset. It has a remarkable ability to manage unstructured information in a way that no one else in the market does. I think that adds a lot of value not only in their space but actually across HP.

So, what we've set up is Autonomy is actually running fairly autonomously (laughter) but we have done a great job I think of integrating the go-to market. So, there are sales leads that are going from Autonomy to HP – interestingly, which we didn't expect so much of in terms of a hardware pull-through – but also from our HP sales team back to Autonomy. We've got a clearing house that vets all those leads. So, that what we turn over to Autonomy are really high quality leads that will allow Autonomy to grow much faster than they would have grown on their own. That's the name of the game for 2012.

There's going to be lots of other things we do together but accelerating the growth of Autonomy using the distribution capability of HP is priority number one, two and three for 2012.

41.    On December 14, 2011, the HP Defendants caused HP to file with the U.S. Securities and Exchange Commission ("SEC") its Annual Report on Form 10-K. With respect to the Acquisition, the HP Defendants stated:

HP's largest acquisition in fiscal 2011 was its acquisition of Autonomy Corporation plc ("Autonomy"). As of October 31, 2011, HP owned an approximately 99% equity interest in Autonomy, and HP expects to acquire a 100% equity interest before the end of the first quarter of fiscal 2012. Autonomy is a provider of infrastructure software for the enterprise. HP reports the financial results of the

SHAREHOLDER DERIVATIVE COMPLAINT

Autonomy business in the HP Software segment. The acquisition date fair value consideration of $11 billion consisted of cash paid for outstanding common stock, convertible bonds, vested in-the-money stock awards and the estimated fair value of earned unvested stock awards assumed by HP. In connection with this acquisition, HP recorded approximately $6.6 billion of goodwill and amortizable purchased intangible assets of $4.6 billion. HP is amortizing the purchased intangible assets on a straight-line basis over an estimated weighted-average life of 8.8 years.

42.     On February 22, 2012, HP held a conference call for analysts and shareholders. With respect to the Acquisition, defendant Whitman, with the approval of the other HP Defendants, stated:

The Autonomy acquisition is going well. And we're continuing to grow our set of assets from Information Management to our IT Performance Suite including security, management of hybrid clouds and Application Lifecycle Management. Software is a critical part of our portfolio and of our forward-looking strategy. It amplifies, differentiates, optimizes and secures our core infrastructure, builds on our solution capabilities and expands customer relationships.

43.     On May 23, 2012, HP held a conference call for analysts and shareholders. During the call, the HP Defendants acknowledged that Autonomy had had a very disappointing revenue quarter, but failed to disclose that an internal investigation into Autonomy had been commenced after a senior Autonomy executive advised the Company's General Counsel that Autonomy had been engaged in accounting improprieties before the Acquisition.

44.     As the summer of 2012 unfolded, the HP Defendants continued to conceal adverse material information about the Acquisition as well as the internal investigation. For instance, in breach of their fiduciary duty of loyalty, the HP Defendants failed to disclose that Autonomy's operating results and historic growth were the product of accounting improprieties, including the mischaracterization of sales of low-margin hardware as software and the improper recognition of revenue on transactions with Autonomy business partners even where customers did not purchase the products.

45.     The unlawful scheme to conceal the truth about the debacle that the Autonomy Acquisition was for HP continued until November 2012. Then, on November 20, 2012, the HP Defendants announced that HP would take a massive $8.8 billion charge relating to the Acquisition due to serious accounting improprieties at Autonomy, stating:

"HP is extremely disappointed to find that some former members of Autonomy's management team used accounting improprieties, misrepresentations and disclosure failures to inflate the underlying financial metrics of the company, prior to Autonomy's acquisition by HP. These efforts appear to have been a willful effort to mislead

- 9 -

1   investors and potential buyers, and severely impacted HP management's ability to fairly
    value Autonomy at the time of the deal.   We remain 100 percent committed to
2   Autonomy and its industry-leading technology."

