1    KEKER & VAN NEST LLP
     JOHN W. KEKER - # 49092
2    jkeker@kvn.com
     JAN NIELSEN LITTLE - # 100029
3    jlittle@kvn.com
     BROOK DOOLEY - # 230423
4    bdooley@kvn.com
     NICHOLAS D. MARAIS - # 277846
5    nmarais@kvn.com
     633 Battery Street
6    San Francisco, CA 94111-1809
     Telephone:     415 391 5400
7    Facsimile:     415 397 7188

8    Attorneys for Proposed Intervenor
     SUSHOVAN HUSSAIN

9                    UNITED STATES DISTRICT COURT

10                  NORTHERN DISTRICT OF CALIFORNIA

11                     SAN FRANCISCO DIVISION

12
     IN RE HEWLETT-PACKARD COMPANY         Master File No. C-12-6003-CRB
13   SHAREHOLDER DERIVATIVE
     LITIGATION.                           **SUSHOVAN HUSSAIN'S REPLY IN
14                                         SUPPORT OF MOTION TO INTERVENE
                                           TO CHALLENGE SETTLEMENT**
15
                                           Date:        August 25, 2014
16                                         Time:        9:30 a.m.
                                           Dept.:       Courtroom 6, 17th Floor
17                                         Judge:       Hon. Charles R. Breyer

18   THIS DOCUMENT RELATES TO:

19   ALL ACTIONS

20

21

22

23

24

25

26

27

28

854590

# TABLE OF CONTENTS

I. INTRODUCTION ..................................................................................................1

II. THIS COLLUSIVE SETTLEMENT CONCEALS THE TRUTH: THAT HP'S BUNGLED INTEGRATION DIMINISHED AUTONOMY'S VALUE, YET HP INSTEAD BLAMES OTHERS, BY TURNING ACCOUNTING DISPUTES INTO ALLEGED FRAUD. ...................................................................................3

III. THIS SETTLEMENT IS PART OF A PATTERN OF HP'S CONTINUOUS (AND THUS FAR SUCCESSFUL) EFFORT TO SHUT DOWN ANY DISCOVERY OR INQUIRY INTO ITS OWN MISMANAGEMENT OF THE AUTONOMY ACQUISITION AND INTEGRATION.......................................6

    A. 2012–2014: *In re HP Shareholder Derivative Litigation* (the *"Ricciardi"* case): HP avoids any discovery, then shuts down this case..................................6

    B. 2013: *Cook v. HP* stockholder access case in Delaware: HP successfully resists disclosure of most documents..........................................................6

    C. 2013–2014: *Cook v. Whitman* case in Delaware: HP tries to terminate the case over Cook's objection due to the California settlement...................................7

    D. 2014: *Steinberg v. Apotheker*: HP "automatically" sweeps it into this case..........8

    E. 2011–2014: Copeland cases: HP refuses shareholder demand, successfully opposes amendment. .........................................................................9

    F. 2014 and beyond: HP's efforts to limit potential future discovery........................9

IV. HP'S PROFFERED "CURE" TO THE BAR ORDER DOES NOT DEPRIVE HUSSAIN OF STANDING OR OF HIS NEED TO INTERVENE. ...............................10

V. DISCOVERY IS APPROPRIATE .........................................................................12

VI. CONCLUSION..................................................................................................14

i

854590

# TABLE OF AUTHORITIES

**Federal Cases**

*Eubank v. Pella Corp.*
753 F.3d 718 (7th Cir. 2014) ........................................................... 13

*Franklin v. Kaypro Corp.*
884 F.2d 1222 (9th Cir. 1989) ......................................................... 11

*In re HealthSouth Corp. Sec. Litig.*
572 F.3d 854 (11th Cir. 2009) ......................................................... 11

*In re HP Inkjet Printer Litigation*
Civ. No. 05-cv-3580-JF ...................................................................... 2

*Steinberg* v. *Apotheker, et al.*
Civ. No. 14-cv-2287-CRB ......................................................... 3, 8, 9

**State Cases**

*Cook v. Hewlett-Packard*
C.A. No. 8667-VCG (Del. Ch.) .......................................................... 6

*Cook v. Hewlett-Packard*
No. 8667-VCG, 2014 WL 311111 (Del. Ch. Jan. 30, 2014) ............ 7, 14

*Cook v. Whitman, et al.*
Del. Ch. C.A. No. 9458-VGC ....................................................... 2, 7, 9

**State Statutes**

8 Delaware Code Section 220 ............................................................... 6

**Other Authorities**

Ferrara, *Shareholder Derivative Litigation: Besieging the Board* ................................. 13

854590

## I.     INTRODUCTION

HP mismanaged the Autonomy merger, then shifted blame for the resulting write-down by characterizing accounting disputes as "fraud". This corrupt settlement is part of a larger effort by HP to cover up both its mismanagement of the Autonomy integration and its ploy to falsely accuse others. By his motion, Mr. Hussain seeks to shine a light on what HP wants to keep in the dark.

