1   WACHTELL, LIPTON, ROSEN & KATZ
    MARC WOLINSKY (*pro hac vice*)
2   GEORGE T. CONWAY III (*pro hac vice*)
    VINCENT G. LEVY (*pro hac vice*)
3   51 West 52nd Street
    New York, NY  10019
4   Tel./Fax:  212.403.1000/2000
    MWolinsky@wlrk.com
5   GTConway@wlrk.com
    VGLevy@wlrk.com
6
    FARELLA, BRAUN & MARTEL, LLP
7   NEIL A. GOTEINER, State Bar No. 83524
    235 Montgomery Street, 17th Floor
8   San Francisco, CA  94104
    Tel./Fax:  415.954.4400/4480
9   NGoteiner@fbm.com

10  Attorneys for Defendant
    HEWLETT-PACKARD COMPANY
11

12

13

14                  IN THE UNITED STATES DISTRICT COURT

15              FOR THE NORTHERN DISTRICT OF CALIFORNIA

16  | IN RE HEWLETT-PACKARD COMPANY | Master File No. 12-CV-6003 CRB |
    | SHAREHOLDER DERIVATIVE LITIGATION | |
17  | | **HEWLETT-PACKARD'S** |
    | | **MEMORANDUM IN SUPPORT OF** |
18  | | **PRELIMINARY APPROVAL OF THE** |
    | | **SETTLEMENT AND IN OPPOSITION** |
19  | | **TO THE MOTIONS TO INTERVENE** |
    | | **AND SEVER** |
20  | This Document Relates to:  All Actions | |
    | | Dept.:   Courtroom 6, 17th Floor |
21  | | Judge:  Hon. Charles R. Breyer |

22

23

24

25

26

27

28

# TABLE OF CONTENTS

Page

SUMMARY OF ARGUMENT ........................................................................................ i

STATEMENT OF ISSUES TO BE DECIDED ........................................................... vi

ARGUMENT ................................................................................................................1

I.    THE PROPOSED SETTLEMENT SHOULD BE PRELIMINARILY APPROVED. .............1

      A.    The Proposed Release Is Appropriate. .........................................................2

            1.    An Independent Demand Review Committee of the Board Conducted an Extensive Investigation into Plaintiff's Allegations. ...................................3

            2.    The HP Board Decided Not To Pursue the Claims at Issue Here, and That Decision Is Entitled to Deference. .............................................7

            3.    The Determinations Made by the DRC and the Board Are Reasonable. ...........7

      B.    The Proposed Corporate Governance Reforms Are Beneficial to HP. ........................13

II.   THE MOTIONS TO INTERVENE AND SEVER SHOULD BE DENIED. .........................15

      A.    Cook and Steinberg ...................................................................................16

      B.    Hussain ....................................................................................................17

            1.    Hussain Failed to Identify a Claim He Wishes To Pursue or File a Proposed Pleading as Required by Rule 24(c) .................................17

            2.    Hussain's Status as a Shareholder .........................................................17

            3.    Hussain Is No Champion of the Interests of HP and Its Stockholders. ...........18

      C.    To the Extent Hussain Has Any Cognizable Interest in the Settlement, It Is Protected. ...................................................................................21

III.  CONCLUSION.................................................................................................23

1

# TABLE OF AUTHORITIES

2

Page

3

**Cases**

4

*Adams* v. *Calvarese Farms Maint. Corp.*,
    No. 4262-VCP, 2010 WL 3944961 (Del. Ch. Sept. 17, 2010) ....................................... 9

5

*Arakaki* v. *Cayetano*,
    324 F.3d 1078 (9th Cir. 2003) ....................................................................................... 15

6

*Ark. Teacher Ret. Sys.* v. *Countrywide Fin. Corp.*,
    75 A.3d 888 (Del. 2013) ............................................................................................ 17-18

7

8

*Aronson* v. *Lewis*,
    73 A.2d 805 (Del. 1984) .................................................................................................. 2

9

*Ash* v. *McCall*,
    No. 17132, 2000 WL 1370341 (Del. Ch. Sept. 15, 2000) ............................................... 2

10

11

*Athale* v. *Sinotech Energy Ltd.*,
    No. 11-cv-05831-AJN, 2013 WL 2145588 (S.D.N.Y. May 16, 2013) ................................. 16 n.12

12

*Beckman Industries, Inc.* v. *Int'l Ins. Co.*,
    966 F.2d 470 (9th Cir. 1992) ....................................................................................... 17

13

14

*Brazen* v. *Bell Atl. Corp.*,
    695 A.2d 43 (Del. 1997) .................................................................................................. 3

15

*Brehm* v. *Eisner*,
    746 A.2d 244 (Del. 2000) ......................................................................................... 9, 10

16

17

*Cohn* v. *Nelson*,
    375 F. Supp. 2d 844 (E.D. Mo. 2005) .................................................................... 15 n.11

18

*Copeland* v. *Lane*,
    No. 5:11-cv-01058 EJD, 2012 WL 4845636 (N.D. Cal. Oct. 10, 2012) ..................... 2, 7

19

20

*Daily Income Fund, Inc.* v. *Fox*,
    464 U.S. 523 (1984) ........................................................................................................ 1

21

*David B. Shaev Profit Sharing Account* v. *Armstrong*,
    No. 1449-N, 2006 WL 391931 (Del. Ch. Feb. 13, 2006) ......................................... 8 n.9

22

23

*Davis* v. *J.P. Morgan Chase & Co.*,
    775 F. Supp. 2d 601 (W.D.N.Y. 2011) ................................................................... 16 n.12

24

*Franklin* v. *Kaypro Corp.*,
    884 F.2d 1222 (9th Cir. 1989) ..................................................................................... 22

25

26

*Gerber* v. *MTC Elec. Techs. Co.*,
    329 F.3d 297 (2d Cir. 2003) ........................................................................................ 22

27

28

*Guttman* v. *Huang*,
  823 A.2d 492 (Del. Ch. 2003) ................................................................ 8 n.9

*In re AOL Time Warner S'holder Deriv. Litig.*,
  No. 02-cv-6302-SWK, 2006 WL 2572114 (S.D.N.Y. Sept. 6, 2006) ........................ 8

*In re Bank of Am. Corp. Sec., Deriv. & ERISA Litig.*,
  No. 09-md-2058-PKC, 2012 WL 1674299 (S.D.N.Y. May 14, 2012) ........................ 16

*In re Caremark Int'l Inc. Deriv. Litig.*,
  698 A.2d 959 (Del. Ch. 1996) ................................................................ 8

*In re Dow Chem. Co. Deriv. Litig.*,
  No. 4349-CC, 2010 WL 66769 (Del. Ch. Jan. 11, 2010) .......................... 8 n.9

*In re HealthSouth Corp. Sec. Litig.*,
  572 F.3d 854 (11th Cir. 2009) ................................................................ 22

*In re Johnson & Johnson Deriv. Litig.*,
  900 F. Supp. 2d 467 (D.N.J. 2012) ................................................ 15 n.11, 16

*In re Motor Fuel Temperature Sales Practices Litig.*,
  MD-1840-KHV, 2011 WL 5331678 (D. Kan. Nov. 4, 2011) .......................... 16 n.12

*In re NVIDIA Corp. Deriv. Litig.*,
  No. C-06-06110, 2008 WL 5382544 (N.D. Cal. Dec. 22, 2008) ................... 1, 8, 15

*In re Oracle Securities Litig.*,
  829 F. Supp. 1176 (N.D. Cal. 1993) ................................................ 1 n.3

*In re Pac. Enterprises Sec. Litig.*,
  47 F.3d 373 (9th Cir. 1995) ................................................................ 8

*In re Rambus Inc. Deriv. Litig.*,
  No. C 06-3513 JF (HRL), 2009 WL 166689 (N.D. Cal. Jan. 20, 2009) ............. 15 n.11

*Kremen* v. *Cohen*,
  No. 5:11-CV-05411-LHK, 2012 WL 2919332 (N.D. Cal. Jul. 17, 2012) ................ 17

*Metro. Life Ins. Co.* v. *Tremont Grp. Holdings, Inc.*,
  No. 7092-VCP, 2012 WL 6632681 (Del. Ch. Dec. 20, 2012) ........................ 9

*Midland Grange No. 27 Patrons of Husbandry* v. *Walls*,
  No. 2155-VCN, 2008 WL 616239 (Del. Ch. Feb. 28, 2008) ........................ 9

*Mohammed* v. *Ellis*,
  No. 12-cv-1831, 2014 WL 4212687 (D. Colo. Aug. 26, 2014) ................ 15 n.11

*Officers for Justice* v. *Civil Serv. Comm'n of City & Cnty. of San Francisco*,
  688 F.2d 615 (9th Cir. 1982) ................................................................ 1

*Scattered Corp.* v. *Chicago Stock Exch.*,
  701 A. 2d 70 (Del. 1997) ................................................................ 3, 7

*Smith New Court Securities Ltd* v. *Scrimgeour Vickers (Asset Mgmt.) Ltd.*,
(1997) A.C. 254 (H.L.(Eng.))(Lord Browne-Wilkinson) .......................................... 22

*Solash* v. *Telex Corp.*,
No. 9518, 1988 WL 3587 (Del. Ch. Jan. 19, 1998) ................................................. 9

*Spangler* v. *Pasadena City Bd. of Educ.*,
552 F.2d 1326 (9th Cir. 1977) ........................................................................... 15

*Spiegel* v. *Buntrock*,
571 A.2d 767 (Del. 1990) ..................................................................................... 3

