**EXHIBIT 1**

**DECLARATION OF MARC WOLINSKY IN SUPPORT OF HP'S MEMORANDUM
IN SUPPORT OF PRELIMINARY APPROVAL OF THE SETTLEMENT AND
IN OPPOSITION TO THE MOTIONS TO INTERVENE AND SEVER**

**CONFIDENTIAL**

# HEWLETT-PACKARD COMPANY
# INDEPENDENT COMMITTEE'S RESOLUTION
# <u>REGARDING DERIVATIVE CLAIMS AND DEMANDS</u>

January 10, 2014

CONFIDENTIAL

# HEWLETT-PACKARD COMPANY
## INDEPENDENT COMMITTEE'S RESOLUTION
## REGARDING SHAREHOLDER DERIVATIVE CLAIMS AND DEMANDS

WHEREAS the members of the Independent Committee (the "Committee") of the Board of Directors ("the Board") of Hewlett-Packard Company ("HP" or the "Company") have carefully considered (*i*) the facts and circumstances relating to the acquisition ("Acquisition") of Autonomy Corporation plc ("Autonomy"), the aftermath of that Acquisition, the allegations raised in the lawsuits, proceedings, demands, and other matters arising from or related to the same set of operative facts, (*ii*) numerous other claims regarding the conduct of HP directors and officers, (*iii*) the nature and causes of injuries allegedly sustained by HP from the conduct asserted in the suits, proceedings, demands, and other matters, (*iv*) whether HP has meritorious claims against any responsible persons or entities in connection with the reviewed matters, (*v*) whether those persons or entities would be able to satisfy any judgment entered against them in favor of the Company and (*vi*) the business and other considerations involved in deciding whether the assertion of any meritorious claims that might exist would be in HP's best interests; and

WHEREAS, in considering those issues, the Committee has specifically considered the claims asserted in the shareholder derivative actions filed in state and federal courts and in the shareholder demand letters brought and presented on behalf of certain of the Company's shareholders, and also has carefully considered potential claims as to certain individuals and entities against whom no claim has previously been asserted (collectively, with the asserted claims, the "Potential Claims"); and

WHEREAS the Committee has carefully examined and considered the information presented by counsel engaged to assist the Committee in its review of the Potential Claims (as more fully described below), all other reasonably available relevant information concerning the Potential Claims, the discussions with counsel at Committee meetings and other communications, and the best interests of HP and its shareholders.

NOW, THEREFORE, the Committee finds and determines as follows:

## I.      Background

### A.      Factual Background

1.      On August 18, 2011, HP announced that it was planning to acquire Autonomy.  Under the terms of the transaction, HP's indirect wholly owned subsidiary, Hewlett-Packard Vision B.V. ("Bidco") acquired all of the outstanding shares of Autonomy for £25.50 ($42.11) per share.  The August 18 announcement also stated that Autonomy's, HP's, and Bidco's Boards of Directors had unanimously approved the Acquisition and recommended that Autonomy's shareholders accept the offer.

2.      Following the announcement, Moody's downgraded HP's outlook from stable to negative.  The Company's share price declined, and the overwhelming shareholder reaction was generally negative.

3.      Following the Acquisition, Autonomy exhibited poor performance as an HP business unit in the first two quarters of 2012.  Autonomy missed its revenue expectations in the first quarter, and it missed both its revenue and its operating-profit expectations by a large margin in the second quarter.

4.      On May 25, 2012, a legacy Autonomy US official advised HP about certain concerns he had as to Autonomy's business and accounting practices.  He told HP that Autonomy had historically restructured its monthly hosting subscriptions to recognize upfront license fees, had sold hardware at a loss, and had engaged in transactions involving value-added resellers ("VARs") that could pose questions under US Generally Accepted Accounting Principles ("GAAP").  He also informed HP that Autonomy's former US Chief Financial Officer had previously made allegations through Autonomy's whistleblower channels regarding revenue recognition in certain contracts and other management practices.

5.      In response to these allegations, PricewaterhouseCoopers ("PwC") was retained to engage in a forensic review of Autonomy's revenue-recognition practices.  The Company also engaged in an exercise aimed at evaluating how the Autonomy official's information and other emerging evidence affected Autonomy's past financial results and HP's forecasts of Autonomy's near-term performance for fiscal year 2012 ("Rebasing Exercise").  The first phase of the global Rebasing Exercise efforts took place over a six-week period between June and mid-July 2012 and identified various issues including those relating to pass-through hardware sales, channel sales, problematic reciprocal arrangements (including barter transactions), and modifications to licensing and hosting arrangements.  While now largely complete, aspects of the Rebasing Exercise effort continue today as Autonomy prepares to file its U.K. statutory accounts for 2011.

6.      In response to the findings of the Rebasing Exercise, PwC's investigation, and Autonomy's performance, HP created a new three-year budget in order to develop a revised operational plan for the Autonomy business unit to execute.  The Company also created a revised ten-year forecast for Autonomy that would project cash flows in order to inform HP's goodwill impairment analysis.

7.      In Q3 2012, HP announced an $8 billion impairment charge for its Enterprise Services ("ES") unit, largely due to goodwill recorded in connection with the acquisition of Electronic Data Systems ("EDS") in 2008.  In preparing the financial statements that disclosed the ES charge, the Company also reviewed its other reporting units.  Although HP concluded that (with several exceptions immaterial here) no circumstances requiring a full impairment test for other reporting units existed at that time, HP disclosed the risk of a Q4 impairment charge in HP's Software segment (which included Autonomy).

2

8.     On November 20, 2012, HP announced that an $8.8 billion impairment charge for goodwill and intangible assets for the Autonomy unit within HP's Software segment would be recognized for the quarter ended October 31, 2012.  The Company qualitatively estimated that the majority of this charge related to accounting improprieties and disclosure failures at Autonomy before the Acquisition, misrepresentations made to HP (and its agents and advisors) in connection with the Acquisition, and the impact of those items on HP's forecasts for the future financial long-term performance of the Autonomy business unit.  The Company also noted in its announcement that the balance of this charge was linked to the recent trading value of HP's stock (and the concomitant need to reconcile the fair value of HP's assets to the Company's market capitalization, plus a reasonable control premium).

B.     **Shareholder Derivative Actions and Shareholder Demands**

1.     **Federal Shareholder Derivative Actions**

a.     Between November 27, 2012 and December 19, 2012, seven shareholder derivative actions were filed in the United States District Court for the Northern District of California by plaintiffs alleging claims relating to the Acquisition.  These actions are as follows:  (i) *Riccardi v. Lynch, et al.*, 12-cv-06003, filed November 27, 2012; (ii) *Espinoza v. Lynch, et al.*, 12-cv-06025, filed November 27, 2012; (iii) *Bascheri v. Apotheker, et al.*, 12-cv-06091, filed November 30, 2012; (iv) *Bertisch v. Apotheker, et al.*, 12-cv-06123, filed December 3, 2012; (v) *City of Birmingham Retirement and Relief System v. Apotheker, et al.*, 12-cv-06146, filed December 18, 2012; (vi) *Tola v. Lynch, et al.*, 12-cv-06423, filed December 18, 2012; and (vii) *Morrical v. Whitman, et al.*, 12-cv-06434, filed December 19, 2012.

b.     All of these federal shareholder derivative actions were assigned or transferred to the Honorable Charles R. Breyer.

c.     On February 7, 2013, another federal derivative action was filed in the United States District Court for the Northern District of California under the caption *Weissmann v. Apotheker, et al.*, 3:13-cv-0557.  On February 20, 2013, this action was also transferred to Judge Breyer.

d.     On February 21, 2013, all of the then-pending federal shareholder derivative actions were consolidated in *In re Hewlett-Packard Company Shareholder Derivative Litigation*, 3:12-cv-06003-CRB (the "Federal Derivative Action").

e.     On March 4, 2013, the Court appointed Stanley Morrical as Lead Plaintiff and the law firm of Cotchett, Pitre & McCarthy, LLP ("Cotchett Pitre") as Lead Counsel.

f.     On May 2, 2013, Lead Plaintiff filed a Consolidated Shareholder Derivative Complaint (the "Complaint").  The Complaint names as defendants Margaret Whitman, Léo Apotheker, Raymond Lane, Marc Andreessen, Shumeet Banerji, Rajiv Gupta, John Hammergren, Ann Livermore, Gary Reiner, Patricia Russo, G. Kennedy Thompson, Ralph Whitworth, Lawrence Babbio, Sari Baldauf, Dominique Senequier, Shane Robison, Barclays

3

Capital (UK) ("Barclays"), and Perella Weinberg Partners LP ("Perella"). The Company is named solely as a nominal defendant against which no recovery is sought.[1]

g. The Complaint alleges deficiencies in, among other things, HP's officers' and directors' implementation and/or oversight of HP's acquisition program, principally focusing on alleged failures in adequate due diligence of Autonomy (including its valuation) in advance of the Acquisition, and it cites multiple supposed red flags relating to Autonomy's accounting practices that were allegedly ignored by HP's officers and directors. The Complaint also alleges that (*i*) HP's directors and officers did not sufficiently evaluate the status of Autonomy's technological offerings – specifically its Intelligent Data Operating Layer ("IDOL") software – in order to determine whether Autonomy was worth the price that HP ultimately paid in the Acquisition, (*ii*) after the Acquisition, the Company's management promoted a software program that purportedly merged existing HP software with Autonomy's IDOL technology in order to justify the Acquisition, despite the fact that the combined software supposedly did not actually exist, (*iii*) HP's announcement of the impairment charge incorrectly blamed the write-down on Autonomy executives when it was actually due to the defendants' alleged failures to appropriately conduct due diligence of Autonomy before the Acquisition and to manage the Autonomy unit after the Acquisition, and (*iv*) before making the impairment announcement, certain of the defendants had caused the Company to enter into a share-buyback program pursuant to which HP repurchased its own outstanding shares of stock at prices that allegedly were artificially inflated. Disclosure failures are alleged to have compounded the deficiencies underlying the due-diligence, integration, and impairment claims.

h. The Complaint asserts the following claims against the following defendants: (*i*) *violation of § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder*: Margaret Whitman, Léo Apotheker, Raymond Lane, Marc Andreessen, Shumeet Banerji, Rajiv Gupta, John Hammergren, Ann Livermore, Gary Reiner, Patricia Russo, G. Kennedy Thompson, Ralph Whitworth, Lawrence Babbio, Sari Baldauf, Dominique Senequier, and Shane Robison; (*ii*) *violation of § 20(a) of the Exchange Act*: Margaret Whitman, Léo Apotheker, Raymond Lane, Marc Andreessen, Shumeet Banerji, Rajiv Gupta, John Hammergren, Ann Livermore, Gary Reiner, Patricia Russo, G. Kennedy Thompson, Ralph Whitworth, Lawrence Babbio, Sari Baldauf, Dominique Senequier and Shane Robison; (*iii*) *breach of fiduciary duty*: Margaret Whitman, Léo Apotheker, Raymond Lane, Marc Andreessen, Shumeet Banerji, Rajiv Gupta, John Hammergren, Ann Livermore, Gary Reiner, Patricia Russo, G. Kennedy Thompson, Ralph Whitworth, Lawrence Babbio, Sari Baldauf, Dominique Senequier and Shane Robison; (*iv*) *abuse of control*: Margaret Whitman, Léo Apotheker, Raymond Lane, Marc Andreessen, Shumeet Banerji, Rajiv Gupta, John Hammergren, Ann Livermore, Gary Reiner, Patricia Russo, G. Kennedy Thompson, Ralph Whitworth, Lawrence Babbio, Sari Baldauf, Dominique Senequier and Shane Robison;

---

[1] Additional individuals and third-party entities, including Cathie Lesjak, Michael Lynch, James Murrin, Deloitte LLP ("Deloitte"), and KPMG LLP ("KPMG"), had been named as defendants in certain of the pre-consolidation federal derivative complaints, but were omitted from the Complaint.

(*v*) *corporate waste*: Margaret Whitman, Léo Apotheker, Raymond Lane, Marc Andreessen, Shumeet Banerji, Rajiv Gupta, John Hammergren, Ann Livermore, Gary Reiner, Patricia Russo, G. Kennedy Thompson, Ralph Whitworth, Lawrence Babbio, Sari Baldauf, Dominique Senequier and Shane Robison; (*vi*) *unjust enrichment*: Margaret Whitman, Léo Apotheker, Raymond Lane, Marc Andreessen, Shumeet Banerji, Rajiv Gupta, John Hammergren, Ann Livermore, Gary Reiner, Patricia Russo, G. Kennedy Thompson, Ralph Whitworth, Lawrence Babbio, Sari Baldauf, Dominique Senequier, and Shane Robison; (*vii*) *aiding and abetting breach of fiduciary duty*: Barclays and Perella; and (*viii*) *negligence*: Barclays Capital and Perella Weinberg Partners.

## 2. State-Court Shareholder Derivative Actions

a. In addition to the actions filed (and now consolidated) in the United Stated District Court for the Northern District of California, several actions were filed in California state courts (the "State Derivative Actions"; collectively with the Federal Derivative Action, the "Derivative Actions"). As with the federal actions, the State Derivative Actions focus principally upon alleged failures in the stewardship of HP's directors and officials in implementing and overseeing the due-diligence, integration, and impairment issues related to HP's acquisition of Autonomy and HP's conduct of its acquisition program. In addition, some of the State Derivative Actions cite breaches by legacy Autonomy officials, as well as by certain of HP's and Autonomy's professional advisors.

b. On December 14, 2012, a lawsuit was filed in the Superior Court of California, County of Santa Clara, by HP shareholder Miriam Birnkrant derivatively on behalf of HP, *Birnkrant v. Lynch, et al.*, Case No. 112-cv-237927. The complaint, which has been voluntarily dismissed, named Michael Lynch, Léo Apotheker, Margaret Whitman, Cathie Lesjak, G. Kennedy Thompson, Rajiv Gupta, Shumeet Banerji, Gary Reiner, John Hammergren, Marc Andreessen, Raymond Lane, Patricia Russo, Ann Livermore, Ralph Whitworth, Shane Robison, Lawrence Babbio, Sari Baldauf, Dominique Senequier, Deloitte LLP ("Deloitte"), KMPG, Perella, and Barclays as defendants, and asserted the following claims against them: (*i*) *Breach of fiduciary duty*: Léo Apotheker, Margaret Whitman, Cathie Lesjak, G. Kennedy Thompson, Rajiv Gupta, Shumeet Banerji, Gary Reiner, John Hammergren, Marc Andreessen, Raymond Lane, Patricia Russo, Ann Livermore, Ralph Whitworth, Shane Robison, Lawrence Babbio, Sari Baldauf and Dominique Senequier; (*ii*) *waste of corporate assets*: Léo Apotheker, Margaret Whitman, Cathie Lesjak, G. Kennedy Thompson, Rajiv Gupta, Shumeet Banerji, Gary Reiner, John Hammergren, Marc Andreessen, Raymond Lane, Patricia Russo, Ann Livermore, Ralph Whitworth, Shane Robison, Lawrence Babbio, Sari Baldauf and Dominique Senequier; (*iii*) *unjust enrichment*: Léo Apotheker, Margaret Whitman, Cathie Lesjak, G. Kennedy Thompson, Rajiv Gupta, Shumeet Banerji, Gary Reiner, John Hammergren, Marc Andreessen, Raymond Lane, Patricia Russo, Ann Livermore, Ralph Whitworth, Shane Robison, Lawrence Babbio, Sari Baldauf and Dominique Senequier; (*iv*) *aiding and abetting breach of fiduciary duty*: Michael Lynch, Deloitte, KPMG, Barclays, and Perella; and (*v*) *negligence*: KPMG.

c. On January 22, 2013, a lawsuit was filed in the Superior Court of California, County of San Mateo, by HP shareholder Vincent Ho derivatively on behalf of HP

(case number 519336).  The complaint names Margaret Whitman, Léo Apotheker, G. Kennedy Thompson, Rajiv Gupta, Shumeet Banerji, Gary Reiner, John Hammergren, Marc Andreessen, Raymond Lane, Patricia Russo, Ann Livermore, Ralph Whitworth, Shane Robison, Lawrence Babbio, Sari Baldauf and Dominique Senequier as defendants, and asserts claims of breach of fiduciary duty and corporate waste against all defendants.

        d.      On July 26, 2013, HP shareholder James Gould, Jr. filed a derivative lawsuit, *Gould v. Whitman, et al.*, Case No. 1:13-cv-250220, on behalf of HP in the Superior Court of California, County of Santa Clara.  The complaint names Margaret Whitman, Léo Apotheker, Raymond Lane, Marc Andreessen, Shumeet Banerji, G. Kennedy Thompson, Rajiv Gupta, John Hammergren, Ann Livermore, Gary Reiner and Patricia Russo as defendants, and asserts claims of breach of fiduciary duty and corporate waste against all defendants.

        e.      On August 16, 2013, HP shareholder Leroy Noel filed a lawsuit in the Superior Court of California, County of Santa Clara, derivatively on behalf of HP (case number 1:13-cv-251346).  The complaint names Margaret Whitman, Léo Apotheker, Raymond Lane, Marc Andreessen, Shumeet Banerji, G. Kennedy Thompson, Rajiv Gupta, John Hammergren, Ann Livermore, Gary Reiner, Patricia Russo and Michael Lynch as defendants, and asserts the following claims against them: (*i*) *breach of fiduciary duty*:  Margaret Whitman, Léo Apotheker, Raymond Lane, Marc Andreessen, Shumeet Banerji, G. Kennedy Thompson, Rajiv Gupta, John Hammergren, Ann Livermore, Gary Reiner and Patricia Russo; (*ii*) *corporate waste*:  Margaret Whitman, Léo Apotheker, Raymond Lane, Marc Andreessen, Shumeet Banerji, G. Kennedy Thompson, Rajiv Gupta, John Hammergren, Ann Livermore, Gary Reiner and Patricia Russo; (*iii*) *unjust enrichment*:  Margaret Whitman, Léo Apotheker, Raymond Lane, Marc Andreessen, Shumeet Banerji, G. Kennedy Thompson, Rajiv Gupta, John Hammergren, Ann Livermore, Gary Reiner, Patricia Russo and Michael Lynch; (*iv*) *breach of California Corporations Code §§ 25400/25500, et seq.*:  Michael Lynch; (*v*) *breach of California Civil Code §§ 1709/1710*:  Michael Lynch; (*vi*) *fraud and deceit*:  Michael Lynch; and (*vii*) *negligent misrepresentation*:  Michael Lynch.

### 3.      Shareholder Demand Letters

        a.      On November 29, 2012, the Board received a demand letter from attorneys purportedly acting on behalf of HP shareholder Frederick Stern.  This letter requests that the Board investigate the Acquisition and take appropriate action against certain current and former members of the Board, current and former HP officers, and various parties regarding acts engaged in conduct relating to the Acquisition.

        b.      That same day, the Board received a second demand letter from attorneys purporting to represent HP shareholder Sarah K. Steiner.  This letter also requests that the Board investigate and take legal action to redress all harm allegedly inflicted on the Company and its shareholders by current and former HP directors and officers and various third parties in connection with the Acquisition.

c.     On December 4, 2012, the Board received an additional demand letter from attorneys purportedly acting on behalf of HP shareholders Harriet Steiner and Edward and Linda Vogel.  The allegations presented in this demand letter are substantially similar to those made in the letters received on November 29, 2012.

d.     On January 25, 2013, HP advised counsel for all demanding shareholders of the creation of the Committee.

e.     On July 12, 2013, the Board received a demand letter from attorneys purportedly acting on behalf of HP shareholders Andrew and Martha Copeland.  This letter makes the following allegations against certain current and former directors and officers (in addition to those claims alleged in the previous demand letters):  (*i*) failing to disclose material facts regarding mismanagement of the Company's operations and the adequacy of the Company's internal controls, (*ii*) failing to disclose material facts in various proxy statements in order to induce HP shareholders to vote in favor of the Board's nominees for directors and ratify the appointment of Ernst & Young LLP ("E&Y") as HP's outside auditor, (*iii*) failing to exercise appropriate oversight duties and to take action to remedy the payment of bribes, (*iv*) permitting various claims to expire without investigating them before their expiration, (*v*) retaining counsel to investigate shareholder demands alleging claims against HP directors and officers with the purpose of protecting such directors and officers, and (*vi*) recklessly entering into transactions to acquire additional corporations, including EDS, 3PAR and Palm.  The demand letter also discusses, but does not specifically raise claims concerning, HP's so-called "foreign-loan" program.

f.     On August 9, 2013, HP informed counsel for Andrew and Martha Copeland that the Committee had already begun an investigation of claims relating to the Acquisition, as well as such other allegations made in their demand letter that had not been previously addressed in other shareholder demands and derivative litigation initiated by the same shareholder.

g.     The shareholder demand letters (collectively, "Demand Letters") raise issues that are encompassed in the Derivative Actions, have been the subject of prior and/or pending litigation or HP Board/Committee reviews, or were addressed by the Committee.

### 4.     Books-and-Records Demands in Delaware and California

a.     Between November 27, 2012 and February 25, 2013, HP received eight demand letters under 8 Del. C. § 220 and/or Cal. Corp. Code § 1601 requesting inspection of the Company's books and records relating to the Acquisition.

b.     Counsel purportedly representing three HP shareholders requesting books and records filed separate complaints in California and Delaware state courts seeking to compel inspection of the requested books and records:  (*i*) *Morrical v. Hewlett-Packard Co.*, Superior Court of California, County of Santa Clara, filed January 4, 2013, (*ii*) *LAMPERS v. Hewlett-Packard Co.*, Delaware Court of Chancery, filed February 25, 2013, and (*iii*) *Cook v. Hewlett-Packard Co.*, Delaware Court of Chancery, filed June 6, 2013.

7

C.      **Related Proceedings**

1.      **Securities Class Actions**

a.      On November 26, 2012, November 30 2012, and January 18, 2013 (later voluntarily dismissed), securities class actions were filed in the United States District Court of Northern District of California and were either assigned or transferred to Judge Breyer.

b.      On March 4, 2013, the Court consolidated the securities class actions and ultimately appointed PGGM Vermogensbeheer B.V. as lead plaintiff and Kessler Topaz Meltzer & Check LLP as lead counsel.

c.      On May 3, 2013, the lead plaintiff filed an Amended Consolidated Complaint (the "Securities Complaint") on behalf of purchasers of the Company's stock from August 19, 2011 to November 20, 2012 under the caption *In re HP Securities Litigation*, No. 3:12-cv-05980-CRB (the "Securities Class Action").

d.      The Securities Complaint names as defendants HP, Léo Apotheker, Cathie Lesjak, Margaret Whitman, James Murrin, Michael Lynch, Shane Robison, and Raymond Lane, and alleges violations of sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and the Securities and Exchange Commission's (the "SEC's") Rule 10b-5.

e.      On November 26, 2013, the Court granted in part and denied in part the defendants' motions to dismiss the Securities Complaint. The Court did not dismiss plaintiffs' allegations relating to certain statements made on or after May 23, 2012 by HP and Whitman regarding the Company's financial position. Lead plaintiff has sought a clarification as to the status of claims against Lesjak for statements made during that period.

