**EXHIBIT 12**

**DECLARATION OF MARC WOLINSKY IN SUPPORT OF HP'S MEMORANDUM
IN SUPPORT OF PRELIMINARY APPROVAL OF THE SETTLEMENT AND
IN OPPOSITION TO THE MOTIONS TO INTERVENE AND SEVER**

A                               House of Lords

# Standard Chartered Bank *v* Pakistan National Shipping Corpn and others (Nos 2 and 4)

[2002] UKHL 43

B    2002 May 20, 21;       Lord Slynn of Hadley, Lord Mustill, Lord Hoffmann,
        Nov 6                             Lord Hobhouse of Woodborough
                                      and Lord Rodger of Earlsferry

C     *Tort — Cause of action — Deceit — Seller's managing director agreeing with shipper to issue falsely antedated bill of lading — Plaintiff bank establishing claim for deceit against defendants including managing director, seller and shippers — Plaintiff concealing late presentation of documents from bank issuing letter of credit — Issuing bank refusing payment on other grounds — Whether plaintiff's deceitful conduct "fault" — Whether defence of contributory negligence available — Whether plaintiff entitled to recover loss from defendants in full — Whether managing director personally liable for fraudulent acts carried out on behalf of seller — Law Reform (Contributory Negligence) Act 1945 (8 & 9 Geo 6, c 28), ss 1(1), 4*

D     The seller, an English company of which M was the managing director, contracted to ship a cargo of bitumen to a buyer in Vietnam cif certain named Vietnamese ports. Payment for the cargo was to be made by a letter of credit issued by a Vietnamese bank in favour of the seller and confirmed by the plaintiff bank. A condition of the credit was that shipment be effected not later than 25 October 1993 and that all documents, including bills of lading and quality and quantity certificates, be presented in conformity with the terms of the credit by not later than 10 November 1993. The cargo was not shipped by 25 October 1993, nor even by 8 November 1993 when the seller's shipping agent and the shipowners agreed with M to issue a bill of lading which was falsely dated so as to appear to comply with the condition of credit. A number of documents, including the falsely dated bill of lading but not the required certificates, were presented to the plaintiff on 9 November with a covering letter signed by M stating that the documents and information contained in them were accurate. The certificates were not presented until 15 November 1993. Although the documents had been presented after the expiry date of the credit, the plaintiff decided to waive late presentation and authorised payment to the seller by discounting its bills. On 16 November the plaintiff wrote to the issuing bank falsely stating that the documents had been presented before the expiry date and claiming reimbursement. The issuing bank refused payment because of other discrepancies in the documents which the plaintiff's employees had not noticed. The plaintiff claimed damages for deceit and conspiracy against the shipowners and M in respect of the falsely dated bills of lading. The judge held that the plaintiff had established a good cause of action in deceit against the defendants, including the shipowners, and personally against M. The shipowners and M appealed on the grounds, inter alia, that the plaintiff had suffered loss partly as a result of its deceit upon the issuing bank and that constituted "fault" within the meaning of section 4 of the Law Reform (Contributory Negligence) Act 1945[1] so that the damages payable fell to be apportioned pursuant to section 1(1). M further appealed against the ruling that he was personally liable. The Court of Appeal dismissed the appeal and held by a majority that the 1945 Act was inapplicable to claims in deceit, but allowed M's further appeal on the ground that he

---

[1] Law Reform (Contributory Negligence) Act 1945, ss 1(1), 4: see post, para 10.

had throughout acted as the seller's representative and was therefore not personally liable.

On the plaintiff's appeal and on the question whether any damages awarded against M should be reduced on the grounds of the plaintiff's contributory negligence—

*Held*, (1) allowing the appeal, that, although M's fraudulent misrepresentation was attributable to the seller and was relied upon by the plaintiff as a representation by the seller, it was also relied upon as M's representation based on his knowledge; that M could not escape personal liability for his fraud on the ground that he had acted within the scope of his employment and was committing the fraud on behalf of his employer; that M was being sued for his own tort of fraud and, once all the elements of the tort were established against him, he was liable for the loss that the plaintiff had incurred as a consequence (post, paras 20–28, 40, 41).

*Hedley Byrne & Co Ltd v Heller & Partners Ltd* [1964] AC 465, HL(E) and *Williams v Natural Life Health Foods Ltd* [1998] 1 WLR 830, HL(E) considered.

(2) That the purpose of the 1945 Act was not to reduce the damages which would previously have been awarded against defendants but to relieve plaintiffs whose actions would previously have failed; that "fault" within the meaning of section 4 of the Act was divided into two limbs, one applicable to defendants and the other to plaintiffs; that fault meant "negligence, breach of statutory duty or other act or omission" which, in the case of a defendant, gave rise to a liability in tort and, in the case of a plaintiff, gave rise at common law to a defence of contributory negligence; that therefore the issue was whether the plaintiff's conduct would at common law be a defence to a claim in deceit against the defendants; that in relation to fraudulent misrepresentation there was no common law defence of contributory negligence so that, if a plaintiff would not have parted with his money if he had known that a representation made by the defendant was false, it was not relevant that the plaintiff also held an irrational or negligent belief about another matter, and but for that belief would not have parted with his money either; and that, accordingly, although the plaintiff had made payment partly in reliance on the negligent and mistaken belief that it could obtain reimbursement from the issuing bank, the damages suffered by the plaintiff as a result of being induced to make payment in reliance on the falsely dated bill of lading did not fall to be apportioned under section 1(1) of the 1945 Act (post, paras 11–18, 25–28, 42).

*Edgington v Fitzmaurice* (1885) 29 Ch D 459, CA approved.

*Redgrave v Hurd* (1881) 20 Ch D 1, CA, *Barton v Armstrong* [1976] AC 104, PC and *Reeves v Comr of Police of the Metropolis* [2000] 1 AC 360, HL(E) considered.

Decision of the Court of Appeal [2000] 1 Lloyd's Rep 218 reversed.
Decision of the Court of Appeal [2001] QB 167; [2000] 3 WLR 1692 affirmed.

