Ian D. Berg (Bar No. 263586)
**ABRAHAM, FRUCHTER & TWERSKY, LLP**
12526 High Bluff Drive, Suite 300
San Diego, California 92130
Tel: (858) 792-3448
Fax: (858) 792-3449
*iberg@aftlaw.com*

***Counsel for Plaintiffs Harriet Steinberg and Edward Vogel***

[Additional counsel listed on signature page]

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

IN RE HEWLETT-PACKARD COMPANY SHAREHOLDER DERIVATIVE LITIGATION

MASTER DOCKET NO. C-12-6003 CRB

THIS DOCUMENT RELATES TO:

HARRIET STEINBERG, et al.,

Plaintiff,

v.

LEO APOTHEKER, et al.,

Defendants,

and

HEWLETT-PACKARD COMPANY, a Delaware corporation,

Nominal Defendant.

Case No. 3:14-cv-02287-CRB

**THE STEINBERG PLAINTIFFS' MEMORANDUM IN RESPONSE TO THE SETTLING PARTIES' SUPPLEMENTAL SUBMISSIONS**

**[PUBLIC VERSION]**

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........ iii

PRELIMINARY STATEMENT ........ 1

SUMMARY OF RELEVANT FACTS ........ 1

SUMMARY OF PROCEDURAL BACKGROUND ........ 4

ARGUMENT ........ 7

I. THE SETTLING PARTIES HAVE FAILED TO DEMONSTRATE THAT THE PROPOSED SETTLEMENT IS FAIR AND REASONABLE ........ 7

A. The Settling Parties Have Failed to Demonstrate That the Claims Which Are the Subject of the Proposed Settlement Lack Merit ........ 8

1. The DRC Resolution Represents an Incomplete Record of the Facts Considered by the DRC and the Board ........ 8

2. A Careful Reading of the DRC Resolution Raises Serious Concerns With Respect to the Purported Good Faith and Reasonableness of the DRC's Investigation ........ 10

a. The DRC Resolution Fails to Offer a Cogent Explanation For Releasing Apotheker and Robison From Liability ........ 10

b. The Committee's Explanation for Absolving HP's Directors From Liability is Equally Unpersuasive ........ 13

[REDACTED] ........ 15

B. The Settling Parties Have Improperly Judged the Likely Success of the Demand Refused Claims Asserted by the Steinberg Plaintiffs ........ 15

C. The Proposed Settlement Suffers From Fatal Defects in Releasing Potential Wrongdoers ........ 17

II. THE MOTION TO SEVER SHOULD BE GRANTED ........ 19

A. The Demand Futility Plaintiffs Have Failed to Establish That They Took the Potential Merits of the Demand Refused Action Into Account in Negotiating the Proposed Settlement ........ 19

B. The Pendency of the Proposed Settlement Should Not Delay the Court's Decision on the Motion to Sever ....................20

CONCLUSION....................21

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Aronson v. Lewis*,
473 A.2d 805 (Del. 1984) ....................14

*Ash v. McCall*,
C.A. No. 17132-CC, 2000 Del. Ch. LEXIS 144 (Del. Ch. Sept. 15, 2000) ....................13

*Barkan v. Amsted Indus., Inc.*,
567 A.2d 1279 (Del. 1989) ....................8

*Brehm v. Eisner (In re Walt Disney Co. Deriv. Litig.)*,
906 A.2d 27 (Del. 2006) ....................11, 13

*Brehm v. Eisner*,
746 A.2d 244 (Del. 2000) ....................10, 15

*City of Orlando Police Pension Fund v. Page*,
970 F. Supp. 2d 1022 (N.D. Cal. 2013) ....................16

*City of Westland Police & Fire Ret. Sys. v. Axcelis Techs., Inc.*,
1 A.3d 281 (Del. 2010) ....................8

*Copeland v. Lane*,
No. 11 Civ. 1508 (EJD), 2013 U.S. Dist. LEXIS 65742 (N.D. Cal. May 6, 2013)....................20

*Francis v. United Bank*,
432 A.2d 814 (N.J. 1981)....................14

*Grimes v. Donald*,
673 A.2d 1207 (Del. 1996) ....................15

*In re China Auto. Sys.*,
C.A. No. 7145-VCN, 2013 Del. Ch. LEXIS 217 (Del. Ch. Aug. 30, 2013) ....................13

*In re KLA Tencor Corp. Shareholder Deriv. Litig.*,
No. C06-03445 JW (HRL) (N.D. Cal. May. 14, 2008) ....................9

*In re Oracle Corp. Deriv. Litig.*,
824 A.2d 917 (Del. Ch. 2003).................... 15-16

*In re Oracle Sec. Litig.*,
829 F. Supp. 1176 (N.D. Cal. 1993) ....................8

*In re Primedia Inc.*,
67 A.3d 455 (Del. Ch. 2013)....................15

*In Re Rino Int'l Corp. Derivative Litig.*,
No. 10 Civ. 2209 (MMD), 2013 U.S. Dist. LEXIS 63632 (D. Nev. May 3, 2013)...........21

*La. Mun. Police Employees Ret. Sys. v. Morgan Stanley & Co.*,
C.A. No. 5682-VCL, 2011 Del. Ch. LEXIS 42 (Del. Ch. Mar. 4, 2011) .................... 8-9

*Lewis v. Fuqua*,
502 A.2d 962 (Del. Ch. 1985)....................10

*London v. Tyrrell*,
C.A. No. 3321-CC, 2010 Del. Ch. LEXIS 54 (Del. Ch. Mar. 11, 2010)....................10

*Lyondell Chemical Co. v. Ryan*,
970 A.2d 235 (Del. 2009) ....................13

*MCG Capital Corp. v. Maginn*,
C.A. No. 4521-CC, 2010 Del. Ch. LEXIS 87 (Del. Ch. May 5, 2010) ....................11, 14

*Nissan Fire & Marine Ins. Co. Ltd. v. Fritz Cos.*,
210 F.3d 1099 (9th Cir. 2000) ....................16

*Revlon v. Macandrews & Forbes Holdings, Inc.*,
506 A.2d 173 (Del. 1986) ....................11

*Scattered Corp. v. Chicago Stock Exch., Inc.*,
701 A.2d 70 (Del. 1997) ....................10, 15

