KEKER & VAN NEST LLP
JOHN W. KEKER - # 49092
jkeker@kvn.com
JAN NIELSEN LITTLE - # 100029
jlittle@kvn.com
BROOK DOOLEY - # 230423
bdooley@kvn.com
NICHOLAS D. MARAIS - # 277846
nmarais@kvn.com
633 Battery Street
San Francisco, CA 94111-1809
Telephone: 415 391 5400
Facsimile: 415 397 7188

Attorneys for Proposed Intervenor
SUSHOVAN HUSSAIN

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE HEWLETT PACKARD COMPANY SHAREHOLDER DERIVATIVE LITIGATION | Master File No. 3:12-cv-6003-CRB |
| THIS DOCUMENT RELATES TO:<br><br>ALL ACTIONS | **PROPOSED INTERVENOR SUSHOVAN HUSSAIN'S SUPPLEMENTAL REPLY BRIEF IN RESPONSE TO QUESTIONS RAISED AT AUGUST 25 HEARING** |

# TABLE OF CONTENTS

**Page**

I. BACK TO FIRST PRINCIPLES: THE QUESTIONS THE COURT WANTED BRIEFED. ....1

II. HP AND PLAINTIFFS FAIL TO MAKE THE CASE FOR PRELIMINARY APPROVAL ....2

A. The unrebutted evidence shows that this settlement is collusive. ....3

B. The unrebutted evidence shows that this settlement is unfair ....5

1. The proposed settlement is not within the range of possible approval ....5

2. HP's settlement is consistent with its long-term strategy of blaming others in an effort to forever conceal the Individual Defendants' failures ....7

III. SUSHOVAN HUSSAIN MAY PROPERLY INTERVENE TO PROTECT HIS RIGHTS. ....10

IV. HP'S SELECTIVE DISCLOSURE OF DOCUMENTS RAISES MORE QUESTIONS ABOUT THIS SETTLEMENT THAN IT ANSWERS. ....13

V. HP'S ATTEMPTS TO "SHOOT THE MESSENGER" ARE HOLLOW AND INACCURATE DISTRACTIONS. ....16

VI. CONCLUSION ....16

# TABLE OF AUTHORITIES

**Page(s)**

## Federal Cases

*Atari Corp. v. Sega of Am.*
161 F.R.D. 417 (N.D. Cal. 1994) ........ 15

*Bd. of Trustees of Leland Stanford Junior Univ. v. Roche Molecular Sys., Inc.*
237 F.R.D. 618 (N.D. Cal. 2006) ........ 15

*Cordy v. USS-Posco Indus.*
12-CV-00553-JST, 2013 WL 4028627 (N.D. Cal. Aug. 1, 2013) ........ 3, 5

*Franklin v. Kaypro Corp.*
884 F.2d 1222 (9th Cir. 1989) ........ 6, 12

*In re HealthSouth Corp. Sec. Litig.*
572 F.3d 854 (11th Cir. 2009) ........ 12

*In re High-Tech Employee Antitrust Litig.*
2014 WL 3917126 (N.D. Cal. Aug. 8, 2014) ........ 2

*In re NVIDIA Corp. Deriv. Litig.*
2008 WL 5382544 (N.D. Cal. Dec. 22, 2008) ........ 2, 5

*In re Oracle Sec. Litig.*
829 F. Supp. 1176 (N.D. Cal. 1993) ........ 6, 7, 8, 9, 10

*In re Pac. Enterprises Sec. Litig.*
47 F.3d 373 (9th Cir. 1995) ........ 4, 5

*Kremen v. Cohen*
2012 WL 2919332 (N.D. Cal. July 17, 2012) ........ 11

*Tennenbaum v. Deloitte & Touche*
77 F.3d 337 (9th Cir. 1996) ........ 14

*United States v. Reyes*
239 F.R.D. 591 (N.D. Cal 2006) ........ 14

*Zarowitz v. BankAmerica Corp.*
866 F.2d 1164 (9th Cir. 1989) ........ 11

## Other Authorities

*Standard Chartered Bank v. Pakistan Nat'l Shipping Corp.*
[2002] UKHL 43, [2003] 1 A.C. 959 (H.L. Eng.) ........ 12

Edna Selan Epstein, *The Attorney-Client Privilege and the Work-Product Doctrine* 1097 (5th ed. 2007) ........ 13, 14

Ralph Ferrara, *Shareholder Derivative Litigation*, § 14.05[2][a] (2d ed. 2014) ........ 3

## I. BACK TO FIRST PRINCIPLES: THE QUESTIONS THE COURT WANTED BRIEFED.

On August 25, the Court refused to grant preliminary approval to the parties' proffered settlement, giving HP and Plaintiff's counsel a week to file a revised settlement that clarified their fee arrangement. After business hours nine days later, HP filed an Amended and Restated Settlement, which simply kicked the fee can down the road and did <u>nothing</u> to disinfect the settlement of the $18–$48 million payoff of plaintiffs' lawyers—money that HP itself will hand over in exchange for a broad release and claims bar for company insiders. *See* Dkt. 209[1] (Hussain Suppl. Brief) at 11–13.

