1   WACHTELL, LIPTON, ROSEN & KATZ
    MARC WOLINSKY (*pro hac vice*)
2   GEORGE T. CONWAY III (*pro hac vice*)
    VINCENT G. LEVY (*pro hac vice*)
3   51 West 52nd Street
    New York, NY  10019
4   Tel./Fax:  212.403.1000/2000
    MWolinsky@wlrk.com
5   GTConway@wlrk.com
    VGLevy@wlrk.com
6
    FARELLA, BRAUN & MARTEL, LLP
7   NEIL A. GOTEINER, State Bar No. 83524
    235 Montgomery Street, 17th Floor
8   San Francisco, CA  94104
    Tel./Fax:  415.954.4400/4480
9   NGoteiner@fbm.com

10  Attorneys for Defendant
    HEWLETT-PACKARD COMPANY
11

12

13
                    IN THE UNITED STATES DISTRICT COURT
14
                  FOR THE NORTHERN DISTRICT OF CALIFORNIA
15

16  IN RE HEWLETT-PACKARD COMPANY        Master File No. 12-CV-6003 CRB
    SHAREHOLDER DERIVATIVE LITIGATION
17                                        **HEWLETT-PACKARD'S REPLY**
                                          **MEMORANDUM IN FURTHER**
18                                        **SUPPORT OF PRELIMINARY**
    _____      **APPROVAL OF THE SETTLEMENT**
19                                        **AND OPPOSITION TO THE MOTIONS**
                                          **TO INTERVENE AND SEVER**
20  This Document Relates to:  All Actions
                                          Dept.:   Courtroom 6, 17th Floor
21                                        Judge:   Hon. Charles R. Breyer
22

23

24

25

26

27

28

1

**TABLE OF CONTENTS**

2

Page

3

SUMMARY OF ARGUMENT ................................................................................ i

4

STATEMENT OF ISSUES TO BE DECIDED .................................................... v

5

ARGUMENT ........................................................................................................ 1

6

I.   THE INTERVENTION MOTIONS WOULD TURN PRELIMINARY APPROVAL

7

    INTO AN ENDLESS PROCESS, AND SHOULD BE DENIED............................ 1

8

II.  THE SETTLEMENT MEETS THE STANDARD FOR PRELIMINARY APPROVAL. ....... 4

9

    A.   The Release Is Appropriate Because The Released Claims Are Extremely
        Weak. ............................................................................................ 4

10

    B.   The Governance Reforms Are Valuable...................................... 6

11

    C.   The Board's Views Are Entitled To Significant, If Not Dispositive Weight. ............... 8

12

    D.   The Settlement Was The Result Of Arm's-Length Negotiations. ............... 10

13

    E.   The Objections To The Attorneys' Fees Are Makeweight. ........................ 11

14

III. THE NOTICE COMPLIES WITH APPLICABLE LAW........................................ 13

15

IV.  COPELAND'S DISCOVERY REQUESTS SHOULD BE DENIED. ................................... 14

16

V.   HUSSAIN LACKS STANDING AND SHOULD BE DENIED DISCOVERY.................... 16

17

    A.   Hussain Has Failed To Satisfy The Basic Requirements Justifying

18

        Intervention............................................................................... 16

19

    B.   Hussain Lacks Standing To Intervene Or To Object As A Shareholder. .................... 16

20

        1.   Hussain Has Not Demonstrated That He Is A Shareholder........................... 16

21

        2.   Hussain Is Adverse To The Corporation And Its Shareholders...................... 17

22

    C.   Hussain Still Has Not Established Any Formal Legal Prejudice, And Lacks
        Standing To Object Based On Any Such Purported Prejudice................................... 20

23

    D.   Hussain's Requests To Obtain Discovery And Submit Still More Briefing Are

24

        Meritless..................................................................................... 22

25

CONCLUSION..................................................................................................... 22

26

27

28

# TABLE OF AUTHORITIES

Page

## Cases

*Alaska Elec. Pension Fund* v. *Brown*,
    941 A.2d 1011 (Del. 2007) .................................................................................. 8

*AT&T Mobility LLC* v. *Concepcion*,
    131 S.Ct. 1740 (2011) .................................................................................. 12 n.16

*Athale* v. *Sinotech Energy Ltd.*,
    No. 11-cv-5831-AJN, 2013 WL 2145588 (S.D.N.Y. May 16, 2013) ....................................... 2 n.5

*Bacas* v. *Way*,
    No. 07-cv-456, 2008 WL 746825 (S.D. Tex. Mar. 20, 2008) ......................................... 14

*Beckman Indus., Inc.* v. *Int'l Ins. Co.*,
    966 F.2d 470 (9th Cir. 1992) ......................................................................... 16

*Cal. Dep't of Toxic Substances Control* v. *Commercial Realty Projects Inc.*,
    309 F.3d 1113 (9th Cir. 2002) ....................................................................... 3 n.7

*Chicago Milwaukee Corp.* v. *Eisenberg*,
    560 A.2d 489 (Del. 1989) ............................................................................ 12

*Churchill Village, L.L.C.* v. *Gen. Elec.*,
    361 F.3d 566 (9th Cir. 2004) ....................................................................... 2 n.6

*Class Plaintiffs* v. *City of Seattle*,
    955 F.2d 1268 (9th Cir. 1992) ....................................................................... 13

*Cohn* v. *Nelson*,
    375 F. Supp. 2d 844 (E.D. Mo. 2005) .............................................................. 7 n.12

*Daily Income Fund, Inc.* v. *Fox*,
    464 U.S. 523 (1984) ............................................................................. 10, 17

*Davis* v. *J.P. Morgan Chase & Co.*,
    775 F. Supp. 2d 601 (W.D.N.Y. 2011) ............................................................... 2 n.5

*Dusek* v. *Mattel Inc.*,
    141 F. App'x 586 (9th Cir. 2005) ................................................................... 15

*Farrell* v. *Open Table, Inc.*,
    No. C11-1785 SI, 2012 WL 1379661 (N.D. Cal. Jan. 30, 2012) ....................................... 11

*Feuer* v. *Thompson*,
    No. 12-cv-279-YGR, 2013 WL 2950667 (N.D. Cal. Jun. 14, 2013) .................................... 12

*In re AT&T Corp. Sec. Litig.*,
    No. 00-5364 (GEB), 2005 WL 6716404 (D. N.J. April 25, 2005) ...................................... 14

*In re Bank of Am. Corp. Sec., Deriv. & ERISA Litig.*,
  No. 09-md-2058-PKC, 2012 WL 1674299 (S.D.N.Y. May 14, 2012) .............................. 1, 2, 4, 14

*In re Beef Indus. Antitrust Litig.*,
  607 F. 2d 167 (5th Cir. 1979) ......................................................................................... 21

*In re Citigroup Inc. S'holder Deriv. Litig.*,
  964 A.2d 106 (Del. Ch. 2009) ..................................................................................... 4 n.10

*In re Fine Paper Litig. State of Wash.*,
  632 F.2d 1081 (3d Cir. 1980) ......................................................................................... 21

*In re First Interstate Bancorp Consol. S'holder Litig.*,
  756 A.2d 353 (Del. Ch. Aug. 26, 1999) ......................................................................... 8

*In re HealthSouth Corp. Sec. Litig.*,
  572 F.3d 854 (11th Cir. 2009) ......................................................................................... 21

*In re Johnson & Johnson Deriv. Litig.*,
  900 F. Supp. 2d 467 (D. N.J. 2012) .............................................................................. 7 n.12

*In re Massey Energy Co.*,
  No. 5430-VCS, 2011 WL 2176479 (Del. Ch. May 31, 2011) ....................................... 4

*In re Motor Fuel Temperature Sales Practices Litig.*,
  No. MD-1840-KHV, 2011 WL 5331678 (D. Kan. Nov. 4, 2011) ............................... 2 n.5

*In re NVIDIA Corp. Deriv. Litig.*,
  No. C-06-06110, 2008 WL 5382544 (N.D. Cal. Dec. 22, 2008) ................................... 1, 4

*In re Oracle Sec. Litig.*,
  829 F. Supp. 1176 (N.D. Cal. 1993) .............................................. 8, 8 n.13, 9, 9 n.14

*In re Oracle Sec. Litig.*,
  852 F. Supp. 1437 (N.D. Cal. 1994) .............................................. 8, 9, 9 n.14, 10

*In re Rambus Inc. Deriv. Litig.*,
  No. C 06-3513 JF (HRL), 2009 WL 166689 (N.D. Cal. Jan. 20, 2009) ...................... 7 n.12, 12

*In re Wachovia Corp. Pick–A–Payment Mortg. Mktg. & Sales Practices Litig.*,
  No. CV 09-02015-JF (PSG), 2011 WL 1496342 (N.D. Cal. Apr. 20, 2011) ................ 15

*Kahan* v. *Rosensteil*,
  424 F.2d 161 (3d Cir. 1970) ......................................................................................... 12

*Kaplan* v. *Rand*,
  192 F.3d 60 (2d Cir.1999) ............................................................................................. 1

*Kremen* v. *Cohen*,
  No. 5:11-CV-05411-LHK, 2012 WL 2919332 (N.D. Cal. Jul. 17, 2012) ..................... 16

*Maher* v. *Zapata Corp.*,
  714 F.2d 436 (5th Cir. 1983) ......................................................................................... 14

*Mohammed* v. *Ells*,
No. 12-cv-1831, 2014 WL 4212687 (D. Colo. Aug. 26, 2014)................................. 7 n.12

*Officers for Justice* v. *Civil Serv. Comm'n of City & Cnty. of San Francisco*,
688 F.2d 615 (9th Cir. 1982) ................................................................................. 15

*Paramount Comm'cns Inc.* v. *Time Inc.*,
Civ. No. 10866, 1989 WL 79880 (Del. Ch. July 14, 1989).................................... 4 n.10

