IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE HEWLETT-PACKARD COMPANY SHAREHOLDER DERIVATIVE LITIGATION<br><br>THIS DOCUMENT RELATES TO:<br><br>ALL ACTIONS<br>_____/ | No. 3:12-cv-06003-CRB<br><br>**ORDER DENYING MOTION FOR PRELIMINARY APPROVAL OF SECOND AMENDED SETTLEMENT** |

      Lead Plaintiff Stanley Morrical, derivatively on behalf of Hewlett-Packard Company ("HP"), moves for Preliminary Approval (dkt. 149) of the parties' Second Amended and Restated Stipulation of Settlement ("Second Amended Settlement") (dkt. 242). The Second Amended Settlement ostensibly narrows the scope of the released claims by removing a list of examples both related and unrelated to the Autonomy acquisition. In its stead, the Second Amended Settlement proposes a two-part release, the first of which bars "all Autonomy-Related claims," and the second of which bars "all Known Claims arising from the allegations in the Complaints, that Settling Plaintiffs or any other Securities Holder asserted or could have asserted derivatively on behalf of the Company." Second Amend. Settlement ¶ 62. The first of these clauses represents a fair and reasonable resolution of derivative litigation related to the Autonomy acquisition, releasing as it does "all Autonomy-Related Claims." But the second clause is much broader, and could be construed to release a universe of claims whose scope and merit are impossible to determine at this juncture.

The allegations in the underlying *Morrical*, *Gould*, and *Noel* complaints reference a history acquisitions and conduct unrelated to Autonomy, ranging to HP's foreign-loan programs, share sales and repurchases, management hiring and compensation, and disclosures–in short, a potential release of unrelated claims that resembles the catch-all list that previously concerned this Court, with the added detriment of ambiguity that can only spawn further litigation about the scope of a settlement intended to quiet future legal action. The releases in the Second Amended Settlement lack a tether to the subject of this litigation, leaving it without clearly defined limits and defeating this Court's ability to determine that the Settlement is a fundamentally fair, adequate, and reasonable resolution of shareholder claims. Accordingly, the Court DENIES the motion for preliminary approval of the Second Amended Settlement.

## I. BACKGROUND

### A. The Autonomy Acquisition

This litigation stems from HP's failed acquisition of Autonomy, which resulted in a write-down of 85 percent of the $11.7 billion purchase price. Consol. Shareholder Compl. (dkt. 75) ¶ 2. HP is a publicly-traded technology company incorporated in Delaware and headquartered in Palo Alto, California. Comp. ¶ 32. Autonomy was a publicly-traded software company based in the United Kingdom and founded by individual defendant Michael R. Lynch in 1996. Id. ¶¶ 2, 75.

In September 2010, HP announced that it had hired Leo Apotheker as the new CEO. Id. ¶ 76. Four months after taking over as CEO, Apotheker announced that he intended to quickly "transform" HP from a hardware producer into a software and services provider. Id. ¶ 77.

In April 2011 Apotheker and Lynch met to discuss a possible acquisition of Autonomy. Id. ¶ 90. In May 2011, HP's Board approved Apotheker's proposal to look into the acquisition and hired Barclays Bank PLC and Perella Weinberg Partners to evaluate the possible deal. Id. 92. According to the Complaint, Apotheker aggressively pushed the acquisition on the Board over CFO and Executive Vice President Catherine A. Lesjak's objections. Id. ¶ 117. In July 2011, Apotheker and Lynch agreed to a deal-in-principal for HP's acquisition of Autonomy, and due diligence on the deal occurred between July 28 and August 18, 2011. On August 18, 2011, HP and Autonomy released a joint press release announcing the planned acquisition. Id. ¶ 11-12.

The day after the acquisition announcement, HP's stock price dropped by approximately 20 percent. This was the first day of the class period. In the weeks and months that followed, whistleblower allegations emerged that suggested HP had overpaid for Autonomy. Id. ¶¶ 235-237. Apotheker responded to the market's negative reaction at an investor conference by making assurances that HP had been "extremely tight and very professional" in evaluating the Autonomy deal. Id. ¶ 13.

