1  WACHTELL, LIPTON, ROSEN & KATZ
   MARC WOLINSKY (*pro hac vice*)
2  GEORGE T. CONWAY III (*pro hac vice*)
   VINCENT G. LEVY (*pro hac vice*)
3  51 West 52nd Street
   New York, NY  10019
4  Tel./Fax:  212.403.1000/2000
   MWolinsky@wlrk.com
5  GTConway@wlrk.com
   VGLevy@wlrk.com
6
   FARELLA, BRAUN & MARTEL, LLP
7  NEIL A. GOTEINER, State Bar No. 83524
   235 Montgomery Street, 17th Floor
8  San Francisco, CA  94104
   Tel./Fax:  415.954.4400/4480
9  NGoteiner@fbm.com
   Attorneys for Defendant
10 HEWLETT PACKARD COMPANY

11
   IN THE UNITED STATES DISTRICT COURT
12
   FOR THE NORTHERN DISTRICT OF CALIFORNIA
13

14
   | IN RE HP SHAREHOLDER DERIVATIVE LITIGATION | Master File No. C-12-6003 CRB |

15

16 This Document Relates to:  All Actions

17

18

19

20

21

22

23

24

25

26

27

28

|  | Master File No. C-12-6003 CRB |
|---|---|
|  | **HEWLETT PACKARD COMPANY'S REPLY MEMORANDUM IN SUPPORT OF PRELIMINARY APPROVAL OF THE THIRD AMENDED AND RESTATED STIPULATION OF SETTLEMENT** |
|  | Dept.:  Courtroom 6, 17th Floor<br>Judge:  Hon. Charles R. Breyer |

# TABLE OF CONTENTS

Page

SUMMARY OF ARGUMENT ...........................................................................................i

ARGUMENT ....................................................................................................................1

I.     THE COURT SHOULD APPROVE THE SETTLEMENT. ...........................................1

       A.     The Release Is Appropriate. ....................................................................1

              1.     The Release Is Properly Circumscribed. ......................................1

              2.     The Claims Being Released Are Extremely Weak. .......................1

       B.     The Settlement Consideration Is Significant.............................................5

       C.     The Notice Is Fair And Appropriate. ......................................................11

       D.     There Is No Basis For Intervention. ........................................................13

II.    THE COURT SHOULD DENY HUSSAIN'S INTERVENTION MOTION..................14

       A.     If The Settlement Is Approved, It Will Not Prejudice Hussain. ...........14

       B.     Hussain's Substantive Attack Fails.........................................................16

CONCLUSION................................................................................................................19

# TABLE OF AUTHORITIES

**Cases** <span style="float:right">Page</span>

*Arace* v. *Thompson*,
2011 WL 3627716 (S.D.N.Y. Aug. 17, 2011) ................................................. 11-12

*Aronson* v. *Lewis*,
473 A.2d 805 (Del. 1984) ......................................................................... 2

*Athale* v. *Sinotech Energy Ltd.*,
2013 WL 2145588 (S.D.N.Y. May 16, 2013) ...................................... 13 n.17

*Beckman Indus., Inc.* v. *Int'l Ins. Co.*,
966 F.2d 470 (9th Cir. 1992) .................................................................. 14

*Brehm* v. *Eisner*,
746 A.2d 244, 261 (Del. 2000) ............................................................... 3

*Bushansky* v. *Armacost*,
2014 WL 2905143 (N.D. Cal. June 25, 2014) ......................................... 12

*Class Plaintiffs* v. *City of Seattle*,
955 F.2d 1268 (9th Cir. 1992) .......................................................... 1, 11

*Daily Income Fund, Inc.* v. *Fox*,
464 U.S. 523 (1984) ............................................................................... 16

*Davis* v. *J.P. Morgan Chase & Co.*,
775 F. Supp. 2d 601 (W.D.N.Y. 2011) ............................................. 13 n.17

*Geber* v. *MTC Elec. Techs. Co., Ltd.*,
329 F.3d 297 (2d Cir. 2003) ........................................ iv, 14, 15 n.20, 16

*Goldman* v. *Northrop Corp.*,
603 F.2d 106 (9th Cir. 1979) .......................................................... ii, 6

*Grunin* v. *Int'l House of Pancakes*,
513 F.2d 114 (1975) ...................................................................... 13 n.16

*Higginbotham* v. *Baxter Int'l Inc.*,
495 F.3d 753 (7th Cir. 2007) ................................................................. 8

*Hill* v. *State Street Corp.*,
2015 WL 127728 (D. Mass. Jan. 8, 2015) ............................................. 12

*In re Atmel Corp. Deriv. Litig.*,
2010 WL 9525643 (N.D. Cal. Mar. 31, 2010) .................................. 14 n.18

*In re Atheros Commc'ns, Inc.*,
2011 WL 864928 (Del Ch. Mar. 4, 2011) ............................................... 8

*In re Bank of Am. Corp. Sec., Deriv. & ERISA Litig.*,
2012 WL 1674299 (S.D.N.Y. May 14, 2012) ................................... 13 n.17

*In re BankAm. Corp. Sec. Litig.*,
   210 F.R.D. 694 (E.D. Mo. 2002) ............................................................................ 13 n.15

*In re Citigroup Inc. S'holder Deriv. Litig.*,
   964 A.2d 106 (Del. Ch. 2009) ............................................................................................ 3

*In re Consolidated Pinnacle West Sec. Litig.*,
   51 F.3d 194 (9th Cir. 1995) ................................................................................... 14 n.18

*In re First Alliance Mortg. Co.*,
   471 F.3d 977 (9th Cir. 2006) ................................................................................. 14 n.18

*In re HealthSouth Corp. Sec. Litig.*,
   572 F.3d 854 (11th Cir. 2009) ...................................................................... 15, 15 n.19

*In re Mobile Commc'ns Corp. of Am., Inc., Consol. Litig.*,
   1991 WL 1392 (Del. Ch. Jan. 7, 1991) ............................................................... ii n.1, 9

*In re Motor Fuel Temperature Sales Practices Litig.*,
   2011 WL 5331678 (D. Kan. Nov. 4, 2011) ......................................................... 13 n.17

*In re Oracle Sec. Litig.*,
   852 F. Supp. 1437 (N.D. Cal. 1994) ......................................................................... ii, 6

*In re Walt Disney Co. Deriv. Litig.*,
   907 A.2d 693 (Del. Ch. 2005) .................................................................................. 4 n.4

*Kaplan* v. *Rand*,
   192 F.3d 60 (2d Cir. 1999) ...................................................................................... 13 n.17

*Kremen* v. *Cohen*,
   2012 WL 2919332 (N.D. Cal. Jul. 17, 2012) .................................................................. 14

*Linney* v. *Cellular Alaska P'ship*,
   151 F.3d 1234 (9th Cir. 1998) .......................................................................................... 1

*Maher* v. *Zapata Corp.*,
   714 F.2d 436 (5th Cir. 1983) ................................................................................... passim

*Marshall* v. *Holiday Magic, Inc.*,
   550 F.2d 1173 (9th Cir. 1977) ............................................................................... 13 n.14

*Metro. Life Ins. Co.* v. *Tremont Grp. Holdings, Inc.*,
   2012 WL 6632681 (Del. Ch. Dec. 20, 2012) ................................................................... 4

*Midland Grange No. 27 Patrons of Husbandry* v. *Walls*,
   2008 WL 616239 (Del. Ch. Feb. 28, 2008) ................................................................ 3-4

*Mullane* v. *Central Hanover Bank & Trust Co.*,
   339 U.S. 306 (1950) ......................................................................................................... 11

*Petrovic* v. *Amoco Oil Co.*,
   200 F.3d 1140 (8th Cir. 1999) ........................................................................................ 12

*Polk* v. *Good*,
   507 A.2d 531 (Del. 1986) ................................................................. ii n.1, 9, 10, 10 n.10

