JOSEPH W. COTCHETT (Cal. SBN 36324)
jcotchett@cpmlegal.com
MARK C. MOLUMPHY (Cal. SBN 168009)
mmolumphy@cpmlegal.com
NANCY L. FINEMAN (Cal. SBN 124870)
nfineman@cpmlegal.com
**COTCHETT, PITRE & McCARTHY, LLP**
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577

*Lead Counsel for Plaintiff Stanley Morrical,*
*derivatively on behalf of Hewlett-Packard Company*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE HEWLETT-PACKARD COMPANY SHAREHOLDER DERIVATIVE LITIGATION<br><br>THIS DOCUMENT RELATES TO:<br><br>ALL ACTIONS | Master File No. C-12-6003-CRB<br><br>**NOTICE OF MOTION AND MOTION FOR FINAL APPROVAL OF THIRD AMENDED SETTLEMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT**<br><br>Date:   July 24, 2015<br>Time:   10:00 a.m.<br>Dept.:  Courtroom 6, 17th Floor<br>Hon. Charles R. Breyer |

LAW OFFICES
COTCHETT, PITRE
& McCARTHY, LLP

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## **TABLE OF CONTENTS**

Page

NOTICE OF MOTION AND MOTION ............................................................................. 1

STATEMENT OF ISSUES TO BE DECIDED .............................................................. 2

MEMORANDUM OF POINTS AND AUTHORITIES ................................................. 2

I.      INTRODUCTION AND STATEMENT OF ISSSUES TO BE DECIDED ..................... 2

II.     OVERVIEW OF THE LITIGATION ................................................................. 4

      A.      The Federal Action ......................................................... 4

      B.      The State Actions ........................................................... 4

      C.      Formation of the Demand Review Committee and Internal Investigation . 5

      D.      Settlement Negotiations and Revisions to Settlement Terms ................... 6

      E.      The Third Amended and Restated Settlement ............................ 7

      F.      Preliminary Approval, Exclusions from Bar Order, and Notice ............... 8

III.    THE STANDARDS FOR JUDICIAL APPROVAL OF A DERIVATIVE
      SETTLEMENT ........................................................................ 9

IV.     THE AGREEMENT IS AN OUTSTANDING RESULT FOR HP AND SHOULD BE
      APPROVED ........................................................................... 9

      A.      The Agreement Confers Substantial Benefits Upon HP ............................. 9

      B.      The Agreement Reflects an Informed Analysis of the Strengths of the
            Case and the Risks of Further Litigation .................................... 12

      C.      The Agreement Was Negotiated At Arms-Length, By Experienced and
            Well-Informed Counsel, With the Assistance of a Respected Mediator .. 14

V.    THE NEGOTIATED PROCESS AND ARBITRATED AMOUNT OF ATTORNEYS' FEES AND EXPENSES SHOULD BE APPROVED .................................................... 15

      A.    The Parties' Negotiated Resolution of Attorneys' Fees and Costs by Binding Arbitration Was Fair and Reasonable Term of Settlement ......... 16

      B.    The Fee and Expense Awards in Judge Walker's Arbitration Decision Should be Approved ...................................................................... 16

            1.    The Agreement Provides Substantial Benefits for HP ...................... 18

            2.    Federal and State Counsel Devoted Substantial Time and Effort ..... 18

            3.    The Action Involved *Complex* Issues of Fact and Law..................... 20

            4.    Counsel Provided Representation On A Fully *Contingent Basis* ...... 20

            5.    HP Benefitted From the *Standing and Ability* of Counsel ................ 21

            6.    Counsel's Requested Award Is Supported By a Lodestar Cross-Check ....................................................................... 21

VI.   THE COURT SHOULD APPROVE A SERVICE AWARD TO FEDERAL PLAINTIFF, STANLEY MORRICAL ........................................................................... 24

VII.  CONCLUSION............................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aronson v. Lewis*
473 A.2d 805 (Del. 1984) ................................................................................. 13

*Behrens v. Wometco Enters., Inc.*
118 F.R.D. 534 (S.D. Fla. 1998) ...................................................................... 22

*Boeing Co.  v. Van Gemert*
444 U.S. 472 (1980) .......................................................................................... 16

*Bogosian v. Gulf Oil*
621 F. Supp. 27 (E.D. Pa. 1985) ...................................................................... 24

*Brazen* v. *Bell Atl. Corp.*
695 A.2d 43 (Del. 1997) ................................................................................... 14

*Cohn v. Nelson*
375 F. Supp. 2d 844 (E.D. Mo. 2005) ................................................. 11, 22, 23

*Girsh v. Jepson*
521 F.2d 153 (3d Cir. 1975) ............................................................................. 12

*Goldman* v. *Northrop Corp.*
603 F.2d 106 (9th Cir. 1979) ........................................................................... 11

*Hanlon v. Chrysler Corp.*
150 F.3d 1011 (9th Cir. 1998) ........................................................................ 9

*Harris v. Marhoefer*
24 F.3d 16, 19 (9th Cir. 1994) ....................................................................... 24

*In re Abercrombie & Fitch Co. S'holders Derivative Litig. v. Jeffries*
886 A.2d 1271 (Del. 2005) ............................................................................... 22

*In re AOL Time Warner Shareholder Derivative Litig.*
2009 U.S. Dist. LEXIS 124372 (S.D.N.Y. Nov. 9, 2009) .......................... 22, 23

*In re Atmel Corp. Derivative Litig.*
2010 U.S. Dist. LEXIS 145551 (N.D. Cal. March 31, 2010) ........................... 20

*In re Caremark Derivative Litigation*
698 A.2d 959 (Del. Ch. 1996) .......................................................................... 13

*In re HP Sec. Litig.*
2013 WL 6185529 (N.D. Cal. Nov. 26, 2013) ................................................. 13

*In re M.D.C. Holdings Securities Litig.*
1990 U.S. Dist. LEXIS 15488 (S.D. Cal. Aug. 30, 1990) ................................. 20

*In re Mego Fin. Corp. Sec. Litig.*
213 F. 3d 454 (9th Cir. 2000) .......................................................................... 24

*In re Omnivision Tech*
2008 WL 123936 (N.D. Cal. Jan. 9, 2009) ...................................................... 24

*In re Oracle Sec. Litig.*
852 F.Supp. 1437 (N.D.Cal. 1994) ............................................................. 17, 18

*In re Pac. Enters. Sec. Litig.*
47 F.3d 373 (9th Cir. 1995) ............................................................................. 12

*In re Rambus Inc. Derivative Litigation*
2009 WL 166689 (N.D. Cal. Jan. 20, 2009) ...................................................... 9

*In re Schering –Plough Corp. Shareholder Derivative Litig.*
2008 U.S. Dist. LEXIS 2569 (D.N.J. Jan. 14, 2008) .................................... 21, 23

*In re United Health Group Inc. Shareholder Deriv. Litig.*
631 F.Sup.2d 1151 (D. Minn. 2009) ................................................................ 23

*In re Xcel Energy, Inc. Securities, Derivative & "ERISA" Litig.*
364 F. Supp. 980 (D. Minn. 2005) ................................................................... 20

*Ingram v. Coca-Cola Co.*
200 F.R.D. 685 (N.D. Ga. 2001) ..................................................................... 16

*Louisiana State Employees' Retirement System*
2001 Del. Ch. LEXIS 115 ................................................................................ 22

*Maher* v. *Zapata Corp.*
714 F.2d 436 (5th Cir. 1983) ........................................................................... 11

*Mego Financial Corp. Sec. Litig.*
213 F.3d 454 (9th Cir.2000) .............................................................................. 9

