REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1

WACHTELL, LIPTON, ROSEN & KATZ
MARC WOLINSKY (*pro hac vice*)

2

GEORGE T. CONWAY III (*pro hac vice*)
51 West 52nd Street

3

New York, NY 10019
Tel./Fax: 212.403.1000/2000

4

MWolinsky@wlrk.com
GTConway@wlrk.com

5

6

FARELLA, BRAUN & MARTEL, LLP
NEIL A. GOTEINER, State Bar No. 83524

7

235 Montgomery Street, 17th Floor
San Francisco, CA 94104

8

Tel./Fax: 415.954.4400/4480
NGoteiner@fbm.com
Attorneys for Defendant

9

HEWLETT-PACKARD COMPANY

10

11

IN THE UNITED STATES DISTRICT COURT

12

FOR THE NORTHERN DISTRICT OF CALIFORNIA

13

14

| IN RE HP SHAREHOLDER DERIVATIVE LITIGATION | Master File No. C-12-6003 CRB |
|---|---|

15

This Document Relates to: All Actions

16

**HEWLETT-PACKARD COMPANY'S RESPONSE TO OBJECTIONS TO FINAL APPROVAL OF THE THIRD AMENDED AND RESTATED STIPULATION OF SETTLEMENT**

17

18

Dept.: Courtroom 6, 17th Floor
Judge: Hon. Charles R. Breyer
Date: July 24, 2015, 10:00 a.m.

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................... iii

TABLE OF CITATIONS ........................................................................................ ix

STATEMENT OF ISSUE ........................................................................................ 1

SUMMARY OF ARGUMENT ................................................................................ 1

ARGUMENT .......................................................................................................... 3

I.      THE OBJECTORS MISSTATE THE STANDARDS GOVERNING APPROVAL OF THE SETTLEMENT. ........................................................................ 3

II.     THE SCOPE OF THE RELEASE IS APPROPRIATE. ..................................... 5

III.    THE CLAIMS BEING RELEASED ARE EXTREMELY WEAK. ................... 7

       A.     The *Morrical* complaint was subject to dismissal on the basis of Morrical's failure to make a demand. ....................................................... 7

       B.     All complaints would be subject to dismissal on the basis of the DRC's and HP board's resolutions. ............................................................ 9

             1.    The DRC was independent, its process thorough and its decisions well-informed. ............................................................. 11

                   (a)    The independence of the DRC is beyond dispute. ..................... 12

                   (b)    The thoroughness of the DRC is beyond dispute. ..................... 14

                   (c)    The DRC was entitled to rely on the law firms that it selected to assist in the conduct of its work. ................................. 15

                   (d)    The objectors' challenge to the DRC's independence on the basis of the manner in which Proskauer conducted the investigation is unfounded. .......................................... 17

                   (e)    That the DRC reached different conclusions than the objectors does not mean that the DRC process was flawed. ......... 19

                   (f)    The Bennett deposition confirms that the DRC's conclusions should be respected and that the objectors' claims to the contrary are frivolous. ................................................. 20

             2.    The conclusions reached by the DRC and HP board were reasonable. ........................................................................ 21

                   (a)    Plaintiffs could not overcome the rigorous standards of Delaware law in asserting claims against HP's current and former directors and officers. .......................................... 22

                   (b)    There was a valid business case for the Autonomy acquisition that predated Apotheker. ....................................... 25

(c)     HP's due diligence was extensive and was consistent with the scope of diligence applicable in UK public company deals. ....................................................................... 26

(d)     There were no "red flags" presented to the directors or HP management. ................................................................... 31

(i)     The inability to obtain the Deloitte work papers cannot support a claim. ................................................. 31

(ii)     The KPMG report did not raise red flags. .......................... 32

(iii)     The analyst reports as a whole did not raise red flags ........ 35

(iv)     Barclays' and Perella's concerns were resolved. ............... 38

(e)     The Technology and Finance and Investment Committees and full HP board were adequately involved in the acquisition. ............................................................... 39

(f)     The full HP board carefully considered Lesjak's dissenting views. ....................................................................... 42

(g)     There is no basis for asserting any claims based on post-announcement events. ............................................... 44

(h)     There is no basis for suing HP's professional advisors. .............. 45

IV.     THE SETTLEMENT CONSIDERATION IS APPROPRIATE. ..................................... 47

A.     The governance reforms are valuable and are directly tailored to address allegations in the complaints. ............................................. 47

B.     Plaintiffs contributed to the development of the reforms. ...................... 50

C.     The fact that HP did not adopt Copeland's ill-conceived reforms is not a basis for rejecting the settlement. ......................................... 53

D.     There is no requirement that any defendant or HP's insurers make a monetary contribution to the settlement. .................................. 54

V.     THE SETTLEMENT IS NOT COLLUSIVE. ................................................. 56

VI.     NOTICE WAS FAIR AND APPROPRIATE. .............................................. 59

VII.     THE OBJECTORS' ATTEMPTS TO RELITIGATE THEIR DISCOVERY DEMANDS SHOULD BE DISREGARDED. ................................................ 61

VIII.     WACHTELL LIPTON IS NOT CONFLICTED. ........................................... 64

CONCLUSION ........................................................................................ 66

# TABLE OF AUTHORITIES

**Cases**                                                                                      **Page(s)**

*Adams* v. *Calvarese Farms Maint. Corp.*,
   2010 WL 3944961 (Del. Ch. Sept. 17, 2010) ............................................ 24

*Alaska Elec. Pension Fund* v. *Brown*,
   941 A.2d 1011 (Del. 2007) ......................................................... 2, 50

*Allied Artists Pictures Corp.* v. *Baron*,
   413 A.2d 876 (Del. 1980) ................................................................ 50

*Alvarado Partners, L.P.* v. *Mehta*,
   723 F. Supp. 540 (D. Colo. 1989) ..................................................... 55

*Arace* v. *Thompson*,
   2011 WL 3627716 (S.D.N.Y. Aug. 17, 2011) ................................... 59

*Aronson* v. *Lewis*,
   473 A.2d 805 (Del. 1984) ............................................................. 2, 7

*Ash* v. *McCall*,
   2000 WL 1370341 (Del. Ch. Sept. 15, 2000) ........................... 7, 8, 30

*Barovic* v. *Ballmer*,
   2014 WL 7011840 (W.D. Wash. Dec. 10, 2014)............................. 11

*Biondi* v. *Scrushy*,
   820 A.2d 1148 (Del. Ch. 2003)................................................ 13 n.11

*Brazen* v. *Bell Atl. Corp.*,
   695 A.2d 43 (Del. 1997) ......................................................... 10, 21

*Brehm* v. *Eisner*,
   746 A.2d 244 (Del. 2000) .......................................................*passim*

*Bushansky* v. *Armacost*,
   2014 WL 2905143 (N.D. Cal. June 25, 2014) ...................... 60 & n.62

*Carlton Invs.* v. *TLC Beatrice Int'l Holdings, Inc.*,
   1997 WL 305829 (Del. Ch. May 30, 1997) ...................... 16, 17 n.14, 62

*Citibank, Inc.* v. *Weill*,
   Index No. 600645/06 (N.Y. Sup. Ct. May 14, 2007)...................... 52 n.53

*City of Orlando Police Pension Fund* v. *Page*,
   970 F. Supp. 2d 1022 (N.D. Cal. 2013) ...................................... 11 n.6

*Class Plaintiffs* v. *City of Seattle*,
   955 F.2d 1268 (9th Cir. 1992)........................................... 1, 3, 4, 5

*Cohn* v. *Nelson*,
   375 F. Supp. 2d 844 (E.D. Mo. 2005)........................................ 49 n.48

*Cook* v. *Hewlett-Packard Co.*,
   2014 WL 311111 (Del. Ch. Jan. 30, 2014) .................................... 63

*Copeland* v. *Apotheker*,
No. 3-14-cv-0622 (EJD) (N.D. Cal.) (*Copeland II*) ....................................... 6 & n.3, 7

*Copeland* v. *Lane*,
2013 WL 1899741 (EJD) (N.D. Cal. May 6, 2013),
*appeal pending* No. 13-16251 (9th Cir.) (*Copeland I*) ...................... 6 & n.3, 44 n.44

*David B. Shaev Profit Sharing Account* v. *Armstrong*,
2006 WL 391931 (Del. Ch. Feb. 13, 2006)
*aff'd*, 911 A.2d 802 (Del. 2006) ....................................................................... 23 n.19

*Duban* v. *Diversified Mortg. Inv'rs*,
87 F.R.D. 33 (S.D.N.Y. 1980) ...................................................................... 55

*Eubank* v. *Pella Corp.*,
753 F.3d 718 (7th Cir. 2014) ........................................................................ 57

*Feuer* v. *Thompson*,
2013 WL 2950667 (N.D. Cal. June 14, 2013) ............................................ 48 n.47

*Glicken* v. *Bradford*,
35 F.R.D. 144 (S.D.N.Y. 1964) ................................................................. 55

*Grunin* v. *Int'l House of Pancakes*,
513 F.2d 114 (8th Cir. 1975) ....................................................................... 60 n.64

*Guttman* v. *Huang*,
823 A.2d 492 (Del. Ch. 2003) ...................................................................... 23 n.19

*Hainey* v. *Parrott*,
617 F. Supp. 2d 668 (S.D. Ohio 2007) ....................................................... 56

*Hanlon* v. *Chrysler Corp.*,
150 F.3d 1011 (9th Cir. 1998) ..................................................................... 4

*Hausman* v. *Buckley*,
299 F.2d 696 (2d Cir. 1962) ......................................................................... 64

*Hesse* v. *Sprint Corp.*,
598 F.3d 581 (9th Cir. 2010) ........................................................................ 1, 5

*Hill* v. *State Street Corp.*,
2015 WL 127728 (D. Mass. Jan. 8, 2015) ................................................. 60

*Howard* v. *SEC*,
376 F.3d 1136 (D.C. Cir. 2004) ................................................................... 34

*In re Accuracy, Inc. S'holder Derivative Litig.*,
757 F. Supp. 2d 919 (N.D. Cal. 2010) ....................................................... 34

*In re Atheros Commc'ns, Inc.*,
2011 WL 864928 (Del. Ch. Mar. 4, 2011) ................................................. 53

*In re BankAm. Corp. Sec. Litig.*,
210 F.R.D. 694 (E.D. Mo. 2002) ............................................................... 61 n.65

*In re Caremark Int'l Inc. Derivative Litig.*,
   698 A.2d 959 (Del. Ch. 1996)..................................................................23 & n.19

*In re Citigroup Inc. S'holder Derivative Litig.*,
   964 A.2d 106 (Del. Ch. 2009)..............................................................................8 n.4

*In re Cornerstone Therapeutics Inc. S'holder Litig.*,
   --- A.3d. ----, 2015 WL 2394045 (Del. May 14, 2015) ........................................22

*In re Dow Chem. Co. Derivative Litig.*,
   2010 WL 66769 (Del. Ch. Jan. 11, 2010) ...........................................................23 n.19

*In re First Interstate Bancorp. Consol. S'holder Litig.*,
   756 A.2d 353 (Del. Ch. Aug. 26, 1999) ....................................................................50

*In re Gen. Motors Co. Derivative Litig.*,
   2015 WL 3958724 (Del. Ch. June 26, 2015) ....................................................*passim*

*In re Gen. Motors Corp. Engine Interchange Litig.*,
   594 F.2d 1106 (7th Cir. 1979)...................................................................................5

*In re Johnson & Johnson Derivative Litig.*,
   900 F. Supp. 2d 467 (D. N.J. 2012) ..................................................................49 n.48

*In re Lear Corp. S'holder Litig.*,
   967 A.2d 640 (Del. Ch. 2008).........................................................................35 n.31, 40

*In re Mego Fin. Corp. Sec. Litig.*,
   213 F.3d 454 (9th Cir. 2000)......................................................................................3

*In re NVIDIA Corp. Derivative Litig.*,
   2008 WL 5382544 (N.D. Cal. Dec. 22, 2008) .................................................49 & n.47

*In re Oracle Corp. Derivative Litig.*,
   824 A.2d 917 (Del. Ch. 2003)....................................................................................10

*In re Oracle Sec. Litig.*,
   852 F. Supp. 1437 (N.D. Cal. 1994) ..............................................................52-53 & n.54

*In re Pac. Enters. Sec. Litig.*,
   47 F.3d 373 (9th Cir. 1995).................................................................................1, 3

*In re Primedia Inc. S'holders Litig.*,
   67 A.3d 455 (Del. Ch. 2013).....................................................................................10

*In re Rambus Inc. Derivative Litig.*,
   2009 WL 166689 (N.D. Cal. Jan. 20, 2009) ....................................................49 n.47 & n.48

*In re REMEC Inc. Sec. Litig.*,
   702 F. Supp. 2d 1202 (S.D. Cal. 2010) ....................................................................34

*In re Wachovia Corp.*,
   2011 WL 1496342 (N.D. Cal. Apr. 20, 2011) .............................................................61

*In re Walt Disney Co. Derivative Litig.*,
   907 A.2d 693 (Del. Ch. 2005), *aff'd*, 906 A.2d 27 (Del. 2006)................................30

*Ironworkers Dist. Council of Phila. & Vicinity Ret. & Pension Plan* v. *Andreotti*,
   2015 WL 2270673 (Del. Ch. May 8, 2015) ............................................... 2, 19

*Jaffe* v. *Morgan Stanley & Co.*,
   2008 WL 346417 (N.D. Cal. Feb. 7, 2008) ................................................ 63

*Kaplan* v. *Wyatt*,
   499 A.2d 1184 (Del. 1985) ......................................................................... 13

*Katell* v. *Morgan Stanley Grp., Inc.*,
   1995 WL 376952 (Del. Ch. June 15, 1995) ................................................ 16

*La. Mun. Police Emps. Ret. Sys.* v. *Morgan Stanley & Co.*,
   2011 WL 773316 (Del. Ch. Mar. 4, 2011) ........................................ 9, 11 n.6

*Lyondell Chem. Co.* v. *Ryan*,
   970 A.2d 235 (Del. 2009) .................................................................... 22, 23

*Maher* v. *Zapata Corp.*,
   714 F.2d 437 (5th Cir. 1983) ..................................................... 20 n.17, 47, 60

*Marshall* v. *Holiday Magic, Inc.*,
   550 F.2d 1173 (9th Cir. 1977) .............................................................. 60 n.63

*Masterson* v. *Pergament*,
   203 F.2d 315 (6th Cir. 1953) ..................................................................... 55

*MCG Capital Corp.* v. *Maginn*,
   2010 WL 1782271 (Del. Ch. May 5, 2010) ........................................ 35 n.30

*Metro. Life Ins.* v. *Tremont Grp. Holdings, Inc.*,
   2012 WL 6632681 (Del. Ch. Dec. 20, 2012) ............................................. 24

*Microtechs., LLC* v. *Autonomy, Inc.*,
   Case No. C-15-2220-RMW-HRL (N.D. Cal.) ........................................... 57

*Midland Grange No. 27 Patrons of Husbandry* v. *Walls*,
   2008 WL 616239 (Del. Ch. Feb. 28, 2008) ............................................... 24

*Mohammed* v. *Ells*,
   2014 WL 4212687 (D. Colo. Aug. 26, 2014) ...................................... 49 n.48

*Mullane* v. *Central Hanover Bank & Trust Co.*,
   339 U.S. 306 (1950) .................................................................................. 59

*Noel* v. *Whitman*,
   No. 1:13-cv-251346 (Cal. Super. Santa Clara Cnty. Aug. 16, 2013) ...... 51 n.50

*Officers for Justice* v. *Civil Serv. Comm'n of City and Cnty. of S.F.*,
   688 F.2d 615 (9th Cir. 1982) .............................................................. 3, 4, 5

*Paramount Commc'ns Inc.* v. *Time Inc.*,
   1989 WL 79880 (Del. Ch. July 14, 1989),
   *aff'd*, 571 A.2d 1140 (Del. 1990) ...................................................... 8 n.4

*Petrovic* v. *Amoco Oil Co.*,
   200 F.3d 1140 (8th Cir. 1999) .......................................................... 2, 60

*Respler* v. *Evans*,
    17 F. Supp. 3d 418 (D. Del. 2014) ........................................................ 2, 64

*Rodriguez* v. *West Publ'g Corp.*,
    563 F.3d 948 (9th Cir. 2009) ................................................................ 1, 4

*Rosenbloom* v. *Pyott*,
    765 F.3d 1137 (9th Cir. 2014) ................................................................. 44

*Sarnacki* v. *Golden*,
    778 F.3d 217 (1st Cir. 2015) .................................................................... 16

*Satchell* v. *Fed. Express Corp.*,
    2007 WL 1114010 (N.D. Cal. 2007) ..................................................... 2, 56

*Scattered Corp.* v. *Chi. Stock Exch.*,
    701 A.2d 70 (Del. 1997) ........................................................ 2, 9, 10, 11

*Smith* v. *Van Gorkom*,
    488 A.2d 858 (Del. 1985) ............................................................... 34 n.30

*Sobel* v. *Hertz Corp.*,
    2011 WL 2559565 (D. Nev. June 27, 2011) .......................................... 4, 5

*Solash* v. *Telex Corp.*,
    1988 WL 3587 (Del. Ch. Jan. 19, 1988) .................................................. 24

*Spiegel* v. *Buntrock*,
    571 A.2d 767 (Del. 1990) ................................................................... 9, 10

*Stepak* v. *Addison*,
    20 F.3d 398 (11th Cir. 1994) ......................................................... 10, 17 n.15

*Stone* v. *Ritter*,
    911 A.2d 362 (Del. 2006) ................................................... 22 & n.18, 23

*Strougo ex rel. The Brazil Fund, Inc.* v. *Padegs*,
    27 F. Supp. 2d 442 (S.D.N.Y. 1998) ............................................... 16 n.13

*Synfuel Tech., Inc.* v. *DHL Express (USA), Inc.*,
    463 F.3d 646 (7th Cir. 2006) ..................................................................... 4

*Torrisi* v. *Tucson Elec. Power Co.*,
    8 F.3d 1370 (9th Cir. 1993) ............................................................... 60 n.63

*Wixon* v. *Wyndham Resort Dev. Corp.*,
    2010 WL 3630124 (N.D. Cal. Sept. 14, 2010) .................................. 2, 48, 49 n.48

*Zucker* v. *Andreessen*,
    2012 WL 2366448 (Del. Ch. 2012) ....................................................... 44 n.44

**Rules and Statutes**

DEL. CODE ANN. tit. 8, § 102(b)(7) ............................................................................ 22

DEL. CODE ANN. tit. 8, § 141(e) ............................................................ 23, 29, 32 n.26

Fed. R. Civ. P. 23(e) .................................................................................................... 3

Fed. R. Civ. P. 23.1(c) ................................................................................................ 59

# TABLE OF CITATIONS

| | |
|---|---|
| Arbitration Decision | Arbitration Decision on Application for Attorney Fees (Exhibit 25) |
| Ashton Decl. | Declaration of Ann. M. Ashton (Exhibit 23) |
| January 2014 Board Resolution | Hewlett-Packard Company Board of Directors' Resolution Regarding Shareholder Derivative Claims and Demands (Exhibit 2) |
| Bennett Dep. | Deposition of Robert Bennett (Exhibit 38) |
| Copeland Br. | Statement of Objections of A.J. Copeland to Proposed Third Amended and Restated Stipulation of Settlement (Docket #379) |
| Ex. __ | Exhibit to the Declaration of Caroline A. Olsen in Support of Hewlett-Packard Company's Response to Objections to Final Approval of the Third Amended and Restated Stipulation of Settlement, dated July 17, 2015 |
| DRC Deck | Excerpted slides from presentation prepared for the HP board by the Demand Review Committee, dated January 9, 2014 (Exhibit 3) |
| DRC Resolution | Hewlett-Packard Company Independent Committee's Resolution Regarding Derivative Claims and Demands (Exhibit 1) |
| Prelim. Approval Order | Order Granting Motion for Preliminary Approval of Third Amended Settlement, Setting Schedule, and Addressing Miscellaneous Relief (Docket #319) |
| Steinberg Br. | Harriet Steinberg's Objection to the Proposed Settlement (Docket #385) |
| Supp. Br. | Supplemental Objections of Harriet Steinberg and A.J. Copeland to the Proposed Settlement (Docket #391) |
| Varma Decl. | Declaration of Rishi Varma Regarding the Corporate Governance Reforms in the Proposed Settlement Agreement (Exhibit 24) |

**STATEMENT OF ISSUE**

Should the proposed settlement, providing HP and its shareholders the benefit of corporate governance reforms and the termination of costly and distracting litigation in exchange for the release of claims deemed to be meritless by an independent committee after a thorough investigation, be finally approved as fundamentally fair, adequate, and reasonable?