3                            *        *        *

4           HP today announced a non-cash impairment charge of $8.8 billion related to
    Autonomy in the fourth quarter of its 2012 fiscal year. The majority of this impairment
5   charge, more than $5 billion, is linked to serious accounting improprieties,
    misrepresentation and disclosure failures discovered by an internal investigation by HP
6   and forensic review into Autonomy's accounting practices prior to its acquisition by HP.
    The balance of the impairment charge is linked to the recent trading value of HP stock
7   and headwinds against anticipated synergies and marketplace performance.

8           46.     Attempting to portray themselves as the victims, as opposed to HP which is the actual

9   victim of the Autonomy debacle, the HP Defendants further stated:

10          HP launched its internal investigation into these issues after a senior member of
    Autonomy's leadership team came forward, following the departure of Autonomy
11  founder Mike Lynch, alleging that there had been a series of questionable accounting
    and business practices at Autonomy prior to the acquisition by HP.  This individual
12  provided numerous details about which HP previously had no knowledge or visibility.

13          HP initiated an intense internal investigation, including a forensic review by
    PricewaterhouseCoopers of Autonomy's historical financial results, under the oversight
14  of John Schultz, executive vice president and general counsel, HP.

15          As a result of that investigation, HP now believes that Autonomy was
    substantially overvalued at the time of its acquisition due to the misstatement of
16  Autonomy's financial performance, including its revenue, core growth rate and gross
    margins, and the misrepresentation of its business mix.

17                           *        *        *
18
            This appears to have been a willful effort on behalf of certain former Autonomy
19  employees to inflate the underlying financial metrics of the company in order to mislead
    investors and potential buyers.  These misrepresentations and lack of disclosure severely
20  impacted HP management's ability to fairly value Autonomy at the time of the deal.

21          47.     HP analysts and shareholders were stunned. As *USA Today* reported on November 20,

22  2012:

23          The Autonomy revelation is another blow for HP, which is struggling to reinvent
    itself as PC and printer sales shrink.
24
            "While the write-down is non-cash, it may call into question the credibility of its
25  board of directors," wrote Shaw Wu, analyst at Sterne Agee & Leach, to a note to
    clients.
26
                             *        *        *
27
            Additionally, Whitman has "highlighted she was comfortable and confident in
28  the deal," says Aaron Rakers, analyst at Stifel Nicolaus. "Given she was on the board

                                    - 10 -

when the Autonomy deal was done, I'm not sure if it's a reflection on her, but another ding against the board."

The size and scope of the charge is staggering, given that the $8.8 billion financial hit is nearly as large as the $10 billion HP paid for the company. But the company, in a release, said: "We remain 100% committed to Autonomy and its industry-leading technology."

48.     As a result of the HP Defendants' fiduciary failures, HP has been and will continue to be damaged.  These damages include, but are not limited to: (i) costs incurred from overpaying for Autonomy; (ii) costs incurred from the internal investigation into Autonomy's accounting improprieties; and (iii) costs incurred from compensation paid to defendants, who have breached their duties to HP.

### DEFENDANT LYNCH'S VIOLATION OF LAW AND DAMAGES TO HEWLETT-PACKARD

49.     Prior to the Acquisition, Autonomy, at the direction of defendant Lynch, used aggressive accounting practices in order to portray Autonomy as a strong and growing company.  Autonomy improperly recognized revenue from certain of its software license sales upfront that under accounting rules should have been deferred.  Autonomy further engaged in "round-trip transactions" – these are deals where Autonomy agreed to buy a client's products or services while at the same time the client purchased Autonomy software.   Additionally, defendant Lynch caused Autonomy to go on an acquisition binge, buying dozens of smaller companies in order to mask Autonomy's declining organic growth.