HP's Opposition swells with bile, but its sound and fury signify nothing. Without any support at all, HP calls Mr. Hussain "a fraudster," which he is not.[1] Meanwhile, HP utterly fails to address any of the questions raised by Mr. Hussain's motion to intervene, including:

- Why did respected Plaintiff's counsel, who in their complaint detailed 445 paragraphs of serious allegations against HP's board and management, suddenly abandon their claims in return for a promise of $18–$48 million?[2]

- On what basis (other than receiving exoneration and a bar from any future claims) did HP's Board conclude that "there is no merit to the claims" against HP insiders?

- Why did Plaintiff's counsel, who previously contested the ability of HP's board to objectively evaluate these claims, and challenged the independence of the Demand Review Committee, suddenly decide to trust the Board's self-serving conclusion that "there is no merit to the claims"?

- On what basis (other than a $25,000 payment to plaintiff Stanley Morrical) do the shareholder plaintiffs who originally sued HP's directors and officers now "agree" that HP's Board and officers are blameless?

- Was a motivation for this settlement the desire of HP insiders to avoid explaining statements they had made that they knew were untrue?

---

[1] HP can't even get Mr. Hussain's employment title right. In the first sentence of its Opposition HP says Mr. Hussain was Autonomy's CFO from 2001 until May 2012. In fact, he was Autonomy's CFO only until October 2011, when the amount of Autonomy shares committed reached the threshold necessary to render HP in control, and therefore the owner, of Autonomy. After that Mr. Hussain became President of Autonomy ("an HP company"), with only sales teams reporting to him. He held this position from October 2011 until his resignation in May 2012. Like HP's name calling, HP's error here demonstrates how it misapprehends relevant facts. Significantly, after the merger, it was HP's Finance Department, *not* Mr. Hussain, that controlled Autonomy's finances. And HP's Finance Department reviewed, approved, and continued many of the Autonomy financial transactions and practices of which HP now complains.

[2] HP says the fee promised to the plaintiffs' attorneys is "largely on a contingent basis." Dkt. 165 (HP Opp.), 3:11–12. True enough, after the first *guaranteed* $18 million is paid, regardless of whether any further case is brought or is successful.

854590

1         Notably, HP's Opposition is completely silent on the key question raised by

2   Mr. Hussain's motion: whether the challenged settlement was collusive.  In their separately filed

3   Opposition, Plaintiff's counsel does address the question of collusion, concluding, without

4   elaboration, that "the Settlement is neither collusive nor unfair."  Dkt. 169[3] ("Pl. Opp."), 1:23.  As

5   if perhaps that might not be convincing enough, Plaintiff further states that "Hussain offers no

6   support for his accusation … other than the fact that, after filing an action, Plaintiff and HP

7   decided to join forces."  Pl. Opp., 1:23–25.  Plaintiff fails to explain how this mysterious decision

8   to "join forces" is distinguishable from the legal dictionary definition of collusion: "a secret

9   arrangement between two or more persons, whose interests are apparently conflicting, to make

10  use of the forms and proceedings of law in order … to obtain a $1 which justice would not give

11  them, by deceiving a court or its officers."[4]

12        Both HP and Plaintiff argue that Mr. Hussain is trying to protect his own interests, rather

13  than the interests of HP and its shareholders.  *See* HP Opp., 1:22; Pl. Opp., 1:13.  We admit that

14  Mr. Hussain has filed this motion in service of his own interests, as litigants usually do.  And we

15  submit that HP's board members, too, are trying to protect interests other than those of HP

16  shareholders, by paying handsomely for an investigation to exonerate its directors and officers,

17  and by paying handsomely the lawyers who had previously accused them, to make them go away.

18  ---

19  [3] Unless otherwise noted, all docket references are to *In re Hewlett-Packard Company Shareholder Derivative Litigation*, master file number 12-6003-CRB.

20  [4] Black's Online Legal Dictionary (2d ed.) (available at http://thelawdictionary.org/collusion/).

Others have recently accused these lawyers and HP of collusion in a different case.  In a Motion for Decertification of Class/Disqualification of Counsel, filed August 1, 2014, the Center for Class Action Fairness accuses lead counsel for the class in that case, Cotchett, Pitre & McCarthy LLP, of "actually colluding" with HP to avoid a challenge to a $2.1 million fee award in that case, while simultaneously negotiating a "separate side agreement to represent HP" in connection with this case.  *See In re HP Inkjet Printer Litigation*, 05-cv-3580-JF, Dkt. 338 (Aug. 1, 2014).  This motion is set to be heard by Judge Jeremy Fogel on September 5, 2014.

In addition, on August 7, 2014, counsel for the plaintiff in the Delaware Chancery Court action *Cook v. Whitman, et al.*, Del. Ch. C.A. No. 9458-VGC, informed this Court by letter of his intent to file a motion to intervene in this action for purposes of seeking lead counsel status.  Cook's counsel suggests a conflict presented by Plaintiffs counsel serving in this case, purportedly on behalf of HP's interests, while simultaneously serving as class counsel *opposed* to HP in *In re HP Inkjet Printer Litigation*, a conflict exacerbated by Plaintiff's counsel also being formally engaged by HP (and paid by HP) in connection with the settlement of this derivative action.  *See* Declaration of Nicholas D. Marais in Support of Sushovan Hussain's Reply filed herewith ("Marais Decl."), Ex. A.