*Standard Chartered Bank* v. *Pak. Nat'l Shipping Corpn. (Nos 2 and 4)*,
(2002) UKHL 43, [2003] 1 A.C. 959 (H.L.Eng.)(Lord Hoffman) ........................... 22

*Stone* v. *Ritter*,
911 A.2d 362 (Del. 2006) ..................................................................................... 8

*UAW* v. *Gen. Motors Corp.*,
No. 05-cv-73991-DT, 2006 WL 334283 (E.D. Mich. Feb. 13, 2006) ................... 16 n.12

*Wixon* v. *Wyndham Resort Dev. Corp.*,
No. C 07-2361 JSW, 2010 WL 3630124 (N.D. Cal. Sept. 14, 2010) .............. 15, 15 n.11

*Zarowitz* v. *BankAmerica Corp.*,
866 F.2d 1164 (9th Cir. 1989) .............................................................................. 19

**Rules and Statutes**

8 DEL. C. § 102(b)(7) ............................................................................................ 6, 8

8 DEL. C. § 141(e) ................................................................................................. 9, 10

Fed. R. Civ. P. 24(c) ............................................................................................... 17

**Other Authorities**

CHARLES ALAN WRIGHT, ARTHUR R. MILLER, MARY KAY KANE, RICHARD L. MARCUS, AND
ADAM N. STEINMAN, 7C FEDERAL PRACTICE AND PROCEDURE (3d ed. 2014) ........................... 1, 18

MANUAL FOR COMPLEX LITIGATION (THIRD) § 30.41 (1995) ............................................. 1

**SUMMARY OF ARGUMENT**

The question presented by this motion is straightforward: whether "the settlement of the claims on the agreed upon terms is 'within the *range* of possible approval.'" *In re NVIDIA Corp. Deriv. Litig.*, No. C-06-06110, 2008 WL 5382544, at *2 (N.D. Cal. Dec. 22, 2008) (emphasis added and citation omitted). And because the parties made clear at the August 25, 2014 hearing that the proposed settlement is not contingent upon the payment of attorneys' fees, the Court's preliminary evaluation must turn upon the settlement's two principal elements: (1) the release to be granted to HP's directors, officers, and outside advisors, and (2) the proposed corporate governance reforms to be effected at HP. Both elements of the settlement are not only "within the range of possible approval" but are in the best interests of the corporation and its shareholders. The settlement warrants preliminary approval.[1]

The release is appropriate because the claims against HP's current and former officers and directors should not and would not succeed. An independent committee of the HP board, the Demand Review Committee ("DRC"), conducted an exhaustive investigation of the circumstances surrounding HP's acquisition of Autonomy. The DRC was led by a prominent and respected activist investor, and was assisted by independent law firms and numerous financial, accounting, and forensic experts. The DRC's lawyers collected documents from and reviewed databases containing 17.5 million electronic files. Wolinsky Decl. Ex. 1 at 16 ("DRC Resolution"). They interviewed over 90 people—everyone who had any significant knowledge of the deal who would speak to them—and reached out to Autonomy's former CEO, Michael Lynch, who declined to be interviewed. *Id.* at 16, 41. The DRC's lawyers and experts devoted some 50,000 hours of work to find out anything and everything about the Autonomy transaction (*id.* at 16)—to learn exactly what happened, and to find out who was responsible.

What they found was a massive fraud. A sophisticated but brazen scheme of deception, or-

---

[1] After the August 25, 2014 hearing, plaintiffs and HP sought to mediate plaintiffs' claims for attorney's fees based on their contribution to the corporate governance reforms that are part of the settlement. At the conclusion of the mediation, plaintiffs and HP agreed to submit the matter of plaintiffs' entitlement to attorneys' fees and expenses to binding arbitration by retired U.S. District Court Judge Vaughn R. Walker, subject to the review and approval of the Court. Amended and Restated Stipulation of Settlement at 35 (Docket No. 201).

HP MEM. ISO PRELIM. APPROVAL OF
SETTLEMENT AND OPP. MOT. INTERVENE
CASE NO. 12-CV-06003-CRB

chestrated by the senior management of Autonomy, that had inflated revenues in Autonomy's publicly filed financial statements for many years, creating the false appearance of a high growth company that was meeting or beating Street estimates through phony software deals and loss-making hardware sales misclassified as software sales.  The effect of the fraud was to inflate Autonomy's revenues by 21.1% in 2009, 29.6% in 2010, and 26.4% in the first half of 2011.  *Id.* at 24-25, 63-64, 67, 87-89.

What the DRC also found was extensive and extraordinary evidence of deceit.  One particularly revealing example is this email sent by the former Autonomy CFO (and would-be intervenor here) Sushovan Hussain near the end of Autonomy's 2010 fiscal year to his boss, former Autonomy CEO Michael Lynch.[2]  The subject is "Us idol"—a reference to the anticipated revenues from the sale of Autonomy's principal software product, IDOL, in its major market, the United States.  The email reflects a CFO in panic:

| | |
|---|---|
| **From:** | Sushovan Hussain [sushovanh@autonomy.com] |
| **Sent:** | Friday, December 10, 2010 1:19 AM |
| **To:** | Mike Lynch |
| **Subject:** | Us idol |

Really don't know what to do mike. As I guessed revenue fell away completely yet SMS report shows massive activity. But I speak with the vp's who are far more accurate. Also stouff, Joel and mike I think keep separate sheets and unless I am v wrong don't discuss the sheets hence plane crashes and they don't know. We've covered up with bofa and hopefully db and Doi but if latter 2 don't happen it's totally bad. There are swathes of reps with nothing to do maybe chase imaginary deals.

So radical action is required, really radical, we can't wait any more.

Everywhere I look at us idol it's bad.

Sent from my iPhone

As Hussain's email describes, the revenue outlook was "totally bad," a financial "plane crash[]" waiting to happen.  As "revenue fell away," Hussain and Lynch "covered up."  Sales reps were chasing "imaginary deals" creating the appearance of "massive activity" where there in fact was little or none.  Hussain couldn't keep the game going much longer—couldn't "wait any more." He "[r]eally didn't know what to do mike."  But Mike Lynch did.  He would take "radical action …

---

[2]    Wolinsky Decl. Ex. 2.

ii

1   really radical," as Hussain so plaintively urged.  He would sell the company, ultimately to HP.

2          As the DRC found, in the due diligence that led up to the sale, HP asked the right questions.

3   The problem was that HP received false answers—repeatedly.  HP and its accounting, financial, and

4   legal advisors reviewed non-public documents in an electronic data room, participated in at least 28

5   due-diligence conference calls, and pored over publicly-filed Autonomy annual financial statements

6   that had been audited by Deloitte UK, as well as quarterly financial statements that had been

7   reviewed by Deloitte UK.  DRC Resolution at 31, 34.  The investigation concluded that HP's

8   officers and directors "engaged in a reasonable process for acquiring Autonomy and managing it

9   after the Acquisition"; "were guided by reasonable judgments based upon assumptions and estimates

10  that appeared reasonable" and "reasonably relied on all reasonably available information before

11  making decisions."  Given all this, the DRC found that there was simply no basis, under the

12  applicable standards of Delaware law, for suing the victims of the fraud perpetrated by Autonomy

13  executives.  *Id.* at 51-52.

14         So if this action were not to settle, and were litigated instead, HP would move to dismiss it

15  under a fundamental principle of Delaware law:  that a board of directors has the statutory authority

16  to manage the business and affairs of the corporation, including the authority to decide whether

17  assertion of a claim by the company is in the best interests of the company and its shareholders.

18  Here, HP's independent board, after considering the results of the DRC's investigation, has

19  concluded that prosecution of this action on behalf of HP would not be in the corporation's best

20  interests.  The board has decided that the claims against HP's directors, officers and advisors lack

21  merit under applicable Delaware law, and that those responsible for perpetrating the fraud should be

22  sued.  Wolinsky Decl. Ex. 3 at 6-11 ("Board Resolution").  On the basis of that decision, HP would

23  move to dismiss here.

24         And on that motion, given the unquestionable independence and disinterestedness of the

25  DRC and of the board, the "*only* relevant question" before the Court would be one of process:

26  whether, in deciding not to prosecute this action, the "directors acted in an informed manner and

27  with due care, and in a good faith belief that their action was in the best interests of the corporation."

28  *Copeland* v. *Lane*, No. 5:11-cv-01508 EJD, 2012 WL 4845636, at *5 (N.D. Cal. Oct. 10, 2012)

(emphasis added); *Scattered Corp.* v. *Chicago Stock Exch.*, 701 A.2d 70, 75-77 (Del. 1997).  The Court would not be required, or even authorized, to evaluate the substance of the board's decision.  The Court would only ask whether the DRC's "investigation … was reasonable and conducted in good faith."  *Scattered*, 701 A.2d at 77.  If the answer to that question is "yes," the board's decision to terminate this action would be protected by the business judgment rule.

Even apart from the board's protected decision not to do so, prosecuting this action would produce huge corporate expenditures with virtually no prospect of any return.  As permitted by Section 102(b)(7) of the Delaware General Corporation Law, HP's corporate charter contains an exculpation provision that effectively bars claims against directors based on the duty of care.  Accordingly, to recover from the directors on the claims asserted here, plaintiff would have to prove that they breached their duty of loyalty.  That is a highly unlikely prospect.  None of the directors had any personal or financial interest in Autonomy, and none is alleged to have "fail[ed] to act in the face of a known duty to act, thereby demonstrating a conscious disregard for their responsibilities." *Stone* v. *Ritter*, 911 A.2d 362, 370 (Del. 2006).