2.      **ERISA Class Actions**

a.      On December 6, 2012, December 8, 2012 and January 22, 2013, three putative class actions alleging ERISA claims were filed in the United States District Court for the Northern District of California and were transferred to Judge Breyer.

b.      On March 4, 2013, the Court consolidated the three ERISA actions and appointed Zamansky & Associates as interim lead counsel, rejecting the shareholder plaintiffs' joint request to appoint an executive committee of interim class counsel.

c.      On June 3, 2013, lead plaintiff filed an Amended Consolidated Complaint alleging ERISA violations against defendants HP, Cathie Lesjak, John McMullen, James Murrin, Mark Levine, Michael Holston, David Healy, John Schultz, Shoreline Investment Management Company, State Street Bank and Trust Company, and HP's § 401(k) Plan as a nominal defendant. The Amended Consolidated Complaint was filed under the caption *In re HP ERISA Litigation*, 3:12-cv-06199-CRB (the "ERISA Class Action"), and alleges that the defendants breached their duties of prudence and loyalty to the Company's § 401(k) plan participants under ERISA § 404(a).

8

         d.      Defendants' motions to dismiss are currently pending before Judge Breyer.

### 3.    Governmental Proceedings

         a.      After initiating its internal investigation of the accounting and disclosure issues at Autonomy, HP brought these matters to the attention of the United States Department of Justice (the "DOJ") and the SEC, as well as prosecutorial and regulatory authorities in the United Kingdom.

         b.      Company counsel as well as Proskauer Rose LLP (as counsel to the Company, reporting to the Committee) have made presentations and produced documents to interested governmental authorities.

         c.      The governmental prosecutorial and regulatory inquiries are currently ongoing.

## II.    Initial Response to Derivative Actions and Demands

### A.    Establishment of Committee

#### 1.    Board's Resolution

         a.      On January 17, 2013, in response to the Derivative Actions and the Demand Letters, the Board established the Committee to consider and evaluate the allegations in the Derivative Actions and the Demand Letters and report its recommendations to the independent and disinterested members of HP's Board. The Board further appointed Gary Reiner, G. Kennedy Thompson and Ralph Whitworth as members of the Committee. Whitworth was chosen by the Committee members to be the Chair of the Committee.

         b.      The Resolution delegated to the Committee "the authority to (*i*) investigate, review, and evaluate the facts and circumstances alleged in the [Derivative Actions and Demand Letters]; (*ii*) make a recommendation to the Board of Directors whether HP should commence litigation concerning any of the claims asserted in the [Derivative Actions and Demand Letters] and authorize the commencement of and direct the prosecution of any litigation that the Board of Directors may authorize in response to the [Derivative Actions and Demand Letters]; and (*iii*) evaluate and make a recommendation to the Board of Directors whether some or all of the claims asserted in the [Derivative Actions and Demand Letters] should otherwise be pursued by HP and, in connection therewith, adopt any new or modified corporate policies or procedures or other internal corrective measures as the Committee deems appropriate."

         c.      The Resolution also authorized the Committee "to retain, at the expense of HP, such legal and other advisers as the Committee, in its sole discretion, deems necessary and appropriate in connection with the discharge of the duties of the Committees and each of its members," and "to take any and all actions it deems appropriate" respecting the Derivative Actions and Demand Letters.

2. **Membership of Committee**

a. **Original Composition**

i. Gary Reiner has served as an HP Director since 2011. He is a member of the Board's Technology Committee and the Nominating & Governance Committee. In 2012, he also served on the Board's Finance & Investment Committee ("FIC"). In 2013, he became Chair of the Board's Nominating & Governance Committee.

ii. G. Kennedy Thompson joined the HP Board in 2006. He served on the Board's Audit Committee, its Nominating & Governance Committee, and its FIC. From 2011 to 2012, Thompson was the Chair of the Audit Committee. Thompson resigned from the Board in May 2013.

iii. Ralph Whitworth joined the Board in November 2011, after the Acquisition. In 2012, he became a member of the FIC and the HR & Compensation Committee. Currently, Whitworth is Interim Chair of the Board, Chair of the FIC, and a member of the HR & Compensation Committee and the Nominating & Governance Committee.

b. **Resignation of Thompson and Appointment of Bennett**

i. On July 18, 2013, in response to Thompson's resignation from the Board, the Board appointed Robert Bennett, who had joined the Board in 2013, to the Committee. Bennett is also a member of the Board's Audit Committee and the FIC.

B. **Procedural Status of Derivative Actions**

1. **Federal Derivative Action**

a. On May 28, 2013, following a joint motion by the parties, the court stayed proceedings in the Federal Derivative Action until July 31, 2013. On September 6, 2013, the court extended the stay in the Federal Derivative Action until January 17, 2014.

2. **Status of State-Court Derivative Actions**

a. The *Birnkrant* action was voluntarily dismissed on March 26, 2013. On April 22, 2013, the proceedings in the *Ho* action were stayed pending the resolution of the Federal Derivative Action. On September 26, 2013, a stay of proceedings was entered for the *Gould* and *Noel* actions pending resolution of the Federal Derivative Action.

## III. Claims Considered by the Committee

A. As part of its mandate to investigate, review and evaluate the facts and circumstances alleged in the Derivative Actions and Demand Letters, the Committee addressed the claims made in such actions and letters, as well as related matters that came to the Committee's attention (*i.e.*, the Potential Claims). The Potential Claims concern a broad array of

alleged misconduct by HP and legacy Autonomy officers, directors, and professional advisors. To provide for a thorough and orderly evaluation of these Potential Claims, the Committee organized its inquiry into segments and subject areas:[2]

1.  Pre-acquisition activity

   a.  HP's policies, practices and procedures guiding its merger and acquisition process;

   b.  HP's (and its professional advisors') due diligence of Autonomy, including evaluation of any alleged "red flags" presented;

   c.  HP's (and its professional advisors') valuation of Autonomy;

   d.  Role of HP's Board and its Technology Committee and FIC;

   e.  The allegations of misrepresentations, accounting and disclosure improprieties, and fiduciary breaches by legacy Autonomy officials (and Autonomy's professional advisors) respecting Autonomy's financial condition, operating results, and future prospects, and the impact (if any) of such conduct (including an evaluation of transactions determined by Company counsel and its forensic professional advisors to have been either improperly recorded or improperly classified in Autonomy's books, records, or financial statements); and

   f.  Related disclosures

---

[2]   On May 23, 2013, the Company received a demand letter from attorneys purporting to represent HP shareholder Lawrence Zucker requesting that the Board institute litigation and engage in various other remedial measures relating to HP's acquisition of Palm in 2010, its alleged misstatements regarding its plans to integrate Palm's operating system (known as "webOS") on HP's products, including printers and personal computers, and the eventual cancellation of this program (collectively, the "webOS Allegations"). Various shareholder derivative actions in federal and state courts had previously been filed against certain current and former HP directors and officers making substantially similar allegations.  On July 19, 2013, the Board determined that the Company's best interests would be served by authorizing the Committee to investigate and review the webOS Allegations.  On August 8, 2013, the Committee retained Proskauer Rose LLP as counsel to the Company, reporting solely to the Committee, to advise and assist the Committee in conducting its review of and making its recommendations to the independent and disinterested members of the Board concerning the webOS Allegations. On that same date, the Committee also retained Brown Rudnick, LLP as counsel to the Company, reporting solely to the Committee, to advise and assist the Committee in conducting its review of and making its recommendations to the Board concerning the webOS Allegations as they relate to R. Todd Bradley.  These matters are not the subject of this Resolution.

2.    Post-acquisition integration of Autonomy into HP

    a.    Structural, operational; and management integration;
    b.    Technology/product integration; and
    c.    Related disclosures

3.    Autonomy impairment

    a.    Activities leading to the impairment charge;
    b.    Impairment amount and allocation; and
    c.    Related disclosures

4.    Other ancillary allegations: evaluated to the extent they have not been considered by, or been the subject of, prior Board review or Company litigation

    a.    EDS acquisition and impairment;
    b.    Officer and director compensation issues;
    c.    CEO turnover and succession issues;
    d.    Stock-repurchase plan;
    e.    Proxy disclosures;
    f.    Bribery, kickbacks, and illegal rebates;
    g.    Foreign-loan program;
    h.    Insider trading by an HP official;
    i.    Sarbanes-Oxley violations;
    j.    Failure to pursue wrongdoers to obtain recovery for misconduct; and
    k.    Failure of directors in their stewardship responsibilities

5.    Independence and disinterestedness of Board members (including Committee members)

6.    Injury to HP

7.    Indemnity and insurance issues

8.    Legal issues

    a.    Standards of conduct applicable to HP's officers, directors, and professional advisors;
    b.    English standards of conduct applicable to legacy Autonomy officers, directors, and professional advisors;
    c.    Possible causes of action under US and English law;
    d.    Timing for the commencement of any proceedings in either the US or England in light of pending governmental prosecutorial and regulatory inquiries;

      e.      Costs/benefits of pursuing or not pursuing claims, including business considerations in connection therewith

9.      Potential reforms to HP's governance and acquisition processes

10.      Potential Claims against third-party advisors to HP or Autonomy

## IV.    Scope of Committee's Inquiry

### A.    Committee's Retention of Advisors

1.      At the outset of its review, the Committee sought to retain counsel to the Company to advise and assist the Committee in conducting a full review of the matters raised by the Derivative Actions, Demand Letters, and other Potential Claims.  The Committee interviewed several law firms and ultimately selected three firms to serve as counsel to the Company, reporting exclusively to the Committee, to assist the Committee in its evaluation of shareholder claims:  (*i*) Proskauer Rose LLP ("Proskauer") respecting HP and legacy Autonomy officer and directors, (*ii*) Choate Hall & Stewart LLP ("Choate") respecting claims against third parties, including HP and Autonomy professional advisors generally, and (*iii*) Brown Rudnick LLP ("Brown Rudnick") respecting claims against three specified professional advisors (collectively, "Committee Counsel").

2.      The Committee authorized Committee Counsel to retain several professional advisors and consultants during the course of its review, including: (*i*) <sup>REDACTED FOR PRIVILEGE</sup> REDACTED FOR PRIVILEGE    as an accounting expert to assist the Committee in its investigation of the Potential Claims, (*ii*) <sup>REDACTED FOR PRIVILEGE</sup>  as an economic consultant to assist the Committee in its investigation of the Potential Claims, (*iii*) PwC as a forensic accounting and valuation consultant to advise on the recording and classification of transactions by legacy Autonomy under GAAP and International Financial Reporting Standards ("IFRS") principles, applicable auditing standards, and measurement of injury to HP, (*iv*) various members of Erskine Chambers ("Erskine Chambers"), English barristers specializing in company, corporate-finance, and commercial litigation, to assist Proskauer and Choate with respect to potential claims and defenses that could be asserted in relation to potential English-law claims, (*v*) Richards, Layton & Finger, P.A., to provide advice on certain legal issues under Delaware law, (*vi*) experts on normative standards of due diligence in UK acquisitions, and (*vii*) Travers Smith LLP ("Travers Smith"), English solicitors, to assist Proskauer and Choate with respect to potential claims and defenses that could be asserted in relation to potential English-law claims.

### B.    Committee Counsel's Consultations with the Company's Other Professional Advisors

#### 1.    Morgan, Lewis & Bockius LLP

a.      Shortly after commencing its review, Proskauer met with Morgan, Lewis & Bockius LLP ("Morgan Lewis"), which represents HP in connection with governmental proceedings and which also was at that time representing HP in the Derivative Actions and the

securities and ERISA class actions, to obtain an overview of (*i*) those proceedings, (*ii*) document-collection efforts to date, (*iii*) the forensic consultant's progress in analyzing problematic Autonomy transactions, and (*iv*) presentations made to governmental authorities.

>   b.      Proskauer continued these discussions, from time to time, to stay abreast of developments in the governmental proceedings.

>   2.      **Wachtell, Lipton, Rosen & Katz ("Wachtell")**

>   a.      In mid-2013, Morrison & Foerster LLP replaced Morgan Lewis as Company counsel in the Derivative Actions, the Securities Class Action, and the ERISA class action.

>   b.      In July 2013, Wachtell replaced Morrison & Foerster as Company counsel in those matters.

>   c.      Proskauer met and spoke with Wachtell on numerous occasions to stay abreast of developments in those matters.

>   C.   **Committee Counsel's Consultations with Attorneys for Defendants and Persons of Interest**

>   1.      Committee Counsel reached out to counsel for various defendants in the Derivative Actions and other persons of interest to arrange interviews to inform the Committee's work.

>   a.      Each of the defendants, except Michael Lynch, agreed to be interviewed (although Lynch's counsel submitted a December 17, 2013 to the Committee and its counsel purporting to summarize Lynch's positions).

>   b.      Each of the persons of interest, except Sushovan Hussain (legacy Autonomy's CFO), Andrew Kanter (legacy Autonomy's GC and COO), and Stephen Chamberlain (legacy Autonomy's VP, Finance), agreed to be interviewed.

>   c.      Representatives from each of the entities of interest – except Qatalyst Partners (Autonomy's investment banker), Deloitte (Autonomy's auditor), Slaughter and May (Autonomy's transaction counsel), and certain VARs – agreed to be interviewed.

>   D.   **Committee Counsel's Consultations with Attorneys for Plaintiffs and Demanding Shareholders**

>   1.      **Meetings with Plaintiffs' Counsel in Federal Derivative Action**

>   a.      On April 2, 2013, Proskauer met with lawyers from Cotchett Pitre, Lead Counsel in the Federal Derivative Action, to provide general background regarding the Committee's mandate.  On November 12, 2013, Proskauer met a second time with Cotchett Pitre

to provide an update on the status of the Committee's review, including the Committee's advisors' preliminary findings regarding types of problematic transactions entered into between Autonomy and certain of its customers before the Acquisition. Proskauer asked Cotchett Pitre on several occasions whether Cotchett Pitre wished to make a presentation to Proskauer (or to the Committee), but Cotchett Pitre did not do so.

## 2. Meetings with Certain Plaintiffs' Counsel in State-Court Derivative Actions

a. On November 13, 2013, Proskauer met with Robbins Geller Rudman & Dowd LLP, plaintiffs' counsel in *Noel v. Whitman* and *Gould v. Whitman*, the Santa Clara County derivative actions, to receive plaintiffs' counsel's presentation respecting the merits of their cases and their clients' proposals for reforms at HP. On December 16, 2013, Robbins Geller provided the Committee with a submission addressing its clients' claims and proposed reforms. Proskauer sent Robbins Geller's submission to the Committee that same day.

## 3. Meetings with Other Plaintiffs'/Shareholders' Counsel

a. Proskauer invited counsel for plaintiffs in the then-pending State Derivative Actions, counsel for shareholders who had submitted Demand Letters, and counsel for shareholders who had by that time submitted books-and-records demand letters to a June 27, 2013 meeting.

i. Attorneys present at this meeting included: (*i*) Robert Frutkin, from the Law Offices of Bernard M. Gross (counsel for demanding shareholder Stern); (*ii*) Jeffrey Abraham, from Abraham, Fruchter, & Twersky LLP (counsel for demanding shareholders Steinberg and Vogel); (*iii*) Gary Graifman, from Kantrowitz, Goldhamer & Graifman, PC (counsel for demanding shareholders Steinberg and Vogel); (*iv*) Michael Green, from Green & Associates LLP (counsel for demanding shareholders Steinberg and Vogel); (*v*) Aaron Brody and Michael Klein, from Stull, Stull & Brody (counsel for Section 220 requester Akerman); (*vi*) Jennifer Sarnelli, from Gardy & Notis, LLP (counsel for Section 220 requester Buzby); (*vii*) Felipe Arroyo, from Robbins Arroyo LLP (counsel for Section 220 requester Tyner); (*viii*) Chris Nelson and Brett Stecker, from The Weiser Law Firm P.C. (counsel for Section 220 requester Cook); (*ix*) John Kehoe, from Girard Gibbs LLP (counsel for Section 220 requester Kansas Public Employees Retirement System); (*x*) Matthew Rand, from Levi Korsinsky, LLP (counsel for Section 220 requester Zucker); and (*xi*) Jeffrey Norton and Roy Shimon, from Newman Ferrara LLP (counsel for state-court plaintiff Ho).

ii. The purposes of this meeting were to (*i*) provide plaintiffs' counsel with an update on the Committee's investigation, including the division of labor among Committee Counsel, (*ii*) receive feedback from plaintiffs' counsel about whether the Committee was covering all relevant issues, and (*iii*) receive any particular facts, issues, or materials that attending counsel want to bring to the Committee's attention. At and after that meeting, certain plaintiffs' counsel brought certain matters to Proskauer's attention.

b.      Proskauer later scheduled a meeting with Greenfield & Goodman LLC, counsel for demanding shareholder Copeland, who did not file his demand until after the June 27, 2013 meeting with shareholders' counsel. However, the meeting with Greenfield & Goodman had to be cancelled due to inclement weather conditions.

### E.      Work of the Committee and Its Advisors

1.      **Committee Meetings**:  The Committee held twelve formal meetings (on February 26, 2013, March 22, 2013, April 22, 2013, May 20, 2013, July 9, 2013, August 8, 2013, September 18, 2013, January 6-7, 2014, January 9, 2014 (two meetings), and January 10, 2014) to discuss the status of its investigation, the work being done by its advisors, and other issues relating to the Potential Claims.  Additionally, Committee Counsel, from time to time, met or communicated separately with members of the Committee respecting developments in the review and on matters of particular interest to them.

2.      **Document Collection/Review**:  Committee Counsel obtained access to three hosted electronic databases, containing over 17.5 million files (including emails).  The first of these databases consists of documents from 84 Autonomy custodians and contains approximately 14.7 million files.  The second database consists of 2.8 million files collected from 41 HP custodians.  The third database consists of Board minutes and related materials and includes 100,501 documents.  Committee Counsel also obtained approximately 240,000 relevant documents directly from the Company and from professional advisors involved in the Autonomy acquisition.  In addition, Committee Counsel obtained (*i*) access to documents that E&Y produced to the SEC relating to the firm's auditing of HP during the relevant period, (*ii*) publicly available documents relating to HP, including the Company's corporate filings, the Company's presentations to analysts, and analyst reports on the Company, and (*iii*) copies of the documents HP produced in response to the books-and-records demands and complaints.

3.      **Interviews**:  Committee Counsel interviewed approximately 90 individuals (some of them more than once) – including (*i*) current and former employees, officers, and directors of HP and Autonomy and (*ii*) various persons and entities who had served as HP's and Autonomy's advisors on issues relevant to the review – on topics related to the Potential Claims.  Committee member Bennett attended the interview of Apotheker.

4.      **Legal Research**:  Committee Counsel, consulting with Delaware, California and English counsel, conducted legal research on the Potential Claims.

5.      **Committee Counsel's Hours**:  Through December 2013, Committee Counsel spent approximately 34,000 hours gathering and analyzing relevant documents, conducting interviews, and analyzing legal, insurance, indemnity, valuation, and business issues relevant to the Committee's mandate.

6.      **Expert Hours**:  The Committee was also informed regarding Potential Claims by more than 16,000 hours of work by experts and consultants retained by Committee Counsel, including (*i*) applicable accounting principles and standards under GAAP and IFRS (including normative standards of conduct thereunder), (*ii*) economic analysis of valuation

16

models, securities-market dynamics, and measurement of injury, (*iii*) forensic analysis of transactional information and data, (*iv*) Delaware and English legal issues, and (*v*) normative standards for due diligence in UK acquisitions.

## V.   Legal Standards Applied by the Committee in Conducting Its Assessment of the Claims Asserted in the Derivative Actions and Demand Letters

A.   The Committee consulted with Committee Counsel and other legal experts on the appropriate US and English legal standards relating to the Potential Claims, including:

1.   Those standards for defining monetary liability or equitable relief under Delaware statutory and common law for (*i*) fiduciary duty of care for directors and officers, (*ii*) fiduciary duty of loyalty for directors and officers, (*iii*) statutorily permitted corporate-charter exculpation of corporate directors, but not officers, from monetary damages to Delaware corporations for breaches of the duty of care, but not for breaches of the duty of loyalty, bad-faith conduct, intentional misconduct or knowing violations of law, or obtaining an improper personal benefit, (*iv*) abuse of control, (*v*) corporate waste, (*vi*) unjust enrichment, (*vi*) insider trading, and (*vii*) duty of candor in corporate disclosures.

2.   Those standards for defining US federal-law claims for monetary liability or equitable relief under the US federal securities statutes for (*i*) material misstatements made in connection with the purchase or sale of securities, (*ii*) insider trading, including contemporaneous-trader claims, (*iii*) controlling-person liability, and (*iv*) proxy disclosures.

3.   Those standards for defining monetary liability or equitable relief for US state-law claims for (*i*) professional negligence/malpractice, (*ii*) aiding and abetting breach of fiduciary duty, and (*iii*) breach of contract.

4.   Those standards for defining monetary liability or equitable relief under California statutory and common law for (*i*) false and misleading statements made in California in connection with the purchase or sale of a security, (*ii*) insider trading where the purchase or sale occurs in California, (*iii*) secondary liability for securities-law violations, (*iv*) non-officer employees' duties of loyalty, (*v*) fraud and deceit, (*vi*) negligent misrepresentation, (*vii*) negligence, (*viii*) civil conspiracy, and (*ix*) unfair, unlawful, or fraudulent business practices occurring or causing injury in California.

5.   Those standards for defining monetary liability or equitable relief under English statutory and common law for (*i*) misrepresentations or omissions by public companies and their directors and officers for published information, (*ii*) intentional misrepresentations or omissions and negligent misstatements that do not involve published financial information, (*iii*) intentional misrepresentations or negligent misstatements in connection with contracts, (*iv*) fraud or deceit, (*v*) untrue or misleading directors' reports, (*vi*) breaches of fiduciary duties by corporate directors or officers, (*vii*) breaches of employment contracts, (*viii*) accounting for improper profits, and (*ix*) professional negligence/malpractice.

17

6.     Various principles that govern when the law of one jurisdiction shall apply over that of another, which principles must be considered when determining (*i*) whether the law of the US or the law of another country will apply and (*ii*) which US state's laws will apply to US state-law claims (*e.g.*, the preeminence of Delaware law, where Delaware is the state of incorporation and the claims concern the conduct of officers and directors of a Delaware corporation, and the vital state-wide interest of California where the matter concerns the conduct of employees based in California or other conduct not proscribed under Delaware law).

## VI.     HP Insurance

A.     The Committee considered the coverage available for certain Potential Claims under the Company's various insurance policies, including:

1.     The Company's primary insurance program, which provides coverage, including defense costs and subject to a retention, for the following: (*i*) Side A coverage for HP's directors and officers resulting from non-indemnifiable losses arising out of claims alleging wrongful acts, (*ii*) Side B coverage for HP itself, so HP can recover for costs in advancing to or indemnifying its directors or officers for covered claims, and (*iii*) securities-claim coverage for HP itself resulting from securities claims against HP arising out of HP's own allegedly wrongful acts.