The following cases are referred to in the opinions of their Lordships:

*Alliance & Leicester Building Society v Edgestop Ltd* [1993] 1 WLR 1462; [1994] 2 All ER 38
*Barton v Armstrong* [1976] AC 104; [1975] 2 WLR 1050; [1975] 2 All ER 465, PC
*Corporación Nacional del Cobre de Chile v Sogemin Metals Ltd* [1997] 1 WLR 1396; [1997] 2 All ER 917
*Edgington v Fitzmaurice* (1885) 29 Ch D 459, CA
*Evans (C) & Sons Ltd v Spritebrand Ltd* [1985] 1 WLR 317; [1985] 2 All ER 415, CA
*Gran Gelato Ltd v Richcliff (Group) Ltd* [1992] Ch 560; [1992] 2 WLR 867; [1992] 1 All ER 865
*Hedley Byrne & Co Ltd v Heller & Partners Ltd* [1964] AC 465; [1963] 3 WLR 101; [1963] 2 All ER 575, HL(E)
*Lee v Lee's Air Farming Ltd* [1961] AC 12; [1960] 3 WLR 758; [1960] 3 All ER 420, PC
*Meridian Global Funds Management Asia Ltd v Securities Commission* [1995] 2 AC 500; [1995] 3 WLR 413; [1995] 3 All ER 918, PC

A  *Murphy v Culhane* [1977] QB 94; [1976] 3 WLR 458; [1976] 3 All ER 533, CA
*Nationwide Building Society v Balmer Radmore* [1999] Lloyd's Rep PN 558
*Nationwide Building Society v Richard Grosse & Co* [1999] Lloyd's Rep PN 348
*Nationwide Building Society v Thimbleby & Co* [1999] Lloyd's Rep PN 359
*Performing Right Society Ltd v Ciryl Theatrical Syndicate Ltd* [1924] 1 KB 1, CA
*R v ICR Haulage Ltd* [1944] KB 551; [1944] 1 All ER 691, CCA
*Rainham Chemical Works Ltd v Belvedere Fish Guano Co Ltd* [1921] 2 AC 465, HL(E)
B  *Redgrave v Hurd* (1881) 20 Ch D 1, CA
*Reeves v Comr of Police of the Metropolis* [2000] 1 AC 360; [1999] 3 WLR 363; [1999] 3 All ER 897, HL(E)
*Salomon v A Salomon & Co Ltd* [1897] AC 22, HL(E)
*Williams v Natural Life Health Foods Ltd* [1998] 1 WLR 830; [1998] 2 All ER 577, HL(E)

C
The following additional cases were cited in argument:

*Directors of Central Railway Co of Venezuela v Kisch* (1867) LR 2 HL 99, HL(E)
*Dobell v Stevens* (1825) 3 B & C 623
*Dowell v General Steam Navigation Co* (1855) 5 E & B 195
*Fairline Shipping Corpn v Adamson* [1975] QB 180; [1974] 2 WLR 824; [1974] 2 All ER 967
D  *Reynell v Sprye* (1852) 1 De G M & G 660
*Trevor Ivory Ltd v Anderson* [1992] 2 NZLR 517

**APPEALS** from the Court of Appeal

These were appeals by leave of the House of Lords (Lord Bingham of Cornhill, Lord Steyn and Lord Clyde) by the plaintiff, Standard Chartered Bank, from a decision of the Court of Appeal (Evans, Aldous and Ward LJJ)
E  on 3 December 1999 allowing an appeal by the fifth defendant, Arvind Mehra, from a decision of Cresswell J on 1 April 1998 that the fifth defendant was not personally liable for the tort of deceit, and by the first defendants, the Pakistan National Shipping Corpn, from a decision of the Court of Appeal (Aldous and Ward LJJ, Sir Anthony Evans dissenting) dated 27 July 2000 that the defence of contributory negligence was not available to the defendants in
F  the plaintiff's action for damages against the defendants, Pakistan National Shipping Corpn, Seaways Maritime Ltd, Oakprime International Ltd and Arvind Mehra, and SGS United Kingdom Ltd as third party.

On 20 May 2002, at the commencement of the hearing, their Lordships granted the first defendants leave to withdraw their appeal on terms agreed between the parties.

The facts are stated in the opinions of Lord Hoffmann and Lord Rodger
G  of Earlsferry.

*John Cherryman QC, Timothy Young QC* and *Lawrence Akka* for Mr Mehra. The first issue is whether Mr Mehra can be held personally liable for the representations made to the plaintiff bank. If he is held to be so liable, the second issue is whether the plaintiff bank can be held to be
H  contributorily at fault under the Law Reform (Contributory Negligence) Act 1945 so that damages should be apportioned accordingly.

It is impossible to construe the representations otherwise than as having been made by Oakprime International Ltd, which was a limited company with legal personality and full capacity to own property, enter into contracts

and conduct business on its own behalf. The plaintiff bank understood the representations and relied on them as being Oakprime's representations.

Mr Mehra could be held liable in addition to Oakprime on two grounds. The first is that he himself expressly or by words or conduct made the representations his own or overtly assumed personal liability for them. The second is that he procured and directed the company to commit the tort. As to the first ground, on the factsa and documents, Mr Mehra did not personally affirm or assume responsibility for the representations made by Oakprime and it was never contended by the plaintiff bank that he did. The trial judge held that there was liability on the second ground, but that ground was never pleaded and Mr Mehra's appeal was for that reason allowed by the Court of Appeal. He should not now be held to be liable on that ground.

A wider issue arises in the context of this case where directors or employees have made representations expressly on behalf of a company. There is then a need to resolve the apparent conflict between the policy that those who have made the representations should be liable for their own torts and the policy that companies should have a separate legal personality and existence. Once a tort has been committed an individual, whether a natural or a legal person, may be fixed with liability because he committed the tort himself, or because the tort was committed by his agent or employee and he is vicariously liable, or because the tort is committed by another pursuant to a course of concerted action with that individual. Where a company has been incorporated, it has been made plain to all the world that limited liability is intended and that the company will have its own duties in contract and tort. That position would be undermined by the imposition of personal liability. Mr Mehra cannot be held directly liable for doing no more than signing a letter on behalf of the company. [Reference was made to *Fairline Shipping Corpn v Adamson* [1975] QB 180; *Trevor Ivory Ltd v Anderson* [1992] 2 NZLR and *Williams v Natural Life Health Foods Ltd* [1998] 1 WLR 830.]