*Sutherland v. Sutherland*,
958 A.2d 235 (Del. Ch. 2008)....................15

*Zapata Corp. v. Maldonado*,
430 A.2d 779 (Del. 1981) .................... 8-9

**Statutes and Rules**

8 Del. C. §102(b)(7)....................13

8 Del. C. §141(e)....................14

8 Del. C. §220 ....................5

Fed R. Civ. P. 23.1(c) .................... 7-8

Plaintiffs Harriet Steinberg and Edward Vogel (collectively referred to herein as the "Steinberg Plaintiffs"), by their undersigned counsel, respectfully submit this memorandum in response to the supplemental briefs filed by Hewlett-Packard Company ("HP" or the "Company") and lead counsel for the plaintiffs in this consolidated action (the "Demand Futility Plaintiffs" and together with HP, the "Settling Parties").[1]

**PRELIMINARY STATEMENT**

The Settling Parties have failed to carry their burden of establishing that the proposed settlement (the "Proposed Settlement") of claims they are presenting to this Court should be approved even on a preliminary basis. The limited information HP belatedly submitted to the Court is insufficient to support the Settling Parties' contention that the Proposed Settlement is fair and reasonable or that the Demand Review Committee (the "DRC" or the "Committee") established by HP's board of directors (the "Board") conducted a reasonable and good faith investigation of the underlying facts or claims. Therefore, and for the reasons stated in greater detail below and in prior submissions to the Court, the Proposed Settlement should not be preliminarily approved and the Steinberg Plaintiffs motion to sever should be granted.

**SUMMARY OF RELEVANT FACTS**

On August 18, 2011, HP announced that it was planning to acquire Autonomy Plc ("Autonomy"), a computer software manufacturer, for $11.1 billion. Hewlett-Packard Company Independent Committee's Resolution Regarding Derivative Claims and Demands (the "DRC Resolution") (attached as Ex. 1 to the Declaration of Marc S. Wolinsky ("Wolinsky Decl.") (Docket No. 211) at 1, §I.A.1; *see also* Steinberg Complaint ¶24.[2] Shareholder reaction to the

[1] The briefs are, respectively, titled Hewlett-Packards' Memorandum in Support of Preliminary Approval of the Settlement and in Opposition to the Motions to Intervene and Sever ("HP Supp. Memo.") (Docket No. 210) and Lead Plaintiff's Supplemental Brief: (1) in Support of Motion for Preliminary Approval of Amended Settlement Agreement; and (2) in Opposition to Intervene and Sever ("Settling Pls. Supp. Memo.") (Docket No. 208).

[2] The "Steinberg Complaint" refers to the corrected complaint filed by the Steinberg Plaintiffs in *Steinberg, et al. v. Apotheker, et al.*, Case No. 3:14-CV-02287-CRB (N.D. Cal.).

announced acquisition (the "Acquisition") was overwhelmingly negative causing the price of HP stock to decline. DRC Resolution at 2, §I.A.2.

Leo Apotheker ("Apotheker"), HP's Chief Executive Officer ("CEO") and Shane Robison ("Robsion"), HP's Chief Strategy & Technology Officer, were the "Sponsors" of the Acquisition. DRC Resolution at 27, §XV.C.2.b. In that capacity, they were "accountable for the acquisition and . . . involved at every stage, including . . . ***ensuring that the due diligence process is followed and completed*** . . . ." DRC Resolution at 28, §XV.C.2.c (emphasis added). HP's Board, which retained ultimate authority to approve the Acquisition, was engaged in the process and approved the Acquisition notwithstanding concerns raised by HP's Chief Financial Officer. Resolution at 34, §XV.C.5.c.

The $11.1 billion price HP paid for Autonomy was largely premised on the amount of revenue generated by Autonomy from software sales and the growth in those sales. DRC Resolution at 24, §XIV.C.1. At the very same time, however, securities analysts were openly questioning the integrity of Autonomy's public reporting of those operating metrics. For example, on September 8, 2010 and October 25, 2010, a JP Morgan analyst opined that Autonomy was recognizing revenues in a more aggressive manner for certain large deals by recognizing most of the revenue up front and then the remainder over a longer period of time. Similarly, in an October 22, 2010 report, KBC Peel Hunt ("Peel Hunt" - brokerage/advisory firm focused on small and mid-cap UK firms) suggested that Autonomy's growth (as Autonomy defined it) was exaggerated and inconsistent with calculations Autonomy made in 2009 causing Peel Hunt to reduce their growth calculation based on what they believed to be significant hardware sales. Peel Hunt also noted that Autonomy seemed to be suggesting that hardware sales were a common feature within software sales and that "Autonomy's definition of organic growth is misleading." Steinberg Complaint ¶40.

Notwithstanding these "red flags" waving in HP's face (*accord* DRC Resolution at 35, §XV.C.7.a), HP failed to obtain the accounting work papers of Deloitte & Touche, Autonomy's outside auditor, which had been previously identified as a "***must have***" of the due diligence

process. DRC Resolution at 32, §XV.C.3.d.iii.(c) ("all of the 'must haves' diligence information . . . other than Deloitte's workpapers" had been obtained) (emphasis added). Instead, "HP received mostly ***oral responses*** to its detailed due-diligence questions respecting, among other things, financial information, revenue projections, growth rates and gross margins . . . ." DRC Resolution at 31, §XV.C.3.d.iii (emphasis added). Thus, KPMG, the outside expert retained by HP to assist in the due diligence process, "advised HP management that ***the limited information from Autonomy (and Deloitte) affected the analysis that KPMG could perform*** . . . ." DRC Resolution at 34, §XV.C.5.b (emphasis added).

Similarly, despite being informed that there was a corporate whistleblower that had made claims investigated by Deloitte & Touche (DRC Resolution at 32, §XV.C.3.d.iii.(c)(2)), HP did not follow up to obtain the identity of the whistleblower, the whistleblower's complaint or allegations, or to have the whistleblower interviewed. That whistleblower turns out to have been the CFO of Autonomy's US operations who made allegations "regarding revenue recognition in certain contracts and other management practices." DRC Resolution at 2, §I.A.4.

On October 3, 2011, HP completed the Acquisition. Steinberg Complaint ¶46. On May 25, 2012, HP began discovering that Autonomy's accounting and reported financial statements were inconsistent with U.S. Generally Accepted Accounting Principles ("GAAP") because Autonomy had recognized license fees upfront rather than amortizing them over the life of the license; had sold hardware at a loss; and, had engaged in transactions as a value added reseller ("VAR"). DRC Resolution at 2, §I.A.4. These were, of course, the very same issues raised as "red flags" prior to the Acquisition by securities analysts or which could have been learned through the whistleblowers complaint.