Also at the August 25 hearing, the Court asked the parties to brief two questions:

1. What factors should the Court consider at the preliminary approval stage?
2. Should the concerns raised by Mr. Hussain and others before the Court be addressed via intervention or objection?

HP's and Plaintiff's September 4 briefs ignore the Court's questions, choosing instead to again oppose Mr. Hussain's motion to intervene (which has been fully briefed since August 11) by launching an *ad hominem* attack against him for daring to question the settlement. Much as HP did during its "internal investigation," the company attempts to deflect attention from the settlement's fatal flaws by shifting the focus to someone—anyone—else. To that end, HP hand-selects <u>two</u> documents from its vaunted database of 17.5 million, which it then knowingly uses out of context to suggest improprieties in Autonomy's accounting—a matter that, by HP's own design, will be adjudicated in U.K. courts at another time.

Meanwhile, as though this Court might not notice, HP and Plaintiff simply fail to address:

- Claims of collusion in the settlement—other than to say "not so";
- Significant infirmities in HP's proposed bar order and so-called judgment credit; and
- The attorneys' fees problem that HP has now hidden from sight.

[1] Unless otherwise noted, all docket references are to this matter, *In re Hewlett-Packard Company Shareholder Derivative Litigation*, Master File No. 3:12-cv-6003-CRB.

We will address in turn each of these issues that are of critical significance to the proposed settlement.

## II. HP AND PLAINTIFFS FAIL TO MAKE THE CASE FOR PRELIMINARY APPROVAL

Tellingly, HP spends just one sentence of its 30-page brief discussing the standards and tests for preliminary approval of its settlement—one of two questions the parties were directed to address. And, even in that single sentence, HP significantly downplays both the case it cites and the relevant standard:

> For the Court to grant preliminary approval and schedule [the fairness] hearing, the Court 'need only conclude that the settlement of the claims on the agreed upon terms is "within the range of possible approval."'

Dkt. 210 (HP Suppl. Brief) at 1 (citing *In re NVIDIA Corp. Deriv. Litig.*, No. C-06-06110-SBA(JCS), 2008 WL 5382544 (N.D. Cal. Dec. 22, 2008)).[2] The Court's analysis in *NVIDIA* was in fact substantially more detailed than that, and—in language that HP has simply omitted—Judge Armstrong immediately went on to explain that:

> To determine whether the Settlement is 'within the range of possible approval,' the Court must evaluate whether the Settlement is 'fair, reasonable, and adequate' and ensure that the agreement is 'not the product of fraud or overreaching by, or collusion between, the negotiating parties.'

*Id.* at *2 (citations omitted) (emphasis added). This Court's task is not "only" to reach a superficial conclusion about the "range of possible approval," as HP urges (although, even if that were the test, the proposed settlement would surely fail). Rather, the criteria that must be addressed are those that Mr. Hussain laid out in his September 4 brief:

- Is this settlement the product of serious, informed, non-collusive negotiations?
- Is it free of any obvious deficiencies?
- Is it free of preferential treatment to class representatives or segments of the class?
- Does it fall within the range of possible approval?

*See, e.g.*, *In re High-Tech Employee Antitrust Litig.*, 11-CV-02509-LHK, 2014 WL 3917126,

[2] It is worth noting that HP continues to rely on cases that highlight the inadequacies of its own proposed settlement. In *NVIDIA*, for example, the Northern District of California granted preliminary approval to the proposed settlement because, in addition to the governance policies and changes, NVIDIA obtained significant financial benefits amounting to more than $15.8 million. *In re NVIDIA*, 2008 WL 5382544, at *3. For more, *see infra* Section II.B.1.

at *17 (N.D. Cal. Aug. 8, 2014) (denying preliminary approval of a $324.5 million settlement); *Cordy v. USS-Posco Indus.*, 12-CV-00553-JST, 2013 WL 4028627, at *4 (N.D. Cal. Aug. 1, 2013) (Tigar, J.) (denying preliminary approval of a $3.5 million settlement because plaintiffs provided "no information about the maximum amount … class members could have recovered").

HP not only fails to identify these issues—it fails to address them, too.

**A. The unrebutted evidence shows that this settlement is collusive.**

As Mr. Hussain has noted from the outset, settlements like this one are inherently vulnerable to "collusion between … defendants (typically the corporation's directors or officers) and the plaintiff's counsel, who generally receive their attorneys' fees from the corporation as part of the agreement." Ferrara, *Shareholder Derivative Litigation*, § 14.05[2][a] (2d ed. 2014). And courts should be particularly vigilant when those attorneys' fees are the only money changing hands—where, as here, the Individual Defendants dip into company coffers to pay exorbitant "attorneys' fees" while the company and its shareholders are expected to settle for cosmetic governance reforms. *Id.* (collecting cases rejecting settlements involving "cosmetic" reforms and no monetary payment).