*Revlon, Inc.* v. *MacAndrews & Forbes Holdings*,
506 A. 2d 173 (Del. 1986) ................................................................................... 4

*Robert F. Booth Trust* v. *Crowley*,
687 F.3d 314 (7th Cir. 2012) ................................................................................ 2 n.6

*Rodriguez* v. *West Publ'g Corp.*,
563 F.3d 948 (9th Cir. 2009) ................................................................................ 1 n.4, 10

*Scattered Corp.* v. *Chi. Stock Exch.*,
701 A.2d 70 (Del. 1997) ...................................................................................... 9, 9 n.14

*Tooley* v. *Donaldson, Lufkin & Jenrette, Inc.*,
845 A. 2d 1031 (Del. 2004) ................................................................................. 10 n.15

*UAW* v. *Gen. Motors Corp.*,
No. 05-cv-73991-DT, 2006 WL 334283 (E.D. Mich. Feb. 13, 2006)..................... 2 n.5

*Unite Nat'l Ret. Fund* v. *Watts*,
No. 04-CV-3603-DMC, 2005 WL 2877899 (D.N.J. Oct. 28, 2005)........................ 7 n.12

*Wixon* v. *Wyndham Resort Dev. Corp.*,
No. C 07-2361 JSW, 2010 WL 3630124 (N.D. Cal. Sept. 14, 2010)...................... 7 n.12

*Zapata Corp.* v. *Maldonado*,
430 A.2d 779 (Del. 1981) .................................................................................... 9 n.14

*Zarowitz* v. *BankAmerica Corp.*,
866 F.2d 1164 (9th Cir. 1989) ............................................................................. 17

**Statutes & Rules**

8 Del. C. § 102(b)(7).............................................................................................. 4

8 Del. C. § 141(e).................................................................................................. 4

Fed. R. Civ. P. 23.1 ............................................................................................... 1, 10, 17

Fed. R. Civ. P. 24 .................................................................................................. 16

1

**Treatises**

2

CHARLES ALAN WRIGHT, et al.,
     7C FEDERAL PRACTICE AND PROCEDURE § 1833 (3d ed. 2014) ....................................................... 17

MANUAL FOR COMPLEX LITIGATION (THIRD) § 30.41 (1995).................................................................. 1

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CITATIONS

8/25/14 Tr.            Transcript Of Proceedings, Case No. 12-6003, dated August 25, 2014

Board Resolution      Exhibit 3 to Declaration Of Marc Wolinsky dated September 4, 2014 (Docket #211-3)

Copeland Br.          A.J. Copeland's Notice Of Motion And Motion To Intervene; Memorandum Of Points And Authorities In Support Thereof (Docket #212)

Copeland II Br.       A.J. Copeland's Notice Of Motion, Motion And Memorandum Of Points And Authorities In support of Motion To Deny Preliminary Approval of Revised Settlement Agreement (Docket #213)

DRC Resolution        Exhibit 1 to Declaration Of Marc Wolinsky dated September 4, 2014 (Docket #211-1)

HP Br.                Hewlett-Packard's Memorandum In Support Of Preliminary Approval Of The Settlement And In Opposition To The Motions To Intervene And Sever (Docket #210)

HP Opp.               Hewlett-Packard's Memorandum Of Points And Authorities In Opposition To Shushovan Hussain's Motion To Intervene To Challenge Settlement (Docket #165)

Hussain Br.           Proposed Intervenor Sushovan Hussain's Supplemental Brief Re: August 25 Hearing (Docket #209)

Hussain Reply Br.     Suhsovan Hussain's Reply In Support Of Motion To Intervene To Challenge Settlement (Docket #170)

Wolinsky Decl.        Declaration Of Marc Wolinsky Submitted Contemporaneously Herewith

1

**SUMMARY OF ARGUMENT**

2      Sushovan Hussain's effort to derail the settlement even before the Court and HP shareholders

3 get a chance to consider it on the merits should be rejected out of hand.  Hussain has no interest in

4 protecting HP or its shareholders.  He filed this improper motion to preview the case HP is preparing

5 against him and to get access to the documents HP provided to the Department of Justice, the SEC

6 and the United Kingdom Serious Fraud Office.  Hussain still has failed to prove that he is an HP

7 shareholder.  He has no standing to challenge a settlement that is based on the conclusion of HP and

8 distinguished plaintiffs' counsel that Hussain, along with his boss, Michael Lynch, defrauded HP.

9      Hussain's substantive attack on the settlement is, likewise, without substance.  It boils down

10 to an accusation that Judge Walker oversaw the negotiation of a collusive settlement.  There was not

11 a shred of evidence to support that claim when the settlement was first presented to the Court, and

12 there is none now.  The retention of Cotchett Pitre and Robbins Geller to assist in the prosecution of

13 claims against Lynch, Hussain and Deloitte UK was never a condition of settlement.  The amended

14 and restated stipulation of settlement removes the proposed engagement letter entirely.  The revised

15 agreement conventionally provides that the Cotchett Pitre and Robbins Geller firms will be paid fees

16 based only on their contributions to the governance reforms, and further stipulates that Judge Walker

17 will determine the amount in binding arbitration, subject to this Court's review.  The fee amount that

18 Judge Walker awards will be included in the settlement notice and will be provided to the Court and

19 the shareholders for their evaluation.  Hussain's suggestion that, by agreeing to arbitrate this fee

20 dispute, Judge Walker is once again colluding with the parties, is beyond the pale.  His suggestion

21 that there is some secret side deal is, likewise, pure fabrication.  There is no side deal.

22      The accusation made by Hussain's counsel at the initial hearing that the DRC's investigation

23 was a whitewash is just one more falsehood.  Hussain — who, like Lynch, refused to be interviewed

24 by the DRC and who, like Lynch, is under criminal investigation — is the last person that the Court

25 should credit.  At the conclusion of the DRC's exhaustive investigation, HP provided plaintiffs'

26 counsel with proof of Hussain's and Lynch's wrongdoing, along with proof that there was no claim

27 here against HP's officers, directors, and advisors.  Plaintiffs' counsel agreed that HP should sue the

28 perpetrators of the fraud, not the victims.  Hussain can spin his version of an alternate reality when

HP REPLY MEM. IFSO PRELIM. APPROVAL OF
SETTLEMENT AND OPP. MOT. INTERVENE
CASE NO. 12-CV-06003-CRB

he is sued, or when a criminal case is brought against him.  But Hussain has no right to *pre*-suit or *pre*-indictment discovery, and the Court should not permit him to turn a suit filed to vindicate HP's interests into a vehicle to obtain ammunition to oppose HP's interests.[1]

Picking up on Hussain's baseless accusations, would-be intervenor A.J. Copeland asserts that the DRC is not independent and not to be trusted.  That claim is without substance.  The DRC was headed by the prominent activist investor Ralph Whitworth, who beneficially owns more than 1.6% of HP's stock and plainly has HP's best interests in mind.  All the members of the DRC were completely independent.  Meanwhile, Copeland has filed multiple baseless complaints against HP's officers and directors.  The district court dismissed his *Copeland I* case, which is on appeal.  Not content to appeal his case or to object to the settlement here, he has filed not one but two motions to intervene in this Court.  The second motion cobbled together passages his counsel had cut and pasted from Hussain's filing.  He then sent HP a demand letter threatening to sue the board unless HP walked away from the settlement.  The letter also stated that "there are other issues which will be raised in a subsequent letter to you."  Copeland provides no reason why the Court should trust him rather than the shareholder-elected members of the DRC and the board to evaluate HP's best interests, and offers no support for his charge that the DRC is not independent.

With those distractions out of the way, there can be no question that the settlement should be preliminarily approved and the various motions to intervene and sever should be denied.

1.   The would-be intervenors here seek to turn the approval process upside down.  The recognized practice is to grant preliminary approval if the proposed settlement is within the range of possible approval — that is, if the Court could potentially approve it at a fairness hearing — and to deny approval only if there is an obvious defect that would be fatal at final approval.  Shareholders are then provided notice of the settlement, and those with standing to challenge it may lodge their objections according to a Court-ordered schedule.  Only after preliminary approval will the Court

---

[1]   Indeed, in invoking the *Brocade* derivative litigation as support for his "whitewash" argument, 8/25/14 Tr. at 52:2-5, Hussain's counsel overlooks the fact that the DRC's counsel, whom he has accused of conducting that "whitewash," sued a number of individuals, including Stephanie Jensen (represented by Keker & Van Nest) for breach of fiduciary duty on behalf of Brocade after she had been convicted in this Court for conspiracy and falsifying books and records.

1   consider the sorts of arguments that Copeland, Cook, and others are seeking to advance here and, if

2   there are any issues that cannot be resolved consensually, the scope of discovery that would-be

3   objectors should be provided.[2]   The notice-and-fairness-hearing system thus establishes an

4   organized, "'adversarial process' that tests the fairness of a proposed settlement…. As the Proposed

5   Intervenors' arguments are directed to the settlement's ultimate fairness and adequacy, they are best

6   weighed alongside those of other likely objectors" at the final approval hearing, as objections. *In re*

7   *Bank of Am. Corp. Sec., Deriv. & ERISA Litig.*, No. 09-md-2058-PKC, 2012 WL 1674299, at *2

8   (S.D.N.Y. May 14, 2012) (quoting *Kaplan* v. *Rand*, 192 F.3d 60, 67 (2d Cir.1999)). The motions to

9   intervene should therefore be denied.