On September 22, 2011, a week before the Autonomy deal closed, Margaret Whitman replaced Apotheker as CEO. Id. ¶ 201. Plaintiff alleges that Whitman and other HP executives sought to withdraw the offer to purchase Autonomy, but were told that the United Kingdom's takeover rules made this impossible. The Autonomy acquisition closed in October 2011.

After the transaction closed, HP began studying Autonomy's software revenue recognition practices to optimize for United States Generally Accepted Accounting Practices ("GAAP"). Id. ¶ 253. HP discovered that Autonomy's earnings and growth numbers were not what they had seemed, and that integrating Autonomy into HP did not result in the revenue or growth anticipated. Id. In an earnings conference call with investors in August 2012, Lesjak and Whitman attributed weak revenue numbers to business trends and touted HP's ability to leverage Autonomy as an integrated system. Id. ¶¶ 267-68.

In May 2012, a whistleblower, identified as a senior member of HP's Autonomy unit, came forward to raise concerns with HP's General Counsel about Autonomy's accounting improprieties. Id. ¶ 235. Whitman learned of the allegations and immediately authorized hiring PricewaterhouseCoopers LLP ("PwC") to conduct an investigation. Id. ¶ 253. While the investigation was still ongoing, HP reported that its software segment results were worsening and that it might record a goodwill impairment. Id. ¶¶ 262-68.

On November 20, 2012, HP announced the results of the PwC investigation. Id. ¶ 289. HP conceded that hundreds of million of dollars of Autonomy's pre-acquisition revenue had been improperly recorded, that key Autonomy documents were missing, and that HP had substantially overpaid for Autonomy. Id. ¶ 290. HP concluded that it had been the victim of a fraud in the Autonomy deal and wrote down 85 percent of the purchase price, a loss of approximately $8.8

3

billion.  Id.  HP's stock dropped another 12 percent on this news.  Id. ¶ 294.  This was the final day of the class period.

### B. Procedural Background

Litigation ensued, with numerous plaintiffs filing related shareholder derivative actions in 2012.  On February 21 and March 4, 2013, this Court consolidated three categories of cases: "derivative shareholder suits, nonderivative securities class actions, and ERISA suits" which all "share[d] common facts."  Order Consolidating Cases, Appointing Lead Plaintiffs, and Appointing Lead Counsel and Interim Lead Counsel (dkt. 65).  All the then-pending actions were "Demand Futile" suits in that the plaintiffs had not made a demand on the Board of Directors.  See Stip. (dkt. 61).

In response to the litigation, HP formed a Demand Review Committee ("DRC") in December 2012 to investigate the derivative claims.  Mot. to Sever (dkt. 143) at 2, 4 (citing Compl., Ex. 1.; Opp'n to Mot. to Sever (dkt. 147) at 3.  While the DRC evaluated the claims, the Court stayed the case pursuant to stipulations.  See Orders Staying Case (dkts. 87, 123).  In January 2014, HP reported to the Court that the DRC had presented its findings and recommendations to the Board of Directors and, on the basis of those recommendations, the Board of Directors made certain unspecified decisions.  See Status Report (dkt. 129) at 2.

HP and the Demand Futile Plaintiffs reached a proposed settlement agreement in front of Retired Chief Judge Vaughn R. Walker.  See generally Mot. for Prelim. Approval (dkt. 149-2); Walker Decl. (dkt. 149-1).  HP concurrently filed an Administrative Motion to File Under Seal certain corporate governance reforms it would enact as part of the settlement (dkt. 150).  Various parties moved to intervene to challenge the proposed settlement.  See Mot. to Intervene (dkts. 160, 172, 212).