*Revlon, Inc.* v. *MacAndrews & Forbes Holdings, Inc.*,
    506 A.2d 173 (Del. 1986) ........................................................................ 3

*Scattered Corp.* v. *Chicago Stock Exch.*,
    701 A.2d 70 (Del. 1997) ........................................................................ i, 2

*Singer* v. *Olympia Brewing Co.*,
    878 F.2d 596 (2d Cir. 1989)............................................................ 15 n.20

*Solash* v. *Telex Corp.*,
    1988 WL 3587 (Del. Ch. Jan. 19, 1988) ................................................ 4

*Spiegel* v. *Buntrock*,
    571 A.2d 767 (Del. 1990) ....................................................................... i, 2

*Stone* v. *Ritter*,
    911 A.2d 362 (Del. 2006) ........................................................................ 3

*Torrisi* v. *Tucson Elec. Power Co.*,
    8 F.3d 1370 (9th Cir. 1993) ............................................................ 13 n.14

*UAW* v. *Gen. Motors Corp.*,
    2006 WL 334283 (E.D. Mich. Feb. 13, 2006) ................................ 13 n.17

*Waller* v. *Fin. Corp. of Am.*,
    828 F.2d 579 (9th Cir. 1987).......................................................... iv, 14

*Zapata Corp.* v. *Maldonado*,
    430 A.2d 779 (Del. 1981) ........................................................................ 2

*Zarowitz* v. *BankAmerica Corp.*,
    866 F.2d 1164 (9th Cir. 1989).......................................................... 16 n.21

**Rules and Statutes**

15 U.S.C. § 78u-4(f)(7) ............................................................................iv, 14

15 U.S.C. § 78u-4(f)(7)(A) ........................................................................... 15

8 DEL. C. § 102(b)(7) ...................................................................................... 3

8 DEL. C. § 141(e) .......................................................................................... 3

Fed. R. Civ. P. 23.1(c)................................................................................... 12

Fed. R. Civ. P. 24(c)...................................................................................... 14

**Other Authorities**

Charles Alan Wright, Arthur R. Miller, Mary Kay Kane,
    Richard L. Marcus, and Adam N. Steinman,
    Federal Practice and Procedure § 1768 (3d ed. 2014) ................... 16 n.21

**TABLE OF CITATIONS**

Akerman Br.                  Morris Akerman's Submission Pursuant to Order
                             Directing Interested Parties to Serve and File Views
                             Regarding Settlement (Docket #295)

Akerman Reply Br.            Reply Memorandum of Points and Authorities in
                             Further Support of Motion for an Order: (1)
                             Vacating the Order Appointing Derivative Lead
                             Plaintiff and Lead Counsel, and (2) Setting a
                             Briefing Schedule for the Filing of New Motions to
                             Appoint Derivative Lead Plaintiff and Lead Counsel
                             (Docket #282)

Cook Br.                     Rodney J. Cook's Statement in Response to the
                             Court's January 23, 2015 Order (Docket #294)

Copeland Br.                 Proposed Intervenor Copeland's Brief in Opposition
                             to Motion for Preliminary Approval of Third
                             Amended and Restated Stipulation of Settlement
                             (Docket #290)

DRC Resolution               Exhibit 1 to Declaration of Marc Wolinsky dated
                             September 4, 2014 (Docket #211-1)

Hussain Br.                  Sushovan Hussain's Response to the Parties' Fourth
                             Proposed Settlement; Renewed Motion to Intervene
                             (Docket #293)

Order                        Order Denying Motion for Preliminary Approval for
                             Second Amended Settlement (Docket #265)

Steinberg Br.                The Steinberg Plaintiffs' Memorandum in
                             Opposition to the Fourth Proposed Settlement
                             (Docket #296)

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## SUMMARY OF ARGUMENT

The parties have now completely struck the clause of the release that the Court believed to be overbroad.  The revised settlement proposes to release only "Autonomy-Related Claims," and accordingly, as this Court found, "represents a fair and reasonable resolution of derivative litigation related to the Autonomy acquisition."  December 19, 2014 Order ("Order") (Docket #265) at 1.  The HP board has unanimously determined that the revised settlement is in the best interests of HP and its shareholders.  The Court should therefore preliminarily approve the settlement and deny the various motions to intervene.

1.    *The Court Should Approve The Settlement*.  To begin with, the claims being released are extremely weak.  The DRC concluded that they lack merit and that their prosecution would not serve the interests of HP or its shareholders.  To challenge that conclusion, the objectors would have to adduce particularized facts, without discovery, showing that the DRC's investigation was unreasonable or conducted in bad faith.  *Spiegel* v. *Buntrock*, 571 A.2d 767, 771, 774 (Del. 1990); *Scattered Corp.* v. *Chicago Stock Exch.*, 701 A.2d 70, 77 (Del. 1997).  Not one of the objectors has remotely carried this burden.  The result is that if the settlement is not approved, the likelihood is that the claims that have been asserted would be dismissed.

Equally significant, the settlement has and will substantially benefit HP and its shareholders.  Pursuant to the agreement, HP has implemented meaningful M&A reforms and, subject to requested Court approval, HP will cause the new spin-off company ("SpinCo") to implement these reforms as well.  The plaintiffs, HP's board, and Judge Walker have all concluded that the reforms will confer a material benefit upon HP and its shareholders.

And the settlement, if approved, will permit HP's board to "avoid any further legal expense" in this case and "take its management out of the courtroom and restore them fulltime to the corporate board room and business."  *Maher* v. *Zapata Corp.*, 714 F.2d 436, 467 (5th Cir. 1983) (internal quotation marks and citation omitted).

The settlement therefore provides significant benefits to HP in enhancing HP's M&A procedures and eliminating the burden, expense, and distraction of litigation over the weak claims that are being released.  And in a derivative suit, "the effects of the suit on the functioning of the corporation may have a substantially greater economic impact on it, both long- and short-term,

1  than the dollar amount of any likely judgment in its favor in the particular action." *Id.* at 461; *see*

2  *also Goldman* v. *Northrop Corp.*, 603 F.2d 106, 109 (9th Cir. 1979) ("Instead of choosing the

3  course of securing the greatest possible money judgment from the Northrop officers, the parties

4  and the court chose the course of terminating litigation and taking steps to assure that such

5  conduct as had been disclosed could not occur in the future."); *In re Oracle Sec. Litig.*, 852 F.

6  Supp. 1437, 1444 (N.D. Cal. 1994) (approving derivative settlement because, among other things,

7  "the best interests of Oracle's shareholders are served by allowing [the defendants] to devote

8  themselves to Oracle's business affairs rather than distracting them with further litigation").

9        In the face of the authority establishing that the settlement should be approved, the

10  objectors continue to raise a mishmash of objections. None has merit:

11       ➢ The objectors dispute that the plaintiffs had a hand in formulating the reforms. But

12         Judge Walker found that "the derivative actions filed by the Cotchett and Robbins

13         Geller firms and their work on this litigation were instrumental in identifying the

14         need for, devising and implementing valuable corporate governance reforms."

15         Docket #233-1 (Arbitration Decision on Application for Attorney Fees) at 11. The

16         objectors offer no basis for second-guessing this conclusion.

17       ➢ The objectors complain again that HP's board adopted the reforms before the

18         Court approved the settlement. But "there is no rule that absolutely requires

19         [parties to] await court approval" before "effectuat[ing] part or all of a

20         settlement."[1] It would have made no sense for HP to await Court approval before

21         implementing the reforms. And HP's commitment to cause SpinCo to adopt the

22         reforms (subject to Court approval of the settlement) should, in any event, dispose

23         of this meritless objection.