*Metropolitan Life Ins. Co.* v. *Tremont Grp. Holdings, Inc.*
2012 WL 6632681 (Del. Ch. Sept. 13, 2012) ................................................. 14

*Mills v. Elec. Auto-Life Co.*
  396 U.S. 375 (1970) ........................................................................ 17

*Officers for Justice v. Civil Service Commission*
  688 F.2d 615 (9th Cir.1982) ................................................ 9, 12, 15

*Razilov v. Nationwide Mut. Ins. Co.*
  2006 U.S. Dist. LEXIS 82723 (D. Or. Nov. 13, 2006) ........................ 24

*Solash v. Telex Corp.*
  1988 WL 3587 (Del. Ch. Jan. 19, 1998) ........................................ 14

*Staton v. Boeing*
  327 F. 3d 938 (9th Cir. 2003) ........................................................ 24

*Sugarland Industries, Inc. v. Thomas*
  420 A2d 142 (Del. 1980) ................................................................ 17

*Tandycrafts, Inc. v. Initio Partners*
  562 A.2d 1162 (Del. 1989) ............................................................ 17

*Unite Nat'l Ret. Fund v. Watts*
  2005 U.S. Dist. LEXIS 26246 (D.N.J. Oct. 28, 2005).......................... 11

*United Steelworkers of America v. Phelps Dodge Corp.*
  896 F.2d 403 (9th Cir. 1990) ........................................................ 23

*Vizcaino v. Microsoft Corp.*
  290 F.3d 1043 (9th Cir. Wash. 2002) ............................................ 22

*Wood v. Baum*
  953 A.2d 136 (Del. 2008) .............................................................. 13

**Statutes**

8 Del. C. 102(b)(7)............................................................................ 13

**Rules**

Fed. R. Civ. P. 23(e) ........................................................................ 9

## NOTICE OF MOTION AND MOTION

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that, pursuant to the Order Granting Motion for Preliminary Approval of Third Amended Settlement ("Preliminary Approval Order") (dkt. 319), on July 24, 2015, at 10 a.m., Federal Lead Plaintiff Stanley Morrical, derivatively on behalf of Hewlett-Packard Company, will move before the Honorable Charles R. Breyer, United States Senior District Judge, at the United States District Court, Northern District of California, 450 Golden Gate Avenue, Courtroom 6, San Francisco, California 94102, for an Order granting final approval of the proposed settlement in this derivative action on the terms set forth in the Third Amended and Restated Stipulation of Settlement dated January 21, 2015 (dkt. 277-1), as supplemented and amended by the Agreement Excluding Sushovan Hussain From Bar Order and Related Release (dkt. 349-1) and the Agreement Excluding Michael Lynch From Bar Order and Related Release (dkt. 359-1) and all exhibits thereto (herein collectively referred to as the "Third Amended Settlement" or "Agreement"), as well as approval of HP's agreement to pay attorneys' fees and expenses to Federal and State Counsel.[1]  Federal Plaintiff will further move for a service award to Federal Plaintiff, as provided in the Agreement.

The Motion is based on the Agreement, this Memorandum of Points and Authorities in Support of Final Approval of Third Amended Settlement, the Declaration of Mark C. Molumphy filed herewith, all documents previously filed in this Action, including the Declaration of David F. Larcker (dkt. 277-3), the Declaration of the Honorable Vaughn R. Walker, United States District Judge (Ret.) (dkt. 149-1), Judge Walker's Arbitration Decision (dkt. 233-1), and the Preliminary Approval Order (dkt. 319), and such additional evidence or argument as may be submitted to the Court.

---

[1] State Court Plaintiffs James R. Gould, Jr. and Leroy Noel join in the Motion and request that the relief sought herein be granted in its entirety.  *See* Joinder in Motion for Final Approval of Third Amended Settlement, filed on June 19, 2015 ("Joinder").

**STATEMENT OF ISSUES TO BE DECIDED**

Should the Agreement entered into between Settling Plaintiffs, HP and the Individual

Defendants be granted final approval and judgment entered thereon?

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.    INTRODUCTION AND STATEMENT OF ISSSUES TO BE DECIDED**

The Agreement resolves derivative claims brought on behalf of nominal defendant

Hewlett-Packard Company ("HP" or the "Company") against certain of its current and former

officers and directors relating to HP's evaluation and acquisition of Autonomy.[2]  The Agreement

represents an outstanding resolution of a highly complex case for HP, and is the result of

vigorous prosecution by Lead Plaintiff Stanley Morrical ("Federal Plaintiff" or "Morrical") and

James R. Gould, Jr. and Leroy Noel ("State Plaintiffs" and, together with Morrical, "Plaintiffs"),

as well as arm's-length negotiations with HP, with the assistance of the Honorable Vaughn R.

Walker, United States District Judge (Ret.), serving as mediator.

The Agreement provides substantial benefits to HP and, if approved, will resolve all

derivative claims pending in this Court relating to Autonomy, as well as related shareholder

derivative actions filed in Santa Clara County Superior Court (together, the "Actions").

Specifically, as a result of the prosecution and settlement of the Actions, HP has agreed to

implement important corporate governance reforms ("Governance Revisions") targeted at HP's

merger and acquisition ("M&A") policies and procedures.  The Agreement also provides that,

upon Court approval, the Governance Revisions adopted as part of the Agreement will be

implemented not only at HP but also at HP Enterprise, the separate corporation to be spun out by

HP to its shareholders.  The Governance Revisions were negotiated over several months with the

direct participation of recognized governance experts and are in the best interest of HP and its

shareholders.  The Governance Revisions not only address the specific allegations relating to

---

[2] Unless otherwise noted, all capitalized terms shall have the same definitions as set forth in the Third Amended and Restated Stipulation of Settlement.

HP's acquisition of Autonomy that gave rise to these proceedings, but anticipate future issues and attempt to significantly strengthen HP's corporate practices going forward.

The Governance Revisions include detailed new policies and procedures relating to HP's M&A activities, and reforms relating to the composition, defined duties and increased role of HP's Risk Management Committee. The Governance Revisions also provide for greater coordination of M&A activity throughout HP's business units, the evaluation of technology integration in due-diligence plans, and formal M&A due diligence training and education. In sum, the proposed Agreement confers substantial benefits on HP and its shareholders.

The Agreement also incorporates the Settling Parties' negotiated resolution of fees and expenses. Specifically, Federal and State Counsel and HP agreed to submit the amount of attorneys' fees and expenses to binding arbitration with Judge Walker. As a result of that process, and subject to the Court's review and approval, HP has agreed to pay $7,171,998 in attorneys' fees and $72,948.90 in expenses to Federal Counsel, and $1,528,002 in attorneys' fees and $108,873.80 in expenses to State Counsel. Agreement (dkt. 277-1) at 38, § IV.A. As found by Judge Walker, the arbitrated fee and expense awards are supported by the results achieved by Counsel's investigation, litigation and negotiation of the Agreement. Arbitration Decision (dkt. 233-1). Finally, HP has agreed to pay a service award of $25,000 to Federal Plaintiff for his time and efforts devoted to the case, subject to Court approval. Agreement (dkt. 277-1) at 39, § IV.C.

In sum, the Agreement is an outstanding resolution of a case of substantial complexity. The Agreement is fair, reasonable, and adequate to HP and its shareholders and confers substantial benefits on HP through the adoption of valuable corporate governance changes. Moreover, the scope of the release is properly limited to Autonomy-Related Claims.

Accordingly, Federal Plaintiff respectfully requests the Court to grant final approval.