**SUMMARY OF ARGUMENT**

Despite a transparent settlement process that has encompassed months of discovery, including the production of over 15,000 pages of documents and the deposition of a member of the Demand Review Committee ("DRC"), the objectors still have presented no evidence suggesting that the settlement is anything but fair, adequate and reasonable.  There is therefore no reason to override the judicial policy in favor of settlement, in particular where, as here, the settlement is the result of hard-fought, arm's-length negotiations overseen by a former federal judge.

As discussed in detail below:

1.      Copeland is wrong when he claims that the Court must weigh the precise dollar value of the released claims against the reforms in order to approve the settlement.  *See Rodriguez* v. *West Publ'g Corp.*, 563 F.3d 948, 965 (9th Cir. 2009).  And Steinberg is just as wrong when she claims that the proponents of the settlement must establish its fairness by clear and convincing evidence.  The test is whether the court determines, in the exercise of its discretion, that the settlement is fundamentally fair, adequate, and reasonable.  *In re Pac. Enters. Sec. Litig.*, 47 F.3d 373, 377 (9th Cir. 1995); *Class Plaintiffs* v. *City of Seattle*, 955 F.2d 1268, 1291 (9th Cir. 1992). That standard has been met.

2.      The scope of the release is appropriate.  *See Hesse* v. *Sprint Corp.*, 598 F.3d 581, 590 (9th Cir. 2010).

3.      The claims that are being released are extremely weak and likely would have been dismissed on the ground that plaintiffs failed to make a demand or on the basis of the DRC Resolution.  *See Scattered Corp.* v. *Chi. Stock Exch.*, 701 A.2d 70, 77 (Del. 1997); *Aronson* v. *Lewis*, 473 A.2d 805, 815 (Del. 1984); *In re Gen. Motors Co. Derivative Litig.*, 2015 WL 3958724, at *11, *16 (Del. Ch. June 26, 2015); *Ironworkers Dist. Council of Phila. & Vicinity Ret. & Pension Plan* v. *Andreotti*, 2015 WL 2270673, at *27 (Del. Ch. May 8, 2015).

4.      The governance reforms that provide the consideration of the settlement are valuable and plaintiffs and their counsel contributed to their development.  *See Wixon* v. *Wyndham Resort Dev. Corp.*, 2010 WL 3630124, at *3 (N.D. Cal. Sept. 14, 2010); *Alaska Elec. Pension Fund* v. *Brown*, 941 A.2d 1011, 1015 (Del. 2007).

5.      The settlement is not collusive.  *See Satchell* v. *Federal Express Corp.*, 2007 WL 1114010, at *4 (N.D. Cal. 2007).

6.      The notice provided to shareholders was appropriate.  *See Petrovic* v. *Amoco Oil Co.*, 200 F.3d 1140, 1153 (8th Cir. 1999).

7.      The objectors received all of the discovery to which they were entitled — and more — and should not now be heard to challenge Magistrate Judge Laporte's orders in that regard.  *See* Docket #348, #364.

8.      Wachtell Lipton, Rosen & Katz was not conflicted.  It has always represented the interests of the company, as directed by the board; the directors' individual interests were represented by their own counsel.  *Cf. Respler* v. *Evans*, 17 F. Supp. 3d 418, 421 (D. Del. 2014).

In short, the proposed settlement caps a rigorous and appropriate corporate governance process that has worked just as Delaware law intended.  Independent directors reviewed the derivative plaintiffs' allegations and recommended specific actions, including litigation against those identified as wrongdoers, and the full board agreed with those recommendations and ordered their implementation.  The settlement is fully consistent with the directive of the board,

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

avoids costly and time-consuming litigation, and advances the interests of the corporation and its shareholders.  Approval of the settlement by this Court is therefore fully warranted.

## ARGUMENT

### I.   THE OBJECTORS MISSTATE THE STANDARDS GOVERNING APPROVAL OF THE SETTLEMENT.

The Court's task in determining whether to grant final approval to the proposed settlement is to evaluate whether, taken as a whole, the settlement is "fundamentally fair, adequate, and reasonable."  Fed. R. Civ. P. 23(e); *In re Pac. Enters. Sec. Litig.*, 47 F.3d 373, 377 (9th Cir. 1995) (citing *Class Plaintiffs* v. *City of Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992)).  *See also In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 458 (9th Cir. 2000).  Among other things, the Court may consider "the strength of the plaintiffs' case; the risk, expense, complexity, and likely duration of further litigation; . . . the amount offered in settlement; the extent of discovery completed and the stage of the proceedings; the experience and views of counsel; . . . and the reaction of the class members to the proposed settlement."  *In re Mego*, 213 F.3d at 458.  Ultimately, in a derivative litigation, the question for the court is whether the settlement is fair, adequate, and reasonable to the corporation itself.

In light of this standard, the Ninth Circuit has held that the "fairness hearing is not to be turned into a trial or rehearsal for trial on the merits."  *Officers for Justice* v. *Civil Serv. Comm'n of City and Cnty. of S.F.*, 688 F.2d 615, 625 (9th Cir. 1982).[1]  Likewise, the proposed settlement is not "to be judged against a hypothetical or speculative measure of what might have been

---

[1]   For this reason, among others, there is no basis for Copeland's request that Robert Bennett, a member of the DRC, or any other witness be called to testify at the fairness hearing.  The Court has made clear that it is important not "to turn the lawsuit into the discovery of the settlement of the lawsuit."  Aug. 25, 2014 Tr. (Docket #199) at 43.

1
2
3
4

achieved by the negotiators." *Id.* Rather, the Court should avoid reaching conclusions on contested issues of fact and law underlying the merits of the dispute, "for it is the very uncertainty of outcome in litigation and avoidance of wasteful and expensive litigation that induce consensual settlements." *Class Plaintiffs*, 955 F.2d at 1291 (quoting *Officers for Justice*, 688 F.2d at 625).

5
6
7
8
9
10
11
12
13
14
15
16
17
18

In the face of this law, Copeland argues the Court must have precise estimates of the value of the released claims and the value of the proposed settlement before it can approve the settlement. Copeland Br. 6. In making this claim, Copeland relies on a line of cases commencing with the Seventh Circuit's decision in *Synfuel Technologies, Inc.* v. *DHL Express (USA), Inc.*, 463 F.3d 646 (7th Cir. 2006), decisions that arose in the context of class action settlements. This case, however, is a derivative suit in which any claims belong to the company, not to shareholders. Regardless, the Ninth Circuit has expressly rejected *Synfuel*'s valuation requirement even in the context of class actions, explaining that "[w]e put a good deal of stock in the product of an arms-length, non-collusive, negotiated resolution, and have never prescribed a particular formula by which that outcome must be tested." *Rodriguez* v. *West Publ'g Corp.*, 563 F.3d 948, 965 (9th Cir. 2009) (citing *Hanlon* v. *Chrysler Corp.*, 150 F.3d 1011, 1027 (9th Cir. 1998); *Officers for Justice*, 688 F.2d at 625).

19
20
21
22
23
24

Copeland's only case from this Circuit, *Sobel* v. *Hertz Corp.*, 2011 WL 2559565 (D. Nev. June 27, 2011), is wholly inapposite, a fact that he elides through the inartful use of ellipses. *Sobel* involved a coupon settlement subject to a Class Action Fairness Act-imposed requirement (not relevant here) requiring the court to evaluate "the real monetary value and likely utilization rate of the coupons provided by the settlement." *Id.* at *10.

25
26
27
28

In his brief, Copeland quotes the following sentence from the *Sobel* court's decision: "[T]he parties have provided no evidence that would allow this court to make any reasoned assessment of the actual value of the settlement to the class members or of the value of the claims to be surrendered. Such lack of evidence is alone grounds for denying final approval . . . ."

Copeland Br. 6 (ellipses in original).  The words he omitted from his quotation were:  "as the court is simply unable to fulfill its duty to the settlement class under Rule 23 and CAFA."  So the sentence as a whole reads:  "Such lack of evidence is alone grounds for denying final approval, as the court is simply unable to fulfill its duty to the settlement class under Rule 23 and CAFA."  *Sobel*, 2011 WL 2559565, at *10.  Thus, the *Sobel* court was clear that the need to perform the sort of calculations that Copeland claims are missing is attributable to the unique requirements imposed by CAFA in coupon settlements.

For her part, Steinberg misstates the evidentiary standard governing this motion, citing *In re General Motors Corp. Engine Interchange Litigation*, 594 F.2d 1106, 1126 n.30 (7th Cir. 1979), for the proposition that when a settlement is "improperly" negotiated the proponents must demonstrate its fairness by "clear and convincing evidence."  Steinberg Br. 17.  But the settlement in *In re General Motors* was the result of unauthorized negotiations undertaken in violation of a court order.  *Id.* at 1126.  It has nothing in common with the settlement now before the Court.  In the Ninth Circuit, the decision whether to approve a settlement "is committed to the sound discretion of the trial judge," *Class Plaintiffs*, 955 F.2d at 1291, who is empowered to balance various factors and make use of "delicate balancing, gross approximations and rough justice."  *Officers for Justice*, 688 F.2d at 625.

## II.     THE SCOPE OF THE RELEASE IS APPROPRIATE.

As the Court noted when it granted preliminarily approval, "a court may approve releases that bar claims 'ar[ising] from the same common nucleus of operative fact' alleged in the settled action."  Docket #319 ("Prelim. Approval Order") at 8 (quoting *Class Plaintiffs*, 955 F.2d at 1288); *Hesse* v. *Sprint Corp.*, 598 F.3d 581, 590 (9th Cir. 2010) ("[W]e have held that federal district courts properly released claims not alleged in the underlying complaint where those claims depended on the same set of facts as the claims that gave rise to the settlement.").

1    That is exactly what the settlement does.  It proposes to release all Autonomy-Related

2    Claims and no others.  As the Court found, the released claims are those at "the core of this litiga-

3    tion:  the Autonomy acquisition," and "[t]he shareholders do not appear to be relinquishing any

4    claims that lack a factual overlap with the substance of this litigation."  Prelim. Approval Order at

5    8-9.[2]

6    Copeland continues to insist that the release is overbroad because it does not specifically

7    exclude claims made by him in his own derivative litigation.[3]  Copeland Br. 3 & n.7.  This objec-

8    tion is makeweight.  The release specifically excludes "the claims made in the operative com-

9    plaint in *Copeland* v. *Lane*, 2013 WL 1899741 (EJD) (N.D. Cal. May 6, 2013), *appeal pending*

10   No. 13-16251 (9th Cir.) (*Copeland I*)," as well as "the claims made in *Copeland* v. *Apotheker*,

11   No. 3-14-cv-0622 (EJD) (N.D. Cal. (*Copeland II*)), but only to the extent such claims are also in-

12   cluded in and covered by *Copeland I*."  Third Amended and Restated Stipulation of Settlement

13   (Docket #277-1) at Part I, ¶ 48.  The *Copeland II* claims that do not overlap with *Copeland I*

14

15

16

17   _____

[2]    Having failed to raise the issue before preliminary approval, Copeland belatedly argues
18   that HP's shareholders were unable to "see precisely what claims were made by Morrical and
     what claims are proposed to be released" because portions of the consolidated complaint were
19   redacted.  Copeland Br. 23 n.28.  But the claims made by Morrical, Steinberg, Copeland, and oth-
     ers are fully detailed in the DRC Resolution, which has been on public file since September 14,
20   2014.  Docket #211-1.  Shareholders thus have been on full notice of the nature of the claims as-
     serted and the scope of the release, which also was described in the Notice of Settlement itself.
21   The governance revisions, likewise, have been described in the Notice and in numerous court fil-
     ings.  *See, e.g.*, Docket #210 (HP brief) at 13-14.  In any event, the operative complaint has now
22   been filed with minimal redactions (Docket #395-1), rendering Copeland's attack moot.

[3]    Judge Davila dismissed Copeland's complaint in *Copeland I* and expressly denied him
23   leave to amend a third time to add "allegations related to actions HP took regarding its acquisition
     of Autonomy corporation."  *Copeland I*, 2013 WL 1899741, at *4-6 (N.D. Cal. May 6, 2013).
24   Copeland sought to evade Judge Davila's ruling by filing his amended complaint as a "new" ac-
     tion and moving to relate that case, *Copeland II*, to this case.  The Court denied his motion (Order
25   at Docket #133), and *Copeland II* was assigned to Judge Davila.  Undeterred, Copeland then
     sought, unsuccessfully, to intervene in this case, not once but twice.  Order Denying Motion for
26   Prelim. Approval of Second Amended Settlement (Docket #265) at 9 (denying motion to inter-
     vene as moot); Prelim. Approval Order at 10 (denying motion to intervene).

27

28

HP'S RESPONSE TO OBJECTIONS TO
FINAL APPROVAL                              6
MASTER FILE NO. C-12-6003 CRB

claims (that is, the *Copeland II* Autonomy-related claims) are claims that are appropriately released by the settlement.

## III.    THE CLAIMS BEING RELEASED ARE EXTREMELY WEAK.

If the case does not settle, HP would make a motion to dismiss that would almost certainly be granted, either because Morrical failed to make a demand or because the DRC and the board concluded that the claims that Morrical asserts should not be pursued.  Steinberg's complaint, which alleges that her demand was wrongfully refused, would almost certainly be dismissed as well.

### A.  The *Morrical* complaint was subject to dismissal on the basis of Morrical's failure to make a demand.

As a threshold matter, the case would be dismissed because Morrical failed to make a demand on the HP board prior to instituting suit.  Under Delaware law, a pre-suit demand is required absent a showing that it would have been futile.  "The requirement that plaintiffs demonstrate futility is — must be — rigorous" in order to "prevent frivolous usurpation of a core director function by a stockholder, with all the distraction and chaos that would portend."  *See In re Gen. Motors Co. Derivative Litig.*, 2015 WL 3958724, at *1 (Del. Ch. June 26, 2015).  Delaware law is clear that the "mere threat of personal liability for approving a questioned transaction, standing alone, is insufficient to challenge either the independence or disinterestedness of directors" to show demand futility.  *Aronson* v. *Lewis*, 473 A.2d 805, 815 (Del. 1984).

Applying this standard, the Delaware Chancery Court in *Ash* v. *McCall*, 2000 WL 1370341 (Del. Ch. Sept. 15, 2000), dismissed a complaint alleging that the directors breached their duty of care by failing to conduct adequate due diligence and thereby causing McKesson to enter into its ill-fated merger with HBOC, a company that it was later learned had engaged in improper accounting.  The Chancellor held that all that plaintiff alleged was that the "directors made a poor decision."  *Id.* at *10.  But "absent some showing of self-dealing or suspect motivation"

1

which is lacking here, as in *Ash*, that allegation "does not state a cause of action, much less meet

2

the standard for excusing demand." *Id.*[4]  While the court relied on plaintiffs' failure to plead par-

3

ticularized facts creating a reasonable doubt that the merger was anything other than a valid exer-

4

cise of business judgment, it noted that the company's exculpatory provision would serve as ade-

5

quate independent grounds to dismiss the duty of care claim. *Id.* at *10.

6

Similarly, just last month, the Delaware Court of Chancery dismissed a case that, like the

7

complaint here, sought to hold the directors personally liable on the theory that the board failed to

8

exercise proper oversight and acted in bad faith.  The litigation arose out of General Motors' ad-

9

mitted failure to recall automobiles with defective ignition switches, a failure that resulted in nu-

10

merous motorist deaths and that subjected the company to billions of dollars in liabilities and sig-

11

nificant reputational harm.  As here, the *General Motors* plaintiffs "conflate[d] concededly *bad*

12

*outcomes* from the point of view of the Company with *bad faith* on the part of the Board." *In re*

13

*Gen. Motors*, 2015 WL 3958724, at *11.  That conflation didn't salvage the plaintiffs' failure to

14

make a demand.

15

16

Thus, just as in *General Motors*, Morrical did not plead with particularity any knowledge

17

by HP's directors that its policies and procedures were inadequate, did not plead with particularity

18

that the directors consciously disregarded their oversight obligations, and did not allege with par-

19

ticularity a basis for concluding that the directors acted in bad faith.  *See id.* at *16.  In short, in

20

the words of the *General Motors* decision, "there is a dearth of well pled facts from which [to]

21

22

_____

23

[4]     Delaware law does not allow such claims for good reason.  It strives to encourage "direc-
tors and managers . . . to maximize shareholder value in the long term by taking risks without the

24

debilitating fear that they will be held personally liable if the company experiences losses." *In re*
*Citigroup Inc. S'holder Derivative Litig.*, 964 A.2d 106, 139 (Del. Ch. 2009).  To foster risk-

25

taking from which all shareholders benefit, Delaware law gives the directors and managers the
freedom to be "brilliantly prescient or dismayingly wrong" — and accepts the results either way.

26

*Paramount Commc'ns Inc.* v. *Time Inc.*, 1989 WL 79880, at *30 (Del. Ch. July 14, 1989), *aff'd*,
571 A.2d 1140 (Del. 1990).

27

28

1    reasonably infer that the Board was *consciously* acting in a manner inimical to [HP] and was ad-

2    vancing instead some other interest, or was otherwise violating its duty of loyalty by acting in bad

3    faith." *Id.* at *17.