50.     However, by early 2011, defendant Lynch was desperate to sell Autonomy, as it was becoming more difficult to continue his scheme, and so he retained Frank Quattrone ("Quattrone") of Qatalyst Partners ("Qatalyst") to help him discreetly shop Autonomy to potential buyers in the California Bay Area (where Autonomy's North American entity was based) and elsewhere. Qatalyst is a technology-focused boutique investment bank firm, headquartered in San Francisco, California. Quattrone founded Qatalyst in March 2008.[1]

51.     Thereafter, defendant Lynch and Quattrone approached several Silicon Valley companies about purchasing Autonomy.  On April 1, 2011, defendant Lynch and Quattrone reportedly

---

[1]   Qatalyst would later serve as Autonomy's lead financial advisory for the Acquisition.

SHAREHOLDER DERIVATIVE COMPLAINT

1  attended a meeting at Oracle Inc.'s headquarters in Redwood City, California. During the meeting,

2  defendant Lynch made a PowerPoint presentation to Oracle's current Vice President, Mark Hurd, and

3  proposed that Oracle purchase Autonomy. The PowerPoint presentation valued Autonomy's revenue

4  and enterprise value as of January 24, 2011 at about $5.7 billion, or slightly less than six times revenue.

5  Oracle reportedly rejected the proposal as being "absurdly high."

6        52.      Later in April 2011, defendant Lynch attended a meeting with defendants Apotheker and

7  Lane at HP's Palo Alto headquarters. During the meeting, defendant Lynch presented an impressive

8  picture of Autonomy as being a company with a longstanding history of strong revenue growth, healthy

9  sustainable margins and a state of the art, high-demand product. Defendant Lynch's formidable

10 marketing skills impressed Apotheker so much that immediately following the meeting, defendant

11 Apotheker reportedly told defendant Lane that he wanted to buy Autonomy at all costs.

12       53.      During the negotiation and due diligence process, defendant Lynch failed to disclose to

13 HP that Autonomy's business and operating results and historic growth were the product of accounting

14 improprieties, including the mischaracterization of sales of low-margin hardware as software and the

15 improper recognition of revenue on transactions with Autonomy business partners even where

16 customers did not purchase the products.

17       54.      During the pre-acquisition review, defendant Lynch further refused to grant broad access

18 to Autonomy's internal books and records for fear of Autonomy's accounting improprieties being

19 discovered, instead limiting the scope of pre-acquisition review of Autonomy to publicly reported

20 financial statements and a few sales contracts.

21       55.      As a result of defendant Lynch's wrongful conduct, HP purchased Autonomy for $10.2

22 billion. Just 13 months later, however, HP wrote off $8.8 billion in goodwill and other intangible assets

23 associated with the Acquisition, or 86% of the $10.2 billion purchase price. As a result of this debacle,

24 on November 21, 2012, the U.S. Department of Justice announced that they had opened an investigation

25 related to accounting improprieties, disclosure failures and misrepresentations at Autonomy that

26 occurred prior to and in connection with the Acquisition.

27       56.      As a result of defendant Lynch's violations of law, HP has been and will continue to be

28 damaged. These damages include, but are not limited to: (i) costs incurred from overpaying for

1 | Autonomy; and (ii) costs incurred from the internal and external investigations into Autonomy's
2 | accounting improprieties.

### DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

4 | 57. Plaintiff incorporates ¶¶1-56.

5 | 58. Plaintiff brings this action derivatively on behalf of nominal party HP to redress injuries
6 | suffered and to be suffered by HP as a proximate result of defendants' breaches of fiduciary duty,
7 | corporate waste, violations of Cal. Corp. Code §§25400/25500, Cal. Civ. Code §§1709-1710, fraud and
8 | deceit, negligent misrepresentation, and unjust enrichment.

9 | 59. Plaintiff delivered a copy of this Complaint to HP before its filing with the Court.

10 | 60. The HP Defendants constitute a majority of the Board. As detailed above, the HP
11 | Defendants breached their fiduciary duties owed to HP in connection with the Acquisition and ensuing
12 | $8.8 billion write-down. The HP Defendants face a substantial likelihood of liability to HP.
13 | Nevertheless, the Board has not commenced legal action against them. Accordingly, a pre-suit demand
14 | on the Board to commence, let alone vigorously prosecute, this action is a useless and futile act, and
15 | therefore excused.