1    Indeed it could be said that Mr. Hussain, by virtue of being "squarely in the company's

2    crosshairs," HP Opp., 6:17–18, is if anything *more* interested in getting to the bottom of what

3    happened in connection with the Autonomy merger, and what it is that HP's management is

4    trying to hide by shutting down this and all other litigation that threatens discovery against it.

5         In response to Mr. Hussain's motion HP has, ineffectively, revised the Bar Order in

6    response to legal infirmities revealed by Mr. Hussain.  HP argues that this quick fix should satisfy

7    Mr. Hussain and deny him standing.  Mr. Hussain, however, cannot be so easily swatted away.

8         For the reasons set forth in our Motion and in this Reply, Mr. Hussain seeks to intervene

9    in this action to challenge the settlement and to obtain the discovery necessary to properly do so.

10   **II.    THIS COLLUSIVE SETTLEMENT CONCEALS THE TRUTH: THAT HP'S**
         **BUNGLED INTEGRATION DIMINISHED AUTONOMY'S VALUE, YET HP**
11       **INSTEAD BLAMES OTHERS, BY TURNING ACCOUNTING DISPUTES INTO**
         **ALLEGED FRAUD.**

12       When in 2011 HP bought Autonomy, it did so knowing it was paying a premium, and

13   knowing that its CFO objected that the price was too high.[5]  HP also knew about accounting

14   issues raised for years by analysts,[6] and it knew that the integration of the companies would

15   present accounting challenges, including moving from European IFRS standards to GAAP.[7]  HP

16   pursued due diligence, to the extent and degree it felt it needed.[8]  And despite all the skepticism

17

18   ───────────────
     [5] HP has admitted "that Lesjak objected to the proposed acquisition of Autonomy in a board
19   meeting on the grounds that it was too expensive and the timing was not right."  *See* HP's
     Amended Answer, filed June 5, 2014 (Dkt. 227) ("HP Securities Answer") in *In re HP Securities
20   Litigation*, case no. 3:12-cv-05980-CRB, ¶ 32.

21   [6] In another derivative action pending before this Court, it has been alleged that "[a]t least as early
     as 2009 questions *existed about Autonomy's financials*" in published documents.  Corrected
22   Complaint, filed June 3, 2014 in *Steinberg* v. *Apotheker, et al.*, 14-cv-2287-CRB, Dkt. 9, ¶ 38
     (emphasis added).  The *Steinberg* complaint goes on to cite numerous analyst reports expressing
23   concern in 2010 about Autonomy's hardware sales, including "pass-through" sales, and the effect
     of hardware sales on gross margins.  *Id.* at ¶¶ 39–42.

24   [7] HP has admitted that, post-acquisition, KPMG (who assisted HP with due diligence) and E&Y
     (HP's auditors), as well as HP's director of Revenue Recognition, Paul Curtis, "reviewed certain
25   accounting issues associated with Autonomy's transition to GAAP from IFRS."  HP Securities
     Answer, ¶¶ 75(2)–(3).

26   [8] HP has stated that KPMG opined that "[t]he data and access provided to us [by Autonomy and
     Deloitte] during due diligence … was comparable with other acquisitions involving large U.K.
27   publicly traded companies."  Dkt. 102 (HP Mot. to Stay), 11:4–5.  HP has in other filings
     admitted that "in November 2011, HP's auditors at Ernst and Young reviewed certain of
28   Deloitte's Autonomy work papers."  HP Securities Answer, ¶ 75(1).

───────────────
3

854590

and challenges, HP pursued and consummated this deal, because its leaders at the time, CEO Léo

Apotheker and Chief Strategy Officer Shane Robison, wanted to take HP in a completely new

direction.  They never had the chance, because they were forced out between when the deal was

announced and when it closed.  Lacking the enthusiasm or vision of those who initially sought the

deal, HP's integration of Autonomy failed miserably.  Hoped-for synergies turned into conflicts

and redundancies.  Sales incentives were mismatched and unproductive.  Unhappy employees

fled.  Apotheker's vision for the acquisition went from dream to disaster.  And meanwhile, for a

year, HP's Finance department reviewed Autonomy's finances, continuing many of the practices

HP now criticizes,[9] and worked to reconcile and make adjustments for the transition from IFRS to

GAAP.

After mismanaging Autonomy and its integration for over a year, on November 20, 2012,

HP announced its $8.8 billion end-of-year write-down of Autonomy, $5 billion of which it

attributed to alleged accounting "improprieties" at Autonomy.  Commentators at the time

questioned whether HP's claims of financial improprieties at Autonomy were an "attempt to

divert attention from yet another bad acquisition,"[10] this write-down being one of many recent

botched HP deals.[11]  Referring to $200 million of Autonomy revenue that HP says was

improperly recorded, and which was cited as the basis for the write-down, the former Chief

Accountant of the SEC asked: "How does that [$200 million adjustment] translate into a

$5 billion writeoff?  …  The big issue isn't the fraud they are talking about.  The big issue is that

HP has made acquisitions that have turned out to be a disaster."[12]  Other commentators published

similar analyses at the time of HP's announcement:

---

[9] For example, hardware sales continued.  HP has since admitted in the press through a
spokesman that "HP eventually learned that a portion of Autonomy's revenues were related to
hardware sales."  *See* Marais Decl., Ex. B (Thomas and Waters, *HP/Autonomy Investigation:
Tangled Web of Hardware and Resellers*, Financial Times (Feb. 17, 2014)).