Under Section 141(e) of the Delaware statute, moreover, directors are "fully protected in relying in good faith" on the company's officers and advisors.  *See, e.g.*, *Brehm* v. *Eisner*, 746 A.2d 244, 261-62 (Del. 2000).  The board retained some of the most accomplished advisors in the country and in good faith relied on them and HP's officers in evaluating the Autonomy deal.

And as for the officers, although these protections do not apply, recovery would still be exceedingly difficult:  to prevail against them, plaintiff would need to prove that the officers took actions "which [were] without the bounds of reason," *Midland Grange No. 27 Patrons of Husbandry* v. *Walls*, No. 2155-VCN, 2008 WL 616239, at *9 (Del. Ch. Feb. 28, 2008), and were "so grossly off-the-mark as to amount to reckless indifference or a gross abuse of discretion," *Metro. Life Ins. Co.* v. *Tremont Grp. Holdings, Inc.*, No. 7092-VCP, 2012 WL 6632681, at *7 (Del. Ch. Dec. 20, 2012); *Solash* v. *Telex Corp.*, No. 9518, 1988 WL 3587, at *9 (Del. Ch. Jan. 19, 1988).  There was nothing like that here, and hence little prospect of recovery here.

At the same time, if HP were to pursue these claims, it would have to pay for the defendants' defense under the advancement and indemnification provisions of HP's charter and bylaws.  That

1   could easily cost the company tens of millions of dollars.  And an even greater cost to the company

2   would be the distraction that this litigation would create to a board and management team that has

3   presided over a 300% increase in stock price since the announcement of the Autonomy write-down.

4       In short, this case would go nowhere if it were litigated.  It would be expensive if it were

5   litigated.  And it would distract the company from its central goal of creating value for shareholders.

6       That makes the proposed settlement fair by any standard.  By virtue of the second principal

7   element of the settlement, the company and its shareholders would be getting much more than they

8   could expect to get if the case were litigated:  the settlement provides for extensive corporate

9   governance reforms crafted with the input of counsel for the plaintiffs and their experts.  This Court

10  and many others have consistently "'recognized that corporate governance reforms … provide

11  valuable benefits' to corporations and their shareholders."  *Wixon* v. *Wyndham Resort Dev. Corp.*,

12  No. C 07-2361 JSW, 2010 WL 3630124, at *3 (quoting *NVIDIA*, 2008 WL 5382544, at *3).  As a

13  result, in cases like this one, courts have routinely approved settlements providing for corporate

14  governance reforms without monetary relief.  "The proposed settlement provides for immediate

15  changes and relief, and it 'eliminates [the] risks of continued litigation, including the very real risk of

16  no recovery after several years of litigation.'" *Wixon*, 2010 WL 3630124, at *3 (quoting *NVIDIA*,

17  2008 WL 5382544, at *3).  Accordingly, as demonstrated more fully below, there is more than

18  ample grounds to conclude, on a preliminary basis, that the proposed settlement is within the range

19  of possible approval.

20      Finally, the pending motions to intervene by Rodney Cook and Hussain, and the pending

21  *Steinberg* motion to sever, should be denied.  Cook's and Steinberg's motions should be denied on

22  the simple and well-trodden ground that a shareholder unhappy with the terms of a settlement does

23  not need to bring his or her own claims in order to protect his or her interests.  Those interests can be

24  fully protected by objecting to the settlement.  Even if the Court were to assume that Hussain is a

25  shareholder, something that his papers do not establish, Hussain's motion should be denied for the

26  same reason, and two others:  (1) Hussain failed to identify any claim that he actually intends to

27  pursue, let alone submit a proposed pleading in intervention as Rule 24(c) requires; and (2) his

28  interests—as a principal architect of the fraud against HP who is being criminally investigated and is

about to be sued by HP—are obviously *antagonistic* to those of HP and its shareholders.  Indeed, Hussain is the *last* person this Court should hear from in deciding whether the proposed settlement is in the best interests of the company.

## STATEMENT OF ISSUES TO BE DECIDED

1.  Whether the proposed settlement, which provides for valuable corporate governance revisions and which releases claims that an independent and disinterested committee of the HP board determined to be meritless following a reasonable and thorough investigation, is "within the range of possible approval" and therefore should be preliminarily approved?

2.  Whether purported HP shareholders Rodney Cook, Harriet Steinberg, and Edward Vogel should object rather than intervene (Cook) or have their case severed (Steinberg and Vogel) if they seek only to litigate claims that the proposed settlement would release—and therefore effectively seek to challenge the terms of the proposed settlement?

3.  Whether Sushovan Hussain, one of the architects of the fraud at Autonomy, should be permitted to intervene notwithstanding his failure to submit a proposed pleading in violation of the Federal Rules, his failure to prove that he is an HP shareholder, and his conflict of interest with HP and its shareholders?

**ARGUMENT**

**I.      THE PROPOSED SETTLEMENT SHOULD BE PRELIMINARILY APPROVED.**

"[T]he provision [of the Federal Rules] requiring notice and court approval of [derivative] settlements … [is] intended to prevent shareholders from suing in place of the corporation in circumstances where the action would disserve the legitimate interests of the company or its shareholders." *Daily Income Fund, Inc.* v. *Fox*, 464 U.S. 523, 532 n.7 (1984).

"The general practice is that once a[] [settlement] agreement has been reached by the parties, it is submitted to the court …. The court then will schedule a hearing, issuing an order to show cause why the suggested disposition should not be accepted, and direct that notice be given to absent shareholders …." CHARLES ALAN WRIGHT, ARTHUR R. MILLER, MARY KAY KANE, RICHARD L. MARCUS, & ADAM N. STEINMAN, 7C FEDERAL PRACTICE AND PROCEDURE § 1839 (3d ed. 2014). For the Court to grant preliminary approval and schedule that hearing, the Court "need *only* conclude that the settlement of the claims on the agreed upon terms is '*within the range of possible approval*.'" *In re NVIDIA Corp. Deriv. Litig.*, No. C-06-06110, 2008 WL 5382544, at *2 (N.D. Cal. Dec. 22, 2008) (quoting MANUAL FOR COMPLEX LITIGATION (THIRD) § 30.41, at 237 (1995)) (emphasis added).

It is only at the final approval hearing that the Court considers objections from shareholders. Even then, "the settlement or fairness hearing is not to be turned into a trial or rehearsal for trial on the merits," and "[n]either the trial court nor [the appellate] court is to reach any ultimate conclusions on the contested issues of fact and law which underlie the merits of the dispute," largely because of "the very uncertainty of the outcome in litigation … that induces consensual settlements" in the first place. *Officers for Justice* v. *Civil Serv. Comm'n of City & Cnty. of San Francisco*, 688 F.2d 615, 625 (9th Cir. 1982). Rather, counsel's view that the settlement is in the best interest of the company's shareholders is entitled to significant weight. *See id.*; *NVIDIA*, 2008 WL 5382544, at *4.[3]

---

[3]    Hussain misrepresented both the standard for preliminary approval and Judge Walker's opinion in *In re Oracle Securities Litigation*, 829 F. Supp. 1176 (N.D. Cal. 1993). Contrary to Hussain's repeated assertions at the Preliminary Approval Hearing, *see* Hearing Tr. (Aug. 25, 2014), 39:11-25, Judge Walker was not applying the standard for preliminary approval of a settlement in *Oracle Securities*; he was applying the standard for final approval, given that

Here, the proposed settlement plainly meets the standard for preliminary approval. The proposed settlement consists of two principal elements: first, a release of claims against various officers, directors and advisors; and second, corporate governance reforms. The release is fair for the simple reason that, if this action were to proceed, the claims against the proposed releasees would almost surely be dismissed. And the corporate governance reforms are plainly valuable. The settlement is in the best interests of the company and its shareholders, and it is certainly within the range of possible approval. The Court should grant preliminary approval.

## A.   The Proposed Release Is Appropriate.

The release is appropriate because, if this case does not settle, HP would make a motion to dismiss that, under settled law, should be granted. As a result, the claims being settled have no value to HP or its shareholders.

As an initial matter, there is no basis for demonstrating demand futility in this action. *Ash* v. *McCall*, No. 17132, 2000 WL 1370341 (Del. Ch. Sept. 15, 2000). The "mere threat of personal liability for approving a questioned transaction, standing alone, is insufficient to challenge either the independence or disinterestedness of directors," and thus to establish demand futility. *Aronson* v. *Lewis*, 473 A.2d 805, 815 (Del. 1984).

But more importantly, the HP board in fact acted on the demands that it did receive and has resolved not to prosecute the claims asserted in the complaint in this action, as well as in the other actions that have been filed relating to the same subject matter, and to seek the dismissal of those claims if the case is not settled. On a motion to dismiss made on the basis of this decision, the issue for the Court to decide would be one of process: not whether the board's decision was a good one, but whether, in deciding not to prosecute the claims, the independent and disinterested "directors acted in an informed manner and with due care, and in a good faith belief that their action was in the best interest of the corporation." *Copeland* v. *Lane*, No. 5:11-cv-01508 EJD, 2012 WL 4845636, at

---

notice had already been disseminated to class members. *See In re Oracle Securities Litig.*, No 3:90-cv-00931-VRW (N.D. Cal. Feb. 3, 1993) (Docket No. 266) ("ORDER by Judge Vaughn R. Walker certifying settlement class, approving notice of proposed settlements, and setting settlement hearing Date Entered: 2/2/93) (cc: all counsel) (cg, COURT STAFF) (Entered: 02/03/1993)").