2.     The exclusions to its primary policy, including (*i*) an "entity vs. insured" exclusion for Side B claims, which does not apply in several cases, including where a third party initiates the action without material assistance from HP/D&Os or where claims follow protected whistleblower activity, (*ii*) a "conduct exclusion" that bars coverage for loss specifically caused by an insured who is adjudicated to have engaged in a deliberate criminal or fraudulent act and (*iii*) an "improper profits exclusion" that precludes coverage for loss specifically resulting when an insured is adjudicated to have gained a profit or advantage to which he or she was not legally entitled.

3.     The Company's DIC program, which provides additional Side A coverage, including defense costs, for HP's directors and officers (but not for HP itself) resulting from non-indemnifiable losses, triggered by one of the following: (*i*) exhaustion of the Company's primary program, (*ii*) loss falling under the terms of the DIC program, but not the primary program, or (*iii*) the primary program insurers' failure to pay.

4.     The exclusions to the Company's DIC program policy, including: (*i*) a "conduct exclusion" to bar coverage if the insured is adjudicated to have engaged in an act of deliberate dishonesty done with actual dishonest purpose and intent, and such dishonesty is material to the claim and (*ii*) an "improper profits exclusion" to preclude coverage if the insured is adjudicated to have gained an improper profit or advantage in certain specific respects.

18

## VII.   HP Indemnification and Advancement

A.   The Committee considered various HP indemnification and advancement issues relevant to certain Potential Claims, including:

1.   Indemnification under Delaware statutory law, which states that (*i*) Delaware corporations are permitted, but not required, to provide their directors and officers with (*a*) indemnification for judgments, settlements, and reasonable expenses (*i.e.*, defense costs) in suits by third parties and (*b*) indemnification for reasonable expenses, but not for judgments or settlements, in suits by or on behalf of the corporation, (*ii*) any such indemnification may be awarded only if the indemnitee is found to have acted in good faith and in a matter that he or she reasonably believed was in or not opposed to the company's best interests, (*iii*) Delaware corporations must provide indemnification for reasonable expenses if the potential indemnitee is successful on the merits or otherwise, and (*iv*) Delaware corporations are permitted, but not required, to advance expenses to their directors and officers.

2.   Provisions of HP's corporate charter as they relate to indemnification or advancement, including the charter's allowance of the Company's indemnification of its directors, officers, and employees to the fullest extent provided under Delaware law.

3.   Provisions of the Company's bylaws relating to ***indemnification***, including:  (*i*) provisions requiring indemnification of directors and officers who are made party to, threatened to be made party to, or otherwise involved in any legal proceeding by reason of their roles as directors or officers of HP or any of its predecessors, (*ii*) provisions permitting indemnification of employees and agents of the Company who are made party to, threatened to be made party to, or otherwise involved in any legal proceeding by reason of their roles as employees or agents of HP or any of its predecessors, (*iii*) the fact that such provisions do not expressly distinguish between actions by third parties and actions by or on behalf of HP, (*iv*) the fact that such provisions cover all expenses and losses, including attorneys' fees, (*v*) whether such provisions would apply to Autonomy directors and officers for their pre- and/or post-Acquisition conduct, and (*vi*) whether the provisions listed above are permissible in light of the Delaware statute.

4.   Provisions of the Company's bylaws relating to ***advancement***, including (*i*) the advancement of defense costs to ***directors*** until the subject proceeding's final disposition, (*ii*) the advancement of defense costs to ***officers and employees*** unless it is determined by clear and convincing evidence that they acted in bad faith or in a manner that they did not believe to be in the best interests of the Company, and (*iii*) the potential for repayment if a judgment is entered against the director or officer or if the terms of a settlement agreement provide for such repayment.

## VIII.   Autonomy Insurance

REDACTED FOR PRIVILEGE

REDACTED FOR PRIVILEGE

## IX.    Autonomy Indemnification and Advancement

A.    The Committee evaluated Autonomy's indemnification and advancement
requirements                                REDACTED FOR PRIVILEGE

20

## X. Additional Considerations Relevant to HP's Best Interests

A. The Committee considered the director-exculpation provisions of HP's charter, insurance coverage, indemnification, advancement, and various prudential and business considerations in determining whether the Company's best interests would be served by pursuing any claims that the Committee identifies as meritorious against the Company's present or former officers, directors, employees or professional advisors.

## XI. Independence and Disinterestedness

A. The Committee, after consultations with Committee Counsel and Delaware Counsel, and after evaluation of the relevant factual information received from each director, considered the following factors in addressing independence for members of the Committee ("Committee Members") and members of the Board ("Board Members") under Delaware law:

1. Any financial, business, social, political, public-service, or philanthropic relationships that Committee Members and Board Members might have with each other or with any controlling shareholder, defendant, potential defendant, plaintiff/demanding shareholder, or relevant officer, employee, auditor, vendor, partner, customer, or counsel of the Company and/or Autonomy, or with any other person who might have an inherent interest in the outcome of the Committee's findings;

2. Whether any Committee Members or Board Members are beholden to any other Committee Member, Board Member, HP management official, or any defendant or person relevant to the Potential Claims;

3. Whether the Committee Members or Board Members have any current business activities outside HP, or are members of any other board of directors of companies, where such activities or companies have a financial or other type of relationship with HP and/or Autonomy, and if such relationships exist, whether such relationships are economically significant to the company and whether the board membership is economically significant to the Committee Member's or Board Member's annual income;

4. The amount and economic significance of the Committee Member's or Board Member's (*i*) compensation received from HP and (*ii*) beneficial ownership of shares in HP, as well as the number of such shares held by the Committee Member's or Board Member's immediate family members;

5. Whether the Committee Members or Board Members have had any previous experience with, involvement in, or opinions or biases respecting shareholder derivative complaints or demand letters or have made any public statements with respect thereto;

6. Whether the Committee Members or Board Members would be willing to authorize a suit against current or former officers, directors, employees, or outside advisors of HP or Autonomy if such a lawsuit is warranted by the results of the Committee's consideration and recommendations respecting Potential Claims;

21

7. Information specific to Committee Members or Board Members that could have an effect on their independence, as listed in the Committee members' and Board Members' annual director questionnaires;

8. Whether the Committee Member or Board Members appeared on both sides of the parties to HP's Acquisition of Autonomy or were personally implicated in any other Potential Claims;

9. The effect, if any, of an insured-versus-insured exclusion in HP's insurance policies; and

10. Whether the Committee Members or Board Members are exposed to a substantial threat of personal liability in connection with the Potential Claims.

## XII. Committee Findings Concerning Committee-Member and Board-Member Independence and Disinterestedness

A. Upon deliberation and consideration of the factors detailed above, the Committee finds that each of the Committee Members and Board Members currently serving on HP's Board (as well as two former directors who were on the HP Board at the time the Derivative Actions were filed and the Demand Letters were submitted) are sufficiently independent and disinterested under Delaware law to consider a pre-suit shareholder demand concerning the Potential Claims and to consider and make recommendations and/or decisions concerning how the Company should respond to the Potential Claims. In making this finding, the Committee took into account additional factors idiosyncratic to certain directors, including:

1. That Raymond Lane, An Livermore, and Margaret Whitman voluntarily recused themselves from participating in the Board's vote on the Board's Resolution respecting the Potential Claims.

2. That Robert Bennett, a Committee Member, (*i*) joined the HP Board after all of the events underlying the Potential Claims had occurred, (*ii*) has voluntarily recused himself from consideration of any possible claim against Perella, and (*iii*) is a member of the Board of Sprint, of which Ralph Whitworth also was a director in 2005-2006, and whose financial statements are audited by Deloitte.

3. That Ralph Whitworth, the Committee Chair, (*i*) joined the HP Board after HP had completed its acquisition of Autonomy and (*ii*) is affiliated with a company, Relational Investors LLC, that has a significant investment in HP and that also has an investment in Illinois Toolworks, of which James Skinner is a director.

4. That Raymond Ozzie, founder of a private start-up technology company, received funding from a co-director's company (Andreessen Horowitz) in an amount that was immaterial to Andreessen Horowitz, Marc Andreessen, and Ozzie personally, but appears to be significant for the start-up company.

22

5.      That Marc Andreessen, John Hammergren, Raymond Lane, and Ann Livermore made political contributions to Margaret Whitman's California gubernatorial campaign, the amounts of which were not material to any of them or to Whitman.

6.      That Marc Andreessen commented in an email that "the wrongdoing took place before the acquisition by HP," but credibly confirmed to Committee Counsel that he could independently evaluate the Committee's recommendations concerning the Board's response to the Potential Claims.

7.      That Marc Andreessen and Raymond Ozzie are members of an advisory board of a telecommunications provider that does work with HP, but neither is personally involved or has a decision-making role in the telecommunications provider's business with HP.

8.      Board members John Hammergren (Chair), Lawrence Babbio, Shumeet Banerji, Dominique Senequier, and G. Kennedy Thompson served on HP's Board's FIC at the time of the Acquisition.

9.      Board members Marc Andreessen (Chair), Gary Reiner, Patricia Russo, and Margaret Whitman served on HP's Board's Technology Committee at the time of the Acquisition

## XIII.  Thoroughness of the Committee's Review

A.      The Committee considered the thoroughness and good faith of its review under Delaware law, noting in particular the following: (*i*) the conduct of the Committee's review as detailed in above, (*ii*) the Committee participation in the development of a detailed work plan for Committee Counsel, as reflected in the minutes of its meetings, (*iii*) the Committee's adoption of a resolution allocating responsibilities for the review among the different Committee Counsel, (*iv*) the Committee's approval of the retention of, its review of the engagement letters for, and the extensive consultation with, its experts and professional advisors, including English and Delaware counsel, (*v*) the Committee's review for completeness of a detailed document-collection plan presented by Committee Counsel, (*vi*) the Committee's participation in the interview of Léo Apotheker, (*vii*) the Committee's receipt and review of Committee agendas for each Committee meeting, (*viii*) the Committee's briefings of the Board regarding the progress of the Committee's review, (*ix*) the Committee's urging the Company to substitute counsel for the Company in the securities and ERISA class actions and the Derivative Actions, (*x*) the Committee's receipt of briefings by Committee Counsel of progress of the US and UK governmental investigations, (*xi*) the Committee's receipt and review, before the January 6-7, 2014 meeting, of materials prepared by Committee Counsel covering all topics addressed in this Resolution, including materials about pre-Acquisition activity (including the valuation process employed), post-Acquisition integration, Autonomy impairment, HP's share-repurchase program, facts underlying potential claims against Lynch and Hussain, applicable legal principles (under Delaware, California, US federal, and English law), indemnity and insurance issues concerning HP and Autonomy, other ancillary allegations, and potential reforms (including reforms proposed by counsel for certain state-court derivative plaintiffs), and (*xii*) the

Committee's receipt and review before the January 6-7 meeting of correspondence from Lynch's counsel laying out their responses to HP's previously published allegations against Lynch.

## XIV.   Injury Suffered by HP

A.     As part of its review, the Committee considered (upon review of materials prepared by its counsel and consultants) whether the Company has suffered any injury from any wrongful conduct in connection with the Acquisition and its aftermath, the resulting legal proceedings, and the Company's responses to those proceedings.

B.     The Committee found that the Company suffered the following types of harms:

1.     Direct injury, as supported by empirical data of (*i*) loss of HP's value due to the Acquisition and (*ii*) interest and fees on bonds issued for the Acquisition.

2.     Legal fees and related costs, including the (*i*) cost of defending the Securities Class Action, (*ii*) cost of defending the ERISA class action, (*iii*) cost of defending the Derivative Actions, (*iv*) cost of investigating the Demand Letters, and (*v*) cost of complying with the government investigations in the US and UK.

3.     Other costs and injury, including (*i*) incentive compensation based on faulted Autonomy financials and (*ii*) reputational injury.

4.     Any potential judgments or settlements in the Securities Class Action and the ERISA class action.

C.     The Committee also considered the quantification of the injury suffered by HP for "overpaying" for Autonomy, to the extent presently estimable.

1.     With respect to the direct loss of value from the Acquisition, the Committee noted the following results of the Rebasing Exercise and other valuation work performed by HP and PwC:

a.     Autonomy's revenue, excluding hardware, was lower than reported by 21.1% in 2009, 29.6% in 2010, and 26.4% in the first half of 2011.

b.     Autonomy's operating margin was lower than reported by the following amounts: (*i*) 2009: 36.8% (reported), 28.7% (revised), 33.9% (revised without hardware); (*ii*) 2010: 36.4% (reported), 21.1% (revised), 26.7% (revised without hardware); and (*iii*) first half of 2011: 35.2% (reported), 22.5% (revised), 26.2% (revised without hardware).

c.     Autonomy's revenue growth was generally lower than reported by the following amounts: (*i*) 2009: 47% (reported), 26.6% (revised), 15.9% (revised without hardware); (*ii*) 2010: 17.7% (reported), 11.7% (revised), 5.0% (revised without hardware); and (*iii*) first half of 2011: 9.4% (reported), 9.9% (revised), 14.4% (revised without hardware).

       d.      Autonomy's organic growth, without acquisitions or hardware, was -7.1% in 2010 and 4.3% in the first half of 2011.

REDACTED FOR PRIVILEGE

       D.      The Committee also considered the quantification of other injury suffered by HP in connection with the Acquisition, to the extent presently estimable.

REDACTED FOR PRIVILEGE

REDACTED FOR PRIVILEGE

**XV.   Potential Pre-Acquisition Claims Against HP Directors, Officers and Employees Relating to Autonomy**

A.   **Shareholder Claims**:  The Committee evaluated the claims made in the Derivative Actions and/or the Demand Letters relating to pre-acquisition conduct respecting the Acquisition, including:

1.   HP's merger and acquisition policies, practices and procedures;
2.   HP's (and its professional advisors') due diligence of Autonomy;
3.   HP's (and its professional advisors') valuation of Autonomy;
4.   Board and Committee conduct;
5.   HP's evaluation of alleged "red flags";
6.   Impact of legacy Autonomy misconduct; and
7.   Related Acquisition disclosures

B.     **Potential Claims**:  In considering the allegations relating to these subjects, the Committee considered the following Potential Claims that HP could assert against some or all of its current or former officers or directors in relation to the pre-Acquisition conduct:  (*i*) duty of care, (*ii*) duty of loyalty, (*iii*) duty of disclosure (federal, state, and English, where applicable),[3] (*iv*) waste, (*v*) unjust enrichment, and (*vi*) abuse of control.

C.     **Committee Findings**:  The Committee, upon consideration of all reasonably available information relating to the conduct of HP directors and officers who were involved in the Acquisition and/or pre-Acquisition due diligence and valuation (including views provided by UK merger and acquisition experts on normative standards for conducting due diligence in UK acquisitions), the comments of Judge Breyer in the transcript of the hearing convened on November 21, 2013 on the motions to dismiss the Securities Class Action, and taking into account standards prescribed by the duty of care, duty of loyalty, duty of disclosure, waste, unjust enrichment, and abuse of control, finds as follows:

1.     **Exculpation**:  HP's charter contains an exculpation provision that conforms to Delaware law allowing a company to exculpate its directors from financial liability for breaches of the duty of care.

2.     **HP's Merger and Acquisition Policies, Practices, and Procedures**

a.     HP has, over time, developed a structured approach to mergers and acquisitions that includes practices, policies and procedures for (*i*) preliminary due diligence to be conducted before receiving an Approval to Negotiate ("ATN"), (*ii*) following the ATN but before receiving Approval to Sign ("ATS"), more complete due diligence, execution of a term sheet and a non-disclosure agreement, engagement of outside professional advisors, target valuation, and negotiation of acquisition documents, and (*iii*) post-ATS due diligence in anticipation of integrating the acquired entity into HP.

b.     HP's acquisition protocols are led by a transaction business Sponsor (Léo Apotheker and Shane Robison for Autonomy), supported by (*i*) a Transaction Team (consisting of the Sponsor and leads for Technology/Product, Finance, Marketing, HR, Corporate Development, Integration, and Legal), (*ii*) HP's Strategy and Corporate Development Group (led by Girish Nair and Andy Johnson, respectively, for the Autonomy acquisition), which helps business units to identify targets that further the strategic objective of the acquiring

---

[3]     Regarding the other asserted claims based upon disclosure issues, including Exchange Action §§ 10(b) and 20(a) claims and fraud and deceit claims under California state law, the Committee's understanding of such claims is that the Company has standing to bring such claims only as a repurchaser of its own stock and that HP is not otherwise a purchaser of its stock.  Those claims will therefore be considered in the context of the stock-repurchase plan.  To the extent the disclosure-related claims do not relate to alleged injury to HP as a purchaser of its own securities, the Committee considered the claims in the context of the fiduciary-duty claims, which include the so-called duty of candor.

business unit (and which reported to Shane Robison during the Autonomy acquisition) and (*iii*) an Integration Team, which plans and implements integration.

   c. The Sponsor of an acquisition is accountable for the acquisition and is involved at every stage, including (*i*) ensuring that the due-diligence process is followed and completed, (*ii*) obtaining Investment Review Board ("IRB") ATN and ATS and (*iii*) supporting the Board's Technology Committee (chartered to provide strategic oversight and guidance on technology issues) and the FIC (chartered to support the Board in evaluating acquisition candidates) in fulfilling their charter obligations to recommend a proposed transaction to the IRB (the HP Board, in the case of the Autonomy acquisition).

   d. The Sponsor and Transaction Team develop a preliminary business case supported by a detailed financial analysis of the target (derived from published financial information, analyst reports, information obtained from the target and business-expert assumptions, and estimates respecting growth rates, margins, number of annual deals, etc.) that is used to calculate target value by means of a detailed valuation model, which separately calculates the stand-alone value for the target and the value of each expected synergy to estimate the target's potential value to HP.

   e. After ATN, (*i*) HP's Mergers, Acquisitions, Divestitures and Outsourcing ("MADO") team, including key corporate functions (*e.g.*, tax, procurement, finance, HR, real estate, information technology, sales operations, etc.), is engaged (often pursuant to defined "MADO playbooks") to support the Sponsor and the Transaction Team on due diligence and integration within their functional areas of expertise (often pursuant to guidelines set forth in a function-specific "MADO playbook"), and (*ii*) professional advisors are retained for finance (including, in the Autonomy transaction, the preparation of fairness opinions), accounting and legal matters.

   f. After ATN, but before ATS, the Sponsor and the Transaction Team, with support from MADO and HP's professional advisors, verifies HP's interest in the target, evaluates acquisition risks and liabilities, and mitigates areas of concern by collecting relevant information from both the target and market participants, with key diligence findings respecting these matters reported regularly in due-diligence reports that are color-coded to distinguish between acceptable and unacceptable risks.

   g. After ATS, the Sponsor remains accountable for achieving performance goals made in the ATS presentation to the IRB, which goals are tracked (and reported to the IRB) quarterly for two (now three) full fiscal years after closing and are evaluated based on an M&A scorecard approved during the ATS stage.

   h. To test the efficacy of these M&A policies, practices and procedures, the Committee conducted a summary review of five significant acquisitions closed before the Autonomy acquisition – EDS (announced May 2008), 3Com (announced November 2009), 3PAR (announced March 2010), Palm (announced April 2010), and ArcSight (announced September 2010) – and determined that (*i*) the protocols followed in these acquisitions were

substantially consistent with HP's M&A policies, practices and procedures, and (*ii*) even if some of these target companies did not meet performance expectations, the M&A protocols could be relied upon by the Board as indicators of a pre-established, comprehensive process designed to further the strategic objectives of the Company.

3.    **HP's (and Its Professional Advisors') Due Diligence of Autonomy**

a.    **Business-Relationship History**:  While it appears that, reaching back to at least Q4 2009, HP had a business relationship with Autonomy involving both Original Equipment Manufacturer ("OEM") and software license agreements, the Committee was unable to confirm with any current employees the full details of the transactions between HP and Autonomy – other than to determine that Autonomy and its technology were known to HP well before the Acquisition.

b.    **Pre-Acquisition Strategic Considerations**:  From as early as 2006, HP and the Board's Technology Committee considered Autonomy on several occasions as a "to-be-aggressively pursued" potential target to support HP's participation in the enterprise search space, but, for a variety of reasons – including HP's then-current strategic focus and Autonomy's then-current market price in relation to its then-current revenue and profits – HP did not proceed with an attempt to acquire Autonomy during that earlier period.

i.    When Apotheker became HP's CEO in November 2010, he told the Board that HP had to expand "into new technologies that may today and in the future be outside of HP's core competencies."

ii.    It soon was made clear to the Board that Apotheker's vision was to engage in a "transformational" initiative that had as its focus securing for HP (by acquisition) a leading position in the Enterprise Information Management segment that would provide key intellectual property for unstructured data analytics in the following areas:  Platform Assets for Enterprise, Search & Discovery, Back-Up/Archiving and Content Management.

c.    **Due Diligence Pre-ATN**:  Apotheker expanded on these sentiments as Sponsor of the Acquisition when presenting the rationale for acquiring Autonomy at the July 19-21, 2011 Board meeting in advance of the ATN.  Apotheker described the potential acquisition as a "transformational opportunity" based on (*i*) Autonomy's ability to fulfill HP's strategic vision of providing context/aware computing, (*ii*) the transaction's potential to be a proactive step in the execution of HP's strategy to increase its high-growth/high-margin software portfolio and (*iii*) the transaction's potential to be "financially accretive" based on revenue and profits from transaction synergies.  In the months before the July 19-21 Board meeting, HP had accumulated its preliminary due diligence to support Apotheker's ATN recommendation, including:

i.    Following overtures by Qatalyst (Autonomy's investment banker), Robison and Johnson, with support from HP's Strategy and Corporate Development Group, entered into a Non-Disclosure Agreement ("NDA") with Autonomy and received, reviewed and stress-tested information from Autonomy's senior officials (including Lynch and

Hussain) and Autonomy's bankers respecting (*x*) Autonomy's business strategy as a "pure software model" and (*y*) its financial condition, operating results, technology and product development, gross margins and distribution channels for its products and services, including OEMs and hosting and cloud services.

        ii.     HP obtained third-party confirmations of market growth for the enterprise search industry and assigned to the Transaction Team HP executives who had recently engaged in extensive due diligence of another acquisition candidate that would have brought a software platform to HP.

        iii.     HP also (*x*) commissioned its Corporate Development Group to analyze Autonomy's reported financial information, as well as analysts', industry experts' and trade groups' and associations' reports on Autonomy and (*y*) sought to confirm its rationale for an Autonomy acquisition with its investment bankers, who did a "deep dive" on Autonomy and on other potential targets that would add software breadth to HP's platform.

        iv.     A detailed presentation prepared for the March 23, 2011 meeting of the Technology Committee provided an overview of Autonomy and discussed its products, "architecture," historical quarterly revenue breakdowns, and historical and projected income statements, as well as general market issues.

        v.     Consistent with its protocols, HP prepared a preliminary business case for the HP Board's May 2011 meeting and virtually identical presentations for the Board's FIC and Technology Committee that restated the business, technology and product rationale for a proposed acquisition of Autonomy, as well as financial information regarding Autonomy, HP's initial valuation estimates, information about Autonomy's OEM business and HP's initial estimate of synergies expected to result from such an acquisition.

        vi.     In June and early July 2011, (*i*) meetings continued between HP executives and senior Autonomy executives concerning Autonomy's operations, including a review by HP in-house experts of Autonomy's products, and HP engaged in (*ii*) further development of an Autonomy valuation model, (*iii*) further consideration of prospective synergies and (*iv*) continued bench-marking of an Autonomy acquisition versus other potential software targets.

        d.    **ATN Board Meeting**: The Board granted ATN at HP's July 19-21, 2011 Board meeting, after receiving presentations from the Company's financial advisors and after Apotheker described the rationale for acquiring Autonomy as "enabling HP to integrate structured and unstructured information and enable enterprise & discovery, content management, and real-time analytics on big data."

        i.     The HP Board was presented with a business case, including discounted cash flow ("DCF") valuation analytics, and support from HP's investment bankers, who asserted that the acquisition of Autonomy "is a crucial offensive move toward [HP's] strategic vision and that [HP] should pursue the acquisition expeditiously."

ii.  HP's investment bankers also introduced an admonition that was to affect the due-diligence process going forward: **"Given UK takeover framework and potential interloper interest, the acquisition of [Autonomy] is not without risk; however, strength of [HP's] strategic rationale and value creation potential provide for very competitive positions and firepower."**

(a)  Interloper threats were identified as including IBM, Oracle, Google, Microsoft, EMC[2] and SAP.