*Young QC* following. The issue of contribution is principally one of the court's jurisdiction. The law does not say that contributory negligence or contributory fault does not apply in cases of deceit. The court has jurisdiction to apportion damages under the Law Reform (Contributory Negligence) Act 1945 even where the claimant's cause of action is in deceit. "Fault" under the Act is a characterisation of the conduct of the parties and the question is whether it has caused damage. On the facts the plaintiff bank was not only at "fault" in that they engaged in deceit in Incom bank but that deceit was causatively relevant. The shipowners' deceit could have caused no damage to the bank unless (a) the bank was itself deceitful and (b) the bank was negligent. The shipowners' deceit was necessary but not sufficient.

The principle that torts of intention are not subject to the defence of contributory negligence finds no support in the authorities before the 1945 Act and since the Act, torts of intention have regularly been subject to the Act: see eg *Murphy v Culhane* [1977] QB 94. Even actionable misrepresentation under the Misrepresentation Act 1967 which is assimilated to fraud is subject to apportionment under the Act: *Gran Gelato Ltd v Richcliff (Group) Ltd* [1992] Ch 560. There has never been a special rule of causation in deceit. The only special rule relates to cases involving

A  misrepresentation, whether fraudulent *or innocent*. The rule is that a misrepresentation is actionable if it is proved to be a material inducement to the claimant, without proof that it was the sole or dominant inducement but all the cases are concerned with the issue of whether a party, who has two motives for acting, has a claim in deceit. None has concerned the question of whether any damage resulting has more than one operative cause. There is a
B  difference between cases on reliance and cases on causation of loss. [Reference was made to *Alliance & Leicester Building Society v Edgestop Ltd* [1993] 1 WLR 1462; *Dobell v Stevens* (1825) 3 B & C 623; *Reynell v Sprye* (1852) 1 De G M & G 660; *Directors of Central Railway Co of Venezuela v Kisch* (1867) LR 2 HL 99; *Redgrave v Hurd* (1881) 20 Ch D 1; *Edgington v Fitzmaurice* (1885) 29 Ch D 459 and *Dowell v General Steam Navigation Co* (1855) 5 E & B 195.]

C  The 1945 Act gives the court the power to exercise its discretion to do what is just and equitable. In the construction of the Act "fault" should be given the widest possible meaning so as to give the court jurisdiction to do what is just and equitable, without any confusion to make any material apportionment. Moral blameworthiness, consideration which drive many of the cases in deceit are irrelevant where, as here, the question is only as to
D  the jurisdiction of the court under the 1945 Act. It is intended to be wider than the old common law interpretation and introduces a wider spread of tortious conduct. [Reference was made to *Reeves v Comr of Police of the Metropolis* [2000] 1 AC 360]. "Fault" as defined by the 1945 Act should include acts of deceit and negligence by the claimant and there is no logical or linguistic basis on which deceit is not "fault". The policy of the common law was founded on the proposition that it was in the interests of everyone
E  that they should look after their own interests but it was accepted in the context of reliance that a fraudster could not complain that his victim had believed his deceit. By contrast where the fraudster accepts that the victim believes his deceit, but would have suffered no loss without his own *independent* deceit, the same reasoning no longer applies. The problem of contributory negligence under the old law was that the courts had no
F  jurisdiction to apportion. Now they do and there is no reason to exclude that jurisdiction simply in 19th century jurisdictional grants. The law has not sought to treat deceit as a special category save as regards remoteness. That is the extent of the special rule even where a claimant has acted reasonably. The rules that apply to the tort of deceit are the same as those which apply to other tortious conduct. The same standards of mitigation
G  and causation apply and damages will be apportioned accordingly.

*Jeffrey Gruder QC* and *Zoe O'Sullivan* for the plaintiff bank were not called upon.

Their Lordships took time for consideration.

6 November. **LORD HOFFMANN**
H  1  My Lords, Mr Mehra was the managing director of Oakprime Ltd, the beneficiary under a letter of credit which had been issued by Incombank, a Vietnamese bank, and confirmed by Standard Chartered Bank, London ("SCB"). The credit was issued in connection with a cif sale of Iranian bitumen by Oakprime to Vietranscimex, a Vietnamese organisation.

A condition of the credit was "Shipment must be effected not later than 25 October 1993". The last date for negotiation was 10 November 1993.

2 Loading was delayed and Oakprime was unable to ship the goods before 25 October 1993. But the shipping agents and shipowners (Pakistan National Shipping Corpn ("PNSC")) agreed with Mr Mehra to issue bills of lading dated 25 October 1993 and did so on 8 November 1993, before the goods had been shipped. On 9 November 1993 Oakprime presented the bill of lading and other documents to SCB under cover of a letter signed by Mr Mehra stating that (with one omission) the documents were all those required by the credit. This statement was false to the knowledge of Mr Mehra because he had himself arranged for the backdating of the bill of lading. The false statement was made to obtain payment under the letter of credit and it is agreed that if there had been no bill of lading or SCB had known that it was falsely dated, payment would not have been made. The omitted document was presented a few days later and certain other documents which had shown discrepancies from the terms of the credit were resubmitted after the final date for negotiation of the credit had passed. Notwithstanding that SCB knew that these documents had been presented late, it decided to waive late presentation. It authorised payment of US$1,155,772·77 on 15 November 1993.

3 SCB then sought reimbursement from Incombank. It sent a standard form letter that included a statement that the documents had been presented before the expiry date. This statement was known by a relevant employee of SCB to be false. Incombank, although unaware of both Mr Mehra's false dating of the bill of lading and SCB's false dating of the presentation of the documents, rejected the documents on account of other discrepancies which SCB had not noticed. Despite further requests, SCB was unable to obtain reimbursement.

4 SCB then sued the shipowners (PNSC), the shipping agents, Oakprime and Mr Mehra for deceit. They had all joined in issuing a false bill of lading intending it to be used to obtain payment from SCB under the credit. Cresswell J held that they were all liable for damages to be assessed [1998] 1 Lloyd's Rep 684.

5 PNSC appealed on the ground that the loss suffered by SCB had been partly the result of its own "fault" within the meaning of section 1(1) of the Law Reform (Contributory Negligence) Act 1945 and that its damages should therefore be reduced to such extent as the court thought just and equitable. Sir Anthony Evans would have accepted this argument and reduced the damages by 25%. But the majority of the court (Aldous and Ward LJJ) held [2001] QB 167 that SCB's conduct was not "fault" as defined in the Act because it was not at common law a defence to an action in deceit: see the definition in section 4 of the Act.