On November 20, 2012, after a forensic review of Autonomy's revenue recognition practices, HP announced an $8.8 billion impairment charge, amounting to 80% of the price paid by HP for Autonomy only one year earlier. DRC Resolution at 2 and 3, §I.A.5 and 8. [redacted]

Also on November 20, 2012, Meg Whitman, the newly appointed CEO of HP, in a conference call with securities' analysts, publicly cast blame on Apotheker and Robison stating "really the two people that should have been held responsible are gone." Abraham Decl. Ex. A at 9. Apotheker, in contrast, according to published reports, maintains that he had properly informed HP's Board of all material facts relating to the Acquisition. *See* James Bandler and Doris Burke, *How Hewlett-Packard Lost Its Way*, FORTUNE, May 8, 2012 (attached as Ex. B to the Abraham Decl.) at 9.

**SUMMARY OF PROCEDURAL BACKGROUND**

On November 27, 2012, the first shareholder derivative action was filed on behalf of HP in this Court. Docket No. 1. Other shareholder derivative actions, all alleging that demand on the Board would have been futile followed. DRC Resolution at 3, §I.B.1. On February 21, 2013, the Court entered a stipulated order consolidating all the filed demand futility actions and any future filed shareholder derivative actions (the "Consolidation Order"). Docket No. 61.

On December 4, 2012, the Steinberg Plaintiffs chose an alternative course of action by making a demand (the "Demand") on HP's Board. DRC Resolution at 7, §I.B.3.c. On January 17, 2013, in response to shareholder demand letters, including that of the Steinberg Plaintiffs, and the pending shareholder derivative actions, HP's Board created the DRC which was charged with reviewing the relevant facts and allegations relating to the Autonomy Acquisition and reporting back to the Board with its recommendations. DRC Resolution at 9, §II.A.1.

On May 28, 2013, following a joint motion by the Settling Parties, the Court stayed proceedings, a stay which has remained in force through subsequent stipulations by the Settling Parties. Docket Nos. 87, 134, 136, 140 and 145. The state court shareholder derivative actions were similarly stayed. DRC Resolution at 10, §II.B.2.

On January 10, 2014, the Committee adopted the DRC Resolution. On January 16, 2014, the Board adopted Hewlett-Packard Company Board of Directors' Resolution Regarding

Shareholder Claims and Demands (the "Board Minutes") (Wolinsky Decl. Ex. 3) which, among other things, resolved that: (1) HP should move to dismiss all pending shareholder derivative actions (Board Minutes at 12 ¶16); (2) the Committee's recommendations for further M&A reforms should be considered by HP management for consideration by the Board (Board Minutes at 12 ¶17); and (3) the Company acting through its counsel and the Committee's counsel should continue its discussions considering possible resolution of the shareholder derivative claims (Board Minutes at 12 ¶18).

On January 31, 2014, Ralph Ferrara, the primary counsel for the DRC, wrote to counsel for the Steinberg Plaintiffs, among others, inviting them to a meeting to discuss the proposed derivative claims. *See* Abraham Decl. at ¶4. As a pre-condition to participating in the meeting, the DRC insisted on a highly restrictive confidentiality agreement premised on the presentation being in connection with settlement discussions (the "Settlement Confidentiality Agreement"), which prohibited the discussion or use of any of the materials discussed at the meeting. *See* Abraham Decl. at ¶5 and Ex. C.

On March 19 and 20, 2014, Mr. Ferrara and other counsel for the Committee, conducted a meeting at the New York offices of the Proskauer firm. Abraham Decl. ¶6. On March 26, 2014, Gary S. Graifman, one of the Steinberg Plaintiffs' lawyers, wrote to Mr. Ferarra asking that he confirm what actions the Committee had recommended and that the Board had decided to take in response to the Steinberg Plaintiffs' demand and the results of the DRC investigation. *See* Abraham Decl. ¶7. Mr. Ferrara declined to do so and, instead, offered to provide copies of the DRC Resolution and the Board Minutes pursuant to the terms of the highly restrictive Settlement Confidentiality Agreement. *See* Abraham Decl. at ¶8.

On April 14, 2014, the Steinberg Plaintiffs made a demand for books and records from HP pursuant to Delaware Gen. Corp. Law §220 seeking the DRC Resolution, the Board Minutes and the DRC material supporting the recommendations and conclusions of the DRC and the Board. *See* Abraham Decl. ¶9 and Ex. E. On April 23, 2014, Ferrara offered to provide the DRC Resolution and Board Minutes (but not the other documents sought) pursuant to the terms

of a less restrictive confidentiality agreement which had been entered into in August 2013 (the "August 2013 Confidentiality Agreement") and allows for the use of documents in Court proceedings provided they are filed under seal. *See* Abraham Decl. ¶8 and Ex. D.

On April 24, 2014, Jeffrey S. Abraham, another one of the Steinberg Plaintiffs lawyers, wrote to Mr. Ferrara accepting HP's offer to produce the DRC Resolution and the Board Minutes. *See* Abraham Decl. ¶10. The Steinberg Plaintiffs then waited patiently for HP to produce the promised documents but none arrived even though the documents were readily available to be sent via e-mail.

On May 16, 2014, after waiting more than three weeks for a response, the Steinberg Plaintiffs filed the Steinberg Complaint. The Steinberg Complaint differs from the consolidated shareholder derivative action previously filed in this Court (the "Consolidated Demand Futility Action") because the Consolidated Demand Futility Action is premised on a theory of demand futility, while the Steinberg action is premised on a theory of wrongful demand refusal.

On May 19, 2014, HP, through its counsel at the Wachtell Lipton firm, finally forwarded by e-mail a copy of the DRC Resolution and the Board Minutes to the Steinberg Plaintiffs, designating them as confidential pursuant to the terms of an August 2013 Confidentiality Agreement rather than highly restrictive Settlement Confidentiality Agreement. *See* Abraham Decl. ¶11 and Ex. F. On June 9, 2014, HP produced additional DRC and Board minutes, which were heavily redacted. The underlying material support for the DRC's analysis was never produced notwithstanding the sustained requests and efforts of the Steinberg Plaintiffs. Steinberg Complaint ¶¶5 and 78-82.