Here, the evidence suggests that HP is paying plaintiffs' counsel between $18 and $48 million to sign away not just this lawsuit—but the company's current and future ability to sue the Individual Defendants for a broad range of sins. *See, e.g.*, Dkt. 209 at 4. When the Court explained that it was "not going to approve the fee arrangement, period. That's out," *see* Hearing Tr. (Aug. 25, 2014) at 18:16–17, HP and plaintiffs' counsel came up with another plan: asking this Court to sign off on their proposed settlement with a handshake agreement that the fee issue would be resolved sometime in the future. That arrangement is disingenuous (at best) and fatal to preliminary approval. By stripping the fee provision from the proposed settlement and notice, the parties have made it impossible for this Court and HP's shareholders to assess (i) how much the company is paying plaintiffs' counsel to walk away from this lawsuit and forgive the Individual

Defendants for all their wrongdoing,[3] (ii) what the nature of plaintiffs' counsel's future engagement is, and the extent to which the promise of future work has affected their judgment in the present matter, and (iii) how much of the final agreement is made up of the $18–48 million in fees.[4]

HP's new plan to put off the fee question until no one is looking is brazen and unprecedented. After this Court told them 'no way,' HP and lead derivative counsel tried to mediate the issue, but failed;[5] now they plan to 'arbitrate' it with Retired Judge Vaughn Walker and return for this Court's blessing sometime in the future. But they have already made their deal: with Judge Walker in attendance, HP promised to pay at least $18 million for services performed—an amount that would be paid whether or not Autonomy or its executives were ever sued—and promised to let plaintiffs' counsel "participate" in a lawsuit in England (where they are not admitted to practice), which, if successful, could put an additional $30 million in their pockets. How is an 'arbitration' going to yield a different result when the parties have already reached an agreement? There is simply no getting away from the fact that the agreement to give the HP insiders a free pass in the form of a bar order was—and still is—part of an agreement that included paying off the derivative lawyers.

Remarkably, in the face of these allegations, there has been nothing but silence. HP's brief never mentions, let alone explains, its new "fee arrangement" with plaintiffs' counsel. Nor

[3] *See, e.g.*, Compl., ¶¶ 1 ("HP's fiduciaries misrepresented facts to conceal their own failings." ), 74 ("HP's officers and directors have also knowingly made false statements to the press … that would expose HP officers and directors to fraud claims."), 93 (claiming that Apotheker and Whitman lied about KPMG's involvement), 173 (Apotheker, Lane and others were so "desperate to close a 'transformative' deal" that they "short circuit[ed] appropriate due diligence.").

[4] Typically, courts compare attorneys' fees to the total settlement value. "Twenty-five percent is the 'benchmark' that district courts should award in common fund cases." *In re Pac. Enterprises Sec. Litig.*, 47 F.3d 373, 379 (9th Cir. 1995) (internal citations omitted). For $48 million to hit that 25% benchmark, HP would need to recover $192 million through this settlement.

[5] Buried in a footnote in HP's latest submission, it concedes that the parties have been unable to resolve the fee problem—and yet, incredibly, they continue to seek this Court's stamp of approval for their half-finished settlement proposal. *See* Dkt. 210, at i. n.1 ("After the August 25, 2014 hearing, plaintiffs and HP sought to mediate plaintiffs' claims for attorney's fees….").

does HP offer anything to rebut claims of collusion.[6] HP must do something to show this Court (and HP's shareholders) that its proposed settlement is "noncollusive"—especially given the courts' general concerns about fee-only deals and the troubling fee arrangement history in this case. Without it, this Court cannot grant HP's motion for preliminary approval.

**B. The unrebutted evidence shows that this settlement is unfair.**

**1. The proposed settlement is not within the range of possible approval.**

HP spends two pages of its brief discussing the only benefit this settlement confers on the company: cosmetic governance reforms that neither Mr. Hussain nor HP's shareholders have yet been able to review. From HP's summary, though—and as this Court has already suggested—it seems likely these are measures that HP ought to have taken even without this litigation: ensuring that HP's Finance and Investment Committee "is composed of members with significant M&A experience," checking that the company conducts "due diligence and related processes," providing "training for employees without M&A expertise." Dkt. 210 at 13–14.

HP claims that these "significant reforms … justify approval of the settlement"—relying for that assertion on this Court's approval of the *NVIDIA* settlement. *Id.* at 15. What HP does not mention, though, is that the *NVIDIA* settlement was approved specifically because in addition to "the valuable corporate governance policies and changes, NVIDIA was able to obtain significant financial benefits that the parties represent amount to more than $15.8 million." *In re NVIDIA*, 2008 WL 5382544, at *3 (Armstrong, J.) (emphasis added). In fact, almost all of HP's cited cases involve financial recoveries that show just how far outside "the range of possible approval" HP's proposal really is:

- In *In re Pacific Enterprises*, "the parties agreed that Pacific Enterprises would receive $12 million from its officers' and directors' insurers" to settle the derivative lawsuit. *In re Pac. Enterprises Sec. Litig.*, 47 F.3d 373, 375 (9th Cir. 1995);

[6] Plaintiff addresses the collusion issue with one conclusory sentence: "Plaintiff's decision to settle with defendants had nothing to do with 'collusion,' … but rather an informed, reasoned determination that HP had been defrauded." Dkt. 208 at 2. Unsurprisingly, Plaintiff's counsel offers no explanation or evidence, simply asking this Court to take them at their word.

- In *Franklin v. Kaypro Corp.*, "[t]he plaintiffs and the settling defendants agreed to settle for $9.25 million." 884 F.2d 1222, 1224 (9th Cir. 1989); and
- In *In re Oracle*, in exchange for the dismissal of class claims, "Oracle will pay $23.25 million … and Arthur Andersen will pay $1.75 million…." *In re Oracle Sec. Litig.*, 829 F. Supp. 1176, 1178 (N.D. Cal. 1993).