10          2.       There is no fatal defect in the settlement. To the contrary, the release is appropriate

11   because the released claims are extremely weak. Delaware law accepts that corporate directors may,

12   in deciding to merge or to acquire a significant asset, "be proven in time to have been brilliantly

13   prescient or dismayingly wrong." *Paramount Comm'cns Inc.* v. *Time Inc.*, Civ. No. 10866, 1989

14   WL 79880, at *30 (Del. Ch. July 14, 1989), *aff'd*, 571 A.2d 1140 (Del. 1990). And so directors and

15   officers are not liable for their business decisions, even when those decisions turn out to have been

16   ill-conceived. Not only would plaintiffs have to overcome this bedrock principle of Delaware law to

17   establish liability, they also would have to overcome the fact that the members of the HP board

18   determined on the basis of a recommendation made by a committee comprised of outside directors

19   — a majority of whom were not on the HP board when the Autonomy deal was done — that the

20   claims being asserted in this case are meritless and that it would not be in the best interests of HP or

21   its shareholders for this case to proceed. Plaintiffs' counsel agreed with the board's judgment that

22   this case should not proceed. To paraphrase the *Oracle* case that Hussain and Copeland cite, "the

23   best interests of [HP's] shareholders are served by allowing the[] [defendants] to devote themselves

24   to [HP's] business affairs rather than distracting them with further litigation." *In re Oracle Sec.*

25   *Litig.*, 852 F. Supp. 1437, 1444 (N.D. Cal. 1994).

26   _____

27   [2]    *See, e.g.*, *In re Bank of Am. Corp. Sec., Deriv. & ERISA Litig.*, No. 09-md-2058-PKC, 2012 WL 1674299, at *3
     (S.D.N.Y. May 14, 2012) ("district court [can] consider[] any shareholder objections at [the] hearing on the terms of the
     proposed settlement").

28

3.     The corporate reforms are valuable, as Copeland concedes.  Copeland Br. 2 ("there are some badly-needed governance enhancements included in the proposed settlement").  Copeland and Hussain are left to argue that there is no proof here that the plaintiffs caused the reforms.  But the Delaware Supreme Court has held that there is a presumption that the lawsuit caused the reforms, and here there isn't a shred of evidence to overcome that presumption.  *Alaska Elec. Pension Fund* v. *Brown*, 941 A.2d 1011, 1015 (Del. 2007).  To the contrary, the HP board already has stated in a board resolution (adopted before settlement talks began) that the reforms were informed by recommendations from Robbins Geller and by the allegations in Cotchett Pitre's consolidated complaint.  Board Resolution at 12.  If any question on this point remains after Judger Walker considers the extent to which plaintiffs' efforts have informed the reforms (as he will do in considering plaintiffs' fee application), it can be resolved at the final approval hearing.

4.     The Court should "put a good deal of stock in the product of an arms-length, non-collusive, negotiated resolution," particularly one overseen by a distinguished mediator and former member of this Court.  *Rodriguez* v. *West Publ'g Corp.*, 563 F.3d 948, 965 (9th Cir. 2009).  Copeland basically concedes that the process here entitles the settlement to a presumption of fairness, acknowledging that plaintiff's counsel is "well-respected and highly competent" and that "the settlement was mediated by the Hon. Vaughn Walker."  Copeland Br. 2-3.  His only objection is that HP's counsel was the one negotiating with plaintiffs and their counsel.  *Id.*  The claim makes no sense.  How does it impugn the judgment of *plaintiffs' counsel* that this case should be settled?

5.     Copeland asserts that the notice is defective.  He could have raised the issue two months ago.  But regardless, the notice is fair and adequate.  It appropriately provides a plain-English description of the case and the settlement and directs shareholders to the stipulation of settlement itself, a document that will be readily retrieved from HP's website, for the complete terms.  *Maher* v. *Zapata Corp.*, 714 F.2d 436, 452 (5th Cir. 1983).[3]

6.     Copeland's discovery requests should be denied as premature and overbroad.  "While

---

[3]     Since submitting the amended and restated stipulation of settlement to the Court, HP has agreed to arbitrate its fee dispute with Vincent Ho.  The parties will submit a revised notice reflecting that fact in advance of the preliminary approval hearing.

objectors are entitled to meaningful participation in the settlement proceedings, and leave to be heard, they are not automatically entitled to discovery or to question and debate every provision of the proposed compromise." *In re Wachovia Corp. Pick–A–Payment Mortg. Mktg. & Sales Practices Litig.*, No. CV-09-02015-JF, 2011 WL 1496342, at *1 (N.D. Cal. Apr. 20, 2011).  There is no basis for subjecting HP to the very "wasteful and expensive" costs and burdens "that induce consensual settlements" in the first place.  *Officers for Justice* v. *Civil Serv. Comm'n of City & Cnty. of San Francisco*, 688 F.2d 615, 625 (9th Cir. 1982).

## STATEMENT OF ISSUES TO BE DECIDED

1.      Whether shareholders should be permitted to intervene when their rights can be fully protected as objectors, and when permitting intervention here would turn the well-recognized, two-step approval process into a drawn out burdensome process of precisely the sort that the settlement was properly intended to avoid?

2.      Whether the proposed settlement, which provides for valuable corporate governance reforms and which releases claims that an independent and disinterested committee of the HP board determined to be meritless following a reasonable and thorough investigation, is "within the range of possible approval" and therefore should be preliminarily approved?

3.      Whether the notice complies with applicable law when it directs interested shareholders to the stipulation of settlement, which is easily available?

4.      Whether Sushovan Hussain, one of the architects of the fraud at Autonomy, should be permitted to object to the settlement, notwithstanding his failure to submit a proposed pleading in support of intervention, his failure to prove that he is an HP shareholder, his conflict of interest with HP and its shareholders, and his failure to prove any legal prejudice?

## ARGUMENT

The settlement satisfies the standard for preliminary approval.  The Court should approve the form of notice and should schedule a hearing to consider shareholder objections in an orderly way.  There is no reason for delay, and no reason for any shareholder to intervene, now or later.

## I.  THE INTERVENTION MOTIONS WOULD TURN PRELIMINARY APPROVAL INTO AN ENDLESS PROCESS, AND SHOULD BE DENIED.

The would-be intervenors ask the Court to defer consideration of preliminary approval until they have had an opportunity to litigate the fairness of the settlement on the basis of prolonged and excessive pre-approval discovery of the sort that the settlement properly was designed to avoid.  That request is without support in the Federal Rules or the case law.  Under Rule 23.1(c), "[n]otice of a proposed settlement, voluntary dismissal, or compromise must be given to shareholders" before "[a] derivative action may be settled, voluntarily dismissed, or compromised."  This translates to a two-step process.

At the first step, the Court considers only whether a proposed settlement "is '*within the range of possible approval.*'"  *In re NVIDIA Corp. Deriv. Litig.*, No. C-06-06110, 2008 WL 5382544, at *2 (N.D. Cal. Dec. 22, 2008) (quoting MANUAL FOR COMPLEX LITIGATION (THIRD) § 30.41, at 237 (1995)) (emphasis added).  Unless there is a patent or "'*obvious* deficienc[y],'" the proposed settlement is preliminarily approved and presented to the shareholders.  *Id.* (emphasis added).  It is at the second step, where the Court has the benefit of timely-filed objections, that the Court evaluates whether the proposed settlement is fair.[4]

The notice-and-fairness-hearing system thus establishes an organized, "'adversarial process' that tests the fairness of a proposed settlement."  *In re Bank of Am. Corp. Sec., Deriv. & ERISA Litig.*, No. 09-md-2058-PKC, 2012 WL 1674299, at *3 (S.D.N.Y. May 14, 2012) (quoting *Kaplan* v. *Rand*, 192 F.3d 60, 67 (2d Cir.1999)).  Stockholders know when to object and how.  The parties to the settlement know what arguments to respond to and when.  And the "district court [can] consider[] any shareholder objections at [the] hearing on the terms of the proposed settlement" —

---

[4]    At this step, too, the Court defers to the parties' judgment that a proposed settlement is fair.  *Rodriguez* v. *West Publ'g Corp.*, 563 F.3d 948, 965 (9th Cir. 2009).

*i.e.*, the final hearing.  *Id.*  Moreover, because several shareholders who have tendered proof of stock ownership (including Cook, Copeland, and the Steinbergs) have made clear that they intend to object here, the Court can rest assured that the adversarial system will be not just hypothetical but real in this case.

Thus, "'there is no need for [any] stockholder to intervene formally in th[is] action or to be a party to it' in order to preserve his or her rights as an objector." *Id.*[5]  There is also no need for them to raise objections now, before preliminary approval.  The shareholders can object before final approval — which defeats any claim that intervention is necessary to protect any interest.[6]  Hussain's attempt to intervene not just as a shareholder but on the ground of formal legal prejudice is equally misplaced.  Hussain has submitted three rounds of briefing, but he still has not shown how the settlement here could cause him any legal prejudice.  See pp. 20-21, below.

The procedure urged by the would-be intervenors would turn the well-established procedure for the orderly submission and consideration of objections on its head.  Copeland's motions to intervene are a case in point.  Lead plaintiff moved for preliminary approval of the settlement on June 30.  Counsel for Copeland promptly contacted counsel for HP, seeking copies of the relevant court filings as well as of the governance reforms (which HP provided, even though the filings were available on PACER).  Wolinsky Decl. Exs. 14, 15, 16.  Rather than seek to appear then, Copeland let the time to oppose the preliminary-approval motion elapse, and waited nearly two more months before appearing.  He then filed not one but two motions, the second of which largely duplicates Hussain's brief (in many places verbatim).  The two motions were filed after plaintiff and HP had

---

[5]    *See also Athale* v. *Sinotech Energy Ltd.*, No. 11-cv-5831-AJN, 2013 WL 2145588, at *2-3 (S.D.N.Y. May 16, 2013) (denying intervention as of right); *Davis* v. *J.P. Morgan Chase & Co.*, 775 F. Supp. 2d 601, 605 (W.D.N.Y. 2011); *In re Motor Fuel Temperature Sales Practices Litig.*, No. MD-1840-KHV, 2011 WL 5331678, at *2 (D. Kan. Nov. 4, 2011); *UAW* v. *Gen. Motors Corp.*, No. 05-cv-73991-DT, 2006 WL 334283, at *5 (E.D. Mich. Feb. 13, 2006) (denying permissive intervention).