At a hearing on August 25, 2014, the Court expressed concern over the breadth and vagueness of the proposed settlement's release clauses as well as the ambiguous severability of the attorney retention clauses from the rest of the agreement.  See Hearing Trans. (dkt. 199).  On September 3, the parties submitted a First Amended Settlement (dkt. 201).  After a hearing on September 26, 2014, but before the Court ruled on the Motion for Preliminary Approval of the

4

Amended Settlement, the parties filed the Second Amended Settlement now at issue.

## II.     LEGAL STANDARD

Federal Rule of Civil Procedure 23 governs a district court's analysis of the fairness of a settlement of a shareholder derivative action. Under Rule 23, a derivative action "may be settled, voluntarily dismissed, or compromised only with the court's approval." Fed. R. Civ. P. 23(e). The Court must determine whether the settlement is "fundamentally fair, adequate and reasonable." In re Rambus Inc. Derivative Litigation, No. c-06-3515-JF, 2009 WL 166689, at *2 (N.D. Cal. Jan. 20, 2009) (citing Fed. R. Civ. P. 23(e); Mego Financial Corp. Sec. Litig., 213 F.3d 454, 459 (9th Cir.2000); Officers for Justice v. Civil Service Commission, 688 F.2d 615, 625 (9th Cir.1982)). "The preliminary determination establishes an initial presumption of fairness." In re Tableware Antitrust Litig., 484 F. Supp. 2d 1078, 1079–80 (N.D. Cal. 2007) (citation omitted). The district court must balance a number of factors, including "the strength of the plaintiffs' case; the risk, expense, complexity, and likely duration of further litigation; . . . the amount offered in settlement; the extent of discovery completed and the stage of the proceedings; [and] the experience and views of counsel . . . ." Mego, 213 F.3d at 458 (citing Hanlon v. Chrysler Corp., 150 F.3d 1011, 1026 (9th Cir. 1998)).[1] "The relative degree of importance to be attached to any particular factor will depend on the unique circumstances of each case." Officers for Justice, 688 F.2d at 625. To determine whether a proposed settlement is "'within the range of possible approval,'" the Court also ensures it is "'not the product of fraud or overreaching by, or collusion between, the negotiating parties.'" In re NVIDIA Corp. Derivative Litigation, No. c-06-06110, 2008 WL 5382544, at *2 (N.D. Cal. Dec. 22, 2008) (quoting Officers for Justice, 688 F.2d at 625); see also Mego, 213 F.3d at 458.

## III.     DISCUSSION

As evident by its name, the Second Amended Settlement is one in a series of proposals to resolve derivative shareholder claims arising from the Autonomy acquisition. The First Amended Settlement altered the original proposed settlement by, among other things, removing references to

---

[1] These cases and factors address the approval of settlements in the class action context, but courts apply them also when reviewing proposed settlements in shareholder derivative suits. See, e.g., Rambus, 2009 WL 166689; see also 7C Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure: Civil 3D § 1839 at 195 (2014) ("[C]ases involving dismissal or compromise under Rule 23(e) of nonderivative class actions . . . are relevant by analogy" to derivative suits.)

5

the retention of Plaintiffs' counsel for future litigation and clarifying that no party may terminate the agreement based on any ruling by the Court on attorneys' fees or the Service Award.  As part of its terms, HP denies all wrongdoing, including with respect to its policies at the time of the Autonomy acquisition.  First Amend. Settlement at 3–4, 48.  The Amended Settlement "benefits the Company through further enhancement of the Company's merger and acquisition policies and procedures as set out in the Governance Revisions."  Id. at 36–37, ¶ 1.