24  

---

25  [1]    *In re Mobile Commc'ns Corp. of Am., Inc., Consol. Litig.*, 1991 WL 1392, at *13 (Del.
Ch. Jan. 7, 1991); *see also Maher*, 714 F.2d at 454 (approving derivative settlement because
26  "lawsuit was at least a contributing factor in several major beneficial changes" to corporation);
*Polk* v. *Good*, 507 A.2d 531, 538 (Del. 1986) (there is consideration so long as a substantial
27  benefit to the corporation is "causally related to the [derivative] lawsuit," even if the benefit
precedes the settlement).

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

> ➤ The objectors question the value of the reforms.  Again, both the HP board and Judge Walker have determined that the reforms are valuable.  There is no substance to the objectors' second-guessing of that judgment.

> ➤ The objectors raise a laundry list of supposed concerns with the form and manner of notice.  The precedents uniformly reject the premise of those objections.

In the end, the shareholder objectors have no hook on which to hang their continued complaints.  Grasping at straws, they question when HP intends to sue former Autonomy CEO Michael R. Lynch and former Autonomy CFO Sushovan Hussain.  If they had bothered to inquire, they would have learned that the litigation process is underway, and that the complaints against the architects of the fraud at Autonomy, as well as the complaint against Deloitte U.K., will, absent settlement, be filed in England following the expiration of the prescribed pre-action protocol period, in accordance with English law.  That is why Hussain asserts obliquely that "[i]t is now clearer than ever that Mr. Hussain will need to prepare and file counter- and cross-claims . . . ."  Docket #293 (Hussain Br.) at 5.

Akerman, Cook, Copeland, and Steinberg also point to the headlines that followed the recent decision of the Serious Fraud Office ("SFO") to drop its investigation into the fraud at Autonomy.  The Court may ask itself why Hussain, who is anything but shy, makes no such claim.  The reason is that he knows, perhaps better than anyone else, that his conduct continues to be the focus of intense scrutiny by the U.S. Government.  Rather than end the investigation into the conduct of Hussain (and his accomplice, Michael Lynch), the SFO "ceded [jurisdiction] to the US authorities whose investigation is ongoing."[2]  The SFO's decision thus reflects a recognition that further investigation is required, and that U.S. authorities are best positioned to pursue that investigation and any resulting proceedings.  HP continues to cooperate with SEC and DOJ officials to support their investigations, which are ongoing.

---

[2]     Press Release, *Serious Fraud Office* (Jan. 19, 2015), *available* at http://www.sfo.gov.uk/ press-room/latest-press-releases/press-releases-2015/hp-autonomy-investigation.aspx.

2.   *The Court Should Also Deny Hussain's Motion To Intervene.*   Hussain has renewed his motion to intervene in order to challenge the bar order after preliminary approval. To intervene, however, Hussain must show "formal legal prejudice." *Waller* v. *Fin. Corp. of Am.*, 828 F.2d 579, 583 (9th Cir. 1987).  He is unable to do so.  To begin with, Hussain's assertion that the bar order enjoins all cross- and counter-claims is just plain wrong.  The bar order would only prohibit Hussain from bringing contribution claims.  And it would provide Hussain a judgment credit worth the full value of those claims.  That "judgment credit" defeats any claim of prejudice because it "adequately compensates [Hussain] for [his] indemnity and contribution claims." *Geber* v. *MTC Elec. Techs. Co., Ltd.*, 329 F.3d 297, 306 (2d Cir. 2003) (Sotomayor, J.).  As a result, courts routinely approve bar orders like the one in this settlement.  In fact, if this case were a securities class action, the PSLRA would *require* the Court to enter a bar order much like the one proposed here.  15 U.S.C. § 78u-4(f)(7).

Although Hussain's motion to intervene does not challenge the settlement (other than the bar order), he repeats his transparent tactic to usurp the settlement-approval process for his own personal ends.  He previously sought to use this action to obtain discovery from HP.  Having now received it as part of the pre-action process that has been instituted in England, he has dropped the discovery demand.  But he continues to use a court filing as his soap box to profess his innocence and to assert that "HP and the Individual Defendants" have "caused damage to Mr. Hussain." Hussain Br. 6.

This is a derivative suit brought on HP's behalf.  It is not the forum for Hussain to plead his case.  Hussain will have ample opportunity to make whatever argument he wishes in the civil proceedings initiated in England and in any criminal or regulatory proceeding launched against him in the United States.  His suggestion that he must be permitted to intervene to assure that nothing will be "swe[pt] . . . under the rug" or "shield[ed] . . . from further, much needed scrutiny" is laughable.  Hussain Br. 6.  Hussain is one of the last people in the world that this Court should be looking to vindicate HP's interests.

**ARGUMENT**

**I.    THE COURT SHOULD APPROVE THE SETTLEMENT.**

"[T]here is a 'strong judicial policy that favors settlements, particularly where complex class action [or derivative] litigation is concerned.'"   Order at 7 (quoting *Linney* v. *Cellular Alaska P'ship*, 151 F.3d 1234, 1238 (9th Cir. 1998)).   In evaluating the fairness of a settlement, the Court will consider, among other things, "the strength of the plaintiffs' case; the risk, expense, complexity, and likely duration of further litigation; . . . the amount offered in settlement; the extent of discovery completed and the stage of the proceedings; [and] the experience and views of counsel."   *Id.* at 5 (alterations in original) (internal quotation marks omitted).   All of these factors favor preliminary approval here.

**A.  The Release Is Appropriate.**

**1.    The Release Is Properly Circumscribed.**

The parties have now struck the portion of the release that the Court disapproved.   The revised settlement proposes to release all Autonomy-Related Claims and no others.   And so, as the Court put it, what remains is "a fair and reasonable resolution of derivative litigation related to the Autonomy acquisition."   Order at 1.   The Autonomy-Related Claims "'ar[ise] from the same common nucleus of operative fact' alleged in the settled action" and thus may properly be released by this settlement.   Order at 8 (quoting *Class Plaintiffs* v. *City of Seattle*, 955 F.2d 1268, 1288 (9th Cir. 1992)).   There is accordingly no basis to question the scope of the release.[3]

**2.    The Claims Being Released Are Extremely Weak.**

As HP has explained, the settlement is appropriate because the claims being released are extremely weak.   The DRC and the HP board — both of which were indisputably independent —

---

[3]    Akerman continues to assert that the release remains overbroad, but all the examples he provides consist of claims based on Autonomy-related allegations asserted in the complaints.  *See* Docket #282 (Akerman Reply Br.) at 6-8.  Meanwhile, Copeland's argument that the proposed settlement would release claims asserted in *Copeland I* (Copeland Br. 8-9) is just wrong, as HP has explained numerous times; the settlement has always carved out those claims.  Docket #224 (HP Reply Br. in Support of Stipulation) at 6; Docket #277-1 (Third Amended and Restated Stipulation of Settlement) at 13, 37-38.

1   have concluded that the released claims are subject to outright dismissal, and that it is not in the

2   interests of the company for the claims to be asserted on the company's behalf.  As a result, were

3   this case litigated, HP would move to dismiss the case on the ground that its board has determined

4   not to prosecute the case.

5           And under Delaware law, the Court would be required to review the board's

6   determination under the business judgment rule, under which the board's determination must be

7   presumed to have been made "on an informed basis, in good faith and in the honest belief that the

8   action taken was in the best interests of the company." *Spiegel* v. *Buntrock*, 571 A.2d 767, 774

9   (Del. 1990); *Aronson* v. *Lewis*, 473 A.2d 805, 811-12 (Del. 1984).  In response, the derivative

10  plaintiffs would bear the burden of coming forward with particularized facts to rebut that

11  presumption, which they would have to do without discovery.  *Scattered Corp.* v. *Chicago Stock*

12  *Exch., Inc.*, 701 A.2d 70, 77 (Del. 1997).  The strong presumption of good faith, and the heavy

13  burden imposed on plaintiffs who seek to overcome it, reflects substantive Delaware law — law

14  that vests corporate boards rather than stockholders with the power to decide whether and whom

15  the corporation should sue, and requires courts to defer to business judgments of directors when

16  they exercise this statutorily granted power.  *Aronson*, 473 A.2d at 811-12.