## II.     OVERVIEW OF THE LITIGATION
### A.     The Federal Action

Between November and December 2012, several shareholder derivative actions were filed in the United States District Court for the Northern District of California in connection with HP's acquisition of Autonomy.  All of these federal shareholder derivative cases were assigned or transferred to the Honorable Charles R. Breyer.

On February 21 and March 4, 2013, the District Court issued orders consolidating three categories of cases: "derivative shareholder suits, nonderivative securities class actions, and ERISA suits" which all "share[d] common facts."  Orders Consolidating Cases (dkt. 61 and 65). The Court also appointed Morrical as lead plaintiff in the shareholder derivative actions, and the law firm of Cotchett, Pitre & McCarthy as lead counsel.

On May 3, 2013, after filing a Petition for Writ of Mandate in Santa Clara Superior Court to obtain HP internal records under California and Delaware shareholder inspection statutes, Morrical filed a comprehensive Consolidated Shareholder Derivative Complaint in the Federal Action.  Molumphy Decl. at ¶¶ 11-12, 18; Consolidated Complaint (dkt. 75).  The Consolidated Complaint asserts that a pre-suit demand on HP's Board of Directors ("Board") would have been futile, and alleges misconduct by the Settling Individual Defendants in connection with HP's failed acquisition of Autonomy.  As alleged, hundreds of millions of dollars of Autonomy's pre-acquisition revenue had been improperly recorded, key Autonomy documents were missing, and HP had substantially overpaid for Autonomy.  *Id.* at ¶ 290.  HP's own internal investigation concluded that it had been the victim of a fraud in the Autonomy deal and, as a result, HP wrote down 85 percent of the purchase price, a loss of approximately $8.8 billion.  *Id.*

### B.     The State Actions

On July 26, 2013, HP shareholder James R. Gould, Jr. filed a shareholder derivative action in state court in Santa Clara County, California.  On August 16, 2013, HP shareholder Leroy Noel filed another shareholder derivative action in state court in Santa Clara County.  On

1  September 26, 2013, the Santa Clara County Superior Court consolidated the *Noel* matter with

2  the *Gould* litigation.

3      The State Complaints, which also assert that a pre-suit demand on HP's Board would

4  have been futile, make claims on behalf of HP against present and former HP directors and

5  officers in connection with the Autonomy acquisition.  The complaint filed in the *Noel* action

6  also alleges violations of certain California statutes by Autonomy's former Chief Executive

7  Officer Michael Lynch in connection with pre-acquisition conduct arising out of his sale of

8  Autonomy securities to HP.

9

10      **C.**    **Formation of the Demand Review Committee and Internal Investigation**

    On January 17, 2013, i.e., after this derivative litigation was filed and just two weeks

11  after Morrical successfully sued to obtain HP's books and records, HP's Board established a

12  Demand Review Committee ("DRC") to investigate the derivative claims and, in connection

13  with those claims, to evaluate the need for new or modified corporate policies or procedures.

14  DRC Resolution at 9 (dkt. 211-1).  The DRC retained Proskauer Rose LLP ("Committee

15  Counsel") as counsel to HP, reporting to the DRC, to assist with its internal investigation shortly

16  thereafter.  On May 28, 2013, while the DRC evaluated the claims, the Court stayed the case.

17  *See* Orders Staying Case (dkts. 87, 123).

18      Throughout 2013, including during the stay when the DRC conducted its review,

19  Committee Counsel continued to communicate with Federal Counsel and exchanged information

20  relating to the asserted claims and defenses, as well as supporting materials regarding the DRC's

21  mandate and its investigation.  Molumphy Decl. at ¶ 22.  Committee Counsel also physically met

22  with Federal Counsel several times, including in-person meetings in April and November 2013,

23  where counsel discussed HP's M&A practices and Federal Counsel received updates regarding

24  the status of the DRC's review, including the DRC's professional advisors' preliminary findings

25  regarding the types of problematic transactions entered into between Autonomy and certain

26  Autonomy business partners before the Acquisition.  *Id.*  Committee Counsel also met with

27  counsel for the State Plaintiffs ("State Counsel") while the DRC was conducting its review.

28

LAW OFFICES
COTCHETT, PITRE
& MCCARTHY, LLP

**Notice of Motion and Motion for Final Approval of Third Amended Settlement; MPA**    **5**
**Master File No. C-12-6003-CRB**

DRC Resolution at 15 (Dkt. 211-1).  In November 2013, Committee Counsel provided State Counsel with an update regarding the status of the DRC's review and, in December, after working with their own corporate governance expert, State Counsel provided Committee Counsel with M&A governance proposals and subsequently various suggestions for enhancement to governance.  *Id.*  During this time, Federal Counsel worked closely with State Counsel to integrate their ideas on proposed reforms, and Federal Counsel utilized the assistance of Stanford Professor David Larcker, a prominent governance expert.  Molumphy Decl. at ¶ 23.

In January 2014, HP reported to the Court that the DRC had presented its finding and recommendations to the Board of Directors.  *See* Status Report (dkt. 129) at 2.  The Board resolved, among other things, that HP had claims against certain legacy Autonomy officials, including Lynch, Autonomy's former Chief Executive Officer, and Hussain, Autonomy's former Chief Financial Officer, as well as Autonomy's former auditors at Deloitte UK.  DRC Resolution at 87-89 (Dkt. 211-1).  The Board further instructed the Company's management to consider governance reforms to address the allegations in the Federal Action and proposals from State Plaintiffs, and resolved that Committee Counsel, along with counsel for HP ("Company Counsel"), should explore resolution of claims asserted in the Federal and State Actions, and if resolution could not be achieved, to move to dismiss the derivative actions.  *Id.*

### D.    Settlement Negotiations and Revisions to Settlement Terms

In early February 2014, in-person settlement negotiations commenced with the assistance and participation of Judge Walker, serving as mediator.  Towards that end, Committee Counsel and Company Counsel held detailed, full-day, face-to-face meetings with Federal Counsel on February 18-20, 2014 and with State Counsel on February 21, 2014.  Molumphy Decl. at ¶ 25. During those meetings, Committee Counsel briefed Federal Counsel and State Counsel on the DRC's findings and recommendations, and counsel continued to discuss proposed governance enhancements.  *Id.*; *see also*, Walker Decl. (dkt. 149-1) at ¶¶ 7-10.

On February 24 and 25, 2014, HP and the Federal and State Plaintiffs participated in the first of several face-to-face mediation sessions with Judge Walker.  Walker Decl. ¶ 24.  Three

weeks later, on March 11-13, 2014, HP and the Federal and State Plaintiffs participated in additional face-to-face mediation sessions with Judge Walker.  *Id.* at ¶¶ 11-12.  Ultimately, after numerous additional conversations, an agreement in principle was reached subject to, among other things, Court approval.  *Id.*

On June 30, 2014, the Settling Parties submitted the initial version of the settlement for preliminary approval.  *See* Motion for Prelim. Approval (dkt. 149-2).  However, on September 3, 2014, after the Court expressed concern over the terms of the proposed attorney retention clause, the parties submitted a First Amended Settlement (dkt. 201) which removed the term, and provided that attorneys' fees and expenses would be determined through a binding arbitration with Judge Walker, and subject to Court approval.  After the Court subsequently expressed concern over the breadth and vagueness of the proposed release, which released non-Autonomy-related claims, the parties filed the Second Amended Settlement (dkt. 242), which proposed a two-part release, the first of which covered "all Autonomy-Related Claims," and the second of which covered all "Known Claims arising from the allegations in the Complaints."  *Id.* at ¶ 62.