4        The notion that demand would have been futile with respect to claims against the compa-

5    ny's former officers is, if anything, even more fatuous.  The board that created the DRC was the

6    same board that dismissed CEO Léo Apotheker before the Autonomy transaction had even

7    closed.  There is every reason to believe that the DRC and the board would have held him or any

8    other officer accountable if the DRC had found evidence to support a claim.

9

10       **B.  All complaints would be subject to dismissal on the basis of the DRC's and
             HP board's resolutions.**

11       If plaintiffs' suits were not dismissed based on failure to make a demand, they would be

12   dismissed on the basis of the DRC's resolution and the HP board action adopting the DRC's rec-

13   ommendations.  The DRC's investigation and its conclusion, adopted by the board, would simi-

14   larly dispose of the objectors' complaints despite their having made demands on the board.

15

16       "[A] decision to refuse a litigation demand is reviewed under the business judgment rule,

17   which forces a plaintiff to overcome the rule's powerful presumptions before a court will examine

18   the merits of the directors' decision." *La. Mun. Police Emps. Ret. Sys.* v. *Morgan Stanley & Co.*,

19   2011 WL 773316, at *7 (Del. Ch. Mar. 4, 2011).  Under this framework, on a motion to dismiss

20   based on the DRC and board resolutions, the only issue would be whether the investigation "was

21   reasonable and conducted in good faith," not whether the court agreed with the board's decision

22   to adopt the DRC's recommendations.  *Scattered Corp.* v. *Chi. Stock Exch.*, 701 A.2d 70, 77 (Del.

23   1997).  *See also Spiegel* v. *Buntrock*, 571 A.2d 767, 773 (Del. 1990) ("The decision to bring a law

24   suit or to refrain from litigating a claim on behalf of a corporation is a decision concerning the

25   management of the corporation" and manifestly "part of the responsibility of the board of direc-

26   tors."); *Morgan Stanley*, 2011 WL 773316, at *5.  "Courts give deference to directors' decisions

27

28

1    reached by a proper process, and do not apply an objective reasonableness test in such a case to

2    examine the wisdom of the decision itself."  *Brazen* v. *Bell Atl. Corp.*, 695 A.2d 43, 49 (Del.

3    1997).

4         The DRC's conclusion that the released claims lack merit applies equally to Steinberg's

5    demand wrongfully-refused complaint and disposes of the objectors' insistence that their claims

6    must be considered separately.  Copeland Br. 15-16; Steinberg Br. 24.  Both Steinberg and

7    Copeland sent demand letters to the board and thus "concede[d] the independence of . . . the

8    board" as a matter of law.  *Spiegel*, 571 A.2d at 777.  Of course, a pre-suit demand does not pre-

9    clude shareholders from challenging the independence and good faith of the board for time im-

10   memorial.  But to succeed on their demand wrongfully refused claim, the objectors would have to

11   plead particularized facts creating a reason to doubt that the investigation of the demand was rea-

12   sonable and made in good faith.  *Scattered Corp.*, 701 A.2d at 77.[5]

13

14        The cases that Steinberg cites to support her argument are all inapposite.  *Stepak* v. *Addi-*

15   *son*, 20 F.3d 398 (11th Cir. 1994), involved a demand investigation dominated by the same firm

16   that represented the wrongdoers in a criminal action involving the same subject matter as the de-

17   mand.  *In re Primedia Inc. S'holders Litig.*, 67 A.3d 455 (Del. Ch. 2013), involved an alleged

18   conflict transaction in which a controlling shareholder usurped a corporate opportunity.  *In re Or-*

19   *acle Corp. Derivative Litig.*, 824 A.2d 917 (Del. Ch. 2003), involved a special litigation commit-

20   tee whose members shared Stanford affiliations with the fellow directors they were investigating

21

22   _____

23   [5]      Relying on evidence that was produced months before their objections were due, the ob-
24   jectors allege that the board lacked independence because certain directors were on the board at
     the time of the acquisition.  But as the objectors concede, the only three executives on the board
25   who participated in the decision to acquire Autonomy (Whitman, Lane, and Livermore) recused
     themselves from the board's vote to accept the DRC's recommendations.  Supp. Br. 4.  The other
26   members of the board were not substantively implicated in any wrongdoing.  While the objectors
     suggest it is improper for the board to rely on the DRC's recommendation, that is precisely what
27   Delaware law authorizes a board to do.  *See* Point III.B.1, *infra*.

28

1    so as to raise questions regarding their impartiality.  And *Barovic* v. *Ballmer*, 2014 WL 7011840

2    (W.D. Wash. Dec. 10, 2014), turned on the committee's failure to interview persons outside the

3    company who could have had probative information.

4          No such facts are presented here.  Rather, as in *Scattered*, Steinberg's purported "'facts'

5    creating a reasonable doubt about the disinterestedness and independence of the [DRC] are not

6    facts at all.  Rather they are conclusory and speculative statements, suffering fatally from a pauci-

7    ty of particularization."  701 A.2d at 75.[6]

8

9          **1.    The DRC was independent, its process thorough and its decisions well-**
              **informed.**

10         The DRC was tasked with investigating, reviewing, and evaluating the facts and circum-

11   stances alleged in the derivative actions and demand letters and making a recommendation to the

12   board on whether HP should prosecute any of the potential claims.  Ex. 2 ("January 2014 Board

13   Resolution") at 2.  Its investigation focused on determining whether it was in the interest of HP to

14   pursue any of the shareholders' claims.  Ex. 1 ("DRC Resolution") at 1.  As Bennett testified,

15

16

17   _____

18   [6]     Steinberg asserts that "HP's belated production of the DRC Resolution . . . shield[ed] the
     vast bulk of the analysis from scrutiny" so as to deem demand wrongfully refused.  Steinberg Br.
19   25.  But Steinberg got something *better* than the DRC Resolution (and more than she could even
     claim to be entitled to receive):  a comprehensive, in-person presentation from the DRC's coun-
20   sel, which laid out the entirety of the DRC's conclusions.  *See* Ex. 4 (March 19, 2014 Sign-In
     Sheet).  And, of course, Steinberg has since received the DRC Resolution itself, as well as 1,289
21   pages of the presentation for the DRC submitted to the board.  The redactions to that deck are en-
     tirely appropriate.  *See* Point VII, *infra*.  In light of this, Steinberg's reliance on *City of Orlando*
22   *Police Pension Fund* v. *Page*, 970 F. Supp. 2d 1022 (N.D. Cal. 2013), is unavailing.  In that case,
     the committee provided only a conclusory demand refusal letter, completely insulating its investi-
23   gation from scrutiny.  Moreover, the court's view that there was a reasonable doubt as to the good
     faith of the investigation largely rested upon the fact that the company had *admitted* wrongdoing
24   in a non-prosecution agreement arising out of the same facts the committee purported to investi-
     gate.  *Id.* at 1030.  There is, of course, no such admission here.  For the same reasons, *La. Mun.*
25   *Police Emps. Ret. Sys.* v. *Morgan Stanley & Co., Inc.*, 2011 WL 773316 (Del. Ch. Mar. 4, 2011),
     does Steinberg no good, as she already had the benefit of "substantive insight" into the board's
26   decision through precisely the same sorts of documents (board minutes and presentations) that the
     court found necessary in that case.  *Id.* at *8.
27

28

HP'S RESPONSE TO OBJECTIONS TO
FINAL APPROVAL                              11
MASTER FILE NO. C-12-6003 CRB

1   nothing was "predetermined . . . before the committee began its work."  Ex. 38 ("Bennett Dep.")

2   196:17-18.

3                          **(a) The independence of the DRC is beyond dispute.**

4          The members of the DRC at the time the DRC completed its work and made recommen-

5   dations to the board were Ralph Whitworth, Gary Reiner and Robert Bennett.   January 2014

6   Board Resolution at 2.  All three are independent directors; none is, or has ever been, an officer of

7   HP.  Two were not on the board at the time of the Autonomy acquisition.  Bennett did not join the

8   HP board until July 2013, long after the operative complaint was filed.  DRC Resolution at 10.

9   He had no relationship with any director other than Whitworth, with whom he had served on the

10   board of another company for just one year.   Bennett Dep. 173:13-18.   He had never met

11   Apotheker before joining the board.  *Id.* at 173:19-22.[7]

12

13          Whitworth, the Chair of the DRC, was not a member of the board at the time of the Au-

14   tonomy acquisition.  *Id.*; *see also* Compl. ¶ 47 (Docket #75-2).  His experience and expertise in

15   corporate governance is extensive.[8]  He is the co-founder and principal of Relational Investors,

16   LLC, a registered investment advisor that held some 30 million shares, more than 1.6% of HP's

17

18   _____

19   [7]     Although it is not entirely clear what the objectors are arguing (Supp. Br. 3), they seem to
        suggest that Bennett's recusal from assessing claims against Perella Weinberg calls into question
20   all of the DRC's conclusions because "whether Perella Weinberg has any potential liability is in-
        herently bound up in the issue of whether HP's directors and officers breached their fiduciary du-
21   ties."  Supp. Br. 3.  They cite no authority for this claim, and ignore the fact that Whitworth and
        Reiner were fully capable of assessing whether HP has any claims against Perella Weinberg with
22   the assistance of Choate Hall, which "recommended that no litigation be brought against" Perella
        Weinberg.  DRC Resolution at 54.  Moreover, even if the DRC had found reason to recommend
23   that HP assert claims against its own directors or officers, that conclusion would not have meant
        that claims would lie against HP's advisors.  A separate analysis of the advisors' potential liabil-
24   ity was required (and was made) independently of the analysis of the directors' and officers' po-
        tential liability.

25   [8]     The objectors recognize as much, calling Whitworth "the most prominent member of the
        DRC."  Supp. Br. 1.  Nonetheless, they attack HP for not making him available for deposition.
26   *Id.*  But Magistrate Judge Laporte's Order did not require that Whitworth testify, and Bennett
        agreed to appear to satisfy that order because Whitworth is no longer a member of the board, hav-
27   ing resigned after he was diagnosed with cancer.

28

1   outstanding stock.  His interests were clearly aligned with those of HP's other public sharehold-

2   ers.[9]

3          Gary Reiner was the only Committee member on the board at the time of the acquisition.

4   As courts have recognized, this fact does not even come close to raising a doubt as to Reiner's

5   independence.  *See, e.g.*, *Kaplan* v. *Wyatt*, 499 A.2d 1184, 1189 (Del. 1985) ("The mere fact that

6   a director was on the Board at the time of the acts alleged in the complaint does not make that di-

7   rector interested or dependent so as to infringe on his ability to exercise his independent business

8   judgment of whether to proceed with the litigation.").[10]

9

10         The objectors try to find support for their claim that Reiner could not serve from Bennett's

11  testimony.  Supp. Br. 2.  But Bennett did not testify that he doubted whether Reiner could serve.

12  He simply asked a question:  I "raised the issue with counsel as to whether or not that was an ac-

13  ceptable arrangement," and "was advised that — that that was not a problem."  Bennett Dep.

14  34:4-13.  Bennett also independently observed Reiner for evidence of conflict.  What he found

15  was that "Reiner's conduct . . . did not give any appearance of having any different perspective or

16

17  didn't appear to be trying to protect his own potential interests."  Bennett Dep. 34:20-23.[11]

18  _____

19  [9]     Recognizing there is no challenge to Whitworth's independence, the objectors only sug-
    gest that his independence "remains unexplored" because the DRC Resolution fails to discuss
20  Whitworth's social and philanthropic affiliations.  Supp. Br. 3.  Not true.  With respect to each of
    the Committee members, the DRC considered, among other things, "Any financial, business, so-
21  cial, political, public-service, or philanthropic relationships . . . with any other person who might
    have an inherent interest in the outcome of the Committee's findings."  DRC Resolution at 21.

22  [10]    Thus, even in the context of a special litigation committee, where the standard for mem-
    bers' independence is higher than the standard for DRC members' independence and disinterest-
23  edness, being subject to minor or indirect liability does not preclude independence and disinter-
    estedness.

24  [11]    The contrast with cases where a committee actually was not independent is stark.  For in-
25  stance, in *Biondi* v. *Scrushy*, 820 A.2d 1148 (Del. Ch. 2003), the directors appointed to the special
    litigation committee had "long-standing personal ties" with the alleged wrongdoer (the notorious
26  CEO of HealthSouth, Richard Scrushy), including joint service on a foundation's board and a col-
    lege stadium jointly named for a committee member and Scrushy.  *Id.* at 1156-57.  On the very
27  same day the committee was formed, the board retained outside counsel to conduct the same in-

28  (footnote continued)

**(b) The thoroughness of the DRC is beyond dispute.**

Pursuant to the authority delegated to it by the board, the DRC retained its own counsel in the United States and the United Kingdom, as well as other professional advisors, including financial, accounting and forensic experts, to assist in its review.  DRC Resolution at 13.  *See also* Bennett Dep. 16:2-7; 31:21-24.  With the assistance of these advisors, the DRC engaged in a year-long evaluation that entailed:

➢ Twelve formal DRC meetings to discuss the status of the investigation, the work being done by the Committee's advisors, and other issues related to potential claims.

➢ The collection of documents and the review by the Committee's counsel of relevant documents from databases containing more than 17.5 million electronic files.

➢ Interviews by the Committee's counsel of more than 90 individuals, including current and former employees, officers and directors of HP and Autonomy, and various advisors to HP and Autonomy on relevant issues.[12]

➢ Approximately 34,000 hours spent by the Committee's counsel on the review of documents, witness interviews and analyses of legal, insurance, indemnity, valuation and business issues relevant to the Committee's mandate.

➢ More than 16,000 hours of work by experts and consultants retained to advise on accounting principles, economic analyses, and Delaware and English legal issues and standards.  DRC Resolution at 16-17.

---

vestigation — and, while the committee was in the early stages of its investigation, issued a press release indicating that the outside firm had cleared Scrushy of any wrongdoing.  *Id.* at 1157-58.

[12]     DRC member Bennett personally attended Apotheker's  interview.  DRC Resolution at 16; Bennett Dep. 16:7-11.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

In addition, counsel for the DRC invited 13 plaintiffs' law firms representing HP share-holders in various derivative actions and demand letters, including counsel to objectors Steinberg and Copeland, to meetings in order to obtain their input, discuss the status of the review and explain the DRC's and the board's conclusions.  *Id.* at 15.  The DRC also sought to interview Sushovan Hussain and Michael Lynch.  Both refused.  *Id.* at 14; Bennett Dep. 82:20-83:2.  Nonetheless, the DRC considered a letter sent by Lynch to the Committee detailing his views on the acquisition and integration.  DRC Resolution at 14; Bennett Dep. 83:3-20 (explaining that the DRC reviewed the claims made in Lynch's letter and concluded that they were not correct).

Following its investigation, the DRC concluded that the claims being settled have no value to HP.  DRC Resolution at 83-89.  As Bennett explained:  "We did not conclude that we had a legitimate legal basis for pursuing the officers and directors other than [Lynch and Hussain]. . . . I think there's virtually no chance of recovering $8.8 billion [from officers and directors]. . . . How are we going to recover that?  We found that there was no wrongdoing."  Bennett Dep. 95:21-96:2; 97:13-14; 97:17-18.  Bennett further explained:  "as a business judgment, the cost of pursuing [released claims], both in terms of the company's money and in terms of distraction of the management team, would make it a very bad decision."  *Id.* at 97:7-10.

### (c)   The DRC was entitled to rely on the law firms that it selected to assist in the conduct of its work.

In the face of all this, Copeland questions the DRC's investigation on the grounds that the DRC relied on counsel, in particular Proskauer Rose LLP, to conduct the investigation.  Copeland Br. 17-18 & n.22.  *See also* Supp. Br. 10.  As Bennett testified, however, the DRC was involved in every stage of the investigation and received thorough updates from the advisors working at its direction.  Bennett explained that counsel presented its findings as to the Autonomy acquisition, "and then the committee made its determinations."  Bennett Dep. 29:9-11.  *See also id.* at 30:15-

1
2

24 (explaining that counsel for the committee conducted the investigation, then presented its findings to the committee).

3
4
5
6
7
8
9
10
11
12
13
14
15
16
17

Contrary to the objectors' claim, Supp. Br. 10, the DRC was fully entitled to rely on the work of counsel acting at its direction to conduct the time-consuming tasks of document review and witness interviews.  "While the directors bear ultimate responsibility for making informed judgments, good faith reliance by a SLC on independent, competent counsel to assist the SLC in investigating claims is legally acceptable, practical, and often necessary."  *Carlton Invs.* v. *TLC Beatrice Int'l Holdings, Inc.*, 1997 WL 305829, at *12 (Del. Ch. May 30, 1997); *see also Sarnacki* v. *Golden*, 778 F.3d 217, 225 (1st Cir. 2015) ("Reliance on experienced outside counsel for the SLC is often taken as evidence that the SLC conducted its investigation reasonably and in good faith, not the opposite."); *Katell* v. *Morgan Stanley Grp., Inc.*, 1995 WL 376952, at *10 (Del. Ch. June 15, 1995) (a special committee "can select any agent to perform its duties as Special Committee, as long as the agents can perform their assigned tasks competently," and a special committee's "heavy reliance on its competent attorneys does not render its investigation unreasonable").[13]

18
19
20
21
22
23

Steinberg and Copeland attempt to attack the DRC's independence by suggesting, wrongly, that the DRC did not hire its own counsel but instead relied upon counsel retained by the company.  Steinberg Br. 14; Copeland Br. 19; Supp. Br. 5.  This is a complete misreading of the DRC Resolution.  The Committee itself interviewed several firms and made its own decision as to which to retain.  Although HP itself was the firms' technical client, the firms reported exclusively

24
25
26
27

---

[13]      The objectors' assertion that there is something untoward in the fact that Proskauer did not record or transcribe its interviews is makeweight.  Supp. Br. 10.  That practice is the norm.  *See, e.g.*, *Strougo ex rel. The Brazil Fund, Inc.* v. *Padegs*, 27 F. Supp. 2d 442, 452 (S.D.N.Y. 1998) ("In the majority of cases in which derivative actions have been terminated by special litigation committees, the interviews were not taken under oath or before a stenographer.").

28

to the DRC, not to the company.  *See* Bennett Dep. 32:9-12 (Proskauer reported solely to the DRC), 184:17-19 ("[T]he committee had interviewed a number of potential advisors, and the committee selected the Proskauer firm.").[14]  Contrary to the objectors' unsupported assertion, Proskauer never served as "counsel to the Board."  Supp. Br. 4.