16 | 61. Further, a majority of the members of the Board have demonstrated their unwillingness
17 | and/or inability to act in compliance with their fiduciary obligations and/or to sue themselves and/or
18 | their fellow directors and allies in the top ranks of the corporation for the violations of law complained
19 | of herein. These are people they have developed professional relationships with, who are their friends
20 | and with whom they have entangling financial alliances, interests and dependencies, and therefore, they
21 | are not able to and will not vigorously prosecute any such action.

22 | 62. Further still, a majority of the members of the Board approved the Acquisition and/or
23 | following the Acquisition participated in efforts designed to conceal or disguise their culpability in and
24 | responsibility for the damages suffered by HP in connection with the Acquisition. As such, a majority
25 | of the Board is not disinterested in the outcome of this action.

26 | 63. Additionally, a majority of the Board recklessly failed to conduct adequate due diligence
27 | of Autonomy in connection with the Acquisition. Thus, a majority of the Board cannot objectively
28 | consider whether to bring the derivative claims against the HP Defendants or other persons.

64. Moreover, a majority of the Board has benefited, and will continue to benefit, from the wrongdoing herein alleged and has engaged in such conduct to preserve their positions of control and the perquisites derived thereof, and is incapable of exercising independent objective judgment in deciding whether to bring this action. Similarly, the acts complained of constitute violations of the fiduciary duty of loyalty (and candor and good faith) owed by a majority of the Board and these acts are incapable of ratification.

65. Lastly, HP has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein. Yet, the Board has not filed any lawsuits against the HP Defendants and/or Lynch, who are responsible for injuries suffered by HP as a result of the Acquisition and related misconduct. Thus, a pre-suit demand on the Board is useless and, therefore, excused as futile.

FIRST CAUSE OF ACTION

Against the HP Defendants for Breach of Fiduciary Duty

66. Plaintiff incorporates ¶¶1-65.

67. This claim is brought against the HP Defendants for breach of fiduciary duty.

68. As HP's directors and officers, the HP Defendants owed the Company fiduciary duties, including duties of care, candor, loyalty and good faith.

69. The HP Defendants breached their fiduciary duties, including their duty of loyalty, by approving the Acquisition and later concealing adverse, material facts regarding the Acquisition and Autonomy's accounting, financial performance and business.

70. As a result of the HP Defendants' breach of fiduciary duty, the Company has suffered substantial damages.

71. Plaintiff, on behalf of HP, has no adequate remedy at law.

SECOND CAUSE OF ACTION

Against the HP Defendants for Corporate Waste

72. Plaintiff incorporates ¶¶1-65.

73. This claim is brought against the HP Defendants for corporate waste.

- 14 -

SHAREHOLDER DERIVATIVE COMPLAINT

74.     As corporate fiduciaries, the HP Defendants owed HP a duty to protect and preserve its valuable corporate assets.

75.     The HP Defendants wasted corporate assets by approving the Acquisition and later by concealing adverse material facts regarding the Acquisition and Autonomy's accounting, financial performance and business.

76.     As a result of the HP Defendants' corporate waste, the Company has suffered substantial damages.

77.     Plaintiff, on behalf of HP, has no adequate remedy at law.

### THIRD CAUSE OF ACTION

### Against the HP Defendants for Unjust Enrichment

78.     Plaintiff incorporates ¶¶1-65.

79.     This claims is brought against the HP Defendants for unjust enrichment.

80.     The HP Defendants have been unjustly enriched by their receipt of salaries, bonuses, fees, securities, and other emoluments of office not justified by HP's performance while under their stewardship.

81.     All the payments and benefits provided to the HP Defendants were at the expense of HP. The Company received no benefit from these payments.