[10] Marais Decl., Ex. C (Drucker, *HP's Accounting Claims Are Seen as Cover for Bad Deals*,
Bloomberg (Nov. 21, 2012)).

[11] Other recent write-downs included an $8 billion write-down of EDS announced in
August 2012; a $1.2 billion write-down of Compaq announced in May 2012; and a $1.67 billion
write-down announced in November 2011 in connection with the failed Palm acquisition and
related business closures.

[12] Marais Decl., Ex. C at 1 (quoting Lynn E. Turner, former chief accountant of the SEC).

The real story here is that HP grossly overpaid—again—for an acquisition.  The $11 billion purchase price was more than 11 times Autonomy's $931 million of revenue for the 12 months ended June 30, 2011.  In other words:  HP was the sucker.  Now it's trying to shift the blame elsewhere, which shouldn't come as a surprise.[13]

*This* is the story that HP wants buried.  *This* is the story that a collusive settlement shields from light.  *This* is the story that Plaintiff's counsel in this case initially trumpeted:

- **That HP botched the acquisition and integration:**  "HP decided that it was more eager to spend $11.7 billion on a high visibility acquisition than actually figuring out what it was buying."[14]

- **That HP is trying to cover up its mismanagement by shifting blame**:  "In an effort to conceal their own gross mismanagement, fraudulent conduct, and potential exposure to securities claims, HP's officers and directors have blamed the vast majority of the $8.8 billion write-down on accounting issues.…  HP sought to maximize the amount of the write-down it could blame on fraud … without acknowledging the mismanagement of HP's own officers and directors.…  [I]t is evident that HP is using those accounting issues as an excuse to write down the value of another bad investment…  HP's officers and directors continue to blame HP's problems on third parties without holding themselves accountable for their own misconduct."[15]

- **That the results of the "investigation" were a foregone conclusion**:  "Back on November 20, 2012, when HP announced the disastrous $8.8 billion write-down relating to Autonomy, it issued a press release and described its '*intense internal investigation*….'  That same day Director and CEO Meg Whitman told analysts that HP's investigation determined that the board was *not* responsible" and "that it bears no responsibility for the Autonomy deal….  [T]his Court [lacks] the means to evaluate the DRC's investigation, which the Court should conduct with heightened scrutiny in light of the fact that HP's Board of Directors already has gone on record—back in November 2012—that it is *not* to blame."[16]

And *this* is the story that Plaintiffs' counsel has now abandoned, deciding instead to "join forces" with HP.

What a difference $18–48 million makes.

Intervention, and discovery directed to the process by which this story has been buried, is appropriate.

---

[13] *Id.* at Ex. D (Weil, *HP's Explanation Still Makes No Sense,* Bloomberg (Nov. 21, 2012)).

[14] Dkt. 75-2 (Consolidated Am. Compl.), ¶ 6.

[15] *Id.* at ¶¶ 18, 23, 27; *see also id.* at ¶ 300.

[16] Dkt. 116 (Plaintiff's Aug. 13, 2013 Opposition to HP's Motion to Stay), vii:14–25 and 6:5–8.

854590

### III.   THIS SETTLEMENT IS PART OF A PATTERN OF HP'S CONTINUOUS (AND THUS FAR SUCCESSFUL) EFFORT TO SHUT DOWN ANY DISCOVERY OR INQUIRY INTO ITS OWN MISMANAGEMENT OF THE AUTONOMY ACQUISITION AND INTEGRATION.

Since its November 2012 announcement of the $8.8 billion write-down, HP has engaged in a vigorous game of Whack-A-Mole, batting at various investor lawsuits that pose the threat of discovery and disclosure of HP's own mismanagement.  HP's successes in squelching disclosure at every turn present a textbook example of defensive stalling, redirection, avoidance, and ultimate prevention of disclosure.

### A.   2012–2014:  *In re HP Shareholder Derivative Litigation* (the *"Ricciardi"* case):  HP avoids any discovery, then shuts down this case.

On November 27, 2012, a week after HP's announcement of the $8.8 billion write-down, derivative plaintiff Philip Ricciardi brought the action now before the court, one of several derivative actions filed at the time.  HP secured an extension of time to respond.  Following litigation concerning consolidation and appointment of lead counsel, a heavily redacted consolidated amended complaint was filed on May 3, 2013.  Dkt. 75-2.  A week later HP moved to stay the case, pending the board's investigation and review of potential claims.  A series of six stipulated stays spanning over thirteen months followed.  *See* Dkts. 87, 123, 135, 137, 141, 146.