*5 (N.D. Cal. Oct. 10, 2012) (emphasis added).  Because HP's independent board relied on the thorough investigation of its independent committee, the Court would only ask whether the committee's "investigation … was reasonable and conducted in good faith."  *Scattered Corp.* v. *Chicago Stock Exch.*, 701 A.2d 70, 75-77 (Del. 1997).

"The decision to bring a law suit or to refrain from litigating a claim is a decision concerning the management of the corporation," and, "[c]onsequently, such decisions are part of the responsibility of the board of directors."  *Spiegel* v. *Buntrock*, 571 A.2d 767, 773 (Del. 1990).  A board's decision to terminate litigation is thus presumptively valid under the business judgment rule: "Courts give deference to directors' decisions reached by a proper process, and do not apply an objective reasonableness test in such a case to examine the wisdom of the decision itself."  *Brazen* v. *Bell Atl. Corp.*, 695 A.2d 43, 49 (Del. 1997).

There was just such a proper process here—an extraordinarily careful and thorough one.

### 1.    An Independent Demand Review Committee of the Board Conducted an Extensive Investigation into Plaintiff's Allegations.

In response to the various derivative actions, including this one, and to demands by other shareholders, the HP board resolved in January 2013 to create the Demand Review Committee, a committee of three independent non-executive members of the board, to assess potential Autonomy-related claims.[4]  The DRC was tasked with investigating, reviewing and evaluating the facts and circumstances alleged in the derivative actions and demand letters and making a recommendation to the board on whether HP should prosecute any of the potential claims.  Board Resolution at 2.  The central operating principle for the DRC's investigation and recommendation was whether the pursuit of any such claims would be in the best interests of HP.  DRC Resolution at 1.

The independence of the DRC is beyond serious contention.  The members of the DRC at the time the DRC completed its work and made its recommendations to the board were Ralph Whitworth, Gary Reiner and Robert Bennett.  Board Resolution at 2.  All three are independent directors; none is, or has ever been, an officer of HP.  And none of the DRC members has been

---

[4]    Board Resolution at 2; DRC Resolution at 9-10.

substantively implicated in any alleged wrongdoing.  Bennett did not even join the HP board until July 2013, long after the complaint was filed.  DRC Resolution at 10.  Whitworth, the Chair of the DRC, was not a member of the board at the time of the Autonomy acquisition.  *Id.*; *see also* Compl. ¶ 47 (Docket No. 75-2).  His experience and expertise in corporate governance is extensive.  He is the co-founder and principal of Relational Investors, LLC, a registered investment advisor which holds some 30 million shares, more than 1.6% of HP's outstanding stock.  His interests are clearly aligned with those of HP's other public shareholders.

Pursuant to the authority delegated to it by the board, the DRC retained its own counsel in the United States and the United Kingdom and other professional advisors, including financial, accounting and forensic experts, to assist in its review.  DRC Resolution at 13.  With the assistance of these advisors, the DRC engaged in a year-long evaluation that entailed:

> ➢ Twelve formal DRC meetings to discuss the status of the investigation, the work being done by the committee's advisors and other issues related to potential claims;
>
> ➢ The collection of documents and the review by the committee's counsel of relevant documents from databases containing more than 17.5 million electronic files;
>
> ➢ Interviews by the committee's counsel of more than 90 individuals, including current and former employees, officers and directors of HP and Autonomy, and various advisors to HP and Autonomy on relevant issues;
>
> ➢ Approximately 34,000 hours spent by the committee's counsel on the review of documents, witness interviews and analyses of legal, insurance, indemnity, valuation and business issues relevant to the committee's mandate; and
>
> ➢ More than 16,000 hours of work by experts and consultants retained to advise on accounting principles, economic analyses, and Delaware and English legal issues and standards.

DRC Resolution at 16-17.  Counsel for the DRC invited and heard from 13 plaintiffs' law firms representing HP shareholders in various derivative actions and demand letters.  *Id.* at 15.  In addition, the DRC sought to interview Sushovan Hussain and Michael Lynch.  Both refused the invitation.

This investigation and assessment enabled the DRC to evaluate the merits of the claims, the

availability and implications of insurance coverage, director-exculpation and indemnification obligations, and various business and prudential considerations—all to determine whether HP's interests would be best served by pursuing any relevant claims, and if so which.  *Id.* at 17-21.

The DRC found that HP's officers and directors had acted in good faith and that HP had no claim against them.  As summarized in the resolution reflecting the DRC's findings, HP's directors and officers "engaged in a reasonable process for acquiring Autonomy and managing it after the Acquisition[,] … were guided by reasonable business judgments based upon assumptions and estimates that appeared reasonable at the relevant time … [and] reasonably relied on all reasonably available material information before making decisions." *Id.* at 51.[5]

The DRC also found that HP's directors and officers:

> ➢ "*did* act with reasonable care and informed themselves of all reasonably available material information before making decisions";

> ➢ "*did* seek to obtain (and did in fact obtain) value for corporate expenditures";

> ➢ "*did* act in good faith and in a manner intended to promote the Company's best[] interests";

> ➢ "*did not* engage in any so-called abuse of control," "receive any improper personal benefit" or "act in [their] own self-interest";

> ➢ "*did not* act in bad faith, with a conscious disregard of their responsibilities, or in furtherance of their personal interests"; and

> ➢ *did not* breach their fiduciary duties or knowingly (or even negligently) make any misrepresentations in connection with the Autonomy acquisition.  *Id.* at 51-52.

The DRC also confirmed that HP's board worked to keep itself well-informed throughout the diligence and negotiation process for the Autonomy acquisition.  The board had met several times in July and August 2011 to consider the Autonomy acquisition and received presentations from HP's management and advisors on key due-diligence findings and the negotiation process.  *Id.* at 34-35. The DRC found that the board had not been presented with any "red flags"—there was absolutely no

---

[5]    The findings and recommendations regarding HP's officers and directors excluded Lynch.  *See, e.g.*, *id.* at 52.

1  indication that Autonomy executives might have been committing a fraud; indeed, the board was

2  informed that KPMG's accounting review, including a due diligence call with Deloitte UK, had

3  presented "no material issues."  *Id*.  The DRC also found that HP's directors are "exculpated from

4  financial liability" for breaches of the duty of care "to the fullest extent consistent with Del. G. Corp.

5  L. § 102(b)(7)," and had "relied on, in appropriate circumstances, information, opinions, reports, or

6  other statements" prepared by HP officers and employees and independent experts and advisors that

7  the directors "reasonably believed to be reliable and competent regarding the relevant issues."  *Id*. at

8  83-84.  As a result, for these additional reasons, the DRC determined there is "no merit" to any of

9  the potential Autonomy-related claims against HP's directors.

10  Based upon all of these considerations, the DRC recommended that "no claims be pursued as

11  to present and former HP officers and directors."  *Id*. at 47-52.[6]  Beyond all this, the DRC also

12  considered that the company would have to fund defense costs and that litigation would result in

13  significant distraction, to the detriment of the company and its shareholders. *Id.* at 49-51.

14  The DRC also found that HP had been defrauded by Autonomy executives.  The DRC

15  determined that "Autonomy's financial statements made significant and material

16  misrepresentations."  *Id*. at 36.  It further found that Lynch and Hussain had engaged in fraud, deceit

17  and/or negligent misrepresentation and that there were meritorious claims against Deloitte UK for

18  professional negligence or malpractice.  *Id*. at 87-88.  On the basis of those findings, and upon

19  considering other relevant factors, the DRC recommended that claims be pursued against Lynch,

20  Hussain and Deloitte UK.  *Id*. at 63-64, 67.

21  Although a major focus of lead plaintiff's complaint is claims related to HP's pre-acquisition

22  due diligence of Autonomy, the DRC also thoroughly investigated, considered and rejected ancillary

23  claims related to HP's integration and management of Autonomy after the close of the acquisition,

24  *id.* at 37-43; the impairment charge for Autonomy, *id.* at 43-47; and HP's share buy-back program,

---

26  [6]   The DRC also found that HP's outside advisors in connection with the Autonomy acquisition, specifically including

27  Barclays and Perella Weinberg, had been "guided by reasonable professional judgments based upon reasonable assumptions and estimates" and had not acted negligently or in bad faith.  DRC Resolution at 58-59.  Therefore, the DRC also recommended that no claims be pursued against these advisors.  *Id.*

28

1   *id.* at 75-76.  The DRC concluded that there was no merit to any claim related to the above-listed

2   issues against either HP's officers and directors or its outside advisors.  *Id.* at 83-86, 89.[7]

3           **2.**     **The HP Board Decided Not To Pursue the Claims at Issue Here, and That**

4                   **Decision Is Entitled to Deference.**

5        On January 10, 2014, the board was presented with the DRC's resolution containing its

6   written findings and recommendations.  The DRC and its counsel also made a presentation to the

7   board on January 15.  Board Resolution at 2-3.  After considering the DRC's recommendations and

8   consistent with them, the board resolved on January 16, 2014 that it was not in the best interests of

9   HP and its shareholders to pursue claims against HP's directors, officers or advisors, including those

10   claims at issue here.  *Id.* at 3, 6-9, 11.[8]  The board did resolve that claims be pursued against Lynch

11   and Hussain, the architects of the fraud that had been perpetrated, as well as against Deloitte UK.  *Id.*

12   at 9-11.