(b)  HP's bankers advised that non-public information provided to HP by Autonomy had to be equally and promptly provided to any other bidder or potential bidder, the result of which could (*i*) impair HP's likelihood of success on its bid and/or (*ii*) result in a competitor's having sensitive Autonomy information even if HP succeeded with its bid. The Board also received professional advice of counsel on these issues.

(c)  After full discussion, HP's Board authorized Apotheker, Robison and HP's management to proceed with their analysis of Autonomy as a target, with the prospect of announcing an acquisition in Q3 2011, and HP management – with support from HP's investment bankers and outside counsel – prepared a nonbinding letter of intent and an amended NDA entered into, respectively, at the end of July and in early August.

(d)  Following the Board meeting, HP hired an expanded team of outside advisors, including KPMG (to assist with accounting due diligence), Barclays (to assist in negotiations and provide financial advisory services), Perella (to provide strategic advice), Freshfields Bruckhaus Deringer ("Freshfields") (to assist in legal due diligence and advice on The City Code on Takeovers and Mergers (the "UK Takeover Code")), Gibson Dunn & Crutcher LLP ("Gibson Dunn") (deal counsel and UK Takeover Code counsel), and others (for limited purposes).

(e)  As a consequence of implications of the UK Takeover Code's requirement to provide all bidders with access to the same confidential information, HP decided – consistent with UK practice under the UK Takeover Code and as confirmed by the Committee's English experts – to rely principally on (*i*) publicly available data and (*ii*) other information exchanged between Autonomy and HP orally, rather than in writing.

iii.  HP and its professional advisors developed a customized list of due-diligence materials and, although written responses were often provided and a data room (including documents provided by Autonomy setting out quarterly revenue by category, redacted top-40 contracts and customers, certain OEM contracts, and the sales pipeline) was established for HP's and its professional advisors' examination, HP received mostly oral responses to its detailed due-diligence questions respecting, among other things, financial information, revenue projections, growth rates and gross margins, in accordance with normal practices for the acquisition of English public companies, as confirmed by the Committee's English experts.

31

(a)      Between August 1 and August 18, 2011, HP's transaction team, supported by its finance, accounting and legal advisors, conducted daily internal status calls as well as daily diligence calls with Autonomy (often documented in HP's officials' notes), including (x) August 1 to August 5 daily finance calls, August 1 to August 5 daily webexes/videos regarding product demonstration and daily HP/Autonomy core-team calls and (y) additional call scheduled as needed – with Autonomy's COO's estimating that a total of 28 diligence calls had occurred as of August 9, 2011.

(b)      On an August 4, 2011 due-diligence call, HP's Corporate Development experts consulted with Autonomy's CFO to confirm assumptions and estimates included in the stand-alone portion of HP's valuation model.

(c)      It was ultimately confirmed to HP's Board that all of the "must haves" diligence information – open-source scan of IDOL, revenue by product, OEM agreements, a list of the top 10 OEM customers and sales pipeline information – had been obtained, other than Deloitte's workpapers, which were instead the subject of an August 17, 2011 due-diligence call among HP, KPMG and Deloitte.

(1)      Deloitte's engagement team had a conference call with HP's transaction team and accounting experts on August 17, during which Deloitte was asked to respond to a list of previously provided questions that related to, among things, revenue recognition, instances of fraud, control weaknesses, significant issues communicated to Autonomy's board, disagreements with management and unadjusted audit differences.

(2)      During the call, Deloitte (x) mentioned that an unidentified whistleblower (whose corporate position or function Deloitte did not describe) had made allegations that Deloitte had investigated and had found to be without merit and (y) made no disclosure of hardware sales or disagreements with Autonomy's management.

e.      Before the Board was presented with materials to support ATS, the Corporate Development Group prepared a draft integration plan to detail the roles, responsibilities and governance structure for the integration of Autonomy into HP, including (i) a steering committee, (ii) the identification of HP and Autonomy integration executives, (iii) an integration program management office and (iv) key integration work streams plus the identity of work-stream leads.

4.      **HP's (and Its Professional Advisors') Valuation of Autonomy**

a.      **Valuation Model**:  The DCF valuation model for Autonomy ("Valuation Model"), which was developed by HP's Corporate Development Group commencing in February 2011:

i.      Was reviewed and relied upon by HP's outside professional advisors for presentation to the FIC on August 18, 2011 and to HP's Board on July 19-21, August 5, August 12, August 16 and August 18, 2011;

       ii.     Incorporated financial information (including revenue growth rates and gross margins) from Autonomy's published financial statements, analyst reports, industry data, public and non-public data, information obtained from and in material respects confirmed by the target during due diligence, and HP management's revenue-synergy estimates, and was collectively relied upon by the Board;

       iii.     Provided in its final iteration an estimated Autonomy stand-alone value of $9.5 billion, $7.4 billion in revenue synergies, $157 million in integration costs and transaction fees and $332 million in tax synergies, cumulatively valuing Autonomy at $17.1 billion (stand-alone plus synergies);

       iv.     Was substantially consistent with the valuation process followed by the Company in four significant acquisitions conducted before the Autonomy transaction and with the Company's M&A policies (described above);

       v.     Was the product of numerous iterations based on the receipt of additional information;

       vi.     Was based on management's evaluation of Autonomy's stand-alone value, expected synergies from the Acquisition, analyst estimates and estimated growth rates and was designed to align the Acquisition with the Company's best interests and to serve as a guide to the Board in setting parameters in the price negotiations in the Acquisition;

       vii.     Informed the FIC's review and recommendation, as supported by the Company's financial experts' fairness opinions, that the price suggested for the Acquisition was reasonable in light of the information relied upon during the due-diligence process; and

       viii.     Informed the Board's determination, as supported by the Company's financial experts' fairness opinions, that the price suggested for the Acquisition was fair to HP in light of the information relied upon during the due diligence process (including consideration of HP's CFO's reservations about the proposed Acquisition) and was in the best interests of the Company to conclude.

       b.    **Price Negotiation**:  During the course of negotiations, the Board conditioned the continued pursuit of Autonomy on maximum price limits:

       i.     Shortly after the Board granted ATN, Apotheker and Robison met with Lynch.  During a July 28, 2011 meeting, Apotheker and Lynch went back and forth regarding price and, while they did not agree on a price, agreed to a narrowed range of £24.94 to £26.94 per share (as set out in the Letter of Intent).

       ii.     At the August 5, 2011 Board meeting, the Board agreed to a maximum price range of £24.94 to £26.94 per share, the range of which was narrowed on August 12, following a market drop, to £25.00 to £25.50 per share.

iii.    On August 14, 2011, Apotheker and Lynch agreed to a price of £25.50 per share, subject to the Board's granting Approval to Sign.

5.    **HP Board and Committee Action**:  Leading up to the ATS request, a series of August meetings was scheduled to update the Board on the progress on the Acquisition, including the status of due diligence and negotiations, with (*i*) meetings on August 5, 12 and 16, 2011, at which the Board received presentations from its advisors and management on key due-diligence findings and other updates to the negotiation process, and (*ii*) an executive session on August 17.

a.    None of the presentations that the Board received from its advisors or management during the August 5, August 12, or August 16 meetings identified any material issues or red flags with respect to Autonomy (except as noted below in connection with comments by Lesjak and Holston).

b.    The Board was advised that KPMG's accounting review, including its interview of Deloitte, presented "no material issues."  KPMG's report had advised HP management that the limited amount of information from Autonomy (and Deloitte) affected the analysis that KPMG could perform, but the report also acknowledged that "the limited provision of data is not unusual in the acquisitions of UK public companies."  The Committee's experts on UK due-diligence procedures confirmed to the Committee that the receipt of limited information is consistent with UK market practices for acquisitions of FTSE 100 companies (as KPMG had advised the Board before the Acquisition).

c.    The Board's non-management directors met on August 17, 2011, principally to consider in executive session the opposition/concerns expressed at the August 16 meeting by HP's CFO Lesjak that, while the strategic vision underlying the Autonomy acquisition should be respected and embraced, she opposed the acquisition of Autonomy at that time because (*i*) the size of the premium would concern shareholders, (*ii*) HP's bankers had underestimated the impact of the acquisition on HP's stock price, as well as the likely negative shareholder sentiment and that (*iii*) HP's history of not executing on its major acquisitions did not counsel proceeding with the Acquisition at that time.  Lesjak had not expressed a view that the proposed Acquisition placed too high a value on Autonomy per se.  Holston had generally agreed with Lesjak's comments.

i.    At the August 17 executive session, the non-management directors considered the issues raised by Lesjak (and Holston), as well as whether the package of disclosures proposed for announcement on August 18, 2011 – the Acquisition, the possible spinoff of the Company's PC business, the 3Q 2011 earnings release, and the discontinuance of operations for webOS devices – contained too many pieces of significant information.  After discussion and deliberation regarding these issues, the non-management directors agreed to ask Apotheker to consider whether the Acquisition should be pursued.  Apotheker, upon reflection and consideration of management's due diligence and the advice of HP's professional advisors, recommended that the Acquisition proceed.

34

6.    **ATS**: HP's Board concluded its deliberation over the Autonomy Acquisition at its August 18, 2011 meeting after receiving presentations from management respecting the strategic value of Autonomy, a summary of the key due-diligence findings, the valuation analytics regarding the Acquisition and fairness opinions from HP's investment bankers.

a.    The Technology Committee and the FIC recommended the Acquisition to the Board at the August 18 meeting.

b.    With respect to the Potential Claims regarding the Technology Committee, the Committee finds that (*i*) Autonomy was discussed with the Technology Committee in 2007 and 2008 presentations, including identification of Autonomy in the 2007 presentation as a possible "select game-change target," (*ii*) a detailed presentation respecting Autonomy was prepared for the March 23, 2011 Technology Committee (and FIC) meeting, (*iii*) Autonomy's technology contribution and compatibility with HP's strategic plans were fully discussed at the May 25, 2011 Technology Committee (and FIC) meeting, and a preliminary business case was presented and (*iv*) technology aspects of the Autonomy transaction were regularly discussed at Board meetings (in which Technology Committee members participated) that had been convened to consider advancing the progress of the Acquisition.

c.    With respect to the Potential Claims regarding the Audit Committee, the Committee finds that the Audit Committee was not tasked in its charter with the responsibility of evaluating any acquisitions, including the Autonomy Acquisition.

7.    **HP's Evaluation of Alleged "Red Flags"**

a.    The alleged "red flags" cited in the Complaint were considered by the Committee along with (*i*) the dates on which the cited analyst and media reports were published, (*ii*) the fact that many positive reports regarding Autonomy published in the same period (dating back to 2005) offset the negative reports that were published and (*iii*) the due diligence that management conducted, which was viewed as the ultimate test to determine whether "red flags" actually existed.  In addition, the Committee considered that, at the close of the due-diligence process, the Board had reviewed presentations from its advisors and management and had come to the conclusion that none of the advisors or Company officials had presented any red flags regarding Autonomy or the Acquisition (except to the extent noted above concerning comments by Lesjak and Holston).

8.    **Impact of Legacy Autonomy's Misconduct**

a.    Dr. Michael Lynch (CEO), Sushovan Hussain (CFO), Andrew Kanter (COO/GC), Stephen Chamberlain (VP, Finance), and Peter Menell (CTO) were considered to be the principal (or most of the principal) managers of Autonomy, which described itself as a "very rare example of a pure software model" in its 2010 Annual Report, and whose principal product (IDOL) was reported to provide functionality for processing/extracting information from unstructured data.

b.     Autonomy's financial statements made significant and material misrepresentations upon which HP relied.  For example, Autonomy's 2010 Annual Report described the company's business model as including more than 400 VARs, more than 400 OEMs, software-as-a-service and hosting service, and represented that a "small part" of the company's business focused on "quick time-to-value and high return [appliance sales]," but it failed to state the material facts that (*i*) Autonomy often used VAR transactions to enable premature and/or unwarranted recognition of revenue and often "round-tripped" transactions to provide VARs with cash to pay for licenses, (*ii*) many so-called OEM sales were improperly classified as OEM transactions, while other purported OEM transactions did not involve embedding of Autonomy's principal product (IDOL), (*iii*) hosting relationships were modified superficially to allow up-front revenue recognition (at the expense of long-term revenue streams and, at times, at the expense of total contract revenue) and (*iv*) significant amounts of hardware (without Autonomy software) were sold at a loss to meet quarterly revenue goals, and the associated costs (or portions of those costs) were improperly recorded to avoid larger impacts on gross margin.

9.     **Related Disclosures about the Acquisition**:  In both the Derivative Actions and the Demand Letters, shareholders assert that HP misled the market with respect to the quality of its M&A policies, practices and procedures, as well as the value of Autonomy.

a.     On September 13, 2011, Apotheker stated:  "We have a pretty rigorous process inside HP that we follow for all of our acquisitions, which is a DCF-based model, and we try to take a very conservative view at this. . . .  We have and are running an extremely tight and very professional due-diligence process. . . .  Autonomy is a publicly traded company in the UK and they are, therefore, audited like any other FTSE company, and they're being audited on very professional standards.  And, therefore, that's where we pick up the trail and do our due – that's the basis of our due diligence."

b.     These statements were not materially misleading, as they referred to an M&A and due-diligence process within HP that (*i*) had in fact been "rigorous" (particularly in the context of the normative standards of conduct for UK public-company transactions) (*ii*) had considered all material information that was reasonably available to the Company, (*iii*) had been followed in prior large acquisitions, (*v*) had been administered professionally by both in-house and outside experts and advisors upon whom HP's directors and officers were entitled to rely, (*vi*) had been professionally implemented in connection with the Acquisition, and (*vii*) used more conservative numbers than certain other valuation scenarios had generated.

c.     HP could reasonably rely on the audited financials of Autonomy, which portrayed Autonomy as a robust "pure software" enterprise with strong revenue growth, high gross margins and valued channels for distributing its products.

d.     The Committee also is aware that the court handling the Securities Class Action dismissed the claims in that case relating to Apotheker's statement.

**XVI.   Potential Claims Against HP Directors, Officers and Employees Relating to the Integration and Management of Autonomy After Acquisition**

A.   **Shareholder Claims**:  The Committee evaluated the claims made in the Derivative Actions and/or the Demand Letters relating to integration conduct ("Integration"), including:

1.   Strategic, operational and governance integration of Autonomy into HP;
2.   HP and Autonomy technology and product integration;
3.   HP's evaluation of alleged "red flags" respecting the progress of integration;
4.   HP's delegating substantial authority to legacy Autonomy officials to manage the Autonomy business unit after the Acquisition; and
5.   Integration-related disclosures

B.   **Potential Claims**:  In considering allegations relating to these subjects, the Committee considered the following Potential Claims that HP could assert against some or all of its current or former officers or directors in relation to the Integration: (*i*) duty of care, (*ii*) duty of loyalty, (*iii*) duty of disclosure (federal, state and English, where applicable), (*iv*) waste, (*v*) unjust enrichment and (*vi*) abuse of control.

C.   **Committee Findings**:  The Committee, upon consideration of all reasonably available information relating to the conduct of HP directors and officers who were involved in the Integration, the comments of Judge Breyer in the transcript of the hearing convened on November 21, 2013 on the motions to dismiss the Securities Class Action, and taking into account standards prescribed by the duty of care, duty of loyalty, duty of disclosure, waste, unjust enrichment and abuse of control, finds as follows:

1.   **Exculpation**:  HP's charter contains an exculpation provision that conforms to Delaware law and allows a company to exculpate its directors from financial liability for breaches of the duty of care.

2.   **Strategic Considerations**:  HP determined to follow a tailored integration for Autonomy based upon the business objective of maximizing the value of the acquisition, including achieving projected revenue synergies.  Typical of tailored integration is to allow the acquired company to operate as a separate or stand-alone business after acquisition (*e.g.*, 3Com, 3PAR).  HP followed this approach with Autonomy in order to minimize disruption to Autonomy's business, preserve Autonomy's perceived strong brand, and avoid interference with Autonomy's apparently successful entrepreneurial record.

3.   **Operational Considerations**:  HP determined to have Autonomy, as a stand-alone business, functionally integrated with HP's corporate structure so that significant process controls for reporting financial results would be implemented and HP's footprint could be leveraged from a sales, customer, geographical and technology perspective to maximize revenue synergies.

a.      HP's integration plan was designed to operationalize synergies in the following areas:  (*i*) Information Management, (*ii*) Unified Analytics, (*iii*) Document Processing Solution, (*iv*) Data Security Solution and (*v*) Geographic Sales Expansion.

b.      HP management determined that the integration focus during the first year should be on sales synergies and leveraging HP's "footprint" to achieve Autonomy's geographic expansion.

c.      Integration of the Vertica and Autonomy business units began, but then halted following relationship tensions between the two.

i.      HP management determined that halting the integration of the Vertica and Autonomy business units was necessary to retain key talent at Vertica.

ii.      Halting the business-unit integration did not prevent continued work on IDOL/Vertica integrated functionality.

4.      **Governance Considerations**:  A governance structure, put in place to oversee Autonomy integration, defined work streams to achieve strategic objectives and involved the following:  (*i*) Integration Steering Committee, (*ii*) Project Management Office ("PMO"), (*iii*) retention of an expert consultant, Boston Consulting Group, and (*iv*) HP's Strategy, Corporate Development and Integration Department, collectively overseen by senior-level HP and Autonomy officials on the Integration Steering Committee through mid-December 2011 and thereafter by senior executive officials.

a.      The Integration Steering Committee received regular status presentations, typically focused on revenue-growth opportunities.

b.      The senior PMO executive in charge of the integration was well-qualified and experienced in integration – and was accepted by all, including legacy Autonomy management.

c.      The new senior executive who was assigned by HP senior management on May 30, 2012 to assume interim leadership of Autonomy after Lynch's departure was directed to address, among other things, product-quality and customer-satisfaction issues.

5.      **Technology Development and Integration**

a.      Autonomy had a history of making regular updates and improvements to IDOL between 2001 and 2011, a history that evidences that IDOL was continually enhanced with updates and improvement releases:  24 releases for IDOL 4, 24 releases for IDOL 5 and 34 releases for IDOL 7 (as confirmed by an Autonomy senior software developer who stated that fundamental and material changes had taken place within the "7" series of IDOL).

       b.    The fact that there had not been a "major version" release of IDOL for several years does not support the conclusion that HP bought "outdated technology" – major-version releases were typically driven by marketing, as opposed to technological, considerations, and technology was continually improved even without major-version releases.

       c.    Lynch, who controlled the marketing and public statements about IDOL 10, announced at HP Discover Vienna (November 29-December 1, 2011) that IDOL 10 would be generally available as of December 1, 2011. HP's revenue-recognition team had previously raised concerns about announcing the availability of a new version of IDOL for the last date of a fiscal quarter (January 31, 2012), but Lynch and his team took the position that IDOL 10 would be available as of December 1, 2011. Neither Whitman nor the Board was apprised of the announcement of the December 1, 2011 availability date for IDOL 10.

       i.    While technical work to integrate Vertica and IDOL functionality was at a "rudimentary" stage at the time of Lynch's announcement, the technological integration work had functionality and practical utility, which was further developed over time but was not utilized.

       d.    On June 4, 2012, at HP Discover Las Vegas, HP's messaging shifted with respect to IDOL 10, describing it as a component of HP's "big data" platform and a part of the Company's "Information-Optimizing Solutions" for managing, understanding and acting on big data, from a portfolio that included new infrastructure designed to help enterprises use Hadoop, the open-source-distributed data-processing technology for storage and processing of large data sets.

       i.    IDOL 10 plus Vertica was not promoted as a fully integrated "single product," but rather as part of HP's big-data platform, portfolio and solution.

       e.    IDOL remains one pillar in HP's current marketing approach to big-data analytics known, in its latest incarnation, as HAVEn, which is promoted as an umbrella brand encompassing HP's various data analytics assets, including Autonomy IDOL, Vertica and ArcSight.

       f.    Shareholders claim that HP was "anxious to justify" the Acquisition by announcing "quick wins," including the launch of IDOL 10, but facts demonstrate that HP's FY12 operational objective was to achieve revenue synergies without the need for significant product development.

### 6.    Alleged Post-Acquisition "Red Flags" Concerning Autonomy

       a.    KPMG's post-Acquisition identification of $41 million in pre-Acquisition "pass-through" hardware sales was appropriately conveyed by both KPMG and HP management to Autonomy management for explanation. Autonomy management ultimately responded that Autonomy "procured hardware as well as software for certain strategic accounts" (an apparent misstatement, inasmuch as Autonomy's resales of hardware were not strategically linked to software sales).

        b.     E&Y's November 2-4, 2011 review of Deloitte's workpapers identified areas of audit risk and also identified Autonomy's hardware revenue, which EY reported to HP (although HP did not yet have the information needed to understand either Autonomy's use of hardware sales to meet revenue targets or the significance of those sales to HP's IRB valuation model of Autonomy).

        c.     On May 25, 2012, an Autonomy official reported concerns about Autonomy's pre-acquisition business practices that had been the subject of a prior review by Autonomy and its auditor (Deloitte), including (*i*) hardware sales, (*ii*) end-of-quarter VAR transactions and (*iii*) hosting transactions.