6 Mr Mehra appealed on the ground that he had made the fraudulent representation on behalf of Oakprime and not personally. The court unanimously upheld this ground of appeal. It ordered SCB to pay Mr Mehra's costs before that court and three-quarters of his costs at trial: [2000] 1 Lloyd's Rep 218.

7 PNSC appealed to your Lordships' House against the decision that the damages could not be reduced and SCB appealed against the decision that Mr Mehra was not personally liable. Shortly before the hearing, PNSC agreed to pay SCB US$1·7m in full and final settlement of its claims to

A   damages, interest and costs. There was no apportionment between these heads of claim and the settlement agreement expressly preserved SCB's claims against other parties. Your Lordships have allowed the petition of PNSC for leave to withdraw its appeal.

  8  At the commencement of the hearing, Mr Cherryman submitted on behalf of Mr Mehra that the settlement gave SCB the whole of any damages to which it could be entitled against PNSC and Mr Mehra as joint
B   tortfeasors. It would therefore be an abuse of the process of the court to pursue the appeal against Mr Mehra. The appeal should be stayed. He did not however propose that any change should be made to the Court of Appeal's order for costs in favour of Mr Mehra. Your Lordships refused the application for a stay on the ground that, quite apart from the question of whether the settlement moneys discharged the whole of SCB's claim, it was
C   entitled to proceed so as to have the order for costs set aside and to obtain an order in its favour.

  9  Before your Lordships Mr Mehra argued that not only was he not liable at all, for the reasons given by the Court of Appeal, but that if he was liable, the damages should be reduced on account of the contributory negligence of SCB.

D   10  My Lords, I shall consider first the defence of contributory negligence. The relevant provisions of the 1945 Act are sections 1(1) and the definition of "fault" in section 4:

> "1(1) Where any person suffers damage as the result partly of his own fault and partly of the fault of any other person or persons, a claim in respect of that damage shall not be defeated by reason of the fault of the
E   person suffering the damage, but the damages recoverable in respect thereof shall be reduced to such extent as the court thinks just and equitable having regard to the claimant's share in the responsibility for the damage . . ."
>
> "4 . . . 'fault' means negligence, breach of statutory duty or other act or omission which gives rise to a liability in tort or would, apart from this
F   Act, give rise to a defence of contributory negligence."

  11  In my opinion, the definition of "fault" is divided into two limbs, one of which is applicable to defendants and the other to plaintiffs. In the case of a defendant, fault means "negligence, breach of statutory duty or other act or omission" which gives rise to a liability in tort. In the case of a plaintiff, it means "negligence, breach of statutory duty or other act or omission" which
G   gives rise (at common law) to a defence of contributory negligence. The authorities in support of this construction are discussed by Lord Hope of Craighead in *Reeves v Comr of Police of the Metropolis* [2000] 1 AC 360, 382. It was also the view of Professor Glanville Williams in *Joint Torts and Contributory Negligence* (1951), p 318.

  12  It follows that conduct by a plaintiff cannot be "fault" within the meaning of the Act unless it gives rise to a defence of contributory negligence
H   at common law. This appears to me in accordance with the purpose of the Act, which was to relieve plaintiffs whose actions would previously have failed and not to reduce the damages which previously would have been awarded against defendants. Section 1(1) makes this clear when it says that "a claim in respect of that damage shall not be defeated by reason of the fault

of the person suffering the damage, but [instead] the damages recoverable in respect thereof shall be reduced . . ."

13 The question is therefore whether at common law SCB's conduct would be a defence to its claim for deceit. Sir Anthony Evans thought that it would. He said that although the conduct of SCB in making a false statement about when the documents had been presented was intentional or reckless, the House of Lords had decided in *Reeves*'s case [2000] 1 AC 360 that an intentional act could give rise to a defence of "contributory negligence" at common law and therefore count as "fault" for the purpose of the Act. I am not sure that it was necessary to rely upon *Reeves* for this purpose, because the Act requires fault in relation to the damage which has been suffered. That damage was SCB's loss of the money it paid Oakprime. In *Reeves*, the plaintiff's husband had intended to cause the damage he suffered. He intended to kill himself. But SCB did not intend to lose its money. It would be more accurate to say that it was careless in making payment against documents which, as it knew or ought to have known, did not comply with the terms of the credit, on the assumption that it could successfully conceal these matters from Incombank. In respect of the loss suffered, SCB was in my opinion negligent.

14 Be that as it may, the real question is whether the conduct of SCB would at common law be a defence to a claim in deceit. Sir Anthony Evans said that the only rule supported by the authorities was that if someone makes a false representation which was intended to be relied upon and the other party relies upon it, it is no answer to a claim for rescission or damages that the claimant could with reasonable diligence have discovered that the representation was untrue. *Redgrave v Hurd* (1881) 20 Ch D 1 is a well known illustration. That was not the case here. SCB should not have paid even if they could not have discovered that the representation about the bill of lading was untrue. But in my opinion there are other cases which can be explained only on the basis of a wider rule. In *Edgington v Fitzmaurice* (1885) 29 Ch D 459 the plaintiff invested £1,500 in debentures issued by a company formed to run a provision market in Regent Street. Five months later the company was wound up and he lost nearly all his money. He sued the directors who had issued the prospectus, alleging that they had fraudulently or recklessly represented that the debenture issue was to raise money for the expansion of the company's business ("develop the arrangements . . . for the direct supply of cheap fish from the coast") when in fact it was to pay off pressing liabilities. The judge found the allegation proved and that the representation played a part in inducing the plaintiff to take the debentures. But another reason for his taking the debentures was that he thought, without any reasonable grounds, that the debentures were secured upon the company's land. Cotton LJ said, at p 481, that this did not matter:

> "It is true that if he had not supposed he would have a charge he would not have taken the debentures; but if he also relied on the misstatement in the prospectus, his loss none the less resulted from that misstatement. It is not necessary to show that the misstatement was the sole cause of his acting as he did. If he acted on that misstatement, though he was also influenced by an erroneous supposition, the defendants will still be liable."

Bowen and Fry LJJ gave judgments to the same effect.