On May 23, 2014, HP filed a notice of consolidation causing the Steinberg Complaint to be consolidated with the Consolidated Demand Futility Action pursuant to the terms of the Consolidation Order originally entered by this Court more than one year earlier on February 21, 2013. On June 6, 2014, the Steinberg Plaintiffs moved to sever their claims from the Consolidated Demand Futility Action. Briefing with respect to the motion to sever was completed on June 27, 2014. *See* Docket Nos. 143, 147 and 148.

On June 30, 2014, the Demand Futility Plaintiffs filed a motion for preliminary approval of the Proposed Settlement. Docket No. 149. On July 21, 2014, in response to the Proposed Settlement's announcement, Shushovan Hussain, a former senior executive at Autonomy and a purported shareholder of HP, moved to intervene and challenge the Proposed Settlement. Docket No. 160. Similarly, on August 13, 2014, Rodney Cook, an HP shareholder who previously filed a shareholder derivative action in Delaware Court of Chancery, filed a motion to intervene for purposes of challenging the Proposed Settlement. Docket No. 173.

On August 25, 2014, the Settling Parties presented the Proposed Settlement for preliminary approval by the Court. The Court declined to preliminarily approve the Proposed Settlement but allowed the Settling Parties to present a revised settlement agreement. *See* Docket No. 190; Transcript of Proceedings ("Tr.") at 63:15-18. The Court also declined to rule on the other motions being heard that day, including the Steinberg Plaintiffs' motion to sever.

On September 4, 2014, HP and the Settling Parties filed a revised settlement stipulation with the Court. Also, HP and the Demand Futility Plaintiffs each filed supplemental briefs in further support of the Proposed Settlement, which also opposed the Steinberg Plaintiffs' motion to sever. In connection with the filing of its Supplemental Memorandum, HP placed several documents before the Court including a redacted copy the DRC Resolution and the Board Minutes. Wolinsky Decl. at Exs. 1 and 3. HP also placed an additional eleven documents before the Court in connection with the Company's supplemental submission supporting the viability of the claims planned to be asserted against Hussain. Wolinsky Decl. Exs. 2 and 4-13. In contrast, HP failed to place any documents (or even any significant details) concerning any purported infirmity in the potential claims against HP's officers and directors, which are the subject of the release contained in the Proposed Settlement.

## ARGUMENT

### I. THE SETTLING PARTIES HAVE FAILED TO DEMONSTRATE THAT THE PROPOSED SETTLEMENT IS FAIR AND REASONABLE

Derivative suits are fiduciary in nature, and the Court must approve the settlement of such cases to ensure that the interest of the absent shareholders has been fairly represented. Fed.

R. Civ. P. 23.1(c); *see also Barkan v. Amsted Indus., Inc.,* 567 A.2d 1279, 1283 (Del. 1989). The Court must determine, using its business judgment, whether the settlement terms are fair, reasonable, and adequate. *Barkan*, 567 A.2d at 1284. The proponents of a settlement bear the burden of showing that a proposed settlement is fair and reasonable. *Id.* at 1285-86. Here, the Settling Parties have failed to carry their burden and, as a result, this Court should exercise its business judgment by refusing to approve the Proposed Settlement. *See In re Oracle Sec. Litig.*, 829 F. Supp. 1176, 1187 (N.D. Cal. 1993) (quoting *Zapata Corp. v. Maldonado*, 430 A.2d 779, 788-89 (Del. 1981)).

### A. The Settling Parties Have Failed to Demonstrate That the Claims Which Are the Subject of the Proposed Settlement Lack Merit

HP premises the fairness of the Proposed Settlement on the decisions taken by the Board and the purported extensive process engaged in by the DRC in order to advise the Board with respect to that decision. HP Supp. Memo. at 2. The DRC Resolution which HP has now placed before the Court figures prominently in this analysis. However, the DRC Resolution offers an inadequate basis for supporting approval of the Proposed Settlement because: (1) it represents an incomplete record of the analysis supporting the DRC's recommendations that claims against HP's officers and directors should not be pursued; and (2) the Committee's analysis as embodied in the DRC Resolution suffers from key analytical gaps calling into question the good faith and reasonableness of the DRC's investigation and conclusions.

#### 1. The DRC Resolution Represents an Incomplete Record of the Facts Considered by the DRC and the Board

It is well-recognized that under Delaware law a shareholder is entitled to the body of material which a board of directors relied upon in deciding upon a shareholder demand. *La. Mun. Police Employees Ret. Sys. v. Morgan Stanley & Co.*, C.A. No. 5682-VCL, 2011 Del. Ch. LEXIS 42 at *23-24 (Del. Ch. Mar. 4, 2011) (citing *City of Westland Police & Fire Ret. Sys. v. Axcelis Techs., Inc.*, 1 A.3d 281, 291 (Del. 2010)). Board and committee minutes standing alone are insufficient to establish the reasonableness and good faith of a board of directors' decision.

Instead, the following documents are necessary to that evaluation:

> (i) the minutes of any meeting of the Board or the Audit Committee where the Litigation Demand was discussed or evaluated, (ii) ***[counsel's] written report and presentation to the Audit Committee in connection with the firm's recommendation to refuse the Litigation Demand,*** (iii) ***the Audit Committee's report and presentation to the Board***, and (iv) ***any documents and other records upon which the Board relied***.

*La. Mun. Police Employees Ret. Sys.*, *supra* (emphasis added).

Here, the need for all the materials supporting the Board's decision, rather than just the DRC Resolution belatedly proffered now by HP, is further demonstrated by the Board Minutes reflecting that the DRC Resolution was only one of many items considered by the Board. Thus, the first page of the Board Minutes states that:

> WHEREAS, the Board has carefully examined and considered (*i*) the presentations . . . of Proskauer Rose LLP, Brown Rudnick LLP, and Choate Hall & Stewart (collectively the "Committee Counsel"), the findings and recommendation of the Independent Committee of the Board (the "Committee"), as embodied in a January 10, 2014 resolution (the "Committee Resolution") . . . (*iii*) all other reasonably available relevant information regarding the Potential Claims; (*iv*) discussions with the Committee's counsel at the January 15 and 16, 2014 Board Meeting . . . .