More significantly, though, HP fails altogether to address the other half of its unbalanced *quid pro quo*: the incredibly broad releases and claims bars for its insiders. If anything, HP's latest filings make the situation all the more concerning.

First, the Court should be especially wary of HP's "independent" committee's decision to give the Individual Defendants a free pass. *In re Oracle*, 829 F. Supp. at 1187 ("Independence is not established by the fact that directors are not defendants in the derivative action. … [W]e must be mindful that directors are passing judgment on fellow directors in the same corporation and fellow directors, in this instance, who designated them to serve both as directors and committee members."). For its part, HP's counsel does nothing to explain why the Individual Defendants are being released in exchange for <u>zero</u> financial contribution. And although the DRC Resolution concludes (without explanation) that "no claims [should] be pursued as to present and former officers and directors," Dkt. 211-1 at 52, it does not appear to recommend or support the wide-ranging releases provided by the proposed settlement.[7]

Second, it appears from the DRC's Resolution that HP actually intends to sue its own subsidiary, Autonomy—against whom claims will not be released—to <u>generate</u> losses:

> b. Cause **Bidco** to direct Committee counsel to assert claims **against Autonomy** under English law (including FSMA) arising out of Autonomy's publication or other disclosure of materially misleading information respecting its financial condition, operating results, future prospects and business model;
>
> c. Cause **Autonomy** to direct Committee counsel to take such actions as are necessary and appropriate under English law (including compliance with any applicable pre-action protocols) to commence proceedings **against Lynch and Hussain in England** <u>for injury incurred in connection with Bidco's claims against Autonomy</u> and Autonomy's other losses….

[7] As Mr. Hussain noted in his September 4 brief, these broad releases mean that HP will no longer be able to sue Individual Defendants, like Meg Whitman, for "<u>any</u> … misleading proxy statements" filed in 2013, or "<u>any</u> sales of [Individual Defendants'] personally held stock"—and on and on. For more, *see* Dkt. 209 at 4.

Dkt. 211-1 at 64; *see also id.* at 87 ("Determine that Bidco has a claim against Autonomy under English law…."); *id.* at 88 (outlining similar plan against Deloitte). Given HP's plan, its lawyers' claims that this settlement will help HP reduce its litigation costs are vacuous; if anything, HP will now have to spend money prosecuting and defending the same lawsuit! Because this settlement does not free HP from future litigation, the only parties benefiting from the broad releases and claims bars are those parties who have contributed nothing to the settlement proposal: the Individual Defendants.

In short, this settlement leaves plaintiffs' counsel richer (by undisclosed tens of millions of dollars) at HP's expense, while HP's insiders walk free from this and other unrelated future litigation. Because the proposed *quid pro quo* is so woefully unbalanced, this deal cannot possibly fall within the "range of possible approval."

**2. HP's settlement is consistent with its long-term strategy of blaming others in an effort to forever conceal the Individual Defendants' failures.**

HP's principal defense of its underwhelming settlement proposal is that the parties now agree that the plaintiff has no case. *See, e.g.*, Dkt. 210 at iii ("[I]f this action were not to settle, … HP would move to dismiss it under a fundamental principle of Delaware law…."); *id.* at 5 ("The DRC found … that HP had no claim against [HP's officers and directors]."). Of course, if that were true, it would be much cheaper for HP to move to dismiss this case, or to secure plaintiffs' counsel's agreement to dismiss it. But what HP's insiders want—and will get through this settlement—is something they could never achieve through litigation: broad releases that will protect them from future lawsuits on a whole host of (often unrelated) claims.

HP's *ipse dixit* claim that no case exists against the insiders is not only tainted irreparably by the payoff to its adversaries, but is simply ridiculous. Indeed, many of the Independent Committee's findings actually support the plaintiffs' case against HP insiders:

- HP now claims that it valued Autonomy at $17.1 billion, which included $7.9 billion in revenue and related synergies—making Ms. Whitman's mismanagement of the merger more relevant than ever. Dkt 211-1 at 33. In fact, HP specifically notes that its "impairment model showed … a loss of $5.3 billion

of originally projected synergies." *Id.* at 45.

- HP's CFO Catherine Lesjak opposed the Autonomy acquisition because, in part, "HP's history of not executing on its major acquisitions did not counsel" in favor of proceeding. *Id.* at 34. HP's general counsel, Michael Holston, "agreed with Lesjak's coments." *Id.* So concerned were HP's non-management directors that they asked Léo Apotheker to reconsider "whether the Acquisition should be pursued." *Id.* Apotheker marched ahead anyway.
- HP acknowledges that, in conducting "due diligence" before acquiring Autonomy, it "decided … to rely principally on (i) publicly available data and (ii) other information exchanged between Autonomy and HP orally, rather than in writing." *Id.* at 31. (Somewhat inconsistently, Plaintiff's counsel claims its own "skeptical" evaluation of HP's settlement proposal involved an analysis of "due diligence materials." Dkt. 208 at 7.) In other words, HP believes that its due diligence efforts were minimal but satisfactory.