[6]    Citing a line of decisions from the Seventh Circuit, Copeland asserts that intervention should be "'freely allow[ed]'" to objecting shareholders who "'want an option to appeal an adverse decision.'"  Copeland Br. 7-8.  In the Seventh Circuit, "intervention (and thus party status) is essential to an appeal in a derivative suit."  *Robert F. Booth Trust* v. *Crowley*, 687 F. 3d 314, 318 (7th Cir. 2012).  In the Ninth Circuit, however, a shareholder need *not* intervene to challenge a settlement in a representative suit, whether in district court or on appeal.  *Churchill Village, L.L.C.* v. *Gen. Elec.*, 361 F.3d 566, 572-73 (9th Cir. 2004).  In the Ninth Circuit and elsewhere, the right to object to a settlement suffices to protect a shareholder's rights.

filed their own briefs, and without having discussed the timing of these filings with anyone.[7] Copeland followed the two motions to intervene with a demand letter threatening to sue HP's board unless it walked away from a settlement that releases claims the board has concluded to be without merit. Wolinsky Decl. Ex. 20. The preliminary approval process reins this chaos in by permitting the Court to consider objections in an organized fashion at the final-approval hearing.

The Steinberg plaintiffs have only added to the confusion. They refused to agree to a schedule for the orderly submission of briefs in advance of the September 26 hearing, and decided to submit a brief when it best suited them. Wolinsky Decl. Exs. 21, 22. The Steinbergs' brief, which was filed on the day HP's brief was due by agreement with everyone else, goes on for 11 pages discussing the merits of the claims that are being released. (Docket #217.) The argument, resting entirely on speculation and inapposite authority, confirms that their principal concern is objecting to the settlement, which they will be free to do as an objector.[8]

Copeland and Hussain nonetheless assert that they must intervene now because, if the Court wishes to alter the bar order (or some other discrete term of the agreement), it must do so before preliminary approval because the Court does not have the power later to rewrite the parties' agreement. Copeland II Br. 5; Hussain Br. 2. Copeland and Hussain cite no authority for the proposition that the Court can or should redline the parties' agreement before preliminary approval. If an issue arises at final approval, the Court and the parties can address it then. And, indeed, the proposed preliminary approval order provides that the settlement agreement can be changed after preliminary approval "with or without further notice" to shareholders. Amended and Restated Stipulation of Settlement Ex. A, ¶ 4 (Docket #201).[9]

---

[7]   Copeland's motion to intervene is thus untimely and should be denied on that additional ground. As Copeland's own cases establish, he was required to "act as soon as he [knew] or ha[d] reason to know that his interests might be adversely affected." *Cal. Dep't of Toxic Substances Control* v. *Commercial Realty Projects, Inc.*, 309 F.3d 1113, 1120 (9th Cir. 2002) (emphasis omitted). Copeland could have filed his motion two months ago, when he asked for and received from HP's counsel a copy of the settlement papers. Wolinsky Decl. Ex. 14.

[8]   Given the timing of the Steinbergs' filing, HP will move for leave to respond.

[9]   In a footnote, Copeland and Hussain point out that the parties have *the option* to terminate the settlement in the event the court makes a material modification to it. Copeland II Br. 5 n.6; Hussain Br. 2 n.3. The termination right applies regardless of whether the modification is made at the preliminary approval hearing or the final approval hearing. So it could not and does not support the claim that anyone needs to intervene before preliminary approval.

The short of it is that the Court at this juncture should consider only whether the settlement is potentially susceptible to approval or whether it suffers from a patent defect.  There is no basis for anyone to intervene, still less to delay the preliminary-approval process, as Hussain and Copeland hope to do.  The motions to intervene should all be denied, and notice should be sent to shareholders to permit the approval process to proceed in the manner provided for by federal law and practice.

## II.     THE SETTLEMENT MEETS THE STANDARD FOR PRELIMINARY APPROVAL.

The would-be intervenors have made a number of assertions.  Not one of them comes close to the sort of "obvious deficienc[y]" that would justify denying preliminary approval.  *NVIDIA*, 2008 WL 5382544, at *2.  Instead, "[a]s the Proposed Intervenors' arguments are directed to the settlement's ultimate fairness and adequacy, they are best weighed alongside those of other likely objectors," and ought not be considered at this juncture.  *Bank of Am.*, 2012 WL 1674299, at *2.

### A.     The Release Is Appropriate Because The Released Claims Are Extremely Weak.

Delaware law "insulates directors and management from personal liability for [mere] business decisions."  *Revlon, Inc.* v. *MacAndrews & Forbes Holdings*, 506 A. 2d 173, 180 n.10 (Del. 1986).  This "free[s] fiduciaries making risky business decisions in good faith from the worry that if those decisions do not pan out in the manner they had hoped, they will put their personal net worths at risk."  *In re Massey Energy Co.*, No. 5430-VCS, 2011 WL 2176479, at *22 (Del. Ch. May 31, 2011).[10]  Beyond this, the law provides that directors are "fully protected" when they rely on management or the corporation's advisors, as HP's directors did here.  8 DEL. C. § 141(e).  The law insulates directors from liability based on allegations that they acted carelessly if the corporation has decided to exculpate them, as HP has done.  8 DEL. C. § 102(b)(7).  And the law provides ample

---

[10]     *In re Citigroup Inc. S'holder Deriv. Litig.*, 964 A.2d 106, 124 (Del. Ch. 2009) ("When one looks past the lofty alle-gations of duties of oversight and red flags used to dress up these claims, what is left appears to be plaintiff shareholders attempting to hold the director defendants personally liable for making (or allowing to be made) business decisions that, in hindsight, turned out poorly for the Company.  Delaware Courts have faced these types of claims many times and have developed doctrines to deal with them — the fiduciary duty of care and the business judgment rule.  These doctrines properly focus on the decision-making process rather than on a substantive evaluation of the merits of the decision.  This follows from the inadequacy of the Court, due in part to a concept known as hindsight bias, to properly evaluate whether corporate decision-makers made a 'right' or 'wrong' decision."); *Paramount Comm'cns Inc.* v. *Time Inc.*, Civ. No. 10866, 1989 WL 79880, at *30 (Del. Ch. July 14, 1989) (courts will not second guess boards for business judgment made in connection with corporate acquisitions), *aff'd*, 571 A.2d 1140 (Del. 1990).

protections to corporate officers and advisors.  For all these reasons and others, the DRC concluded that the released claims are meritless and that pursuing them would not be in the best interests of the corporation or its shareholders.  That decision is entitled to deference from the Court.  HP Br. 2-13.

The members of the DRC were independent.  A majority of them were not on the board when the Autonomy transaction was approved.   The DRC hired three distinguished law firms to investigate the wide-ranging claims raised in the various complaints and demand letters, Proskauer Rose, Choate Hall and Brown Rudnick.  Led by Ralph Ferrara of Proskauer Rose, the former General Counsel of the SEC, the three firms conducted a thorough investigation, interviewing over 90 people.  They had access to millions of documents.  They gave Lynch and Hussain the opportunity to be interviewed; both declined, no doubt concerned that anything they said to the DRC could be used against them in a later criminal or civil proceeding.  DRC Resolution at 14.  And even though Lynch declined to be interviewed, the DRC considered the arguments that he made proclaiming his innocence.  *Id.* at 14, 41.  The DRC's conclusion was that Lynch and Hussain had defrauded the company and that their shrill accusation that HP was just seeking to divert attention from its own mishandling of the acquisition was, itself, a baseless diversion tactic.

In light of all of this, it was eminently fair and reasonable for the parties to agree to a release that extinguishes claims against the company's officers, directors, and advisors and permits HP to focus on the individuals and entities that are responsible for the harms that were inflicted.  As Hussain would have it, the entire DRC exercise was a "whitewash."  8/25/14 Tr. 52.  According to him, "Ralph Ferrara's internal 'investigation,' [] was designed to absolve HP and its leadership."  Hussain Br. 4.  In Hussain's alternate universe, Choate Hall and Brown Rudnick presumably joined Proskauer Rose in sweeping the truth under the rug.  Ralph Whitworth, the prominent activist investor who headed the DRC and beneficially owns more than 1.6% of HP's stock, and the other members of the DRC sacrificed the well-being of the company and its shareholders.  As Hussain would have it, Cotchett Pitre and Robbins Geller unethically took a dive.  To add to the insult, Hussain asserts that Judge Walker either colluded or was an unwitting bystander to an orchestrated charade and, in agreeing to arbitrate the open fee dispute, Judge Walker is participating in a "ludicrous" exercise.  Hussain Br. 11.

1    Accusations of this sort from Sushovan Hussain should be given no credence.    The

2  documents submitted in HP's prior brief establish that Hussain fraudulently represented to HP that a

3  "government agency" (code name for the Vatican Library) purchased $11.5 million of software from

4  Autonomy and that the contract was Autonomy's fourth largest deal.   But there was no legitimate

5  sale to a "government agency" — or anyone else.   The culprits here are Mike Lynch and Sushovan

6  Hussain, not HP's officers and directors, not the members of the DRC, not Proskauer Rose, not

7  Choate Hall, not Brown Rudnick, not Cotchett Pitre, not Robbins Geller, and not Judge Walker.

8    Copeland and Hussain also both object on the ground that the release covers claims that

9  "have nothing to do with the Autonomy acquisition."   Hussain Br. 4; Copeland II Br. 9-10.   The

10  reason these claims are being released is that shareholders advanced them in derivative suits or

11  demand letters that also advanced claims related to Autonomy; the DRC investigated them; and the

12  DRC and the board found the claims to be without merit and determined that it would not be in the

13  best interests of HP to pursue them.   *See* DRC Resolution at 68-80.