Most importantly, the description of released claims as it appeared in the First Amended Settlement was broad and detailed, and extended much more broadly than liability related to the Autonomy acquisition.  Released claims explicitly included "conduct in connection with the [Autonomy] Acquisition" as well as a lengthy list of apparently unrelated claims, including "alleged violations of federal or state securities laws," "the Company's hiring and compensation of its officers and directors," "the Company's share repurchase program," "the Company's historical strategy for and implementation of acquisitions," "allegedly false or misleading proxy statements filed by the Company in 2013," "the Company's foreign loan program," and "the adequacy of and compliance with the Company's internal controls," among others.  First Amend. Settlement at 14–15.  This was followed by a non-exhaustive forty-nine-part list of examples of "Released Claims," which appeared to confirm that the Individual Defendants are released from violations both related and unrelated to the Autonomy acquisition.  Examples of released claims included: HP's "merger and acquisitions policies, practices, and procedures"; "alleged historical [] overpayment for acquisitions . . . including but not limited to the acquisitions of Autonomy and EDS"; Meg Whitman's compensation; anything related to the Board's 2011 authorization of $10 billion in share repurchases; HP's "hiring and compensation policies and practices"; "any allegedly false or misleading proxy statements filed by the Company in 2013"; and "any sales of [Individual Defendants'] personally held HP stock."  First Amend. Settlement at 16, 20–21.

After this Court expressed concerns about the extent to which the released claims appeared to go far beyond those related to the Autonomy acquisition, but before the Court ruled on preliminary approval, the parties amended again, and filed the Second Amended Settlement now at issue.  The most salient change in this Second Amended Settlement appeared in the provisions

6

related to the Released Claims. It now appears as follows:

> "Released Securities Holder/Company Claims" means all Autonomy-Related Claims, and all Known Claims arising from the allegations in the Complaints, that Settling Plaintiffs or any other Securities Holder asserted or could have asserted derivatively on behalf of the Company, or that the Company could have asserted directly in its own right, against any of the Releasees, as of, on or before the Final Settlement Date; provided, however, that Released Securities Holder/Company claims shall not include Non-Released Preserved Claims, Non-Released Pending Claim, and direct Claims that Settling Plaintiffs or any other Securities Holder might have against a Releasee (such as claims made in the Securities Class Action and the ERISA Class Action). Second Amend. Settlement ¶ 62.

Gone are the expansive definitions and long list of examples of released claims that are unrelated to the Autonomy Acquisition. But it does not appear to this Court that brevity of form was accompanied by brevity of substance. The shortened text belies the fact that an expansive reading of the second clause, which releases "Known Claims arising from the allegations in the Complaints," could encompass claims that extend far beyond the Autonomy acquisition, and the Court cannot be sure just how far. Indeed, HP's counsel acknowledged at the September 26 hearing that many of its unrelated releases that appeared in the prior proposed settlement can be connected to allegations in the various complaints because those complaints "put in issue" HP practices including the company's share repurchase program, the entire history of the company's acquisition strategy, the foreign-loan program, executive compensation and succession planning–in other words, much of the same breadth of releases unrelated to the Autonomy acquisition as appeared in the previous proposal.

Although there is a "strong judicial policy that favors settlements, particularly where complex class action litigation is concerned," Linney v. Cellular Alaska P'ship, 151 F.3d 1234, 1238 (9th Cir.1998), "[t]he purpose of Rule 23(e) is to protect the unnamed members of the class from unjust or unfair settlements affecting their rights," In re Syncor ERISA Litig., 516 F.3d 1095, 1100 (9th Cir.2008). Accordingly, this Court must deny preliminary approval if it appears that the settlement is not "fundamentally fair, adequate, and reasonable." See Nen Thio v. Genji, LLC, 14 F. Supp. 3d 1324, 1333 (N.D. Cal. 2014) (citing Torrisi v. Tucson Elec. Power Co., 8 F.3d 1370, 1375 (9th Cir.1993)). "In determining whether the proposed settlement meets this standard, the Court does not have the ability 'to delete, modify, or substitute certain provisions . . . . The settlement must stand or fall in its entirety.'" Id. (citing Torrisi, 8 F.3d at 1375).