17          **1.**   In the face of this well-settled precedent, Copeland and Steinberg rely on a line of

18  cases beginning with *Zapata Corp.* v. *Maldonado*, 430 A.2d 779 (Del. 1981), to suggest that HP

19  has the burden to demonstrate that the DRC's investigation was thorough.  *See* Docket #290

20  (Copeland Br.) at 3-4; Docket #296 (Steinberg Br.) at 3-4.  Those cases are inapposite; as HP has

21  already explained, *Zapata* applies only when a shareholder demand is *excused* because a majority

22  of the board lacks independence.  *Spiegel*, 571 A.2d at 778; Docket #229 (HP Mem. in Opp. to

23  Steinberg) at 3-5.  But this case involves precisely the opposite circumstance:  demand was

24  *required* because a majority of the board was independent — a fact that both Copeland and

25  Steinberg have conceded by making pre-action demands on the board.  *Spiegel*, 571 A.2d at 777.

26  As a result, the opposite legal regime governs:  the business judgment rule, not *Zapata*.  And

27  under the business judgment rule, it is the shareholder's burden to come forward with

28  particularized facts impugning the board's decision-making process.  *Id.* at 777.  None of the

objectors has even attempted to do this.  The objectors' arguments therefore fail as a matter of law.

      **2.**   But even apart from the standard of review governing the board's decision not to prosecute this case, the objectors' arguments against the DRC's conclusions fail on their own terms.  As HP previously explained, there is no merit to the assertion that the company has valuable claims against HP's officers and directors.  Steinberg Br. 5.  Not one of the objectors even tries to grapple with the well-established principles of Delaware law that "insulate directors and management from personal liability for [mere] business decisions," which is all that this lawsuit is about.  *Revlon, Inc.* v. *MacAndrews & Forbes Holdings, Inc.*, 506 A.2d 173, 180 n.10 (Del. 1986); *see also In re Citigroup Inc. S'holder Deriv. Litig.*, 964 A.2d 106, 139 (Del. Ch. 2009) (Delaware law strives to encourage "directors and managers . . . to maximize shareholder value in the long term by taking risks without the debilitating fear that they will be held personally liable if the company experiences losses.").

      Thus, any claim against the directors here is bound to fail.  As permitted by Section 102(b)(7) of the Delaware General Corporation Law, HP's corporate charter contains an exculpation provision that effectively bars claims against directors based on the duty of care.  Accordingly, to recover from the directors on the claims asserted here, plaintiff (or HP) would have to prove that the directors breached their duty of loyalty.  Moreover, under Section 141(e) of the Delaware statute, directors are "fully protected in relying in good faith" on the company's officers and advisors.  *See, e.g.*, *Brehm* v. *Eisner*, 746 A.2d 244, 261 n.51 (Del. 2000).  But, here, not one of the directors had any personal or financial interest in Autonomy, and none is alleged to have "fail[ed] to act in the face of a known duty to act, thereby demonstrating a conscious disregard for their responsibilities." *Stone* v. *Ritter*, 911 A.2d 362, 370 (Del. 2006).  And the board retained some of the most accomplished advisors in the country and relied on them and HP's officers in good faith.

      The claims against the officers would fare no better.  To prevail against them, plaintiff (or HP) would need to prove that the officers took actions "which [were] without the bounds of reason," *Midland Grange No. 27 Patrons of Husbandry* v. *Walls*, 2008 WL 616239, at *9 (Del.

Ch. Feb. 28, 2008), and were "so grossly off-the-mark as to amount to reckless indifference or a gross abuse of discretion," *Metro. Life Ins. Co.* v. *Tremont Grp. Holdings, Inc.*, 2012 WL 6632681, at *7 (Del. Ch. Dec. 20, 2012); *see also Solash* v. *Telex Corp.*, 1988 WL 3587, at *9 (Del. Ch. Jan. 19, 1988). As the DRC concluded, there was nothing like that here.[4]

**3.** Copeland asserts that HP's failure to take action against legacy Autonomy officials provides evidence that the DRC got it wrong, while several objectors point to the SFO's decision to close its investigation. Tellingly, Hussain is completely silent on this point. Here's why.

Last fall, the first steps were taken under English procedures to initiate litigation against Hussain, Lynch, and Deloitte U.K. Pre-action letters were sent to all three to inform them of HP's intent to pursue litigation and to lay out the substance of the claims in chapter and verse. Absent a settlement, formal proceedings will be initiated against them in England following the expiration of the prescribed pre-action protocol period. That the litigation process is underway disposes of Copeland's unsubstantiated "whitewash" claim.[5]

---

[4]   Neither Steinberg nor anyone else explains how HP could establish liability against Apotheker or Robison, in their capacity as corporate officers, given the facts found by the DRC and Delaware's gross-negligence standard. *In re Walt Disney Co. Deriv. Litig.*, 907 A.2d 693, 749-50 (Del. Ch. 2005); *see* Docket #229 (HP Mem. in Opp. Steinberg) at 7-11 (addressing claims against Apotheker and Robison). Similarly, Steinberg provides no basis to second-guess the DRC's substantive conclusions that Whitman had acted appropriately and therefore HP had no viable claim against Whitman based on her public statements. As the DRC found, "[w]hen Autonomy missed its Q2 2012 revenue forecast, HP management directed a review, which reported the principal cause as poor transaction execution by Autonomy." Docket #211-1 (DRC Resolution) at 42. Thus, on May 23 and June 5, 2012, Whitman "appropriately publicly stated that 'scaling challenges' contributed to Autonomy's poor results." *Id.*

[5]   There is no merit to Copeland's claim that Wachtell Lipton's supposed conflict provides evidence of a "whitewash." Copeland Br. 10-11. The individual defendants have their own counsel and there is no conflict. *See, e.g.*, Docket #259 (HP Reply Mem. in Supp. Second Stip. Settlement) at 9; Docket # 280 (HP Opp. to Copeland's Renewed Intervention); Docket #292 (HP Opp. to Preliminary Injunction).

As for the SFO's statement, it must be read in full:

> In respect of some aspects of the allegations, the SFO has concluded that, on the information available to it, there is insufficient evidence for a realistic prospect of conviction.
>
> *In respect of other aspects and on the application of well-established principles, jurisdiction over the investigation has been ceded to the US authorities whose investigation is ongoing.*

(emphasis added).  The SFO added that "[i]n order not to undermine the US-based investigation we are unable to go into further detail at this stage . . . ."[6]

Thus, as Hussain well knows, the criminal and regulatory investigations against him are ongoing.  The SFO's decision is only a practical judgment that U.S. authorities are better positioned to pursue the investigation and any prosecution.

*        *        *

Ultimately, not one of the objectors makes an effort to overcome the business judgment rule — a failure that would prove dispositive in litigation and would defeat their claims.  In the present posture, that failure shows that the settlement should be approved.

### B.  The Settlement Consideration Is Significant.

In addition to considering the weaknesses of plaintiffs' claims, the Court should also take into account the benefits achieved by the settlement.  Order at 5.  Here, the settlement would provide significant benefits — particularly when measured against the claims being released.