On December 19, 2014, the Court issued its Order denying preliminary approval of the Second Amended Settlement.  December 19, 2014 Order (dkt 265).  While the Court found that the release of "all Autonomy-Related Claims" represented a "fair and reasonable resolution of derivative litigation related to the Autonomy acquisition," it held that the second clause's inclusion of claims "arising from the allegations in the Complaints" rendered the release overbroad.  *Id.* at 7.

**E.    The Third Amended and Restated Settlement**

On October 6, 2014, HP announced plans to separate into two new publicly traded Fortune 50 companies: one comprising HP's enterprise technology infrastructure, software and services businesses, which will do business as Hewlett-Packard Enterprise, and one that will comprise HP's personal systems and printing businesses, which will do business as HP Inc. Molumphy Decl. at ¶ 34.

1    Following HP's announcement and the Court's December 19, 2014 Order, the Settling

2    Parties engaged in further negotiations to address the Court's decision.  *Id*. at ¶ 35.  On January

3    21, 2015, the Settling Parties entered into a Third Amended and Restated Stipulation of

4    Settlement which made certain changes to the prior versions, and the Settling Parties moved for

5    preliminary approval.  Motion for Prelim. Approval (dkt. 277).  Most salient, the Settling Parties

6    agreed to remove the clause of the release that the Court disapproved and to retain only the

7    clause of the release – which is limited to Autonomy-Related Claims – that the Court deemed

8    "fair and reasonable."  Third Amended Settlement (dkt. 277-1) at §I.A.61, §III.E.1.e.

9    The Settling Parties also addressed HP's October 2014 announcement that HP would split

10   its business into two public companies.  The Settling Parties agreed that, subject to the Court

11   approving the settlement, HP would implement the Governance Revisions not only at HP but

12   also at HP Enterprise.  *Id.* at §III.A.1-2.

### F.    Preliminary Approval, Exclusions from Bar Order, and Notice

15   On March 13, 2015, the Court granted preliminary approval of the Third Amended

16   Settlement and ordered that notice be provided to HP shareholders.  Preliminary Approval Order

17   (dkt. 319).  On May 22, 2015 and June 9, 2015, following a hearing on Sushovan Hussain's

18   motion to intervene, the Settling Parties entered into separate agreements excluding Sushovan

19   Hussain and Michael Lynch, respectively, from the proposed bar order and release provided in

20   the Third Amended Settlement.  Hussain and Lynch Agreements (dkt. 349 and 359).  All other

21   terms of the Third Amended Settlement remained the same.

22   The Court-approved notice was published in various newspapers and posted with the

23   SEC and on HP's website.  Declaration of Marc Wolinsky (dkt. 360).  Further, the Governance

24   Revisions, summarized in the notice and in HP's public filings in this Court, were made

25   available to HP shareholders for their review.  *Id.*; Molumphy Decl. at ¶ 40.  Several

26   shareholders have taken advantage of this opportunity and, to Lead Plaintiff's knowledge, no

27   shareholder has raised any issue with respect to access to the proposed reforms.  *Id.*

28

III.   **THE STANDARDS FOR JUDICIAL APPROVAL OF A DERIVATIVE SETTLEMENT**

Federal Rule of Civil Procedure 23.1 governs a district court's analysis of the fairness of a settlement of a shareholder derivative action. Under Rule 23.1, a derivative action "may be settled, voluntarily dismissed, or compromised only with the court's approval.

The Court must determine whether the settlement is "fundamentally fair, adequate and reasonable" (*In re Rambus Inc. Derivative Litigation*, No. c-06-3515-JF, 2009 WL 166689, at *2 (N.D. Cal. Jan. 20, 2009) (citing Fed. R. Civ. P. 23(e); *Mego Financial Corp. Sec. Litig.*, 213 F.3d 454, 459 (9th Cir. 2000); *Officers for Justice v. Civil Service Commission*, 688 F.2d 615, 625 (9th Cir. 1982)), and generally may apply the same factors used when reviewing a settlement of a class action. *Rambus*, 2009 WL 166689. These factors include "the strength of the plaintiffs' case; the risk, expense, complexity, and likely duration of further litigation; . . . the amount offered in settlement; the extent of discovery completed and the stage of the proceedings; [and] the experience and views of counsel . . . ." *Mego*, 213 F.3d at 458 (citing *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998)). "The relative degree of importance to be attached to any particular factor will depend on the unique circumstances of each case." *Officers for Justice*, 688 F.2d at 625. The Court must also ensure the agreement "is not the product of fraud or overreaching by, or collusion between, the negotiating parties, and that the settlement, taken as a whole, is fair, reasonable and adequate to all concerned." *Id.*

IV.   **THE AGREEMENT IS AN OUTSTANDING RESULT FOR HP AND SHOULD BE APPROVED**

A.   **The Agreement Confers Substantial Benefits Upon HP**

The Agreement provides significant corporate governance reforms which will continue to benefit HP (and HP Enterprise) for years. More particularly, as a result of the prosecution and settlement of the Actions, HP has agreed to adopt M&A reforms which include:

- A senior executive-level Risk Management Committee, with Board-approved charter, charged with ensuring that due diligence risk issues are identified and raised to the CEO and Board level;

- Implementation of a comprehensive internal electronic database, linking all the separate business units involved in M&A due diligence with over 500 specified due diligence items, ranging from valuation to integration;

- Reforms to the Board's Finance & Investment Committee and Investment Review Board, charged with oversight of M&A activity, relating to the composition and dissemination of due diligence prepared reports by advisors retained by the Company, and a defined process review of M&A activities, with specific criteria and metrics for target selection, valuation and integration;

- Bolstering institutionalized due diligence education and training;

- Implementation of a new fairness opinion policy relating to outside advisor's independence, conflicts of interest, and the assumptions and qualifications used in written fairness opinions; and

- A new M&A due diligence policy, with a technology due diligence plan to be approved by Board's Technology Committee.

Moreover, as additional consideration provided in the Agreement, the Settling Parties agreed that HP will cause HP Enterprise, the newly formed public company that will result from the separation of HP into two Fortune 50 companies, to adopt the Governance Revisions described above, subject to the Court's approval of the settlement.  Third Amended Settlement (dkt. 277-1) at § III.A.2.  Thus, both companies will now benefit from these valuable Governance Revisions, along with HP's shareholders, who will own shares in both companies.

The Governance Revisions directly address the allegations in the Actions and are causally connected to the efforts of Plaintiffs and their Federal and State Counsel.  Professor Larcker, who worked with Federal Counsel during the negotiation process, opined that the reforms will

1    provide substantial benefits to HP and its shareholders by changing HP's M&A practices and

2    reducing the likelihood of future harm.  Larcker Decl. (dkt. 277-3) at ¶¶ 2, 6-14.  Similarly,

3    Judge Walker, who oversaw the negotiations, found "the derivative action conferred a substantial

4    benefit to HP by promoting and assisting in the development and implementation of new

5    corporate governance measures designed to prevent future failures to detect accounting

6    improprieties, misrepresentations and disclosure failures in the due diligence process leading up

7    to large mergers and acquisitions."  Arbitration Decision (dkt. 233-1) at 8.

8           Corporate governance reforms that "serve to prevent and protect [the company] from the

9    reoccurrence of" alleged wrongdoing that resulted in material harm to the corporation confer a

10   substantial benefit on the corporation and its shareholders that warrants settlement approval.