> **(d) The objectors' challenge to the DRC's independence on the basis of the manner in which Proskauer conducted the investigation is unfounded.**

The objectors' related claim that the entire work of the DRC was suspect because of the manner in which Proskauer oversaw the project is without a shred of substance.  Supp. Br. 4-5.  Their first argument is based on the fact that the DRC tasked two other firms with investigating potential claims against professional advisors:  Choate Hall (as to Perella Weinberg ("Perella")) and Brown Rudnick (as to Barclays).  DRC Resolution at 54.  But that is not a basis for rejecting the DRC's work, it is a basis for accepting it.  Choate Hall and Brown Rudnick had no conflict that would prevent them from providing objective advice to the DRC based on their respective investigations.[15]

Copeland's additional argument is that the DRC's independence was compromised because Proskauer was directed to consult with "counsel for the Individual Defendants/HP/the

---

[14]     The objectors' demand, Supp. Br. 5, for the Proskauer retention letter is meritless, as they have failed to show how it would be relevant to assessing the fairness and adequacy of the settlement — especially given that both the DRC Resolution and Bennett's testimony are clear that Proskauer reported solely to the DRC.  DRC Resolution at 13; Bennett Dep. 32:9-12, 184:17-19.  The objectors similarly lack any basis to attack the settlement because they were barred from deposing a Proskauer attorney.  Supp. Br. 5.  Magistrate Judge Laporte correctly refused the request because Copeland "point[ed] to no persuasive reason why this Court should deviate from the general rule that counsel 'are not deposed regarding the assistance or advice they provide to their clients in this type of action.'"  Docket #364 at 2 (quoting *Carlton Invs.*, 1997 WL 38130, at *5).

[15]     The only case the objectors cite, *Stepak*, 20 F.3d 398, is completely inapposite.  In *Stepak*, the investigation of a shareholder's demand was dominated by a law firm that represented the wrongdoers in a criminal action involving the same subject matter; the conflicted firm therefore could not conduct a vigorous investigation without risking violation of its duties to those preexisting clients.

1
2
3
4
5
6
7

Board (*i.e.*, Wachtell), which was negotiating simultaneously in the purported interests of HP and, *de facto*, in the interests of the Individual Defendants." Copeland Br. 20.[16] But as HP explained to Copeland in February 2015, when he demanded that Wachtell, Lipton, Rosen & Katz ("Wachtell Lipton") be discharged, Wachtell Lipton was retained by the company to represent the company; the individual officer and director defendants had the benefit of their own counsel. Ex. 5 (Feb. 25, 2015 Letter from J. Schultz to R. Greenfield).

8
9
10
11
12
13
14
15
16

The board, acting at the recommendation of the DRC, resolved that the derivative claims be settled or dismissed and unanimously resolved that the stipulation of settlement was in the best interests of the company and its shareholders. *Id.* The DRC's counsel, Proskauer, along with Wachtell Lipton, negotiated the initial terms of the settlement, including a broad release of claims against current and former HP officers and directors. By that time, the DRC and the board had reached their conclusions, and the interests of HP and of the individual defendants were entirely aligned: the company and the individuals all wanted to see the meritless derivative claims re-solved (or dismissed) without further litigation.

17
18
19
20
21
22

After the Court indicated that it would not approve of the version of the settlement that in-cluded a retention agreement for plaintiffs' counsel, Wachtell Lipton worked on behalf of the company to negotiate a revised settlement agreement. In doing so, it worked in the interests of the company and pursuant to the directive of the HP board — which had concluded that settling litigation that it had deemed to be meritless was in HP's interests — rather than serving the inter-

23
24
25
26
27

[16]     The DRC presentation did *not* say that Proskauer or the other DRC counsel allowed the company's counsel to dictate the scope, substance, or nature of their review. To the contrary, the DRC Resolution and the DRC presentation made clear that the DRC's counsel were chosen by and reported *exclusively to the DRC*, not to the company's counsel. Within that framework, a cer-tain amount of consultation or coordination between DRC counsel and the company's counsel on procedural matters, timing, logistics, and other such matters is entirely appropriate in the course of a complicated, extensive, ten-month review that intersected with ongoing criminal investiga-tions here and abroad.

28

1    ests of the individual directors and officers, who were represented by their own counsel.  As to

2    Copeland's demand that Wachtell Lipton be dismissed, the board unanimously determined that to

3    do so would not be in the best interests of the company or its shareholders.  *Id.*

4           **(e)   That the DRC reached different conclusions than the objectors
5                   does not mean that the DRC process was flawed.**

6           For her part, Steinberg merely reiterates the claims she would have the company bring and

7    tries to twist the Committee's decision to recommend against pursuing those claims into evidence

8    of its bad faith.  Steinberg Br. 27-30.  But the mere fact that objectors disagree with the DRC's

9    conclusions does not render those conclusions invalid or conspiratorial.

10          "Demonstrating that directors have breached their duty of loyalty by acting in bad faith

11   goes far beyond showing a questionable or debatable decision on their part."  *Ironworkers Dist.*

12   *Council of Phila. & Vicinity Ret. & Pension Plan* v. *Andreotti*, 2015 WL 2270673, at *27 (Del.

13   Ch. May 8, 2015).  "[M]ere disagreement with the Committee's ultimate conclusion, as well as its

14   subsidiary conclusions leading thereto, will be insufficient to raise a reasonable doubt that the

15   Board acted in good faith and on an informed basis."  *Id.*

16          The objectors' arguments rely on the same *res ipsa loquitur* logic that the court rejected in

17   *Ironworkers*:  they believe that the Autonomy acquisition was so costly to the company "that

18   *somebody* must be liable for a breach of fiduciary duties, and that liability is so clear and so

19   valuable to [HP] that a decision not to pursue that claim must have been made in bad faith."  *Id.* at

20   *26.  Here, the DRC *did* determine someone was liable:  Hussain and Lynch.  This case is

21   exceptional because the DRC not only determined who the wrongdoers were, but the company is

22   currently pursuing the executives at the heart of the fraud in the U.K. courts and has initiated pre-

action proceedings against Autonomy's accountants.[17]   There is thus no basis upon which to question the good faith, independence, or thoroughness of the DRC's investigation.

(f) **The Bennett deposition confirms that the DRC's conclusions should be respected and that the objectors' claims to the contrary are frivolous.**

Grasping at straws, the objectors argue that the DRC did not act in an informed basis because Bennett could not recall certain information at his deposition.  Supp. Br. 6.  As the Court will see upon a review of the entirety of Bennett's deposition transcript, Bennett had a masterful recall of the facts; that is especially true in light of the breadth and depth of the DRC investigation.  When he could not remember a specific fact from memory, Bennett asked to see the DRC Resolution in order to refresh his recollection; over and over again, counsel for Copeland refused this simple request.  *See, e.g.*, Bennett Dep. 58:18-20; 67:2-5; 101:4-11; 122:3-8; 127:10-19.  The problem, therefore, was not with Bennett's recollection and diligence — the problem was with Copeland's sharp deposition tactics.

Indeed, rather than ask meaningful questions that would aid this Court in evaluating the independence and good faith of the committee, counsel subjected Bennett to a memory test with absurd and wasteful questioning.  For example, Bennett was asked about details of the release, without being provided a copy of the release, on the ostensible basis that the release was ambiguous, even though Bennett had no parol evidence to offer on the subject since he was not a negotiator of its terms.  But Bennett was nonetheless clear (and correct) when he testified that all

---

[17]     Steinberg suggests that the settlement should not be approved until the company's pending suit against Lynch and Hussain is resolved.  Steinberg Br. 35.  That suggestion would only hurt the company whose interests she purports to protect by continuing the distraction of litigation against directors and other releasees.  Instead, the directors should be allowed to refocus their energies where they belong for the sake of the company and its shareholders:  the boardroom, not the courtroom.  *See Maher* v. *Zapata Corp.*, 714 F.2d 437, 467 (5th Cir. 1983).

of the Autonomy-related claims against the individual defendants are being released, with the exception of those against Lynch and Hussain.  Bennett Dep. 117:1-22.

The absurdity of the objectors' misuse of the deposition to critique Bennett and his recollection is highlighted by their claim that he should be faulted because he did not recall that Lesjak had raised concerns about Autonomy's accounting practices before the transaction was completed.  Supp. Br. 6.  Of course Bennett has no memory of Lesjak expressing accounting concerns because Lesjak *did not* express any such concerns.  Indeed, when Bennett asked to see something that would reflect Lesjak's concerns as to Autonomy's accounting practices, objector's counsel could not provide it.  Bennett Dep. 75:18-20.  And, indeed, even though objectors have repeated the claim that Lesjak raised these sorts of concerns, they have never provided a shred of substantiation for their unfounded assertion.  Copeland Br. 12; Supp. Br. 6.

Bennett's testimony on Lesjak's *actual* concerns, however, was crisp.  Bennett Dep. 75:2-8 ("She had concerns about the transaction from the perspective of what the Wall Street reaction would be to such a large acquisition and such a large premium.  I do not recall seeing or hearing anything in which she objected to the transaction itself or expressed concerns about the accounting.").

## 2. The conclusions reached by the DRC and HP board were reasonable.

In light of the thoroughness and independence of the DRC, on a motion to dismiss, the Court would not need to — in fact, would be precluded from — second-guess the HP board's business judgment that the asserted claims should be dismissed.  *Brazen*, 695 A.2d at 49.  This Court's review could therefore end here and approval of the settlement would be fully warranted.  But even if the objectors' attacks on the DRC's conclusions were considered on their own terms, they would still fail.

(a) **Plaintiffs could not overcome the rigorous standards of Delaware law in asserting claims against HP's current and former directors and officers.**

The claims objectors would have the company pursue against the directors boil down to allegations that they failed to exercise their duty of care. Those claims would be dismissed on the pleadings. HP's charter contains an exculpation provision that, in accordance with Delaware law, protects HP's directors from personal liability for breaches of the duty of care. *See* DEL. CODE ANN. tit. 8, § 102(b)(7). The Delaware Supreme Court has recently made clear that "[w]hen the independent directors are protected by an exculpatory charter provision and the plaintiffs are unable to plead a non-exculpated claim against them, those directors are entitled to have the claims against them dismissed," regardless of the standard of review applicable to the underlying conduct. *In re Cornerstone Therapeutics Inc. S'holder Litig.*, --- A.3d. ----, 2015 WL 2394045, at *1 (Del. May 14, 2015).

Faced with this absolute bar against duty of care claims, the objectors try to recast their claims as claims for breaches of the duty of loyalty. To plead and prove a duty of loyalty claim, a plaintiff would have to plead that the directors acted in bad faith[18] — which can encompass either "an intent to harm" or "intentional dereliction of duty." *Lyondell Chem. Co.* v. *Ryan*, 970 A.2d 235, 240 (Del. 2009). There is no allegation here that any director intentionally wronged the corporation to advance his or her personal interests. Thus, to succeed on a claim against the directors, plaintiffs would have to prove that the directors acted in bad faith by "fail[ing] to act in the face of a known duty to act, thereby demonstrating a conscious disregard for their responsibilities." *Stone*, 911 A.2d at 369-70. This is a high standard: "[I]f the directors failed to do all that

---

[18]     There is no independent fiduciary duty of good faith; rather, only the duties of care and loyalty can give rise to liability. *Stone* v. *Ritter*, 911 A.2d 362, 370 (Del. 2006).

they should have under the circumstances, they breached their duty of care.  Only if they know-ingly and completely failed to undertake their responsibilities would they breach their duty of loyalty." *Lyondell*, 970 A.2d at 243-44.

Claims of this type have been described as "possibly the most difficult theory in corpora-tion law upon which a plaintiff might hope to win a judgment." *In re Caremark Int'l Inc. Deriva-tive Litig.*, 698 A.2d 959, 967 (Del. Ch. 1996).[19]  They require a plaintiff to establish that the di-rectors either (1) "utterly failed to implement any reporting or information systems or controls," or (2) "having implemented such a system or controls, consciously failed to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their at-tention." *Stone*, 911 A.2d at 370.  Delaware law is clear that hindsight-driven claims of suppos-edly inadequate oversight, like those the objectors would have HP bring (*see, e.g.*, Steinberg Br. 20), are inadequate.  *See In re Gen. Motors*, 2015 WL 3958724, at *15 ("[I]n criticizing the Board's risk oversight and its delegation thereof, throughout the Complaint, the Plaintiffs concede that the Board was exercising *some* oversight, albeit not to the Plaintiffs' hindsight-driven satis-faction.").

The directors are further protected by Delaware law entitling them to rely on managers and advisors.  *See Brehm* v. *Eisner*, 746 A.2d 244, 261 (Del. 2000); DEL. CODE ANN. tit. 8, § 141(e).  To overcome the protections of Section 141(e), a plaintiff must allege particularized

---

[19]    In *Caremark* itself, the "extremely weak" claims that the directors had failed to monitor the corporation were settled on the basis of corporate governance reforms and changes to the company's drug referral policies.  698 A.2d at 972.  Failure-to-monitor claims against directors and officers are routinely dismissed on the pleadings by the Delaware Court of Chancery.  *See, e.g.*, *In re Dow Chem. Co. Derivative Litig.*, 2010 WL 66769, at *15 (Del. Ch. Jan. 11, 2010); *David B. Shaev Profit Sharing Account* v. *Armstrong*, 2006 WL 391931 (Del. Ch. Feb. 13, 2006) *aff'd*, 911 A.2d 802 (Del. 2006); *Guttman* v. *Huang*, 823 A.2d 492, 507-08 (Del. Ch. 2003).  Merely demanding a "better" system for information reporting will not suffice.  *See In re Gen. Motors*, 2015 WL 3958724, at *14.

facts demonstrating, for instance, that the directors "did not in fact rely on the expert," or that the "reliance was not in good faith," or even that "they did not reasonably believe that the expert's advice was within the expert's professional competence." *Brehm*, 746 A.2d at 262.  There are no such allegations here.

While these provisions of Delaware law do not apply to HP's officers, a plaintiff seeking to bring claims against them would still have to prove that the officers acted with gross negligence. *Adams* v. *Calvarese Farms Maint. Corp.*, 2010 WL 3944961, at *18 (Del. Ch. Sept. 17, 2010); *Midland Grange No. 27 Patrons of Husbandry* v. *Walls*, 2008 WL 616239, at *9 (Del. Ch. Feb. 28, 2008).  Delaware courts construing this standard have held that a would-be plaintiff would have to prove that HP's officers took actions "which [were] without the bounds of reason," *Adams*, 2010 WL 3944961, at *18 (quotation marks omitted), and were "'so grossly off-the-mark as to amount to reckless indifference or a gross abuse of discretion.'" *Metro. Life Ins.* v. *Tremont Grp. Holdings, Inc.*, 2012 WL 6632681, at *7 (Del. Ch. Dec. 20, 2012) (quoting *Solash* v. *Telex Corp.*, 1988 WL 3587, at *9 (Del. Ch. Jan. 19, 1988)).[20]

The facts considered and the conclusions reached by the DRC and presented to the board demonstrate that these strict standards of Delaware law could not be satisfied in this case.

---

[20]    Steinberg argues that the DRC applied "a single standard based upon the exculpation provisions of Delaware law" and ignored the fact that HP's officers could be liable for gross negligence. Steinberg Br. 27. Not true. The DRC Resolution reflects that the DRC was fully cognizant of the different standards applicable to officers and directors. *See, e.g.*, DRC Resolution at 48 ("The Committee considered the provision in HP's charter providing for exculpation of its directors (but not officers or employees).").  The DRC also assessed the claims against the officers and directors separately and under the relevant standards. *See id.* at 83-86.

Again, grasping at straws, the objectors mischaracterize portions of Bennett's deposition to argue that the exculpatory provision in HP's charter was the basis for the DRC's decision to dismiss claims against HP's officers.  But Bennett made clear that, in addition to the exculpatory charter provision, the Committee's recommendation also was based on its finding that there was no wrongdoing:  "As it has been explained and described to me, and with the exculpatory provisions that we have in the charter, and with, *in any case, our finding of no wrongdoing*, there's very little probability of success."  Bennett Dep. 96:23-97:2 (emphasis added).

**(b) There was a valid business case for the Autonomy acquisition that predated Apotheker.**

Although the objectors have balkanized their claims into several fragmented parts, the overall thrust is that HP was unaware of the true state of affairs at Autonomy prior to the acquisition not because HP was the victim of a massive fraud but because its officers and directors failed to conduct adequate due diligence and to inform themselves about Autonomy.  Steinberg Br. 18-24; Copeland Br. 7-15.  The findings recounted in the DRC's resolution — facts that the objectors ignore — refute the claim that Apotheker, Robison, Lesjak, or any other HP officer or director breached their fiduciary duties by failing to inform themselves adequately.

Far from being uninformed, the DRC's investigation established that HP's knowledge of and interest in Autonomy predated the acquisition by several years.  HP had firsthand knowledge of Autonomy's technology prior to the acquisition.  As early as 2009, the two companies developed a business relationship, entering several Original Equipment Manufacturer ("OEM") and licensing agreements, which enabled HP's internal use of Autonomy products.  As a result of these connections, "Autonomy and its technology were known to HP well before the Acquisition."  DRC Resolution at 29.

HP was also familiar with Autonomy, as it had previously considered the company as a potential target.  Under the leadership of CEO Mark Hurd, HP developed a business strategy to expand its software enterprise and considered a number of potential software acquisitions as part of that strategy.  Indeed, three of the acquisitions HP completed before Autonomy — 3PAR, ArcSight, and Fortify — were executed to expand HP's software footprint.  As part of the same strategy, the Technology Committee recognized Autonomy's ability to "support HP's participation in the enterprise search space," and it repeatedly considered Autonomy as a potential target.  *Id.*  Through this process, HP accumulated knowledge of Autonomy, its technology, and the pros and cons of a potential acquisition.  *Id.*

1   Steinberg misleadingly claims that HP affirmatively rejected Autonomy as a viable acqui-

2   sition candidate in 2010, ███████████████████████████████████████████

3   ████████████████████████████████████████████████████████████████████

4   ██████████████████████████████████ Steinberg Br. 21; *see also* Supp. Br. 9. ██████

5   ████████████████████████████████████████████████████████████████████

6   ████████████████████████████████████████████████████████████████████

7   ████████████████████████████████████████████████████████████████████

8   ████████████████████████████████████████████████████████████████████

9   ████████████████████████████████████████████████████████████████████

10   ████████████████████████████████████ As the DRC concluded, HP never doubted

11   the technological or strategic merits of an Autonomy acquisition; rather, its decision not to pursue

12   Autonomy earlier was simply a matter of prioritization.  DRC Resolution at 29.

13                    **(c)  HP's due diligence was extensive and was consistent with the scope
14                    of diligence applicable in UK public company deals.**

15   ████████████████████████████████████████████████████████████████████

16   ████████████████████████████████████████████     ███████████████████

17   ████████████████████████████████ As the DRC found, HP completed months of pre-

18   liminary due diligence on the deal before the board formally considered the acquisition:

19
20   ➢   Directed by a transaction team comprising veterans with significant experience, a team

21       that had recently completed extensive due diligence on another potential software acquisi-

22       tion, HP received, reviewed, and stress-tested information from Autonomy's senior offi-

23       cials and bankers regarding the company's financial condition, operating results, technol-

24       ogy, product development, and business strategy.  DRC Resolution at 30.

25   ██ ████████████████████████████████████████████████████████████████

26   ████████████████████████████████████████████████████████████████████

27   ████████████████████████████████████████████████████████████████████

28

➢ HP Corporate Development analyzed Autonomy's publicly reported financial information, as well as analysts', industry, experts' and trade groups' reports on Autonomy. Based on this information, HP's investment bankers confirmed the rationale for an Autonomy acquisition. DRC Resolution at 30.