82.     As a proximate result of the HP Defendants' unjust enrichment, the Company has suffered substantial damages.

83.     Plaintiff, on behalf of HP, has no adequate remedy at law.

### FOURTH CAUSE OF ACTION

### Against Defendant Lynch for
### Violation of Cal. Corp. Code §§25400/25500, *et seq.*

84.     Plaintiff incorporates ¶¶1-65.

85.     This claim is brought pursuant to Cal. Corp. Code §§25400/25500 against defendant Lynch.

86.     Defendant Lynch offered for sale and sold Autonomy securities to HP via material misrepresentations and/or omissions regarding Autonomy's accounting, financial performance and business.

87.     The misrepresentations and/or omissions omitted to state material facts required to make the misrepresentations and/or omissions regarding Autonomy's accounting, financial performance and business not false and/or misleading when made.

88.     The misrepresentations and/or omissions regarding accounting, financial performance and business were made in connection with the Acquisition and to sell Autonomy securities to HP at an inflated price.

89.     Defendant Lynch knew or had reasonable grounds to believe that the misrepresentations and/or omissions were materially false and/or misleading when made.

90.     A substantial portion of the transactions in connection with the sale of Autonomy securities to HP and related misconduct occurred in California.  Additionally, at all relevant times, Autonomy maintained dual headquarters with main offices in both Cambridge, England and San Francisco, California.  Defendant Lynch as CEO of Autonomy was often present at Autonomy's San Francisco office.  Defendant Lynch further retained a California based investment banking firm in order to target California based companies in an effort to sell Autonomy.  Defendant Lynch attended meetings in California related to selling Autonomy, including attending meetings with HP representatives in connection with the Acquisition.  Many of the misrepresentations and/or omissions were made while in California and/or were intended to and did enter into California by way of telephone calls and emails to residents of California.  HP is based in California and many of its shareholders are California residents.

91.     Nominal party HP had no reason to believe the representations regarding Autonomy's accounting, financial performance and business were untrue.

92.     As a result of defendant Lynch's violation of the provisions of the Cal. Corp. Code §§25400/25500, the Company has suffered substantial damages.

93.     Plaintiff, on behalf of HP, has no adequate remedy at law.

SHAREHOLDER DERIVATIVE COMPLAINT

1

**FIFTH CAUSE OF ACTION**

2

**Against Defendant Lynch for Violation of California Civil Code §§1709-1710**

3        94.     Plaintiff incorporates ¶¶1-65.

4        95.     This claim is brought against defendant Lynch for fraud in violation of Cal. Civ. Code

5    §§1709-1710.

6        96.     To induce nominal party HP to enter into the Acquisition and purchase Autonomy and

7    with the intent to deceive HP, defendant Lynch engaged in a deceitful course of conduct that included

8    representations to nominal party HP that misstated and/or omitted material facts regarding the true state

9    of Autonomy's accounting, financial performance and business.

10       97.     Nominal party HP had no reason to believe that the representations regarding

11   Autonomy's accounting, financial performance and business were untrue when made.

12       98.     As a result of defendant Lynch's violations of Cal. Civ. Code §§1709-1710, the

13   Company has suffered substantial damages.

14       99.     Plaintiff, on behalf of HP, has no adequate remedy at law.

15

**SIXTH CAUSE OF ACTION**

16

**Against Defendant Lynch for Fraud and Deceit**

17       100.    Plaintiff incorporates ¶¶1-65.

18       101.    This claim is brought against defendant Lynch for fraud and deceit.

19       102.    Defendant Lynch knowingly and/or recklessly made false and misleading statements of

20   material fact, and omitted material facts necessary in order to make his statements to HP regarding

21   Autonomy's accounting, financial performance and business, in light of the circumstances under which

22   the statements were made, not false and/or misleading when made.

23       103.    Nominal party HP had no reason to believe that the representations regarding

24   Autonomy's accounting, financial performance and business were untrue when made.

25       104.    As a result of defendant Lynch's fraud and deceit, the Company has suffered substantial

26   damages.

27       105.    Plaintiff, on behalf of HP, has no adequate remedy at law.