On June 30, 2014, with *no* litigation having taken place, the settlement between HP and Plaintiff's counsel was announced, including its reference to secret governance changes, a bar order to prevent further claims, and an $18–$48 million fee—one that has to rank among the largest fees ever paid to settle a derivative case without any litigation.

### B.   2013:  *Cook v. HP* stockholder access case in Delaware:  HP successfully resists disclosure of most documents.

On July 2, 2013, Plaintiff Rodney Cook filed an action under 8 Delaware Code Section 220 for stockholder access to HP's books and records.  *Cook v. Hewlett-Packard*, C.A. No. 8667-VCG (Del. Ch.).  HP produced just 200 documents comprising 2668 pages, and mightily resisted any further disclosure, to the point of taking to trial the question whether further disclosures were required.  The Delaware Chancery Court ultimately declined to order further disclosure, including the 750,000 additional pages of documents requested by Mr. Cook (which HP has disclosed to the

6

854590

Government).[17]  *See* Marais Decl., Ex. E (*Cook v. Hewlett-Packard Co.*, No. 8667-VCG, 2014 WL 311111 (Del. Ch. Jan. 30, 2014) (unpublished)), *5.

### C.    2013–2014:  *Cook v. Whitman* case in Delaware:  HP tries to terminate the case over Cook's objection due to the California settlement.

Even though HP was successful in limiting disclosure, the 200 documents it did disclose gave Mr. Cook a basis to file a derivative action in Delaware Chancery Court, *Cook v. Whitman*, Civ. Action No. 9458-VCG, alleging that HP's insiders and others breached their fiduciary duties in connection with HP's acquisition of Autonomy.  HP moved to stay this action due to the pendency of the derivative action in California.  Briefing followed.  Then, on June 30, the settlement of the California derivative action was announced.

HP immediately attempted to leverage the California settlement to shut down the Delaware derivative action.[18]  Plaintiff's counsel responded by noting the unfairness of HP's using a settlement in California—reached "with no real litigation activity"—to bar Cook's claims[19] (which claims are based on the same documents apparently also provided to the newly enriched California plaintiffs' counsel, but which they have chosen not to use).

---

[17] Nor did HP disclose the "tens of millions of documents" it provided to the Demand Review Committee.  *See* Dkt. 149-1 (Declaration of Judge Vaughn R. Walker), 2:24.

[18] As HP's attorney explained:

> So, in this case, if the settlement [in California] receives preliminary approval which is scheduled to be heard on August 21st, the Court will then issue an order which will have an injunction, and the injunction will preclude stockholders in other jurisdictions with proceeding to litigate the claims that are being settled in California.

Marais Decl., Ex. F (transcript of July 17 *Cook v. Whitman* teleconference), 7:10–16.

[19] As explained by plaintiff Cook's counsel:

> Mr. Cook's lawsuit is … based on the materials that were produced in the 220 investigation…. Conversely, in California, you have shareholders who … now, in essence, without firing a shot, because there was no real litigation activity that went forth in California, they have entered into a settlement that would purport to release Mr. Cook's distinct claims brought on behalf of the company….  [I]f the Court does not proceed any further in this case [before the California court grants preliminary approval of the settlement], it may well be that this court has no opportunity to consider the allegations and claims that have been uniquely raised in this forum by a plaintiff who followed the preferred, strongly preferred, Delaware procedure about how to go about best pleading derivative claims.

Marais Decl., Ex. F at 12:21–13:2; 13:15–22; 17:7–17.

7

854590

Cook asked the Delaware court for expedited consideration of HP's stay motion before the California settlement terminated Cook's Delaware claims.  HP resisted expedited consideration of its motion.  The Chancery Court sided with HP and stayed the Delaware proceedings pending the resolution of the California motion to approve a settlement.  Cook's counsel has now indicated a plan to intervene in this action, to try to pursue the claims he asserted in Delaware (which this California settlement would preclude).[20]

### D.     2014: *Steinberg v. Apotheker*:  HP "automatically" sweeps it into this case.

On May 16, 2014, another derivative action was filed in the Northern District of California, *Steinberg, et al. v. Apotheker, et al*., 14-cv-2287.  The complaint in this action also alleges failures in HP's due diligence in its acquisition of Autonomy, and challenges the "good faith or reasonable analysis performed by the Demand Review Committee."  The *Steinberg* plaintiffs also complain of HP's "delaying and obfuscating" by not responding to a shareholder demand or document demands.

On June 6, 2014, the *Steinberg* case was automatically swept into the present derivative action, by virtue of a February 21, 2013 stipulated order, which HP negotiated with other derivative plaintiffs' counsel, consolidating their cases and providing that any future filed derivative actions would be "automatically consolidated" into the present action.  *See* Dkt. 61 in 12-cv-06003; Dkt. 10 in 14-cv-2287.[21]  The *Steinberg* plaintiffs have moved in this case for relief from the automatic consolidation order, and to sever their "demand refusal" case from this "demand futility" case.  Dkt. 143.  HP's opposition, filed on June 20, belittled the *Steinberg* case as nothing more than "a new label on what is admittedly the same old wine," Dkt. 147, 1:4, and

---

[20] Indeed, HP invited Cook's counsel to intervene in this action, stating to the Delaware Chancery Court:

> If they think the settlement is not in the best interests of the company and the stockholders, they certainly have the opportunity to go out there and file their objections and litigate them there or try to intervene in the California action and take over as the lead plaintiff.