13        The board's decision not to pursue claims against HP's directors, officers and advisors would

14   end this case if it were to proceed.  For there can be no question that, in deciding that terminating

15   this litigation was in the best interests of the company, HP's independent and disinterested "directors

16   acted in an informed manner and with due care, and in a good faith belief that their action was in the

17   best interest of the corporation."  *Copeland*, 2012 WL 4845636, at *5.  The committee was

18   independent; its investigation was thorough; and the board's reliance on the committee's judgment is

19   entitled to deference under the business judgment rule.  *Scattered*, 701 A. 2d at 75-77.

20           **3.**     **The Determinations Made by the DRC and the Board Are Reasonable.**

21        The fact that HP's board has acted in good faith and with due care in deciding to terminate

22

---

23   [7]   The DRC also found that Whitman's statements on an earnings call on May 23, 2012 and to the media on June 5, 2012 were neither misleading nor incomplete because Whitman believed Autonomy's problems were due to scaling challenges, she had no intent to mislead HP shareholders or the public, and no one yet knew whether the whistleblower's allegations of pre-acquisition accounting improprieties (which were made on May 25—two days *after* Whitman's May 23 statement) were well-founded or the extent or materiality of any such improprieties.  DRC Resolution at 42.

25   [8]   At the time of the resolution, HP's board had twelve directors, including three new directors not among the eleven then-current directors named as defendants in plaintiff's complaint.  *Compare* Compl. ¶¶ 33-47 *with* Board Resolution at 4-6.  Three directors named as defendants, Meg Whitman, Raymond Lane and Ann Livermore, voluntarily recused themselves from voting on the board's resolution.  Board Resolution at 4.  A fourth director, Bennett (one of the three non-defendant new directors), also a member of the independent committee, voluntarily recused himself with respect to potential claims against Perella Weinberg.  *Id.* at 4.

1   this litigation would be enough to sustain its decision to seek dismissal of this case.  But even if it

2   were not, the claims would likely fail on the merits.  Settlement is highly favored in derivative

3   actions because they are "'notoriously difficult and unpredictable."  *NVIDIA*, 2008 WL 5382544 at

4   *2 (quoting *In re AOL Time Warner S'holder Deriv. Litig.*, No. 02-cv-6302-SWK, 2006 WL

5   2572114, at *3 (S.D.N.Y. Sept. 6, 2006)).  And as the Ninth Circuit has explained, "[e]ven if the

6   potential recovery might have been large, the odds of winning [a] derivative lawsuit [are] extremely

7   small" and such suits are consequently "rarely successful."  *In re Pac. Enterprises Sec. Litig.*, 47

8   F.3d 373, 378 (9th Cir. 1995).  That is true in this case.

9          HP's charter contains an exculpation provision pursuant to Section 102(b)(7) of the Delaware

10  corporate code, 8 DEL. C. § 102(b)(7), which protects HP's directors from personal liability for

11  breaches of the duty of care.  There is no allegation here that any director intentionally wronged the

12  corporation in order to advance his or her personal interests.  Therefore, to succeed on a claim

13  against the directors, a plaintiff would have to prove that the directors breached their duty of loyalty

14  because they "fail[ed] to act in the face of a known duty to act, thereby demonstrating a conscious

15  disregard for their responsibilities."  *Stone* v. *Ritter*, 911 A.2d 362, 370 (Del. 2006).

16         And if the claim is based on an allegation of lack of director oversight (as it is, for instance,

17  in the post-acquisition period), a plaintiff would need to show that the directors either (1) "utterly

18  failed to implement any reporting or information systems or controls," or (2) "having implemented

19  such a system or controls, consciously failed to monitor or oversee its operations thus disabling

20  themselves from being informed of risks or problems requiring their attention."  *Id.*  Claims of this

21  type have been described as "possibly the most difficult theory in corporation law upon which a

22  plaintiff might hope to win a judgment."  *In re Caremark Int'l Inc. Deriv. Litig.*, 698 A.2d 959, 967

23  (Del. Ch. 1996).  In *Caremark* itself, the "extremely weak" claims that the directors had failed to

24  monitor the corporation were settled on the basis of certain corporate governance reforms and

25  changes to certain drug referral policies.  *Id.* at 972.[9]

26

27  [9]   Failure-to-monitor claims against directors and officers are routinely dismissed by the Delaware Court of Chancery
    on the pleadings.  *See, e.g.*, *In re Dow Chem. Co. Deriv. Litig.*, No. 4349-CC, 2010 WL 66769, at *15 (Del. Ch. Jan. 11,

28

Beyond this, under Delaware law, directors are "fully protected in relying in good faith" on the managers and advisors of a corporation. *See Brehm* v. *Eisner*, 746 A.2d 244, 261 (Del. 2000); 8 DEL. C. § 141(e).   To overcome Section 141(e), a plaintiff must allege particularized facts demonstrating, for instance, that the board "did not in fact rely on the expert," or that the "reliance was not in good faith," or even that "they did not reasonably believe that the expert's advice was within the expert's professional competence." *Brehm*, 746 A.2d at 261.

While these provisions of Delaware law do not apply to HP's officers, plaintiff would still have to prove that the officers acted with gross negligence. *Adams* v. *Calvarese Farms Maint. Corp.*, No. 4262-VCP, 2010 WL 3944961, at *18 (Del. Ch. Sept. 17, 2010); *Midland Grange No. 27 Patrons of Husbandry* v. *Walls*, 2008 WL 616239, at *9 (Del. Ch. Feb. 28, 2008).   Construing this standard, the Delaware courts have held that a would-be plaintiff would have to prove that HP's officers took actions "which [were] without the bounds of reason," *Adams*, 2010 WL 3944961, at *18, and were "so grossly off-the-mark as to amount to reckless indifference or a gross abuse of discretion." *Metro. Life Ins. Co.* v. *Tremont Grp. Holdings Inc.*, No. 7092-VCP, 2012 WL 6632681, at *7 (Del. Ch. Dec. 20, 2012); *Solash* v. *Telex Corp.*, 1988 WL 3587, at *9 (Del. Ch. Jan. 19, 1988).

The overwhelming evidence uncovered by the DRC and reviewed by the board demonstrates that these strict standards under Delaware law cannot be met.

a.   *HP's Extensive Due Diligence.*   The DRC's investigation found that the pre-acquisition "due diligence" conducted by HP was entirely consistent with what is typically conducted for deals involving public U.K.-based companies that are subject to the U.K. Takeover Code.[10]   HP and its numerous accounting, financial, and legal advisors reviewed non-public documents, participated in at least 28 due diligence phone calls, and pored over publicly filed Autonomy financial statements that had been audited by Deloitte UK.   DRC Resolution at 31-32.   The board received several

---

2010); *David B. Shaev Profit Sharing Account* v. *Armstrong*, No. 1449-N, 2006 WL 391931 (Del. Ch. Feb. 13, 2006) *aff'd*, 911 A.2d 802 (Del. 2006); *Guttman* v. *Huang*, 823 A.2d 492, 507-08 (Del. Ch. 2003).

[10]   The U.K. Takeover Code requires a potential target to provide the same nonpublic information to all bona fide suitors.   DRC Resolution at 31.   HP had legitimate concerns that one of Autonomy's competitors would invoke the U.K. Takeover Code to demand any nonpublic information shared by Autonomy executives, with an eye toward disrupting a possible HP acquisition or gaining a competitive advantage over HP if the deal went through.   *Id.*   These concerns were shared with the HP board.   *Id.*

updates on the due diligence process, and it ultimately approved the acquisition after HP found no material issues in its review and its financial advisors deemed the proposed price to be fair. *Id.* at 34-35. The board, by statute, was entitled to rely on the advice on these subjects that it received from the company's advisors and from management. *See* 8 DEL. C. § 141(e); *Brehm*, 746 A.2d at 262.

HP's management consulted with the board and its committees on numerous occasions and convened a substantial team of employees from Corporate Development, Finance, Sales Operations, Legal, and several other departments, to spearhead the due diligence. DRC Resolution at 27-28, 31. HP also hired best-in-class advisors for the transaction, Barclays and Perella Weinberg, to advise on strategy and the fairness of the price. *Id.* at 31. While one fairness opinion is generally more than sufficient, in this case, both banks reviewed and opined that the transaction was fair. *Id.* at 54. HP also retained two top-tier international law firms, Freshfields and Gibson Dunn, to conduct legal due diligence, provide advice on the U.K. Takeover Code, and act as deal counsel, respectively. *Id.* at 31. In addition, HP retained KPMG to conduct financial and accounting due diligence. *Id.*

The HP team collected and scrutinized public information and non-public documents and representations supplied by Autonomy executives. *Id.* By the end of the due diligence process, Autonomy executives had provided a response to every one of HP's "must have" diligence requests except one, access to Deloitte UK's work papers. *Id.* at 32. The materials they had provided included the open-source scan of its source code, lists of revenue by product category, redacted sample OEM contracts, and redacted lists of top 40 customers and top 40 contracts. *Id.* at 31-32. Deloitte UK agreed to a due diligence phone call with the HP team and KPMG as a substitute for producing its work papers. *Id.* at 32. The HP team asked the right questions about Autonomy's revenue recognition policies, including whether Deloitte UK had had any disagreements with Autonomy's management about accounting policies or conclusions, but Deloitte UK failed to disclose any disagreements. *Id.*

The board also considered dissenting views. As discussed in the DRC resolution, HP's CFO Catherine Lesjak expressed concern about the deal during a board meeting. Lesjak stated that, in her view, while the strategic vision for the deal was sound, the size of the premium would concern

shareholders, HP's bankers had underestimated the impact of the acquisition on the stock price, and HP had a history of not executing on major acquisitions.  She did not state or believe that the proposed acquisition of Autonomy placed too high a value on Autonomy.  The board took Lesjak's concerns seriously and met in executive session to consider them and proceeded only after HP CEO Léo Apotheker responded to her concerns to the board.  *Id.* at 34.  Far from casting doubt upon the board's thoroughness and deliberation, the episode demonstrates it.