REDACTED FOR PRIVILEGE

40

       d.     Lynch has been highly critical of HP's handling of Autonomy integration, but, while providing a written submission to the Committee, he declined to meet with Committee Counsel.

       i.     Lynch's complaints about HP's post-Acquisition conduct are inconsistent with HP's need to apply necessary controls and processes to oversee and scale Autonomy's business and to ensure its conformance with applicable accounting rules and HP's accounting policies.

       ii.     Lynch's approach to managing Autonomy, with decision-making concentrated in a handful of senior Autonomy executives, was inconsistent with operating the business on a scale envisioned by HP's growth and synergy strategy.

       iii.     Lynch's claims of significant Autonomy employee attrition caused by HP practices appear unfounded. Attrition at Autonomy actually declined, and headcount actually increased, after the Acquisition closed.

       iv.     Lynch's resistance to HP involvement in Autonomy's business, including HP's efforts to obtain information for financial reporting, is inconsistent with Lynch's claim that HP operationally and financially mismanaged Autonomy.

       v.     The breakdown of the relationship between Autonomy and Vertica was precipitated by cultural differences between the two companies and by Lynch's coarse and authoritarian management style, including his efforts – which proved unfounded after a review – to blame Vertica for accounting improprieties.

       vi.     All of the above led the HP executive team to doubt Lynch's management style and effectiveness, and ultimately led to his termination.

       vii.     Lynch's assertions in his written submission directed to explaining and justifying Autonomy's transactional accounting policies, practices and procedures have been reviewed by the Committee's forensic experts and determined to be without merit.

### 7. Integration-Related Disclosures

a.      Lesjak's November 21, 2011 statement that integration was focused on enabling the global sales force to ramp up software revenue was consistent with HP's near-term synergy strategy for integration.

b.      When Autonomy missed its Q1 2012 revenue forecast, HP management appropriately disclosed on February 22, 2012 that realizing Autonomy revenue synergies would take time, and it instructed HP's revenue-recognition organization to more closely examine Autonomy's revenue-recognition policies, practices and procedures.

c.      When Autonomy missed its Q2 2012 revenue forecast, HP management directed a review, which reported the principal cause as poor transaction execution by Autonomy.  On May 23, 2012, two days before the Autonomy official met with HP on May 25, 2012 (as described above), (*i*) Lesjak appropriately publicly stated, in relation to Autonomy's failure to meet its forecast, that "sales execution was a challenge," and (*ii*) Whitman appropriately publicly stated that "scaling challenges" contributed to Autonomy's poor results, a comment that she appropriately repeated (given the limited progress that had been made on HP's review of transactional concerns raised by a former Autonomy official) on June 5, 2012.

i.      For the avoidance of doubt, the Committee finds that, in addition to Whitman's specific June 5 statements' being neither misleading nor incomplete, as of June 5, 2012:

(a)      The investigation triggered by Autonomy's official's report was only ten days old (at most), and the forensic accounting expert had not been engaged until May 30-31;

(b)      No one yet knew whether the initial allegations of improprieties could be confirmed, the extent of any pre-Acquisition improprieties, or whether they were material to HP's valuation assumptions and forecasts for Autonomy;

(c)      No evidence has been found of an intent to mislead HP, its shareholders, or the securities markets;

(d)      No evidence has been found that Whitman did not believe her explanation about scaling problems at Autonomy;

(e)      "Scaling problems" that Whitman cited were not inconsistent with what HP later learned about the accounting and disclosure improprieties, which resulted from the manner in which legacy Autonomy officials had run the company; and

(f)      Whitman said that "for many entrepreneurs, processes and discipline are dirty words, and you have to have those things, especially within [HP]."

42

d.      While the December 1, 2011 announcement of the general availability of IDOL 10 as a "single processing layer" marking a "fundamental shift in [the] ability to process this volume of [structured and unstructured] data," as well as other statements respecting the development of IDOL 10 up to June 2012, were marked by puffery and exaggeration, at the time these statements were made a "rudimentary" technological integration of IDOL and Vertica had been initiated, and that integration had functionality and practical utility, which was further developed over time but was not utilized.  Under all the circumstances, the statements were not materially misleading.  Nor does it appear likely that those statements in themselves caused any injury to anyone.

## XVII.  Potential Claims Against HP Directors, Officers and Employees Relating to the Impairment Charge for Autonomy

A.      **Shareholder Claims**:  The Committee evaluated the Claims made in the Derivative Actions and/or the Demand Letters relating to impairment conduct ("Impairment"), including:

1.      Activities leading to the impairment charge;
2.      Impairment amount and allocation; and
3.      Related disclosures

B.      **Potential Claims**:  In considering the allegations relating to these subjects, the Committee considered the following Potential Claims that HP could assert against some or all of its current or former officers or directors in relation to the Impairment:  (*i*) duty of care, (*ii*) duty of loyalty, (*iii*) duty of disclosure (federal, state and English, where applicable), (*iv*) waste, (*v*) unjust enrichment and (*vi*) abuse of control.

C.      **Committee Findings**:  The Committee, upon consideration of all reasonably available information relating to the conduct of HP directors and officers who were involved in the Impairment, and taking into account standards prescribed by the duty of care, duty of loyalty, duty of disclosure, waste and abuse of control, finds as follows:

1.      **Activities Leading to the Autonomy Impairment Charge**
REDACTED FOR PRIVILEGE

b.      In Q3 2012, HP took an $8 billion impairment charge for its ES reporting unit but did not take any impairment respecting Autonomy, notwithstanding Autonomy's disappointing performance in Q1 and Q2 2012, because (*i*) HP still believed in Autonomy's long-term trajectory, (*ii*) the Autonomy forensic review was in its early stages, (*iii*) Autonomy had not yet been able to develop a revised long-term forecast (a 10-year forecast)

that could be used for an impairment analysis, and (*iv*) HP did not perceive any triggers that would require an interim impairment analysis in Q3 2012. HP's auditors concurred in those determinations.

   c. As described below, however, HP disclosed the fact that, as of October 2011 (the Acquisition date), the Autonomy business unit's fair value was equal to its carrying value. That statement informed the market of the possibility of an impairment charge for Autonomy in the following quarter, when the Company would conduct its annual goodwill impairment review.

   2. **Impairment Amount and Allocation**

   a. In Q4 2012, HP Software and HP Finance, assisted by HP's Corporate Development Group, prepared a three-year budget and a ten-year forecast for Autonomy.

   b. As a starting point, the revised Autonomy business unit's revenue projections relied on historical figures (which excluded hardware revenues) that had been developed as part of the Rebasing Exercise and were enhanced with additional information as it was developed. The new information resulted in, among other things, a large drop in Autonomy's projected license revenue.

   c. On September 19, 2012, HP Finance and HP Software executives advised (*i*) HP's Audit Committee that Autonomy's goodwill was at risk of impairment, noting (in particular) HP's Q3 disclosure that, as of the Acquisition date, Autonomy's fair value was equal to its carrying value and (*ii*) HP's Board respecting Autonomy's continuing weakness. The executives estimated (contrary to the estimates provided to HP's Board at the time of the Acquisition) flat license revenue for many quarters until Autonomy returned to a time of real growth.

   d. A draft valuation model with an impairment calculation was presented to Lesjak on October 15, 2012 (and proceeded through several iterations up through its presentation to the Board on October 24). This version of the model estimated license-revenue growth for Autonomy's principal product mix and considered in concert (*i*) a stated weighted average cost of capital ("WACC") and a terminal growth rate to calculate a DCF value for Autonomy and (*ii*) an initial market-capitalization reconciliation analysis and risk premium, but (*iii*) no explicit synergies (though some implicit synergies were already included as part of the revised stand-alone value).

   e. On October 23, in response to a question from Whitman to Lesjak about whether some explicit synergies were still realizable and should be included in the model, HP Finance and HP Corporate Development reviewed and revised the original synergies presented to the Board at the time of the Acquisition and added some explicit synergies to the impairment model, after those synergies had been referred to Duff & Phelps, an outside expert, for DCF calculations.

f.      On October 24, a detailed presentation describing the erosion of Autonomy's value was presented to the Board, including a proposed revision to (*i*) Autonomy's stand-alone value (as developed in the Rebasing Exercise), derived principally from revised growth assumptions by product line and costs forecasted as a percentage of total revenues, resulting in ten-year projected cash flows discounted with a stated WACC, and (*ii*) reduced projected revenues from four explicit synergies (later reviewed by HP's outside auditors), the DCF values of which had been calculated by Duff & Phelps separately from the stand-alone projections.

g.      Because the sum of the estimated fair values of HP's reporting units exceeded HP's market capitalization (plus a reasonable control premium) at the time of the impairment analysis, HP needed to adjust risk premiums for its reporting units, with Autonomy and Enterprise Services receiving the highest risk premium – although almost all units received additional risk premiums to make the market-capitalization reconciliation work.  The additional risk premiums had been allocated among the various reporting units on a rational basis, considering that each reporting unit faced different risks.

h.      HP's impairment model showed a loss of $6 billion of originally projected stand-alone value, a loss of $5.3 billion of originally projected synergies, and a $3.6 billion decrease in value due to the change in the discount rate required by the market-capitalization reconciliation, leaving a remaining value of $2.2 billion.

i.      HP's Q4 2012 impairment charge amounted to $8.8 billion ($11 billion carrying value minus $2.2 billion revised value equals $8.8 billion), a calculation in which HP's outside auditors concurred.

j.      The documents reviewed and individuals interviewed did not suggest that HP over-allocated the impairment charge to accounting and disclosure improprieties, as opposed to other factors that led to Autonomy's loss of value.

k.      The documents reviewed and individuals interviewed also did not suggest that HP had any intent to improperly inflate the amount of its impairment charge; in fact, some of the later revisions to the impairment model (such as the increase in certain growth rates and the addition of certain explicit synergies) increased Autonomy's revised value.  In addition, HP chose to use a 16% discount rate for Autonomy, instead of Duff & Phelps' proposed 17% discount rate, which would have decreased Autonomy's revised value.

l.      Autonomy has not met even the lowered forecast for FY 2013 that informed the impairment.  This shortfall appears to reflect the fact that even the information available to HP in the summer and early fall of 2012 did not fully convey the lasting adverse effects of Autonomy's pre-Acquisition conduct.  Autonomy's inability to meet the lowered forecasts undercuts any claim that the HP intentionally was overly pessimistic in the forecasting that underlay the impairment model and was trying to inflate the impairment charge.

45

### 3. Related Disclosures: Q3 2012

a. Notwithstanding its assessment that an impairment review for Autonomy was unnecessary in Q3, HP decided to make additional disclosures in Q3 about the possibility of impairment in Q4 2012.

b. HP's first disclosure came in its Q3 2012 earnings call (on August 22, 2012), when Lesjak stated that "[w]e typically conduct an annual review of the carrying value of goodwill during the fourth quarter of each fiscal year. The factors considered in such a review include market conditions, the trading value of HP stock and the long-term outlook for the business. Any one of these factors or any combination thereof may require us to record in Q4 an additional impairment charge against the value of the goodwill in the HP portfolio. Our largest balance for goodwill is in the Software segment" (which included Autonomy).

c. Starting within hours after the earnings call, numerous analysts interpreted HP's statement as warning that an impairment charge for Autonomy's goodwill was likely to follow in Q4 2012.

d. HP's Form 10-Q for Q3 2012 repeated and elaborated on the statement made in the analyst call about a potential Q4 impairment: "During its fourth quarter of fiscal 2012, HP will perform its annual goodwill impairment review for all of its reporting units as of August 1, 2012. If there are changes in HP's stock price, or significant changes in the business climate or operating results of its reporting units, HP may incur additional goodwill impairment charges. The Software segment includes $14.6 billion of goodwill, of which $7.7 billion relates to the legacy HP software business and $6.9 billion relates to the Autonomy acquisition. Based on HP's last annual goodwill impairment review completed as of August 1, 2011, the excess of fair value over carrying value of the legacy HP software business was 38% of the carrying value, which is lower than that of HP's other reporting units. At the time of the Autonomy acquisition in October 2011, the fair value of Autonomy approximated the carrying value."

e. The language was prepared after review of SEC guidance for disclosure of impairment risks – material that HP's auditors had provided to HP on August 28, 2012. A preliminary (but not final) version of the Form 10-Q was also reviewed by Gibson Dunn (DC), which is HP's regular disclosure counsel.

f. HP's auditors initially had proposed a less-specific disclosure, which had not mentioned Autonomy's fair value or carrying value.

g. In response to a recommendation from HP's in-house financial accounting expert, HP determined to reference the impairment risk for Autonomy in the proposed Q3 disclosure of Q4 impairment risks, because the in-house expert wanted to make sure that the market considered the impairment risk to Autonomy, not only to the Software reporting unit.

46

h.    HP's management embraced the recommendation of its in-house financial accounting expert to provide the additional disclosure based on the reasonable belief that the more specific language, when combined with the Q2 disclosures about Autonomy's poor performance, would alert the market to the impending risk of an Autonomy impairment in Q4.

i.    HP's auditors concurred with the revised, more specific language used in the Form 10-Q, calling it "appropriate disclosure given the recent economic events and the fact that the Company, through the annual forecasting process, is evaluating the long term growth goals in Q4 2012."

j.    Because HP had not seen impairment triggers for Autonomy in Q3, the Committee is unable to determine what the outcome would have been if HP had conducted a goodwill impairment test in that quarter.

## 4.    Related Disclosures:  Q4 2012

a.    HP used an expert public-relations firm to assist its media outreach after the Q4 disclosure of the Autonomy impairment (which disclosure included the comment that a "majority" of the charge related to Autonomy's pre-acquisition conduct), and set as its primary goal to tell a true story to protect the Company's credibility and not, in the view of the directors and officers interviewed by Committee Counsel, simply to protect management or the Board.

b.    Because E&Y could not "audit" quantification of Autonomy's accounting errors, HP included the "majority" language only in its Q4 earnings release, the earnings call, and the litigation note in its 2012 Form 10-K, but not in the Form 10-K's goodwill footnote.

## XVIII. Costs/Benefits and Conclusions Respecting Potential Claims Against HP Officers and Directors Arising from the Acquisition, Integration, and Impairment

A.    **Costs/Benefits**:  In reaching its recommendations and exercising its business judgment regarding whether claims should be pursued by or on behalf of the Company against HP directors and officers arising out of the Acquisition, Integration and Impairment, the Committee considered the costs/benefits and risks/rewards of initiating claims, including, among other things:

1.    **Merits**:  The unlikelihood that the Company would prevail on Potential Claims(except perhaps as to Michael Lynch for his conduct as an HP officer after the Acquisition) and the magnitude of any potential recovery, as well as whether pursuit of such claims would not otherwise be in the best interests of the Company;

2.    **Applicable Law**:  Any claims for breach of fiduciary duty brought against HP's directors or officers would likely be governed by Delaware law, even if such claims were brought in California state or federal court (including any fiduciary-duty claims brought against Lynch for his conduct as an HP officer following the Acquisition, but excepting any claim

against non-officer Sushovan Hussain for breach of an employee's duty of loyalty, which claim would likely be governed by California law);

3. **Exculpation**: The Committee considered the provision in HP's charter providing for exculpation of its directors (but not officers or employees) from liability for monetary damages (but not injunctions, restitution or disgorgement) arising from violations of the fiduciary duty of care, as authorized by Delaware General Corporation Law, but not permitting exculpation for (*i*) breach of the duty of loyalty, (*ii*) actions taken in bad faith, (*iii*) actions involving knowing misconduct or violations of law and (*iv*) actions from which the director derived an improper personal benefit, including unjust enrichment and insider trading;

a. While not covered by the exculpation provision, HP's officers acting as such cannot be held liable for breach of the fiduciary duty of care absent gross negligence;

4. **Federal and State Claims**: The claims asserted against HP officers and directors under the federal securities laws and California state statutory and common law are not likely to succeed, particularly when they relate to adjudicating the normative standards of conduct expected of directors and officers of Delaware corporations;

5. **Insurance Coverage**: The availability of insurance coverage if Potential Claims were to be pursued by or on behalf of the Company against any of HP's directors or officers in relation to the Acquisition, Integration or Impairment, including:

a. The Company's primary insurance program, which in the aggregate provides coverage, including defense costs, for the following: (*i*) Side A coverage for HP's directors and officers resulting from non-indemnifiable losses arising out of claims alleging wrongful acts (as defined in the policies), (*ii*) Side B coverage for HP itself, to recover for costs in advancing to or indemnifying its directors or officers for covered claims, and (*iii*) securities-claim coverage for HP itself resulting from securities claims against the Company arising out of HP's own allegedly wrongful acts;

b. The exclusions in the primary insurance program's policies, including (*i*) an "entity vs. insured" exclusion for Side B claims, which does not apply in several cases, including where a third party initiates the action without material assistance from HP or its directors and officers, or where claims follow protected whistleblower activity, (*ii*) a "conduct exclusion" that bars coverage for loss specifically caused by an insured who is adjudicated to have engaged in a deliberate criminal or fraudulent act and (*iii*) an "improper profits exclusion" that precludes coverage for loss specifically resulting when an insured is adjudicated to have gained a profit or advantage to which he or she was not legally entitled;

c. The Company's DIC program, which provides additional Side A coverage, including defense costs, for HP's directors and officers resulting from non-indemnifiable losses, triggered by one of the following: (*i*) exhaustion of the Company's primary insurance program, (*ii*) loss falling under the terms of the DIC program but not the primary program, or (*iii*) primary program insurers' failure to pay;

d. The exclusions to the Company's DIC program policy, including: (*i*) a "conduct exclusion" to bar coverage when an insured is adjudicated to have engaged in an act of deliberate dishonesty done with actual dishonest purpose and intent, such dishonesty being material to the claim and (*ii*) an "improper profits exclusion" to preclude coverage when an insured is adjudicated to have obtained improper profits in certain specific respects;

e. The potential that directors' and officers' defense costs will reduce the amount of insurance coverage;

f. The lack of insurance coverage for the Company's own costs of prosecuting Potential Claims;

g. The potential impact that seeking and obtaining coverage could have on future insurance premiums;

6. **Ability to Pay**: Whether any of the officers or directors have the ability to pay any resulting judgment awards or settlement amounts, considering that (*i*) although some such directors and officers (including Whitman, Lane, Andreessen and Hammergren) might have substantial personal assets/net worth, the Committee was unable to analyze the financial condition of every potential defendant; (*ii*) if insurance coverage is not available, and if the defendants do not have sufficient personal assets to satisfy any judgment or settlement, HP would not be able to recover significant damages even if it is successful in proving that the defendants violated their duties in relation to the Acquisition, Integration or Impairment, and (*iii*) in light of the magnitude of HP's injury, the directors neither individually nor collectively have sufficient assets to make HP whole;

7. **Indemnification**: The Committee considered various HP indemnification issues relevant to the Potential Claims, including:

a. Indemnification under Delaware statutory law, including: (*i*) the permissibility (but not the requirement) of indemnification for judgments, settlements and reasonable expenses (*i.e.*, defense costs) in suits brought by third parties, (*ii*) the permissibility (but not the requirement) of indemnification for reasonable expenses, but not judgments or settlements in suits brought by or on behalf of the Company, unless the defendant is adjudged liable to the Company (although the court may order otherwise for good cause shown), (*iii*) the requirement that any indemnification for any type of proceeding can be awarded only if the indemnitee is found to have acted in good faith and in a matter that he or she reasonably believed was in or not opposed to the Company's best interests, and (*iv*) the requirement of indemnification if the potential indemnitee is successful on the merits or otherwise;

b. Provisions of HP's corporate charter as they relate to indemnification, including the provision allowing the Company to indemnify its directors, officers and employees to the fullest extent permitted under Delaware law;

c. Provisions of the Company's bylaws relating to **indemnification**, including: (*i*) provisions requiring indemnification of directors and officers who are made party

49

to, threatened to be made party to, or otherwise involved in any legal proceeding by reason of their roles as directors or officers of HP or any of its predecessors, (*ii*) provisions permitting indemnification of employees and agents of the Company who are made party to, threatened to be made party to, or otherwise involved in any legal proceeding by reason of their roles as employees or agents of HP or any of its predecessors, (*iii*) the fact that such provisions do not expressly distinguish between actions by third parties and actions by or on behalf of HP, (*iv*) the fact that such provisions cover all expenses and losses, including attorneys' fees, (*v*) whether such provisions would apply to Autonomy directors and officers for their pre- and/or post-Acquisition conduct and (*vi*) whether the provisions listed above are permissible in light of the Delaware statute.

        8.    **Advancement**: Provisions of the Company's bylaws relating to *advancement*, including (*i*) the advancement of defense costs to *directors* until the subject proceeding's final disposition, (*ii*) the advancement of defense costs to *officers and employees*, unless it is determined by clear and convincing evidence that they acted in bad faith or in a manner that they did not believe to be in the best interests of the Company, and (*iii*) the potential for repayment if a judgment is entered against the director or officer or if the terms of a settlement agreement provide for repayment, all of which could result in:

        a.    Potentially millions or even tens of millions of dollars in advancement of defense costs for HP officer/director defendants;

        b.    The Company's being required to continue advancing those costs until all appeals are exhausted for all potential defendants;

        c.    The primary insurance program's aggregate insurance limit, with a retention for derivative claims (and a different retention for other claims), and the potentially applicable exclusions under that program;

        d.    The prospect that any Side B recovery under HP's insurance policy for advanced expenses would reduce future coverage for judgments and settlements against HP in the Securities Class Action or any other matters;

        e.    The risk of no Side B coverage at all under the primary insurance program for claims brought or assisted by the Company;

        f.    The DIC program's aggregate insurance limit and the potentially applicable exclusions under that program; and

        g.    The risk the Company might not be able to recoup its advancements from its directors or officers absent an adverse judgment (and even if an adverse judgment is obtained, only if the relevant director or officer has sufficient assets to repay the Company).

        9.    **Potential Collateral Impacts**: The potential impact that pursuit of Potential Claims by or on behalf of the Company could have on other proceedings, including (for

example) (*i*) the Company's defense of the Securities Class Action and the ERISA class action, where allegations in support of the Company's Potential Claims could compromise or prejudice the Company's defense of the claims asserted by the plaintiffs in those class actions and (*ii*) the successful prosecution of the governmental proceedings.

      10.   **Business Considerations**: The potential distractions and other business considerations that could result from an action by or on behalf of HP against some or all of HP's directors or officers relating to the due diligence performed during the Acquisition, the valuation of Autonomy, the integration of Autonomy, the impairment charge taken and any disclosures relating thereto, including: (*i*) the potential for compromising the Company's strategic development, diversification and growth initiatives, (*ii*) the distraction of key employees from their day-to-day business operations, (*iii*) the potential for adverse media attention resulting from revived attention to past negative corporate events, (*iv*) the demands that litigation would impose on in-house counsel tasked with prosecution of those claims, (*v*) the burden that litigation would impose on the Company's directors, officers, and employees in complying with discovery and trial proceedings and monitoring the progress of the litigation, (*vi*) the risk that litigation against the Company's own directors and officers could damage morale within the Company, potentially diminishing employees' enthusiasm for their work, creating mistrust, and leading to employee attrition, (*vii*) the potential for reputational injury resulting from the pursuit of the Claims, including the collateral effects on the Company if the defendants or potential defendants assert wrongdoing by HP, (*viii*) the potential for counterclaims and countersuits resulting from the Company's pursuit of Claims, (*ix*) the potential for positive public reaction if the Company is perceived as taking deserved action against wrongdoers, and (*x*) the potential for aggravating relationships with third parties, such as HP's legacy and/or current financial, legal, and accounting advisors, if HP were to pursue Potential Claims that implicated their work;

      11.   **Lynch Contribution Claim**: With respect to Lynch, the existence of any potential contribution claim in the Securities Class Action and/or the ERISA class action if HP is required to pay a judgment or settlement for which he should share some responsibility;

      12.   **Hussain Employee-Duty Claim**: With respect to the prospect of a claim that Hussain breached his duty of loyalty to HP as an employee for his post-Acquisition conduct, the Committee considered the treatment of such claims in the Northern District of California, where some courts have held that a breach of such a duty occurs only when an employee transfers his or her loyalty to another, competing employer, such as by working for the competitor.