A  15 This case seems to me to show that if a fraudulent representation is relied upon, in the sense that the claimant would not have parted with his money if he had known it was false, it does not matter that he also held some other negligent or irrational belief about another matter and, but for that belief, would not have parted with his money either. The law simply ignores the other reasons why he paid. As Lord Cross of Chelsea said in *Barton v Armstrong* [1976] AC 104, 118–119:

B

"If . . . Barton relied on the [fraudulent] misrepresentation Armstrong could not have defeated his claim to relief by showing that there were other more weighty causes which contributed to his decision to execute the deed, for in this field the court does not allow an examination into the relative importance of contributory causes. 'Once make out that there has been anything like deception, and no contract resting in any degree on that foundation can stand': per Lord Cranworth LJ in *Reynell v Sprye* (1852) 1 De G M & G 660, 708."

C

16 In *Edgington v Fitzmaurice* 29 Ch D 459 the defence was not that the plaintiff could have discovered that the representation was false. It was that he was also induced by mistaken beliefs of his own, but for which he would not have subscribed for the debentures. That is very like the present case. It is said here that although SCB would not have paid if they had known the bill of lading to be falsely dated, they would also not have paid if they had not mistakenly and negligently thought that they could obtain reimbursement. In my opinion, the law takes no account of these other reasons for payment. This rule seems to me based upon sound policy. It would not seem just that a fraudulent defendant's liability should be reduced on the grounds that, for whatever reason, the victim should not have made the payment which the defendant successfully induced him to make.

D

E

17 As Sir Anthony Evans correctly pointed out, the rule in *Redgrave v Hurd* 20 Ch D 1 applies to both innocent and fraudulent misrepresentations. The wider rule in *Edgington v Fitzmaurice* probably applies only to fraudulent misrepresentations. In *Gran Gelato Ltd v Richcliff (Group) Ltd* [1992] Ch 560 Sir Donald Nicholls V-C said that, in principle, a defence of contributory negligence should be available in a claim for damages under section 2(1) of the Misrepresentation Act 1967. But, since the alleged contributory negligence was that the plaintiff could with reasonable care have discovered that the representation was untrue, the rule in *Redgrave v Hurd* prevented the conduct of the plaintiff from being treated as partly responsible for the loss. This left open the possibility that, in a case of innocent representation, some other kind of negligent causative conduct might be taken into account.

F

G

18 In the case of fraudulent misrepresentation, however, I agree with Mummery J in *Alliance & Leicester Building Society v Edgestop Ltd* [1993] 1 WLR 1462 that there is no common law defence of contributory negligence. (See also Carnwath J in *Corporación Nacional del Cobre de Chile v Sogemin Metals Ltd* [1997] 1 WLR 1396 and Blackburn J in *Nationwide Building Society v Thimbleby & Co* [1999] Lloyd's Rep PN 359.) It follows that, in agreement with the majority in the Court of Appeal, I think that no apportionment under the 1945 Act is possible.

H

19 Your Lordships were told that the Solicitors' Indemnity Fund, which not infrequently has to compensate mortgage lenders who have made loans

on the strength of fraudulent statements by partners or employees of solicitors whom the fund has insured, has some concern about the rule that contributory negligence is no defence to a claim in deceit. For example, in *Nationwide Building Society v Richard Grosse & Co* [1999] Lloyd's Rep PN 348 Blackburn J said that if contributory negligence had been a defence, he would have held that the plaintiff building society was two-thirds to blame and in *Nationwide Building Society v Balmer Radmore* [1999] Lloyd's Rep PN 558 he would have said that it was three-quarters to blame. It is easy to see that a rule based upon moral disapproval of fraud is less attractive when the fraudster is not the person paying the damages. But the answer, in my opinion, is not to improve the position of fraudsters but to amend the terms upon which public indemnifiers like the fund are liable: compare paragraph 13(d) of the Criminal Injuries Compensation Scheme 2001.

20  My Lords, I come next to the question of whether Mr Mehra was liable for his deceit. To put the question in this way may seem tendentious but I do not think that it is unfair. Mr Mehra says, and the Court of Appeal accepted, that he committed no deceit because he made the representation on behalf of Oakprime and it was relied upon as a representation by Oakprime. That is true but seems to me irrelevant. Mr Mehra made a fraudulent misrepresentation intending SCB to rely upon it and SCB did rely upon it. The fact that by virtue of the law of agency his representation and the knowledge with which he made it would also be attributed to Oakprime would be of interest in an action against Oakprime. But that cannot detract from the fact that they were his representation and his knowledge. He was the only human being involved in making the representation to SCB (apart from administrative assistance like someone to type the letter and carry the papers round to the bank). It is true that SCB relied upon Mr Mehra's representation being attributable to Oakprime because it was the beneficiary under the credit. But they also relied upon it being Mr Mehra's representation, because otherwise there could have been no representation and no attribution.

21  The Court of Appeal appear to have based their conclusion upon the decision of your Lordships' House in *Williams v Natural Life Health Foods Ltd* [1998] 1 WLR 830. That was an action for damages for negligent misrepresentation. My noble and learned friend, Lord Steyn, pointed out that in such a case liability depended upon an assumption of responsibility by the defendant. As Lord Devlin said in *Hedley Byrne & Co Ltd v Heller & Partners Ltd* [1964] AC 465, 530, the basis of liability is analogous to contract. And just as an agent can contract on behalf of another without incurring personal liability, so an agent can assume responsibility on behalf of another for the purposes of the *Hedley Byrne* rule without assuming personal responsibility. Their Lordships decided that on the facts of the case, the agent had not assumed any personal responsibility.

22  This reasoning cannot in my opinion apply to liability for fraud. No one can escape liability for his fraud by saying: "I wish to make it clear that I am committing this fraud on behalf of someone else and I am not to be personally liable." Evans LJ [2000] 1 Lloyd's Rep 218, 230 framed the question as being "whether the director may be held liable for the company's tort". But Mr Mehra was not being sued for the company's tort. He was being sued for his own tort and all the elements of that tort were proved

A   against him. Having put the question in the way he did, Evans LJ answered it by saying that the fact that Mr Mehra was a director did not in itself make him liable. That of course is true. He is liable not because he was a director but because he committed a fraud.