Board Minutes at 1. Similarly, the Board Minutes consciously draw a distinction between the DRC Resolution, on the one hand, and the Committee's work, on the other hand (Board Minutes at p. 5 ¶2), evidencing that the DRC Resolution does not represent the totality of the analysis performed by or on behalf of the DRC.[3]

This limited record which HP has placed before the Court is insufficient to demonstrate the good faith or reasonableness of the DRC's investigation. *Accord In re KLA Tencor Corp. Shareholder Deriv. Litig.*, No. C06-03445 JW (HRL) (N.D. Cal. May. 14, 2008) (further discovery ordered where the "Report is somewhat lacking in terms of evidentiary support for the conclusions reached") (citing *Zapata*, 430 A.2d at 788). Therefore, it cannot serve as a basis for supporting the fairness or reasonableness of the Proposed Settlement.

---

[3] The Board's purported reliance on the DRC Resolution is caveated by the phrase "where they deemed it appropriate to do so." Board Resolution at 5, ¶2. The same is true of the Board's purported reliance on counsel's presentation. *Id.*

**2. A Careful Reading of the DRC Resolution Raises Serious Concerns With Respect to the Purported Good Faith and Reasonableness of the DRC's Investigation**

The only arguably substantive materials relied upon by the Board and provided to the Court by HP as the basis for approving the Proposed Settlement is the DRC Resolution.[4] The DRC Resolution, however, is only entitled to deference if its findings and recommendations are supported by a reasonable basis. *See*, *e.g.*, *Scattered Corp. v. Chicago Stock Exch., Inc*., 701 A.2d 70, 75 (Del. 1997), *overruled on other grounds, Brehm v. Eisner,* 746 A.2d 244 (Del. 2000). A reasonable basis only exists if the DRC correctly understood and analyzed both the facts and the law relevant to the case. *See*, *e.g.*, *London v. Tyrrell*, C.A. No. 3321-CC, 2010 Del. Ch. LEXIS 54, 56-57 & nn.79-80 (Del. Ch. Mar. 11, 2010) (citing *Lewis v. Fuqua*, 502 A.2d 962, 968-70 (Del. Ch. 1985) (holding that a committee did not have a reasonable basis for its dismissal recommendation because it had incorrectly concluded that the business judgment rule applied to the challenged transactions)). Here, the DRC Resolution fails in both respects as in relation to: (a) the liability of Apotheker and Robison concerning the Acquisition; and (b) the liability of HP's directors relating to the Acquisition; and (c) analyzing the full extent of the $8.8 billion loss suffered by HP.

**a. The DRC Resolution Fails to Offer a Cogent Explanation For Releasing Apotheker and Robison From Liability**

The DRC Resolution, in a discussion limited to a single paragraph, acknowledges that securities' analysts publicly questioned the veracity of the reported growth in Autonomy's software sales prior to the Acquisition. DRC Resolution at 35, §XIV.C.7.a. The DRC then seeks to downgrade the importance of this publicly available information by concluding that these analyst and media reports did not constitute "red flags" for the Board primarily because of "the due diligence that ***management conducted*** which was viewed as the ultimate test to determine whether 'red flags' actually existed." *Id.* at §XIV.C.7.a(iii) (emphasis added).

[4] The other documents recently provided to the Court appear to relate to the claims against Mr. Hussain.

However, this explanation offers no assistance to Apotheker and Robison since they were the members of HP's management who were the Acquisitions "sponsors" and, therefore, responsible for insuring that all due diligence had been properly performed. DRC Resolution at 28, §XV.C.2.c. These executive defendants cannot claim a safe harbor from liability based upon relying on their own faulty advice especially where they did not get Deloitte & Touche's workpapers, which were considered "must have" due diligence documents. DRC Resolution at 32, §XV.C.3.d.iii.(c).

The net effect was that Apotheker and Robison remained uninformed of the true state of affairs at Autonomy prior to the Acquisition. Such a failure to be properly informed of relevant facts in connection with a major corporate transaction constitutes gross negligence under Delaware law. *See, e.g.*, *Brehm v. Eisner (In re Walt Disney Co. Deriv. Litig.)*, 906 A.2d 27, 64-65 (Del. 2006) (gross negligence includes "a failure to inform one's self of available material facts."); *MCG Capital Corp. v. Maginn*, C.A. No. 4521-CC, 2010 Del. Ch. LEXIS 87, at *79 n.129 (Del. Ch. May 5, 2010) (failure to be "adequately informed" constitutes gross negligence). As the Committee acknowledges, such gross negligence is sufficient to support liability against defendants Apotheker and Robison in their capacity as HP's officers. *See* DRC Resolution at 48, §XVIII.A.3.a.

HP attempts to confuse the issue by claiming that this gross negligence is somehow justified by the U.K. Takeover Code preventing complete and effective due diligence. *See* HP Supp. Memo. at 9 & n.10. However, the U.K. Takeover Code, which is alluded to but not discussed at length in the DRC Resolution, appears to be consistent with the general fiduciary duties of a board of directors under Delaware law to properly entertain any competing *bona fide* offers to acquire a company. *See, e.g.*, *Revlon v. Macandrews & Forbes Holdings, Inc.* 506 A.2d 173, 184 (Del. 1986) (requiring a level playing field among potential bidders in a sale of corporate control). The Committee and HP also fail to explain the precise competitive or disruptive factors would have been caused by reviewing Deloitte & Touche's workpapers, or interviewing the whistleblower. Indeed, the purported concern for competitive or disruptive

upsetting of a purportedly strategic acquisition is belied by other due diligence HP actually did perform.  DRC Resolution at 29-32, §XV.C.3.

Defendant Meg Whitman publicly stated, Apotheker and Robison "led" the Autonomy Acquisition.  *See*, *e.g.*, DRC Resolution at 72, §XXII.D.2.e.  The Committee attempts to explain this statement away as not reflecting any assignment of fault to Apotheker and Robison.  *Id*. However, the DRC's analysis is unconvincing given the context in which the statement was made as it was widely interpreted as casting blame on Apotheker and Robison.  *See*, *e.g.*, J. Bort, *Meg Whitman Blamed a Well Respected HP Tech Executive for the Autonomy Disaster – And is Ruffling Feathers*, Business Insider (Nov. 28, 2012).  In responding to analysts' questions concerning who if anyone was being held internally responsible, defendant Whitman specifically stated that: "really the two people [*i.e.*, Apotheker and Robison] that should have been held responsible are gone."  *See* Abraham Decl. Ex. A at 9.