And these admissions come from a Board and Committee whose independence, partiality and objectivity are undoubtedly flawed. As is clear from the Independent Committee's Resolution, Committee Counsel was given tens of millions of dollars to clear HP and point the finger at Autonomy.[8] Indeed, the vast majority (84%) of documents made available for their review were Autonomy's, not HP's—suggesting the investigators knew from the beginning that they were looking to blame Autonomy, not HP insiders, for the calamitous merger. And both the Board and Committee Counsel are plainly beholden to the Individual Defendants, showing great deference to the financial well-being of the insiders the proposed bar order seeks to protect.

HP's attempts at misdirection—evident in both the DRC Resolution and the proposed settlement—are by no means new. That the company has a long history of covering up its own mismanagement of the Autonomy acquisition by shifting blame to others is apparent from the

[8] The DRC Resolution explains that Committee Counsel spent "approximately 34,000 hours" looking into these claims. Dkt. 211-1 (HP Resolution) at 16. At a blended rate of $750 per hour, Committee Counsel's "independent" report—which happened to find that HP did no wrong—would have cost HP a staggering $25.5 million. (The Committee also paid "experts and consultants" for another 16,000 hours of work, which presumably cost many millions more.)

DRC's own chronology of events leadings up to HP's Q4 2012 announcement. The DRC resolution describes those events as follows:

On November 2–4, 2011, HP's accountants reviewed Deloitte's work papers, including "areas of audit risk," and "identified Autonomy's hardware revenue, which E&Y reported to HP." Dkt. 211-1 at 40. On May 25, 2012, HP received information from an Autonomy official about alleged improprieties relating to hardware sales, end of quarter VAR transactions, and hosting transactions. *Id.* As a result, HP retained forensic accountants PWC on May 30, 2012. *Id.* at 42. On June 5, 2012, despite HP's having known for up to seven months about these alleged accounting issues, Meg Whitman attributed Autonomy's issues to "scaling challenges," a statement HP and Ms. Whitman apparently still stand behind. *Id.* at 42.[9] By mid-July, PWC had completed the first phase of its review and identified "various issues including those relating to pass-through hardware sales, channel sales, … barter transactions and modifications to licensing and hosting transactions." *Id.* at 2. On September 10, 2012, HP filed its Form 10-Q for Q3 2012, again saying nothing about accounting issues having any effect on Autonomy's value; to the contrary, HP averred that "at the time of the Autonomy acquisition in October 2011, the fair value of Autonomy approximated the carrying value." *See id.* at 46. At this point, HP had had Deloitte's work papers for over 10 months, "whistleblower" information for almost four months, and it had been two months since PWC completed the first phase of its forensic review—and yet, as of the Fall of 2012, HP apparently saw nothing in this wealth of information that required a write-down of Autonomy.

Indeed, it was not until November 20, 2012—more than a year after E&Y's review of Deloitte's work papers and six months after the "whistleblower" claimed accounting improprieties at Autonomy—that HP, with the assistance of "an expert public-relations firm to assist its media outreach," claimed that a "majority" of the $8.8 billion write-down was attributable to accounting improprieties at Autonomy. *Id.* at 47. In the analyst call that day, HP's CFO Catherine Lesjak claimed that "over $5 billion [of the write-down] [was] related to

[9] *See* Whitman Reply ISO MTD (Dkt. 188), *In re HP Secs. Litig.*, Master File No. 12-cv-5980-CRB, at 9 (arguing that Ms. Whitman's statements—including her view that "this [was] a classic case of scaling a business from start-up to grownup"—were not false or misleading).

accounting improprieties."[10] The DRC report also notes, however, that HP changed its mind about how much blame was attributable to Autonomy: just one month later, when HP filed its Form 10-K with the SEC on December 27, HP backed away from the "majority" language "[b]ecause E&Y could not 'audit' its quantification of Autonomy's accounting errors." Dkt. 211-1 at 47. Who, then, was responsible for the "majority" of the impairment charge? What are the "other factors that led to Autonomy's loss of value" that are hinted at in the DRC's resolution—but not discussed? *See id.* at 45. It is precisely these "other factors" that HP is trying to make sure no one ever knows about, by burying them with this settlement. And it is those "other factors" that may form the basis for contribution claims against HP insiders—especially those officers who were responsible for Autonomy's failed integration—should HP seek to lay blame at the feet of Mr. Hussain and other former Autonomy executives or advisors.

## III. SUSHOVAN HUSSAIN MAY PROPERLY INTERVENE TO PROTECT HIS RIGHTS.

The second issue the Court asked the parties to brief was whether this settlement "can … be tested by way of objection as distinct from by way of intervention…." Hearing Tr. (Aug. 25, 2014), 41:18–20. HP never addresses this question—choosing instead to renew its opposition to Mr. Hussain's motion to intervene. *See, e.g.*, Dkt. 210 at 17 ("[T]here is no purpose to be served in having [Hussain] intervene in a case that the parties have agreed to settle.").