14    For example, shareholders asserted that HP's officers and directors failed to conduct

15  adequate due diligence on the EDS acquisition and overpaid for the asset — allegedly "a harbinger

16  of what followed in the Autonomy acquisition."   DRC Resolution 68.   The DRC evaluated these

17  allegations and found, among other things, that HP had "retained professional advisors" who had

18  "committed over 11,000 hours of support resulting in a 646-page due-diligence report" and that HP

19  had "obtained a fairness opinion from Lehman Brothers supporting the reasonableness of the EDS

20  valuation."   *Id.*   Thus, the DRC concluded that the claims were meritless.   *Id.*[11]

21    **B.    The Governance Reforms Are Valuable.**

22    Courts have routinely approved governance-based settlements, like this one, that result in

23

24

---

25  [11]    Separately, Copeland asserts that there is "no doubt" that the release covers claims he advanced in *Copeland* v. *Lane*, No. 11-cv-01058-EJD (*Copeland I*), which is currently pending on appeal in the Ninth Circuit.  Copeland II Br.

26  10.  But the settlement clearly states that the release does not cover these claims.  Amended and Restated Stipulation of Settlement, Ex. C § I.A.47 (Docket #201) (defining "Non-Released Pending Claims" to include "the claims made in the

27  operative complaint in *Copeland* v. *Lane*, No. 11-cv-1058 (EJD) (N.D. Cal.), *appeal pending* No. 13-16251 (9th Cir.) ('*Copeland I*'), as of the date of this Agreement.").

28

1    enhancements to the corporation's procedures even if they do not include monetary relief.[12]  It is an

2    appropriate structure for a settlement in this case.

3            Copeland — whose attorneys have received the reforms — concedes that "there are some

4    badly-needed governance enhancements included in the proposed settlement."  Copeland Br. 2.  In

5    the next breath, Copeland nonetheless complains that they are "undisclosed" and "hidden" (even

6    though his counsel has them).  Copeland II Br. 6, 8; *see also* Hussain Br. 3.  The reforms have been

7    described in public filings.  They are summarized in the notice in sufficient detail to permit

8    shareholders to understand their substance.  Amended and Restated Stipulation of Settlement Ex. B

9    (Docket #201).  They have been submitted to the Court and are available to any HP shareholder with

10   a legitimate desire to see them.  (Docket #150), Amended and Restated Stipulation of Settlement §

11   V.A (Docket #201).  But for the reasons set forth in HP's motion to seal — reasons that not a single

12   person has disputed — it would not serve the interests of the corporation or its shareholders for the

13   reforms to be made public, as they would provide a roadmap to potential acquisition partners and

14   competitors, thus diminishing their value and potentially injuring HP.  (Docket #150-1.)

15           Copeland next asserts that the governance reforms are illusory because they remain "subject

16   to HP management's review and approval."  Copeland Br. 5.  That is not the case.  When the

17   settlement was first signed, the reforms did remain subject to management review to ensure they

18   could be implemented in the way they were written.  Stipulation of Settlement § III.A.1 (Docket

19   #149).  But management and the board have since determined that all the reforms could and should

20   be adopted, with minor modifications to facilitate their implementation.  Wolinsky Decl. ¶¶ 2-4.  The

21   board resolved that the reforms "are advisable to and in the best interests of the Company and its

22   shareholders."  *Id.* ¶ 3.  As a result, the reforms have now been approved.  *Id.*  And thus, the

23   amended and restated stipulation of settlement provides that "HP shall implement" them.  Amended

24   and Restated Stipulation of Settlement § III.A.1 (Docket #201).  The requirement is unconditional.

25   ───────────────

26   [12]   *See, e.g.*, *Wixon* v. *Wyndham Resort Dev. Corp.*, No. C 07-2361 JSW, 2010 WL 3630124, at *2 (N.D. Cal. Sept. 14, 2010); *In re Johnson & Johnson Deriv. Litig.*, 900 F. Supp. 2d 467, 485 (D. N.J. 2012); *Cohn* v. *Nelson*, 375 F. Supp. 2d

27   844, 853 (E.D. Mo. 2005); *Unite Nat'l Ret. Fund* v. *Watts*, No. 04-CV-3603-DMC, 2005 WL 2877899, at *1 (D.N.J. Oct. 28, 2005); *In re Rambus Inc. Deriv. Litig.*, No. C 06-3513 JF (HRL), 2009 WL 166689, at *3 (N.D. Cal. Jan. 20, 2009); *Mohammed* v. *Ells*, No. 12-cv-1831, 2014 WL 4212687, at *3 (D. Colo. Aug. 26, 2014).

28

Seizing on a question posed by the Court at the August 25 hearing, Copeland and Hussain switch tack and speculate that HP would have made governance changes anyway. Copeland Br. 2; Hussain Br. 3. Under Delaware law, however, "courts 'recognize a presumption that there is a causal relationship between [a] benefit [achieved] and a timely filed suit.'" *Alaska Elec. Pension Fund* v. *Brown*, 941 A.2d 1011, 1015 (Del. 2007). To rebut the presumption, Hussain and Copeland "have the burden of demonstrating that the lawsuit did not in any way cause its action." *Id.* And they have offered nothing to satisfy their "heavy" burden in overcoming this presumption. *In re First Interstate Bancorp Consol. S'holder Litig.*, 756 A.2d 353, 363 (Del. Ch. Aug. 26, 1999).

In fact, the HP board resolved (before the settlement talks began) that the DRC's "recommendations for further M&A reforms" had been "informed by recommendations from [Robbins Geller] and by the allegations in Lead Plaintiff's consolidated complaint" in this action. Board Resolution at 12. And Judge Walker, in considering plaintiff's application for an award of attorneys' fees, will consider the extent to which plaintiffs' efforts contributed to the formulation and adoption of the reforms. Unlike in the *Oracle* case Copeland and Hussain cite, there is ample basis for concluding that the reforms here were informed by plaintiffs' counsel and their experts — far more than enough to proceed to final approval.[13]

### C.   The Board's Views Are Entitled To Significant, If Not Dispositive Weight.

The fact that the independent board has determined that the case should not proceed is not just relevant to the Court's evaluation of the strength of plaintiff's case. It is also entitled to significant, even dispositive weight on the question of whether the settlement is fair to the company and its shareholders — even without regard to the governance reforms.

Indeed, what Copeland and Hussain do not say about the *Oracle* case is that the Court ultimately *approved* the settlement even without discussing the governance reforms, because the directors had determined that discontinuing the litigation was in the best interests of the corporation.

---

[13]   In *Oracle*, the Court denied *final* approval to a settlement where there was no evidence that the plaintiffs were responsible for the reforms. *In re Oracle Sec. Litig.*, 829 F. Supp. 1176, 1184-85 (N.D. Cal. 1993). It follows that the settlement had been *preliminarily* approved without that proof.

*In re Oracle Sec. Litig.*, 852 F. Supp. 1437 (N.D. Cal. 1994).  Thus, in *Oracle*, where the only benefit appeared to be the prospect of obtaining litigation peace, the Court declined to approve the settlement and requested the views of the corporation as to whether the settlement was in the company's best interests.  829 F. Supp. at 1183-90.  After the hearing, a special litigation committee, assisted by independent counsel, determined that prosecuting the case would not be in the company's best interests, and that, therefore, the settlement was in the best interests of the company and its shareholders.  852 F. Supp. at 1440-41.  The Court then granted final approval based solely on that fact.  *Id.* at 1441-44.

This case is *a fortiori*.  The board established a committee of unquestionably independent directors.  They conducted a thorough investigation with the assistance of independent counsel.  The results were presented to the independent board and approved by it.  The DRC and the board determined, after the review conducted by independent counsel, that the claims proposed to be released in the settlement are meritless.  DRC Resolution at 26-47, 52-57, 68-80; Board Resolution at 6-9, 11.  They also determined that prosecuting this case would be costly to the corporation in view of its advancement and indemnification obligations and that it would ill serve the corporation and its shareholders in the end.  DRC Resolution at 48-52, 58-59, Board Resolution at 3-4, 6-9, 11.  The board thus directed counsel to seek to find a settled resolution and, absent that, to move to dismiss the case.  *Id.* at 12.  The fact that the settlement accomplishes all the board's objectives should be determinative, as it was in *Oracle*, because the board's judgment is entitled to dispositive weight under the business judgment rule.  *Scattered Corp.* v. *Chi. Stock Exch.*, 701 A.2d 70, 75-77 (Del. 1997).[14]

Thus, the would-be intervenors have it all wrong when they say that the shareholders are "forced to surrender a great deal" in the release of claims.  Copeland II Br. 9; *see also* Hussain Br. 3

---

[14]   In *Oracle*, the board established a special litigation committee, rather than a demand review committee.  Under *Zapata Corp.* v. *Maldonado*, 430 A.2d 779 (Del. 1981), that triggered a higher standard of review, because the formation of a special litigation committee is presumed to constitute a concession that the full board would be operating under a conflict.  In this case, however, the independent HP board retained the ultimate decision for itself, as it was entitled to do under Delaware law, and is entitled to the protection of the business judgment rule without having to satisfy the heightened *Zapata* standard.  The burden here would be on objectors to prove a disabling conflict and to displace the presumption of the business judgment rule.  *Scattered*, 701 A.2d at 75-77.