7

The Court is unable to say that it is "fundamentally fair, adequate and reasonable" to release claims unrelated to the gravamen of this case, claims whose scope and potential merit–and therefore value to the shareholders–cannot possibly be determined at this juncture. See In re Rambus, 2009 WL 166689 (citing Fed. R. Civ. P. 23(e)); Mego Financial Corp., 213 F.3d at 459; Officers for Justice, 688 F.2d at 625. HP admits that the second clause of the release discharges claims that are not related to the Autonomy acquisition, to the extent that those claims "could be stated based on the allegations" in the various underlying complaints. See Submission re Second Amend. Settlement (dkt. 243) at 5. But the scope of the potentially released claims could be staggering, as the *Morrical*, *Noel*, and *Gould* complaints include facts that run the temporal and substantive gamut of HP's history and practices. See, e.g., Morrical Complaint ¶¶ 3-4, 61-63, 66-74, 282; Gould Complaint ¶¶ 29-30; Noel Complaint ¶¶ 33-34.

"[A] federal court may release not only those claims alleged in the complaint, but also a claim 'based on the identical factual predicate as that underlying the claims in the settled class action." Reyn's Pasta Bella, LLC v. Visa USA, Inc., 442 F.3d 741, 748 (9th Cir. 2006) (quoting Class Plaintiffs v. City of Seattle, 955 F.2d 1268, 1287-89 (9th Cir.1992)); see also Cancilla v. Ecolab Inc., No. 12-cv-03001-CRB, 2014 WL 2943237, at *7 (N.D. Cal. June 30, 2014) (same). Thus, a court may approve releases that bar claims "ar[ising] from the same common nucleus of operative fact" alleged in the settled action. See Class Plaintiffs, 955 F.2d at 1288. And the Ninth Circuit has enforced a release that "bar[red] claims that 'ar[o]se out of or [we]re related to the matters referred to' in the complaint" that had been settled. Howard v. America Online Inc., 208 F. 3d 741, 747 (9th Cir. 2000) (quoting release). But the Released Claims at issue here are altogether different in that they share no orbit with the Autonomy nucleus of operative facts. Instead, the shareholders appear to be relinquishing a whole universe of potential claims regarding HP governance and practices with no factual predicates that overlap the Autonomy acquisition–the subject of this litigation.

The unknown scope and potential value of released claims leaves this Court unable to determine "the strength of the plaintiffs' case" and whether the "amount offered in settlement" is fairly and reasonably commensurate. See Mego, 213 F.3d at 458 (citing Hanlon v. Chrysler Corp.,

150 F.3d 1011, 1026 (9th Cir. 1998). In exchange for their release of claims, HP shareholders receive the benefit of certain corporate governance reforms that have already been instituted–although, as HP admits, the "nature and extent and depth of the fraud that was committed on HP" makes it doubtful that "changing the process really would have resulted in . . . something different" in the Autonomy acquisition, see Submission re Approval Schedule (dkt. 233) at Ex. A p.62:3-13, and therefore these reforms may have little or no value in relation to the allegations in the complaint. "In theory, settlement of the derivative suit should benefit the current shareholders." In re Oracle Securities Litigation, 829 F. Supp. 1176, 1184 (N.D. Cal. 1993) (denying approval of a proposed settlement in a shareholder derivative action). But as it now stands, the Second Amended Settlement "confers a substantial benefit on the individual defendants and derivative plaintiffs' counsel," a benefit whose magnitude remains impossible to ascertain, while "the brunt of the derivative settlement" falls upon HP and its shareholders—the allegedly aggrieved parties. See In re Oracle, 829 F. Supp. at 1184–85. In the end, the Court must return to the guiding principles of Federal Rule of Civil Procedure 23(e), and is unable to give this proposed settlement an imprimatur of fairness and reasonableness.

## IV. CONCLUSION

In light of the unresolved vagueness and breadth of the releases in the Second Amended Settlement, and therefore the parties' abdication of their responsibility to satisfy this Court that HP and its shareholders have received adequate consideration, the motion for preliminary approval of the Second Amended Settlement is DENIED. All pending motions whose relevance depended on preliminary approval of the proposed settlement are hereby DENIED AS MOOT.

**IT IS SO ORDERED.**

Dated: December 19, 2014

CHARLES R. BREYER
UNITED STATES DISTRICT JUDGE