*First*, the settlement would provide the significant benefits of strengthened M&A processes.  Court after court has approved settlements, like the proposed settlement here, that result in significant enhancements to the corporation's procedures.  Docket #243 (HP Submission Re: Second Am. Stip.) at 5 (collecting authority).  Here, the complaint sought injunctive relief to remedy perceived deficiencies in HP's governance.  After arms' length negotiations, the plaintiffs determined that a settlement based on reforms that address their allegations would be in the best

---

[6]      Press Release, *Serious Fraud Office* (Jan. 19, 2015), *available at* http://www.sfo.gov.uk/press-room/latest-press-releases/press-releases-2015/hp-autonomy-investigation.aspx.

interests of HP and its shareholders.  Similarly, the HP board, while denying wrongdoing, has concluded that implementing the reforms would benefit HP and its shareholders.  A reform-based settlement is therefore appropriate, as the Fifth Circuit long ago explained:

> [W]here, as here, the derivative suit is largely an attack on past corporate management practices, as well as on some present officers and directors, the dollar amount of a possible judgment, which is essentially the sole goal in the class action damage suit, is not the sole, and may well not be the most important, matter to be considered, for the effects of the suit on the functioning of the corporation may have a substantially greater economic impact on it, both long- and short-term, than the dollar amount of any likely judgment in its favor in the particular action.

*Maher* v. *Zapata Corp.*, 714 F.2d 436, 461 (5th Cir. 1983).

*Second*, HP would also derive a significant benefit from the termination of litigation, because the settlement would "avoid any further legal expense to [HP]" in this case "and, of at least as great importance, . . . take its management out of the courtroom and restore them fulltime to the corporate board room and business."  *Maher*, 714 F.2d at 467 (internal quotation marks omitted).  Indeed, "the best interests of [HP's] shareholders are served by allowing [the defendants] to devote themselves to [HP's] business affairs rather than distracting them with further litigation."  *In re Oracle Sec. Litig.*, 852 F. Supp. 1437, 1444 (N.D. Cal. 1994).

These are significant benefits that justify approval of the settlement.  *Maher*, 714 F.2d at 461, 467; *see also Goldman* v. *Northrop Corp.*, 603 F.2d 106, 109 (9th Cir. 1979) ("Instead of choosing the course of securing the greatest possible money judgment from the Northrop officers, the parties and the court chose the course of terminating litigation and taking steps to assure that such conduct as had been disclosed could not occur in the future.").

In the face of the well-settled authority confirming the fairness of settlements such as this, the objectors recycle unsubstantiated and unsupported objections to the consideration.  The objectors' arguments fall into four categories, and all of them should be rejected.

**1.**   The case law forecloses the objectors' half-hearted argument that the settlement is unfair because the consideration consists of corporate reforms rather than money.  Docket #243

(HP Submission Re: Second Am. Stip.) at 5 (collecting cases).[7]  Reform instead of money is an appropriate result given the weakness of the claims.

Recognizing that the weight of authority is against them, the objectors now argue that the reforms have little value in relation to the allegations in the complaint.  Copeland Br. 5-6; Steinberg Br. 8-9.  Not so.  The reforms significantly improve HP's M&A processes:  among other improvements, they provide enhanced board and risk management committee oversight of the due diligence process; they more closely align the board and the Finance and Investment Committee ("FIC"), which is responsible for M&A oversight; they increase the responsibilities of the FIC; they increase the involvement of management and the executive committee in evaluating acquisition targets; they provide for formal M&A training for employees without prior expertise; and they impose additional due-diligence requirements.

Judge Walker concluded that the reforms were significant and that they were "*directly tailored* to prevent the types of alleged breaches of fiduciary duty involved in large acquisitions" like HP's acquisition of Autonomy.  Docket #233-1 (Judge Walker Arbitration Decision) at 11 (emphasis added).  The board, too, has determined that the reforms are meaningful and would significantly benefit the company.  That should be sufficient to deny the objection and grant preliminary approval.

---

[7]      While admitting that parties may settle derivative litigation without monetary relief, Cook insists that, in the "unique circumstances" of this case, the absence of a "monetary component" demonstrates collusion.  Cook Br. 3.  Meanwhile, Akerman and Steinberg complain that the individual defendants are not providing consideration — which is really just another way of saying that the defendants should be paying money (given that HP's directors, in their capacity as directors, have agreed to implement the reforms).  Akerman Br. (Docket #282) at 8; Steinberg Br. 5.  These arguments are contrary to Delaware law, especially where, as here, the corporate charter contains a Section 102(b)(7) provision.  "[A derivative] settlement may fairly, reasonably, and adequately serve the best interest of a corporation, on whose behalf the derivative action is brought, *even though no direct monetary benefits are paid by the defendants to the corporation*."  *Maher*, 714 F.2d at 466 (emphasis added); *see also* Docket #224 (HP Mem. in Further Supp. Prelim. Approval) at 6-7 (collecting authority).  And Cook points to no evidence to support his allegation of collusion; there is none.  Instead, the only evidence in the record demonstrates that the negotiations were "contentious and hard-fought."  Docket #149-1 (Decl. of Judge Walker) at 5.

1       The objectors nonetheless question the value of the reforms because HP has refused to

2 acknowledge that they would have prevented the Autonomy fraud.  The argument is without

3 substance.  "[B]y definition, *all* frauds demonstrate the 'inadequacy' of existing controls, just as

4 all bank robberies demonstrate the failure of bank security and all burglaries demonstrate the

5 failure of locks and alarm systems."  *See Higginbotham* v. *Baxter Int'l Inc.*, 495 F.3d 753, 760

6 (7th Cir. 2007) (Easterbrook, J.).  It does not follow that a bank, having fallen victim to a

7 burglary, should not improve its alarm system unless it believes that the improvements would

8 have prevented the particular burglary that occurred.

9       Beyond that, it is impossible to know what would have happened with Autonomy in an

10 imaginary parallel universe in which the reforms had been in place.  It should suffice that, here,

11 HP and the plaintiffs have reviewed HP's M&A processes in light of the allegations in the

12 complaints and determined to make improvements.  The fact that HP cannot say that these

13 improvements would have been enough to detect the massive fraud to which HP fell victim does

14 not at all undercut the substantial benefit the reforms will confer.

15       Unable to find any shortcoming with the reforms,[8] Copeland argues that the Court should

16 deny preliminary approval because the board didn't adopt two reforms he happens to favor.

17 Copeland Br. 5-6.  Of course, this does not show that the settlement reforms are insubstantial.  In

18 any event, Copeland's first reform — eliminating contingent-fee arrangements for financial

19 advisors — is inconsistent with case law recognizing that such arrangements are "undoubtedly

20 routine" and can benefit shareholders.  *See, e.g.*, *In re Atheros Commc'ns, Inc.*, 2011 WL 864928,

21 at *8 (Del Ch. Mar. 4, 2011) (noting that contingent-fee arrangements can "reduce . . . expense"

22 and "properly incentivize the financial advisor to focus on the appropriate outcome").  Copeland

23 is also just wrong on the facts of this case:  Perella Weinberg, for example, had a flat-fee

24

25

26   [8]     In previous briefing, Copeland conceded that the reforms at issue were valuable.  Docket

27 #212 (Copeland Motion to Intervene) at 2.

28

1   arrangement.[9]   It is unclear what Copeland's second reform is designed to accomplish, but it

2   appears that he would have financial advisors render opinions on *non*-financial matters,

3   something they obviously lack qualification to do.

4       **2.**   The objectors recycle their assertion that the settlement lacks consideration because the

5   HP board has already adopted the reforms.   Docket #282 (Akerman Reply Br.) at 7-8; Copeland

6   Br. 5; Steinberg Br. 5-6.   This contention rests on the perverse notion that a corporation should

7   wait to implement beneficial reforms because they serve as consideration for a settlement that is

8   subject to court approval.   Unsurprisingly, the courts have rejected this argument.   Again, *Maher*

9   v. *Zapata Corp.* is instructive.   The settlement there provided for the dismissal of derivative

10  claims and the payment of attorneys' fees, and objectors asserted that it was "nothing more than a

11  voluntary dismissal without any consideration."   714 F.2d at 454 (internal quotation marks

12  omitted).   The court approved the settlement (and the approval was upheld) because "[t]h[e]

13  lawsuit was at least *a contributing factor* in several major beneficial changes" to the corporation.