11   *Unite Nat'l Ret. Fund v. Watts*, No. 04-cv-3603 (DMC), 2005 U.S. Dist. LEXIS 26246, at *18

12   (D.N.J. Oct. 28, 2005).  "As corporate debacles such as Enron, Tyco and WorldCom

13   demonstrate, strong corporate governance is fundamental to the economic well-being and

14   success of a corporation" and "'[c]ourts have recognized that corporate governance reforms such

15   as those achieved here provide valuable benefits to public companies.'"  *In re NVIDIA Corp.*

16   *Derivative Litig.*, No. C-06-06110-SBA (JCS), slip op. at 4 (N.D. Cal. Dec. 22, 2008) (citation

17   omitted)); *see also*, *Cohn v. Nelson*, 375 F. Supp. 2d 844, 853 (E.D. Mo. 2005); *Maher* v. *Zapata*

18   *Corp.*, 714 F.2d 436, 461 (5th Cir. 1983) ("[W]here, as here, the derivative suit is largely an

19   attack on past corporate management practices, as well as on some present officers and directors,

20   the dollar amount of a possible judgment, which is essentially the sole goal in the class action

21   damage suit, is not the sole, and may well not be the most important, matter to be considered, for

22   the effects of the suit on the functioning of the corporation may have a substantially greater

23   economic impact on it, both long- and short-term, than the dollar amount of any likely judgment

24   in its favor in the particular action."); *Goldman* v. *Northrop Corp.*, 603 F.2d 106, 109 (9th Cir.

25   1979) ("Instead of choosing the course of securing the greatest possible money judgment from

26

27

28

the Northrop officers, the parties and the court chose the course of terminating litigation and taking steps to assure that such conduct as had been disclosed could not occur in the future.").

### B. The Agreement Reflects an Informed Analysis of the Strengths of the Case and the Risks of Further Litigation

In assessing the fairness, reasonableness, and adequacy of a settlement, the court should balance the benefits of the settlement against the continuing risks of litigation. *Girsh v. Jepson*, 521 F.2d 153, 157 (3d Cir. 1975); *Officers for Justice*, 688 F.2d at 625. There is no question that derivative actions are complex and fraught with risk. Indeed, the Ninth Circuit, in affirming the district court's approval of a settlement in a derivative action, noted that "the odds of winning [a] derivative lawsuit [are] extremely small" because "derivative lawsuits are rarely successful." *In re Pac. Enters. Sec. Litig.*, 47 F.3d 373, 378 (9th Cir. 1995). This case was no different.

Indeed, Plaintiffs <u>carefully</u> investigated the facts and considered the benefits of the Governance Revisions against the merits and risks of potential recovery from continued litigation. Prior to reaching settlement, Morrical and his Federal Counsel devoted substantial time and effort to this case, taking the lead in investigating the relevant claims back in 2012, after the Autonomy write-down was first announced, making a shareholder "books and records" demand under both California and Delaware inspection statutes and then filing a separate writ of mandate action in California Superior Court to compel production, locating and interviewing key witnesses, including the accounting firm that advised HP during the Autonomy due diligence, and preparing an extraordinarily detailed complaint. Molumphy Decl. at ¶¶ 46-48, 56-64.

Although Plaintiffs believe that the claims are meritorious, liability is by no means a foregone conclusion. For instance, had Plaintiffs continued to litigate, there was a risk that they would not have prevailed on defendants' pre-trial motions designed to eliminate or curtail the derivative claims. Even if Plaintiffs prevailed at the pleading stage, significant risks remained in getting past the Settling Defendants' anticipated motions for summary judgment and obtaining a favorable judgment after trial.

Given HP's incorporation in Delaware, Morrical had to navigate the complexity of Delaware corporate law, including its statutes and case law governing derivative actions, demand futility, the business judgment rule, and exculpation protections to directors, among other things. Delaware strictly applies the demand requirement, whereby demand is futile only if (1) a majority of Board lacks independence to consider demand or (2) there is "a reasonable doubt that the challenged transaction was the product of a valid exercise of business judgment." *Aronson v. Lewis*, 473 A.2d 805, 814 (Del. 1984). Here, on the date of filing, HP's Board was comprised almost entirely of outside directors, and none personally benefitted from the Autonomy transaction.

Similarly, there were complexities in establishing that the members of the HP Board lacked independence because they faced a substantial likelihood of personal liability for approving the deal. *Id.* at 815. Under Delaware's business judgment rule, directors are presumed to have acted in good faith, on an informed basis, and in the best interests of the corporation. *Id.* at 812. Further, under Delaware statute, directors may be immunized from liability, even for bad decisions, if they reasonably rely on information provided by management or outside professionals. 8 Del. C. 141(e). Here, HP's Board retained several law firms, an accountant, and two professional bankers, and Morrical had to evaluate the complexities of their interaction and their ultimate advice to HP that it was paying a fair price based on independent valuation models. Molumphy Decl. at ¶¶ 61, 63.

Plaintiffs also had to address the Delaware statute permitting corporations to exculpate directors from liability for breaches of duty of care in their corporate charter. 8 Del. C. 102(b)(7). Since HP had such a provision here, Plaintiffs had to address exceptions to that statute, such as bad faith or violation of a duty of loyalty, arguably requiring evidence that the directors acted with intent to wrong the corporation and advance their personal interests. *See*, e.g., *Wood v. Baum*, 953 A.2d 136, 141 (Del. 2008).

While the legal standards applicable to claims against HP's officers are not identical to the directors, who are covered by HP's exculpation provision, they nonetheless are stringent.

Morrical would need to prove that they violated their duty of care by acting with gross negligence, a standard that some Delaware courts have interpreted to require proof that HP's officers took actions "which [were] without the bounds of reason" and "so grossly off-the-mark as to amount to reckless indifference or a gross abuse of discretion."  *See, e.g.*, *Metropolitan Life Ins. Co.* v. *Tremont Grp. Holdings, Inc.*, 2012 WL 6632681, at *7 (Del. Ch. Sept. 13, 2012); *Solash* v. *Telex Corp.*, 1988 WL 3587, at *9 (Del. Ch. Jan. 19, 1998).  Again, HP's officers would certainly argue that the due diligence process was consistent with standards applied to evaluate UK corporations, and the opinions provided by outside advisors confirmed that the ultimate price paid was fair to HP.  Thus, Morrical had to understand the process by which HP's officers informed themselves, and pertinent differences between US and UK laws.  In fact, Federal Counsel consulted with UK authorities in London, including the Financial Conduct Authority, as well as experts on pertinent due diligence issues.  Molumphy Decl. at ¶ 63.

Morrical also had to take into account the impact of the Board's creation of a DRC, including the composition of the DRC, the extent of its investigation, and the legal impact of their decision to pursue Autonomy officials (and not to pursue HP officials).  *Id.* at ¶ 64.  Had Morrical been able to overcome demand futility, HP would certainly bring a motion to terminate or take-over the case to pursue other claims, based on the resolution of HP's Board and its DRC.  HP would also claim that, under Delaware law, the Board's decision to terminate certain litigation and bring litigation against Autonomy was presumptively valid under the business judgment rule.  *Brazen* v. *Bell Atl. Corp.*, 695 A.2d 43, 49 (Del. 1997).

In sum, based upon the record and applicable law, it is clear that there were serious risks in overcoming potential defenses and in establishing liability.

## C.   The Agreement Was Negotiated At Arms-Length, By Experienced and Well-Informed Counsel, With the Assistance of a Respected Mediator

The Agreement was reached as a result of good faith bargaining at arm's length without collusion, including many face-to-face mediation sessions overseen by Judge Walker, and more negotiation sessions that followed.  Molumphy Decl. at ¶¶ 21-29, 34-36, 45; Walker Decl. (dkt.

149-1) at ¶¶ 6-12, 16-23.  Judge Walker's assistance assured an arm's length process and a sound result for HP and its shareholders.