➢ In March 2011, a detailed presentation was prepared for the Technology Committee meeting that provided an overview of Autonomy, its products, its architecture, its revenue breakdown, and expected financial performance. *Id.*

➢ Consistent with HP's protocols, a detailed preliminary business case for the Autonomy deal was prepared for the board's May 2011 meeting. Similar presentations were prepared for the board's Finance and Investment Committee ("FIC") and Technology Committee. *Id.*

After HP completed this preliminary due diligence, the board met to consider granting management authority to negotiate a deal at its July 19-21, 2011 meeting. Consistent with HP's practice in previous deals, Apotheker assumed the role of deal sponsor at the meeting, presenting the rationale for the acquisition to the board. The board also received presentations from HP's financial advisors and investment bankers, which praised the deal as a "'crucial offensive move toward [HP's] strategic vision'" and recommended "'that [HP] should pursue the acquisition expeditiously.'" DRC Resolution at 30.

During the meeting, HP's investment bankers warned the board that the U.K. Takeover Code created certain risks for the acquisition. Under the Code, "non-public information provided to HP by Autonomy had to be equally and promptly provided to any other bidder or potential bid-

der." *Id.* at 31.  HP's bankers identified IBM, Oracle, Google, Microsoft, EMC[2], and SAP as potential interlopers and warned that sharing Autonomy's non-public information with them could impair HP's likelihood of success on its bid and result in a competitor having sensitive Autonomy information if HP succeeded.  *Id.* at 30-31.  Accordingly, HP would primarily rely on reported financial information and oral representations if it moved forward with the acquisition.  After a full discussion and assessment of these and other risks, the HP board authorized management to proceed with an analysis of Autonomy as a target.  *Id.* at 31.

As the DRC found, HP's subsequent due diligence was entirely consistent with what is typically conducted for deals involving public U.K.-based companies that are subject to the U.K. Takeover Code.  *Id.* at 31-32.  KPMG said the same thing in its report (cited heavily by the objectors).  Ex. 6 (KPMG Report) at 7.

Thus, following the board's July meeting, HP convened a cross-disciplinary team of employees from Corporate Development, Finance, Sales Operations, Legal, and several other departments to spearhead the due diligence.  DRC Resolution at 27-28, 31.  These teams reviewed nonpublic documents, participated in at least 28 due diligence phone calls, and pored over publicly filed Autonomy financial statements — statements that had already been audited by Deloitte UK.  *Id.* at 31-32.  Not content with that, HP insisted on more.  As a result, HP received assurances (which turned out to be false) from Autonomy's then-CFO Hussain that Autonomy's public financials were accurate.  *Id.* at 32.

To assist HP's internal efforts, HP hired Barclays and Perella to advise on strategy and the fairness of the price.  *Id.* at 31.  While one fairness opinion is generally more than sufficient, in this case, both banks reviewed the transaction and opined that it was fair.  *Id.* at 54-55.  ▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  By statute, the

1   board was entitled to rely on this advice. *See* DEL. CODE ANN. tit. 8, § 141(e); *Brehm*, 746 A.2d

2   at 261-62.

3        HP also retained two top-tier international law firms, Freshfields and Gibson Dunn, to

4   conduct legal due diligence, to provide advice on the U.K. Takeover Code, and to act as deal

5   counsel.  DRC Resolution at 31.  In addition, HP retained KPMG to conduct financial and ac-

6   counting due diligence.  *Id.*

7        The HP team collected and scrutinized public information and nonpublic documents and

8   representations supplied by Autonomy executives.  *Id.* at 31-32.  By the end of the due diligence

9   process, Autonomy executives had provided a response to every one of HP's "must have" dili-

10  gence requests except one — access to Deloitte UK's work papers.  *Id.* at 32.  The materials Au-

11  tonomy had provided included the open-source scan of its source code, lists of revenue by prod-

12  uct category, redacted sample OEM contracts, and redacted lists of top forty customers and top

13  forty contracts.  *Id.* at 31-32.[21]

14

15       In parallel with management's efforts, the board met five times over the course of August

16  2011 to keep abreast of the progress of the transaction and HP's extensive diligence efforts.  Dur-

17  ing these meetings, the board received presentations from management and professional advisors

18  on key due diligence findings and other updates on the negotiation process.

19

20

21

22  [21]   Steinberg argues that HP's due diligence was inadequate because Apotheker and Shane
    Robison failed to arrange for "hands-on testing of Autonomy's software by a software engineer."
23  Steinberg Br. 20.  This objection is without substance.  The entire acquisition was overseen by
    Robison, HP's *Chief Technology Officer*, who bore an impressive technology resume. ███████

24  ████████████████████████████████████████████████████████████████████████████

25  ████████████████████████████████████████████████████ Regardless, it is unclear how
    HP could have been damaged by not having its own software engineers test Autonomy's soft-
26  ware.  The problem with Autonomy was not that its software did not perform as promised.  The
    problem was that its financial statements were fraudulent.

27

28

1   In light of all of these findings, the DRC concluded that HP's diligence "had in fact been

2   'rigorous' (particularly in the context of the normative standards of conduct for UK public-

3   company transactions)," and "had considered all material information that was reasonably availa-

4   ble to the Company." DRC Resolution at 36.

5   These facts do not state a violation of the duty of care by Apotheker, Robison, Lesjak or

6   any other HP officer or director.[22] *In re Walt Disney Co. Derivative Litig.*, 907 A.2d 693, 749

7   (Del. Ch. 2005), *aff'd*, 906 A.2d 27 (Del. 2006); *see also id.* at 765 (concluding no breach of fidu-

8   ciary duty by accepting counterparty's representations as true).  To the contrary, the objectors'

9   efforts to cobble together an attack on the DRC's conclusions "relies entirely on the wisdom of

10  hindsight" — precisely the sort of claim that the Delaware courts consistently reject. *Ash*, 2000

11  WL 1370341, at *10 (dismissing gross negligence claim against directors based on failed acquisi-

12  tion).  The problem was not that Apotheker, Robison, Lesjak or anyone else did not diligently

13  seek the truth about Autonomy.  The problem was that Lynch and Hussain intentionally con-

14  cealed it.[23]

---

[22]   In addition to the defendants named in the operative complaint, other individuals and third-party entities, including James Murrin and KPMG, were named as defendants in some of the pre-consolidation federal derivative complaints, but they were omitted from the operative complaint.  Nevertheless, the DRC considered the potential claims and concluded that it was not in the company's interest to pursue any of them.  DRC Resolution at 51.

[23]   As HP later discovered, Autonomy's publicly filed financials, which were reviewed by Deloitte UK, together with the narrative in the annual reports that accompanied the numbers, were riddled with misrepresentations and outright falsehoods.  As the Court will see upon review of the Particulars of Claim that has been filed against Lynch and Hussain in the U.K. (Docket #337), there is nothing to Steinberg's suggestion that there was no fraud at Autonomy, a suggestion based on nothing more than the U.K. Serious Fraud Office's ("SFO") decision to close its investigation.  Steinberg Br. 16.  All the SFO did was to "cede[] [jurisdiction] to the US authorities whose investigation is ongoing."  Ex. 34 (Press Release, HP Autonomy Investigation, *Serious Fraud Office* (Jan. 19, 2015)).  HP continues to cooperate with SEC and DOJ officials to support their investigations, which are ongoing.

██████████████████████████████████████████████████████████

(footnote continued)

**(d) There were no "red flags" presented to the directors or HP management.**

Notwithstanding the abundant evidence that Autonomy's executives actively concealed a massive fraud from HP, the objectors contend that HP would have discovered the fraud if only it had paid attention to "red flags" before the acquisition.  The DRC considered this claim and concluded that none of the supposed red flags provides a basis for asserting a claim against any present or former officer or director (other than Lynch).[24]  DRC Resolution at 35.  That conclusion was correct.

### (i)  The inability to obtain the Deloitte work papers cannot support a claim.

The objectors first contend that HP's inability to obtain Deloitte UK's work papers was a fatal flaw in the diligence process.  Steinberg Br. 7, 19; Copeland Br. 10-11.  The directors were never advised of any issue in this regard.  To the contrary, they were told that "KPMG's accounting review, including its interview with Deloitte, presented 'no material issues.'"  DRC Resolution at 34.

███████████████████████████████████████████████████████████████

███████████████████████████████  Instead of gaining access to the papers themselves, Deloitte UK agreed to a due diligence phone call with the HP team and KPMG as a substitute.  DRC Resolution at 32.[25]  ████████████████████████████████████████

─────────────────────

████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████

---

[24]    Sushovan Hussain was never an officer of HP.

[25]    Steinberg mistakenly claims that the Deloitte UK call occurred after the board had authorized the acquisition.  Steinberg Br. 7.  The call occurred after the board provided approval to ne-

(footnote continued)

█████████████████████████████████████████ The HP team asked the right questions about Autonomy's revenue recognition policies, specifically asking whether Deloitte UK had any disagreements with Autonomy's management about accounting policies or conclusions.  Deloitte UK failed to disclose any disagreements.  *Id.* ██████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████

### (ii) The KPMG report did not raise red flags.

The objectors next allege that HP's due diligence was insufficient because KPMG was unable to complete certain diligence tasks due to a lack of data about Autonomy.  Steinberg Br. 7; Copeland Br. 10.[26]  KPMG's report acknowledged that the information available to it was more limited than in non-U.K. takeovers.  Nowhere did KPMG suggest that HP's due diligence was inadequate as a result.  Rather, the report expressly noted that "the data and access provided to us during due diligence [were] . . . comparable with other acquisitions involving large U.K. publicly traded companies."  Ex. 6 (KPMG Report) at 7.  The HP board was fully informed that diligence would be limited due to the constraints of the U.K. Takeover Code and, as noted, were told that KPMG had not uncovered any material issues.[27]

---

gotiate but *before* the board authorized HP to close the deal on August 18, 2011.  DRC Resolution at 32, 35.

[26]    No claim can be asserted against the HP directors on the basis of the KPMG report, as they were told that "KPMG's accounting review, including its interview of Deloitte, presented 'no material issues.'"  DRC Resolution at 34.  The directors were entitled to rely on this advice. *See* Del. Code Ann. tit. 8, § 141(e); *Brehm*, 746 A.2d at 261.

[27]    The DRC's "experts on UK due-diligence procedures confirmed to the Committee that the receipt of limited information is consistent with UK market practices for acquisitions of FTSE 100 companies (as KPMG had advised the board before the Acquisition)."  DRC Resolution at 34.

HP'S RESPONSE TO OBJECTIONS TO
FINAL APPROVAL                                    32
MASTER FILE NO. C-12-6003 CRB

And, critically, in light of the nature of the fraud that was later uncovered at Autonomy, KPMG concluded (incorrectly, it turned out) that Autonomy "recognize[d] revenue in accordance with" the relevant accounting standard.  *Id.*  KPMG added that "the majority of [Autonomy]'s revenue recognition policies appear to be consistent with U.S. GAAP and HP policies."  *Id.*  The report further said that any differences in revenue recognition between Autonomy's practices and HP's policies "should only have a *short-term impact on [HP's] GAAP model revenue recognition (i.e.,* through  FY13) . . . ."  *Id.* (emphasis added).  In short, contrary to Steinberg's and Copeland's telling, KPMG's report did not wave red flags, it flashed green lights.[28]

Relatedly, the objectors assert that Apotheker and Robison were grossly negligent in failing to review the KPMG report themselves.  Steinberg Br. 19; Copeland Br. 9-10, 9 n.14.  The claim is without substance.  ███████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████It is therefore disingenuous for the objectors to claim that Apotheker and Robison were remiss in not reviewing the draft KPMG report.  ███████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████

---

[28]   Steinberg and Copeland assert that KPMG found Autonomy's organic growth rates suspect.  Steinberg Br. 19; Copeland Br. 10.  ████████████████████████████████

██████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████

1    █████████████████████████████████████ ███████

2    ███████████████████████████████.[29]

3        Apotheker and Robison were entitled, as senior HP executives, to rely on the work of sub-

4 ject matter experts who were actively engaged with KPMG in the due diligence effort, including

5 the head of HP's Corporate Development, Andrew Johnson.  In light of the "gross negligence

6 akin to recklessness" standard that would apply, it is not "'without the bounds of reason'" that

7 HP's CEO and CTO would rely on their subject-matter experts to review the accounting report.

8 *In re Accuracy, Inc. S'holder Derivative Litig.*, 757 F. Supp. 2d 919, 934 (N.D. Cal. 2010) (quot-

9 ing *In re Walt Disney*, 907 A.2d at 750); *In re REMEC Inc. Sec. Litig.*, 702 F. Supp. 2d 1202,

10 1239-51 (S.D. Cal. 2010) (CEO acted reasonably by delegating and relying on work conducted by

11 CFO and accounting department regarding complex goodwill impairment issue); *see also Howard*

12 v. *SEC*, 376 F.3d 1136, 1147-48 (D.C. Cir. 2004) (reasonable for a senior corporate executive to

13 rely on the expertise of internal and external counsel, as well as the company's corporate finance

14 department, in preparing documents for and approving a transaction).[30]

15

16

---

[29]    The fact that KPMG did not specifically opine that the call was an adequate substitute for Deloitte UK's work papers is inapposite. Supp. Br. 9. As noted, KPMG told HP that the level of information provided to KPMG — even without Deloitte's work papers — was comparable to what it received in other U.K. transactions. Ex. 6 at 7 (KPMG Report).



[30]    The cases cited by the objectors (Supp. Br. 8) discuss the legal standard applicable in duty of care cases and have no bearing on the facts of this case. *See, e.g., Brehm*, 746 A.2d at 264 (noting that "good faith . . . is a key ingredient of the business judgment rule"); *Smith* v. *Van Gorkom*, 488 A.2d 858, 872 (Del. 1985) ("[u]nder the business judgment rule there is no protec-

(footnote continued)

Finally, the objectors focus on the timing of the Deloitte UK call ███████ ████████████████████████████████████████████ to suggest that the acquisition was conducted in "extreme haste" and with a "lack of interest."  Supp. Br. 9.  The contention is nothing more than a weak debating point.  If full disclosure had been made in the diligence call, there is no doubt that the deal as then conceived would have stopped dead in its tracks.[31]

### (iii) The analyst reports as a whole did not raise red flags.

Steinberg next argues that HP failed to consider analyst reports that raised supposed red flags about the acquisition.  Steinberg Br. 28.  Again, the DRC reviewed the reports and concluded that they did not provide a basis for asserting any claims.  As the DRC explained, the "many positive reports regarding Autonomy published in the same period (dating back to 2005), offset the negative reports."  DRC Resolution at 35.[32]

Indeed, in the years preceding the acquisition, positive analyst reports on Autonomy were commonplace.  *See, e.g.*, Exs. 39 at 1 (Societe Generale in April 2010:  "Our positive view on

_____

tion for directors who have made an unintelligent or unadvised judgment" (internal quotation marks omitted)); *MCG Capital Corp.* v. *Maginn*, 2010 WL 1782271, at *21 n.129 (Del. Ch. May 5, 2010) (recognizing that there must be a causal link between negligent conduct, *e.g.*, "sloth-like delivery of information" and a failure of the board to be "adequately informed when they make a corporate decision").

[31]  In any event, Delaware law recognizes that "[s]eizing specific opportunities is an important business skill, and that involves some measure of risk.  Boards may have to choose between acting rapidly to seize a valuable opportunity without the luxury of months, or even weeks, of deliberation . . . .  Courts should therefore be extremely chary about labeling what they perceive as deficiencies in the deliberations of an independent board majority over a discrete transaction as not merely negligence or even gross negligence, but as involving bad faith."  *In re Lear Corp. S'holder Litig.*, 967 A.2d 640, 654 (Del. Ch. 2008).

[32]  Misreading the resolutions, Steinberg argues the DRC acted in bad faith by "confin[ing]" its analysis to [analyst] reports 'cited in the Complaint.'"  Steinberg Br. 28.  Not true.  While the DRC focused on the "dates on which the *cited* analyst and media reports were published," the DRC considered much more, including the "many positive reports" not cited in the complaints.  DRC Resolution at 35 (emphasis added).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Autonomy is unchanged . . . thanks to several drivers"); 40 at 1 (Deutsche Bank in April 2009: "Business momentum and management commentary continues to support our view that the group is in a unique position, being both a high growth software company and a safe haven from the current economic crisis."); 41 at 1 (J.P. Morgan in July 2008:  "Autonomy's strong performance is an indication of strong product offering, lack of competition and continued benefit from legislation in US.  We remain believers in Autonomy's strong growth potential with 50% EPS CAGR over FY07-09E.").

And contrary to Steinberg's assertion, the analyst reports remained favorable in the run up to the acquisition.  Indeed a brief survey of reports in the final quarter before the acquisition shows that analysts were still providing glowing reviews of Autonomy:

> Jeffries headlined its July 2011 report with "Strong Growth Driven by Cloud and OEM," elaborating that "Q2 11 results confirm strong traction across key segments such as OEM and Cloud.  The relatively positive tone of Q&A in the analyst call confirms that suspicions with respect to accounting issues have faded.  The scene is set for the premium organic growth rate to unfold in a premium rating, which we believe to be entirely warranted."  Ex. 8 at 1 (July 2011).

> Societe Generale praised Autonomy's "Q2 earnings above expectations" and noted, "IDOL products organic growth was 15% . . . .  OEM business remained dynamic with 27% growth, in line with prior quarters. . . .  Cloud signings are up 27%, with 'commit customers' at $437m, showing strong growth potential."  Ex. 9 at 1 (July 2011).

> Barclays Capital commented:  "Another good quarter. . . .  Autonomy has followed up a strong Q1 with a quarter of healthy product revenue growth. . . .  We do not see much weakness in Autonomy's numbers."  Ex. 10 at 1 (July 2011).

> Panmure Gordon & Co. wrote, "Autonomy has delivered Q2 results ahead of our expectations, and the outlook statement is better than we hoped.  Again, 'Cloud' is the highlight

of the results — with 17% growth . . . this improves Autonomy visibility and strengthens the investment case." Ex. 11 at 1 (July 2011).

Steinberg also claims that investors were uniformly skeptical of Autonomy's organic growth, citing a number of analyst reports. Steinberg Br. 4-5. But for every skeptic, there was an analyst praising Autonomy's impressive organic growth. For example, in March 2010, Societe Generale wrote, "We believe Autonomy should be able to deliver EPS growth of 20%+ pa over the next three years. . . .  This strong organic growth is driven by:  1) an increase in regulatory and compliance obligations for companies . . . ; 2) high structural growth within the large installed base (20,000+ clients) . . . ; 3) strong leverage from the fast-growing OEM business . . . ; and 4) new products such as Meaning-Based Marketing solutions and IDOL SPE." Ex. 12 at 4.