28

SHAREHOLDER DERIVATIVE COMPLAINT

1

2

## SEVENTH CAUSE OF ACTION

### Against Defendant Lynch for Negligent Misrepresentation

3      106.   Plaintiff incorporates ¶¶1-65, except any allegations that defendant Lynch made any

4 untrue statements and omissions intentionally or recklessly.  For the purposes of this cause of action,

5 plaintiff expressly disclaims any claim of fraud or intentional or reckless misconduct.

6      107.   This claim is brought against defendant Lynch for negligent misrepresentation.

7      108.   Defendant Lynch misrepresented and omitted material facts to HP regarding

8 Autonomy's accounting, financial performance and business.

9      109.   Defendant Lynch knew, or was negligent in not knowing at the time, that his

10 representations regarding Autonomy's accounting, financial performance and business were false

11 and/or misleading when made.

12      110.   Nominal party HP had no reason to believe that the representations regarding

13 Autonomy's accounting, financial performance and business were untrue when made.

14      111.   As a result of defendant Lynch's negligent misrepresentations, the Company has suffered

15 substantial damages.

16      112.   Plaintiff, on behalf of HP, has no adequate remedy at law.

17

## EIGHTH CAUSE OF ACTION

### Against Defendant Lynch for Unjust Enrichment

18

19      113.   Plaintiff incorporates ¶¶1-65.

20      114.   This claims is brought against defendant Lynch for unjust enrichment.

21      115.   As a result of the Acquisition and related misconduct, defendant Lynch has been unjustly

22 enriched at the expense of HP.

23      116.   All the payments, benefits and other consideration provided to defendant Lynch were at

24 the expense of HP.  The Company received no benefit from these payments.

25      117.   As a proximate result of defendant Lynch's unjust enrichment, the Company has been

26 injured and is entitled to damages.

27      118.   Plaintiff, on behalf of HP, has no adequate remedy at law.

28

## PRAYER FOR RELIEF

WHEREFORE, plaintiff demands judgment as follows:

A.     Awarding money damages against all defendants, jointly and severally, for all losses and damages suffered as a result of the Acquisition and related wrongdoing complained of herein, together with pre-judgment interest, to ensure defendants do not participate therein or benefit thereby;

B.     Directing all defendants to account for all damages caused by them and all profits, and/or other consideration they have obtained as a result of their unlawful conduct, including all salaries, bonuses, and securities, and imposing a constructive trust thereon;

C.     Directing HP to take all necessary actions to reform and improve its corporate governance and internal control procedures to comply with applicable law, including, but not limited to, federal and state securities laws and state corporation laws regarding fiduciary duties;

D.     Awarding punitive damages;

E.     Awarding costs and disbursements of this action, including reasonable attorneys', accountants' and experts' fees; and

F.     Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED:  August 16, 2013

BARRETT JOHNSTON, LLC
GEORGE E. BARRETT
DOUGLAS S. JOHNSTON, JR.
TIMOTHY L. MILES
217 Second Avenue, North
Nashville, TN 37201-1601
Telephone: 615/244-2202
615/252-3798 (fax)

ROBBINS GELLER RUDMAN
   & DOWD LLP
AELISH M. BAIG

_____
AELISH M. BAIG

- 19 -
SHAREHOLDER DERIVATIVE COMPLAINT

1

2                              Post Montgomery Center
One Montgomery Street, Suite 1800

3                              San Francisco, CA  94104
Telephone:  415/288-4545

4                              415/288-4534 (fax)

5                              ROBBINS GELLER RUDMAN
                                  & DOWD LLP

6                              TRAVIS E. DOWNS III
BENNY C. GOODMAN III

7                              655 West Broadway, Suite 1900
San Diego, CA  92101-8498

8                              Telephone:  619/231-1058

9                              619/231-7423 (fax)

10                           Attorneys for Plaintiff Leroy Noel

11  S:\CptDraft\Derivative\Cpt Hewlett-Packard Autonomy 2 (CA State).docx

- 20 -
SHAREHOLDER DERIVATIVE COMPLAINT