*Id.* at 9:19–24.

[21] This stipulation is another example of an agreement that benefits both HP and plaintiffs' counsel: it both shields HP from additional derivative suits and protects plaintiffs' counsel from additional competing plaintiffs' counsel.

8

854590

sought to wrap the *Steinberg* case into this action (which, we now know, was at that point days away from settlement).[22]  Steinberg's motion for relief from consolidation and to sever will be heard on August 25, at the same time as Mr. Hussain's motion to intervene.

### E.    2011–2014:  Copeland cases:  HP refuses shareholder demand, successfully opposes amendment.

The remaining derivative cases criticizing HP's handling of the Autonomy merger are the *Copeland* cases.  Plaintiff Copeland made a demand to the HP Board in 2011 alleging various acts of mismanagement.  HP's Board declined the demand, and Copeland sued.  *Copeland v. Lane, et al.*, 11-cv-01058-EJD ("Copeland I").  In December 2012, Copeland sought to amend his complaint to include allegations relating to the Autonomy merger and the 2012 write-down.  On May 6, 2013, Judge Davila denied leave to amend, and granted HP's motion to dismiss, deferring to the business judgment of HP's Board in refusing Copeland's demand.  *See id.* at Dkt. 162.  Copeland's appeal is pending before the Ninth Circuit.  *Copeland v. Lane, et al.*, 13-16251 ("Copeland I Appeal").  Meanwhile, Copeland filed an additional derivative action,  *Copeland v. Apotheker,* 14-CV-00622-EJD ("Copeland II"), which, in a 98-page complaint, alleges that "[t]here's been a long series of boardroom failures that have harmed the reputation of the company and repeatedly destroyed shareholder value over an extended period of time," with numerous specific examples of mismanagement including, *inter alia*, the Autonomy merger.  *See Copeland II*, Dkt. 1 at 4:18–20.  By stipulation, *Copeland II* is stayed pending resolution of the *Copeland I* appeal.

### F.    2014 and beyond:  HP's efforts to limit potential future discovery.

It has been almost three years since the acquisition was completed, over two years since a supposed whistleblower claimed that HP was a "victim" of Autonomy accounting improprieties, and more than 20 months since HP's announcement of its write-down and the filing of lawsuits against it.  In all that time, HP has not sued anyone from Autonomy.  This uncharacteristic restraint is also part of HP's plan to avoid discovery.  HP has now admitted that it intends to sue

---

[22] In its opposition, HP suggested a failure of diligence on the part of Steinberg's counsel's for not objecting to the February consolidation order in this case back at the time it was entered.  This is another example of HP's view that parties with issues should intervene.  Dkt. 147, 6 n.3.

854590

Dr. Lynch and Mr. Hussain in the United Kingdom, where "discovery is limited" and where "English civil procedure denies … broad discovery…."  HP Opp. at 1:14–15 and 7:4–7.  This tactical forum choice further makes plain HP's desire to hide what is going on, and to protect insiders from discovery, so that HP can maintain through its tireless publicity machine its narrative that it is immune from claims of mismanagement, and that all fault lays with accounting disputes that HP calls fraud.  (This forum choice also makes plain the absurdity of paying $18–$48 million to California plaintiffs' counsel, who have no ability to practice law in England.)

* * *

In summary, in the three years since the acquisition, and the soon-to-be two years since HP's announcement of the write-down, HP has at every turn beat back every effort at inquiry into its mismanagement surrounding the Autonomy acquisition.  Despite many efforts by plaintiffs' counsel in numerous actions, HP has successfully limited its document production concerning the Autonomy acquisition to just 200 documents produced under seal in Delaware.  HP has otherwise remained immune from any discovery or inquiry about its own mismanagement of the acquisition and integration.  This collusive settlement is another chapter in HP's master plan.

## IV.   HP'S PROFFERED "CURE" TO THE BAR ORDER DOES NOT DEPRIVE HUSSAIN OF STANDING OR OF HIS NEED TO INTERVENE.

HP and Plaintiff's counsel brush aside Mr. Hussain's concerns about the Complete Bar Order, while at the same time, "to avoid any doubt," HP concedes the need for revisions to address Mr. Hussain's concerns.  Despite these proffered revisions, much doubt still exists.