In the end, none of the presentations that the board received from management or its advisors identified any material issues or "red flags" concerning Autonomy.  *Id.*  Management noted that, with respect to the finance and accounting areas, KPMG had found "no material issues."  *Id.*  The bankers made separate presentations to the board, and each provided a fairness opinion on August 18.  *Id.* at 35, 54-55.  Having taken all this information into account, and having confirmed with the CEO his belief that Autonomy would be an important acquisition for HP, the board voted to approve the deal.  *Id.* at 34-35.  The directors breached no fiduciary duty in casting their "yes" votes.  They had actively monitored the thorough due diligence of Autonomy conducted by HP's managers and advisors.  They could not have known they were being deceived by Autonomy executives.

*b.   The Problem:  Autonomy's Executives Lied.*  HP did not miss the fraud at Autonomy because it wasn't diligent enough.   The problem was that Autonomy executives had lied. Repeatedly.  The audited financials that were publicly filed every year, and the published quarterly financials that were reviewed by Deloitte UK, together with the narrative in the annual reports that accompanied the numbers, were riddled with misrepresentations and outright falsehoods.  Revenue, excluding hardware, was lower than reported by 21.1% in 2009, 29.6% in 2010, and 26.4% in the first half of 2011.  Operating margins were overstated by allocating a portion of the loss associated with those sales to SG&A.  Revenue growth was overstated by the inclusion of phony software deals and loss making hardware sales in every period; for example, revenue growth in 2010 was reported to be 17.7% but was actually only 5% when the phony software and hardware deals are excluded. DRC Resolution at 24-25.

In its 2010 Annual Report, Autonomy was described as a pure software company with almost 90% gross margins.  The Annual Report stated that 400 OEM customers included IDOL in their

software, which would lead to a steady stream of high gross margin royalties.  Wolinsky Decl. Ex. 4 at i, 15-16 ("Annual Report").  None of this was true.  The DRC found that the annual report had failed to disclose that (1) Autonomy executives had used phony VAR transactions to enable premature and/or unwarranted recognition of revenue and often "round-tripped" transactions to provide VARs with cash to pay for licenses, (2) many supposed OEM transactions either had been improperly classified or had not involved the embedding of Autonomy's IDOL software, (3) hosting contracts had been modified to recognize the revenue up-front rather than pro rata at the expense of long-term revenue streams and, at times, at the expense of total contract revenue, (4) Autonomy executives had entered into loss-making pure hardware sales to pump up revenue and close gaps at the end of the quarter, labelling the hardware sales as software revenue, and (5) Autonomy executives had inflated gross margins by allocating a large portion of the costs from those loss-making hardware sales to sales and marketing (which does not affect gross revenue), rather than to cost of goods sold (which does).  DRC Resolution at 36.

Autonomy executives continued their campaign of deceit throughout HP's due diligence process.  Again and again, they made misrepresentations to HP in response to questions that, had they been answered truthfully, would have exposed their fraud.  HP asked detailed questions respecting, among other things, financial information, revenue projections, growth rates, and gross margins.  *Id.* at 31.  Not only did Autonomy executives fail to disclose any of their inappropriate accounting practices, they affirmatively told HP that the public financials were accurate.  Hussain confirmed the assumptions that HP had embedded in its valuation model, assumptions derived from the public financials.  *Id.* at 32.  Hussain also signed off on sharing lists of top 40 contracts and customers that included improperly recognized revenue from VAR transactions and revenue misclassified as OEM revenue.  (More on that below, pp. 20-21).

HP was also misled by the information provided—or, more precisely, not provided—by Deloitte UK.  On the August 17, 2011 due diligence call with HP and KPMG, Deloitte UK dismissively noted that a whistleblower had come forward in the past, but failed to tell HP and KPMG that the individual was Autonomy's then-CFO for the Americas.  DRC Resolution at 32. Deloitte UK failed to disclose the seriousness and extent of the allegations made, and of the concerns

that the executive had, which have since been shown to have been well-founded.  *Id.*  And Deloitte UK did not disclose that it had long-running disagreements with Autonomy management over accounting practices at Autonomy.  *Id.*

   *c.  Lynch's and Hussain's Attempt to Shift the Blame:  The Post-Acquisition Period*.  When HP disclosed that it had been deceived, Autonomy's former leadership was quick to accuse HP of fumbling in the post-acquisition period—what else was there for Lynch and Hussain to say?  Various shareholders leveled claims based on those allegations.  The DRC, however, thoroughly investigated, considered and rejected the notion that HP's integration and management of Autonomy after the close of the acquisition was the real cause of revenue shortfalls at Autonomy, *see* DRC Resolution at 37-43; that there was anything improper in the amount or manner in which HP recorded an impairment charge for Autonomy, *see id.* at 43-47; and that there was anything improper with the share buy-back program that HP conducted after the Autonomy acquisition closed, *see id.* at 75-76.

*   *   *

   In short, the DRC concluded that HP's losses didn't result from any lack of diligence on HP's part but from the extraordinary extent to which Lynch and Hussain lied, and the extraordinary extent to which Deloitte UK negligently certified financial statements riddled with inaccuracies.  And it concluded that Lynch and Hussain's accusation that the problem was HP's handling of the integration is just a tactic intended to distract from their own wrongdoing.  And so the DRC and the board rightly concluded that the derivative claims asserted here are meritless, and that it would not be in HP's best interest to pursue them.  The release contemplated in the proposed settlement therefore is entirely fair to the corporation.

  **B.**  **The Proposed Corporate Governance Reforms Are Beneficial to HP.**

   The corporate governance reforms contemplated in the settlement are valuable to the corporation and its shareholders.  These reforms include the following:

   ➢ <u>Closer alignment between the board and HP's Finance and Investment Committee</u>:  The HP Board of Directors will work more closely with the Finance and Investment

Committee ("FIC"), which has been responsible for M&A oversight. The reforms call on the Board to ensure that the FIC is composed of members with significant M&A experience, to discuss potential transactions before the FIC provides approval to sign, and to review the FIC's decisions regarding approval to sign for large transactions.

➢ Increased responsibilities for the FIC: The FIC will advise the Board regarding the disclosure protocols of M&A transactions, conduct a yearly process review to evaluate implemented and planned improvements to the M&A process, and ensure that M&A due diligence and related processes have been properly preserved.

➢ Increased depth of involvement by HP's Management Executive Committee (EC) in the evaluation of acquisition targets: The EC will review and recommend changes where necessary to the criteria developed by the business units to evaluate the attractiveness of potential transaction targets. The EC's recommendations will be reviewed by the Board of Directors and the FIC for approval.

➢ Formal training for employees without M&A expertise: Non-M&A professionals involved in the transaction process will be given training that is given to M&A professionals. In addition to this training, the reforms call for training with respect to appropriate revenue recognition practices for all employees of newly acquired companies dealing with certain business functions.

➢ Greater oversight of due diligence by HP's Risk Management Committee: HP's Risk Management Committee ("RMC") will review important due diligence findings, be available as a point of escalation for identified risks, and ensure that all elevated risks are properly resolved or further investigated. The RMC will also have three permanent members, including the Chief Financial Officer, the General Counsel and the Director of Corporate Development.

➢ Additional focus on due diligence for acquired technology: For larger transactions, a written technology due diligence plan that is specific to the particular transaction being evaluated will be approved by a Technology Committee.

➢ Adoption of a formal fairness opinion policy: HP's fairness opinion policy will require

consideration of whether a potential transaction can be deemed fair from a financial perspective and the evaluation any facts or circumstances that might compromise the independence of an advisor.

These are significant reforms that justify approval of the settlement. As the case law makes clear, governance reforms achieved in the settlement of derivative litigation "'provide valuable benefits' to corporations and their shareholders." *Wixon* v. *Wyndham Resort Development Corp.*, No. C 07-2361 JSW, 2010 WL 3630124, at *3 (N.D. Cal. Sept. 14, 2010) (quoting *NVIDIA*, 2008 WL 5382544, at *3). And that is because, as this Court has recognized, "strong corporate governance is fundamental to the economic well-being and success of a corporation." *NVIDIA*, 2008 WL 5382544, at *3 (granting preliminary approval of settlement where corporate governance reforms "provide[d] valuable benefits" to the Company). As a result, courts have routinely approved settlements providing only for governance reforms without monetary relief.[11]

## II.   THE MOTIONS TO INTERVENE AND SEVER SHOULD BE DENIED.

Also before the Court are motions to intervene by Cook and Hussain, and a motion to sever by Steinberg and Vogel. In order to intervene as of right, a proposed intervenor must show, among other things, that his interests are not "adequately represented by existing parties." *Arakaki* v. *Cayetano*, 324 F.3d 1078, 1083 (9th Cir. 2003). Permissive intervention should be denied if the proposed intervenors lack "standing to raise relevant legal issues," or if their "interests are adequately represented by other parties," or if intervention will fail to "significantly contribute … to the just and equitable adjudication of the legal questions presented," or if it "will prolong or unduly delay the litigation." *Spangler* v. *Pasadena City Bd. of Educ.*, 552 F.2d 1326, 1329 (9th Cir. 1977) (Kennedy, J.). Neither Cook nor Hussain can meet either standard for intervention, and their

---

[11]   *See, e.g.*, *Wixon*, 2010 WL 3630124, at *2; *In re Johnson & Johnson Deriv. Litig.*, 900 F. Supp. 2d 467, 485 (D. N.J. 2012); *Cohn* v. *Nelson*, 375 F. Supp. 2d 844, 853 (E.D. Mo. 2005) ("Where the corporate governance reforms are achieved independently of any monetary benefits, the therapeutic benefits are even more worthwhile"); *In re Rambus Inc. Deriv. Litig.*, No. C 06-3513 JF (HRL), 2009 WL 166689, at *3 (N.D. Cal. Jan. 20, 2009) ("In the instant case, the Court is satisfied that the corporate governance reforms are of significant value to [the company]"); *Mohammed* v. *Ellis*, No. 12-cv-1831, 2014 WL 4212687, at *3 (D. Colo. Aug. 26, 2014) ("The fact that the settlement involves only corporate governance reforms . . . does not weigh against approval of the settlement. To the contrary, the corporate governance reforms . . . are specifically and appropriately designed to prevent the recurrence of the alleged misconduct ….").

motions should be denied.  In addition, there is no reason to sever Steinberg's demand-refused case at this time because the proposed settlement, if approved, would release the claims asserted in her complaint.