    B.   **Conclusions and Recommendations**: The review found that HP's present and former directors and officers (other than Lynch for his conduct after the Acquisition) engaged in a reasonable process for acquiring Autonomy and managing it after the Acquisition, that they were guided by reasonable business judgments based upon assumptions and estimates that appeared reasonable at the relevant time, that they reasonably relied on all reasonably available material information before making decisions (including advice received from professional advisors and consultants, the fairness opinions given by HP's financial advisors, and (with respect to directors) representations of management), and that they (*i*) *did not* act in bad faith,

with a conscious disregard of their responsibilities, or in furtherance of their personal interests in connection with the Acquisition, Integration, or Impairment, (*ii*) *did not* (for HP's directors) breach their duty of oversight, (*iii*) *did not* act with gross negligence or recklessness in connection with the Acquisition, the Integration or the Impairment (although the directors would be exculpated from financial liability for any such conduct in any event), (*iv*) *did not* engage in any abuse of control (which the Committee understands to be the same as an allegation of breach of fiduciary duty), irrationally squander corporate assets, or obtain any improper personal benefit or unjust enrichment, (*v*) *did not* knowingly, deliberately, recklessly, grossly negligently, or negligently disseminate false information to the Company, its shareholders, or the securities markets in connection with public statements regarding the Acquisition, the Integration, the Impairment, or the financial condition, operating results or future prospects of HP and/or Autonomy, and (*vi*) *did* act in good faith and in a manner intended to promote the Company's bests interests in connection with the Acquisition, Integration, and Impairment, (*vii*) *did* (for HP's directors) fulfill their oversight responsibilities, (*viii*) *did* act with reasonable care and informed themselves of all reasonably available material information before making decisions in connection with the Acquisition, Integration, and Impairment, (*ix*) *did* seek to obtain (and did in fact obtain) value for corporate expenditures in connection with the Acquisition, Integration, and Impairment, and (*x*) *did* attempt to inform (and did in fact inform) the Company, its shareholders, and the securities markets of information about the Acquisition, the Integration, the Impairment, and the financial condition, operating results, and future prospects of HP and Autonomy. Accordingly, the Committee recommends that no claims be pursued as to present and former HP officers and directors, except that the Company should preserve any contribution claims that might exist against Lynch in connection with the Securities Class Action and/or the ERISA class action.

## XIX.  Potential Claims Against HP's Professional Advisors Arising Out of the Acquisition

A.    **Shareholder Claims:**  The Committee evaluated the Claims made in the Derivative Actions and/or the Demand Letters relating to conduct of HP's professional advisors Barclays, Perella and KPMG (collectively "HP's Professional Advisors")[4] respecting the Acquisition, including whether HP's Professional Advisors:

> 1.    Breached professional and contractual duties to HP in (*i*) rendering faulty advice and (*ii*) conducting inadequate financial and business due diligence on Autonomy; and

---

[4]    The Committee also reviewed the pre- and post-acquisition conduct of (*i*) other HP professional advisors (Gibson Dunn, Morgan Lewis, and Freshfields), (*ii*) Autonomy's professional advisors (Slaughter and May, Qatalyst, and Morgan Lewis), and (*iii*) certain VARs that had entered into allegedly improper transactions with Autonomy before the Acquisition.  After deliberating over whether those parties' conduct gave rise to claims by HP or Autonomy, the likelihood of succeeding in the prosecution of any such claims, and the costs and benefits of pursuing any such claims, the Committee reached the conclusions further described below.

     2.      Were motivated to close the Acquisition for their own financial gain.

    B.    **Potential Claims**:  In considering the allegations relating to these subjects, the Committee considered the following Potential Claims could be asserted by or on behalf of the Company against some or all of HP's Professional Advisors in relation to the Acquisition: (*i*) negligence/professional malpractice, (*ii*) aiding and abetting breach of fiduciary duty and (*iii*) breach of contract.

    C.    **Committee Findings**:  The Committee, upon consideration of all reasonably available information relating to the conduct of HP's Professional Advisors and E&Y in connection with the Acquisition, and taking into account standards prescribed by (*i*) negligence/professional malpractice, (*ii*) aiding and abetting breach of fiduciary duty, (*iii*) breach of contract, and, as to Barclays, (*iv*) fraud, finds as follows:

    1.    **Barclays**

        a.     Barclays' duties and liabilities in connection with the Acquisition are subject to presumptively valid contractual limitations, including a limitation of liability based other than on bad faith, willful misconduct, or gross negligence.

        b.     The Letter of Engagement entered into between HP and Barclays provides for Barclays to (*i*) deliver general business and financial analysis, (*ii*) assist in negotiations and related strategy, (*iii*) advise on the UK Takeover Panel and (*iv*) identify and arrange transaction financing.  The Letter of Engagement disclaims any duties or obligations other than those expressly undertaken, including any duty to assure the adequacy of due diligence.

        c.     No evidence was found suggesting deliberate concealment or that Barclays had acted in bad faith, engaged in willful misconduct or had otherwise been grossly negligent in its work on the Acquisition.

        d.     Barclays understood that HP's directors and officers (*i*) had engaged in an extensive market assessment, financial analysis, and modeling of Autonomy, (*ii*) had participated in the analysis of Autonomy and Autonomy products before the Acquisition, (*iii*) had participated in multiple meetings to consider the Acquisition, and (*iv*) had retained other advisors, including KPMG and Perella, to assist HP in its analysis and due diligence – all of which supports a view that Barclays could reasonably conclude that HP's directors and officers were fulfilling their duties of care and loyalty and, conversely, that Barclays did not "knowingly" participate in any such (nonexistent) breach.

        e.     The Committee has found that that HP's directors and officers did not breach their fiduciary duties in connection with the Acquisition – a finding that precludes an aiding/abetting claim against Barclays.

f.      No evidence was found that Barclays knew that any of its statements were false or that Barclays acted in reckless disregard as to whether any of its statements were false.

g.      Management and the Board were aware of Barclays' financial interest in the Acquisition.

h.      HP conducted its own examination and assessment of Autonomy directly and through other advisors and did not discover information inconsistent with statements made by Barclays.

i.      Barclays' conclusion that the consideration to be paid to acquire Autonomy was "fair" depended on Barclays' stated and reasonable reliance on market information regarding Autonomy and, to a significant degree, on Barclays' adoption of HP management's assumptions regarding Autonomy financial projections and synergies. Barclays' adoption of these assumptions, at the request of HP's management, was expressed in the formal fairness opinion as well as the accompanying presentation.

j.      The facts that two law firms – Brown Rudnick as to Barclays, and Choate as to Perella – undertook separate investigations of the two financial advisors whose roles in the Acquisition overlapped to some degree and that each law firm, being equally diligent and thorough, has recommended that no litigation be brought against either advisor enhanced the Committee's capacity to vet the reasonableness of the recommendations regarding both Barclays and Perella.

2.   **Perella**

a.      As originally contemplated, Perella's role was to provide broad strategic advice to HP, a role that later matured into (*i*) evaluating the rationale for the Acquisition, (*ii*) addressing premium-to-market issues, (*iii*) assessing potential shareholder reaction, and (*iv*) providing an independent view on transaction advice, due diligence, and valuation analysis.

b.      Perella agreed to a monthly retainer (and minimum fee) with the opportunity to negotiate in good faith for an enhanced fee, which arrangement was subsequently modified in a later engagement letter to a flat fee, subject to a potential enhancement (which was not paid).

c.      Perella's engagement letter contained an indemnity from liability and expressed Perella's right to rely on information provided to it without verifying the accuracy of that information.

d.      Perella (*i*) participated in due-diligence calls with Autonomy, (*ii*) provided advice on due-diligence and deal-protection considerations, (*iii*) provided advice in connection with price negotiations, (*iv*) performed a DCF analysis, (*v*) presented to the Board, (*vi*) delivered a fairness opinion, (*vii*) counseled HP concerning the prospects of post-

announcement withdrawal from the Acquisition and (*viii*) prepared a presentation for HP regarding potential responses to the Joe Bloggs attack on Autonomy.

e.      Perella agrees that it was provided with access to the due-diligence information it needed to perform its engagement regarding the Acquisition and does not believe that HP should have done more due diligence or conducted the process differently.

f.      Perella attended and presented to the HP Board at meetings on July 19-21, August 5, August 12, August 16, and August 18, 2011 regarding (*i*) the strategic rationale for the Acquisition and the pros and cons of the Acquisition and (*ii*) the valuation analysis, including a DCF model based in part on Autonomy's public filings, Wall Street research, and estimates made by HP regarding Autonomy's future performance and synergies.

g.      No evidence was found that would suggest that Perella knew about any of the alleged improprieties at Autonomy or could reasonably be expected to have detected them under the circumstances.

h.      Perella's valuation analysis was roughly consistent with Barclays' and HP's own analyses.

i.      Perella understood that HP's directors and officers (*i*) had engaged in an extensive market assessment, financial analysis, and modeling of Autonomy, (*ii*) had participated in the analysis of Autonomy and Autonomy products before the Acquisition, (*iii*) had participated in multiple meetings to consider the Acquisition, and (*iv*) had retained other advisors, including KPMG and Barclays, to assist HP in its analysis and due diligence – all of which supports a view that Perella could reasonably conclude that HP's directors and officers were fulfilling their duties of care and loyalty and, conversely, that Perella did not "knowingly" participate in any such (nonexistent) breach.

j.      The Committee has found that that HP's directors and officers did not breach their fiduciary duties in connection with the Acquisition – a finding that precludes an aiding/abetting claim against Perella.

3.      **KPMG**

a.      KPMG, which routinely provides transaction-support services to HP, was retained on July 25, 2011 pursuant to a Standard Service Agreement and a Statement of Work specific to the Acquisition to help HP perform financial due diligence regarding the Acquisition (led by partner Andrew Gersh), including (*i*) preparation of due-diligence questions for HP to use, (*ii*) participation in due-diligence calls with Autonomy in early August 2011, (*iii*) participation in the August 17, 2011 call with Deloitte and (*iv*) assistance with the post-closing balance sheet in October 2011.

b.      The Statement of Work stated the due-diligence services to be provided.

   c.  KPMG participated in due-diligence calls with Autonomy during the week of August 1 respecting, among other things, (*i*) Autonomy's recently released half-year financial statements, (*ii*) revenue-recognition policies and procedures, including recognition of revenue from transactions with VARs, (*iii*) Autonomy's balance sheet and income statement and (*iv*) three key customer contracts.

   d.  KPMG prepared a draft report dated August 9, 2011 to describe its due-diligence work, which report was not superseded by a final version even though further due diligence (including an August 17 due-diligence call with Deloitte) occurred.

   e.  KPMG's report noted the "very limited" information that KPMG was provided by Autonomy, but added that the data and access that were provided were comparable to those available in other acquisitions involving large UK public companies. The Committee's UK due-diligence experts confirmed to the Committee that KPMG's assertions about the extent of pre-Acquisition access to due-diligence materials reflected standard UK market practices for acquisitions of FTSE 100 companies.

   f.  KPMG's draft report identified the particular activities outlined in the Statement of Work that KPMG had been able to perform, as well as those that it could not perform because of the limited information that Autonomy had provided.

   g.  KPMG was a signatory to the Deloitte's August 16, 2011 letter agreement, which KPMG confirmed was standard practice in circumstances such as this.

   h.  KPMG confirmed to HP that lack of access to auditor workpapers was not unusual in UK public-company transactions.

   i.  KPMG provided suggested questions to be asked of Deloitte during the August 17, 2011 diligence call, which questions HP forwarded to Autonomy.

   j.  No information was found that KPMG knew of any of the alleged improprieties at Autonomy before the Acquisition or that KPMG reasonably could have been expected to have detected them under the circumstances.

   k.  In its post-closing balance-sheet review, KPMG found evidence of certain hardware sales and made inquiries about them.

  **4.**  **Ernst & Young**

   a.  E&Y has audited HP's financial statements since 2000.

   b.  E&Y did not participate in any aspect of due diligence preceding the Acquisition.

   c.  E&Y (*i*) participated, post-Acquisition, in the allocation of the Autonomy purchase price among Autonomy's tangible and intangible assets and goodwill,

(*ii*) was allowed to view (but not copy) Deloitte workpapers relating to Autonomy in the context of E&Y's effort to create an opening balance sheet post-Acquisition, (*iii*) reviewed HP's quarterly financial disclosures in Q1-Q3 2012 and, in that context, reviewed Autonomy management's analysis of Autonomy's revenue and costs, and (*iv*) acted as HP's auditor with respect to the ES and Autonomy impairments, and (*v*) reviewed HP's disclosures and anticipatory disclosures concerning those impairments.

        d.      The Autonomy purchase-price allocation was prepared by Duff & Phelps. E&Y then audited that allocation, and the results of that allocation were disclosed in HP's FY 2011 Report on Form 10K.

        e.      In the course of E&Y's exposure to Deloitte's workpapers for the purpose of establishing an opening balance sheet (and not for the purpose of assessing the accuracy of prior financial disclosures or the adequacy of Deloitte's services as Autonomy's pre-Acquisition auditor), E&Y noted that Autonomy had sold material quantities of hardware (although it was not entirely clear at that time whether those sales had involved hardware embedded with software). E&Y reported its observation to HP management.

        f.      E&Y also observed other information in Deloitte's workpapers that, when viewed in the context of other facts that are now known, appear to be relevant to wrongful conduct by Autonomy management, but E&Y did not deem those observations to be sufficiently significant to report to HP management.

        g.      In the course of E&Y's review of HP's Q1 and Q2 2012 financial disclosures, E&Y noted accounting weakness at Autonomy, and, as a result, HP and E&Y increased the level of scrutiny that they applied to Autonomy's revenue-recognition processes beginning in Q2 2012.

        h.      E&Y reviewed HP's 2Q 2012 disclosure of the possibility of an impairment charge relating to ES in Q3 2012 as well as HP's 3Q 2012 disclosure of the possibility of an impairment charge relating to Autonomy in Q4 2012. EY deemed those disclosures to be appropriate in the circumstances, as does the Committee.

        i.      E&Y audited the impairment charges taken for the ES and Autonomy business units and deemed the amounts of those charges to be reasonable.

        j.      E&Y performs other non-audit services for HP, but the amount of those fees in relation to its audit fees (10% to 15% of total fees) is below that of many peer companies.

D.    **Costs/Benefits**:  In reaching its recommendations and exercising its business judgment regarding whether claims should be pursued by or on behalf of the Company against HP's Professional Advisors and/or E&Y, the Committee considered the costs/benefits and risks/rewards of initiating claims, including, among other things:

1.    Whether the Company would likely prevail on the Potential Claims against HP's Professional Advisors and/or E&Y relating to the Acquisition, while also exercising its business judgment as to whether asserting such claims would be in the Company's best interest.

2.    The ability of HP's Professional Advisors and/or E&Y to pay any settlement awards or any judgment amounts entered if the Company were to succeed in establishing the merits of its Potential Claims against those advisors.

3.    The high prosecution costs of pursuing an action against any of HP's Professional Advisors and/or E&Y, including (*i*) the risk of litigating any such claims in both the US and the UK simultaneously against different advisors, (*ii*) complying with discovery demands made by its advisors in their defense of such litigation and (*iii*) the fee-shifting provisions of English law.

4.    The engagement agreements that HP entered into with its advisors and (where applicable) whether the terms of such agreements limited such advisors' role in the Acquisition process, or limit or preclude the Company from bringing claims relating to each advisor's work on the Acquisition.

5.    The risk of some or all of its advisors' bringing counterclaims against the Company in response to an action against them.

6.    The impact of pursuing such claims on the Company's defense of the Securities and ERISA class actions.

7.    Business considerations, including, (*i*) distraction of key HP employees from their day-to-day business operations (*ii*) the potential for adverse media attention resulting from a revived attention to past negative corporate events, (*iii*) the demands that litigation would impose on in-house counsel tasked with prosecution of those claims and (*iv*) the burden that litigation would impose on the Company's directors, officers and employees in complying with discovery and trial proceedings and monitoring the progress of the litigation.

8.    Potential damage to the Company's professional relationships with some or all of its advisors if it were to bring an action against one or more of HP's Professional Advisors and/or E&Y.

E.    **Conclusions and Recommendations**:  The review found that HP's Professional Advisors and E&Y were guided by reasonable professional judgments based upon reasonable assumptions and estimates, reasonably relied on all reasonably available material information before making decisions, and (*i*) *did not*, as HP's professional advisors, act negligently, in bad

faith, or with a disregard of their responsibilities in the Acquisition, or otherwise act outside the normative standards of conduct for each of their professions, (*ii*) *did not* negligently or recklessly disseminate false information to HP or the securities markets with respect to public statements regarding the Acquisition or the financial condition or operating results and future prospects of HP and/or Autonomy, (*iii*) in the case of E&Y, *did not* engage in any professional negligence in connection with its audits of HP's financial statements, its review of HP's quarterly financial statements, its review of HP's public disclosures, and any advice rendered in connection with the Autonomy and ES impairment charges and disclosures relating to those charges, and (*iv*) *did* act in good faith, in a reasonable effort to fulfill their responsibilities as defined by their engagement letters and otherwise, and within the normative standards of conduct for each of their professions.  Accordingly, the Committee recommends that no claims be pursued as to HP's Professional Advisors or E&Y.

## XX.   Potential Claims Against Autonomy and/or Its Former Directors and Officers Arising out of the Acquisition

A.     **Shareholder Claims:**  The Committee evaluated the claims made in the Derivative Actions and/or the Demand Letters relating to conduct of Autonomy and its former directors and officers, including that:

1.   Michael Lynch made materially false and misleading statements regarding the Autonomy acquisition and Autonomy's business, financial condition, and accounts;

2.   Michael Lynch was motivated to close the Autonomy transaction for his own financial gain;

3.   Michael Lynch engaged in and/or condoned aggressive or deceptive accounting practices;

4.   Certain Autonomy directors, officers, and employees also engaged in aggressive or deceptive accounting practices; and

5.   Certain Autonomy directors, officers, and employees also made material misstatements in connection with the Acquisition.

B.     **Potential Claims**:

1.     **Autonomy**:
       REDACTED FOR PRIVILEGE

2.     **Autonomy Officials**:
       REDACTED FOR PRIVILEGE

59

REDACTED FOR PRIVILEGE

C.      **Committee Findings**:
REDACTED FOR PRIVILEGE

2.      **Claims Against Autonomy**
REDACTED FOR PRIVILEGE

3. **Claims Against Autonomy Officials**

REDACTED FOR PRIVILEGE

D. **Costs/Benefits**:

REDACTED FOR PRIVILEGE

1. **Claims Against Autonomy**

REDACTED FOR PRIVILEGE

REDACTED FOR PRIVILEGE

2.   **Claims Against Autonomy Officials**

REDACTED FOR PRIVILEGE

REDACTED FOR PRIVILEGE

E.      **Conclusions and Recommendations**

1.      In light of all of these considerations (and others), and informed by the appropriate laws under which any claims could be pursued, the Committee recommends that the Board:

a.      Cause **Bidco** to direct Committee counsel to take such actions as are necessary and appropriate under English law (including compliance with any applicable pre-action protocols) to commence proceedings **against Lynch and Hussain in England** for deceit and misrepresentation or misstatement to redress the injury suffered by Bidco in connection with the Acquisition;

63

b.      Cause **Bidco** to direct Committee counsel to assert claims **against Autonomy** under English law (including FSMA) arising out of Autonomy's publication or other disclosure of materially misleading information respecting its financial condition, operating results, future prospects and business model;

c.      Cause **Autonomy** to direct Committee counsel to take such actions as are necessary and appropriate under English law (including compliance with any applicable pre-action protocols) to commence proceedings **against Lynch and Hussain in England** for injury incurred in connection with Bidco's claims against Autonomy and Autonomy's other losses, and

d.      Cause **HP/Bidco** to assert claims for recovery on behalf of HP/Bidco **against Lynch and Hussain in the US** for injury that HP/Bidco incurred in connection with the Acquisition.

2.      The Committee recommends that the commencement of such proceedings and assertion of such claims be deferred, for a period of time to be determined by the Committee, to give Company counsel and the Committee's counsel an opportunity to explore whether the claims can be resolved without further proceedings.

3.      The Committee further recommends that, if the Company asserts claims against Lynch and Hussain in the US, it consider staying the prosecution of such claims pending proceedings in England.

## XXI.   Potential Claims Against Deloitte

A.      **Shareholder Claims**:  The Committee evaluated the Claims made in the Derivative Actions and the Demand Letters relating to the conduct of Deloitte in connection with the Acquisition, including whether Deloitte :

1.      Consciously ignored or recklessly/negligently disregarded red flags about accounting problems at Autonomy prior to the Acquisition;

2.      Failed to conform its audits of Autonomy to the applicable normative standards of conduct for independent auditors practicing in England;

3.      Misled HP (and KPMG) in responding to questions posed to it in the August 17, 2011 due-diligence call;

4.      Exhibited an appropriate degree of independence and professional skepticism in conducting the Autonomy audits.

64

B.   **Potential Claims**:

REDACTED FOR PRIVILEGE

C.   **Committee Findings**:

REDACTED FOR PRIVILEGE

REDACTED FOR PRIVILEGE

D.       **Costs/Benefits**:

REDACTED FOR PRIVILEGE

REDACTED FOR PRIVILEGE

E.    **Conclusions and Recommendations**:

1.    In light of these considerations, the Committee recommends that the Board cause Autonomy to direct Committee counsel to take such actions as are necessary and appropriate under English law (including compliance with any applicable pre-action protocols) to commence proceedings against Deloitte in England for injury incurred by Autonomy in connection with Bidco's claims against Autonomy and any other losses that Autonomy suffered as a result of Deloitte's conduct.

2.    The Committee recommends that the commencement of such proceedings be deferred, for a period of time to be determined by the Committee, to give Company counsel and the Committee's counsel an opportunity to explore whether the claims can be resolved without further proceedings.

## XXII.  Other Claims/Allegations Against HP Directors and Officers[5]

### A.      EDS issues

1.      **Description of Allegations**:  In a harbinger of what followed in the Autonomy acquisition, HP (*i*) recklessly pursued and failed to conduct adequate due diligence on EDS, (*ii*) overpaid for EDS, (*iii*) mismanaged EDS after it was acquired, and (*iv*) misled investors about these matters and the roles played by various HP officers and directors in connection with them.