23   Both Evans and Aldous LJJ treated the *Williams* case [1998] 1 WLR 830 as being based upon the separate legal personality of a company. Aldous LJ [2000] 1 Lloyd's Rep 218, 233 referred to *Salomon v A Salomon*

B   *& Co Ltd* [1897] AC 22. But my noble and learned friend, Lord Steyn, made it clear [1998] 1 WLR 830, 835 that the decision had nothing to do with company law. It was an application of the law of principal and agent to the requirement of assumption of responsibility under the *Hedley Byrne* principle. Lord Steyn said it would have made no difference if Mr Williams's principal had been a natural person. So one may test the matter by asking

C   whether, if Mr Mehra had been acting as manager for the owner of the business who lived in the south of France and had made a fraudulent representation within the scope of his employment, he could escape personal liability by saying that it must have been perfectly clear that he was not being fraudulent on his own behalf but exclusively on behalf of his employer.

24   I would therefore allow the appeal against Mr Mehra and restore the order which Cresswell J made against him. In enforcing this order, SCB will

D   of course have to give credit for the money it has received from PNSC but how this sum should be apportioned is not a matter which your Lordships have been asked to consider.

**LORD MUSTILL**

25   My Lords, I have had the advantage of reading in draft the opinion

E   of my noble and learned friend, Lord Hoffmann. For the reasons he has given I would allow the appeal against Mr Mehra and restore the order which Cresswell J made against him.

**LORD SLYNN OF HADLEY**

26   My Lords, I have had the advantage of reading in draft the opinion of my noble and learned friend, Lord Hoffmann. For the reasons he gives

F   I would allow the appeal against Mr Mehra and restore the order of Cresswell J against him.

**LORD HOBHOUSE OF WOODBOROUGH**

27   My Lords, for the reasons given by my noble and learned friend, Lord Hoffmann, and to be given by my noble and learned friend, Lord Rodger of Earlsferry, I agree that the appeal against Mr Mehra should be

G   allowed and the judgment of Cresswell J against him restored.

**LORD RODGER OF EARLSFERRY**

28   My Lords, I have had the advantage of reading the speech of my noble and learned friend, Lord Hoffmann, in draft. I agree with it and, for the reasons he gives, I too would allow the appeal and dismiss the cross-appeal. I add some observations of my own, first, on Mr Mehra's liability

H   and then, briefly, on his defence of contributory negligence.

29   The appeal arises out of proceedings by Standard Chartered Bank ("Standard Chartered") against a number of defendants. Among them were the fourth defendant, a company, Oakprime International Ltd ("Oakprime"), and the fifth defendant, Mr Mehra, the managing director of

Oakprime. Standard Chartered seek damages for loss which they suffered as a result of paying under a confirmed letter of credit in favour of Oakprime. The letter of credit was for payment for a cargo of bitumen which Oakprime had sold to Vietnamese buyers and which was to be sent by sea from Iran to Vietnam. Loading should have been completed by 25 October 1993 but was not in fact finished until 5 December. Despite this, the documents presented to Standard Chartered on 9 November included bills of lading falsely dated 25 October. In reliance on, inter alia, the false date on the bills of lading Standard Chartered paid Oakprime and, as Lord Hoffmann has explained, lost their money. Although the writ was served on Oakprime, the company was not represented and took no part in the proceedings. Eventually, after the trial, counsel for Standard Chartered stated in open court that they were not seeking to enter judgment against Oakprime. Judgment was entered against Mr Mehra, however, for having authorised, directed and procured the deceit of Standard Chartered. He appealed and the Court of Appeal allowed the appeal. They held in effect that, while Oakprime would have been liable in damages to Standard Chartered for the loss caused by the presentation of the false bills of lading, Mr Mehra was not. When Standard Chartered's case against Mr Mehra and the findings of the trial judge are considered, this is an untenable conclusion.

30  Cresswell J [1998] 1 Lloyd's Rep 684 summarised Standard Chartered's case against Mr Mehra and Oakprime in this way, at p 696:

> "As against Mr Mehra and Oakprime, SCB relies on the tendering of the false bills of lading as constituting a representation that the contents of the bills were true and accurate . . . In addition SCB also relies on the tendering of the shipping advice stating that the eta of the vessel was 15 November 1993, the invoice and the packing list as constituting an implied representation that Mr Mehra and Oakprime believed that loading had been completed on 25 October 1993. SCB say that Mr Mehra deliberately presented the documents to SCB in order to obtain payment while fully aware of their falsity."

It should be noted that Standard Chartered's amended points of claim proceeded on the basis that both Mr Mehra and Oakprime had made false representations and that both were liable in damages for fraud and deceit.

31  Among the facts that Cresswell J found are the following. In about the middle of October 1993 Mr Mehra and two other defendants agreed on a plan which involved the issue of falsely dated bills of lading with a view to their presentation to Standard Chartered: see p 688. On 9 November 1993 Mr Mehra himself presented to Standard Chartered what purported to be most of the documents required by the letter of credit, including the falsely dated bills of lading, and sought payment under the letter of credit: see p 694. He presented them under cover of a letter dated that day and written on Oakprime notepaper. The relevant parts of the letter were in these terms:

> "We enclose herewith all the documents required under the above letter of credit No 0801C931C1025 with the exception of the SGS certificate which will be delivered to you within the next few days. We appreciate you examining the attached documents prior to receipt of the SGS certificates and please advise us in the event you find any discrepancies in the documents. We will deliver the SGS certificate as

A    soon as issued at which time, we would requires you to discount the draft, value of US$1,215,660 and pay the discounted proceeds to our account with National Westminster Bank who details are as follows . . . We thank you for your support and assistance in this matter."

The letter was signed "Arvind Mehra Managing Director". Mr Mehra appreciated that what he and the two other defendants were doing
B   amounted to deliberate deception of Standard Chartered: see p 690. Contemporary documents showed his intimate involvement in the fraud and "Mr Mehra (and through him Oakprime) intended SCB to suffer loss by making the payment": see p 696. "Mr Mehra knew the true position as to the loading of *Lalazar* at all material times. He dishonestly presented antedated and false bills of lading and other false documents to SCB": see
C   pp 700, 708.

    32   Not surprisingly, therefore, having found that Standard Chartered relied on the accuracy of the bills of lading in making payment to Oakprime, Cresswell J concluded, at p 704:

> "As against Mr Mehra (and Oakprime) SCB relies on the tendering of the false bills of lading as constituting a representation that the contents of the bills were true and accurate (in addition SCB also relies on the
D   tendering of the shipping advice stating that the ETA of the vessel was 15 November 1993, the invoice and the packing list as constituting an implied representation that Mr Mehra believed that loading had been completed on 25 October 1993). For similar reasons to those that apply in the case of PNSC and Seaways, all the ingredients of the tort of deceit are made out against Mr Mehra (and Oakprime)."