Equally unavailing is the Committee's contention that the analysts publicly questioning Autonomy's reported growth rate in software sales dates was somehow diminished by the many positive analyst reports "dating back to 2005 . . . ."  DRC Resolution at 35, §XIV.C.7.a(i) and (ii).  This contention, on its face, lacks a reasonable basis because it fails to analyze or discuss the relevant facts contained in the analyst reports, the dates of those reports and the number of such reports.  Instead, a reader is treated to a conclusion rather than a serious and thorough analysis of the relevant facts.  Moreover, the DRC's conclusion is unreasonable on its face because the October 2010 analyst reports came only months before HP embarked on the Acquisition and were significantly more relevant than analyst reports going back to 2005, which are so far removed from events occurring in 2010 and 2011 that they could not negate the significance of the red flags raised by Autonomy's published financial statements.

In any event, the more cogent question becomes why HP proceeded with an $11.1 billion acquisition in the face of known red flags without obtaining adequate due diligence.  Hard earned shareholder equity is not Monopoly money to be put at risk and lost based on a hunch where there were existing public and well-known "red flags" concerning Autonomy's reported growth

rate. That is a question which the Committee fails to address or answer.

Accordingly, exonerating Apotheker and Robison from liability does not reasonably reflect application of a gross negligence standard. Instead, it incorporates a new standard into Delaware corporate law – the "anything goes" standard in which corporate executives gamble $11.1 billion of shareholder equity without making certain that adequate due diligence has been performed.[5]

**b. The Committee's Explanation for Absolving HP's Directors From Liability is Equally Unpersuasive**

The Committee's analysis with respect to HP's directors seems equally suspect. Although Section 102(b)(7) of the Delaware General Corporation Law is a barrier to recovery, it is not an absolute bar. Instead, the statute allows for recovery against directors in cases where there is either a lack of good faith or a breach of the fiduciary duty of loyalty. *See* 8 *Del. C.* §102(b)(7). A conscious disregard of known facts can form the basis for conduct which does not qualify as good faith under Delaware law. *See*, *e.g.*, *Lyondell Chemical Co. v. Ryan*, 970 A.2d 235, 240 (Del. 2009) (quoting *In re Walt Disney Co. Deriv. Litig.*, 906 A.2d at 64-66). This includes claims based upon a failure of the Board to properly oversee corporate operations which amount to a breach of the duty of loyalty including situations where, as here, the Board had knowledge of specific red flags such as third-party reports "suggesting potential accounting improprieties."[6] *In re China Auto. Sys.*, C.A. No. 7145-VCN, 2013 Del. Ch. LEXIS 217, 29 (Del. Ch. Aug. 30, 2013) (quoting *Ash v. McCall*, C.A. No. 17132-CC, 2000 Del. Ch. LEXIS 144, at *4 (Del. Ch. Sept. 15, 2000)).

---

6 *See* DRC Resolution at 35, §XV.C.7.a.

The DRC Resolution, however, seeks to slam the door shut on the Board's liability by concluding that the directors are absolved from liability because they relied on management's representations that the necessary due diligence had been properly obtained. *See*, *e.g.*, DRC Resolution at 51, §XVIII.B. The Steinberg Plaintiffs, however, find it extremely doubtful that Apotheker or Robison have conceded, or would ever concede, that they willfully or otherwise hid any facts from the Board since that would constitute a dramatic admission of fault. Instead, published reports strongly suggest that Apotheker will take the position that he informed the Board of all relevant facts relating to the Acquisition. *See* James Bandler and Doris Burke, *How Hewlett-Packard Lost Its Way*, FORTUNE, May 8, 2012 at 9 (Abraham Decl. Ex. B). Therefore, absent a specific document similar to the purported "smoking guns" HP has now supplied to the Court with respect to Hussain's liability, it would be irrational to conclude at this early stage that HP's directors would prevail in the case of conflicting testimony.

Similarly infirm is the effort to deflect the Board's potential liability based upon Section 141(e) of Delaware's General Corporation Law. *See* HP Supp. Memo. at 9-10. That statutory provision does not insulate a director from consciously disregarding facts with which they are charged with knowing. *See*, *e.g.*, *MCG Capital Corp.*, 2010 Del. Ch. LEXIS 87, at *63 n.103 (directors are "duty bound to make an inquiry into the adequacies of the presentation by . . . employees."); *Aronson v. Lewis,* 473 A.2d 805, 813 (Del. 1984) (the business judgment rule "has no role where directors have abdicated their functions . . . ."); *Francis v. United Bank*, 432 A.2d 814, 822 (N.J. 1981) ("The sentinel asleep at his post contributes nothing to the enterprise he is charged to protect."). This assumes that the Board was justified in purportedly relying on Apotheker with respect to accounting due diligence since the safe harbor only applies to matters a board member "reasonably believes are within such other person's professional or expert competence . . . ." 8 Del. C. §141(e). Here, however, it appears that those matters were reviewed by KPMG which accurately reported that there were holes in the accounting due diligence. *See* DRC Resolution at 34, §XV.C.5.b. Yet, the Committee fails to mention what effort the Board took to learn of KPMG's conclusions or what action the Board took upon learning these facts.

*See*, *e.g.*, *Sutherland v. Sutherland*, 958 A.2d 235, 242 (Del. Ch. 2008).

**B. The Settling Parties Have Improperly Judged the Likely Success of the Demand Refused Claims Asserted by the Steinberg Plaintiffs**

Key to the Settling Parties claims that the Proposed Settlement is fair and reasonable is their contention that the Steinberg Plaintiffs are doomed to eventually fail in the prosecution of the underlying claims because the decision whether or not to engage in litigation is protected by the business judgment rule. *See* HP Supp. Memo. at 8-9; Demand Futility Plaintiffs Supp. Memo. at 14-15. These arguments misapprehend controlling Delaware law as well as the procedural posture of the case.