Problematically, HP not only fails to explain the differences between objection and intervention—it actively confuses them. For instance, HP argues that Mr. Hussain should not be allowed to intervene because "shareholders can object only if they have standing to file derivative litigation in the first place." *Id.* at 18. One's standing to object is immaterial to one's efforts to intervene, especially given that HP is trying to restrict the rights of non-parties. (And, even if they were related, HP has mischaracterized the Ninth Circuit's standard for objection.[11])

[10] *See* Transcript (Q4 2012 Hewlett-Packard Earnings Conference Call) at 6, available at http://online.wsj.com/public/resources/documents/hppdf112012.pdf.

[11] HP continues to rely on *Zarowitz* in claiming that objectors "cannot have interests that are 'hostile' to those of other shareholders." Dkt. 210 at 18–19 (citing *Zarowitz v. BankAmerica Corp.*, 866 F.2d 1164, 1166 (9th Cir. 1989)). In fact, the Ninth Circuit rejected the argument that a shareholder is deprived of his right to object because of a conflict with other shareholders—because it would "strip[] from an objecting shareholder his right to speak and be heard in opposition to a settlement…." *Zarowitz*, 866 F.2d at 1166.

Despite HP's second attempt to oppose Mr. Hussain's motion for intervention, the following points remain undisputed:

- Non-parties are entitled to intervene to challenge a settlement when their significant, protectable legal interests "may be impaired" by the disposition of this case. *See* Dkt. 209 at 6; Dkt. 165 (HP Opp.) at 2;
- Mr. Hussain's formal legal rights will be curtailed by the proposed settlement. *See, e.g.*, Hearing Tr., 48:15–49:4 (HP counsel explaining that Mr. Hussain will be barred from suing Ms. Whitman for contribution for her mismanagement of the acquisition); and
- Mr. Hussain's motion to intervene is timely.

It does not matter that Mr. Hussain "fail[ed] to attach a pleading,"[12] or that HP questions his status as a shareholder,[13] or that HP believes his interests are "adverse" to its own. As long as HP seeks to gain an upper hand by curtailing Mr. Hussain's legal rights through a lawsuit he is not involved in, Mr. Hussain is entitled to intervene and challenge those efforts. It is absurd, and inimical to due process, to suggest that Mr. Hussain should sit by quietly while HP attempts to sign his rights away.

HP's reliance on its so-called "judgment credit" as a means to address Mr. Hussain's concerns is similarly unavailing. HP claims that its Complete Bar Order "constitutes very significant compensation … in light of the perception by the underlying plaintiffs and [HP] that [Hussain] was a central figure in the violations." Dkt. 210 at 21–22 (citing *In re HealthSouth Corp. Sec. Litig.*, 572 F.3d 854, 866 (11th Cir. 2009)). HP's reliance on *HealthSouth* is telling in

[12] To support its claim that failure to attached a pleading "renders [Mr. Hussain's] motion to intervene procedurally deficient," HP relies on *Kremen v. Cohen*, 2012 WL 2919332 (N.D. Cal. July 17, 2012). But, as Judge Koh explained in *Kremen*, a pleading is "not required 'where ... the movant describes the basis for intervention with sufficient specificity….'" *Id.* at *9. There can be no doubt here that Mr. Hussain has made his grounds for intervention perfectly clear—indeed, HP specifically revised the bar order in response to those arguments. That HP has chosen not to address those bases in its opposition papers does not somehow invalidate them.

[13] As HP acknowledges, it gave Mr. Hussain restricted stock units in November 2011. Dkt. 210 at 18:5. Those stocks have been in Mr. Hussain's Merrill Lynch account since November 16, 2012, and are still there to this day. *See* Declaration of Jan Nielsen Little, ¶ 3 and Exs. A–B. There is no doubt that Mr. Hussain meets the settlement's broad definition of Securities Holder, or that he will be entitled to object at the appropriate time.

at least two ways. First, HealthSouth's former CEO Richard Scrushy was a non-settling defendant—not a non-party, like Mr. Hussain—which means he was able to (and did) challenge the bar order even without intervening. Second, the Eleventh Circuit specifically noted that the bar order was balanced "by crediting non-settling defendants in any future judgment with the greater of settling defendant's proportionate liability or the amount actually paid by the settling defendant." *Id.* at 857–58 (emphasis added). In *HealthSouth*, the amount paid by the settling defendant—and therefore the minimum judgment credit afforded to Mr. Scrushy—was $445 million. Here, settling defendants will pay nothing.[14] Moreover, even if HP were to propose a reasonable judgment credit, there is no guarantee that such a credit would protect Mr. Hussain in a foreign jurisdiction.

Finally, HP suggests that the Complete Bar Order is immaterial because, "[u]nder English law, … Hussain is not liable for, and therefore could not seek contribution from, any HP officer or director for any harm he or she supposedly caused Autonomy through any negligence after the deal closed." Dkt. 210 at 22. None of the parties here is adequately equipped to discuss the meaning, relevance or effect of United Kingdom legal decisions—nor do they need to.[15] If HP believes that Mr. Hussain cannot seek contribution from the Individual Defendants, then HP can and should simply remove Mr. Hussain from its proposed bar order. (In so doing, it would also obviate Mr. Hussain's need to intervene and simplify this Court's task.)