(same).  The derivative claims being released here belong to the corporation, and HP's board has determined that HP and its shareholders would be obtaining *an immense benefit* from the release — the ability to focus on running the business, and a loss of nothing (because the claims are not legally viable).  To paraphrase the *Oracle* case, here, "the best interests of [HP's] shareholders are served by allowing these [defendants] to devote themselves to [HP's] business affairs rather than distracting them with further litigation."  *Oracle*, 852 F. Supp. at 1444.  "[T]he provision [of the Federal Rules] requiring notice and court approval of [derivative] settlements … [is] intended to prevent shareholders from suing in place of the corporation in circumstances where the action would disserve the legitimate interests of the company or its shareholders."  *Daily Income Fund, Inc.* v. *Fox*, 464 U.S. 523, 532 n.7 (1984).  It is only by completely ignoring the purposes of Rule 23.1 as well as bedrock Delaware law that any of the would-be intervenors here can claim that the settlement causes the company and its shareholders some great, undisclosed harm.[15]

### D.    The Settlement Was The Result Of Arm's-Length Negotiations.

The Court should also "put[] a good deal of stock" in the fact that the settlement is "the product of an arms-length, non-collusive, negotiated resolution," overseen by a distinguished mediator.  *Rodriguez* v. *West Publ'g Corp.*, 563 F.3d 948, 965 (9th Cir. 2009).  "'Parties represented by competent counsel are better positioned than courts to produce a settlement that fairly reflects each party's expected outcome in litigation.'"  *Id.* at 967.

From Judge Walker's perspective, "the settlement [wa]s the product of exceedingly capable attorneys operating … in earnest pursuit of their respective clients' interests."  Walker Decl. ¶ 23.  Judge Walker thought that "the efforts, vigor and skills of counsel, together with their consultants and clients, [we]re unrivalled."  *Id.* ¶ 23.  "The negotiations, while cordial, were contentious and hard-fought" and "seemed to have completely collapsed more than once" before fees were discussed.

---

[15]   Citing a handful of cases addressing the approval of class action settlements, Hussain and Copeland imply that the settlement is suspect because the shareholders should be receiving a concrete benefit beyond what the settlement offers indirectly.  Hussain Br. 2-3, 12-13; Copeland II Br. 3, 6-7.  This is a derivative action, however, and only derivative claims are being released.  "Because a derivative suit is being brought on behalf of the corporation, the recovery, if any, must go to the corporation."  *Tooley* v. *Donaldson, Lufkin & Jenrette, Inc.*, 845 A. 2d 1031, 1036 (Del. 2004).

*Id.* ¶ 20.  Ultimately, they did result in an agreement to settle the claims.  And "[o]nly after the parties had agreed on … [the key] settlement terms [including the reforms] did they begin in [Judge Walker's] presence to discuss issues relating to attorneys' fees, including plaintiffs' counsel's role in any affirmative proceedings that HP might bring against Autonomy-related persons and entities." *Id.* ¶ 22.  Even then, the Court's approval of attorneys' fees was *never* a condition of the settlement. *See Farrell* v. *Open Table, Inc.,* No. C11-1785 SI, 2012 WL 1379661, at *2 (N.D. Cal. Jan. 30, 2012) (finding no collusion where, as in this case, "[t]he settlement was negotiated at arms-length by experienced counsel"; there was a declaration attesting to its non-collusive nature; and "the agreement was signed before attorneys' fees were negotiated.").

Copeland basically concedes the point.  He acknowledges that plaintiff's counsel is "well-respected and highly competent" and that "the settlement was mediated by the Hon. Vaughn Walker."  Copeland Br. 2-3.  His only objection is the nonsensical assertion that the process was tainted because HP's counsel was the one negotiating with plaintiffs' counsel.  *Id.*  HP's counsel had been instructed by the board (which had acted based on the DRC resolutions) to seek to reach a resolution of the case consistent with the DRC's investigation.  The claims released here are the claims that the board determined were meritless based on that investigation.  How does the fact that HP's counsel was on the other side of the table impugn the judgment of plaintiff's counsel that this case should be settled on the terms presented here?  The claim makes no sense.

**E.     The Objections To The Attorneys' Fees Are Makeweight.**

With no real prospect for challenging the substantive terms of the settlement agreement or the process by which it was reached, Copeland and Hussain claim that the attorneys' fees here demonstrate unfairness and collusion.  The objection is meritless.

*a.  There is no agreement to hire plaintiffs' counsel.*  The stipulation of settlement originally submitted to the Court contemplated that HP would retain plaintiffs' counsel to assist HP in prosecuting affirmative claims, but the stipulation has *always* provided that the Court's approval of attorneys' fees was not a condition of the settlement.  The parties have executed an amended stipulation that eliminates the engagement letter and makes doubly clear that attorneys' fees are not a

1   condition of the settlement.  Amended and Restated Stipulation of Settlement §§ III, IX.D (Docket

2   #201).  Copeland and Hussain may be unwilling to accept this fact, Copeland II Br. 13; Hussain Br.

3   11-12, but it is undeniable.  Wolinsky Decl. ¶ 5.

4       *b.  There is no basis to question HP's agreement to pay attorneys' fees based on the reforms*

5   *in an amount to be determined by Judge Walker.*  The only fees that will be paid, if the Court

6   approves them, relate to plaintiffs' contribution to the governance reforms.  This is unremarkable.

7   Plaintiffs who contribute to the formulation of governance reforms have a claim for attorneys' fees.

8   *Feuer* v. *Thompson*, No. 12-cv-279-YGR, 2013 WL 2950667 at *2 (N.D. Cal. Jun. 14, 2013); *In re*

9   *Rambus Inc. Deriv. Litig.*, No. C 06-3513 JF (HRL), 2009 WL 166689, at *3 (N.D. Cal. 2009).

10  Here, Cotchett Pitre and Robbins Geller contributed to the governance revisions.  Their clients have

11  a claim for attorneys' fees.

12      The fact that the amount of the fee is being submitted to arbitration by Judge Walker is not,

13  as Hussain and Copeland would have it, a sign of collusion.  Quite the contrary, it is just a further

14  indication of the fact that the settlement was negotiated at arm's-length.[16]  There was never anything

15  "hidden" about the attorneys' fees, Hussain Br. 12, and there is nothing hidden now.

16      *c.  It is entirely proper for HP, rather than the defendants, to be paying the attorneys' fees.*

17  Copeland and Hussain assert that it is improper for the attorneys' fees here to be paid by HP as

18  opposed to the directors and officers.  Copeland II Br. 10-11; Hussain Br. 4.  But it has long been

19  settled that, "where shareholder litigation confers a substantial benefit upon a corporation and no

20  fund is available to pay for the fees and expenses of plaintiffs' counsel, it is appropriate for the

21  corporation to absorb the costs of plaintiffs' attorneys' fees and expenses."  *Chicago Milwaukee*

22  *Corp.* v. *Eisenberg*, 560 A.2d 489 (Del. 1989); *see also Kahan* v. *Rosensteil*, 424 F.2d 161, 167 (3d

23  Cir. 1970) ("[i]n derivative suits when a plaintiff sues corporate officers for breach of their fiduciary

24  duties, the corporation which benefits from the suit — not the directors charged with

25  mismanagement — is directed to pay" attorneys' fees.).  While HP may submit a claim to the

---

26

27  [16]  *See AT&T Mobility LLC* v. *Concepcion*, 131 S.Ct. 1740, 1745 (2011) (discussing the strong and "'liberal federal policy favoring arbitration'").

28

company's directors-and-officers insurers for the fees, there is nothing improper about HP paying the fees in the first instance.

> d. *The fees are severable*.  Finally, if the Court does have concerns about the attorneys' fees, it can consider those concerns (and the appropriate fees) at the final approval hearing.   The arbitration is ongoing.   The notice will be sent after the arbitration concludes and will advise shareholders of the amount of the award.   But in the end, the settlement is *not* contingent on the payment of attorneys' fees.   It can be approved even if no money is paid to plaintiffs' counsel.

*     *     *

In sum, the settlement would pass the test for *final* approval because it is eminently fair and reasonable to the corporation and its shareholders.   At this juncture, however, the only question is whether the settlement is susceptible to being approved or whether, instead, it suffers from a patent and fatal defect.  There is no such defect.  The settlement should be preliminarily approved.

## III.   THE NOTICE COMPLIES WITH APPLICABLE LAW.

Copeland says he seeks to challenge the proposed notice because it is inadequate.  Not so. The proposed notice, which will be published in a number of national publications, "'contain[s] a description of the … action and an explanation that approval of the proposed settlement'" would result in a release.  *Class Plaintiffs* v. *City of Seattle*, 955 F.2d 1268, 1293 (9th Cir. 1992).   In describing the release, the notice states in relevant part as follows:

> The Settlement Agreement, if approved, will result in a release of claims against HP's officers and directors (other than legacy Autonomy officer Michael R. Lynch) and an injunction and order barring the prosecution of all derivative claims arising out of or related to the facts and circumstances giving rise to the Federal Lawsuit and the State Lawsuits.

> The Settlement Agreement, all of its exhibits and the Court's order preliminarily approving the settlement (the "Preliminary Approval Order") can be found at www.___.com.

> [If the Settlement Agreement is approved], Plaintiff and all other holders of HP securities will release the individuals and entities identified as 'Releasees' consistent with the terms of the Release in the Agreement.

Amended and Restated Stipulation of Settlement Ex. B, at 3-4 (Docket #201).   Thus, it contains a plain-English description and refers shareholders to the stipulation of settlement, which is publicly

available and will be posted on HP's website.

It is well established that a notice "need not explain to [shareholders] all the consequences involved in [a] settlement" and can legitimately "tell[] the shareholders that the descriptions were 'only summaries' and the court files were open for inspection."  *Maher* v. *Zapata Corp.*, 714 F.2d 436, 452 (5th Cir. 1983).  This would "invite[] [shareholders] to conduct a further investigation, if they so desired, on the basis for, the background of, and the legal implications of the settlement." *Id.*; *see also Bacas* v. *Way*, No. 07-cv-456, 2008 WL 746825, at *2 (S.D. Tex. Mar. 20, 2008) (approving notice that gave general information and instructed shareholders "how to obtain a copy of" the settlement).