14  *Id.* at 454 (emphasis added) (internal quotation marks omitted).   It did not matter that the benefits

15  were achieved before the settlement was signed, or that they were not even among the terms of

16  the settlement agreement.

17      Thus, "there is no rule that absolutely requires [parties to] await court approval" before

18  "effectuat[ing] part or all of a settlement."   *In re Mobile Commc'ns Corp. of Am., Inc., Consol.*

19  *Litig.*, 1991 WL 1392, at *13 (Del. Ch. Jan. 7, 1991).   Instead, so long as a substantial benefit to

20  the corporation is "causally related to the [derivative] lawsuit," that benefit will serve as

21  consideration for a derivative settlement even if it preceded the settlement.   *Polk* v. *Good*, 507

22

23

24

_____

25  [9]      DRC Resolution at 54.  Copeland's passing remark that there is no record before the Court
26  related to HP's claims against the "Settling Advisor Defendants" (Copeland Br. 5 n.7) is also
    wrong.  The DRC thoroughly considered those claims, as its resolution (which is before the
27  Court) makes clear.  *See* DRC Resolution at 52-59.

28

A.2d 531, 538 (Del. 1986).[10]  Here, the reforms are demonstrably and causally connected to the lawsuits.

In any event, if there were any doubt on this score, the parties' agreement to implement the reforms at the new HP spinoff dispels it.  As noted above, HP has announced that it will divide itself.  That transaction will be effectuated by creating a new company and spinning off the shares of that new company ("SpinCo") to HP's then-current shareholders.  Under the terms of the revised settlement, HP will cause SpinCo to implement the reforms *after* Court approval.  If future performance were necessary, there it is.

**3.**  Steinberg contends that HP's commitment to implement the reforms at SpinCo should not count as consideration.  That commitment, Steinberg argues, will "provide[] no benefit to HP and, therefore, cannot support the settlement."  Steinberg Br. 4.  She ignores the fact that *HP's shareholders* will receive shares of SpinCo in the split and will therefore benefit from the implementation of the reforms.  The revision thus comports with the Court's statement that the "settlement of [a] derivative suit should benefit the current shareholders" of the company.  Order at 9 (internal quotation marks omitted).

Copeland and Akerman tack the other way, saying the revision adds nothing because SpinCo would have implemented the reforms anyway.  Copeland Br. 9-10; Docket #295 (Akerman Br.) 1-2.  They are wrong.  The prior versions of the settlement preceded announcement of the split.  And contrary to Akerman's assertion, SpinCo will not be a "successor" to HP.  Absent the revision, SpinCo would not have had the obligation to implement the reforms.  Now, if the settlement is approved, it will.

**4.**  Finally, several of the objectors question whether lead plaintiffs contributed to the reforms.  But again, there can be no serious dispute that "th[e] lawsuits w[ere] at least a

_____

[10]     This line of authority also disposes of Akerman's and Steinberg's complaint that not all the releasees provided consideration.  Akerman Br. 8; Steinberg Br. 5-7.  "Validity of a settlement does not depend on every compromised claim in a lawsuit being supported by independent consideration."  *Polk*, 507 A.2d at 538.

contributing factor in" the reforms.  *Maher*, 714 F.2d at 454 (internal quotation marks omitted).  Judge Walker found "that the derivative actions filed by the Cotchett and Robbins Geller firms and their work on this litigation were instrumental in identifying the need for, devising and implementing valuable corporate governance reforms . . . and therefore provide a substantial benefit to HP and its shareholders."  Docket #233-1 (Arbitration Decision of Judge Walker) at 11.  *See also* Docket #149-1 (Declaration of Judge Walker) at 5.   The HP board likewise acknowledged in a formal resolution that lead plaintiffs contributed meaningfully to the reforms.  The objection is contrary to all the facts in the record and without a shred of basis.

### C.  The Notice Is Fair And Appropriate.

The objectors' challenge to the manner and form of notice remains meritless.   The proposed notice — which will be published on two separate occasions in four national publications and posted online and in an online SEC filing — "contain[s] a description of the . . . action and an explanation that approval of the proposed settlement" would result in a release.  *Class Plaintiffs* v. *City of Seattle*, 955 F.2d 1268, 1293 (9th Cir. 1992) (internal quotation marks omitted).   The objectors will have (and have had) ample time to review and comment on the proposed settlement.  This proposed procedure is comprehensive; it is similar to what courts have accepted in like cases; and it more than satisfies due process.

**1.**  Copeland continues to assert that notice by publication is insufficient and that HP must incur the multi-million dollar cost of notifying the owners of its 1.9 billion shares (investors who, after all, invested in a technology company) by snail mail.  Copeland Br. 11.  Is that argument credible in a world in which anyone with a computer or a smartphone will be able to access the settlement agreement through a Google search?  And is it credible in light of the fact that HP will be publishing notice about a settlement that has had a fair share of press coverage already in four national newspapers?

Copeland's principal case for his luddite world-view is *Mullane* v. *Central Hanover Bank & Trust Co.*, 339 U.S. 306, a case decided in 1950.  But *Mullane* is not controlling because it did not involve a derivative settlement, and it "d[oes] not bar notice by publication."  *Arace* v. *Thompson*, 2011 WL 3627716, at *4 (S.D.N.Y. Aug. 17, 2011).  "In a derivative action, a court

may determine that notice of a proposed settlement by publication is appropriate . . . ." *Id.* (citing Fed. R. Civ. P. 23.1(c)).  And as HP has already explained, court after court has endorsed notice by publication and internet in similar cases.  Docket #259 (HP Reply Mem. in Supp. Second Stip. Settlement) at 11-12 (collecting authority).  Indeed, in the *only* derivative case cited by Copeland on the requirements of notice, the court *endorsed* a procedure that was far less rigorous than the one proposed here, requiring neither publication nor direct mailing.  *See Bushansky* v. *Armacost*, 2014 WL 2905143, at *7 (N.D. Cal. June 25, 2014).[11]

    **2.**   Copeland and Cook argue that the notice should contain more detail about the settlement process.[12]  Copeland Br. 12-13; Cook Br. 4-5.  But they "point to no case law to support their contention that this level of detail is required."  *Hill* v. *State Street Corp.*, 2015 WL 127728, at *2 (D. Mass. Jan. 8, 2015).  "It is well settled that the notice is not required to provide a complete source of information."  *Petrovic* v. *Amoco Oil Co.*, 200 F.3d 1140, 1153 (8th Cir. 1999) (internal quotation marks omitted).  A notice need "only summari[ze]" the terms of the settlement while directing shareholders to the settlement documents themselves.  *Maher*, 714 F.2d at 452 (internal quotation marks omitted).  Here, the notice contains a comprehensive description of the settlement and directs shareholders to the stipulation of settlement, which will be on HP's website.[13]

    **3.**  Copeland cites no authority to support any of his remaining contentions, and the weight of the authority is against him on all of them.  Copeland Br. 12-13.  Thus, courts have routinely

---

[11]    The court required defendant to: (1) post a "link on [its] investor relations website that leads to a webpage to be displayed for a minimum of thirty days"; (2) submit "an 8-K filing with the SEC"; and (3) issue a "press release."  *Bushansky*, 2014 WL 2905143, at *7.

[12]    Copeland continues to insist that the notice's definition of "Autonomy-Related Claims" is "imprecise," but he has yet to point to any particular ambiguity.  Copeland Br. 12.  Indeed, the notice simply repeats the definition of Autonomy-Related Claims in the settlement itself.