The settlement negotiations also involved experienced counsel with a firm understanding of the strengths and weaknesses of the claims and defenses asserted, including those outlined above.  Molumphy Decl. at ¶¶ 21-23, 29, 49, 56-58.  In addition to these legal complexities, the action presented complicated factual issues.  The Autonomy acquisition was a massive transaction, indeed one of the largest in HP's history.  Accordingly, Plaintiffs' investigation involved the review of thousands of documents and witnesses located world-wide.  *Id.*  The witness statements had to be compared and correlated with the physical evidence, including contemporaneous email correspondence and due diligence materials, and evaluated under the umbrella of pertinent legal and accounting standards.  *Id.*

Significant weight should be attributed to the belief of informed and experienced counsel that settlement is in the best interest of those affected.  *Officers for Justice*, 688 F.2d at 625.  As detailed above, Federal and State Counsel devoted substantial time and resources investigating the underlying legal claims and defenses.  As a result, they had unique knowledge of the strengths and weaknesses of the case and, combined with their experience in shareholder derivative actions, were extremely well-informed about the case at the time of negotiations.

## V.   THE NEGOTIATED PROCESS AND ARBITRATED AMOUNT OF ATTORNEYS' FEES AND EXPENSES SHOULD BE APPROVED

After negotiating the principal terms of the settlement, counsel for the Federal and State Plaintiffs and HP separately negotiated the amount of attorneys' fees and expenses.  Molumphy Decl. at ¶ 28; Walker Decl. at ¶ 13.  However, when those negotiations did not yield an agreement, the Settling Parties agreed to submit the matter to Judge Walker for binding arbitration, subject to the Court's review and approval.  *Id.*

On September 25, 2014, Judge Walker rendered his Arbitration Decision.  Arbitration Decision (dkt. 233-1).  Judge Walker awarded $7,171,998 in fees and $72,948.90 in expenses to

Federal Counsel, Cotchett Pitre & McCarthy, and $1,528,002 in fees and $108,873.80 in expenses to State Counsel, Robbins Geller Rudman & Dowd LLP and Barrett Johnston Martin & Garrison, LLC. *Id.* at fn 1, 30-31.

## A.   The Parties' Negotiated Resolution of Attorneys' Fees and Costs by Binding Arbitration Was Fair and Reasonable Term of Settlement

The United States Supreme Court has long endorsed the consensual resolution of attorneys' fees issues as the ideal toward which litigants should strive. *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983) ("A request for attorney's fees should not result in a second major litigation. Ideally, of course, litigants will settle the amount of a fee."). Moreover, where there is no evidence of collusion and no detriment to the parties, the court should give "substantial weight to a negotiated fee amount." *Ingram v. Coca-Cola Co.*, 200 F.R.D. 685, 695 (N.D. Ga. 2001); Walker Decl. (dkt. 149-1) at ¶¶13-15, 22.

Here, HP and Plaintiffs jointly agreed to submit resolution of fees and expenses to binding arbitration before Judge Walker, a respected neutral, subject to the Court's review and approval. Molumphy Decl. at ¶¶ 50-51. Judge Walker was well-positioned to serve as an arbiter of fees, and to evaluate the respective contributions of Federal and State Counsel, having served as the mediator during the arm's-length settlement negotiations. He considered each side's written briefs, and held a hearing with oral arguments, before issuing a written decision supporting his award. *Id.*

## B.   The Fee and Expense Awards in Judge Walker's Arbitration Decision Should be Approved

For the reason stated in Judge Walker's Arbitration Decision, the attorneys' fees and expenses awarded by Judge Walker are reasonable, supported by pertinent legal authorities in federal court and in Delaware, where HP is incorporated, and should be approved by this Court.

Under the "substantial benefit" doctrine, counsel who prosecute a shareholder derivative action that confers benefits on the corporation are entitled to an award of attorneys' fees and costs. See *Boeing Co. v. Van Gemert*, 444 U.S. 472 (1980); *Mills v. Elec. Auto-Life Co.*, 396

U.S. 375, 397-98 (1970).  Further, it is well recognized that the "benefit" need not be pecuniary in nature.  In *Mills*, the Supreme Court stated that "a corporation may receive a 'substantial benefit' from a [stockholders' action], justifying an award of counsel fees, regardless of whether the benefit is pecuniary in nature," and that "regardless of the relief granted, private stockholders' actions of this sort 'involve corporate therapeutics,' and furnish a benefit to all shareholders by providing an important means of enforcement of the proxy statute." *Id.* at 395-96.

Indeed, Delaware (where HP is incorporated) and federal law are well-established that attorneys fees should be awarded when a settlement confers a substantial benefit on a corporation in the form of corporate governance reforms:

> "Under both Delaware and federal law, a court may grant fees and expenses to derivative counsel when the derivative suit creates a common fund or confers a substantial corporate benefit. 'Typically, successful derivative . . . suits which result in the recovery of money . . . or which result in the imposition of changes in internal operating procedures that are designed to produce such monetary savings in the future, are viewed as fund creating actions.'"

*In re Oracle Sec. Litig.*, 852 F.Supp. 1437, 1445 (N.D.Cal. 1994) (ellipsis in original), citing *Tandycrafts, Inc. v. Initio Partners*, 562 A.2d 1162, 1164 (Del. 1989) and *Mills v. Electric Auto-Lite Co.*, *supra*, 396 U.S. at 394-96; see also *In re Rambus Inc. Deriv. Litig.*, 2009 WL 166689, at *3 (N.D.Cal. 2009) (in approving fees, district court noted that "courts consistently have approved attorneys' fees and expenses in shareholder actions where the plaintiffs' efforts resulted in significant corporate governance reforms but no monetary relief."); *Unite Nat'l Ret. Fund v. Watts*, 2005 U.S. Dist. LEXIS 26246 (D.N.J. Oct. 28, 2005) (approving $9.2 million fee in settlement based on corporate governance reforms aimed at underlying conduct).

With respect to the appropriate <u>amount</u> of the fee award, federal and Delaware courts again apply many of the same factors.  In Delaware, courts apply the five factors set out in *Sugarland Industries, Inc. v. Thomas*, 420 A2d 142 (Del. 1980), including: (1) the results achieved by counsel, (2) the amount of time and effort applied to a case, (3) the relative complexities of the litigation, and the skills applied by counsel to their resolution, (4) the

contingent nature of the case, and (5) the standing and ability of counsel. *Id.* at 149. "The Ninth

Circuit takes the same general approach as the Delaware Supreme Court outlined in

*Sugarland…*" *Oracle*, 852 F.Supp. at 1449.

As demonstrated in the Arbitration Decision, each of these five factors supports Judge

Walker's awards.

### 1.   The Agreement Provides Substantial Benefits for HP

As discussed above, the Agreement provides substantial benefits to HP in the form of

Governance Revisions which directly address HP's existing M&A practices, and will

additionally be applied to HP's spin-off company. Molumphy Decl. ¶¶ 43-44. The Revisions

provide for, among other things, significantly enhanced procedures which will help create a

corporate environment where the issues complained of are less likely to reoccur. In fact, from

Morrical's perspective, they may prevent frauds like this from happening in the future. The

parties spent substantial time discussing and evaluating HP's internal M&A processes, and the

Governance Revisions reflect significant improvements crafted during these joint discussions.

*Id.* at ¶¶ 21-29, 36, 43-44. Morrical was also greatly assisted by a prominent corporate

governance expert, Stanford Professor David Larcker, who opined that the Governance

Revisions are highly valuable to HP and will have positive long-lasting effects on HP and its

shareholders. Molumphy Decl. at ¶ 27; Larcker Decl. at ¶¶10-14.