Likewise, in July 2010, Credit Suisse noted its "view that Autonomy continues to exhibit strong organic growth and resistance to pricing pressure." Ex. 13 at 1. The report continued: "The Company's strong IDOL technology, coupled with an extensive catalogue of data repository connectors, provides high barriers to entry, which we believe will allow the company to sustain its strong and profitable growth for the foreseeable future." *Id.* at 2.[33]

In any event, because HP also had access to financial information not available to analysts, the company reasonably concluded that its due diligence process would be the "ultimate test" of whether there were any red flags. DRC Resolution at 35. ██████████████

---

[33]     *See also* Ex. 14 at 1 (Credit Suisse in April 2009 noted that for the first quarter of 2009, Autonomy had an organic growth rate of 17.5% and that the company's "key metrics" were "sound"); Ex. 15 at 1 (RBC Capital in 2009: "the current guidance is for 10-20% top line organic growth"; "Underlying Q4 organic growth was 29%"); Ex. 16 at 1 (UBS Capital in July 2008: "40% organic license growth; 40% margins"). Even the reports cited by Steinberg recognize Autonomy's organic growth was impressive. *See, e.g.*, Ex. 17 at 1 (Steinberg Ex. 32) ("Autonomy posted 13% organic growth" in the second quarter of 2010); Ex. 18 at 1 (Steinberg Ex. 33) ("Organic growth of 13% (19% for IDOL products) is in line.").

The problem was that Hussain was lying.[34]

### (iv) Barclays' and Perella's concerns were resolved.

Steinberg's next alleged "red flag" —

— is without substance.  Steinberg Br. 6

_____

[34]     Steinberg focuses on reports from the second quarter of 2010 to suggest the reports should have alerted HP to Autonomy's hardware sales.  But the reports do not suggest that there was a trend towards increasing hardware revenues and instead treat the apparent spike in hardware revenue as an exception.  *See, e.g.*, Ex. 17 (Steinberg Ex. 32); Ex. 19 (Steinberg Ex. 34).  Moreover, the hardware at issue in those reports was not the "naked," loss-making hardware that HP discovered only after the acquisition.  Rather, the hardware discussed in the reports was for appliances — hardware loaded with Autonomy software.  *See* Ex. 18 at 1 (Steinberg Ex. 33) (noting a "*mix shift* towards appliance" revenue) (emphasis added).  Autonomy's management had previously warned investors that hardware revenue would be higher in the second quarter due to an increase in sales of Arcpliance, an appliance product that included hardware.  As Credit Suisse explained, investors' focus on hardware in that quarter was expected and unexceptional. Ex. 13.  Steinberg also cites a few cherry-picked analyst reports to suggest that the investment community writ large was skeptical of Autonomy's financial results.  Steinberg Br. 4-5.  But other reports hailed Autonomy as a "'growth' software provider" with "a 'pure' business model with new license sales comprising 66% of overall revenue . . . ."  Ex. 12 at 13.

1  █████████████████████████████████████████████████████

2  ████████████ .[35]

3     ███████████████████████████████████████████████████

4  ████████████████████████████████████████████████████████

5  ████████████████████████████████████████████████████████

6  ████████████████████████████████████████████████████████

7  ████████████████████████████████████████████████████████

8  ████████████████████████████████████████████████████████

9  ████████████████████████████████████████████████████████

10 ████████████████████████████████████████████████████████

11 ████████████████████████████████████████████████████████

12 ████████████████████ .[36]

13

**(e) The Technology and Finance and Investment Committees and full HP board were adequately involved in the acquisition.**

Steinberg's next attack is on the two HP board committees with responsibility for acquisi-

tions, the Technology and the Finance and Investment Committees.  But Steinberg has it exactly

backwards. ███████████████████████████████████████████████████

████████████████████████████████████████████████████  Thus,

---

[35]    As noted, the May 2011 presentation went to members of the Corporate Development team, not to the HP board. ████████████████████████████████████████

████████████  The KPMG report likewise fails to mention concerns about HP's disclosure transparency.  In short, lack of transparent disclosures could not be a red flag that the board ignored because the board was never presented with the issue.

[36] ████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

rather than delegate to a board committee, the full board acted on the acquisition, discussing the deal at seven separate meetings, including one devoted exclusively to that subject.  DRC Resolution at 30-35.

That is a sign of effective and focused board oversight; it cannot provide a basis for a breach of the duty of oversight.  *See, e.g.*, *In re Lear*, 967 A.2d at 654 (concluding that plaintiffs did "not come close to pleading facts suggesting that the [defendant] directors 'consciously and intentionally disregarded their responsibilities' and thereby breached their duty of loyalty" when it was clear that "the [defendant] board held regular meetings and received advice from several relevant experts").

In any event, both committees more than lived up to their responsibilities.  Steinberg contends that the Technology Committee failed to sufficiently vet Autonomy's technology prior to approving the transaction.  Steinberg Br. 23-24.  Again, this complaint is irrelevant.  There has never been a question about the efficacy of Autonomy's software.  In any event, this complaint misconstrues the Technology Committee's responsibilities.

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████  Again, the Committee was entitled to rely on those representations.  *Brehm*, 746 A.2d at 261.

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

1

2

3    ████████████████████████████████   Having considered all of these facts,

4    the DRC concluded the allegations against the Technology Committee were unsubstantiated.

5    DRC Resolution at 35.[37]

6

7    Separately, Steinberg contends that the FIC failed adequately to supervise the acquisition

8    process.  Steinberg Br. 23.  ████████████████████████████████████

9    ████████████████████████████████████████████████████████

10   ████████████████████████████████████████████████████████

11   ████████████████████████████████████████████████████████

12   ████████████████████████████████████████████████████████

13   ████████████████████████████████████████   ██████████

14   ████████████████████████

15   ████████████████████████████████████████████████████████

16   ████████████████████████████████████████████████████████

17   ████████████████████████████████████████████████████████

18   ████████████████████████████████████████████████████████

19

20

21   _____

22   [37]    The DRC also considered and rejected Steinberg's unsubstantiated (and irrelevant) allega-
     tion that Autonomy's technology was outdated.  Autonomy issued regular updates and improve-
23   ments to its IDOL technology, including 24 releases for IDOL 4 and 24 releases for IDOL 5, and
     38 releases for IDOL 7.  DRC Resolution at 38.  A senior Autonomy software developer con-
24   firmed that the 38 releases for IDOL 7 resulted in "fundamental and material changes" to the
     technology.  *Id.*  As the DRC found, "[t]he fact that there had not been a 'major version' release
25   of IDOL for several years does not support the conclusion that HP bought 'outdated technology,'"
     as major version releases were typically driven by marketing, as opposed to technological consid-
26   erations, and technology was continually improved even without major-version releases."  *Id.* at
     39.

27

28

1  ████████████████████████████████████[38]  Again, the FIC was enti-

2  tled to rely on those representations.  *Brehm*, 746 A.2d at 261.[39]

3  ### (f)  The full HP board carefully considered Lesjak's dissenting views.

4  Copeland asserts that HP's CFO Catherine Lesjak warned of accounting improprieties at

5  Autonomy.  Copeland Br. 8.  There is absolutely no basis for that claim, and Copeland cites none.

6  Neither Lesjak, nor, for that matter, any other presenter to the HP board identified any accounting

7  concerns regarding Autonomy.  DRC Resolution at 34.  And as discussed in the DRC's resolu-

8  tion, Lesjak stated that, in her view, while the strategic vision for the deal was sound, the size of

9  the premium would concern shareholders and HP's bankers had underestimated the impact of the

10  acquisition on the stock price.  She did not state or indicate that the proposed acquisition of Au-

11  tonomy placed too high a value on Autonomy.  *Id.*

12

13  And contrary to Steinberg's claim, the board did not ignore Lesjak's warnings and "new

14  news" about the acquisition.  Steinberg Br. 8-9, 11-12.[40]  After Lesjak raised her concerns, the

15  board's outside directors met in an additional, executive session on August 17, 2011 to consider

16

---

[38]  ████████████████████████████████████████████████████
████████████████████████████████████████████████████

[39]  The objectors assert that Bennett's deposition demonstrates that the DRC failed to assess
whether the members of the board, the Technology Committee, or the FIC consciously disregard-
ed their duties because Bennett did not affirmatively raise that issue.  *See* Supp. Br. 8.  But Ben-
nett was never asked a question that would have elicited the answer that objectors fault him for
failing to give.

[40]  The objectors suggest that Lesjak based her opposition to the deal on earlier due diligence
conducted on Autonomy in Project Aggie, which led HP to reject an Autonomy acquisition in
2010.  Steinberg Br. 21; Supp. Br. 10.  ████████████████████████████████████
████████████████████████████████████████████████████
███████████████████████.  The actual reasons that Lesjak
gave for objecting to the Autonomy deal are reflected in the DRC Resolution.  DRC Resolution at
34.

those concerns and to make sure there were adequate responses.  Bennett Dep. 200:22-201:2; 201:9-13.[41]  It was only after that meeting, and after the board again met with Apotheker, that the directors decided to proceed with the transaction.  *Id.* at 34.  *See also* Bennett Dep. 69:17-18 ("Cathy's objections were made known to the board."); 74:25-75:8 (discussing Lesjak's concerns); 200:21-201:13 (explaining that the board met to consider the issues raised by Lesjak).

Steinberg suggests that the board simply rubber-stamped Apotheker's recommendation without reviewing any additional materials.  Steinberg Br. 9.  But as the DRC noted, the board reviewed substantial additional materials at its August 18 follow-up meeting *after* it learned of Lesjak's concerns.  ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████  Far from casting doubt upon the board's thoroughness and deliberation, the episode demonstrates that it heard critical views, took them seriously, and made a conscious decision to go forward only after the concerns were addressed.[42]

As Steinberg's own cases make clear, the HP board's active response to Lesjak's concerns is a far cry from the kinds of conscious inaction courts require to sustain claims for breach of the

_____

[41]     Copeland snipes that there were no minutes taken at the August 17, 2011 meeting.  While there is nothing unusual about the fact that no minutes were made at an executive board session, there is no dispute as to what occurred in the meeting based on the DRC's interviews of the meeting participants.  DRC Resolution at 34.

[42]     Steinberg argues that the Committee acted in bad faith by "explaining away" a statement by Whitman on November 20, 2012 that "the two people [Apotheker and Robison] that should have been held responsible [for the Autonomy acquisition] are gone."  Steinberg Br. 27.  But as the DRC correctly determined, the statement "was intended to convey that those two executives had 'owned' the transaction process, but were no longer with the Company — not that they had engaged in any wrongdoing in connection with the Acquisition."  DRC Resolution at 72.  It is clear from the context that Whitman was *not* blaming Apotheker or Robison.  Quite the opposite: Whitman defended HP's "very extensive due diligence process"; its reliance on "audited financials, audited by Deloitte, not Brand X accounting firm, but Deloitte"; and its hiring of KPMG to assist in the diligence.  Ex. 37 (Steinberg Ex. 42) at 8-9.

duty of loyalty.  *Cf. Rosenbloom* v. *Pyott*, 765 F.3d 1137, 1153-54 (9th Cir. 2014) (plaintiffs adequately pleaded a claim for conscious disregard of duties because:  (1) the board ignored "repeated FDA warnings about illegal promotion of Botox," which "constituted a red flag, waved nearly every year for five straight years, that Allergan was breaking federal law"; (2) "an employee resigned after filing an ethics complaint" relating to the illegal conduct; and (3) the board actively encouraged the illegal marketing tactics).

> **(g) There is no basis for asserting any claims based on post-announcement events.**



Steinberg questions the absence of a provision enabling HP to terminate the deal because it changed its mind.  Steinberg Br. 10.  As Bennett explained in his deposition, there is nothing unusual about an acquisition agreement limiting the circumstances in which the acquirer can ter-

---

[43]    "Joe Bloggs" is the U.K. equivalent of "John Doe."  *See* wikipedia.org/wiki/Joe_Bloggs.

[44]    Copeland argues that the board failed to have a succession plan in place to deal with Apotheker's departure before the Autonomy deal closed.  Copeland Br. 12-13.  This claim was already considered by a prior special committee of HP's board (which found that HP did in fact have a succession plan) and was rejected by Judge Davila in *Copeland I*, 2013 WL 1899741, at *2, *11, and by the Delaware Court of Chancery in *Zucker* v. *Andreessen*, 2012 WL 2366448, at *10-11 (Del. Ch. June 21, 2012), which held that HP's directors did not face a substantial threat of liability for allegedly failing to establish a CEO succession plan because the plaintiff had not identified a basis from which the existence of a known duty to establish such a plan could reasonably be inferred.  The DRC was entitled — as it explained in its Resolution — to rely on the prior committee's work and on the prior judicial decisions on this issue.  *See* DRC Resolution at 73-74.

minate to situations in which there is a post-signing material adverse change in the target's business.  Bennett Dep. 41:4-25.  In any event, board chairman Raymond Lane asked HP's management and advisors whether there was any way for HP to terminate the deal.[45]  They concluded that there was no basis to do so.  *Id.* at 42:7-48:18.

### (h) There is no basis for suing HP's professional advisors.

The objectors assert that the settlement improperly releases valuable claims against HP's professional advisors Barclays and Perella.  Steinberg Br. 24; Copeland Br. 7, 34 n.34; Supp. Br. 3.  Again, the DRC investigated these potential claims and concluded that it was not in HP's interest to pursue them.  DRC Resolution at 53-55, 58-59.

The DRC found that both Barclays and Perella had engagement letters that severely limited HP's ability to recover.  Contrary to Steinberg's contention, there is no "mystery" about their terms.  Steinberg Br. 24.  Barclays' agreement with HP included "a limitation of liability based other than on bad faith, willful misconduct or gross negligence," while Perella's "engagement letter contained an indemnity from liability."   DRC Resolution at 53-54; *see also* Bennett Dep. 97:25-98:2 ("We concluded that given the contractual relationships we had with those advisors, that there was not a claim to be made against them.").

The DRC also considered the information that was available to Barclays and Perella, and the fact that both advisors, by the terms of their engagement letters, were entitled to rely on the information they received about Autonomy without verifying its accuracy.  *Id.* at 53-55.  There was also no evidence uncovered that either Barclays or Perella was aware of Autonomy's ac-

---

[45] ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ Rather than show bad faith, Lane's persistence shows the board's conscious oversight.

counting improprieties.  As the DRC concluded, "two law firms . . . undertook separate investigations of [Barclays and Perella]."  *Id.* at 54.  The fact that "each law firm, being equally diligent and thorough, ha[d] recommended that no litigation be brought against either advisor enhanced the Committee's capacity to vet the reasonableness of the recommendation regarding both Barclays and Perella."  *Id.*

Steinberg asserts that the board abdicated its responsibility by hiring Barclays, which served in a dual capacity as both financial advisor and loan underwriter.  Steinberg Br. 22.  But the board was fully aware of Barclays' financial interest in the deal. ███████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████ Contrary to Copeland's contention (Copeland Br. 34 n.34), Perella did not have a financial interest in the Autonomy acquisition going forward.[46]

Based on these and other factors described in the Resolution, the DRC concluded that the advisors "*did not*" act in bad faith, "*did not*" act negligently, and "*did*," in fact, "act in good faith, in a reasonable effort to fulfill their responsibilities as defined by their engagement letters . . . ."  DRC Resolution at 52-59 (emphasis in original).  The objectors have not put forth any basis to contradict those conclusions.

---

[46]     Steinberg complains that she is unable to assess the potential liability of Barclays and Perella because portions of the presentation prepared for the board on those issues have been redacted.  Steinberg Br. 24.  Steinberg has no need for the redacted materials; the DRC Resolution lays out the Committee's analysis in full detail.  Regardless, this attack on the redactions to the DRC presentation is a wrongful attempt to retread old ground, as Magistrate Judge Laporte has already rejected objectors' demands for unredacted versions of that presentation.  Docket #348 at 1-2; Docket #364 at 2.  *See* Point VII, *infra*.

## IV.    THE SETTLEMENT CONSIDERATION IS APPROPRIATE.

### A. The governance reforms are valuable and are directly tailored to address allegations in the complaints.

As demonstrated above, if this action were to proceed, the claims against the defendants would almost certainly be dismissed.  In contrast, the corporate governance reforms have significant value.  HP has agreed to implement the reforms not only at HP but also at HP Enterprise, the newly formed public company that will result from the spinoff of HP's enterprise technology infrastructure, software and services businesses.  The settlement will further benefit the company and its shareholders by avoiding further legal expense, and "of at least as great importance . . . tak[ing] its management 'out of the courtroom and restor[ing] them fulltime to the corporate board room and business.'"  *Maher*, 714 F.2d at 467.

Steinberg argues that the governance reforms are inadequate consideration because the parties have failed to demonstrate that the reforms would have "prevented the damages HP suffered in connection with the Acquisition."  Steinberg Br. 30.  But that is not the test.  As Steinberg concedes, the reforms are appropriate if they confer a "'substantial benefit' on HP."  *Id*.  The reforms in this case provide such a benefit to HP — particularly when measured against the claims being released — because they are tailored to address the overarching allegation in the complaint that HP had a weak M&A diligence process and strengthen HP's process for reviewing and approving potential acquisitions or targets.  Docket #367-3 (Governance Revisions).  Specifically:

> ➤ **Closer alignment between the board and HP's Finance and Investment Committee ("FIC")**:  The HP board will work more closely with the FIC, which has been responsible for M&A oversight.  The reforms call on the board to ensure that the FIC is composed of members with significant M&A experience, to discuss potential transactions before the FIC provides approval to sign, and to review the FIC's decisions regarding approval to sign for large transactions.

1

2

3

4

> **Increased responsibilities for the FIC**:  The FIC will advise the board regarding the disclosure protocols of M&A transactions, conduct a yearly process review to evaluate implemented and planned improvements to the M&A process, and ensure that M&A due diligence and related processes have been properly observed.

5

6

7

8

9

> **Increased depth of involvement by HP's Management Executive Committee ("EC") in the evaluation of acquisition targets**:  The EC will review and recommend changes where necessary to the criteria developed by the business units to evaluate the attractiveness of potential transaction targets.   The EC's recommendations will be reviewed by the board of directors and the FIC for approval.

10

11

12

13

14

15

> **Greater oversight of due diligence by HP's Risk Management Committee**:  HP's Risk Management Committee ("RMC") will review important due diligence findings, be available as a point of escalation for identified risks, and ensure that all elevated risks are properly resolved or further investigated.   The RMC will also have three permanent members, including the Chief Financial Officer, the General Counsel and the Director of Corporate Development.

16

17

18

> **Additional focus on due diligence for acquired technology**:  For larger transactions, the Technology Committee will approve a written technology due diligence plan that is specific to the particular transaction being evaluated.

19

20

21

22

> **Adoption of a formal fairness opinion policy**:  HP's fairness opinion policy will require both consideration of whether a potential transaction can be deemed fair from a financial perspective and the evaluation of any facts or circumstances that might compromise the independence of an advisor.  *Id.*

23

████████████████████████████████████████████████

24

██████████s, and the overwhelming weight of authority supports that decision.[47]   As Bennett

25

26

27

28

[47]        Ex. 22 (July 16, 2014 Board Resolution); *Feuer* v. *Thompson*, 2013 WL 2950667, at *2 (N.D. Cal. June 14, 2013) ("Courts have recognized that corporate governance reforms provide valuable benefits to corporations and their shareholders.") (internal quotation marks and citation

(footnote continued)

testified at his deposition, the reforms resulted in "formalizing processes and institutionalizing disciplines to the process," which was "beneficial and valuable to the company." Bennett Dep. 198:7-10. Bennett specifically highlighted the reform ensuring that "all the experts reports" and "advisory reports go to the finance and investment committee" — a reform advocated by Cotchett Pitre — as a particularly beneficial improvement. *Id.* at 198:17-20.