First, HP asserts that the bar order applies "only if Hussain advances claims 'where [his] alleged injury … is [his] alleged liability to the Company or Autonomy….  In other words, it applies only to the extent that Hussain seeks to hold others responsible for the losses that he caused to HP."  HP Opp. at 5:12–15.  That, of course, is exactly the problem.  If, as it has said it will, HP sues Mr. Hussain for "alleged liability to the Company," and if Mr. Hussain in turn "seeks to hold others"—for example, HP insiders or advisors—"responsible for the losses that [*HP claims*] he caused to HP," it would appear from HP's own words here that such claims would be barred.  Indeed, HP's proposed addition of Section 14.d.(6) to the Bar Order would seem to

10

854590

confirm this, by adding a specific reservation of claims "by Legacy Autonomy Officials …
*against the Company or Autonomy*"—but *not* against other releasees (*e.g.*, HP insiders or
advisors).  *See* Dkt. 166 (Wolinsky Declaration), Ex. 2 at 12; *id.*, Ex. 4 at 8.  In other words, HP's
proffered revisions appear designed to preclude Mr. Hussain from ever making any claims against
the very individuals who mismanaged HP's acquisition of Autonomy, undermined the
companies' integration, and are to blame for HP's disastrous write-down.[23]  Moreover, if
Mr. Hussain were sued by a third-party, the HP settlement would appear to preclude him from
bringing contribution or other claims against HP's insiders or advisors.

Second, HP and Plaintiffs claim that this settlement presents a "routine," "typical,"
"standard" bar order, as established in *Franklin v. Kaypro Corp.*, 884 F.2d 1222 (9th Cir. 1989).
As such, HP contends that Mr. Hussain will actually gain a "very significant" and "very generous
benefit," because the bar order "reduces Hussain's liability with a judgment credit that
'corresponds to the percentage of responsibility of the applicable releasee(s) for the loss to the
Company or Autonomy.'"  HP Opp. at 2:27 and 5:17–24 (citing *In re HealthSouth Corp. Sec.
Litig.*, 572 F.3d 854 (11th Cir. 2009)).  In *HealthSouth*, for example, the bar order was balanced
by "crediting non-settling defendants in any future judgment with the greater of settling
defendant's proportionate liability *or the amount actually paid by the settling defendant*."  *Id.* at
857–58 (emphasis added).  In *HealthSouth*, the amount paid by the settling defendant,
HealthSouth, was $445 million.  *Id.* at 861.

In this case, of course, the amount paid by the settling defendants is precisely… *zero*.  The
"generous" credit afforded here is, therefore, an undefined and unexplained "percentage of
responsibility of the applicable Releasee(s)."  Although HP says nothing about how this
"percentage" would be determined, it repeatedly makes clear that it believes that number to be
*zero*.  *See, e.g.*, Dkt. 149-2 (Stipulation of Settlement), 2 ("WHEREAS, … the Board resolved …

[23] Plaintiff's opposition also tries to brush away Mr. Hussain's concerns by asserting that
Mr. Hussain's "personal rights are not negatively impacted by the settlement [because it] carves
out direct claims."  Pl. Opp. at 1:16.  However, what Plaintiff's papers appear to give, HP's
proffered amendment to the Bar Order takes away.  HP has amended the reservation for "direct
claims" to limit it to direct claims "made in the capacity of the Securities Holder as a Securities
Holder."  Dkt. 166, Ex. 2 at 10; *id.*, Ex. 4 at 6.

SUSHOVAN HUSSAIN'S REPLY IN SUPPORT OF
MOTION TO INTERVENE TO CHALLENGE SETTLEMENT
Case No. C-12-6003-CRB

854590

1   that there is *no merit* to the claims asserted against the named defendants….”); *id.* at 3 (“[T]he

2   Settling Individual Defendants … expressly *deny all assertions* of wrongdoing or liability arising

3   out of the allegations in the Federal Action.”); *id.* at 30–31 (noting the Board’s resolution that

4   “each of the Settling Individual Defendants had *at all times adequately fulfilled* his or her duties

5   of care, loyalty, good faith, disclosures and oversight…”); *id.* at 30 (“*There is no merit* to the

6   claims asserted against the Settling Individual Defendants [or] any other current or former HP

7   officers and directors…”).  The alleged “credit” protection offered thus appears chimerical.[24]

8         Finally, HP seeks refuge in cases that hold that non-settling defendants cannot challenge

9   the fairness or adequacy of a settlement (as shareholders can), but can only object to any portion

10  of a settlement agreement that “strips a non-settling party of a legal claim or cause of action, such

11  as a cross claim-for contribution or indemnification.”  HP Opp., 4.  HP ignores the dual impact of

12  this settlement on Mr. Hussain, as both a shareholder subject to potentially broad releases ***and*** as

13  a putative future defendant directly affected by the Bar Order—both of which give him proper

14  standing to intervene at this time.

15  **V.    DISCOVERY IS APPROPRIATE**

16        In his opposition, Plaintiff states reassuringly that “there is no need for Hussain to

17  intervene to provide ‘careful scrutiny’ [of the settlement] since HP shareholders already have the

18  right to review and comment on the Settlement at the Fairness Hearing.”  Pl. Opp., 2:1–3.  HP

19  adds that Mr. Hussain is not entitled to discovery, because “[a]ll he needs to see is the settlement

20  agreement, which he already has.”  HP Opp., 7:10.