### A.     Cook and Steinberg

Cook's motion must be denied under the well-established rule that shareholders cannot intervene to challenge the terms of a proposed settlement when they may freely "exercis[e] their rights as objectors under Rule 23.1."  *In re Bank of Am. Corp. Sec., Deriv. & ERISA Litig.*, No. 09-md-2058-PKC, 2012 WL 1674299, at *3 (S.D.N.Y. May 14, 2012).[12]  The questions that Cook raises in his moving papers—about the lack of monetary recovery by HP, *see* Cook Motion at 3-4 (Docket No. 172)—go to "the settlement's ultimate fairness and adequacy," and thus "are best weighed alongside those of other likely objectors" at the final approval hearing.  *Bank of Am. Corp.*, 2012 WL 1674299, at *2; *see also In re Johnson & Johnson Deriv. Litig.*, 900 F. Supp. 2d at 478 (denying permissive intervention where proposed intervenor "seeks to assert the rights of [the company]" whose interests were already adequately represented).  Cook's motion for intervention, either as of right or permissive, should be denied.

Steinberg too can protect her interests by objecting.  She argues that her demand-refused case should be severed from lead plaintiff's demand futility case, but the fact that she made a demand is a distinction without a difference, given that the parties have agreed to a settlement that is now pending Court approval and, if this litigation were to proceed, HP would move to dismiss the case based on the board's determination that the suit is not in the company's best interests.  The proposed settlement would release all the claims asserted in her lawsuit.  Therefore, as a substantive matter, even if Steinberg's case were severed now, there would be no litigation for her to prosecute.

---

[12]   *See also Athale* v. *Sinotech Energy Ltd.*, No. 11-cv-5831-AJN, 2013 WL 2145588, at *2 (S.D.N.Y. May 16, 2013) (denying intervention as of right); *Davis* v. *J.P. Morgan Chase & Co.*, 775 F. Supp. 2d 601, 605 (W.D.N.Y. 2011); *In re Motor Fuel Temperature Sales Practices Litig.*, MD-1840-KHV, 2011 WL 5331678, at *2 (D. Kan. Nov. 4, 2011); *accord UAW* v. *Gen. Motors Corp.*, No. 05-cv-73991-DT, 2006 WL 334283, at *5 (E.D. Mich. Feb. 13, 2006) (denying permissive intervention); *Athale*, 2013 WL 2145588, at *3.

### B.     Hussain

Hussain's motion is even more flawed than Cook's and Steinberg's.  As someone facing potential criminal and civil charges for the fraud he perpetrated upon HP, he is the last person to whom the Court should give credence in the context of a derivative action brought to protect HP's interests.

#### 1.     Hussain Failed to Identify a Claim He Wishes To Pursue or File a Proposed Pleading as Required by Rule 24(c).

Hussain's first problem is that he failed to comply with the plain terms of Fed. R. Civ. P. 24(c).  Rule 24(c) provides that an intervention "motion *must* … be accompanied by a pleading that sets out the claim or defense for which intervention is sought."  (Emphasis added.)  When a pleading is not attached, "the movant [must] describe[] the basis for intervention with sufficient specificity to allow the district court to rule" on the motion to intervene.  *Beckman Indus., Inc.* v. *Int'l Ins. Co.*, 966 F.2d 470, 475 (9th Cir. 1992).  Hussain cannot meet this basic requirement because he does not even identify a claim he seeks to bring or defense he wishes to assert.  That alone is sufficient grounds to deny his motion.  *E.g.*, *Kremen* v. *Cohen*, No. 5:11-CV-05411-LHK, 2012 WL 2919332, at *9 (N.D. Cal. Jul. 17, 2012) ("Movant's failure to attach a pleading not only renders his motion to intervene procedurally deficient, but moreover deprives the Court of a basis for determining whether it has an independent basis … over Movant's claims or defenses").

This is not just attributable to lawyer oversight.  If Hussain did submit a pleading and make affirmative statements, he would make admissions that could be used against him in the event he is indicted.  And in any event, there is no purpose to be served in having him intervene in a case that the parties have agreed to settle.

#### 2.     Hussain's Status as a Shareholder.

Hussain's second problem arises under a basic principle of corporate law.  Since he apparently is seeking to intervene as a plaintiff in a derivative action, he must have standing to act as a plaintiff.  And it is axiomatic that, to have standing to serve as a derivative plaintiff, Hussain has to show that he was "a stockholder at the time of the alleged wrong" and that he "maintain[ed] shareholder status throughout the litigation." *Ark. Teacher Ret. Sys.* v. *Countrywide Fin. Corp.*, 75

A.3d 888, 894 (Del. 2013) (reaffirming continuous-ownership rule after answering certified question from the United States Court of Appeals for the Ninth Circuit).

Hussain has not submitted anything to establish that he was a stockholder at the time of HP's acquisition of Autonomy, or that he is an HP stockholder now.  All he says is that, at some point in the past, HP granted him restricted stock units.  That grant took place on November 16, 2011, *after* the Autonomy transaction closed,[13] and so the contemporaneous-ownership rule deprives him of standing to prosecute any claims on behalf of HP relating to that transaction.  Under the terms of the grant, his right to receive unvested shares ended when he left HP.  Wolinsky Decl. Ex. 5 at ¶ 7 (if employment is terminated before the lapse of the restriction period all unvested RSUs "shall be forfeited").  And while his vested RSUs were converted to shares, Hussain has never claimed that he held them when this action was commenced, or that he is a current shareholder.

Obviously, Hussain knows what his holdings are, and could easily clear up any questions about them.  And on August 27, HP gave Hussain the opportunity to do just that:  it sent his counsel a letter asking for simple proof of his shareholder status.  Hussain rejected the request out of hand, refusing to provide *any* information unless HP would agree to disclose the documents he seeks through his motion to intervene.[14]  Hussain puts the cart before the horse.

### 3.    Hussain Is No Champion of the Interests of HP and Its Stockholders.

The third problem with Hussain's motion for intervention is that his interests are adverse to those of HP and its stockholders.  Courts around the country hold that shareholders can object only if they have standing to file derivative litigation in the first place.  At a minimum, this means Hussain must show that his interests are not "antagonistic to those [he] is seeking to represent."  CHARLES ALAN WRIGHT, ARTHUR R. MILLER, MARY KAY KANE, RICHARD L. MARCUS, AND ADAM N. STEINMAN, 7C FEDERAL PRACTICE AND PROCEDURE § 1833 (3d ed. 2014).  Although the Ninth Circuit has stopped short of holding that objectors must have standing to sue (leaving the question for another day), it, too, has cautioned that objectors cannot have interests that are "hostile" to those

---

[13]   Wolinsky Decl. Ex. 5 (Stock Notification and Award Agreement).
[14]   Wolinsky Decl. Exs. 6, 7.

1    of other shareholders.  *Zarowitz* v. *BankAmerica Corp.*, 866 F.2d 1164, 1166 (9th Cir. 1989).  Here,

2    there can be no doubt that Hussain's interests are "antagonistic" and "hostile" to those of HP and its

3    shareholders.  He committed a massive fraud.  He is the subject of criminal investigations into that

4    fraud (investigations with which HP has cooperated, and will continue to cooperate).  And on the

5    basis of the year-long DRC investigation, he is about to be sued for that fraud.

6            The evidence uncovered by HP and the DRC makes abundantly clear how the interests of

7    HP, as the victim of fraud, and Hussain, a principal perpetrator of that fraud, inescapably conflict.

8    One central element of the fraud Hussain orchestrated involved phony software license deals similar

9    to the sort that this Court became familiar with in the *Informix* case, in which the company's CEO

10   pleaded guilty to fraud for entering into secret side deals with purchasers of software licenses as part

11   of a scheme to inflate his company's revenues.[15]  What Autonomy executives did was to enter into

12   illusory agreements to sell Autonomy software to value-added resellers, or "VARs."  They would

13   immediately recognize revenue from those transactions, even if the VARs did not have an end-user

14   lined up to purchase the software and could not be and were not expected to pay the amounts owed

15   to Autonomy.