2.      **Committee Findings**:  The Committee, upon consideration of all reasonably available information relating to the conduct of HP's officers and directors, and taking into account the allegations described above, finds as follows:

a.      On May 13, 2008, HP announced the acquisition of EDS for $13.9 billion.

b.      The EDS acquisition was first presented to the Board and the FIC on January 17, 2008 with the strategic objective of increasing HP's services footprint and maximizing cost and revenue synergies.

c.      HP undertook comprehensive operational due diligence of EDS and (*i*) retained professional advisors, including PwC (which committed over 11,000 hours of support resulting in a 646-page due-diligence report focusing on EDS operations, financing, and integration planning), and (*ii*) obtained a fairness opinion from Lehman Brothers supporting the reasonableness of the EDS valuation.

d.      HP's Board (*i*) was actively involved in considering and approving the proposed acquisition of EDS, (*ii*) received detailed written presentations in advance, (*iii*) discussed the strategic rationales for the acquisition, the due-diligence findings, the valuation analysis, the potential synergies, the proposed operating model, possible alternatives, market reactions and the proposed timetable and (*iv*) adopted and approved resolutions authorizing HP to acquire EDS for $25 per share.

---

[5]      In addition to the claims assessed in this section and otherwise in this Resolution, the Derivative Actions and Demand Letters assert (*i*) Sarbanes-Oxley violations, which the Committee treated as derivative of other claims considered in this Resolution, (*ii*) that directors and officers failed to pursue wrongdoers to obtain recovery for misconduct, a topic that the Committee addresses throughout this Resolution and in its recommendations for proceedings to be initiated, where appropriate, for injuries incurred by HP/Bidco for conduct this Committee deems to be actionable, and (*iii*) that HP directors have failed in their stewardship responsibilities, a topic that the Committee has considered otherwise in this Resolution (particularly with respect to HP directors' and officers' conduct in connection with the Acquisition and other matters) and as to which the Committee has made the indicated findings, conclusions and recommendations.

       e.      Five directors who voted for the EDS acquisition were not on the HP Board at the time of the Autonomy acquisition, and nine directors who voted for the Autonomy acquisition joined the HP Board after the EDS acquisition.

       f.      Commencing with an announcement within hours after the EDS acquisition, HP began a process of regular disclosures respecting the integration and restructuring program for EDS (including plans for a workforce reduction ("WFR")).

       g.      HP established an HP/EDS Steering Committee to oversee the integration of EDS.  The steering committee met regularly, provided monthly updates to HP's Executive Committee, and provided regular reports to key Board Committees about the progress of the integration and EDS's performance.

       h.      HP's senior management monitored the ES reporting unit (of which EDS became a part) and kept the Board, and its FIC and Audit Committee, apprised of the gradual erosion of ES's profitability, which was attributed to a number of factors, including (*i*) frequent business (and Company) leadership changes, (*ii*) failure to achieve certain ambitious business-case cost synergies due to certain execution issues, (*iii*) unintended consequences of the WFR initiatives, (*iv*) general macroeconomic conditions, (*v*) certain unprofitable contractual arrangements, and (*vi*) shifts in market trends.

       i.      The evaluation of a possible ES impairment was triggered by an HP-wide restructuring plan (which imposed significant pro-rata costs on ES because of ES's size), market conditions, declining margins, consideration of change in ES's long-term trajectory, and the total value of HP's reporting units in relation to the Company's market capitalization.

       j.      Accounting decisions and disclosures related to the impairment were reviewed and concurred in by HP's auditors.

       k.      In light of the decline in ES's revenue and profit, HP disclosed in Q2 2012 that it was evaluating the value of the ES reporting unit.

       l.      On August 8 and 22, 2012, HP, with the expert support of Duff & Phelps, announced an $8 billion goodwill impairment charge against its ES, which includes EDS. The impairment charge was finalized in Q4 2012, in connection with HP's annual goodwill impairment analysis.

      3.    **Conclusions and Recommendations**:  HP (*i*) engaged in a reasonable process in acquiring EDS in 2008 and in managing it after the acquisition, (*ii*) engaged in a reasonable process to assess and calculate the ES (including EDS) impairment, (*iii*) conveyed an early warning to the market in Q2 2012 about a possible revaluation of ES, (*iv*) appropriately disclosed both the prospect and the fact of the impairment, (*v*) was supported by Duff & Phelps, and (*vi*) obtained E&Y's concurrence in the impairment and disclosure process.  The Committee also has considered the applicable legal standards and the business and prudential considerations involved in determining whether any claims should be asserted.  Based on all of these

considerations, the Committee recommends that no claims be pursued as to HP officers and directors regarding the allegations raised as to ES/EDS, including the impairment charge and its timing and disclosure.

## B.    General Compensation Issues

1.    **Description of Allegations**:  Misconduct in connection with HP's general compensation of officers and directors.

2.    **Committee Findings Regarding Officer/Director Compensation**:  The Committee, upon consideration of all reasonably available information relating to the conduct of HP's officers and directors, and taking into account the allegations described above, finds as follows:

a.    HP's HR Department engages a management compensation consultant to research and analyze market data and make compensation recommendations.

b.    HP, through its Board and the Board's Human Resources & Compensation Committee ("HRC"), considers various factors in setting compensation levels for directors and officers, including (*i*) market competitiveness, (*ii*) internal equity, (*iii*) business results, and (*iv*) shareholder return on investment.

c.    The HRC (*i*) meets multiples times each year to consider total compensation metrics and awards (including bonus compensation and not merely base salaries), (*ii*) reviews market data and benchmarks against peer companies' data in setting compensation targets, and (*iii*) is supported by independent legal counsel and its own independent compensation consultants (different from those engaged by the HR Department), which consultants provide detailed compensation guidance on peer-group selection, benchmarking, business performance, and profitability.

d.    The HRC considers market trends and conditions before setting executive compensation (other than CEO compensation, which the Board sets), and the HRC reports its actions to the Board.

e.    In recent years, HP has been in approximately the 75th percentile for officer and director compensation among its peers.

f.    From at least 2004 to 2012, HP's Board and Committee members received no additional compensation for meeting attendance until after the first six meetings; since 2012, no additional compensation is paid for meeting attendance until after the first ten meetings.

3.    **Conclusions and Recommendations**:  HP, the HRC and the Board have reasonable processes for determining officer and director compensation, including (*i*) obtaining advice from independent consultants and attorneys, (*ii*) considering peer-group metrics that take into consideration HP's profitability and shareholder return on investment, (*iii*) setting

compensation consistent with its peer group's and (*iv*) receiving value for payments made to officers and directors.  The Committee also has considered the applicable legal standards and the business and prudential considerations involved in determining whether any claims should be asserted.  Based on all of these considerations, the Committee recommends that no claims be pursued as to HP officers and directors regarding HP's compensation of officers and directors.

C.      **Mark Hurd's Compensation and Severance**

1.      **Description of Allegations**:  Misconduct in connection with Mark Hurd's compensation and severance.

2.      **Committee Findings Regarding Mark Hurd's Compensation and Severance**:  The Committee, upon consideration of all reasonably available information relating to the conduct of HP's officers and directors, and taking into account the allegations described above, finds as follows:

a.      **Issues Concerning Hurd's Compensation**

i.      The issue concerning Mark Hurd's compensation appears to relate to the $42.5 million that he received for the 2008 fiscal year.

ii.      HP had been performing well during that period:  its revenue was well above the 75th percentile relative to HP's § 16 peer group, and HP's total shareholder returns and earnings per share growth had outperformed the S&P 500 and the Company's § 16 peer group from fiscal years 2005 through 2008.

iii.      The HRC and the Board considered Hurd's 2008 compensation after obtaining a report and advice from the HRC's compensation consultant.

b.      **Issues Concerning Hurd's Termination and Severance**

i.      Issues regarding Mark Hurd's termination and severance were examined by a prior Review Committee of the Board, represented by Dechert LLP, which found no merit to the claims.

ii.      The reviewing court found no wrongful refusal of the prior shareholder demand.

iii.      The Committee reviewed and took into consideration the work of the prior Committee and court ruling.

3.      **Conclusions and Recommendations Concerning Hurd's Compensation**:  HP, the HRC, and the Board engaged in reasonable processes for making decisions about Hurd's compensation, including (*i*) obtaining advice from independent consultants, (*ii*) considering peer-group metrics and practices, (*iii*) setting compensation consistent with its peer group's and (*iv*) receiving value for payments made.  The Committee also

has considered the applicable legal standards and the business and prudential considerations involved in determining whether any claims should be asserted. Based on all of these considerations, the Committee recommends that no claims be pursued as to HP officers and directors regarding HP's compensation of Mark Hurd.

**4.** **Conclusions and Recommendations Concerning Hurd's Termination and Severance**: The Committee defers to the work of the prior Committee and the determinations of the reviewing court, and, accordingly, the Committee recommends that no claims be pursued as to HP officers and directors regarding Mark Hurd's termination and severance.

**D.** **Léo Apotheker's Hiring and Severance**

**1.** **Description of Allegations**: Misconduct in connection with Léo Apotheker's hiring and severance.

**2.** **Committee Findings Regarding Apotheker Hiring and Severance**: The Committee, upon consideration of all reasonably available information relating to the conduct of HP's officers and directors, and taking into account the allegations described above, finds as follows:

**a.** Apotheker's hiring was examined by a prior Review Committee of the Board, represented by Wilmer Hale LLP, which found no merit to the claims.

**b.** The Committee reviewed and took into consideration the work of the prior Committee.

**c.** Apotheker's $13.2 million severance was paid pursuant to his employment agreement, and his restricted stock was payable immediately upon separation.

**d.** Apotheker's $2.4 million bonus was the minimum permitted under his employment agreement, and the FY 2011 performance goals were determined by the terms of his contract to have been met.

**e.** Whitman's comment that "the CEO at the time and the Head of Strategy who led this deal are both gone: Léo Apotheker and Shane Robison" was intended to convey that those two executives had "owned" the transaction process, but were no longer with the Company – not that they had engaged in any wrongdoing in connection with the Acquisition.

**3.** **Conclusions and Recommendations**: The Committee defers to the work of the prior Committee on Apotheker's hiring and, with respect to his severance, concludes that the payments were made pursuant to the terms of his employment contract and, in any event, were not made in bad faith and did not constitute an irrational squandering of corporate assets. The Committee also has considered the applicable legal standards and the business and prudential considerations involved in determining whether any claims should be asserted. Based on all of these considerations, the Committee recommends that no claims be pursued as to HP

72

officers and directors regarding Léo Apotheker's hiring and severance and that no claim be pursued against Apotheker for any breach of duty or unjust enrichment in accepting the payments made to him.

### E.    Margaret Whitman's Hiring

1.    **Description of Allegations**:  Claims by demanding shareholder that HP hired Margaret Whitman despite her lack of technology-industry experience and despite eBay's allegedly reckless acquisition of Skype when Whitman was eBay's chief executive officer.

2.    **Committee Findings Regarding Margaret Whitman's Hiring**:  The Committee, upon consideration of all reasonably available information relating to the conduct of HP's officers and directors, and taking into account the allegations described above, finds as follows:

a.    The demanding shareholder made similar claims in a prior complaint, which was dismissed by the Court with prejudice.

b.    Whitman, since her appointment as CEO, has provided excellent leadership for the Company.

3.    **Conclusions and Recommendations**:  The Committee concludes that the hiring of Whitman was prudent and that HP's Board did not breach any duty in hiring her as HP's chief executive officer.  The Committee also has considered the applicable legal standards and the business and prudential considerations involved in determining whether any claims should be asserted.  Based on all of these considerations, the Committee recommends that no claims be pursued as to HP officers and directors regarding Margaret Whitman's hiring.

### F.    Lack of CEO Succession Plan

1.    **Description of Allegations**:  Claims by a demanding shareholder that HP has no succession plan and "no serious process" to evaluate potential CEO candidates based on disclosed criteria.

2.    **Committee Findings Regarding CEO Succession Plan**:  The Committee, upon consideration of all reasonably available information relating to the conduct of HP's officers and directors, and taking into account the allegations described above, finds as follows:

a.    A prior Board Review Committee, represented by Dechert LLP, examined similar allegations and found that HP had and has an "emergency" CEO succession plan and a long-term process to identify CEOs.

b.    The court reviewing the Board's decision, based on that Committee's recommendation, held that the Board had not wrongfully refused the demanding shareholder's allegations on the CEO succession plan.

       c.     Another court (Delaware Chancery) held that HP's directors did not face a substantial threat of liability for allegedly failing to establish a CEO succession plan because the plaintiff had not identified a basis from which the existence of such a known duty to establish such a plan could reasonably be inferred.

       3.     **Conclusions and Recommendations**: The Committee defers to the work of the prior Committee regarding the CEO succession plan and the court decisions addressing this issue. Accordingly, the Committee recommends that no claims be pursued as to HP officers and directors regarding a CEO succession plan.

       G.     **Shane Robison's Compensation**

       1.     **Description of Allegations**: Misconduct in connection with excessive compensation paid in 2011 to Shane Robison.

       2.     **Committee Findings Regarding Robison Compensation**: The Committee, upon consideration of all reasonably available information relating to the conduct of HP's officers and directors, and taking into account the allegations described above, finds as follows:

       a.     Robison retired on November 1, 2011, after eleven years at HP, and he received total 2011 compensation valued at approximately $9 million.

       b.     Robison (*i*) led many of HP's largest acquisitions and HP's research and development program, (*ii*) served as HP's Chief Strategy & Technology Officer, overseeing HP's technology strategy and investments, and (*iii*) led HP's Strategy and Corporate Development Group, including its in-house M&A function.

       c.     Robison's position was *sui generis*, in light of his broad range of responsibilities: surveys showed no valid match at comparable companies.

       d.     Robison's FY 2011 base compensation, which was set in the fall of 2010, several months before HP's first contacts with Autonomy, reflected market conditions and internal pay-equity considerations.

       e.     Robison's bonus compensation amount and stock awards were set before the ATN for Autonomy.

       f.     Whitman's comment that "the CEO at the time and the Head of Strategy who led this deal are both gone: Léo Apotheker and Shane Robison" was intended to convey that those two executives had "owned" the transaction process, but were no longer with the Company – not that they had engaged in any wrongdoing in connection with the Acquisition.

       3.     **Conclusions and Recommendations**: Robison's compensation was set according to the reasonable terms of his employment, and consistent with the compensation process discussed above. The Committee also has considered the applicable legal standards and

the business and prudential considerations involved in determining whether any claims should be asserted. Based on all of these considerations, the Committee recommends that no claims be pursued as to HP officers and directors regarding Robison's compensation, or against Robison for accepting the compensation paid to him.

H. **Share Repurchases**

  1. **Description of Allegations**: The HP Board's implementation of its 2011 authorization of a $10 billion share repurchase authority was grossly negligent and reckless given that, between June 2011 and November 2012, the Board was in possession of material non-public information respecting substantial future impairment charges, Autonomy accounting fraud and faults in Autonomy's technology platform.

  2. **Committee Findings Regarding Share Repurchases**: The Committee, upon consideration of all reasonably available information relating to the conduct of HP's officers and directors, and taking into account the allegations described above, finds as follows:

   a. HP's stock-repurchase program has been in effect continuously since at least FY 2002, with regular board reauthorizations.

   b. HP repeatedly and publicly stated its intent to maintain the share-repurchase program to respond to dilution from the issuance of shares under employee-benefit programs.

   c. The market wanted and expected HP to continue its share repurchases, especially to avoid dilution, and at least some investors wanted HP to increase its share repurchases.

   d. On July 19, 2011, the FIC recommended that the Board approve authorization for an additional $10 billion share repurchase after receiving and considering a presentation on HP's share-repurchase program and management's rationale for the additional authorization – which included a valuation summary indicating that HP was "currently trading at attractive levels" and summarizing HP's capital-investment priorities.

   e. The Board's authorization, which was granted one month before the Autonomy acquisition was announced, 13 months before the ES impairment charge was announced, and 16 months before the Autonomy impairment charge was announced, (*i*) did not direct any particular level of repurchase activity, (*ii*) permitted flexibility in capital allocation and (*iii*) delegated to management the balancing of capital-allocation priorities and the authority to implement up to the authorized amount of repurchases.

   f. Management's implementation was aimed at seeking highest risk-adjusted returns for capital.

   g. After the close of each fiscal quarter, HP's CFO (*i*) evaluates the implementation for the next quarter, (*ii*) recommends the level of repurchases to the CEO, taking

into consideration capital-allocation priorities, option-exercise forecasts, cash and debt projections, and impact on ratings and HP stock values, and (*iii*) implements a 10b5-1 plan for the quarter, to be administered by a share-repurchase agent without HP's subsequent involvement.

h.      Management greatly reduced share repurchases after the Autonomy acquisition (still focused on maintaining "zero dilution" and HP's debt rating), notwithstanding the fact that at least some institutional investors were urging ever-greater share repurchases.

i.      The May 31, 2011 10b5-1 plan was implemented before any commitment was made to acquire Autonomy, and 15 months before the ES impairment and at a time when no impairment triggers were yet perceived; the September 30, 2011 plan was implemented before the closing of the Autonomy tender offer and 11 months before the ES impairment, when no impairment triggers were yet perceived; the December 22, 2011 plan was implemented before HP acquired any knowledge about problems at Autonomy and eight months before the ES impairment, when no impairment triggers were perceived; the March 9, 2012 plan was implemented 2½ months before accounting concerns were raised by a legacy Autonomy official and five months before the ES impairment, when no impairment triggers were perceived; the May 31, 2012 plan was implemented only six days after the legacy Autonomy official first expressed his concerns and before their significance was known, and 2½ months before the ES impairment, when HP was only beginning to evaluate the potential need for an impairment review; and the August 30, 2012 plan was implemented after the August 22, 2012 Q3 earnings announcement signaling a possible Autonomy impairment in Q4, but *before* any decision was made about whether Autonomy was impaired, and *after* HP's August 8 and August 22, 2012 announcements of the ES impairment charge.

3.      **Conclusions and Recommendations**: HP's share-repurchase program was a long-standing program designed in part to offset dilution in response to market expectations. The program was implemented utilizing prophylactic 10b5-1 plans that met the prescribed standards for such plans. The Board, in reasonable reliance on, among other things, the work of its FIC, acted in good faith and exercised reasonable oversight in re-authorizing the repurchase program and understanding how management intended to implement it. HP officials acted with due care and good faith in implementing the program. HP also appropriately disclosed the existence and operation of the program. HP also received value for its share repurchases. The Committee also has considered the applicable legal standards and the business and prudential considerations involved in determining whether any claims should be asserted. Based on all of these considerations, the Committee recommends that no claims be pursued as to HP officers and directors regarding the stock-repurchase program.

I.      **Proxy Disclosures**

1.      **Description of Allegations**: Claims by demanding shareholder of misconduct with respect to proxy statements' failures to disclose director and auditor misconduct and incompetence, as well as the existence of special committees.

76

2.    **Committee Findings Regarding Proxy Disclosures**:  The Committee, upon consideration of all reasonably available information relating to the conduct of HP's officers and directors, and taking into account the allegations described above, finds as follows:

a.    A prior Board Review Committee, represented by Dechert LLP, examined similar allegations by the demanding shareholder and found that no misconduct had occurred.

b.    The court reviewing the Board's decision, based on the Committee's recommendation, held that the Board had not wrongfully refused the demanding shareholder's allegations on the proxy claims.

c.    HP had no obligation to confess wrongdoing that does not appear to have occurred.

d.    HP has no duty to disclose one-time, ad hoc committees.

3.    **Conclusions and Recommendations**:  The Committee defers to the work of the prior Committee and the determinations of the reviewing court.  The Committee also reaches the same conclusions as to similar allegations concerning the proxy statement issued after the prior Committee's work and the court's determinations.  In addition, the Committee has considered the applicable legal standards and the business and prudential considerations involved in determining whether any claims should be asserted.  Based on all of these considerations, the Committee recommends that no claims be pursued as to HP officers and directors regarding proxy disclosures.

J.    **Failed Acquisition Strategy**

1.    **Description of Allegations**:  Derivative complaints and demand letters charge that HP has engaged in a failed acquisition strategy over many years, including with respect to Autonomy, EDS, Palm and 3PAR.

2.    **Committee Findings Regarding HP's Acquisition Strategy**:  The Committee, upon consideration of all reasonably available information relating to the conduct of HP's officers and directors, and taking into the allegations described above, finds as follows:

a.    Previous sections of this resolution discuss HP's acquisitions of Autonomy and EDS.

b.    The Palm acquisition is currently being reviewed by the Committee in connection with a demand made by another shareholder and will be the subject of a separate report and recommendation to the Board.

c.    The 3PAR acquisition was the subject of a prior report by a Board Review Committee (represented by Dechert LLP), a Board decision that found the allegations to be without merit, and a court decision that upheld the Board's refusal of demand regarding the

77

3PAR acquisition, which ruling is on appeal to the United States Court of Appeal for the Ninth Circuit.

3.     **Conclusions and Recommendations**: The Committee defers to the work of the prior Committee and the court decision respecting the 3PAR acquisition, refers to prior conclusions in this Resolution respecting Autonomy and EDS, and will address the Palm acquisition issues in its ongoing review of that acquisition. Accordingly, the Committee recommends that no claims be pursued as to HP officers and directors regarding a failed acquisition strategy (subject to whatever findings and recommendations the Committee reaches in its subsequent resolution concerning the Palm acquisition).

K.     **Bribery, Kickbacks, and Illegal Rebates**

1.     **Description of Allegations**: Shareholder claims of misconduct with respect to oversight and remedial failures regarding the payment of bribes in violation of the Foreign Corrupt Practices Act (the "FCPA") and "stonewalling" DoJ and SEC investigations.

2.     **Committee Findings Regarding Bribery, Kickbacks and Illegal Rebates**: The Committee, upon consideration of all reasonably available information relating to the conduct of HP's officers and directors, and taking into account the allegations described above, finds as follows:

a.     Issues regarding certain alleged FCPA misconduct were examined by a prior Review Committee of the Board, represented by Dechert LLP, which found no merit to the claims.

b.     The reviewing court upheld the Board's refusal of the shareholder demand.

c.     The Committee reviewed and took into consideration the work of the prior Committee and court ruling.

3.     **Conclusions and Recommendations**: The Committee defers to the work of the prior Committee and the determinations of the reviewing court concerning the FCPA allegations previously considered. Accordingly, the Committee recommends that no claims be pursued as to HP officers and directors regarding bribery, kickbacks and illegal rebates in connection with those matters.

L.     **Foreign-Loan Program**

1.     **Description of Allegations**: Shareholder claims that HP engaged in a "questionable tax evasion scheme" involving "staggered foreign loans."