E
When he came to hold Mr Mehra liable, however, Cresswell J put his conclusion in these terms, at p 706:

> "Mr Mehra contends by way of defence that he is not liable for the acts of Oakprime. I refer to my detailed findings as to Mr Mehra's conduct set out above. The relevant principles are referred to in *Clerk & Lindsell on
F    Torts*, 17th ed, para 4-49, *C Evans Ltd v Spriteband Ltd* [1985] 1 WLR 317 and *Williams v Natural Life Health Foods Ltd* [1996] 1 BCLC 131. In the present case Mr Mehra authorised, directed and procured the acts complained of with full knowledge that the acts complained of were tortious. He is accordingly personally liable."

    33   Even on first reading, this was a strangely complex way to formulate
G   Mr Mehra's liability. As the judge had spelled out, in what Evans LJ rightly called "devastating detail", Mr Mehra did not authorise, direct or procure other people to present the bills of lading and other documents: it was Mr Mehra himself who presented them to Standard Chartered, knowing full well that the bills of lading had been antedated and intending that Standard Chartered should suffer loss by paying Oakprime in reliance on the documents. It was these acts of his that were to be regarded as the acts of
H   Oakprime.

    34   Standard Chartered's amended points of claim did not include a case to the effect that Mr Mehra should be held liable for authorising, directing and procuring the various deceitful acts. The pleader had rightly preferred the simpler—not to say, more accurate—allegation that Mr Mehra had done

the various acts himself and should be held liable accordingly. Before the Court of Appeal counsel for Mr Mehra seized on this point. The amended statement of claim had not alleged that Mr Mehra was liable as a joint tortfeasor for procuring and inducing Oakprime to make the false representations. Cresswell J had, therefore, been wrong to find Mr Mehra liable on that basis. Counsel for Standard Chartered applied to amend to include such a case, but the Court of Appeal refused leave. It was in these circumstances that they went on to allow Mr Mehra's appeal against Cresswell J's decision [2000] 1 Lloyd's Rep 218. The Court of Appeal's thinking can be seen in this passage from the judgment of Aldous LJ, at p 233:

> "14. Evans LJ has referred to documents relied on as containing the misrepresentations. They are all on Oakprime headed paper or clearly stated to be from Oakprime. Mr Mehra's name appears as the person signing the documents as managing director of or on behalf of Oakprime. In my view the representations were made by Oakprime and all the evidence points to the conclusion that SCB relied upon them as being representations by Oakprime.
>
> "15. Since *Salomon v A Salomon & Co Ltd* [1897] AC 22, companies have been recognised as separate legal entities to their shareholders, their directors and their employees. Leaving aside certain cases, not applicable in this case, where it has been held permissible to lift the corporate veil, e g where the company is a mere façade, directors or employees acting as such will only be liable for tortious acts committed during the course of their employment in three circumstances.
>
> "16. First, if a director or an employee himself commits the tort he will be liable. An example is the lorry driver who is involved in an accident in the course of his employment. Although Mr Mehra was the person who was responsible for making the misrepresentations, he did not commit the deceit himself. For reasons I have already stated the representations were made by Oakprime and not by him. Further, SCB relied upon them as representations by Oakprime and not as representations by Mr Mehra."

35  The result of the Court of Appeal's reasoning really comes to this: a director can himself orchestrate and execute a scheme of deceit, can himself submit false documents to a bank with the intention that they should pay and suffer loss but, provided that he can be said to have carried out all these fraudulent acts "on behalf of" or "as" the company of which he is a director, he is not to be held personally liable for the resulting loss. Only the company—which in this particular case does not seem to have been worth powder and shot—is liable. The director himself can be held liable, it is said, only on "the converse of vicarious liability", by being held liable for the company's tort if "he ordered or procured the acts of other persons which render the company liable": see p 230, per Evans LJ. So, in this case, Mr Mehra does the fraudulent acts as a director of Oakprime, Oakprime are accordingly liable for those acts but Mr Mehra cannot be held personally liable for his own acts because they did not involve ordering or procuring others to perform the fraudulent acts which make the company liable. Understandably, Evans LJ showed some signs of unease at the conclusion to which his reasoning had led him.

36  The incorporation of companies is vitally important for commerce since it allows transactions to be entered into and carried out, property to be

n/a

A  held and actions to be raised by, or against, a body which continues in existence despite changes in the individuals who conduct or invest in the business. The company is a separate entity, distinct from the directors, employees and shareholders. The law has rightly insisted that the distinction should be duly observed: *Lee v Lee's Air Farming Ltd* [1961] AC 12. In particular the company does not act as the agent of the directors and, in general, they do not incur personal liability for the acts of the company or

B  its employees: *Rainham Chemical Works Ltd v Belvedere Fish Guano Co Ltd* [1921] 2 AC 465, 488, per Lord Parmoor. Directors may, however, be personally liable if they directed or procured the commission of a wrongful act. The exact scope of this type of liability has been discussed in a line of cases. *Performing Right Society Ltd v Ciryl Theatrical Syndicate Ltd* [1924] 1 KB 1, 14, per Atkin LJ and *C Evans & Sons Ltd v Spritebrand Ltd* [1985]

C  1 WLR 317 may serve as examples.

37  A hallmark of modern companies is that the liability of the shareholders is limited. This is not a necessary characteristic of a commercial corporation. Indeed even for some time after the Limited Liability Act 1855 (18 & 19 Vict c 133) there were major trading entities which had been incorporated but the investors in which were exposed to

D  unlimited liability for the corporation's debts. This could, and not infrequently did, result in the investors' ruin. By reducing and defining the potential risk to investors, limited liability opens the way for modern companies to raise the necessary capital for their business, either privately or on the stock market. For this reason, only in exceptional circumstances does the law allow a creditor of the company to pierce the veil of incorporation and fix the shareholders with personal liability: *Salomon v A Salomon & Co*

E  *Ltd* [1897] AC 22.

38  Although Aldous LJ referred to lifting the corporate veil, the question of the limited liability of shareholders is irrelevant to the present issue since Standard Chartered do not seek to make Mr Mehra liable as a shareholder in Oakprime. Nor do Standard Chartered seek to make Mr Mehra liable, by virtue of his position as a director, for the deceitful acts of Oakprime or its employees or other agents. Rather, they seek to do no

F  more than hold him liable for deceitful acts that he himself performed. So no question arises as to whether he directed or procured the doing of tortious acts by others and the *C Evans & Sons Ltd v Spritebrand Ltd* [1985] 1 WLR 317 line of cases is not in point.