The business judgment rule does not apply if HP's directors did "not act in good faith, act in a manner that cannot be attributed to a rational business purpose or reach their decision by a grossly negligent process that includes the failure to consider all material facts reasonably available." *Brehm*, 746 A.2d at 264. In the context of demand refusal, the Steinberg Plaintiffs need to allege facts sufficient to create "a ***reason to doubt***" whether demand was improperly refused. *Grimes v. Donald*, 673 A.2d 1207, 1219 (Del. 1996) (emphasis added). Allegations that the Board "was biased, lacked independence, or ***failed to conduct a reasonable investigation***" can demonstrate "a reasonable doubt that demand was properly refused." *Scattered*, 701 A.2d at 75; *see also In re Primedia Inc.*, 67 A.3d 455, 472 (Del. Ch. 2013) ("had I understood that full disgorgement was possible, I would have denied the SLC's motion . . . ."); *In*

*re Oracle Corp. Deriv. Litig.*, 824 A.2d 917, 925 and 928 (Del. Ch. 2003) (litigation committee's findings were held to not be reasonable notwithstanding an "extremely lengthy Report totaling 1,110 pages . . . .").

The facts necessary to support a reasonable doubt with respect to the Board's refusal of demand are supplied by HP's failure to provide a copy of the DRC Resolution to the Steinberg Plaintiffs. *See*, *e.g.*, *City of Orlando Police Pension Fund v. Page*, 970 F. Supp. 2d 1022, 1030 (N.D. Cal. 2013) ("defendants have effectively insulated its investigation from scrutiny"). Here, the facts are even stronger because of HP's machinations in refusing to directly respond to Steinberg's demand for months after the Board had already made its decision.

These facts do not change with the belated production of the DRC Resolution, a document which still shields the vast bulk of the Committee's analysis from critical inquiry, thus making it an inadequate basis upon which to obtain dismissal of the claims. *Accord City of Orlando, supra*. Moreover, as demonstrated above, the DRC Resolution is fraught with analytical errors, such that the Steinberg Plaintiffs would be able to allege a reasonable doubt as to whether the investigation of the DRC and the Board's conclusions satisfy the good faith, due care and reasonableness standard of Delaware law. *See* Point I.B, *supra*.

Once past the motion to dismiss phase, Defendants would presumably move for summary judgment based upon the actions of the Committee and the Board. Assuming such a motion is appropriate under Delaware law, the burden would shift to Defendants in order to prove that the DRC and the Board acted in good faith, with due care and reasonably in conducting the investigation and reaching the conclusions. *Accord Nissan Fire & Marine Ins. Co. Ltd. v. Fritz Cos.*, 210 F.3d 1099, 1105-1106 (9th Cir. 2000) (on summary judgment the burden is on the moving party). There is no reason to believe or conclude based on the limited record before the Court at this time that defendants would prevail on such a motion.

The next step would then be a summary judgment on the merits by any individual defendants. Given the paucity of information provided to the Court (and the Steinberg Plaintiffs) it is not reasonable to conclude at this time that those defendants would prevail on such a

summary judgment motion.

The same is true of the trial phase.  Although the burden of proof would shift to the Steinberg Plaintiffs, the record facts as presented to the Court at this time do not support a conclusion that the Steinberg Plaintiffs could not prevail on the claims asserted.

### C.   The Proposed Settlement Suffers From Fatal Defects in Releasing Potential Wrongdoers

Releasing all of HP's officers and directors from liability without obtaining any monetary benefit in return, cannot under any scenario, constitute fair, reasonable or adequate resolution in the context of this case.[7]  The premise supporting the release contained in the Proposed Settlement is that any such claims lack merit.  Tr. at 34:6-9.  However, as demonstrated above, there is not enough information that has been made available to support such conclusions.

The consequences of how that release injures the Company cannot be fully known until the suit against the Autonomy defendants proceeds.  Similarly, the degree of liability on the part of Apotheker or Robison (or any of the other HP directors and officers) cannot be fully known until then.  For example, if a suit against Messrs. Lynch and Hussain proceeds, they have indicated that Apotheker and Robison (and potentially other HP officers and directors) were provided with the relevant information; or, alternatively, given every opportunity to conduct due diligence and chose not to.  If the finder of fact agrees, the Company would have lost any ability to vindicate those claims due to the release contemplated in the proposed Settlement before the Court.  Similarly, if documentary materials (*e.g.*, e-mails or memos) are produced during trial which constitute admissions on the part of either Robison or Apotheker (or other HP directors and officers) that they failed to proceed with due care, or failed to make an informed decision or

---

[7]     At the August 25, 2014 hearing, the Court focused on the effects of the releases on the fairness of the settlement and noted:

> Well, I'm not inclined to rule on it ***until I've made a judgment as to what the effect that a – a release would have as to individuals who may or may not have been participating in this matter.***

Tr. at 27 (emphasis added).

to proceed in good faith, then the ability of HP to sue for their breaches of duty will have been lost forever ***for no monetary consideration***. The essential point is, of course, that without knowing the extent of their liability in causing damage to the Company, these executives should not be afforded a release. Indeed, the Company can proceed with suit against Messrs. Lynch and Hussain without releasing other potential wrongdoers.

Having failed to perform adequate due diligence before consummating the Autonomy merger, HP is intent on repeating that very same mistake now, by forging into unknown territory with litigation and releasing some of the primary actors prematurely. They do so without knowing or making a determination first, whether the evidence ultimately uncovered will reveal that the released actors are at fault for the enormous losses suffered by the Company. Such irrational and rash conduct cannot pass muster as fair, reasonable and adequate.

Moreover, the record is inadequate to establish which of the M&A reforms the Proposed Settlement is responsible for achieving. The record provided by HP refers to "***further*** M&A reforms." Board Minutes at 12 ¶17 (emphasis added). This strongly suggests that HP had already engaged in M&A reforms prior to or independent of any input by Demand Futility Plaintiffs. *See* Tr. at 10:4-7 (calling into question whether the M&A reforms resulted from the pendency of the action). Indeed, on November 20, 2012, in connection with the announcement of the write down, defendant Whitman has publicly stated that HP had already made changes to its M&A procedures including that:

> [D]ue diligence now reports to our Chief Financial Officer. At the time when I came to the company, I was surprised to find that due diligence and M&A reported to Strategy as opposed to the Chief Financial Officer. I've never seen that before in my career and that's a decision I made right away before I knew any of this.

Transcript of Nov. 20, 2012 Conference Call attached as Ex. A at 9 to the Abraham Decl.

## II. THE MOTION TO SEVER SHOULD BE GRANTED

In seeking to avoid severance of Plaintiff Steinberg's claims, the Demand Futility Plaintiffs argue that they did, in fact, take into account potential demand refused claims (Settling Pls. Supp. Memo. at 14), and HP argues that severance is inappropriate at this time because of the Proposed Settlement. HP Supp. Memo. at 16. Each of these arguments lacks merit.