Although intervenors are now starting to line up—presumably because it has become increasingly clear that the proposed settlement is collusive and unfair—Mr. Hussain is still unique among them. He is not in negotiation discussions with HP's lawyers, is not susceptible to a

[14] HP relies on two other cases to support its claim that its proposed bar order provides Mr. Hussain "the full value of any contribution claims [he] might have…." Dkt. 210 at 21. But, like *HealthSouth*, both of those cases involved substantial payments by the settling defendants. In *Franklin v. Kaypro Corp.*, the settling parties agreed to pay $9.25 million—and, even then, the Ninth Circuit sent the settlement back to the District Court because it failed to sufficiently limit "the subsequent exposure of the nonsettling defendants." *Franklin v. Kaypro Corp.*, 884 F.2d 1222, 1232 (9th Cir. 1989). In *Gerber v. MTC Elec. Technologies Co.*, the settling parties contributed $8 million, $4.075 million and $1.956 million. 329 F.3d 297, 301 (2d Cir. 2003).

[15] We note, though, that HP appears to have confused two distinct legal concepts in its September 4 brief. *See* Dkt. 210 at 22. The case HP cites, *Standard Chartered Bank v. Pakistan Nat'l Shipping Corp.* [2002] UKHL 43, [2003] 1 A.C. 959 (H.L. Eng.), deals with the defense of contributory negligence—not, as HP claims, with claims for contribution.

settlement buy-out, and is uniquely concerned with challenging the settlement's egregious bar order.

## IV. HP'S SELECTIVE DISCLOSURE OF DOCUMENTS RAISES MORE QUESTIONS ABOUT THIS SETTLEMENT THAN IT ANSWERS.

HP's latest decision to trickle out a small handful of documents makes it clearer than ever that the company is willing to share some documents—but only those that it likes, and only to lawyers with whom it wants to curry favor. *See, e.g.*, Hearing Tr. (Aug. 25, 2014), 31:18–21 (noting that HP has "been providing documents to potential objectors all along"); *id.* at 32:4–5 ("[W]e worked with the Steinbergs, we worked with Copeland, we provided documents."). This sort of selective disclosure is prohibited precisely because it is used by litigants to distort the truth "by selecting those facts or those mental impressions that will be disclosed and concealing other damaging facts or mental impressions." 2 Edna Selan Epstein, *The Attorney–Client Privilege and the Work-Product Doctrine* 1097 (5th ed. 2007).

In HP's September 4 filing, for instance, the Independent Committee's Resolution is riddled with unjustified and unexplained redactions. These include information highly relevant to determining the propriety of the broad releases for HP insiders, such as: (i) select information about how HP quantified "the injury suffered by HP for 'overpaying' for Autonomy," Dkt. 211-1 at 24, (ii) "quantification of the other injury suffered by HP in connection with the acquisition," *id.* at 25–26, (iii) information about a May 25, 2012 report to HP by an Autonomy official about Autonomy's pre-acquisition business practices, *id.* at 40–41, and (iv) information about potential claims against Autonomy, Autonomy officials and Deloitte, *id.* at 59–67.[16]

HP appears to believe that it can publish the evidence it likes, while withholding those documents it doesn't, and that it can show documents to some adversaries, but not others. Hearing Tr., 47:19–20 ("[W]e would never share that with the people that [we] are planning to sue…."); *id.* at 46:3–4 (noting that HP would "never in a million years" share reports with

[16] In addition, Exhibit 3 to the Wolinsky Declaration is the 12-page HP Board Resolution regarding shareholder derivative claims. This Resolution also "redact[s] for privilege" information about: potential claims against Lynch and Hussain for post-acquisition conduct, Dkt. 211-3 at 10–11; potential claims against other Autonomy directors and officers, *id.* at 11; potential claims against Qatalyst, *id.*; and potential claims against Autonomy Customers, *id.*

Mr. Hussain, Mr. Lynch or Deloitte).  This, of course, is not a legitimate privilege claim.  While an attorney's advice to a Board or Board committee might be privileged, generally neither Board Committee Resolutions nor Board Resolutions are "privileged" documents.  And HP's decision to publish vast chunks of these resolutions indicates that it, too, does not consider the DRC and Board resolutions privileged *per se*.

HP must now disclose fully unredacted versions of its Exhibits 1 and 3 for at least three reasons.

First, HP has offered no justification or explanation for its redactions.

Second, to the extent that HP contends that these resolutions are privileged, a waiver has been effected by "partial disclosure" of the document.  *See, e.g.*, 1 Epstein at 407 ("It is a universally applied principle that a client cannot partially disclose a portion of a privileged communication and at the same time maintain the privilege as to the remainder."); *Tennenbaum v. Deloitte & Touche*, 77 F.3d 337, 340–41 (9th Cir. 1996) (waiver of privilege "protect[s] against the unfairness that would result from a privilege holder selectively disclosing privileged communications to an adversary, revealing those that support the cause while claiming the shelter of the privilege to avoid disclosing those that are less favorable").  Similarly, to the extent HP contends that these resolutions constitute attorney work product, "once partial disclosure of work-product materials is voluntarily made, total disclosure will have to be made…."   2 Epstein at 1097; *see also United States v. Reyes*, 239 F.R.D. 591, 598 (N.D. Cal 2006) (Breyer, J.). ("[A]ttorney work-product privilege is not absolute and may be waived, for example, when an attorney attempts to use the work product as testimony or evidence, or reveals it to an adversary to gain an advantage in litigation.")