Copeland's second motion nonetheless asserts that this part of the proposed notice is "incomprehensible," "undecipherable," "confusing and contradictory."  Copeland II Br. 3, 11.  But he does not identify a single word that is difficult to understand.  *See In re AT&T Corp. Sec. Litig.*, No. 00-5364 (GEB), 2005 WL 6716404, at *4 n.2 (D. N.J. April 25, 2005) (rejecting challenge to notice of settlement where objector "fail[ed] to provide the Court with any evidence, argument or reasons supporting his assertion" that the notice was "'improper, vague, and unduly cumbersome and constitutes a violation of the United States Constitution'").  Instead, he says that a shareholder would have a difficult time understanding the release.  Copeland II Br. 3.

## IV.   COPELAND'S DISCOVERY REQUESTS SHOULD BE DENIED.

Copeland seeks discovery of five categories of documents to inform his objections, and he states that he needs the documents before preliminary approval.  The request fails at the threshold because Copeland has no basis to object before preliminary approval.  *Bank of Am.*, 2012 WL 1674299, at *2-3.  The requests should also be rejected as a substantive matter:

> ➢  Copeland's motion requests the documents that HP provided to shareholders under Section 220 of the Delaware corporation law.  Copeland II Br. 14.  But HP's counsel has already provided those very documents to Copeland, and did so a full day before Copeland filed his motion.  Wolinsky Decl. Ex. 17.

> ➢  Copeland requests an unredacted copy of the amended complaint filed in this action.

Copeland II Br. 14.  He never requested one from HP before filing his motion.  HP's counsel provided a copy after Copeland filed his untimely brief.  Wolinsky Decl. Ex. 18.

> Copeland requests access to the parts of the DRC's report that formed the basis for the board's judgment that HP's directors, officers, and advisors should be released from liability.  Copeland II Br. 14.  But as Copeland acknowledges in his brief, he was already "provided with certain material facts by counsel to the DRC … about the DRC's investigation and conclusions."  Copeland Br. 6 n.7.  Regardless, HP has already represented in open court that it would make the report available to those entitled to see it, and has already provided the DRC's resolution on the Court's public docket.

> Copeland requests access to information concerning the documents referenced in Judge Walker's declaration.  Again, Copeland never made this request before.  He also does not explain exactly what he wants or why he wants it.

> Copeland requests communications about the settlement.  It is well established, however, that "'[s]ettlement negotiations involve sensitive matters'" and, thus, that "'discovery [of settlement negotiations] is proper only where the party seeking it lays a foundation by adducing from other sources evidence indicating that the settlement may be collusive.'"  *Dusek* v. *Mattel Inc.*, 141 F. App'x 586, 588 (9th Cir. 2005).  Copeland has made no such showing here.

"While objectors are entitled to meaningful participation in the settlement proceedings, and leave to be heard, they are not automatically entitled to discovery or to question and debate every provision of the proposed compromise." *In re Wachovia Corp. Pick–A–Payment Mortgage Mktg. & Sales Practices Litig.*, No. CV 09-02015-JF (PSG), 2011 WL 1496342, at *1 (N.D. Cal. Apr. 20, 2011).  HP will work with potential objectors and provide them the discovery to which they are due, but HP will not subject itself to the very "wasteful and expensive" costs and burdens "that induce consensual settlements" in the first place. *See Officers for Justice* v. *Civil Serv. Comm'n of City & Cnty. of San Francisco*, 688 F.2d 615, 625 (9th Cir. 1982).  There is no basis for Copeland's broad

discovery requests, particularly at the preliminary approval stage.

## V.   HUSSAIN LACKS STANDING AND SHOULD BE DENIED DISCOVERY.

For all the reasons stated above, there is no basis to Hussain's motion to intervene.  But there are also additional reasons that Hussain lacks standing to challenge the settlement — whether as an intervenor or an objector — and the Court should so hold.

### A.   Hussain Has Failed To Satisfy The Basic Requirements Justifying Intervention.

As HP has pointed out, Hussain's motion should be denied because he failed to include a proposed pleading or to provide notice of the claims he wished to press or defenses he wished to interpose.  Fed. R. Civ. P. 24(c); *Beckman Indus., Inc.* v. *Int'l Ins. Co.*, 966 F.2d 470, 474-75 (9th Cir. 1992); *Kremen* v. *Cohen*, No. 5:11-CV-05411-LHK, 2012 WL 2919332, at *9 (N.D. Cal. Jul. 17, 2012).  Hussain's latest filing does not cure the defect.  He seeks to dismiss it as a technicality.

What Hussain has done, however, is to "deprive[] the Court of a basis for determining whether it has an independent basis … over [his] claims or defenses." *Id.*  Hussain's motion stands in stark contrast to those of bona fide shareholders who try to intervene — including Cook and Copeland.  Cook filed a derivative case in Delaware, while Copeland filed one here.  The basis for those intervention motions was apparent.  The motions fail for other reasons, but at least they provide HP and the Court with notice of the basis for the motions.  Hussain has not done this, and it is apparent that Hussain does not actually wish to press any claims.  What he wants to do is to obtain pre-suit discovery to which he is not entitled and to derail a settlement that is beneficial to HP.[17]

### B.   Hussain Lacks Standing To Intervene Or To Object As A Shareholder.

#### 1.   Hussain Has Not Demonstrated That He Is A Shareholder.

Regardless of whether Hussain meets the prerequisites for intervention, Hussain's attempt to

---

[17]   Hussain asserts that "HP welcomed [Ho] with open arms" when Ho sought to intervene.  Hussain Br. 8.  But Ho, like Cook and Copeland, had previously filed a derivative complaint.  Moreover, Ho sought to intervene for the sole pur-pose of seeking attorneys' fees.  Given that Ho was going to move for fees either in this Court or in California state court (where his derivative suit is pending), HP had no objection to letting Ho do so here (although HP would oppose the fee application), and indeed HP believed that this outcome would be in the interests of judicial efficiency.  Ho remains free to file any objection to the settlement as an objector, if he so desires.

challenge the settlement as a shareholder should be rejected out of hand.  Under Rule 23.1, only shareholders are entitled to object to a settlement.  Even at this late stage, Hussain has failed to provide any proof to support his claim that he is a shareholder, despite HP's requests that he do so.

### 2.    Hussain Is Adverse To The Corporation And Its Shareholders.

As HP pointed out in its August 4, 2014 opposition to Hussain's motion to intervene, shareholders with interests that are "hostile" to those of other shareholders or the corporation lack standing to object.  HP Opp. at 3 (quoting *Zarowitz* v. *BankAmerica Corp.*, 866 F.2d 1164, 1166 (9th Cir. 1989)); *see also* HP Br. 18-19.  Hussain has provided no contrary legal authority and has not disputed that he is adverse to HP.  Nor could he, given the indisputable facts that the HP board has resolved to sue him and that he is trying to fight back.  Hussain's interests are clearly "antagonistic to those [of the corporation and the shareholders he] is seeking to represent," and thus he lacks standing to object.  CHARLES ALAN WRIGHT, ARTHUR R. MILLER, MARY KAY KANE, RICHARD L. MARCUS, & ADAM N. STEINMAN, 7C FEDERAL PRACTICE AND PROCEDURE § 1833 (3d ed. 2014).

Hussain concedes that he "has filed [his] motion [to intervene] in service of his own interests,"[18] and asserts that he is "in a better position than others to intervene" given the adversity of his position.[19]  But the question here is *not* whether the settlement is "fair" to Hussain or whether there is some abstract interest "in getting to the bottom of what happened."[20]  The *only* question the Court will have to address at final approval is whether the settlement is fair to "the legitimate interests of the company [and] its shareholders."  *Daily Income Fund*, 464 U.S. at 532 n.7.  And Hussain has no standing to appear here to ensure that the settlement meets this standard.  Hussain's lawyers all but conceded that there was no precedent permitting him to object.[21]

Notwithstanding this, in various statements outside of the Court, Hussain and his former boss, Mike Lynch, have made a mighty effort to portray themselves as the champions of HP's

---

[18]   Hussain Reply Br. 2.
[19]   Hussain Br. 8.
[20]   Hussain Reply Br. 3.
[21]   8/25/14 Tr. 44.

1   interest.[22]  Hussain will no doubt try to repeat that effort in his reply papers.  The Court should have

2   none of it.

3         1.      Most telling is the fact that not one of Hussain's or Lynch's public statements have

4   ever justified how loss-making hardware revenues could be publicly reported as software revenues,

5   how sales to software users (like Tottenham Hotspurs  a soccer club) could be classified as royalty

6   payments from original equipment manufacturers (like Microsoft), or why long-term hosting

7   contracts were renegotiated so that Autonomy would receive deeply discounted lump-sum payments.

8   And on the subject of the phony Vatican Library deal, all Lynch and Hussain say is that Autonomy

9   and the Vatican were in negotiations at the time that Autonomy recognized $11 million of revenue

10  on a sale to MicroTech,[23] a reseller that the Vatican never heard of.[24]  Nothing in accounting or

11  common sense allows a company to recognize revenue on an uncompleted sale that is the subject of

12  ongoing negotiations and where there is no actual sale to the reseller.

13        2.      In the face of Hussain's December 10, 2010 email to Lynch expressing unmitigated

14  "panic" over Autonomy's failure to realize sales,[25] Hussain and Lynch offer the classic, lame excuse

15  that the email is taken out of context and that, in fact, Autonomy was "ahead of targets and, just two

16  weeks later, delivered record results."[26]  But the only way that Autonomy was able to make its

17  revenue targets for the fourth quarter of 2010 was by selling $35 million of computer hardware at a

18  loss, reporting those sales as software sales, and recognizing significant additional revenue on

19  improperly accelerated or non-existent VAR and roundtrip deals.  Without Hussain's customary end-

20  of-quarter financial engineering, Autonomy would not have come anywhere close to meeting its

21

22  [22]   Lynch et al., *Court Filed Document Raises Questions Over HP's Statements* (Sept. 11, 2014), available at
       http://autonomyaccounts.org/court-filed-document-raises-questions-over-hps-statements/; *see also* Karen Gullo, Amy

23     Thomson & Suzi Ring, *Autonomy CFO Said Sales Reps Maybe Chased 'Imaginary Deals,'* Bloomberg, Sept. 5, 2014;
       Juliette Garside, *HP Court Filing Claims Autonomy in 2010 Headed for Financial 'Plane Crash,'* The Guardian

24     (London), Sept. 5, 2014.