[13]    Thus, Copeland's request that HP detail the timing of the enactment of the reforms; to disclose "that there have been material improvements in the proposed settlement . . . initiated by Mr. Copeland and other[s]"; and to post each of his pre-suit demand letters on HP's website are without merit and appear to be tailored to a fee application by Copeland's counsel, not protecting HP or its shareholders.  *See* Copeland Br. 12-13.

approved objection deadlines set 28 days from the notice being sent, not 28 days from the submission of any brief in support of the settlement.[14]  HP's decision to give shareholders access to the DRC resolution and the governance reforms subject to a confidentiality agreement is entirely consistent with precedent — indeed, Copeland already has been provided a copy of the reforms.[15]  The notice period provides ample time for the objectors' out-of-state attorneys to seek admission to practice, assuming they needed it, and even if it didn't, the notice period would still be adequate.[16]

### D.  There Is No Basis For Intervention.

Copeland and Cook have renewed their motions to intervene.  *See* Docket #269 (Copeland Renewed Motion to Intervene); Cook Br. at 1.  Because their purpose is simply to object to the settlement, however, "'there is no need for [either] to intervene formally . . . or to be a party to it' in order to preserve his or her rights as an objector."[17]  The Court should therefore deny Copeland's and Cook's motions.

---

[14]  *E.g.*, *Torrisi* v. *Tucson Elec. Power Co.*, 8 F.3d 1370, 1375 (9th Cir. 1993) (holding a 31-day notice period between mailing of notice and deadline to object was adequate in opt-out class action); *Marshall* v. *Holiday Magic, Inc.*, 550 F.2d 1173, 1178 (9th Cir. 1977) (26 days between mailing of notice and deadline for opting out of class was "more than adequate").  Beyond that, Copeland's objection to the schedule is puzzling given that the Court has not yet set a schedule.

[15]  *E.g.*, *In re BankAm. Corp. Sec. Litig.*, 210 F.R.D. 694, 706 (E.D. Mo. 2002) (concluding that "due process has been provided" when settlement procedure allowed objectors to view confidential documents under the terms of the existing protective order).

[16]  *E.g.*, *Grunin* v. *Int'l House of Pancakes*, 513 F.2d 114, 121 (1975) (rejecting argument that notice period was inadequate because "it did not give class members an opportunity to retain counsel"; "appellant is incorrectly attempting to limit our review of the factual setting in this case to the 19-day notice period").

[17]  *In re Bank of Am. Corp. Sec., Deriv. & ERISA Litig.*, 2012 WL 1674299, at *3 (S.D.N.Y. May 14, 2012) (quoting *Kaplan* v. *Rand*, 192 F.3d 60, 67 (2d Cir. 1999)).  *See also e.g.*, *Athale* v. *Sinotech Energy Ltd.*, 2013 WL 2145588, at *2-3 (S.D.N.Y. May 16, 2013) (denying intervention); *Davis* v. *J.P. Morgan Chase & Co.*, 775 F. Supp. 2d 601, 605 (W.D.N.Y. 2011) (same); *In re Motor Fuel Temperature Sales Practices Litig.*, 2011 WL 5331678, at *2 (D. Kan. Nov. 4, 2011) (same); *UAW* v. *Gen. Motors Corp.*, 2006 WL 334283, at *5 (E.D. Mich. Feb. 13, 2006) (same).

## II.   THE COURT SHOULD DENY HUSSAIN'S INTERVENTION MOTION.

The Court should also deny Hussain's motion to intervene.  To begin with, Hussain (who has not even filed a motion to intervene) has not provided the Court with the requisite pleading or even notice of the claims he wishes to press or defenses he wishes to interpose.  Fed. R. Civ. P. 24(c); *Beckman Indus., Inc.* v. *Int'l Ins. Co.*, 966 F.2d 470, 474-75 (9th Cir. 1992); *Kremen* v. *Cohen*, 2012 WL 2919332, at \*9 (N.D. Cal. Jul. 17, 2012).

Moreover, in order to intervene, Hussain must demonstrate that the settlement would result in "formal legal prejudice."  *Waller* v. *Fin. Corp. of Am.*, 828 F.2d 579, 583 (9th Cir. 1987). Hussain has filed nearly half a dozen briefs — and he still hasn't done that.

### A.  If The Settlement Is Approved, It Will Not Prejudice Hussain.

In his effort to establish formal legal prejudice, Hussain again takes aim at the bar order in the revised settlement.  As before, the bar order would prohibit Hussain from bringing contribution claims (or disguised contribution claims), but it would also give him a judgment credit worth the full value of those claims — whatever that value may be.  That "judgment credit" negates any claim of prejudice, because it "adequately compensates [Hussain] for [his] indemnity and contribution claims . . . ."  *Geber* v. *MTC Elec. Techs. Co., Ltd.*, 329 F.3d 297, 306 (2d Cir. 2003) (Sotomayor, J.).  Recognizing as much, courts routinely approve bar orders such as this one.[18]  Indeed, if this were a securities class action rather than a derivative case, the Court would be *required* to enter such a bar order under the PSLRA.  15 U.S.C. § 78u-4(f)(7).

In response to this uniform authority, Hussain continues to rely on spurious distinctions and outright mischaracterizations.  For example, Hussain continues to assert that the bar order would prohibit *all* cross- and counterclaims that he may have against the individual defendants. Hussain Br. 1, 3.  That is false.  As HP has explained many times, the bar order covers *only* claims "where the alleged injury of such person or entity is that person's or entity's alleged

---

[18]     *See, e.g.*, *In re Consol. Pinnacle W. Sec. Litig.*, 51 F.3d 194, 197 (9th Cir. 1995); *In re First Alliance Mortg. Co.*, 471 F.3d 977, 1004 (9th Cir. 2006); *In re Atmel Corp. Deriv. Litig.*, 2010 WL 9525643, at \*7-8 (N.D. Cal. Mar. 31, 2010).

liability to the Company or Autonomy" on account of the Autonomy acquisition.  Docket #277-2 at 93.  It does not bar any claims except for actual or disguised contribution claims.  And as compensation it provides a judgment credit.

Hussain's challenge to the judgment credit is equally baseless.  *First*, there is no substance to Hussain's contention that the decisions upholding bar orders support a distinction between non-settling defendants and third parties, a distinction Hussain now claims to have discovered. Hussain Br. 5.  In previous briefing, Hussain repeatedly claimed that he is "similarly situated to a 'non-settling defendant.'"  *See, e.g.*, Docket #160 (Hussain Motion to Intervene) at 5.  But in any event, courts routinely uphold bar orders that prohibit contribution claims by third parties as well.[19]  In the settlements of securities class actions, Congress has even directed that a court "shall enter a bar order" covering contribution claims "*by any person* against the settling covered person."  15 U.S.C. § 78u-4(f)(7)(A) (emphasis added).

*Second*, there is no substance to Hussain's assertion that the judgment credit is worthless because the settlement consideration is not monetary and the settling defendants have denied wrongdoing.  Hussain Br. 5 & n.9.  In *HealthSouth*, the sole authority Hussain cites, the bar order provided for a credit worth "*the greater of* [1] settling defendant's proportionate liability *or* [2] the amount actually paid by the settling defendant."  *In re HealthSouth Corp. Sec. Litig.*, 572 F.3d 854, 857-58 (11th Cir. 2009).  "[T]he amount actually paid by the settling defendant" (*id.* at 858) was relevant because the law prohibits double recoveries.[20]  Here, it is irrelevant because there could not be any double recovery.

---

[19]     *E.g.*, *In re HealthSouth Corp. Sec. Litig.*, 572 F.3d 854, 857 n.5 (11th Cir. 2009) (rejecting objection to bar order that covered claims asserted by "Non-Settling Defendants *and all other persons*" (emphasis added)); *In re PPA Products Liability Litig.*, 227 F.R.D. 553, 568 (W.D. Wash. 2004) (approving bar order covering nonsettling defendants and all other persons).

[20]     *See also Geber*, 329 F.3d at 303 ("[T]he cap, which ensures that a judgment credit is at least the amount of the settlement for common damages, complies with this Circuit's 'one satisfaction' rule, which prohibits a plaintiff from recovering more than 'one satisfaction for each injury.'" (quoting *Singer* v. *Olympia Brewing Co.*, 878 F.2d 596, 600 (2d Cir.1989))).