### 2.   Federal and State Counsel Devoted Substantial Time and Effort

Federal Counsel devoted substantial time and effort to this case, taking the lead in

investigating the relevant claims back in 2012, after the Autonomy write-down was first

announced, obtaining critical evidence through separate shareholder inspection litigation,

preparing an extraordinarily detailed complaint, and ultimately, leading the negotiation of a

resolution that provides valuable reforms to HP. Molumphy Decl. at ¶¶ 9-12, 17-18, 21-29. This

effort, described in detail in the Molumphy Declaration filed herewith, was properly considered by Judge Walker in his Arbitration Decision.[3]  The work included:

- Shareholder inspection demands made under both Delaware and California law;

- A Writ of Mandate proceeding filed in Santa Clara Superior Court to compel HP to produce relevant internal books and records, resulting in the production of HP internal books and records, many of which were ultimately provided to HP shareholders in other related actions;

- Identification and interviews of former employees of HP and Autonomy, including the key HP executives responsible for the due diligence process and negotiations with Autonomy's CEO, Michael Lynch, which interviews took place both in the United States and in Europe;

- Interviews of representatives of KPMG, HP's outside accountant retained to evaluate Autonomy, and obtaining the reports that it prepared;

- An exhaustive evaluation of the Autonomy acquisition from both sides of the transaction;

- Review of due diligence materials provided by Autonomy;

- Review of HP Board and Board Committee presentations, including fairness opinions and valuation materials, relating to Autonomy deal;

- Review of Autonomy records contemporaneously provided to HP; and

- Consultation with experts with specialized knowledge of the pertinent accounting, due diligence, and governance issues.

Molumphy Decl. at ¶¶ 10-12, 17-18, 21-23, 25, 27-29, 49, 56-58, 63.

---

[3] State Counsel at Robbins Geller has separately filed papers describing State Counsel's work on the case and its lodestar calculations, which were also considered by Judge Walker.  *See* Ex. A and B to the Declaration of Benny C. Goodman, III in Support of State Plaintiffs' Joinder in Motion for Final Approval of Third Amended Settlement ("Goodman Declaration").

The witness statements were compared and correlated with the physical evidence, including contemporaneous email correspondence and due diligence materials, and evaluated under the umbrella of pertinent legal and accounting standards.  Much of this evidence also formed the basis for an extraordinarily detailed, 180-page Consolidated Complaint.

### 3. The Action Involved *Complex* Issues of Fact and Law

As discussed above, this case presented federal and Delaware state claims against various HP's officers and directors, as well as professional advisors that the Board retained and relied upon, related to the evaluation, acquisition and integration of a foreign-based corporation for billions of dollars, as well as fiduciary duty, accounting, revenue recognition and corporate disclosure issues, governed by both United States and United Kingdom law, that were relevant to the acquisition.  In addition to these legal complexities, the action presented complicated factual issues.  The Autonomy acquisition was a massive transaction, indeed one of the largest in HP's history.  Accordingly, Federal Counsel's investigation involved the review of thousands of documents and witnesses literally located world-wide.  Molumphy Decl. at ¶¶ 12, 17, 21, 25, 29, 56-57, 63.  Suffice to say, this was a case of enormous legal and factual complexity.

### 4. Counsel Provided Representation On A Fully *Contingent Basis*

Federal Counsel represented Morrical on a fully contingent basis, advancing all of their attorney time as well as expenses for several years, with no guaranty of recovery.  Molumphy Decl. at ¶ 65.  Indeed, while it is well recognized that shareholder derivative suits provide the primary means of enforcing required standards of conduct on the part of corporate officials (*In re M.D.C. Holdings Securities Litig.,* No. CV 89-0090, 1990 U.S. Dist. LEXIS 15488, *7-9 (S.D. Cal. Aug. 30, 1990), derivative litigation is "notoriously difficult."  *See In re Xcel Energy, Inc. Securities, Derivative & "ERISA" Litig.*, 364 F. Supp. 980, 1003 (D. Minn. 2005); *see also In re Atmel Corp. Derivative Litig.*, No. C 06-4592, 2010 U.S. Dist. LEXIS 145551, * 42 (N.D. Cal. March 31, 2010) ("The odds of winning a derivative lawsuit are extremely small.") (quotations omitted).  Accordingly, attorneys who agree to represent shareholder plaintiffs in derivative

1   actions on a contingent basis face a substantial risk of non-payment.  *See, e.g., In re Schering –*

2   *Plough Corp. Shareholder Derivative Litig.*, No. 01-1401, 2008 U.S. Dist. LEXIS 2569, *2

3   (D.N.J. Jan. 14, 2008) ("Because there is no fee-shifting statute, derivative litigation counsel . . .

4   took on significant risk.").

### 5.    HP Benefitted From the *Standing and Ability* of Counsel

Federal Counsel is one the foremost securities and derivative litigation firms in the

United States, and the attorneys who worked on this litigation have decades of experience in

derivative litigation.  Molumphy Decl. at ¶¶ 71-72, Ex. B (firm resume).  As discussed in detail

above, Counsel utilized their standing and ability during all phases of this case to benefit HP and

its shareholders.  Indeed, after filing its detailed complaint, Federal Counsel actively continued to

investigate the relevant claims, and by objecting to HP's efforts to indefinitely stay the case,

ultimately obtained a Court order requiring HP's Demand Review Committee to conduct and

complete its investigation by January 2014.  *Id.* at ¶¶ 11-12, 17-20.  In the meantime, Federal

Counsel obtained additional information through its own investigation, third parties, settlement

discussions and the mediation, and became intimately familiar with the evidence in support or in

response to the key claims.  *Id.*  Thus, by the time the settlement was negotiated, Federal Counsel

was in a good position to reasonably assess HP's practices in the context of similar situations

with other companies, as well as to help craft appropriate corporate reforms to help ensure

similar harm was not suffered in the future.

### 6.    Counsel's Requested Award Is Supported By a Lodestar Cross-Check

Judge Walker confirmed his Arbitration Decision by a "cross-check" with Federal and

State Counsel's lodestar amounts, a method often used by federal courts to evaluate the

reasonableness of an award of attorneys' fees.  Arbitration Decision (dkt. 233-1) at 23-28; *See*

*also, In re Shering-Plough Corp.*, 2008 U.S. Dist. LEXIS 2569, at *18 (approving $9.5 million

fee award after conducting lodestar analysis).  Delaware courts also have the discretion to apply

a "lodestar" approach to cross-check the reasonableness of the proposed fees.  *In re Abercrombie*

& *Fitch Co. S'holders Derivative Litig. v. Jeffries,* 886 A.2d 1271, 1275 (Del. 2005) (court

properly relied on "lodestar" analysis to evaluate reasonableness of fees when "benefit"

bestowed on corporation was not quantifiable); *Louisiana State Employees' Retirement System*,

2001 Del. Ch. LEXIS 115 at *34 n.56 (court used "lodestar" as "cross-check" of fees when

"benefit" could not be readily determined).

> Under the lodestar method, the court reviews the fee petition to ascertain the number of
hours reasonably billed and then multiplies that figure by an appropriate hourly rate.  Once that
initial computation has been made, the court may, in its discretion, increase the lodestar by
applying a multiplier based on factors such as the risk of the litigation and the quality of
counsel's work.  *In re AOL Time Warner Shareholder Derivative Litig.,* No. 02 Civ. 6302, 2009
U.S. Dist. LEXIS 124372, *19 (S.D.N.Y. Nov. 9, 2009).  Notably, many of the factors used to
determine an appropriate lodestar multiplier are similar to the factors used under Delaware's
*Sugarland* test, and discussed above.