Judge Walker concluded that the reforms "provide a substantial benefit to HP and its shareholders." Ex. 25 ("Walker Arbitration Decision") at 11. And as this Court recognized when it preliminarily approved the settlement, "[t]he revisions to HP's mergers and acquisitions policies through the corporate governance reforms inure to the benefit of both HP entities, and at this early stage of the litigation, the trade-off of Autonomy-related claims for corporate governance reforms appears fair, reasonable, and adequate." Prelim. Approval Order at 9.

The case law likewise recognizes that governance reforms achieved as part of a derivative settlement can "'provide valuable benefits' to corporations and their shareholders." *Wixon* v. *Wyndham Resort Dev. Corp.*, 2010 WL 3630124, at *3 (N.D. Cal. Sept. 14, 2010) (quoting *In re NVIDIA*, 2008 WL 5382544, at * 3). Because of these benefits, courts routinely approve reform-only settlements without a monetary component.[48]

---

omitted); *In re Rambus Inc. Derivative Litig.*, 2009 WL 166689, at *3 (N.D. Cal. Jan. 20, 2009) (corporate governance reforms valuable to company); *In re NVIDIA Corp. Derivative Litig.*, 2008 WL 5382544, at *3 (N.D. Cal. Dec. 22, 2008) (recognizing that "strong corporate governance is fundamental to the economic well-being and success of a corporation").

[48] *See, e.g.*, *Mohammed* v. *Ells*, 2014 WL 4212687, at *3 (D. Colo. Aug. 26, 2014) ("The fact that the settlement involves only corporate governance . . . does not weigh against approval of the settlement. To the contrary, the corporate governance reforms . . . are specifically and appropriately designed to prevent the recurrence of the alleged misconduct . . . ."); *In re Johnson & Johnson Derivative Litig.*, 900 F. Supp. 2d 467, 485 (D. N.J. 2012); *Wixon*, 2010 WL 3630124, at *2; *In re Rambus*, 2009 WL 166689, at *3 ("In the instant case, the Court is satisfied that the corporate governance reforms are of significant value to [the company]"); *Cohn* v. *Nelson*, 375 F. Supp. 2d 844, 853 (E.D. Mo. 2005) ("Where the corporate governance reforms are achieved independently of any monetary benefits, the therapeutic benefits are even more worthwhile").

### B. Plaintiffs contributed to the development of the reforms.

The objectors wrongly continue to deny that settling plaintiffs had a substantial impact in developing the reforms.  Steinberg Br. 32-33.  As a preliminary matter, under Delaware law, "courts 'recognize a presumption that there is a causal relationship between [a] benefit [achieved] and a timely filed suit.'" *Alaska Elec. Pension Fund* v. *Brown*, 941 A.2d 1011, 1015 (Del. 2007). To overcome this presumption, Copeland and Steinberg "have the burden of 'demonstrating that the lawsuit did not in *any way* cause its action.'"  *Id.* (emphasis added) (quoting *Allied Artists Pictures Corp.* v. *Baron*, 413 A.2d 876, 880 (Del. 1980)).  Neither Copeland nor Steinberg have provided any evidence to meet this "heavy" burden.  *In re First Interstate Bancorp. Consol. S'holder Litig.*, 756 A.2d 353, 363 (Del. Ch. Aug. 26, 1999).  As a result, the Court need not determine which reforms originated with plaintiffs.  *All* the reforms developed after the filing of the complaints — reforms adopted through the efforts of the DRC, a committee formed in response to those complaints — are properly considered as a response to the litigation and as benefits conferred by the settlement.

While HP management did initiate reforms on its own (as any responsible management would), those reforms were not as extensive as those recommended by the DRC and then further developed with input from plaintiffs' counsel.  Ex. 23 ("Ashton Decl.") at 2-3; Ex. 24 ("Varma Decl.") at 1-2; Bennett Dep. 139:19-22 ("[T]he settlement includes a more robust set of . . . procedures for the M&A process than what the company had developed on its own.").

As Judge Walker concluded, "the derivative actions filed [in this litigation] were instrumental in identifying the need for, devising and implementing valuable corporate governance reforms that are directly tailored to prevent the types of alleged breaches of fiduciary duty involved in large acquisitions" like the Autonomy deal.  Walker Arbitration Decision at 11. For that reason, and as Judge Walker concluded, the HP board resolved, prior to the commencement of settlement talks, that the DRC's "recommendations for further M&A reforms" had been "informed by recommendations from [Robbins Geller] and by the allegations in Lead Plaintiff's consolidated complaint."  *Id.* at 17 (internal quotation marks and citation omitted). Thus, the objectors' assertion that the source of the corporate governance reforms was HP rather

1   than Lead Plaintiff (Copeland Br. 24-26; Steinberg Br. 32-33) is just wrong.   In fact, both

2   Robbins Geller and Cotchett Pitre took an active role in developing the governance reforms.   And

3   contrary to Steinberg's claim (Steinberg Br. 33), in December 2013,[49] Robbins Geller provided a

4   revised set of reforms to Proskauer that were focused on M&A issues.[50]

5   ███████████████████████████████████████████████████████

6   ███████████████████████████████████████████████████████

7   ██████████████████████████████████████████████

8           The DRC commented on the proposed reforms.   Ashton Decl. at 3.

9   ███████████████████████████████████████████████████████

10  ██████████████████████████████████████████████████████[51]

11  The DRC resolved to recommend a set of corporate governance reforms to the board, and noted

12  that its recommendations to the board had been informed by the recommendations from plaintiffs.

---

[49]      Copeland incorrectly states that Exhibit L to his brief is the November 2013 version of Robbins Geller's proposed reforms.   In November 2013, Robbins Geller presented a set of re-forms to Proskauer.   At that time, Proskauer noted that, in contrast to the core claims in the com-plaints, the proposed reforms were not M&A-related.   *See* Ashton Decl. at 1-2.   Copeland has *not* submitted the November 2013 Robbins Geller deck.   On December 12, 2013, Robbins Geller sent a revised proposal that was more M&A-focused but included a proposal to add a governance ex-pert to the board.   That is Copeland's Exhibit L.   After Proskauer reminded Robbins Geller that Whitworth, a noted governance expert, was already on the board, Robbins Geller provided anoth-er version of the deck, on December 16, 2013, recommending that HP continue to enhance the corporate governance expertise on the board.   *See* Ashton Decl. 2; Docket #350 (Letter Brief) at 4-5 (describing the timeline).   Thus, Copeland's suggestion that the minimal number of differ-ences between the two slide decks undercuts Robbins Geller's contribution to the reforms is without substance.   *See* Copeland Br. 25-26.

[50]      Robbins Geller also recommended that HP sue Michael Lynch, something that the firm had already done in its state court complaint.   Compl. ¶¶ 65, 84-118, *Noel* v. *Whitman*, No. 1:13-cv-251346 (Cal. Super. Santa Clara Cnty. Aug. 16, 2013).   HP has of course now sued Lynch (and Hussain) in the U.K. for perpetrating the fraud at Autonomy.

[51]      Robbins Geller's influence on the reforms recommended by the DRC is evident from a comparison of the suggestions that Robbins Geller made and the reforms the DRC proposed.   Two representative examples underscore this contribution.   ████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████.

1   *See* Bennett Dep. 108:6-17; 139:9-12; 140:23-141:1.  The board considered the DRC's recom-

2   mendations and directed management to consider the reforms.  *See* January 2014 Board Resolu-

3   tion at 12.  Indeed, the HP board explicitly acknowledged that the proposed reforms had been in-

4   formed by plaintiffs' actions.  *Id.  See also* Bennett Dep. 108:6-17; 139:9-12; 140:23-141:1.[52]

5       Thereafter, plaintiffs were provided with a copy of the reforms and the parties engaged in

6   substantial negotiations regarding the reforms during the mediation overseen by Judge Walker.

7   The result was a set of reforms that reflected joint input from Cotchett Pitre and Robbins Geller.

8   *See* Ex. 30 (Term Sheet) at Schedule A.  ████████████████████████

9   ████████████████████████████████████████████████

10  ████████████████████████████████████████████████

11  ████████████████████████████████████████████████

12  ████████████████████████ █ ████████████████████

13  ████████████████████████████████████████████████

14  ████████████████████████████████████████████████

15  ████████████████████████████████████████

16      Relying principally on *In re Oracle Securities Litigation*, 852 F. Supp. 1437 (N.D. Cal.

17  1994), Steinberg speculates that other factors could have caused the reforms.[54]  But what *could*

---

[52]     In an odd twist, the objectors switch from complaining that they have not received enough documents to complaining about documents that *were* produced to them.  Supp. Br. 13.  The additional documents were produced in advance of the Bennett deposition precisely so that the objectors could question Bennett on the nature and extent of plaintiffs' impact on the DRC's corporate governance proposals.

[53]     *Citibank, Inc.* v. *Weill*, Index No. 600645/06 (N.Y. Sup. Ct. May 14, 2007), is inapposite. In an unreported decision, the court found that the plaintiff had not contributed sufficiently to the reforms because there was "no acknowledgement of plaintiff's role in the adoption of these reforms by Citigroup in the stipulation."  *Id.* at 29.  By contrast, the stipulation here clearly recognizes that the "Governance Revisions . . . had been informed by allegations in the Federal Action and by proposals from State Plaintiffs."  Third Amended and Restated Stipulation of Settlement (Docket #277-1) at 2.

[54]     In *Oracle*, the court found that the derivative suit did not cause the reforms relying primarily on the fact that Oracle was being investigated by the SEC.  852 F. Supp. at 1447-48.  Indeed, the court noted that "Oracle's pattern of acquiescence toward the SEC . . . is clear" and found that "Oracle's remedial policy changes appear to be one step in the process by which Ora-

(footnote continued)

1    *have* happened is irrelevant here because what *did* happen is that Cotchett Pitre and Robbins

2    Geller both meaningfully contributed to the development of the corporate governance reforms.

3    Moreover, the *Oracle* court granted final approval to the settlement even absent evidence that the

4    complaint or derivative counsel caused or contributed to the reforms "[o]n the basis of the report

5    of Oracle's special litigation committee," which found that prosecuting the derivative action

6    would not be in the company's best interest, and that, therefore, the settlement was in the best

7    interests of the company and its shareholders.   *Id.* at 1440-44.   Thus, far from providing

8    justification for rejecting the settlement, *Oracle* is *a fortiori* for approving it.

9        Finally, Copeland takes issue with the DRC's failure to adopt Robbins Geller's proposal

10   to link executive compensation to the success of an acquisition.  Copeland Br. 27-28.  Bennett

11   explained why that proposal would not be in HP's interests:  "If you try to set up scenarios where

12   somebody's compensation is damaged if anything goes wrong, you encourage a culture where

13   nothing happens and . . . no one is willing to take any risks."  Bennett Dep. 144:15-18.

14   ### C. The fact that HP did not adopt Copeland's ill-conceived reforms is not a basis for rejecting the settlement.

15

16       Copeland has conceded that "there are some badly-needed corporate governance

17   enhancements included in the proposed settlement."  Docket #212 (Copeland Brief) at 2.  He

18   nonetheless argues that the reforms are inadequate because — predictably — they do not include

19   two reforms that Copeland favors:  eliminating contingent fee arrangements for financial advisors

20   and requiring HP's financial advisors to render opinions on non-financial matters.  Copeland Br.

21   34-35.  But Copeland's first reform ignores the fact that case law has repeatedly recognized

22   contingent fees for advisors as "undoubtedly routine" and beneficial to shareholders.  *See, e.g.*, *In*

23   *re Atheros Commc'ns, Inc.*, 2011 WL 864928, at *8 (Del. Ch. Mar. 4, 2011) (noting that

24

25   _____

26   cle hoped to placate the SEC."  *Id.* at 1448.  Unlike Oracle, HP is not being investigated by the SEC.  Bennett Dep. 215:6-10 (HP is not under investigation by SEC related to Autonomy acquisition).

27

28

1    contingent-fee arrangements can "reduce . . . expense" and "properly incentivize the financial

2    advisor to focus on the appropriate outcome.").

3         And as Bennett testified, there was not "any reason to believe that [a contingency fee

4    arrangement] undermined [any advisor's] independence in the matter."  Bennett Dep. 194:24–

5    195:3.  Instead, what matters is the reputation of the advisor for doing high-quality work; the fee

6    arrangement should not matter if the firm is one of high repute.  *Id.* at 194:10-12, 195:8-17.  As

7    Bennett noted, the fact that bankers were paid on a contingent basis is "very common" and there

8    was no "reason to believe that [the fee arrangement] undermined their independence in the

9    matter."  *Id.* at 194:25-195:3.  Indeed, as noted above, Perella did not even have a contingent fee

10   arrangement.  It was paid the same amount regardless of whether or not it deemed the transaction

11   price fair.

12        Copeland's other desired reform — requiring financial advisors to render opinions that a

13   given transaction is fair to HP "in all material respects" — fares no better, as financial advisors

14   are not qualified to render opinions on non-financial matters.[55]

### D.  There is no requirement that any defendant or HP's insurers make a monetary contribution to the settlement.

17        Copeland and Steinberg both also complain that HP should have obtained monetary con-

18   tributions from the defendants themselves, or obtained a payment on the directors' behalf from

19   HP's insurance carriers.  Copeland Br. 16-17; Steinberg Br. 33-34.  But once the DRC concluded

20   that HP had no claims to bring, there was no basis for demanding a payment from any defendant

21   or from HP's insurers.  Thus, while, as Bennett testified, the DRC *did* consider the potential

22   availability of insurance proceeds, it concluded that because the underlying claims were meritless,

---

25   [55]    Steinberg argues that the reforms would remain intact even if the settlement is not ap-
26   proved.  But in so arguing, she tacitly admits that the reforms have value.  *See* Steinberg Br. 33
     ("[T]here is every indication that they would remain in place to the extent they are viewed as add-
27   ing a dose of prevention to a potential repetition of the errors made in the Acquisition.").

further consideration of just how much of a payout could be obtained from insurance carriers was unnecessary.  *See* Bennett Dep. 119:20-23; 186:13-17 ("[W]e concluded that the settlements weren't worth $200 million [a hypothetical number included in Copeland's counsel's deposition question], and so we wouldn't have wanted to — to draw down our insurance for something that we didn't think was worth it.").  For these same reasons, once the DRC concluded that the claims against the individual defendants other than Lynch, Hussain and Deloitte UK were without merit and not worth pursuing, there was no reason to conduct an in-depth examination of their personal net worth or to demand any monetary contribution from them.[56]

In any event, the law is clear that not all released parties must contribute to a settlement. *See, e.g.*, *Masterson* v. *Pergament*, 203 F.2d 315, 330 (6th Cir. 1953) (fact that not all releasees contributed to settlement not reason for the court to deny approval); *Glicken* v. *Bradford*, 35 F.R.D. 144, 152 (S.D.N.Y. 1964) ("The general rule is that release of noncontributing defendants is no reason for disapproving a compromise.").  The question before the Court is whether sufficient compensation is being paid, not the appropriate contribution of each defendant.  *Alvarado Partners, L.P.* v. *Mehta*, 723 F. Supp. 540, 548 (D. Colo. 1989); *see also Duban* v. *Diversified Mortg. Inv'rs*, 87 F.R.D. 33, 40 (S.D.N.Y. 1980) ("[T]he release of noncontributing defendants through a settlement agreement is no reason for disapproving the compromise.") (internal quotation marks and citation omitted).

---

[56]    Bennett Dep. 96:7-14 ("But at the end of the day we concluded that there was no probability of success and there's no point consuming management time and attention and consuming corporate funds that we would have to advance to defend the claims.  There's no point in doing that with no likelihood of success."); *see also id.* at 94:16-21 ("[T]here were not meritorious claims to be pursued against the officers and directors, and so . . . the company has no interest in the . . . expense or distraction of pursuing those claims because we . . . concluded that they would not succeed.").

## V. THE SETTLEMENT IS NOT COLLUSIVE.

In granting preliminary approval, this Court observed that "the Third Amended Settlement appears to be the result of good-faith and arms'-length bargaining, with no evidence of fraud or collusion to taint the negotiation." Prelim. Approval Order at 9. Despite months of discovery, the objectors have unearthed nothing to disturb this Court's conclusion.

Thus, Copeland argues that the settlement should not be approved because the DRC expected "that the litigation was on a track to settle." Copeland Br. 22. There is no substance to that claim. As Bennett testified, "I don't think anything was predetermined. Nothing was [predetermined] before the committee began its work." Bennett Dep. 196:17-18. *See also* DRC Resolution at 83-90.[57]

Once settlement discussions were initiated, they were conducted at arm's length with experienced and informed counsel on both sides. The negotiations that led to this settlement had an additional protection against collusion: mediation by retired federal Judge Vaughn Walker. The oversight of Judge Walker, "an experienced mediator in the settlement process[,] confirms that the settlement is non-collusive." *Satchell* v. *Fed. Express Corp.*, 2007 WL 1114010, at *4 (N.D. Cal. 2007); *see also Hainey* v. *Parrott*, 617 F. Supp. 2d 668, 673 (S.D. Ohio 2007) ("The participation of an independent mediator in the settlement negotiations virtually insures that the negotiations were conducted at arm's length and without collusion between the parties.").

As Judge Walker observed, the negotiations "were intense and detailed" and "contentious and hard fought." Docket #149-1 ("Walker Decl.") at 5. He concluded that "the settlement is the product of exceedingly capable attorneys operating from a thorough base of knowledge and

---

[57]     Copeland points to the fact that plaintiffs were permitted "otherwise unimaginable latitude" in their confirmatory discovery as evidence of collusion. Copeland Br. 22 & n.26. But of course had HP not allowed that discovery, he inevitably would have complained that plaintiffs had insufficient information by which to decide whether to settle. So in Copeland's world, HP is being damned for allowing the discovery, but would have been just as damned if it hadn't. Copeland's related argument that the parties should have engaged in motion to dismiss briefing first would have imposed even greater costs and distraction on the company whose interests he purports to represent.

1    experience and in possession of a significant body of evidence and in earnest pursuit of their

2    respective clients' interests." *Id.* at 6. If, as the objectors claim, the settlement negotiations were

3    tainted by collusion, Judge Walker would have noticed and indicated as much. Instead, Judge

4    Walker submitted a declaration describing an arm's-length process devoid of collusion.

5          This settlement, therefore, is a far cry from other settlements that courts have rejected.

6    For instance, the "scandalous" settlement in *Eubank* v. *Pella Corp.*, 753 F.3d 718, 721 (7th Cir.

7    2014), involved, *inter alia*, a representative plaintiff who was the father-in-law of class counsel,

8    as well as class counsel who had been charged with misappropriation of firm assets and whose

9    suspension had been recommended by the Illinois bar (motivating him to "obtain a large

10    attorney's fee in this case before his financial roof fell in on him"). *Id.* at 721-22. There are no

11    such indicia of misbehavior or ill motivation here.