21        We disagree.  “Subject to the court’s discretion, an objecting shareholder may be

22  permitted to engage in limited discovery with respect to the process by which the settlement was

23  reached, the merits of the underlying claims, and the good faith and independence of the board in

24  _____

[24] A Bar Order with a judgment credit makes a lot more sense where settling defendants are
25  actually paying money in settlement.  In that situation, a bar order will typically provide that if the
company later obtains a judgment against a non-settling defendant, for which a released settling
26  defendant is found to be jointly liable, the non-settling defendant will be entitled to a judgment
credit equal to the released defendant’s pro-rata share of the future judgment.  In such situations,
27  there is a fairness hearing to ensure that the amount paid by the settling defendant is, under the
circumstances, a reasonable estimate of his or her liability.  *See, e.g.*, *In re Brocade Commc’ns*
28  *Systems Inc. Derivative Litig.*, 05-cv-02233 CRB, Dkts. 434, 435, 452, 453, 476.

854590

approving the proposed settlement." Ferrara, *Shareholder Derivative Litigation: Besieging the Board*, § 14.04[2]. A settlement agreement that appears collusive on its face especially cries out for a "clash of the adversaries to generate the information that the judge needs" to evaluate it.[25] Mr. Hussain has standing to be that challenger, because of his status as a putative future defendant whose potential claims against others are potentially barred, and because his status as an HP shareholder makes him potentially relatively more exposed to a claims bar.

Limited discovery is appropriate and necessary here to inform Mr. Hussain's challenge. The Court will ultimately have to determine whether or not this settlement is "'fundamentally fair, adequate, and reasonable' from the point of view of the corporation and its shareholders," Ferrara, *supra*, at §14.05 (citing cases), which includes a determination that "'the settlement is not collusive but was reached after arm's length negotiation." *Id.*; *see also* Dkt. 149 (Plaintiff's Mot. for Approval of Settlement), 11:9. The discovery sought here by Mr. Hussain will inform an evaluation of whether the settlement here is fair, adequate, reasonable, and not collusive.

As noted in our moving papers, we seek the following discovery:

    i)    Disclosure of an unredacted copy of the amended complaint;

    ii)    Access to information concerning the "extensive presentation on the findings and recommendations," the "electronic databases containing tens of millions of documents," and the reports of interviews of "nearly 100 individuals" referenced in the Declaration of Judge Walker filed in connection with the proposed settlement; and

    iii)    The report of the "Independent Committee's findings and recommendations," which formed the basis for HP's Board's resolution "that there is no merit to the claims asserted against the named defendants in the Federal Action or the State Actions (other than as to Legacy Autonomy Official Michael Lynch)...."

In addition, we seek discovery of the 200 documents (2668 pages) that HP provided to Delaware and California plaintiffs' counsel, which were described as follows by the Delaware

---

[25] *Eubank v. Pella Corp.*, 753 F.3d 718, 720 (7th Cir. 2014) (quoted in Dkt. 160 (Hussain Mot. to Intervene), 9 n.10). *See also* Ferrara, *Shareholder Derivative Litigation*, at §14.01, n. 4 (quoting *Levy v. General Electric Capital Corp*, 2001 US Dist. LEXIS 13099, at *18 (S.D. N.Y. 2001) ("The task of the district courts [reviewing a settlement] is not easy, for plaintiffs and defendants have submerged their adversary relationship in order, together, to propose the settlement which they have negotiated, including the fee to be awarded to derivative counsel.")).

13

854590

Chancery Court:

> The Plaintiff has already received … documents relating to Autonomy's accounting practices, documents reviewed by HP's board detailing HP's desire to unwind the Autonomy acquisition, documents reviewed by HP's board detailing the impairment charge, documents related to HP's service division's operating margin, reports of findings of HP's internal investigations regarding Autonomy's historical results, and reports of findings of HP's internal investigations regarding the write down.  Those documents included minutes from all board meetings and committee meetings at which the Autonomy acquisition was discussed, as well as all presentations that were made to the board and its committees dealing with the acquisition, including presentations made by the Company's financial advisors.  Those documents are sufficient for the Plaintiff to investigate wrongdoing on the part of HP's officers and directors.

*Cook v. Hewlett-Packard Co.*, 2014 WL 311111, *3–4 (Del. Ch. Jan 30, 2014).

## VI.      CONCLUSION

After incompetently mismanaging Autonomy for over a year, on November 20, 2012, HP announced to the market a number of serious accusations of impropriety.  Key aspects of these accusations were untrue, and HP knew it.  Since that day HP has been actively engaged in a cover up of its mismanagement and the events leading up to the announcement.  And now HP seeks through this corrupt settlement to bury the facts, and cut off all further inquiry or claims, including claims Mr. Hussain may assert in his defense once HP sues him.

For these reasons, and for the reasons stated in our moving papers, Mr. Hussain's motion should be granted, allowing him to intervene, obtain limited discovery, and challenge this settlement.

Dated:  August 11, 2014                                        KEKER & VAN NEST LLP


                                                              By:     /s/ John W. Keker
                                                              JOHN W. KEKER
                                                              JAN NIELSEN LITTLE
                                                              BROOK DOOLEY
                                                              NICHOLAS D. MARAIS

                                                              Attorneys for Proposed Intervenor
                                                              SUSHOVAN HUSSAIN

854590