16           One particularly egregious VAR transaction was born of the unsuccessful attempts of

17   Autonomy executives to sell software to the Vatican for use in digitizing the Biblioteca Apostolica

18   Vaticana ("Vatican Library" or "BAV").  When negotiations with the Vatican Library stalled,

19   Autonomy executives sold the software to a VAR called MicroTech on March 31, 2010, the last day

20   of the first quarter of the fiscal year.  They booked $11 million of revenue from that sale.

21   Autonomy's records listed the BAV as the intended end-user of the software.  But that was a lie.

22   MicroTech made no effort to sell the software, and had no contact with the BAV.  And Autonomy

23   executives never sold any software to the BAV, either.  The transaction was fake, and the revenue

24   was fake.

25           Bizarrely, four years later, after HP had blown the whistle on the fraud at Autonomy and

---

[15]  *See United States* v. *White*, No. 02-cr-0375-CRB (N.D. Cal. May 26, 2004); Securities and Exchange Comm'n, *In the Matter of Informix Corp.*, No. 3-10130, Order Instituting Public Administrative Proceedings, Making Findings, and Imposing a Cease-and-Desist Order (Jan. 11, 2000).

1   after the Vatican Library had announced that it had hired a different vendor for its digitization

2   project, MicroTech sent a letter to the Vatican to inquire about the "project between the [Vatican]

3   Biblioteca and Autonomy."  Wolinsky Decl. Ex. 8.  The VAR wrote: "In March 2010, MicroTech

4   was requested by Autonomy to participate as a reseller in an ongoing project.  ...  As part of that

5   project, MicroTech purchased … ($11,550,000) worth of [Autonomy] software."  The VAR sought

6   to "confirm your receipt and use of the software and to obtain payment for that use."  *Id.*

7       Monsignor Cesare Pasini of the BAV responded that the BAV "has never dealt with the

8   company MicroTech and was not even aware of its involvement with Autonomy at the time."

9   Wolinsky Decl. Ex. 9.  He noted that the BAV's discussions with Autonomy had ended in 2011.  In

10  other words, the Vatican had never heard of MicroTech, never dealt with MicroTech, and never

11  agreed to purchase the $11.5 million of Autonomy software recognized by Autonomy executives

12  back in the first quarter of 2011.  Moreover, the Vatican had interacted only with Autonomy

13  executives, not MicroTech, even though the software had already supposedly been sold to

14  MicroTech for the Vatican's use.

15      The fraudulent Vatican deal surfaced as one element of the fraud perpetrated by Hussain on

16  HP in due diligence.  In response to a request, Autonomy executives prepared a list of their top 40

17  contracts.  The unredacted list, which was circulated among Lynch, Hussain, COO Andrew Kanter,

18  and VP of Finance Steve Chamberlain on August 4, 2011, identified the fourth largest customer as

19  MicroTech with a value of $11.55 million.  A separate column titled "end user (if diff)" listed the

20  BAV, and the "Services" was classified as "European Govt."  Wolinsky Decl. Ex. 10.

21      Hussain knew that Autonomy had never transacted with the BAV.  Nonetheless, he approved

22  the list and instructed Kanter to redact the list and place it in the data room that had been created to

23  facilitate HP's due diligence.  Moreover, in a clear indication that Hussain and other Autonomy ex-

24  ecutives deliberately tried to hide from HP the fact that many of the top "customers" were actually

25  VARs, they deleted the entire "end user (if diff)" column, including the "end user (if diff)" heading

26  itself.  As a result, on the redacted top 40 contracts list shared with HP, line 4 stated only:  "value:

27  $11,550[,000]" and "Industry: European Govt."  Wolinsky Decl. Ex. 11.

28

| # | Customer | End user (if diff) | Value (ex services) $ | Services |
|---|----------|--------------------|-----------------------|----------|
| 1 | Bank of America | | 22,509 | Bank |
| 2 | UBS | | 19,919 | Bank |
| 3 | BP | Direct | 14,200 | Energy |
| 4 | Microtech | BAV | 11,550 | European Govt |
| 5 | KPMG | Direct | 11,337 | Professional Services |
| 6 | Filetek | VA | 10,500 | US Government |
| 7 | Prisa | Direct | 9,663 | Media |

*Unredacted version of top 40 contracts list not shared with HP (above);*
*Misleadingly redacted version shown to HP (below)*

| # | Customer | value (ex pro serv) $'000 | Industry |
|---|----------|---------------------------|----------|
| 1 | | ✓22,509 | Bank |
| 2 | | ✓19,919 | Bank |
| 3 | | 14,200 | Energy |
| 4 | | 11,550 | European Govt |
| 5 | | 11,337 | Professional Services |
| 6 | | 10,500 | US Government |
| 7 | | 9,663 | Media |

Therefore, line 4 of the redacted top 40 contracts list contained two misrepresentations: Autonomy executives lied about whether there was ever any sale to the Vatican at all, and also concealed the fact that there were resellers involved in these major contracts. Other deals on the top-40 list were fake as well.

And the list itself is just the tip of the evidentiary iceberg that shows how Hussain is the fraudster, HP is the victim—and thus that their interests are diametrically opposed.

## C. To the Extent Hussain Has Any Cognizable Interest in the Settlement, It Is Protected.

Plainly, Hussain has no cognizable interest in challenging a settlement that grew out of an HP board decision to sue him. Hussain's claimed interest in terms of the bar order is equally fatuous.

The bar order in the proposed final order approving the settlement provides Hussain and other potential defendants the full value of any contribution claims they might have, without having to bring those claims. Thus, the bar order reduces Hussain's liability with a judgment credit that "corresponds to the percentage of responsibility of the applicable Releasee(s) for the loss to the

1   Company or Autonomy."  Proposed Order Approving Settlement and Judgment, ¶13(a) (Docket No.

2   201-3, at 7-8).  "This constitutes very significant compensation to [Hussain], in light of the

3   perception by the underlying plaintiffs and [HP] that [Hussain] was a central figure in the

4   violations."  *In re HealthSouth Corp. Sec. Litig.*, 572 F.3d 854, 866 (11th Cir. 2009).  Bar orders of

5   this sort are standard fare in "partial settlements," where plaintiffs settle with some defendants but

6   not others, and they have been upheld time and again.  *Franklin* v. *Kaypro Corp.*, 884 F.2d 1222 (9th

7   Cir. 1989); *HealthSouth*, 572 F.3d 854; *Gerber* v. *MTC Elec. Techs. Co.*, 329 F.3d 297 (2d Cir.

8   2003) (Sotomayor, J.).

9          Hussain's challenge to the efficaciousness of the clause is without substance.  As an initial

10   matter, Hussain has no claim for contribution against any HP officer or director.  In an action for

11   fraud under English law, Hussain would not be able to defend on the basis that the people he

12   defrauded contributed to their victimization by conducting negligent due diligence.  *Standard*

13   *Chartered Bank* v. *Pakistan Nat'l Shipping Corp. (Nos 2 and 4)* [2002] UKHL 43, [2003] 1 A.C.

14   959 at 965-67 ¶¶ 11-18 (H.L. Eng.) (Lord Hoffmann) (Wolinsky Decl. Ex. 12).  Thus, to the extent

15   Hussain is being barred from asserting a claim, for example, against an HP executive for negligently

16   relying upon Hussain's misrepresentations, it is a bar that has no financial consequence to him.

17          Hussain's (false) claim that HP management is responsible for running Autonomy into the

18   ground post-acquisition also has no bearing on Hussain's liability.  Under English law, damages for

19   fraud are limited to losses directly flowing from the misrepresentations (and would not therefore

20   include avoidable losses caused by any purported post-acquisition failings by HP).  It is for that

21   reason that damages are measured as of the time the fraud was completed, here, when HP's

22   subsidiary closed on the Autonomy acquisition.  *Smith New Court Secs. Ltd.* v. *Scrimgeour Vickers*

23   *(Asset Mgmt.) Ltd.* [1997] A.C. 254 at 266-67 (H.L. Eng.) (Lord Browne-Wilkinson) (Wolinsky

24   Decl. Ex. 13).  As a result, Hussain is not liable for, and therefore could not seek contribution from,

25   any HP officer or director for any harm he or she supposedly caused Autonomy through any

26   negligence after the deal closed.

27          And Hussain is equally off-base when he claims that the judgment reduction credit is illusory

28   because the settlement states that the directors and officers admit no wrongdoing.  In defending a

suit brought by the company, Hussain would have the opportunity to affirmatively establish that one of the directors or officers released by the settlement was responsible for a certain percentage of the losses suffered by the company in connection with Autonomy.  Hussain's own liability would be reduced by any such percentage, *e.g.*, if he establishes that releasees were responsible for 20 percent of the loss, he would owe 80 percent of money damages.  The fact that the settling directors and officers do not admit wrongdoing in the settlement stipulation does not bar Hussain from trying to establish otherwise for the purpose of obtaining a judgment credit.

## III.      CONCLUSION

For the foregoing reasons, lead plaintiff's motion for preliminary approval of the proposed settlement should be granted, and Hussain and Cook's respective motions to intervene, and Steinberg and Vogel's motion to sever, should be denied.

Dated:  September 4, 2014

WACHTELL, LIPTON, ROSEN & KATZ

By:  _____
         Marc Wolinsky
         George T. Conway III
         Vincent G. Levy
         51 West 52nd Street
         New York, NY  10019
         Telephone:  (212) 403-1000
         Facsimile:  (212) 403-2000

         FARELLA BRAUN & MARTEL, LLP
         Neil A. Goteiner
         235 Montgomery Street
         San Francisco, CA  94104
         Telephone:  (415) 954-4400
         Facsimile:  (415) 954-4480

         *Attorneys for Defendant Hewlett-Packard Company*