2.     **Committee Findings Regarding Foreign-Loan Program**: The Committee, upon consideration of all reasonably available information relating to the conduct of

HP's officers and directors, and taking into account the allegations described above, finds as follows:

          a.       In general, the Internal Revenue Code provides that no taxes are owed if an offshore company lends to a US company and the loan is repaid or unwound within the quarter.

          b.       HP, like many other US companies, engages in this practice – including in connection with financing the Autonomy Acquisition – which practice has been the subject of both Congressional inquiries and examination by the IRS.

          c.       HP has conducted its tax program after receiving advice from outside advisors.

          d.       HP's tax program has been publicly disclosed.

          e.       No claim has been asserted by governmental authorities against HP, and no taxes have been assessed against the Company respecting this issue

        3.     **Conclusions and Recommendations**:  Management is appropriately monitoring the issue; the program has been publicly disclosed; and no governmental authority has asserted a claim against HP.  Accordingly, the Committee recommends that no claims be pursued as to HP officers and directors regarding the foreign-loan program.

    M.     **Insider-Trading Allegations Regarding James Murrin**

        1.     **Description of Allegations**:  One of the original derivative complaints alleged that James Murrin, HP's then-Controller and Principal Accounting Officer, sold two-thirds of his HP stock while in possession of material, non-public information.

        2.     **Committee Findings Regarding Insider-Trading Allegations as to Murrin**:  The Committee, upon consideration of all reasonably available information relating to the conduct of James Murrin in undertaking certain stock trades, and taking into account the allegations described above, finds as follows:

          a.       Murrin's exercises of options (which were set to expire within a month or two of each exercise) and stock sales on (*i*) August 22, 2011 (four days after the announcements of the Autonomy acquisition, HP's 3Q earnings release and possible spinoff of the personal computer division), (*ii*) November 29, 2011 (before HP learned of Autonomy's 1Q 2012 results and before concerns were raised by a legacy Autonomy official), and (*iii*) February 28, 2012 (two months before HP learned of Autonomy's 2Q 2012 results, and three months before the legacy Autonomy official met with HP) all took place within open trading windows and had been pre-cleared by Murrin with HP Legal.

          b.       Murrin's January 30, 2012 exercise of options and sale of stock were effected pursuant to a 10b5-1 plan that had been made on December 6, 2011 (the last day of

an open trading window before the options were set to expire on January 31, 2012) and had been pre-cleared with HP Legal, and the sales were made under the 10b5-1 plan on the last trading day before the options' January 31, 2012 expiration date.

        c.     Murrin had no material non-public information on December 6, 2011 when he entered into his 10b5-1 plan, inasmuch as HP had already announced its Q4 2011 and FY 2011 earnings as of that date, and no significant post-acquisition results were available yet from Autonomy.

        3.    **Conclusions and Recommendations**: Murrin (*i*) exercised options and sold resulting shares shortly before option expiration dates, (*ii*) sold within open trading windows except when he sold pursuant to a 10b5-1 plan that was made within an open trading window, (*iii*) pre-cleared his transactions or, for the January 30, 2012 sale, the making of this 10b5-1 plan with HP Legal, and (*iv*) made sales consistent with a strategy to diversify his holdings. The Committee also has considered the applicable legal standards and the business and prudential considerations involved in determining whether any claims should be asserted. Based on all of these considerations, the Committee recommends that no claims be pursued as to James Murrin.

## XXIII. Holistic Evaluation of Potential Claims Against HP Directors and Officers

    A.    To confirm its recommendations and conclusions with respect to each of the individuals and entities discussed above, and avoid the risk of overly atomizing the conduct of each relating to the Potential Claims, the Committee also holistically considered whether all such allegations, when considered collectively, would change the Committee's view with respect to any of the particularized individuals and entities. The Committee concluded that such a holistic consideration would not change the Committee's views as expressed above.

## XXIV. Proposed Reforms

    A.    Shareholders initiating Derivative Actions (particularly counsel for plaintiffs in *Noel v. Whitman*) and Demand Letters have proposed that HP implement governance and operational reforms that would enhance the likelihood of success in completing and integrating a significant acquisition. In evaluating these proposals, the Committee considered:

        1.    Process goals, including (*i*) improvements since the Acquisition, (*ii*) effective Board, Board committee, and management oversight of the entire M&A process, (*iii*) informed decision-making and (*iv*) adherence to a standardized M&A process.

        2.    Between March 2004 and May 2007, HP had a Board Committee responsible for M&A oversight, which duties were assumed by the FIC in May 2007.

        3.    The FIC evaluates and revises M&A policies, oversees integration, evaluates success of completed acquisitions, makes strategic and process recommendations to the Board and annually reviews its own charter and performance.

4.      The HP Board's Technology Committee provides oversight of technology aspects of large M&A acquisitions.

5.      HP's IRB provides oversight and approval for HP's acquisitions.  The IRB includes the FIC for HP's large acquisitions and the full Board for HP's largest acquisitions.

6.      HP recently completed an internal review of its M&A process and developed a solid framework to unify stages of a robust M&A function:  (*i*) strategy formulation, (*ii*) initial target assessment, (*iii*) deal execution and (*iv*) integration.

7.      HP created an M&A transaction Risk Management Committee ("RMC"), the composition of which will be adapted to each acquisition, to ensure that risks are identified, diligence findings are assessed holistically, and mitigation plans are implemented.

8.      HP has developed, for implementation in the next 12 to 24 months, a comprehensive M&A transaction and knowledge-management tool for buy-side M&A incorporating (*i*) 597 action items from target selection to integration, (*ii*) an intelligent due-diligence framework to be tailored to each acquisition, (*iii*) a comprehensive M&A database, (*iv*) an interactive and intelligent user interface (Midaxo) that unites enterprise-wide resources, (*v*) a color-coded system to identify risks in the M&A process and (*vi*) processes to facilitate information transfer and issue reporting among acquisition and integration teams and decisionmakers.

B.      **Committee Recommendations**:  The Committee has prepared a separate communication to HP management proposing some additional recommendations for management to consider.  The Committee, at its discretion, will also inform the federal and/or California court of its recommendations.  Those recommendations have been informed by recommendations by plaintiffs' counsel in *Noel v. Whitman* and *Gould v. Whitman*.  The Committee recommends that management consider the Committee's recommendations and present them, with  management's own comments, for consideration by the Board within 180 days or, for good cause, such other time as deemed appropriate by the FIC.

* * * * *

## RESOLUTIONS

NOW, THEREFORE, in view of the foregoing, and after considering all of the information reasonably available to the Committee, including the bests interests of the Company, and after the Committee's discussions and deliberations, in the good-faith exercise of the Committee's business judgment, concerning all of the allegations in the Derivative Actions and the Demand Letters and any other matters addressed by Committee counsel's presentations or otherwise before the Committee (*i.e.*, the Potential Claims), the Committee hereby concludes and resolves as follows:

1.     **Committee Independence and Disinterestedness:**  RESOLVED that no Committee member voting on the determination of how to respond to the Derivative Actions, Demand Letters, or other Potential Claims is precluded from doing so, as no such director (*i*) has a substantial likelihood of being held personally liable for money damages arising from the Potential Claims, (*ii*) has a personal financial interest that might conflict with the interests of the Company, (*iii*) is or was dominated or controlled by any other director or other individual or entity reviewed in connection with the Potential Claims, (*iv*) has a disabling business, personal, financial, political, or philanthropic relationship with any other director, person, or entity reviewed in connection with the Potential Claims, or (*v*) is otherwise subject to any external influence that would prevent him from bringing his own judgment to bear on the issues in question; *provided, however,* that Mr. Bennett has voluntarily recused himself from considering any Potential Claims as to Perella Weinberg Partners.  In addition, to the extent that any such Committee member participated in any matter that is the subject of these resolutions, he acted in the best interest of the Company and its shareholders (as opposed to self-interest or the interests of others) and thus is disinterested and independent in all material respects.  Finally, no other information has been presented that would allow for a conclusion that any such Committee member's business judgment is impaired in considering the matters and allegations raised in the Potential Claims; nor is there any other basis for so concluding.

2.     **Committee Counsel's Review:**  FURTHER RESOLVED that the inquiries undertaken by Committee Counsel (as assisted by their experts and consultants) were reasonable, were undertaken in good faith, and were sufficiently thorough to allow the Committee members to reasonably rely (where they deemed it appropriate to do so) on counsel's presentation, supported by the Committee's expert advisors and consultants, in discharging their duties, and to allow the Committee members to determine what responses to the Potential Claims (including, without limitation, litigation or other action against current and former directors, officers, advisors, or employees) have merit or are otherwise in the best interests of the Company and its shareholders.

3.     **Board Independence and Disinterestedness:**  FURTHER RESOLVED that the Committee recommends that the Board determine that each current director of the Company (other than Raymond Lane, Ann Livermore, and Margaret Whitman, who have voluntarily recused themselves from participating in the Board's vote on the Board's Resolution concerning the Potential Claims) – and each former director who served on the Board at the time the first shareholder derivative action concerning the Acquisition was filed – is or would have been sufficiently disinterested and independent under the standards established by Delaware law to consider a pre-suit shareholder demand concerning the Potential Claims and to consider and make decisions concerning the Committee's findings, conclusions, and recommendations, in that no such director (*i*) has a substantial likelihood of being held personally liable for money damages arising from the Potential Claims, (*ii*) has a personal financial interest that might conflict with the interests of the Company, (*iii*) is or was dominated or controlled by any other director or any other person or entity reviewed in connection with the Potential Claims, (*iv*) has a disabling business, personal, financial, political, or philanthropic relationship with any other director, person, or entity reviewed in connection with the Potential Claims, or (*v*) is otherwise

82

subject to any external influence that would prevent him or her from bringing his or her own judgment to bear on the issues in question.

        4.    **HP Directors:**  FURTHER RESOLVED that the Committee recommends that the Board determine that each current or former **director of the Company**, in connection with actions taken or not taken concerning the Potential Claims (including the Acquisition, the Integration, and the Impairment):

        a.    Is exculpated from financial liability to the Company to the fullest extent consistent with Del. Gen. Corp. L. § 102(b)(7), pursuant to a provision of the Company's Certificate of Incorporation;

        b.    Sufficiently informed himself or herself of all reasonably available material information before making decisions relating to the Potential Claims;

        c.    Discharged his or her duties without engaging in gross negligence, without exhibiting a reckless indifference to or a deliberate disregard of the Company's stockholders, and without participating in actions that were outside the bounds of reason;

        d.    In discharging his or her duties, relied on, in appropriate circumstances, information, opinions, reports, or other statements prepared by

        i.    One or more officers or employees of the Company whom the director reasonably believed to be reliable and competent regarding the relevant issues, and

        ii.    Independent experts and advisors whom the director reasonably believed to be reliable and competent regarding the relevant issues;

        e.    Acted in a manner he or she believed to be in the best interests of the Company and its shareholders, did not act in his or her own self-interest, and did not allow any personal, business, or financial interest possessed by a director (including himself or herself), officer, or controlling shareholder and not shared by the Company's shareholders generally to take precedence over the Company's best interests;

        f.    Discharged his or her duties in good faith, without engaging in an intentional failure to act in the face of a known duty to act, and without demonstrating a conscious disregard for his or her duties;

        g.    Did not intentionally cause the Company to violate positive law;

        h.    Was capable of exercising his or her own independent judgment concerning the Potential Claims free of domination or control by a third party;

        i.    Fulfilled his or her duty of oversight and assured himself or herself that an adequate process was in place to allow the Board to fulfill its oversight responsibilities

concerning the Potential Claims (including the integration of Autonomy into HP and the impairment charge taken for Autonomy) by

                i.     Not failing to implement any reporting, information system, or controls at the Company, and

                ii.     Having implemented such systems or controls, not failing to monitor or oversee operations or otherwise disabling himself or herself from being informed of risks or problems at the Company that required his or her attention;

            j.     Did not knowingly, deliberately, recklessly, grossly negligently, or negligently misinform or mislead the Company, its shareholders, or the market in his or her public disclosures or in any other dissemination of information in connection with the Potential Claims;

            k.     Did not engage in any so-called "abuse of control" in connection with any of the Potential Claims;

            l.     Did not receive any improper personal benefit in connection with the Potential Claims;

            m.     Did not irrationally squander or give away corporate assets or otherwise engage in or permit corporate waste in relation to the Potential Claims;

            n.     Did not violate federal or state securities laws or other laws in connection with the Potential Claims;

            o.     Was not unjustly enriched in connection with any of the Potential Claims; and

            Therefore, (*i*) there is no merit to any claim for (*a*) breach of the fiduciary duty of care (for which the directors are exculpated from financial liability in any event), (*b*) breach of the fiduciary duty of loyalty for self-dealing or acting in bad faith, (*c*) breach of the fiduciary duty of loyalty for failing to provide adequate oversight, (*d*) breach of the fiduciary duty of disclosure, (*e*) corporate waste, (*f*) abuse of control, (*g*) unjust enrichment, or (*h*) violation of federal or state securities laws or other laws against any current or former director of the Company arising from any actions taken or not taken concerning the Potential Claims; (*ii*) no current or former director would likely be subject to liability concerning the Potential Claims; and (*iii*) considering the above and the other factors set out elsewhere in this Resolution, it would not be in the best interests of the Company and its shareholders to pursue litigation or other action against any current or former director of

the Company in his or her capacity as a director concerning the Potential Claims.

     5.    **HP Officers:** FURTHER RESOLVED that the Committee recommends that the Board determine that each current or former **officer of the Company**, with the exclusion of Michael Lynch (whose conduct as an HP officer is addressed separately below), as to actions taken or not taken concerning the Potential Claims:

     a.    Sufficiently informed himself or herself of all reasonably available material information before making decisions relating to the Potential Claims;

     b.    Discharged his or her duties without engaging in gross negligence, without exhibiting a reckless indifference to or a deliberate disregard of the Company's stockholders, and without participating in actions that were outside the bounds of reason;

     c.    In discharging his or her duties, relied on, in appropriate circumstances, information, opinions, reports, or other statements prepared by

     i.    One or more other officers or employees of the Company whom the officer reasonably believed to be reliable and competent regarding the relevant issues, and

     ii.    Independent experts and advisors whom the officer reasonably believed to be reliable and competent regarding the relevant issues;

     d.    Acted in a manner he or she believed to be in the best interest of the Company and its shareholders, did not act in his or her own self-interest, and did not allow any personal, business, or financial interest possessed by a director, officer (including himself or herself), or controlling shareholder and not shared by the Company's shareholders generally to take precedence over the Company's best interests;

     e.    Discharged his or her duties in good faith, without engaging in an intentional failure to act in the face of a known duty to act, and without demonstrating a conscious disregard for his or her duties;

     f.    Did not intentionally cause the Company to violate positive law;

     g.    Was capable of exercising his or her own independent judgment concerning the Potential Claims free of domination or control by a third party;

     h.    Fulfilled his or her managerial responsibilities and assured himself or herself that an adequate process was in place to allow himself or herself to fulfill his or her managerial responsibilities;

     i.    Did not knowingly, deliberately, recklessly, grossly negligently, or negligently misinform or mislead the Company, its shareholders, or the market in his or her

public disclosures or in any other dissemination of information in connection with the Potential Claims;

        j.     Did not engage in any so-called "abuse of control" in connection with any of the Potential Claims;

        k.     Did not receive any improper personal benefit in connection with the Potential Claims;

        l.     Did not irrationally squander or give away corporate assets or otherwise engage in or permit corporate waste in relation to the Potential Claims;

        m.     Did not violate federal or state securities laws or other laws in connection with the Potential Claims;

        n.     Was not unjustly enriched in connection with any of the Potential Claims;

        o.     As to James Murrin, did not engage in improper exercises of options for or sales of HP stock in connection with any of the Potential Claims; and

> Therefore, (*i*) there is no merit to any claim for (*a*) breach of the fiduciary duty of care, (*b*) breach of the fiduciary duty of loyalty for self-dealing or acting in bad faith, (*c*) breach of the fiduciary duty of disclosure, (*d*) corporate waste, (*e*) abuse of control, (*f*) unjust enrichment, or (*g*) violation of federal or state securities laws or other laws against any current or former officer of the Company arising from any actions taken or not taken concerning the Potential Claims; (*ii*) no such current or former officer would likely be subject to liability concerning the Potential Claims; and (*iii*) considering the above and the other factors set out elsewhere in this Resolution, it would not be in the best interests of the Company and its shareholders to pursue litigation or other action against any such current or former officer of the Company in his or her capacity as an officer concerning the Potential Claims; *provided, however*, that nothing in this paragraph applies to Michael Lynch's conduct as an HP officer.

      6.    **Autonomy:** FURTHER RESOLVED that, as to whether the Company and/or Bidco have claims against **Autonomy Corporation plc** under English law, including under FSMA, for misrepresentations and omissions in Autonomy's published information, other publicly available information, and other information conveyed to the Company (or Bidco), the Committee recommends that the Board take the following actions:

    a.  Determine that Bidco has a claim against Autonomy under English law, including under FSMA, with precise causes of action to be framed based on advice from Erskine Chambers;

    b.  Determine that Bidco, with advice from Erskine Chambers and the Committee's counsel, should send a letter asserting such claim to Autonomy, and then take any further steps to obtain redress as necessary and appropriate under English law; and

    c.  Determine that the assertion of any claim against Autonomy should be deferred, for a period of time to be determined by the Committee, to give Company counsel and the Committee's counsel an opportunity to explore whether the claims can be resolved without further proceedings.

    7.  **Lynch and Hussain (Pre-Acquisition):**  FURTHER RESOLVED that, as to whether the Company, Bidco, and/or Autonomy have claims against **Michael Lynch and Sushovan Hussain for their conduct *before* the Acquisition**, the Committee recommends that the Board take the following actions:

    a.  Determine that **Bidco** has claims against Lynch and Hussain under English law, including for deceit and/or under the Misrepresentation Act, with precise causes of action to be framed based on advice from Erskine Chambers;

    b.  Determine that **Autonomy** has claims against Lynch and Hussain under English law, including under the Companies Act 2006 and for breach of fiduciary duty, with precise causes of action to be framed based on advice from Erskine Chambers;

    c.  Determine in connection with the English-law claims that Bidco and Autonomy, with advice from Erskine Chambers and the Committee's counsel, should take such actions as are necessary and appropriate under English law (including compliance with any applicable pre-action protocols) to commence proceedings in England against Lynch and Hussain;

    d.  Determine that the commencement of any proceedings in England against Lynch and Hussain should be deferred, for a period of time to be determined by the Committee, to give Company counsel and the Committee's counsel an opportunity to explore whether the claims can be resolved without further proceedings;

    e.  Determine that Lynch and Hussain violated California law in their dealings with HP (and/or Bidco) in relation to the Acquisition by, among other things, violating California securities laws, engaging in fraud, deceit, and/or negligent misrepresentation, and obtaining unjust enrichment; and

    f.  Determine in connection with the California-law claims that:

     i.  The Company should embrace the allegations asserted against Lynch in *Noel v. Whitman*, pending in California Superior Court for the County of Santa Clara;

     ii.  The Company should seek to realign itself as plaintiff in the *Noel* case, add Hussain as a defendant, add any other applicable claims against Lynch, and seek a stay of the *Noel* litigation (at least as to the claims against Lynch and Hussain) pending disposition of the claims to be asserted against Lynch and Hussain in the United Kingdom; and

     iii.  The assertion of any claim against Lynch and Hussain should be deferred, for a period of time to be determined by the Committee, to give Company counsel and the Committee's counsel an opportunity to explore whether the claims can be resolved without further proceedings.

   8.  **Lynch and Hussain (Post-Acquisition):**  FURTHER RESOLVED that,
          REDACTED FOR PRIVILEGE

   9.  **Other Autonomy Directors and Officers:**  FURTHER RESOLVED that,
          REDACTED FOR PRIVILEGE

   10.  **Deloitte:**  FURTHER RESOLVED that, as to whether the Company, Bidco, and/or Autonomy have claims against **Deloitte LLP**, the Committee recommends that the Board take the following actions:

     a.  Determine that Autonomy has claims against Deloitte under English law, including for professional negligence or malpractice;

     b.  Determine that Autonomy, with advice from Erskine Chambers and the Committee's counsel, should take such actions as are necessary and appropriate under English law (including compliance with any applicable pre-action protocols) to commence proceedings in England against Deloitte; and

     c.  Determine that the commencement of any proceedings against Deloitte should be deferred, for a period of time to be determined by the Committee, to give

Company counsel and the Committee's counsel an opportunity to explore whether the claims can be resolved without further proceedings.

11.   **Professional Advisors**:  FURTHER RESOLVED that, as to **KPMG, Ernst & Young LLP, Barclays Capital, Perella Weinberg Partners, Freshfields Bruckhaus Deringer, Gibson Dunn & Crutcher LLP, Slaughter and May, and Morgan, Lewis & Bockius LLP**, the Committee recommends, after considering the potential claims and the other factors set out elsewhere in this Resolution, that the Board determine not to assert any claims against those actual or potential defendants.

12.   **Qatalyst**:  FURTHER RESOLVED that,
REDACTED FOR PRIVILEGE

13.   **Autonomy Customers**:  FURTHER RESOLVED that,
REDACTED FOR PRIVILEGE

14.   **Demand Futility/Refusal**:  FURTHER RESOLVED that the Committee recommends that the Board determine that the derivative plaintiffs should have served demands on the Company before filing suit, because pre-suit demands would not have been futile.

15.   **Response to Actions and Demands**:  FURTHER RESOLVED that the Committee recommends that the Board determine that the Company should move, at a time deemed appropriate by the Committee, to dismiss all pending derivative actions and rebuff all pending shareholder demand letters except to the extent described above, with any such motions to dismiss asserting that (*i*) pre-suit demand was not excused because a demand would not have been futile, and (*ii*) the complaints fail to state a claim or are otherwise without merit in any event; *provided, however,* that any such dismissals should preserve HP's, Bidco's, and/or Autonomy's rights to assert claims as otherwise stated in this Resolution.

16.   **Reforms**:  FURTHER RESOLVED that the Board should determine that the Recommendations for further M&A reforms proposed by the Committee, as informed by recommendations from plaintiffs' counsel in *Noel v. Whitman* and *Gould v. Whitman*, should be considered by management and presented for consideration by the Board within 180 days or, for good cause, such other time as deemed appropriate by the FIC.

17.   **Discussions with Plaintiffs' Counsel**:  FURTHER RESOLVED that the Committee recommends that the Board determine that the Company, acting through its counsel and the Committee and its counsel, provide – at the Committee's discretion – the Board's resolution to counsel for the derivative plaintiffs and demanding shareholders and explore

89

whether any resolution of those claims and demands is feasible consistent with the Committee's other recommendations.

18.   **SFO and FRC:**   FURTHER RESOLVED that the Committee recommends that the Board should direct the Committee, acting through its counsel, to keep the UK Serious Fraud Office and the UK Financial Reporting Council advised of the Board's Resolutions and any proceedings instituted pursuant to them, and otherwise respond to any inquiries from those agencies.

19.   **Continued Oversight:**   FURTHER RESOLVED that the Committee, in consultation with the Company and its counsel, will oversee, direct, and monitor the implementation of the Board's Resolutions (including the negotiation of a potential resolution with Autonomy, Lynch, Hussain, and Deloitte), and the Committee's counsel will report to the Committee concerning such implementation.