39  At the heart of the Court of Appeal's decision is the view that, because Mr Mehra was a director of Oakprime and acted as such when

G  cheating Standard Chartered, his acts must be regarded solely as the acts of Oakprime and he should have no personal civil liability for them. As Mr Cherryman acknowledged, no man could escape the clutches of the criminal law by the simple device of showing that he had carried out his frauds in his capacity as a director of a company and in circumstances where his acts were to be attributed to the company: *Meridian Global Funds Management Asia Ltd v Securities Commission* [1995] 2 AC 500. In *R v*

H  *ICR Haulage Ltd* [1944] KB 551, 559, for example, both the managing director and, through him, the haulage company were convicted of conspiracy to defraud. His acts "were the acts of the company and the fraud of that person was the fraud of the company". In the world of tort, however, all was said to be more happily arranged for the fraudster. He could use the

device of acting as a director to escape any liability to his victims: they were to be regarded not as his victims but just as the victims of the company's fraud. His fraud might be the fraud of the company but, somehow or other, it was not his own fraud.

40  My Lords, the maxim culpa tenet suos auctores may not be the end, but it is the beginning of wisdom in these matters. Where someone commits a tortious act, he at least will be liable for the consequences; whether others are liable also depends on the circumstances. Here, as the facts make plain and as Cresswell J specifically found, "all the ingredients of the tort of deceit are made out against Mr Mehra (and Oakprime)". In other words Standard Chartered have proved all that is required to make Mr Mehra—and through him Oakprime—liable in deceit. That being so, there is no conceivable basis upon which Mr Mehra should not indeed be held liable for the loss that Standard Chartered suffered as a result of his deceit. If he had been a mere employee of Oakprime and had done the same things and written the same letters on behalf of the company in that capacity, it could never have been suggested that Mr Mehra was not personally liable for his fraudulent acts. His status as a director when he executed the fraud cannot invest him with immunity.

41  The Court of Appeal sought support for their view that Mr Mehra should not be held personally liable in the speech of Lord Steyn in *Williams v Natural Life Health Foods Ltd* [1998] 1 WLR 830, 834–835. In truth it provides no such support. The issue in that case related to the personal liability of a director for a misleading projection, prepared in large part by him and issued by the company, as to the profits which the plaintiffs might earn by opening a health food shop under a franchise. Lord Steyn, with whom the other members of the House concurred, said, at p 835:

> "But in order to establish personal liability under the principle of *Hedley Byrne*, which requires the existence of a special relationship between plaintiff and tortfeasor, it is not sufficient that there should have been a special relationship with the principal. There must have been an assumption of responsibility such as to create a special relationship with the director or employee himself."

Since the plaintiffs had failed to show a special relationship with the director himself, the House held that he was not liable. Lord Steyn was dealing with the tort of negligence where a claimant must establish that the defendant owed him a duty of care. There is no such requirement in the case of deceit. Liability for deceit is so self-evident that we do not consider it as resulting from a breach of duty (*Tony Weir, Tort Law* (2002), p 30). Mr Mehra set out by his fraudulent acts to make Standard Chartered pay under the letter of credit. He succeeded. He is accordingly personally liable for the loss which he thereby caused them.

42  I turn now to the matter of contributory negligence. As Lord Hoffmann has explained, whether or not the defence of contributory negligence is available to Mr Mehra depends on whether Standard Chartered's payment of the sum under the letter of credit would, apart from the Law Reform (Contributory Negligence) Act 1945, give rise to a defence of contributory negligence. In agreement with Mummery J in *Alliance & Leicester Building Society v Edgestop Ltd* [1993] 1 WLR 1462, Lord Hoffmann has concluded that there is no common law defence of

A  contributory negligence in the case of fraudulent misrepresentation. I respectfully regard that conclusion as compelling. As Mummery J pointed out, if the negligence of the plaintiff had been a defence to an action of deceit at common law, this would have meant that it would have been a complete defence, absolving the fraudulent defendant of all liability. Such an extreme doctrine could hardly have passed through the law without leaving its mark in the cases. But there is no trace of it. Indeed, the signs are that before 1945 the defence of contributory negligence was thought not to apply where the defendant intended to cause the plaintiff harm. I do not repeat the citations given by Mummery J but draw attention to two further indications of the way that the law was generally understood.

43 In 1882 Sir Frederick Pollock drafted a Civil Wrongs Bill for the Government of India, the aim being to set out a codified, if slightly simplified, version of English tort law. To Pollock's lasting disappointment the Bill was never enacted. Pollock dealt with contributory negligence in clause 64 which, significantly, was drafted in such a way that it would operate as a defence only in the case of negligence by the defendant or someone for whose negligence he was answerable. Similarly, five years later in his *Law of Torts* (1887) Pollock treated contributory negligence in the chapter on negligence and indicated that the defence would not apply in the case of an intentional harm (Appendix D, p 484). He remained of this view more than 40 years later in the last edition to come from his pen: *Law of Torts* 13th ed (1929), pp 615 and 675–676.

44 Similarly, in an authoritative essay on "Contributory Negligence" in American law, written in 1908 and reprinted in his *Studies in the Law of Torts* (1926), pp 528–529, Bohlen stated:

"If the defendant's wrong be intentional, only consent, express or necessarily implied from the circumstances, will bar recovery . . . the unanimous current of decision is that when the defendant's wrong is something more than mere negligence—when it involves an intent to cause harm—contributory negligence is no defense."

45 In *Murphy v Culhane* [1977] QB 94, an interlocutory decision, Lord Denning MR said that a widow's claim for damages for the death of her husband might fall to be reduced under the 1945 Act because it had resulted from a criminal affray in which he had participated. That would appear to conflict with the view that contributory negligence had never been a defence open to a defendant who had intended to harm the plaintiff. There were other arguments available to the defendant, however, and *Murphy v Culhane* is distinguishable from the present case. I should wish to reserve my opinion as to whether this particular observation of Lord Denning MR should be regarded as sound.

*Appeal allowed with costs.*

Solicitors: *Ashok Patel & Co; Lovells.*

S H