### A. The Demand Futility Plaintiffs Have Failed to Establish That They Took the Potential Merits of the Demand Refused Action Into Account in Negotiating the Proposed Settlement

The Demand Futility Plaintiffs contention that they took into account the potential strength of the demand refused action represents a conclusory statement not supported by any record facts. Any lawyer properly representing the interests of demand refused plaintiffs would attempt to obtain the documents underlying the decision not to sue (see Point I.A., *supra*) particularly where, as here, the DRC Resolution raises so many questions with respect to the *bona fides* of the Board's actions. *See* Point I.B, *supra*.

Instead, it appears that Demand Futility Counsel received the same presentation regarding the Committee's actions as the Steinberg Plaintiffs. *See* Tr. at 32:5-8. Although Demand Futility Counsel claims to have reviewed 35,000 pages of documents, the contents of those documents and their connection with the DRC's investigation remains unknown at this time. These actions are, therefore, insufficient to demonstrate that sufficient probing of the Committee's investigation or the DRC Resolution ever took place. Also, the scope of the 35,000 pages of documents purportedly reviewed by Demand Futility Counsel pales in comparison with that purportedly undertaken by the DRC. *See* DRC Resolution at 16, §IV.E.2 (DRC's counsel obtained access to electronic databases hosting 17.5 million files and obtained 240,000 relevant documents from the Company).[8]

Similarly, Demand Refused Counsel does not claim to have reviewed any notes of interviews performed by the DRC's counsel, or even to know the identity of the interviewees and

---

[8] These documents appear to be in addition to the documents HP produced in response to books-and-records demands such as the one made by Demand Futility Counsel. *Id*. at §IV.E.2 (iii).

the subjects of their individual testimony. This, notwithstanding the fact that approximately 90 interviews were conducted (Resolution at 16, §IV.E.3) and that the interviews now form a key part of HP's claims as to the extensiveness of the DRC's investigation. *See*, *e.g.*, Tr. at 32:23-24; HP Supp. Memo. at 4.

*Copeland v. Lane*, No. 11 Civ. 1508 (EJD), 2013 U.S. Dist. LEXIS 65742 (N.D. Cal. May 6, 2013), the sole case upon which Demand Refused Counsel relies (Settling Pls. Supp. Memo. at 15), is not on point. In *Copeland,* no facts were alleged or presented raising a reasonable doubt with respect to the good faith or reasonableness of the investigation, instead, plaintiffs stated in conclusory terms that the investigation had been a "sham" and a "whitewash." *Id.* at *28.

Here, in contrast, even at this preliminary stage and under time pressure, the Steinberg Plaintiffs have presented numerous flaws and open questions in the Committee's analysis as well as in the fairness of settling prior to seeing key documents. *See* Points I.A. and I.B., *supra*. Aside from a mere general statement that demand refused shareholder derivative actions are difficult to prevail upon (as are demand futility actions), nothing specific is proffered in terms of work done to analyze the viability of the demand refused claims. It is axiomatic, however, that broad generalities cannot be substituted for the hard work of applying the controlling law to the detailed facts of each individual case, something that the Demand Futility Counsel has failed to do with respect to the Steinberg Plaintiffs' claims.

**B. The Pendency of the Proposed Settlement Should Not Delay the Court's Decision on the Motion to Sever**

At oral argument on August 25, 2014, the Court suggested that the motion for severance may be impacted by the pendency of the Proposed Settlement. Tr. at 70:10-11. HP now also suggests that severance is inappropriate because the Steinberg Plaintiffs can preserve their rights by objecting to the Proposed Settlement. *See* HP Supp. Memo. at 16. The Steinberg Plaintiffs respectfully submit that this argument lacks merit and severance is appropriate at this time because HP and the Demand Futility Plaintiffs have failed to demonstrate that the Court should

either preliminarily or permanently approve the Proposed Settlement.

Substantial doubts have already been raised with respect to the Proposed Settlement. At the same time, the Steinberg Plaintiffs, despite having separate and distinct claims, are not parties to the Proposed Settlement, which militates in favor of severance. The decision in *In Re Rino Int'l Corp. Derivative Litig.*, No. 10 Civ. 2209 (MMD), 2013 U.S. Dist. LEXIS 63632 (D. Nev. May 3, 2013), is on point. There, in a procedurally similar circumstance, the court refused to order consolidation of two derivative actions holding that:

> [J]udicial economy is not served by consolidating the actions. The Nevada Plaintiffs have entered into a preliminary settlement agreement with Defendants — an agreement which California Plaintiffs oppose. Although the issues are similar, the different procedural posture of the cases and the inevitable confusion and delay engendered by the plaintiffs' disputed settlement positions militates against consolidation.

*Id*. at *5.

**CONCLUSION**

Therefore, for all the reasons stated above and in prior submissions to this Court, this Court should: (1) deny the Settling Parties' motion for preliminary approval of the Proposed Settlement; and (2) grant the Steinberg Plaintiffs' motion to sever their claims from those of the Demand Refused Plaintiffs.

Dated: September 17, 2014 **ABRAHAM, FRUCHTER & TWERSKY, LLP**

By: */s/ Ian D. Berg*

Ian D. Berg (Bar No. 263586)
12526 High Bluff Drive, Suite 300
San Diego, CA 92130
Tel: (858) 792-3448
Fax: (858) 792-3449
*iberg@aftlaw.com*

**ABRAHAM, FRUCHTER & TWERSKY, LLP**
Jeffrey S. Abraham, *pro hac vice*
Lawrence D. Levit
Philip T. Taylor
One Penn Plaza; Suite 2805
New York, New York 10119
Tel: (212) 279-5050
Fax: (212) 279-3655
*jabraham@aftlaw.com*
*llevit@aftlaw.com*
*ptaylor@aftlaw.com*

**KANTROWITZ, GOLDHAMER & GRAIFMAN, P.C.**
Gary S. Graifman, *pro hac vice*
Michael L. Braunstein
210 Summit Avenue
Montvale, New Jersey 07645
Tel: (201) 391-7000
Fax: (201) 307-1088
*ggraifman@kgglaw.com*

**GREEN & ASSOCIATES, LLC**
Michael S. Green
522 Route 18, Suite 5
East Brunswick, New Jersey 08816
Tel: (732) 390-5900

***Counsel for the Plaintiffs Harriet Steinberg and Edward Vogel***