Third, any privilege claim is waived to the extent HP has shared documents with third parties.  According to HP's own filings, HP made an "extensive presentation on the findings and recommendations" of the DRC to counsel from Cotchett Pitre and Robbins Geller as well as state derivative plaintiffs' counsel in February 2014.  *See* Dkt 149 at 6:26–7:3; Dkt 149-1 at ¶ 7.  The Demand Review Committee's "findings" having been shared with lawyers who were (at least then) opposing counsel, which constitutes a waiver of privilege as to the contents of the

Committee Resolution or other documents discussing the Demand Review Committee's findings. "Generally disclosure of confidential communications or attorney work product to a third party, such as an adversary in litigation, constitutes a waiver of privilege as to those items." *Bd. of Trustees of Leland Stanford Junior Univ. v. Roche Molecular Sys., Inc.*, 237 F.R.D. 618, 622 (N.D. Cal. 2006).[17]

Finally, Mr. Hussain also notes that HP appears to have received a document—the "Committee Counsel Presentation"—which apparently "supports" the Committee's Resolution. *See* Dkt 211-3 at ¶¶ 6–7. Review of this document is also necessary to evaluate the validity of the Board's decision to terminate this derivative lawsuit.

Whether Mr. Hussain proceeds through intervention or objection, he is entitled to at least the following discovery:

- Fully unredacted copies of (i) the amended complaint;[18] (ii) the DRC Resolution; and (iii) the HP Board of Directors' Resolution;
- The Committee Counsel Presentation referenced in the Board's Resolution, Dkt. 211-3 at ¶¶ 6–7;
- Access to information concerning the "extensive presentation on the findings and recommendations," the "electronic databases containing tens of millions of documents," and the reports of interviews of "nearly 100 individuals" referenced in the Declaration of Judge Walker filed in connection with the proposed settlement; and
- The report of the "Independent Committee's findings and recommendations," which formed the basis for HP's Board's resolution "that there is no merit to the claims asserted against the named defendants in the Federal Action or the State Actions (other than as to Legacy Autonomy Official Michael Lynch)…."

[17] While HP has not asserted any "settlement discussion privilege," we would note that even if a settlement privilege were to attach to discussions between HP and plaintiffs' counsel, that "settlement privilege" would not restore a waived attorney client privilege with respect to attorney client documents that HP shared during negotiations with its then-opposing counsel. *Atari Corp. v. Sega of Am.*, 161 F.R.D. 417, 420 (N.D. Cal. 1994) ("Any voluntary disclosure inconsistent with the confidential nature of the work product privilege waives the privilege. '[D]isclosure to the adverse party is inherently inconsistent with the adversary system'. Waiver of a privilege may occur by voluntary disclosure to an adverse party during settlement negotiations, despite any agreement between the parties to keep the information confidential.") (internal citations omitted).

[18] Although the Court ordered that the Complaint be unsealed ("except the portions identified in its Order of May 20, 2013"), Dkt. 83 at 1, no unredacted version has been filed.

## V. HP'S ATTEMPTS TO "SHOOT THE MESSENGER" ARE HOLLOW AND INACCURATE DISTRACTIONS.

Ironically, Plaintiff's counsel accuses Mr. Hussain of "deflecting attention" away from some unexplained future lawsuit and towards the proposed settlement that is actually at issue in this case. Dkt. 208 (Pl.'s Suppl. Brief) at 2:2–3. Of course, that is indeed what Mr. Hussain seeks to do: cut through HP's noise and press releases to focus the discussion on the collusive and unfair settlement currently before this Court. Although Mr. Hussain will not be sidetracked by HP's frantic September 4 rant, it is worth noting several things:

First, deals referenced in the two documents cited by HP were reviewed by Autonomy's Audit Committee and outside auditors. Mr. Hussain stands ready to defend against HP's false allegations at the appropriate time and in the appropriate forum.

Second, by refusing to produce any of its 17.5 million documents and then selectively parading just two emails—both of which were knowingly offered out of context—HP is doing precisely what waiver of privilege is designed to prevent: distorting the record and hiding evidence it does not like.

Third, to give true meaning to Plaintiff's allegations of "deflection" and misdirection, HP's rambling seven-page discussion of these deals should be weighed against the number of sentences HP dedicates to rebutting the allegations that this settlement is collusive: zero.

## VI. CONCLUSION

HP and Plaintiff have failed to address the Court's questions or present any evidence that their proposed settlement is fair and noncollusive. If anything, the settlement—now oddly silent on attorneys' fees—is even less ripe for approval than it was on August 25.

There is also no meaningful dispute that Mr. Hussain is entitled to intervene to protect his legal interests, which HP concedes will be jeopardized by the proposed bar order. Mr. Hussain is

//

//

//

//

//

willing to proceed as the Court prefers, provided that he is afforded the relief requested and the discovery required to make his participation meaningful.

Dated: September 17, 2014

KEKER & VAN NEST LLP

By: */s/ John W. Keker*
JOHN W. KEKER
JAN NIELSEN LITTLE
BROOK DOOLEY
NICHOLAS D. MARAIS

Attorneys for Proposed Intervenor
SUSHOVAN HUSSAIN