       [23]   Lynch et al., *Court Filed Document Raises Questions Over HP's Statements* (Sept. 11, 2014), available at
25     http://autonomyaccounts.org/court-filed-document-raises-questions-over-hps-statements/.

26     [24]   Exhibit 9 to Declaration of Marc Wolinsky dated September 4, 2014 (Docket #211-9).

       [25]   Exhibit 2 to Declaration of Marc Wolinsky dated September 4, 2014 (Docket #211-2).

27     [26]   Lynch et al., *Court Filed Document Raises Questions Over HP's Statements* (Sept. 11, 2014), available at
       http://autonomyaccounts.org/court-filed-document-raises-questions-over-hps-statements.

28

1    revenue for the fourth quarter of 2010 and its stock would have cratered.

2          3.      Again in the face of Husain's December 10 panic email, Lynch and Hussain say that

3    they "did [not] consider selling the company a necessity" in December 2010 — asserting that

4    "Qatalyst Partners, the bank that handled the sales process, was not engaged by Autonomy until June

5    2011."[27]  But just 12 days after Hussain sent his panicked email, Lynch and Qatalyst were already

6    discussing Qatalyst's fees,[28] and by January 2011 Qatalyst was already shopping Autonomy to

7    Oracle.[29]

8          4.      Lynch and Hussain say that some of the issues HP is now raising were discussed in

9    reports from Autonomy's former auditors at Deloitte UK to the Autonomy audit committee.[30]  What

10   Lynch and Hussain do not say, however, is that Autonomy's executives refused to share those

11   documents with HP before the acquisition.  They also do not say that Autonomy officials repeatedly

12   disregarded Deloitte UK's warnings about Autonomy's improper accounting practices and that

13   Deloitte UK abrogated its own duties by issuing unqualified opinions even though Autonomy

14   refused to come clean.

15         5.      Lynch and Hussain say that, *after* the acquisition closed, Autonomy and HP

16   executives had a number of communications about hardware sales, suggesting that there could not

17   have been a fraud because HP did not cry foul at that time.  The reason is that Lynch and Hussain

18   lied to HP about these sales.  One of the emails that Lynch has posted on his website shows that,

19   when HP asked questions about hardware sales after the acquisition, Autonomy executives said they

20   were legitimate sales to "strategic accounts."[31]  That claim was an outright lie.  As the DRC has

21   found, Autonomy executives sold pure hardware, without any software, and did so at a loss at the

22

23

24   [27] Lynch et al., *Court Filed Document Raises Questions Over HP's Statements* (Sept. 11, 2014), available at http://autonomyaccounts.org/court-filed-document-raises-questions-over-hps-statements/.

25   [28] Wolinsky Decl. Ex. 19.
     [29] http://www.oracle.com/us/corporate/features/autonomy-presentation-1-505952.pdf.

26   [30] Lynch et al., *Court Filed Document Raises Questions Over HP's Statements* (Sept. 11, 2014), available at http://autonomyaccounts.org/court-filed-document-raises-questions-over-hps-statements/.

27   [31] Lynch et al., *Court Filed Document Raises Questions Over HP's Statements* (Sept. 11, 2014), available at http://autonomyaccounts.org/court-filed-document-raises-questions-over-hps-statements/.

28

1  end of the quarter for the sole purpose of meeting revenue targets.[32]

2        6.     Lynch and Hussain have claimed that, regardless of what they did, HP's $8.8 billion

3  impairment charge is attributable only to the movement in HP's stock price and to the fact that HP

4  wrote down synergies by $5.3 billion (from its original, optimistic projection of $7.4 billion).[33]  This

5  contention is without merit.  HP's 2012 impairment analysis showed a $6 billion loss on

6  Autonomy's originally projected *standalone* value.[34]  This loss in value was the direct result of

7  Hussain's fraud.  As for the attendant synergies, it is disingenuous to suggest that the reduced

8  projections were the result of HP's over-optimism.  When HP decided to buy Autonomy, it of course

9  believed that the deal had tremendous potential and that, as Autonomy continued to grow,

10  Autonomy's growing revenue would generate incremental revenue at HP.  But HP did not know that

11  its synergy projections were based on fraudulent financials — financials that Hussain and Lynch

12  vouched for during the due diligence.[35]  Without the bogus deals, HP had much less to build on:  the

13  Autonomy business was smaller and slower-growing than had been represented.

14        In essence, the problem was "garbage in, garbage out."  No valuation model, no matter how

15  sophisticated, can produce accurate results if the inputs are based on fraudulent data.  And so, the

16  DRC quite appropriately concluded that "the documents reviewed and individuals interviewed did

17  not suggest that HP over-allocated the impairment charge to accounting and disclosure

18  improprieties."[36]

19       **C.**     **Hussain Still Has Not Established Any Formal Legal Prejudice, And Lacks
20  Standing To Object Based On Any Such Purported Prejudice.**

21        Hussain also has no standing to object to the settlement's purported "attempts to strip him of

22  his legal rights" via a bar on contribution claims, a bar that he claims is his "primary concern" in

23  objecting.  Hussain Br. 6.  English law does not recognize contribution claims in a suit for fraud.  HP

---

32  DRC Resolution at 36.
33  Lynch et al., *Court Filed Document Raises Questions Over HP's Statements* (Sept. 11, 2014), available at http://autonomyaccounts.org/court-filed-document-raises-questions-over-hps-statements/.
34  DRC Resolutions at 45.
35  DRC Resolution at 32.
36  DRC Resolution at 45.

Br. 22.  As a legal matter, the bar order cannot affect a legal right that Hussain does not have.  And although the settlement will bar whatever contribution claims he does have, the settlement also gives him a judgment credit worth the full value of those claims — whatever that value may be.  Consequently, there can be no prejudice at all, and no basis to object.

In what is now the third brief he has filed in support of intervention, Hussain still has no response.  Instead, the only assertion he makes to protect what he says is his "primary concern" appears in a footnote buried in the middle of his brief.  Citing the *HealthSouth* case, he implies, but does not quite bring himself to say, that the judgment credit is illusory because the defendants' "contribution [in the settlement] is <u>zero</u>."  Hussain Br. 6 n.10.

The argument is without merit.  The bar order in *HealthSouth* provided for a credit worth "'<u>the greater of</u> [1] settling defendant's proportionate liability <u>or</u> [2] the amount actually paid by the settling defendant.'"  *In re HealthSouth Corp. Sec. Litig.*, 572 F.3d 854, 857-58 (11th Cir. 2009) (emphasis added).  In that case, therefore, "the amount actually paid by the settling defendant" was relevant, and could increase the value of the judgment credit (in order to avoid double-recovery).  In this case, however, the judgment credit is worth exactly what Hussain would be entitled to receive if he were to prevail on a contribution claim — "a credit of an amount that corresponds to the percentage of responsibility of the applicable Releasee(s) for the loss to the Company or Autonomy."  Amended and Restated Stipulation of Settlement, Ex. C at 8; Ex. D at 4 (Docket #201).  The fact that the defendants here have paid no money is irrelevant.[37]

The bar order thus will cause Hussain no prejudice.  And even if it did, that prejudice would certainly not open the door to the broader objections he seeks to raise.  *In re Beef Indus. Antitrust Litig.*, 607 F. 2d 167, 172 (5th Cir. 1979) (legal prejudice does not empower "non-settling defendant" to challenge fairness of settlement); *In re Fine Paper Litig. State of Wash.*, 632 F.2d 1081, 1087-88 (3d Cir. 1980) (same).

---

[37]   There is also another reason why intervention is unnecessary for him to challenge the bar order.  The extinguishment of claims under the bar order is all "subject to a hearing to be held by the Court, if necessary."  Amended and Restated Stipulation of Settlement, Ex. C at 7-8; Ex. D 3-4 (Docket # 201).  That means nothing needs to be resolved today.

**D.     Hussain's Requests To Obtain Discovery And Submit Still More Briefing Are Meritless.**

Given that Hussain lacks standing to object and that his interests are opposed to HP's, Hussain's requests to obtain discovery and to participate in the settlement-approval process should be rejected.  In any event, Hussain does not need discovery to protect the only legal interest he identifies, his interest in challenging "the bar against any future contribution claims and the valueless 'judgment credit' HP claims protects him."  Hussain Br. 7.  That objection is a purely legal one.  He needs no documents from HP to assert it.  And with Hussain having taken three shots at the bar order, and with a fourth one coming in connection with preliminary approval, there is no reason to hold up this settlement so that Hussain can brief the same issue yet one more time.

## CONCLUSION

For the foregoing reasons, lead plaintiff's motion for preliminary approval of the proposed settlement should be granted.  The various motions to intervene and to sever should be denied.  The Court should further rule that Hussain lacks standing to object to the settlement and should deny Hussain's requests to obtain documents and to submit further briefing.

Dated:  September 17, 2014

WACHTELL, LIPTON, ROSEN & KATZ

By: _____

   Marc Wolinsky
   George T. Conway III
   Vincent G. Levy
   51 West 52nd Street
   New York, NY  10019
   Telephone:  (212) 403-1000
   Facsimile:  (212) 403-2000

FARELLA BRAUN & MARTEL, LLP
   Neil A. Goteiner
   235 Montgomery Street
   San Francisco, CA  94104
   Telephone:  (415) 954-4400
   Facsimile:  (415) 954-4480

*Attorneys for Defendant Hewlett-Packard Company*