1    The judgment credit here will be worth *exactly* what the English courts determine

2  Hussain's contribution claims are worth — "an amount that corresponds to the percentage of

3  responsibility of the applicable Releasee(s) for the loss to the Company or Autonomy."  Docket

4  #277-1 at 100.  Consequently, the judgment credit provides adequate compensation and defeats

5  any claim of prejudice.  *Geber*, 329 F.3d at 306.

6              **B.  Hussain's Substantive Attack Fails.**

7    Hussain does not dispute that he lacks standing to object to the settlement, given that his

8  interests are adverse to those of HP and its shareholders.[21]  And he has little to say about the

9  substance of the settlement.  But Hussain asserts that he is innocent of the fraud that the U.S.

10  authorities are investigating and for which HP has initiated the legal process in England, and he

11  uses his court filing as an opportunity to level his own accusations against HP and the defendants.

12  Hussain Br. 6-9.

13    There is no reason or justification for the Court to consider any part of Hussain's assertion

14  that "*HP* and the Individual Defendants made materially misleading statements" and "caused

15  *damage to Mr. Hussain*."  Hussain Br. 6 (emphasis added).  This is a derivative case brought on

16  HP's behalf, and the purpose of the settlement-approval process is to safeguard "the legitimate

17  interests of the company or its shareholders."  *Daily Income Fund, Inc.* v. *Fox*, 464 U.S. 523, 532

18  n.7 (1984).  Hussain's repeated attempts to usurp this process to serve his own ends are both

19  transparent and improper.  Hussain will have ample opportunity to make whatever arguments he

20  wants in response to the civil suits in England (to say nothing of the ongoing criminal and

21  regulatory investigations in the United States).

22    And Hussain's substantive attacks will also fail:

23

24

_____

25  [21]    *See Zarowitz* v. *BankAmerica Corp.*, 866 F.2d 1164, 1166 (9th Cir. 1989); *cf.* Charles

26  Alan Wright, Arthur R. Miller, Mary Kay Kane, Richard L. Marcus, and Adam N. Steinman,
Federal Practice and Procedure § 1768 (3d ed. 2014) (shareholders cannot act as representatives

27  in a class action when also a putative defendant).

28

1.  Hussain asserts that he did not cost HP billions of dollars in damages because in one HP document he has seen, "HP identified only $8.4 million in transactions that it could confirm as not complying with IFRS." Hussain Br. 6-7. Hussain still ignores reality. The DRC found that Hussain, Lynch, and others were frauds, and had caused Autonomy to materially misstate its financial results in a blatant scheme to pump up the value of their company's stock:

> ➤ Depending on the year, revenues were lower than reported by 21.1% to 29.6%

> ➤ For the first half of 2011, margins were reported at 35.2% but were actually 26.2%

> ➤ For 2009, the growth rate was reported to be 47% but was actually 15.9%[22]

The DRC further found that these and other misrepresentations had a material effect on HP's valuation models. The problem was essentially garbage in, garbage out: when the correct Autonomy results were used, "HP's impairment model showed a loss of $6 billion of originally projected standalone value" that the model produced from the false reported results.[23]

2.  There is also no merit to Hussain's argument that the $8.8 billion write-down cannot be attributed to Autonomy's former management because HP's impairment model showed a $5.3 billion loss in synergies and a $3.6 billion loss due to a change in the discount rate. Hussain Br. 7. As just noted, HP's impairment analysis showed a $6 billion loss in *standalone* value.[24] This was a direct result of Hussain's and Lynch's fraud. As for the attendant synergies, when HP decided to buy Autonomy, and in reliance upon financial statements that turned out to be phonied up, HP believed that as Autonomy continued to grow, Autonomy's growing revenue would generate incremental revenue in the form of enhanced revenue growth.[25] But once it was recognized that Autonomy's revenues had been inflated, it became apparent that the synergies associated with growing those phantom sales could never be realized. Without the bogus deals, HP had much less to build on: the Autonomy business was smaller than had been represented,

---

[22]   DRC Resolution at 24-25.

[23]   DRC Resolution at 33.

[24]   DRC Resolution at 45.

[25]   DRC Resolution at 32.

1   with little or no growth in software license revenue.  Hussain's fraud thus *did* cause a majority of

2   the impairment charge.

3        **3.**  Next, Hussain mischaracterizes the facts yet again when he says that the DRC admitted

4   that Ernst & Young "could not confirm that the 'majority' of the write-down was due to fraud."

5   Hussain Br. 7.  The DRC said no such thing.  The DRC found only that E&Y could not "*audit*

6   [HP's] quantification of Autonomy's accounting errors."[26]  For that reason, HP did not include

7   the quantification in the goodwill note of its 2012 Form 10-K.  But HP did include it in "the

8   litigation note in its 2012 Form 10-K" as well as "in its Q4 earnings release [and] the earnings

9   call."[27]  HP has *never* backed down or "admitted that Ms. Whitman's and Ms. Lesjak's statements

10   were false" (Hussain Br. 7) — because those statements were *true*.  Thus, the DRC concluded

11   that "[t]he documents reviewed and individuals interviewed did not suggest that HP over-

12   allocated the impairment charge to accounting and disclosure improprieties."[28]

13        **4.**  Finally, Hussain's assertion that there was no fraud and that HP was at all times aware

14   of the transactions HP is now placing in issue (Hussain Br. 8-9) flies in the face of the DRC's

15   conclusions to the contrary.  Hussain has no satisfactory answer to the compelling evidence of

16   fraud that HP has presented, including the phony Vatican deal.  *E.g.*, Docket #210 (HP Mem. in

17   Supp. Prelim. Approval) at 18-21; Docket #224 (HP Mem. in Further Supp. Prelim. Approval) at

18   18-20.  He says Deloitte U.K. signed off on Autonomy's transactions; but that doesn't help him

19   because the legal process has been instituted against Deloitte U.K. as well.  As for Hussain's

20   claim that HP became aware after the acquisition closed that Autonomy had engaged in hardware

21   sales, notably absent is any acknowledgement by Hussain of the truth:  that the hardware sales

22   were reported as software revenue and were done at quarter end for no purpose other than to show

---

26     DRC Resolution at 47.

27     DRC Resolution at 47.

28     DRC Resolution at 45.

1   a growing top line when there was none.  That truth was not discovered by HP until after Lynch

2   and Hussain were removed from their positions of authority at Autonomy.

3                                  **CONCLUSION**

4         In sum, the Court should preliminarily approve the settlement and deny any outstanding

5   motion to intervene.  The problematic part of the release is now gone, and the settlement would

6   provide significant benefits.  The claims being released are weak, at best, and if they could ever

7   survive a motion to dismiss and were pursued, HP would have to pay for the defense of the very

8   people that the objectors would have HP sue.  The result would be an endless distraction, to HP,

9   its management, and its board, all to no end. Moreover, Hussain's motion to intervene should be

10   denied because his interests are opposed to the interests of HP and he still has not explained how

11   the settlement would substantively impair any formal legal right he may have.

12

13   Dated:  February 13, 2015           WACHTELL, LIPTON, ROSEN & KATZ

14

15

16                           By:  _____

17                                Marc Wolinsky

18                                George T. Conway III
                                 Vincent G. Levy

19                                51 West 52nd Street
                                New York, NY  10019

20                                Telephone:  (212) 403-1000
                                Facsimile:  (212) 403-2000

21

22                                FARELLA, BRAUN & MARTEL, LLP
                                Neil A. Goteiner

23                                235 Montgomery Street
                                San Francisco, CA  94104

24                                Telephone:  (415) 954-4400
                                Facsimile:  (415) 954-4480

25                                *Attorneys for Defendant Hewlett Packard Company*

26

27

28