> Federal courts apply a positive multiplier when these factors are found and not reflected
in the lodestar amount.  "In shareholder litigation, federal courts typically apply a multiplier of *3
to 5* to compensate counsel for the risk of contingent representation."  *Cohn v. Nelson*, 375 F.
Supp. 2d 844, 862 (E.D. Mo. 2005) (derivative action collecting cases on multipliers; emphasis
added).  Similarly, in *Vizcaino v. Microsoft Corp.,* 290 F.3d 1043 (9th Cir. Wash. 2002), the
Ninth Circuit approved the lodestar method as a "cross-check" against a percentage award and
noted that "courts have routinely enhanced the lodestar to reflect the risk of non-payment in
common fund cases."  *Id*. at 1050-51.  The Ninth Circuit surveyed the range of multipliers
approved by other courts, and found that multiples ranging from *1.0 to 4.0* are frequently
awarded in common fund cases, with the majority of cases in the *1.5 to 3.0* range.  *Id.* at 1052-
1054, and fn. 6; *see also Behrens v. Wometco Enters., Inc.*, 118 F.R.D. 534, 549 (S.D. Fla. 1998)
("Most lodestar multiples awarded in cases like this are between *3 and 4*" (emphasis added)).

Courts have also approved positive multipliers in derivative cases settled on the basis of valuable governance reforms, citing the same factors that Judge Walker found present here. *See e.g.*, *In re United Health Group Inc. Shareholder Deriv. Litig.*, 631 F.Supp.2d 1151, 1160 (D. Minn. 2009) (approving $29 million fee, which included 2.75 multiplier based on quality of work, risk of recovery, and contingent representation); *In re AOL time Warner Shareholder Deriv. Litig.*, 2009 U.S. Dist. LEXIS 124372, *19, 79-80 (S.D.N.Y. Nov. 9, 2009) (approving $8.77 million fee in corporate governance derivative settlement, which included a 1.6 multiplier); *In re Schering-Plough Corp. Shareholder Deriv. Litig.*, 2008 U.S. Dist. LEXIS 2569, *17-18 (D.N.J. Jan. 14, 2008) (approving $9.5 million fee in corporate governance derivative settlement, which included 1.37 multiplier); *Cohn v. Nelson*, 375 F.Supp.2d at 362 (approving $2.25 million fee in corporate governance derivative settlement, which included a 2.9 multiplier).

In his Arbitration Decision, Judge Walker awarded $8.7 million in fees to Federal and State Counsel, representing a modest 2.48 multiplier on the firms' combined lodestar as of the September 2014 arbitration, and a 3.43 multiplier based on fees calculated using 2014 Laffey Matrix Rates. Arbitration Decision (dkt. 233-1) at 27-28. Of that total amount, Judge Walker awarded $7,171,998 in fees to Federal Counsel, which represented a 2.73 multiplier to the firm's lodestar of $2,631,327 as of September 2014 (*id.* at 28) and a 2.34 multiplier based on the firm's updated lodestar of $3,061,169 through the present. Molumphy Decl. at ¶¶ 73, 75, Ex. C.

Importantly, Federal Counsel's lodestar reflects a reasonable number of hours at an hourly rate that is identical to that charged to other, <u>non-contingency</u> clients, i.e., the rates do not already reflect the contingent risk of non-payment. Molumphy Decl. at ¶ 77, Exs. C (lodestar report) and F (representative hourly agreements). Moreover, they are consistent with (and in many cases, less than) prevailing rates for counsel performing similar work in this district, and have been approved by courts in other recent cases. *Id.* at ¶ 76, Ex. E (orders); *see also United Steelworkers of America v. Phelps Dodge Corp.*, 896 F.2d 403, 407 (9th Cir. 1990) (affidavits of plaintiff's attorney regarding prevailing rates in the community, and rate determinations in other

cases, particularly those setting a rate for the plaintiff's attorney, are satisfactory evidence of the prevailing market rate).

Finally, Judge Walker approved reimbursement of $72,948.90 in costs advanced by Federal Counsel as of September 2014.  Arbitration Decision (dkt. 233-1) at 30.  These expenses were incurred in reaching the successful resolution of this matter, and are of the type allowable under the law.  Molumphy Decl. at ¶ 78, Ex. G (cost report); *see also In re Omnivision Tech*, 2008 WL 123936, at *11 (N.D. Cal. Jan. 9, 2009); *Harris v. Marhoefer*, 24 F.3d 16, 19 (9th Cir. 1994).[4]

## VI.    THE COURT SHOULD APPROVE A SERVICE AWARD TO FEDERAL PLAINTIFF, STANLEY MORRICAL

Service payments promote the public policy of encouraging individuals to undertake the responsibility of representative lawsuits, and may be appropriate given the substantial time and effort necessary to prosecute a case.  *In re Mego Fin. Corp. Sec. Litig.*, 213 F. 3d 454, 463 (9th Cir. 2000); *Staton v. Boeing*, 327 F. 3d 938, 977 (9th Cir. 2003); *Razilov v. Nationwide Mut. Ins. Co.*, Case No. 01-CV-1466-BR, 2006 U.S. Dist. LEXIS 82723 (D. Or. Nov. 13, 2006) (court may consider factors such as risk to representative plaintiff, personal difficulties encountered, amount of time and effort spent, duration of the litigation, and/or the personal benefit, or lack thereof, enjoyed by representative as a result of the litigation).

Here, in consideration for his time and effort in bringing and prosecuting the Federal Action, HP agreed to pay Federal Plaintiff Stanley Morrical a service award of $25,000.  Third Amended Settlement (dkt. 277-1) at 39, §IV, C.  The payment is within the range of awards typically given.  *See, e.g.*, *Bogosian v. Gulf Oil*, 621 F. Supp. 27, 32 (E.D. Pa. 1985) (awarding $20,000 to each of two named class representatives based on participation in discovery and 500 plus hours spent on case); *Razilov*, *supra*, 2006 U.S. Dist. LEXIS 82723 at *11-13 (approving

---

[4] While Federal Counsel incurred additional expenses after the September 2014 Arbitration relating to the settlement approval process, objector discovery and related motions, and ongoing communications with HP shareholders, they do not seek such expenses in this Motion.

$10,000 award to each class representative based on the time and effort spent on case, lengthy duration, and plaintiff's insignificant personal benefit from case).

Morrical provided substantial assistance to counsel throughout the life-span of this case. Molumphy Decl. at ¶ 80.  Morrical was involved in the pre-filing investigation, made a separate shareholder "books and records" inspection request, filed a petition for writ action against HP in California Superior Court, consulted with counsel regarding case strategy, attended hearings, and closely monitored and reviewed the settlement negotiations and documentation. *Id.*  After preliminary approval was granted, Morrical responded to document requests and interrogatories served by objectors, and monitored the related motion practice. *Id.*

Accordingly, Morrical's participation conferred a significant benefit on HP and its shareholders and HP's agreement to pay him a Service Award should be approved.

## VII.   CONCLUSION

For all the reasons stated herein, Federal Plaintiff respectfully submits that the Third Amended Settlement is fair, reasonable, and adequate to HP and its shareholders, and requests that the Court approve the settlement in its entirety.

Dated:  June 19, 2015                Respectfully Submitted,

                                     */s/  Mark C. Molumphy*
                                     Mark. C. Molumphy

                                     **COTCHETT, PITRE & McCARTHY, LLP**
                                     840 Malcolm Road, Suite 200
                                     Burlingame, CA 94010
                                     Telephone: (650) 697-6000
                                     Facsimile: (650) 697-0577

                                     *Lead Counsel for Plaintiff Stanley Morrical,*
                                     *derivatively on behalf of Hewlett-Packard Company*