12          With nothing new to say, the objectors recycle the argument that the fee provisions in the

13    original settlement evidence collusion. Steinberg Br. 17-18; Copeland Br. 23 n.29. The objection

14    is meritless. The fact that the original stipulation of settlement contemplated that HP would retain

15    plaintiffs' counsel to assist HP in prosecuting affirmative claims against the parties who

16    defrauded HP is not evidence of collusion.[58] Rather, it reflected a decision by HP to engage

17    counsel who had become fully familiar with the facts and who this Court had already recognized

18    as "experienced and informed" (Docket #319 at 9) to assist in the prosecution of the company's

19    claims, claims that have now resulted in the initiation of litigation in the Northern District of

20    California by an HP subsidiary against a company that aided and abetted the fraud at Autonomy.

21    *See Microtechs., LLC* v. *Autonomy, Inc.*, Case No. C-15-2220-RMW-HRL (N.D. Cal.).

22          Far from being a "fee-induced framework for a settlement," Copeland Br. 3, *see also*

23    Steinberg Br. 17-18, no discussion of fees took place until after the parties agreed on corporate

24

25    [58]    Steinberg's assertion that the $18 million fee was to be paid "for the Settling Plaintiffs'
purported role in the Governance Revisions," Steinberg Br. 17, is flat-out wrong. Rather, that fee

26    was to be paid in exchange for plaintiffs' counsel assistance prosecuting those claims. *See* Ex. 35
at 72 (Arbitration Transcript) ("the overwhelming justification for [the 18 million-dollar retainer]

27    was the services that HP was going to be getting").

28

governance reforms.  *See* Walker Decl. at ¶¶ 13 ("To the best of my knowledge, the parties did not engage in any discussion about attorney's fee amounts before reaching the agreement in principle."), 22 ("Only after the parties had agreed on those settlement terms did they begin in my presence to discuss issues relating to attorneys' fees, including plaintiffs' counsel's role in any affirmative proceedings that HP might bring against Autonomy-related persons and entities.");

██████████████████████████████████████████████████████████████

Indeed, the Settlement Term Sheet expressly stated that "[n]o fee amounts have been discussed prior to the execution of this Term Sheet."  Ex. 30 at 5.[59]

Bennett made this clear at his deposition, explaining that the proposed governance reforms were finalized before the fee negotiation was conducted, and that the fee provisions were always severable from the settlement agreement itself.  Bennett Dep. 214:4-9; 214:17-24; 217:8-12.  And there was nothing secretive about the arrangement.  The fee provision contained in the original settlement was transparent, and the stipulation *always* provided that the Court's approval of the fee provision was not a condition of the settlement.  Stipulation of Settlement (Docket #149-2), at § 4.  *See also* Docket #199 at 16:22-17:14, 17:24-18:10.  Once the question was raised, the parties executed an amended stipulation eliminating the retention agreement and confirming what was true all along, *i.e.*, that the retention agreement was not a condition to the settlement.  Amended and Restated Stipulation of Settlement (Docket #201).

Thus, Copeland's and Steinberg's argument that "the reasonable inference is that negotiations over the terms of the settlement were entangled with negotiation of attorneys' fees" (Supp. Br. 12) is tendentious conjecture without a shred of substance.  The parties to the settlement negotiation, a retired federal judge, Bennett, and the settlement term sheet itself have

---

[59]    Copeland and Steinberg also recycle their old refrains that they were allowed inadequate discovery, this time with regard to the settlement negotiation process given the alleged taint of the original retention agreement.  But Magistrate Judge Laporte concluded, correctly, that they were not entitled to discovery of the parties' settlement negotiations.  Docket #348 at 3; Docket #354 at 1-2.  *See* Point VII, *infra*.

1   all been clear that the discussions of attorneys' fees occurred only after an agreement had been

2   reached on the reforms.

3   ## VI.   NOTICE WAS FAIR AND APPROPRIATE.

4        Yet again, Copeland argues that notice of the proposed settlement was inadequate.

5   Copeland Br. 48-51.  He was wrong when he made the argument at the preliminary approval

6   stage and he is wrong now.  HP provided notice in the manner approved by the Court through

7   publication in *The New York Times*, *Investor's Business Daily*, *The Wall Street Journal*, and *The*

8   *San Francisco Chronicle*, through an 8-K, and on the Investor Relations page of the HP web-

9   site.[60]  Courts have approved this notice procedure innumerable times in the past.[61]

10       Copeland's principal case for his contention that notice was inadequate is *Mullane* v. *Cen-*

11  *tral Hanover Bank & Trust Co.*, 339 U.S. 306 (1950) — the same case he cited to the Court be-

12  fore preliminary approval.  As HP pointed out then, *Mullane* is not controlling because it did not

13  involve a derivative settlement, and, as other courts have recognized, it "d[oes] not bar notice by

14  publication."  *Arace* v. *Thompson*, 2011 WL 3627716, at *4 (S.D.N.Y. Aug. 17, 2011).  "In a de-

15  rivative action, a court may determine that notice of a proposed settlement by publication is ap-

16  propriate . . . ."  *Id.* (citing Fed. R. Civ. P. 23.1(c)).  Indeed, in the *only* derivative case cited by

17  Copeland on the requirements of notice, the court *endorsed* a procedure that was far less rigorous

---

[60]    In accordance with the Court's Order, HP filed an affidavit attesting to its compliance with the Notice requirements on June 10, 2015 (Docket #360).

[61]    *See* Docket #259 (HP Reply Mem. in Supp. Second Stip. Settlement) at 11-12 (collecting authorities).

1

2

than the one employed here, requiring neither publication nor direct mailing.  *See Bushansky* v.

*Armacost*, 2014 WL 2905143, at *7 (N.D. Cal. June 25, 2014).[62]

3

4

5

6

7

8

9

10

11

   Copeland again asserts that the notice should have contained more detail about the settle-

ment process.  Copeland Br. 50-51.  But he "point[s] to no case law to support [his] contention

that this level of detail is required."  *Hill* v. *State Street Corp.*, 2015 WL 127728, at *2 (D. Mass.

Jan. 8, 2015).  "It is well settled that the notice is not required to provide a complete source of in-

formation."  *Petrovic* v. *Amoco Oil Co.*, 200 F.3d 1140, 1153 (8th Cir. 1999) (internal quotation

marks omitted).  A notice need "only summari[ze]" the terms of the settlement while directing

shareholders to the settlement documents themselves.  *Maher*, 714 F.2d at 452 (internal quotation

marks omitted).  That is exactly what the notice here did.

12

13

14

15

16

17

18

19

   Copeland cites no authority to support his hodgepodge of other objections. Copeland Br.

50-51.  Courts have routinely approved objection deadlines set 28 days from the notice being

sent, not 28 days from the submission of any brief in support of the settlement.[63]  The notice peri-

od provides ample time for the objectors' out-of-state attorneys to seek admission to practice, as-

suming they needed it, and even if they didn't, the notice period would still be adequate.[64]  HP's

decision to give shareholders access to the governance revisions subject to a confidentiality

20

---

21

22

[62]    The court required defendant to:  (1) post a "link on [its] investor relations website that
leads to a webpage to be displayed for a minimum of thirty days"; (2) submit "an 8-K filing with
the SEC"; and (3) issue a "press release."  *Bushansky*, 2014 WL 2905143, at *7.

23

24

[63]    *E.g.*, *Torrisi* v. *Tucson Elec. Power Co.*, 8 F.3d 1370, 1375 (9th Cir. 1993) (holding a 31-
day notice period between mailing of notice and deadline to object was adequate in opt-out class
action); *Marshall* v. *Holiday Magic, Inc.*, 550 F.2d 1173, 1178 (9th Cir. 1977) (26 days between
mailing of notice and deadline for opting out of class was "more than adequate").

25

26

27

[64]    *E.g.*, *Grunin* v. *Int'l House of Pancakes*, 513 F.2d 114, 121 (8th Cir. 1975) (rejecting ar-
gument that notice period was inadequate because "it did not give class members an opportunity
to retain counsel"; "appellant is incorrectly attempting to limit our review of the factual setting in
this case to the 19-day notice period").

28

1  agreement was approved by court order and entirely consistent with precedent.[65]  The Consolidat-

2  ed Complaint has been posted on HP's website since March 24, 2015, and the unredacted version

3  was filed in advance of this submission.

4  **VII.   THE OBJECTORS' ATTEMPTS TO RELITIGATE THEIR DISCOVERY**

5  **DEMANDS SHOULD BE DISREGARDED.**

6  Copeland and Steinberg rehash the demands for discovery that they have made repeatedly

7  through the course of this action, insisting that Magistrate Judge Laporte's decisions denying

8  those demands were erroneous.  Copeland Br. 4 n.10, 44-48; Steinberg Br. 17-18; Supp. Br. 11.

9  But the time for rehashing those demands has long since passed.[66]

10  As Magistrate Judge Laporte has explained, objectors "'are not automatically entitled to

11  discovery or to question and debate every provision of the proposed compromise.'"  Docket #348

12  (Order Denying Discovery) at 2 (quoting *In re Wachovia Corp.*, 2011 WL 1496342, at *1 (N.D.

13  Cal. Apr. 20, 2011)).  To the extent that discovery is permitted, "'the Court may, in its discretion,

14  limit the discovery or presentation of evidence to that which may assist it in determining the

15  fairness and adequacy of the settlement.'"  *Id.* (quoting *In re Wachovia*, 2011 WL 1496342, at

16

17  *1).[67]

18

19  In denying Copeland's most recent demand to depose the principal negotiators of the

20  proposed settlement, Magistrate Judge Laporte found that "Copeland points to no persuasive

21

22  [65]    *E.g.*, *In re BankAm. Corp. Sec. Litig.*, 210 F.R.D. 694, 706 (E.D. Mo. 2002) (concluding

23  that "due process has been provided" when settlement procedure allowed objectors to view confi-
    dential documents under the terms of the existing protective order).

24  [66]    This Court has declined to review Magistrate Judge Laporte's rulings each time the objec-
    tors have sought relief from them by not taking action in response to those requests.

25  [67]    As HP explained in its opposition to Copeland's most recent motion for discovery, the

26  cases upon which he relied (the very same cases to which he now points the Court, *see* Copeland
    Br. 47-48 n.53) are manifestly distinguishable and, if anything, only support the correctness of

27  Magistrate Judge Laporte's conclusions.  *See* Docket #361 at 7 n.3.

28

reason why this Court should deviate from the general rule that counsel 'are not deposed regarding the assistance or advice they provide to their clients in this type of action.'"   Docket #364 at 2 (quoting *Carlton Invs.*, 1997 WL 38130, at *5).   She further reiterated her conclusion that Copeland had shown no need for an unredacted version of the DRC's presentation to the board.   *Id.* (citing Order Denying Discovery (Docket #348) at 1-2).[68]   So much for the objectors' insistence that the redactions to the presentation have improperly "shield[ed] evaluation of the Potential Claims from scrutiny."   Supp. Br. 11.

The objectors do not even *pretend* that they are after anything other than privileged materials.   While they believe it is likely that there is some "treasure trove of documents containing the DRC's (i.e., counsel's) evaluation of the Potential Claims," Supp. Br. 12, even if there were the objectors would have no right to it — as Magistrate Judge Laporte has been very clear each time the objectors have tried to attack the privilege shielding those documents from disclosure.   Copeland has thus received all (indeed, more than) the discovery to which he is entitled.[69]

For her part, Steinberg points to the existence of millions of documents in various data-bases as evidence that plaintiffs conducted insufficient discovery.   Steinberg Br. 34-35.   That classic *non-sequitur* is also without merit.   The speculation that there must be *something* of relevance in those documents runs directly contrary to the Delaware Court of Chancery's decision in purported intervenor Rodney Cook's losing Section 220 trial.   The court there concluded that

---

[68]   *See also* Docket #348 at 3 (finding that Copeland had not shown an adequate basis for discovery of settlement negotiations); Docket #354 at 1-2 (refusing Steinberg's demand for dis-covery of settlement negotiations); Docket #364 at 2 (denying Copeland's demand to depose set-tlement negotiators).

[69]   Copeland's motion for reconsideration of Magistrate Judge Laporte's June 17, 2015 order is no longer "pending."   Copeland Br. 45.   That motion was deemed denied after 14 days.   N.D. Cal. L.R. 72-2 ("If no order denying the motion or setting a briefing schedule is made within 14 days of filing the motion, the motion shall be deemed denied.").

Cook's demands "amount[ed] to a fishing expedition. . . .'" *Cook* v. *Hewlett-Packard Co.*, 2014 WL 311111, at *5 (Del. Ch. Jan. 30, 2014).

It is obvious to anyone with even the most remote familiarity with document review, let alone modern day e-discovery, that the mere fact that there are millions of documents in a database does not mean that any of them are relevant to the issue before the Court, *i.e.*, whether to approve this settlement. A large percentage of the documents were collected in order to provide the government with the information it requested to investigate the fraud committed by Lynch and Hussain prior to the acquisition. *See id.* at *1, *2, *5 (noting that, in his Section 220 action, Cook sought "all documents produced by, or sought from, the Company by all governmental authorities investigating wrongdoing *by the acquired entity*," that HP was cooperating with the various governmental investigations, and that HP had provided 750,000 pages of documents to the governmental investigators). Those documents certainly are relevant to the DRC's work in deciding whether to sue Lynch, Hussain and Deloitte UK. But they have no relevance to whether the settled claims have merit.

As this Court has previously cautioned, "[o]ne of the benefits of . . . resolving litigation — a recognized benefit — is the curtailment of the costs of discovery," and it is important not "to turn the lawsuit into the discovery of the settlement of the lawsuit." Aug. 25, 2014 Tr. (Docket #199) at 43-44. Were it otherwise, the very benefits of settlement, including avoiding the distraction, expense, and burden of litigation, would be substantially undone. *See Jaffe* v. *Morgan Stanley & Co.*, 2008 WL 346417, at *2 (N.D. Cal. Feb. 7, 2008).

Objectors (and plaintiffs) have all the documents to which they are entitled, and Magistrate Judge Laporte has repeatedly found that they are entitled to no more. *See, e.g.*, Docket #348, #354. *See also Cook*, 2014 WL 311111, at *5 (the only documents "necessary and essential" to Cook's stated purpose in making his Section 220 demand were "the documents that the Plaintiff

1    has already received:  board and committee minutes for meetings at which the board discussed the

2    Autonomy acquisition, and documents reflecting presentations given at those meetings").

3    ## VIII.    WACHTELL LIPTON IS NOT CONFLICTED.

4            Finally, Copeland alone makes the completely unsubstantiated allegation that the settle-

5    ment should not be approved because the company's counsel, Wachtell Lipton, is somehow con-

6    flicted, advancing the interests of the company's directors and officers at the expense of the inter-

7    ests of the company itself.  Copeland Br. 38-44.

8            Copeland made, and lost, this argument when he opposed preliminary approval.  Docket

9    #290; Copeland Br. 10.  He also made the same claim to the HP board on January 11, 2015, de-

10   manding that the board terminate Wachtell Lipton as counsel on the ground that the firm had im-

11   properly put the interests of the individual directors and officers above the interests of HP.  The

12   board rejected Copeland's allegation as meritless.  As was explained to Copeland at the time,

13   Wachtell Lipton has been directed by HP's Office of the General Counsel through each phase in

14   the litigation.  Ex. 5 (Feb. 25, 2015 Letter from J. Schultz to R. Greenfield).  Once the DRC and

15   the board resolved that HP should seek to have the *Morrical* suit and the related state court litiga-

16   tion settled or dismissed, it was entirely appropriate for Wachtell Lipton to negotiate for a settle-

17   ment providing for a release of the victims of Lynch and Hussain's fraud.[70]

18           The cases that Copeland does cite for support on this point, *Hausman* v. *Buckley*, 299 F.2d

19   696, 699-700 (2d Cir. 1962), and *Respler* v. *Evans*, 17 F. Supp. 3d 418, 421 (D. Del. 2014), both

20   found no conflict of interest.  And Copeland concedes that the case law acknowledges that it can

---

[70]     Two retired Delaware Supreme Court Justices, Andrew Moore and Jack Jacobs, have pub-
licly stated that Copeland's claim of conflict is without basis.  Justice Jacobs concluded that
"[s]ince the company's interest was aligned with the board's interest, there's no conflict."  And
Justice Moore concluded flatly that he "cannot see how the conflict of interest accusation against
Wachtell has any real basis."  Ex. 33 (Oct. 17, 2014 Reuters Article).

1
2
3

be appropriate for a firm to represent both the individual defendants and the nominal defendant in

a derivative action when their interests are aligned (as they are in seeking the resolution of a case

deemed to be meritless).  *See* Copeland Br. 39.

4
5
6
7
8
9
10
11
12
13
14
15

      Objectors' final argument is that Wachtell Lipton's defense of Bennett at his deposition

somehow indicates "that the precise lines in the representation between Proskauer and Wachtell

(which also served as *de facto* counsel to the individual defendants) were often blurred."  Supp.

Br. 5.  Not so.  Bennett is not named as a defendant and thus is not a party to this action.  There

was therefore nothing objectionable with Wachtell Lipton, as the company's counsel, represent-

ing a current independent director at his deposition.  The individual defendants are all represented

by their own counsel, several of whom attended the deposition defending the interests of their cli-

ents.  Bennett Dep. 1-3 (listing four sets of counsel for individual defendants).  No one could ar-

gue with a straight face that any defendants are confused as to who represents them, or that any of

their counsel are not fully cognizant of who their clients are.

16
17
18
19
20
21
22
23
24
25
26
27
28

## CONCLUSION

The settlement will provide significant benefits to HP and its shareholders.  The claims being released are extremely weak and if they were to survive a motion to dismiss (which is extremely unlikely), HP would have to pay for the defense of the very weak claims that the objectors would have the company pursue.  The corporate governance reforms negotiated by plaintiffs will improve the company's M&A processes and provide significant benefits both to HP itself, and to HP Enterprise, the new company that is being spun off to HP shareholders.  The Court should approve the settlement.


Dated:  July 17, 2015                              WACHTELL, LIPTON, ROSEN & KATZ


                                                   By: _____
                                                        Marc Wolinsky
                                                        George T. Conway III
                                                        51 West 52nd Street
                                                        New York, NY  10019
                                                        Telephone:  (212) 403-1000
                                                        Facsimile:  (212) 403-2000

                                                        FARELLA, BRAUN & MARTEL, LLP
                                                        Neil A. Goteiner
                                                        235 Montgomery Street, 17th Floor
                                                        San Francisco, CA  94104
                                                        Telephone:  (415) 954-4400
                                                        Facsimile:  (415) 954-4480

                                                   *Attorneys for Defendant Hewlett-Packard Company*